1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  MARTIN LUTHER KING, JR.
   COUNTY; PIERCE COUNTY;
9  SNOHOMISH COUNTY; CITY AND
   COUNTY OF SAN FRANCISCO;
10 COUNTY OF SANTA CLARA; CITY
   OF BOSTON; CITY OF COLUMBUS;
11 and CITY OF NEW YORK,
12
13                              Plaintiffs,

   vs.
14
15 SCOTT TURNER in his official capacity
   as Secretary of the U.S. Department of
16 Housing and Urban Development; the
   U.S. DEPARTMENT OF HOUSING
17 AND URBAN DEVELOPMENT; SEAN
   DUFFY in his official capacity as
18 Secretary of the U.S. Department of
   Transportation; the U.S. DEPARTMENT
19 OF TRANSPORTATION; MATTHEW
   WELBES in his official capacity as acting
20 Director of the Federal Transit
   Administration; and the FEDERAL
21 TRANSIT ADMINISTRATION,
22
23                             Defendants.

No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24
25
26
27

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 1

## I.    INTRODUCTION

1.    It is not the prerogative of the President "to make laws or a law of the United States" which would plainly "invade the domain of power expressly committed by the constitution exclusively to congress." *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). Rather, it is the duty of the President, and, by extension, the executive branch agencies he administers, to "take care that the laws are faithfully executed." U.S. Const. art. II, sec. 3. Among other things, this duty requires the executive branch to respect the powers granted to Congress and those reserved to the states, while carefully administering statutes enacted through the legislative process.

2.    In authorizing federal grant dispersals, Congress exercised its spending power to establish permissible conditions that agencies may impose on a grant award. Absent a statute, an agency lacks authority to impose grant conditions beyond what Congress has authorized, and such "conditions are ultra vires." *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019). In short, an agency's power to condition grants is wholly dependent on the existence of statutory authority. *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

3.    Moreover, Congress's power to attach conditions to federal grants is constrained by the Constitution. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The Executive's power to attach conditions to federal grants thus is further restricted by the limits of congressional power.

4.    Here, the U.S. Department of Housing and Urban Development (HUD) and the U.S. Department of Transportation (DOT), through the Federal Transit Administration (FTA), seek to impose conditions on funding provided through congressionally authorized federal grant programs to coerce grant recipients that rely on federal funds into implementing President

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 2

Trump's policy agenda, and direct them to adopt his legal positions contrary to settled law. By unilaterally imposing funding conditions Congress has not authorized and that even Congress could not constitutionally enact, Defendants usurp Congress's power of the purse. These conditions bear little or no connection to the purposes of the grant programs Congress established. They also contravene bedrock separation of powers principles and violate numerous other constitutional and statutory protections, including (among others) the Tenth Amendment's anti-commandeering principle, and the Fifth Amendment's void-for-vagueness doctrine, as well as the Administrative Procedure Act (APA).

5.      In sum, Defendants' unlawful attempts to repurpose federal grant programs established by Congress harm Plaintiffs by threatening already-awarded and soon to be awarded funds they need to support critical programs and services for their residents, including permanent and transitional housing, and other forms of assistance. Allowing the unlawful grant conditions to stand would negatively impact Plaintiffs' committed budgets, force reductions in their workforce, and undermine their ability to determine for themselves how to meet their communities' unique needs. As such, Plaintiffs seek an order declaring the HUD and FTA grant conditions at issue unlawful, void, and unenforceable and enjoining their imposition and enforcement.

## II.      JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

7.      Venue properly lies within the Western District of Washington because this is an action against an officer or employee of the United States and an agency of the United States,

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 3

there are Plaintiffs residing in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

### III.    PARTIES

8.    Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. As described further below, King County relies on nearly $67 million each year in HUD Continuum of Care (CoC) grant funds to serve its homeless residents, who numbered almost 17,000 during a recent count. Additionally, King County relies substantial federal grants—including over $446 million in appropriated FTA grants—to provide critical transit services and improvements for the benefit of King County residents. King County brings the action as to the unlawful CoC Funding Conditions and FTA Funding Conditions, as further defined below.

9.    Plaintiff Pierce County is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. Pierce County relies on just over $4.9 million annually (as of 2025) in CoC funds to support permanent supportive housing and rapid rehousing projects for individuals and families experiencing homelessness throughout the county. Pierce County brings the action only as to the unlawful CoC Funding Conditions.

10.    Plaintiff Snohomish County is a home rule charter county organized and existing under and by virtue of the constitution and laws of the state of Washington. Snohomish County relies on nearly $16.7 million each year in CoC grant funds to serve its homeless residents. Snohomish County brings the action only as to the unlawful CoC Funding Conditions.

11.    Plaintiff City and County of San Francisco ("San Francisco") is a municipal

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 4

corporation organized and existing under and by virtue of the laws of the State of California. San Francisco relies on approximately $50 million each year in HUD grant funds to serve its homeless residents, who numbered 8,323 during the most recent count. San Francisco brings the action only as to the unlawful CoC Funding Conditions.

12.     Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California. Santa Clara administers more than $34 million each year in HUD grant funds to serve the region's approximately 10,000 homeless residents. Santa Clara brings the action only as to the unlawful CoC Funding Conditions.

13.     Plaintiff City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. Boston relies on nearly $48 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Boston brings the action only as to the unlawful CoC Funding Conditions.

14.     Plaintiff City of Columbus ("Columbus") is a municipal corporation organized under Ohio law, *see* Ohio Const. art. XVIII. It is the capital of Ohio, its largest city, and the fourteenth largest city in the United States, with a population of over 905,000 according to the 2020 Census and an unhoused population of over 2,500. Columbus relies upon approximately $1 million per year of HUD grant funds from the ESG and HOME programs which are passed through to the county's Community Shelter Board in order to provide crucial services to the city's and county's homeless residents. Columbus also provides $10 million annually to the Community Shelter Board from its general revenue fund. Columbus brings the action only as to the unlawful CoC Funding Conditions.

15.     Plaintiff City of New York ("NYC") is a municipal corporation organized and existing under the laws of the State of New York. NYC, through its Department of Housing

Preservation and Development, receives approximately $53 million in CoC funds to provide rental assistance for chronically homeless households to reside in permanent supportive housing. As the collaborative applicant and Homeless Management Information System lead agency for the New York City Continuum of Care ("NYC CoC"), NYC through its Department of Social Services receives an additional approximately $6 million in grants to provide technical and administrative support to all of the programs in the NYC CoC. NYC brings the action only as to the unlawful CoC Funding Conditions.

16.     Defendant Scott Turner is the Secretary of HUD, the highest ranking official in HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

17.     Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

18.     Defendant Sean Duffy is the Secretary of DOT, the highest ranking official in DOT, and responsible for the decisions of DOT. He is sued in his official capacity.

19.     Defendant DOT is an executive department of the United States federal government. 49 U.S.C. § 102(a). It houses a number of operating administrations, including the FTA. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

20.     Defendant Matthew Welbes is the acting Administrator of the FTA, the highest ranking official in the FTA, and responsible for the decisions of the FTA. He is sued in his official capacity.

21.     Defendant FTA is an operating administration within DOT. 49 U.S.C. § 107(a). FTA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 6

# IV.    FACTUAL ALLEGATIONS

## A.    Continuum of Care Funding

### 1.    Congress Authorizes the Establishment of the Continuum of Care Program through the McKinney-Vento Homeless Assistance Act

22.    Congress enacted the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act") "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b).

23.    Among the programs Congress established through subsequent amendments to the Homeless Assistance Act is the Continuum of Care (CoC) program. *Id.* §§ 11381–89. The CoC program is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers and state and local governments to quickly rehouse homeless individuals and families; to promote access to, and effective utilization of, mainstream programs by homeless individuals and families; and to optimize self-sufficiency among those experiencing homelessness. *Id.* § 11381.

24.    The Homeless Assistance Act directs the Secretary of HUD (the "HUD Secretary") to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id.* § 11382(a). These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient. The CoC program funds a variety of programs that support homeless individuals and families, including through the construction of new shelters and supportive housing, rehousing support, rental assistance, child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383.

25.    Grants are awarded to local coalitions, or "Continuums," that may include

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 7

representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and other stakeholders. 24 C.F.R. § 578.3. Each Continuum designates an applicant to apply for CoC funding on behalf of the Continuum. *Id.*

> **2.    Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CoC Funding Conditions**

26.    HUD's administration of the CoC program, including the award of CoC grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CoC program, the selection criteria HUD must apply in awarding CoC grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 11383, 11386, 11386a.

27.    Section 422 of the Homeless Assistance Act, 42 U.S.C. § 11382, contains Congress's overarching authorization for HUD to award CoC grants. Subsection (A) of that section states:

> The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies.

28.    Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use. These required criteria include things like the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need within the geographic area for homeless services. *Id.* (b)(1)–(2).

29.    Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 8

"[r]equired agreements" to which grant recipients must adhere. Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers. 42 U.S.C. § 11386(b).

30.     The Homeless Assistance Act does not authorize HUD to condition CoC funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal anti-discrimination law, nor on participating in aggressive and lawless immigration enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

31.     Congress has authorized the Secretary to promulgate regulations establishing, *inter alia*, other selection criteria and "other terms and conditions" on grant funding "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8), 11386a(b)(1)(G), 11387.

32.     Pursuant to this authority, HUD has promulgated the Continuum of Care Program rule at 24 C.F.R. part 578 (the "Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the CoC grant agreements they execute with HUD. *Id.* § 578.23(c). While the Rule permits HUD to require CoC recipients to comply with additional "terms and conditions," such terms and conditions must be "establish[ed] by" a Notice of Funding Opportunity (NOFO).[1] *Id.* § 578.23(c)(12).

33.     The Rule does not impose any conditions on CoC funding related to prohibiting

---

[1] The terms NOFO, "Notice of Funding Availability," and "Funding Opportunity Announcement" refer to a formal announcement of the availability of federal funding. As part of an effort to standardize terminology, most federal agencies now use the term NOFO. For clarity, this Complaint uses the term NOFO.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 9

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

all kinds of DEI, facilitating enforcement of federal immigration laws, verification of

immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

Congress has not delegated authority that would permit an agency to adopt such conditions.

### 3. Congress Appropriates CoC Funding and Authorizes HUD to Issue a NOFO for Fiscal Years 2024 and 2025

34.    Funding for CoC grants comes from congressional discretionary appropriations.

35.    Most recently, Congress appropriated funds for the CoC program in the

Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25 (the "2024 Appropriations

Act").

36.    The 2024 Appropriations Act contains additional directives to HUD regarding

CoC funding. For instance, it requires the Secretary to "prioritize funding . . . to continuums of

care that have demonstrated a capacity to reallocate funding from lower performing projects to

higher performing projects," and requires the Secretary to "provide incentives to create projects

that coordinate with housing providers and healthcare organizations to provide permanent

supportive housing and rapid re-housing services." *Id.*, 138 Stat. 362–363.

37.    The 2024 Appropriations Act also authorized HUD to issue a two-year NOFO for

Fiscal Years 2024 and 2025 program funding. *Id.*, 138 Stat. 386.

38.    By statute, the HUD Secretary must announce recipients within five months after

the submission of applications for funding in response to the NOFO. 42 U.S.C. § 11382(c)(2).

39.    The HUD Secretary's announcement is a "conditional award," in that the recipient

must meet "all requirements for the obligation of those funds, including site control, matching

funds, and environmental review requirements." *Id.* § 11382(d)(1)(A).

40.    Once the recipient meets those requirements, HUD must obligate the funds within

45 days. *Id.* § 11382(d)(2) (providing that "the Secretary shall obligate the funds").

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 10

41.     None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CoC grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4.     HUD Conditionally Awards CoC Funds to Plaintiffs

42.     In January 2024, HUD posted a biennial NOFO announcing a competition for CoC funding for Fiscal Years 2024 and 2025 (the "FYs 2024 & 2025 NOFO"). *See* U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

43.     The FYs 2024 & 2025 NOFO directed Continuums to consider policy priorities in their applications, including "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." *Id.* at 9. The FYs 2024 & 2025 NOFO specified that "HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities . . . ." *Id*. The FYs 2024 & 2025 NOFO further specified that "CoC should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation." *Id*.

44.     The NOFO did not include any grant funding conditions related to prohibiting all

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 11

kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

45.    Each of the Plaintiffs, in coordination with its Continuum, developed its applications in compliance with the FYs 2024 & 2025 NOFO's stated policy priorities. Each Plaintiff Continuum timely submitted its application in response to the FYs 2024 & 2025 NOFO.

46.    On January 17, 2025, HUD announced the conditional award list for FY 2024, which included each of the Plaintiffs.

### 5.    Plaintiffs Rely on CoC Grants to Serve their Homeless Residents

47.    Tens of thousands of individuals and families experiencing homelessness live within Plaintiffs' geographical limits. Many of these individuals rely on services provided by Plaintiffs with funding from the CoC program to access rapid rehousing (which provides short-term rental assistance), permanent and transitional housing services, and case management that supports linkages to healthcare, job training, and other resources that facilitate their ability to obtain and keep their housing.

48.    Plaintiffs historically have applied annually for CoC funds on behalf of Continuums that include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and/or other stakeholders. Grant awards are currently distributed to scores of programs serving homeless individuals and families in each of Plaintiffs' jurisdictions.

49.    CoC grants support permanent supportive housing programs, which provide long-term, affordable housing combined with supportive services for individuals and families experiencing, or at risk of, homelessness. These programs allow participating individuals and families to live independently and stably in their communities.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 12

50.     CoC grants also support rapid rehousing programs, which help individuals and families exit homelessness and return quickly to permanent housing. Rapid rehousing is a key component of Plaintiffs' response to homelessness because it connects people to housing as quickly as possible by providing temporary financial assistance and other supportive services like housing search and stability case management.

51.     Other programs funded by CoC grants include transitional housing programs that provide temporary, short-term housing for homeless individuals and families who require a bridge to permanent housing; supportive services, which include things like conducting outreach to homeless individuals and families and providing referrals to housing or other needed resources; and operation of systems for collecting and managing data on the provision of housing and services to program participants.

52.     Thousands of Plaintiffs' residents experiencing, or at risk of, homelessness rely on these programs and others funded by the CoC program. The loss of CoC funding threatens the ability of Plaintiffs to provide critical programs and would result in program participants losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence.

53.     For FY 2024, HUD conditionally awarded Plaintiffs a total of over $280 million in CoC grants to continue homelessness assistance programs, ensuring Plaintiffs' ability to serve their residents so they would not experience a sudden drop off in the availability of housing services, permanent and transitional housing, and other assistance.

54.     In reliance on these awards, many Plaintiffs have already notified service providers of forthcoming funding and/or contracted with service providers for homelessness assistance services.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 13

**B.    Federal Transit Administration Funding**

55.    Congress has established by statute a wide variety of grant programs administered by the Federal Transit Administration (FTA) that provide federal funds to state and local governments for public transit services. These include programs codified in title 49, chapter 53 of the U.S. Code, as amended by the Fixing America's Surface Transportation (FAST) Act of 2015, Pub. L. 114-94, 129 Stat. 1312, and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

56.    For instance, section 5307 authorizes the Secretary of Transportation to make urbanized area formula grants ("UA Formula Grants"), which go toward funding the operating costs of public transit facilities and equipment in urban areas, as well as certain capital, planning, and other transit-related projects. *See* 49 U.S.C. § 5307(a)(1). Section 5307 imposes specific requirements on UA Formula Grant recipients related to the recipient's operation and control of public transit systems. *See id.* § 5307(c). None of these requirements pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

57.    Section 5309 establishes certain fixed guideway capital investment grants ("Fixed Guideway Grants"). *See* 49 U.S.C. § 5309(b). This program funds certain state and local government projects that develop and improve "fixed guideway" systems—meaning public transit systems that operate on a fixed right-of-way, such as rail, passenger ferry, or bus rapid transit systems. *Id.* §§ 5302(8), 5309(b). Section 5309 imposes specific requirements on Fixed Guideway Grant recipients related to, for example, the recipient's capacity to carry out the project, maintain its equipment and facilities, and achieve budget, cost, and ridership outcomes. *See id.* § 5309(c). None of these requirements pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 14

58.     Section 5337 authorizes grants to fund state and local government capital projects that maintain public transit systems in a state of good repair, as well as competitive grants for replacement of rail rolling stock ("Repair Grants"). *See* 49 U.S.C. § 5337(b), (f). Section 5337 specifically limits what projects may be eligible for Repair Grants, *id.* § 5337(b), and imposes specific requirements on multi-year agreements for competitive rail vehicle replacement grants, *id.* § 5337(f)(7). It does not, however, impose any conditions on Repair Grants related to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

59.     Section 5339 authorizes grants to fund the purchase and maintenance of buses and bus facilities ("Bus Grants"). *See* 49 U.S.C. § 5339(a)(2), (b), (c). The Bus Grant program incorporates the specific funding requirements set forth in section 5307 for UA Formula Grants and imposes other requirements on Bus Grant recipients. *See id.* § 5339(a)(3), (7), (b)(6), (c)(3). Section 5339 does not, however, impose any conditions on Bus Grants related to a prohibition on all kinds of DEI or local participation in enforcement of federal immigration laws.

60.     Since at least 2021, Congress has annually appropriated funding for FTA-administered grant programs, including the four identified above (collectively, the "FTA Grants"). And in the annual appropriations legislation, Congress has set forth priorities and directives to the Secretary of DOT (the "DOT Secretary") with respect to transportation funding, but it has never imposed or authorized directives for or conditions on FTA Grants related to a prohibition on DEI or local participation in federal immigration enforcement. *See* Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 334, 342.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 15

61.     Plaintiff King County operates public transit eligible for FTA Grants. King County currently has more than $446 million in appropriated federal funds from FTA grant programs for transit services and improvements provided or undertaken for the benefit of its residents.

**C.      Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on CoC and FTA Funding**

**1.      President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants**

62.     Since taking office, President Trump has issued numerous executive orders purporting to direct the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, and conflict with the law as interpreted by the courts. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including opposition to all forms of DEI policies and initiatives, participation in aggressive and lawless immigration enforcement, exclusion of transgender people, and cutting off access to lawful abortions. These unlawful conditions are imposed to direct and coerce grant recipients to comply with the President's policy agenda.

63.     The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants. *Id*. § 3(b)(iv).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 16

64.     The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id.* § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894 today—plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

65.     The DEI Order does not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

66.     The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Executive Order 14218 § 2(ii), 90

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 17

Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

67.     The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status. *See* 8 U.S.C. § 1611(a). In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including . . . PRWORA." *Id.* § 2(i).

68.     On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement. The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials . . . continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits . . . from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf." https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-communities-from-criminal-aliens/. The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 18

obstruction of criminal law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens." https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

69.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that"'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

70.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order"). The Acting Director of the U.S. Office of Management and Budget (OMB) issued a

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 19

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order. Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo"). The OMB Memo told agency heads that the Trump administration's policy is "not to use taxpayer funds to fund, facilitate, *or promote* abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." *Id.* (emphasis added). The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo. *Id.*

### 2.    HUD Attaches New, Unlawful Conditions to CoC Funding

71.    In or around March and April of 2025, following President Trump's issuance of the executive orders described above and Defendant Turner's confirmation as HUD Secretary, HUD presented Plaintiffs with CoC grant agreements (collectively, the "Grant Agreements") for some of the CoC funds Plaintiffs were awarded. These Grant Agreements contain additional funding conditions that were not included in the FYs 2024 & 2025 NOFO, and are not authorized by the Homeless Assistance Act, the Appropriations Act, or the Rule HUD itself promulgated to implement the CoC program. HUD has required Plaintiffs agree to these conditions to receive the CoC funds they are entitled to.

### i.    *Overview of New, Unlawful Conditions*

72.    Each of the Grant Agreements presented to Plaintiffs contains substantially the

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 20

same unlawful, new terms and conditions, including the following (collectively, the "CoC Funding Conditions"):

73.    First, the Grant Agreements state that "[t]his Agreement, the Recipient's use of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only certain specified statutes, rules, and grant-related documents, but also by "all current Executive Orders." The Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . other Executive Orders" (together, the "EO Condition").

74.    Second, a grant recipient must certify that:

> it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964.

The recipient must further agree that that this condition is "material" for purposes of the FCA by agreeing that:

> its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA].

(together, the "CoC Discrimination Condition").

75.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Administration's communications to federal grant recipients make clear that the agencies seek compliance with the Trump administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs. Without Congress passing his anti-DEI agenda, President Trump instead purports to have granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 21

seeking grant funding.

76.     Third, the Grant Agreements provide:

> No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation . . . .

The Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . [the Immigration Order] . . or immigration laws " (together, the "CoC Enforcement Condition").[2]

77.     Fourth, the Grant Agreements impose requirements purportedly related to PRWORA and other immigration eligibility and verification requirements:

> The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [*sic*] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

> . . . .

> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements (SAVE) system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(the "Verification Condition").

78.     Fifth, the Grant Agreements require the recipient to agree that it "shall not use

---

[2] More recent grant agreements contain updated language that precisely recites the Immigration Order. In these, the last part of this condition reads "…or abets *so-called "sanctuary"* policies that seek to shield illegal aliens from deportation.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 22

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order (the "Gender Ideology Condition").

79.    Finally, the Grant Agreements require the recipient to agree that it "shall not use any Grant Funds to fund or promote elective abortions, as required by" the Abortion Order (the "Abortion Condition").

80.    These conditions are unconstitutional and unlawful for several reasons. As an initial matter, neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any other legislation authorizes HUD to attach these conditions to federal funds appropriated for CoC grants.

### ii.  The EO Condition is unlawful

81.    The EO Condition purports to incorporate *all* executive orders as "govern[ing]" the use of CoC funds and operation of CoC projects. These orders in many ways purport to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws. In so doing, the EO Condition seeks to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means.

82.    Further, the EO Condition is unconstitutionally vague. Executive orders are the President's directives to federal agencies. These orders are unintelligible as applied to grant recipients. Further, the directives as implemented in the unlawful conditions at issue are vague and unintelligible.

### iii.  The CoC Discrimination Condition is unlawful

83.    Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding. But executive agency memoranda and letters make clear that the Trump administration's conception of an "illegal" DEI program is contrary to actual

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 23

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

nondiscrimination statutes and is inconsistent what any court has endorsed when interpreting them.

84.     For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history. Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

85.     That broad conception is confirmed in a letter from DOT Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law." Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (April 24, 2025) ("Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

86.     Defendant Turner has stated that "HUD is carrying out Present Trump's executive orders, mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's Executive Orders, removing diversity, equity, inclusion (DEI)." Press Release No. 25-059, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https://www.hud.gov/news/hud-no-25-059 (emphasis added).

87.     Taking to the Twitter platform now known as "X," Defendant Turner expressed how his agency intends to enforce the new conditions on HUD CoC Grants, stating, "CoC

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 24

funds . . . will not promote DEI, enforce 'gender ideology,' support abortion, subsidize illegal immigration, and discriminate against faith-based groups." Scott Turner Post of Mar. 13, 2025, https://x.com/SecretaryTurner/status/1900257331184570703.

88.    Neither the text of Title VI, nor any other statute or other condition enacted by Congress, prohibits recipients of federal funding from according concern to issues of diversity, equity, or inclusion. The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs. Indeed, existing case law rejects the Trump administration's expansive views on nondiscrimination law with respect to DEI. For example, this Court recently confirmed the lawfulness of a local government's use of affinity groups and DEI initiatives in a case raising federal nondiscrimination law and equal protection claims. *See generally Diemert v. City of Seattle*, 2:22-CV-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025). The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat. Yet, the DEI Order seeks to impose his views on DEI as if they were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce federal grant recipients into acquiescing in his administration's unorthodox legal interpretation of nondiscrimination law.

89.    Accepting these conditions would permit Defendants to threaten Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with President Trump's political agenda. This threat is intensified by the Grant Agreements' provision that purports to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim. Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump administration disapproves of.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 25

*Id.* § 3733.

90.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.

### iv.  The Enforcement Condition is unlawful

91.    Congress has not delegated to HUD authority to condition CoC funding on a recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation." It also is unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and by giving agencies free rein to arbitrarily enforce it.

92.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminary enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties—including Plaintiffs King County, Santa Clara, and San Francisco—on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies." *City & Cnty. of San Francisco v. Trump*, 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause"; "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process"; and "violate[s] the Tenth Amendment

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 26

because [it] impose[s] [a] coercive condition intended to commandeer local officials into enforcing federal immigration practices and law." *Id.* at *2.

### v. The Verification Condition is unlawful

93.    Further, PRWORA does not authorize the Verification Condition for at least two reasons. First, PRWORA explicitly does *not* require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations. 8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner." *Id.* § 1642(b)(ii), (iii). The Attorney General has issued interim guidance and a proposed verification rule, but never implemented a final rule. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation. 62 Fed. Reg. at 61348–49. Absent implementing regulations, Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so exceeds the authority created in PRWORA.

94.    Second, SAVE is a database operated by DHS that is sometimes used to assist federal immigration enforcement actions. The condition would require Plaintiffs to gain access to this system, train their own employees how to use the system, and require them to enter immigration information. Such an effort to commandeer local resources for matters related to

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 27

federal immigration enforcement is counter to federal law, as well as applicable local and state laws precluding local participation in federal immigration enforcement.

### vi.  The Gender Ideology Condition is unlawful

95.    The Gender Ideology Condition improperly seeks to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology." This violates HUD's own regulations, which mandate "equal access" to CoC "programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity, and in a manner that affords equal access to the individual's family," including facilities with "shared sleeping quarters or shared bathing facilities." 24 C.F.R. § 5.106(b)–(c). HUD regulations also prohibit subjecting an individual "to intrusive questioning or asked to provide anatomical information or documentary, physical, or medical evidence of the individual's gender identity." *Id.* § 5.106(b)(3). While Defendant Turner announced HUD will no longer enforce these regulations, the regulations remain in effect and applicable to the CoC program.

96.    The Gender Ideology Condition is also vague. The definition of "gender ideology" is not only demeaning, but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of homeless services.

97.    The Trump administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders. For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 28

U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program. The CDC ended the grant in order to comply with the Gender Ideology Order. *See* Kristen Hwang, *LA clinics lose funding for transgender health care as Trump executive orders take hold*, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

98.    On February 28, 2025, this Court enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers. *Wash. v. Trump*, 2:25-CV-00244-LK, 2025 WL 659057, at *11–17, *24–25 (W.D. Wash. Feb. 28, 2025). Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers." *Id.* at *11. The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people." *Id.* at *24 (citation omitted).

### vii. The Abortion Condition is unlawful

99.    The Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions. While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality it goes

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 29

well beyond the Hyde Amendment. The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024). But the Hyde Amendment to the 2024 Appropriations Act does not require grant recipients to refrain from "*promot[ing]* abortion"—a vague prohibition that is susceptible to arbitrary enforcement. And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power.

100.    In sum and as further explained below, HUD's imposition of the CoC Funding Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    The FTA Attaches New, Unlawful Conditions to FTA Grants

101.    On March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA Grant programs discussed above.

102.    The March 26 Master Agreement imposed a new condition on all FTA Grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FTA Discrimination Condition"). While FTA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the March 26 Master Agreement provided:

> (1)  Pursuant  to  section  (3)(b)(iv)(A),  Executive  Order  14173,
> Ending   Illegal   Discrimination   and   Restoring   Merit-Based

Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].

(2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

103.    That FTA plans to enforce these new conditions more broadly than current nondiscrimination law is reinforced by the March 26 Master Agreement's requirement that the "comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow *federal guidance prohibiting discrimination*."

104.    Further, the Agreement defined "Federal Requirement" to include "[a]n applicable federal law, regulation, or *executive order*" (the "FTA EO Condition"). Likewise, the Agreement defined "Federal Guidance" to include "any federal document or publication signed by an authorized federal official providing official instructions or advice about a federal program that is not defined as a 'federal requirement' and applies to entities other than the Federal Government."

105.    The FTA Discrimination Condition also is in apparent tension with other requirements in the Master Agreement. For example, the Master Agreement requires compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

106.    The Duffy Letter to all recipients of DOT grants (including the FTA Grants) further addresses the broad scope of the administration's anti-DEI agenda and how it conflicts

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 31

with established federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"— "presumptively" violates federal nondiscrimination laws. The Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

107.    On April 25, 2025, the FTA issued another updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA Grant programs discussed above.

108.    The April 25 Master Agreement contains the same FTA Discrimination Condition and the FTA EO Condition set forth above. But the April 25 Master Agreement contains an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FTA Enforcement Condition").

109.    In particular, the FTA Enforcement Condition amends an existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law*.

110.    The Duffy Letter to all recipients of DOT grants (including the FTA Grants) states that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law" and that

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 32

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"[d]eclining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability."

111.    Neither the statutory provisions creating the FTA Grants, the relevant appropriations acts, nor any other legislation authorizes the FTA to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

112.    In sum and as further explained below, the FTA Discrimination Condition, the FTA EO Condition, and the FTA Immigration Enforcement Condition (collectively, the "FTA Funding Conditions) violate the violates the Separation of Powers, the Spending Clause, Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

**D.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Funding for Critical Programs and Services**

113.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by the poison pill of heightened risk of FCA claims, or foregoing the benefit of grant funds—paid for (at least partially) through local federal taxes—that are necessary for crucial local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

114.    Withholding CoC grants from Plaintiffs would result in a loss of hundreds of

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 33

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

millions in funding for housing and other services that Plaintiffs have adopted to meet the basic needs of their homeless residents. It would result in Plaintiffs being unable to serve their residents resulting in the loss of access to housing, healthcare, counseling, and other assistance. The loss of this funding, which represents a significant percentage of each Plaintiff's total budget for homelessness services, would have devastating effects on Plaintiffs' residents and communities more broadly.

115.    Withholding FTA Grants from plaintiff King County would result in a loss of hundreds of millions in funding for public transit services operated by certain plaintiffs, including capital projects, maintenance, and improvements, that will result in long-lasting harm to King County's finances. The loss of this funding, which represents a significant percentage of its total budget for public transit services, would threaten transit improvements and safety initiatives and have severe negative impacts on these services.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Funding Conditions)*
*(All Plaintiffs as to CoC / King County as to FTA)*

116.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

117.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

118.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 34

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

119.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

120.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

121.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

122.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et*

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 35

*seq.* The President has not done so.

123.    Congress has not conditioned the provision of CoC grant funds or FTA Grants on compliance with a prohibition on all forms of DEI policies and initiatives, nor on promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions. Nor has Congress delegated to Defendants the authority to attach the CoC Funding Conditions or the FTA Funding Conditions unilaterally.

124.    By imposing the CoC Funding Conditions and the FTA Funding Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

125.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

126.    Here, HUD and the FTA seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

127.    For these reasons, Defendants' conditioning of CoC grants on Plaintiffs' compliance with the CoC Funding Conditions violates the separation of powers doctrine.

128.    For the same reasons, Defendants' conditioning of FTA Grants on King County's compliance with the FTA Funding Conditions violates the separation of powers doctrine.

### **Count 2: Spending Clause**
***(All Funding Conditions)***
***(All Plaintiffs as to CoC / King County as to FTA)***

129.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 36

130.     The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

131.     As described above, Defendants violate the separation of powers because the CoC Funding Conditions and the FTA Funding Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause as well.

132.     The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The funding conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

133.     Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

134.     Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* at 210.

135.     Even if Congress had delegated authority to the Executive and HUD to condition CoC grant funding on terms prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions, the funding conditions set forth in the CoC Grant Agreements would violate the Spending Clause by:

  a. imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

  b. imposing conditions that are so severe as to coerce Plaintiffs;

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 37

c.  imposing conditions that are not germane to the stated purpose of CoC program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

d.  with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require Plaintiffs to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id.* at 210.

136.  Similarly, even if Congress had delegated authority to the Executive and the FTA to condition FTA Grants on recipients' agreement on terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration or enforcement of federal immigration laws, the funding conditions set forth in the Master Agreement would violate the Spending Clause by imposing ambiguous funding conditions and, with respect to promoting the aggressive enforcement of federal immigration laws, imposing conditions not germane to the public transit purposes of the statutes that create the FTA Grant programs.

**Count 3: Tenth Amendment**
***(FTA Funding Conditions only)***
***(King County only)***

137.  Plaintiffs re-allege and incorporate the above as if set forth fully herein.

138.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

139.  Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012). States must have a "legitimate choice whether to accept the federal conditions in

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 38

exchange for federal funds." *Id.* at 578.

140.    Even if Congress had delegated authority to the Executive and FTA to condition FTA grant funding on a prohibition on any policy that "promotes" the Administration's conception of an "illegal" DEI program or on participation in the Administration's aggressive enforcement of federal immigration laws, these conditions would violate the Tenth Amendment by imposing conditions so severe—for King County, potential loss of over $446 million of appropriated FTA funds and, with respect to the DEI condition, a heightened threat of FCA enforcement—as to coerce King County to adopt the Administration's reinterpretation of the law. *See id.* at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

### Count 4: Fifth Amendment Due Process (Vagueness)
*(All Funding Conditions)*
*(All Plaintiffs as to CoC / King County as to FTA)*

141.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

142.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

143.    The CoC Funding Conditions and the FTA Funding Conditions are unconstitutionally vague.

144.    Initially, the CoC EO Condition and the FTA EO Condition are vague in purporting to incorporate all executive orders. Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients. The purported incorporation of "all

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 39

current Executive Orders" into "the Recipient's use of funds provided under this Agreement" and "the Recipient's operation of projects assisted with Grant Funds" renders the other new funding conditions vague.

145. For instance, the CoC Discrimination Condition and the FTA Discrimination Condition fail to make clear what conduct is prohibited and fail to specify clear standards for enforcement. This uncertainty is amplified by agency letters and statements, including the Duffy Letter and Turner statements, that are at odds with case law and statutes.

146. The CoC Enforcement Condition (which incorporates by reference the Immigration Order) fail to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

147. Similarly, the FTA Immigration Enforcement Condition fails to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

148. The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited. By the same token, the Gender Ideology Condition affords unfettered discretion to HUD and other agencies to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

149. The meaning of the phrase "promote elective abortion" is also vague, leaving federal grant recipients without fair notice of what activities would violate the prohibition and affording HUD and other agencies unfettered discretion.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 40

150.     The vagueness with which the terms and conditions identified above define the conduct they prohibit is likely to chill First Amendment protected expression on matters of public concern.

151.     Thus, the CoC Funding Conditions and FTA Funding Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious
### (All Funding Conditions)
### (All Plaintiffs as to CoC / King County as to FTA)

152.     Plaintiffs re-allege and incorporate the above as if set forth fully herein.

153.     Defendants HUD and the FTA are both "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). Additionally, the Grant Agreements and the Master Agreement are both agency actions subject to review under the APA.

154.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

155.     The Grant Agreements are final agency actions because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump administration policy priorities as a condition to receiving federal CoC funds. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 41

156.     Similarly, the Master Agreement is a final agency action because it reflects a final decision—in accord with presidential directives—to require grant recipients to comply with various Trump administration policy priorities as a condition to receiving federal FTA funds.

157.     These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

158.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

159.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

160.     HUD has provided no reasoned explanation for its decision to impose conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on CoC funds that have no connection to those issues.

161.     HUD has provided no reasoned basis for withholding funds Congress appropriated for disbursement, except to the extent the Grant Agreements make clear HUD is

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 42

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

enacting the President's policy desires, as expressed in Executive Orders 14168, 14173, 14182, and 14218, in place of Congress's intent.

162.    HUD also ignores essential aspects of the "problem" it purports to address via the CoC program, including Plaintiffs' reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already appropriated funds, and the potential impacts on homeless individuals and families who may be dissuaded from accepting services if they must verify their immigration status or are unable to use their identified gender in doing so.

163.    Similarly, the FTA has provided no reasoned basis for anti-DEI-related conditions to all FTA Grants, seeking to impose the Administration's view on all policies and programs, even when they are unrelated to programs receiving FTA funding. Moreover, the FTA has failed to explain how Plaintiffs could simultaneously comply with the FTA Discrimination Condition, while also complying with other requirements in the Master Agreement that are in apparent tension with that condition. *See* Master Agreement § 48(b)(3) (requiring compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible").

164.    Nor has the FTA provided a reasoned basis for imposing conditions related to "cooperation" with federal immigration enforcement on FTA funds that have no connection to that issue.

165.    The FTA also has ignored Plaintiffs' reasonable reliance on awarded, but not yet obligated, funds and the expectation of reimbursement from already appropriated funds.

166.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. §

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 43

2201 that imposing the CoC Funding Conditions and the FTA Funding Conditions violates the

APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and

preliminarily and permanently enjoin Defendants from imposing the CoC Funding Conditions or

FTA Funding Conditions without complying with the APA.

### Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Contrary to Constitution
*(All Plaintiffs as to CoC / King County as to FTA)*

167.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

168.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

immunity." 5 U.S.C. § 706(2)(B).

169.    As described above, HUD's imposition of the CoC Funding Conditions violates

bedrock constitutional provisions and principles including the separation of powers between the

President and Congress, the Spending Clause, and the Fifth Amendment.

170.    In addition, the FTA's imposition of the FTA Funding Conditions violates the

separation of powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

171.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. §

2201 that imposing the CoC Funding Conditions and FTA Funding Conditions violates the APA

because it is contrary to constitutional rights, powers, privileges, or immunities; provide

preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants

from imposing the CoC Funding Conditions or FTA Funding Conditions without complying

with the APA.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 44

**Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**In Excess of Statutory Authority**
*(All Funding Conditions)*
*(All Plaintiffs as to CoC / King County as to FTA)*

172.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

173.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

174.    Defendants may exercise only authority granted to them by statute or the Constitution.

175.    No law or provision of the Constitution authorizes HUD or the FTA to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

176.    Neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any other legislation authorizes HUD to impose conditions on CoC grant funding related prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions.

177.    In addition, none of the statutes creating the FTA Grants nor the relevant appropriations acts authorize the FTA to impose conditions on federal transit funding related to prohibiting all forms of DEI policies and initiatives or promoting aggressive and lawless immigration enforcement.

178.    Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed funding conditions, HUD and the FTA attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 45

withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq.*

179.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Funding Conditions and the FTA Funding Conditions violates the APA because it is in excess of HUD's and the FTA's statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD and the FTA from imposing the CoC Funding Conditions or FTA Funding Conditions without complying with the APA.

**Count 8: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Contrary to Regulation**
*(All Funding Conditions)*
*(All Plaintiffs as to CoC / King County as to FTA)*

180.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

181.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A).

182.    HUD's Rule implementing the CoC program provides that recipients may be required to sign grant agreements containing terms and additional conditions established by HUD beyond those specifically listed to the extent those terms and conditions are established in the applicable NOFO. 24 C.F.R. § 578.23(c)(12). The NOFO under which Plaintiffs were awarded CoC funding for FY 2024 contains no terms or conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

183.    By imposing new terms and conditions on Grant Agreements not included in the NOFO or authorized elsewhere in the Rule or any other regulations, HUD failed to comply with

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 46

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

its own regulations governing the formation of CoC grant agreements and failed to observe procedure required by law.

184.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Funding Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the CoC Funding Conditions without complying with the APA.

### Count 9: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Without Procedure Required By Law
### *(All Funding Conditions)*

185.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

186.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

187.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

188.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 47

189.    The FTA is subject to notice-and-comment requirements for certain statements pertaining to grants issued under title 49, chapter 53 of the U.S. Code (including the FTA Grants). Specifically, "[t]he Administrator of the [FTA] shall follow applicable rulemaking procedures under section 553 of title 5 before the [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance under this chapter." 49 U.S.C. § 5334(k)(1). For this purpose, "binding obligation" means "a substantive policy statement, rule, or guidance document issued by the [FTA] that grants rights, imposes obligations, produces significant effects on private interests, or effects a significant change in existing policy." *Id*. § 5334(k)(2).

190.    The FTA has also adopted regulations requiring it to proceed by notice-and-comment rulemaking when it promulgates a substantive rule. *See* 49 C.F.R. § 601.22(a) ("Unless the Administrator, for good cause, finds a notice is impractical, unnecessary, or contrary to the public interest, and incorporates such a finding and a brief statement of the reasons for it in the rule, a notice of proposed rulemaking must be issued, and interested persons are invited to participate in the rulemaking proceedings involving rules under an Act."); 49 C.F.R. §§ 601.24–601.28 (notice-and-comment procedures).

191.    Through the CoC Funding Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on CoC Grant Agreements that require grant recipients to comply with various Administration directives as a condition to receiving federal CoC funds. These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy. *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules . . . create rights, impose obligations, or effect

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 48

a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

192.    In imposing the CoC Funding Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

193.    Through the FTA Funding Conditions, the FTA has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new terms and conditions to FTA Grants that require grant recipients to comply with various Administration directives as a condition to receiving federal transit funds, which is a substantive policy statement, rule, or guidance document that imposes obligations or effects a significant change in existing policy, not an interpretive rule or a general statement of policy.

194.    In imposing the FTA Funding Conditions, the FTA failed to comply with the notice-and-comment requirements set forth in 49 U.S.C. § 5334(k)(1) and its own regulations, and thus failed to observe procedure required by law.

195.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Funding Conditions and FTA Funding Conditions violates the APA because it is without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing the CoC Funding Conditions or FTA Funding Conditions without complying with the APA.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 49

1

## VI.    PRAYER FOR RELIEF

2  WHEREFORE, all Plaintiffs request the following relief:

3     A.    A declaration that the CoC Funding Conditions are unconstitutional, not

4          authorized by statute, and otherwise unlawful;

5
6     B.    A preliminary and permanent injunction enjoining HUD from (1) imposing or

7          enforcing the CoC Funding Conditions or any materially similar terms or

8          conditions to any CoC funds awarded to Plaintiffs or members of Plaintiffs'

9          Continuums, or (2) taking any other action in furtherance of any withholding or

10         conditioning of federal funds based on such terms or conditions; and

11 WHEREFORE, plaintiff King County requests the following additional further relief:

12
13    C.    A declaration that the FTA Funding Conditions are unconstitutional, not

14         authorized by statute, and otherwise unlawful;

15    D.    A preliminary and permanent injunction enjoining DOT and FTA from (1)

16         imposing or enforcing the FTA Funding Conditions or any materially similar

17         terms or conditions to any FTA funds awarded to King County, or (2) taking any

18         other action in furtherance of any withholding or conditioning of federal funds

19         based on such terms or conditions; and

20 WHEREFORE, all Plaintiffs request the following additional relief:

21
22    E.    Award Plaintiffs' reasonable costs and attorneys' fees; and

23    F.    Grant any other further relief that the Court deems fit and proper.

24
25
26
27

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 50

DATED this 2nd day of May, 2025.

LEESA MANION
King County Prosecuting Attorney

/s/ David J. Hackett
David J. Hackett, WSBA #21234
*General Counsel to Executive*

/s/ Alison Holcomb
Alison Holcomb, WSBA #23303
*Deputy General Counsel to Executive*

/s/ Erin Overby
Erin Overbey, WSBA #21907
*Senior Deputy Prosecuting Attorney*

/s/ Cristy Craig
Cristy Craig, WSBA #27451
*Senior Deputy Prosecuting Attorney*

/s/ Donna Bond
Donna Bond, WSBA #36177
*Senior Deputy Prosecuting Attorney*

Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov
aholcomb@kingcounty.gov
eroverbey@kingcounty.gov
cristy.craig@kingcounty.gov
donna.bond@kingcounty.gov

*Attorneys for Plaintiff Martin Luther
King, Jr. County*

PACIFICA LAW GROUP LLP

/s/ Paul J. Lawrence
Paul J. Lawrence, WSBA #13557

/s/ Jamie Lisagor
Jamie Lisagor, WSBA #39946

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 51

1

2          /s/ Sarah S. Washburn
          Sarah S. Washburn, WSBA #44418

3
          /s/ Meha Goyal
4          Meha Goyal, WSBA #56058

5          /s/ Luther Reed-Caulkins
          Luther Reed-Caulkins, WSBA #62513
6          *Special Deputy Prosecutors*

7
          PACIFICA LAW GROUP LLP
8          401 Union Street, Suite 1600
          Seattle, WA 98101
9          T: 206-245-1700
          F: 206-245-1750
10          Paul.Lawrence@PacificaLawGroup.com
          Jamie.Lisagor@PacificaLawGroup.com
11          Sarah.Washburn@PacificaLawGroup.com
          Meha.Goyal@PacificaLawGroup.com
12          Luther.Reed-Caulkins@PacificaLawGroup.com

13
          *Attorneys for Plaintiffs Martin Luther King, Jr.*
14          *County and Pierce County*

15

16          JASON J. CUMMINGS
          Snohomish County Prosecuting Attorney
17
          /s/ Bridget E. Casey
18          Bridget E. Casey, WSBA #30459

19          /s/ Rebecca J. Guadamud
20          Rebecca J. Guadamud, WSBA #35588

21          /s/ Rebecca E. Wendling
22          Rebecca E. Wendling, WSBA #35887

23          Snohomish County Prosecuting Attorney's Office
          3000 Rockefeller Avenue, M/S 504
24          Everett, WA 98201-4046
          (425) 388-6392
25          Bridget.Casey@co.snohomish.wa.us
          Rebecca.Guadamud@co.snohomish.wa.us
26          Rebecca.Wendling@co.snohomish.wa.us

27          *Attorneys for Plaintiff Snohomish County*

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 52

1

2    DAVID CHIU
     San Francisco City Attorney

3
     */s/ David Chiu*
4    David Chiu (CA Bar No. 189542)*
     *San Francisco City Attorney*
5    Yvonne R. Meré (CA Bar No. 175394)*
     *Chief Deputy City Attorney*
6    Mollie M. Lee (CA Bar No. 251404)*
     *Chief of Strategic Advocacy*
7    Sara J. Eisenberg (CA Bar No. 269303)*
     *Chief of Complex and Affirmative Litigation*
8    Ronald H. Lee (CA Bar No. 238720)*
     Alexander J. Holtzman (CA Bar No. 311813)*
9    *Deputy City Attorneys*
     1390 Market Street, 7th Floor
10   San Francisco, CA 94102
     (415) 554-4700
11   Cityattorney@sfcityatty.org
     Yvonne.Mere@sfcityatty.org
12   Mollie.Lee@sfcityatty.org
     Sara.Eisenberg@sfcityatty.org
13   Ronald.Lee@sfcityatty.org
     Alexander.Holtzman@sfcityatty.org
14

15   *Attorneys for Plaintiff*
     *City and County of San Francisco*
16

17

18   OFFICE OF THE COUNTY COUNSEL,
     COUNTY OF SANTA CLARA
19
     */s/ Tony LoPresti*
20   Tony LoPresti (CA Bar No. 289269)*
     *County Counsel*
21   Kavita Narayan (CA Bar No. 264191)*
     *Chief Assistant County Counsel*
22   Meredith A. Johnson (CA Bar No. 291018)*
     *Lead Deputy County Counsel*
23   Stefanie L. Wilson (CA Bar No. 314899)*
     Cara H. Sandberg (CA Bar No. 291058)*
24   *Deputy County Counsels*
     70 West Hedding Street
25   East Wing, 9th Floor
26

27

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 53

San José, CA 95110
(408) 299-9021
tony.lopresti@cco.sccgov.org
kavita.narayan@cco.sccgov.org
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
cara.sandberg@cco.sccgov.org

*Attorneys for Plaintiff County of Santa Clara*

ADAM CEDERBAUM
Corporation Counsel, City of Boston

*/s/ Samantha H. Fuchs*
Samantha H. Fuchs (MA BBO No. 708216)*
*Senior Assistant Corporation Counsel*
Samuel B. Dinning (MA BBO No. 704304)*
*Senior Assistant Corporation Counsel*
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
samantha.fuchs@boston.gov
samuel.dinning@boston.gov

*Attorneys for Plaintiff City of Boston*

CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

*/s/ Richard N. Coglianese*
Richard N. Coglianese (OH Bar No. 0066830)*
Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
(614) 645-0818 Phone
(614) 645-6949 Fax
rncoglianese@columbus.gov

*Attorney for Plaintiff City of Columbus*

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 54

PUBLIC RIGHTS PROJECT

*/s/ Naomi Tsu*
Naomi Tsu (OR Bar No. 242511)*
Sharanya (Sai) Mohan (CA Bar No. 350675)*
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
naomi@publicrightsproject.org
sai@publicrightsproject.org

*Co-Counsel for Plaintiff City of Columbus*


MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

*/s/ Doris Bernhardt*
Doris Bernhardt (NY Bar No. 4449385)*
Joshua P. Rubin (NY Bar No. 2734051)*
Aatif Iqbal (NY Bar No. 5068515)*
*Assistant Corporation Counsels*
100 Church Street
New York, NY 10007
(212) 356-1000
dbernhar@law.nyc.gov
jrubin@law.nyc.gov
aiqbal@law.nyc.gov

*Attorneys for Plaintiff City of New York*


* *Pro Hac Vice application forthcoming*

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 55