THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR.
COUNTY; PIERCE COUNTY;
SNOHOMISH COUNTY; CITY AND
COUNTY OF SAN FRANCISCO;
COUNTY OF SANTA CLARA; CITY
OF BOSTON; CITY OF COLUMBUS;
CITY OF NEW YORK; CITY &
COUNTY OF DENVER;
METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY;
PIMA COUNTY; COUNTY OF
SONOMA; CITY OF BEND; CITY OF
CAMBRIDGE; CITY OF CHICAGO;
CITY OF CULVER CITY; CITY OF
MINNEAPOLIS; CITY OF PASADENA;
CITY OF PITTSBURGH; CITY OF
PORTLAND; CITY OF SAN JOSÉ;
CITY OF SANTA MONICA; CITY OF
TUCSON; CITY OF WILSONVILLE;
CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY; INTERCITY
TRANSIT; SAN FRANCISCO COUNTY
TRANSPORTATION AUTHORITY;
TREASURE ISLAND MOBILITY
MANAGEMENT AGENCY; PORT OF
SEATTLE; KING COUNTY REGIONAL
HOMELESSNESS AUTHORITY; and
SANTA MONICA HOUSING
AUTHORITY,

                                    Plaintiffs,

vs.

No. 2:25-cv-00814-BJR

AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 1

1  SCOTT TURNER in his official capacity
   as Secretary of the U.S. Department of
2  Housing and Urban Development; the
   U.S. DEPARTMENT OF HOUSING
3  AND URBAN DEVELOPMENT; SEAN
   DUFFY in his official capacity as
4  Secretary of the U.S. Department of
   Transportation; the U.S. DEPARTMENT
5  OF TRANSPORTATION; TARIQ
   BOKHARI in his official capacity as
6  acting Administrator of the Federal
   Transit Administration; the FEDERAL
7  TRANSIT ADMINISTRATION;
   GLORIA M. SHEPHERD in her official
8  capacity as acting Director of the Federal
9  Highway Administration; the FEDERAL
   HIGHWAY ADMINISTRATION;
10 CHRIS ROCHELEAU in his official
   capacity as acting Administrator of the
11 Federal Aviation Administration; the
   FEDERAL AVIATION
12 ADMINISTRATION; DREW FEELEY in
13 his official capacity as acting
   Administrator of the Federal Railroad
14 Administration; and the FEDERAL
   RAILROAD ADMINISTRATION,
15
16
                              Defendants.
17

18
19
20
21
22
23
24
25
26
27

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 2

## I.    INTRODUCTION

1.    It is not the prerogative of the President "to make laws or a law of the United States," which would plainly "invade the domain of power expressly committed by the constitution exclusively to congress." *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). Rather, it is the duty of the President, and, by extension, the executive branch agencies he administers, to "take care that the laws are faithfully executed." U.S. Const. art. II, sec. 3. Among other things, this duty requires the executive branch to respect the powers granted to Congress and those reserved to the states, while carefully administering statutes enacted through the legislative process.

2.    In authorizing federal grant dispersals, Congress exercised its spending power to establish permissible conditions that agencies may impose on a grant award. An agency lacks authority to impose grant conditions beyond what Congress has authorized, and such "conditions are ultra vires." *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019). In short, an agency's power to condition grants is wholly dependent on the existence of statutory authority. *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

3.    Moreover, Congress's power to attach conditions to federal grants is constrained by the Constitution. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The Executive's power to attach conditions to federal grants thus is further restricted by these limits on congressional power.

4.    Here, the U.S. Department of Housing and Urban Development (HUD) and the U.S. Department of Transportation (DOT)—in many cases acting through its operating administrations,[1] including the Federal Transit Administration (FTA), the Federal Highway

---

[1] DOT refers to each of its administrations as "operating administrations." 49 C.F.R. § 1.2. They include, among others, the DOT administrations named as Defendants in this lawsuit.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 3

Administration (FHWA), the Federal Aviation Administration (FAA), and the Federal Railroad Administration (FRA) (collectively, the "DOT Defendants")—seek to impose conditions on funding, provided through congressionally authorized federal grant programs, to coerce grant recipients that rely on federal funds into implementing President Trump's policy agenda, and direct them to adopt his legal positions, contrary to settled law. By unilaterally imposing grant conditions Congress has not authorized and that even Congress could not constitutionally enact, Defendants usurp Congress's power of the purse. These conditions bear little or no connection to the purposes of the grant programs Congress established. They also contravene bedrock separation of powers principles and violate numerous other constitutional and statutory protections, including (among others) the Tenth Amendment's anti-commandeering principle and the Fifth Amendment's void-for-vagueness doctrine, as well as the Administrative Procedure Act (APA).

5.      In sum, Defendants' unlawful attempts to repurpose federal grant programs established by Congress harm Plaintiffs by threatening *more than $4 billion* in already-awarded and soon to be awarded funds they need to support critical programs and services for their residents, including permanent and transitional housing, transit services and improvements, airports, and more. Allowing the unlawful grant conditions to stand would negatively impact Plaintiffs' committed budgets, force reductions in their workforce, and undermine their ability to determine for themselves how to meet their communities' unique needs. As such, Plaintiffs seek an order declaring the grant conditions at issue unlawful, void, and unenforceable and enjoining their imposition and enforcement.

## II.      JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 4

7.      Venue properly lies within the Western District of Washington because this is an action against an officer or employee of the United States and an agency of the United States, there are Plaintiffs residing in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

### III.      PARTIES

8.      Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. King County relies on nearly $67 million each year in HUD Continuum of Care (CoC) grant funds to serve its homeless residents, who numbered almost 17,000 during a recent count. Additionally, King County relies on substantial federal grants—including over $446 million in appropriated FTA grants—to provide critical transit services and improvements for the benefit of King County residents. And King County also relies on significant federal funding— including over $7 million in FAA entitlement grants awarded in 2023 and 2024 (with over $6.6 million remaining to be disbursed) and a projected $9.5–$15.3 million in FAA entitlement grant funding for 2025–2029—in operating, maintaining, and improving the King County International Airport/Boeing Field in Seattle, Washington. Finally, King County relies on approximately $84 million in grants administered by FHWA, including discretionary grants awarded directly to King County and formula grants awarded to the Washington State Department of Transportation and the Puget Sound Regional Council and allocated to King County, for highways, roads, tunnels, bridges, and other transit capital projects. King County brings the action as to the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions, as further defined below.

9.      Plaintiff Pierce County is a home rule charter county organized and existing under

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 5

and by virtue of the constitution and laws of the State of Washington. Pierce County relies on just over $4.9 million annually (as of 2025) in CoC funds to support permanent supportive housing and rapid rehousing projects for individuals and families experiencing homelessness throughout the county. Pierce County also relies on substantial transportation grants, including more than $14 million in FHWA grants and at least $696,000 in FAA grants, some of which are passed through from the Washington State Department of Transportation. Pierce County brings the action as to the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

10.    Plaintiff Snohomish County is a home rule charter county organized and existing under and by virtue of the constitution and the laws of the State of Washington. Snohomish County relies on nearly $16.7 million each year in CoC grant funds to serve its homeless residents. While the amount varies from year to year, Snohomish County relies on millions of dollars in FAA grant funds annually to cover the costs of airport improvements at Paine Field Airport. Snohomish County relies on DOT grant funds, including FHWA grant funds, every year and has applied for $34 million in FHWA grant funds and $2 million in other DOT grant funds. These grant funds would fund projects related to road and bridge improvements and improvements to a solid waste rail facility. Snohomish County brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

11.    Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California. San Francisco relies on approximately $50 million each year in HUD grant funds to serve its homeless residents, who numbered 8,323 during the most recent count. San Francisco also relies on nearly $1.3 billion in FTA grants and nearly $170 million in FHWA grants to provide critical transit services and street improvements for the benefit of people traveling to, from, and within San

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 6

Francisco. Additionally, San Francisco anticipates receiving $803 million in funding from the FAA as part of its current capital improvement plan to fund critical rehabilitation, replacement, and reconstruction projects related to taxiways, runways, terminals, and other airport infrastructure. San Francisco brings the action as to the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

12.     Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California. Santa Clara administers tens of millions of dollars each year in HUD grant funds to serve the region's approximately 10,000 homeless residents. Most recently the Santa Clara County Continuum of Care was awarded approximately $47 million in grant funding in HUD CoC funds, of which the County of Santa Clara is the direct recipient for approximately $33 million. The County of Santa Clara anticipates another approximately $2.2 million in HUD grant funding through the Community Development Block Grant (CDBG) and HOME Investment Partnerships Program (HOME) grants. Additionally, Santa Clara relies on significant federal funding from FHWA for projects like bridge rehabilitation and repair, for which it currently has approximately $140 million in programmed federal funds and $55 million in obligated federal funds, of which approximately $11.2 million has not yet been invoiced for reimbursement. Santa Clara receives these grant funds indirectly pursuant to an agreement with the California Department of Transportation. Santa Clara brings this action as to the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

13.     Plaintiff City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. Boston relies on nearly $48 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Boston also has applied for and received eight grants from DOT over the past four years, and utilizes and relies upon over $67

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 7

million in DOT funds administered by both the FHWA and the FTA. These funds provide support for key infrastructure projects, pedestrian and vehicle safety improvements, revitalization initiatives in underserved areas, and important connectivity upgrades. These investments in city streets and infrastructure serve as the foundation of Boston's economy and of the ties among Boston's neighborhoods. Boston brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

14.     Plaintiff City of Columbus ("Columbus") is a municipal corporation organized under Ohio law, see Ohio Const. art. XVIII. It is the capital of Ohio, its largest city, and the fifteenth largest city in the United States, with a population of over 905,000 according to the 2020 U.S. Census. Columbus's Community Shelter Board, Columbus's CoC designee, directly receives HUD CoC grant funds and receives an additional approximately $1 million per year of HUD grant funds from the ESG and HOME programs which are passed through from Columbus in order to provide crucial services to the city's and county's homeless residents. Columbus also provides $10 million annually to the Community Shelter Board from its general revenue fund. Since 2020, Columbus has been awarded over $200 million from the FHWA in both formula funding grants and discretionary grants. Columbus brings the action only as to the unlawful DOT Grant Conditions. Columbus brings the action as to the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

15.     Plaintiff City of New York ("NYC") is a municipal corporation organized and existing under the laws of the State of New York. NYC, through its Department of Housing Preservation and Development, receives approximately $53 million in CoC funds to provide rental assistance for chronically homeless households to reside in permanent supportive housing. As the collaborative applicant and Homeless Management Information System (HMIS) lead agency for

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 8

the New York City Continuum of Care ("NYC CoC"), NYC, through its Department of Social Services ("NYC DSS"), receives an additional approximately $6 million in grants to provide technical and administrative support to all of the programs in the NYC CoC. NYC, through several of its agencies, also receives hundreds of millions of dollars in federal funding from components of the federal DOT, such as the FHWA and FTA, including well over $500 million to the New York City Department of Transportation ("NYC DOT") as a direct recipient or sub-recipient of competitive and formula grants. NYC brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

16.     Plaintiff City & County of Denver ("Denver") is a home rule city and county organized and existing under the constitution and laws of the State of Colorado and the Denver City Charter. Denver is the capital city of Colorado and the state's largest city and county with a population of 714,000 according to 2023 census data. Denver, through its Department of Aviation, is the owner and operator of the Denver International Airport, the third busiest airport in the United States, and the sixth busiest airport in the world. Denver receives hundreds of millions of dollars in FAA grant funds, $130 million in FHWA grant funds, and also relies on approximately $167 million in FTA grant funds to provide critical transit services and improvements. Denver brings the action only as to the unlawful DOT Grant Conditions.

17.     Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee. On March 11, 2025, Nashville received a notice of award for two FY 2024 HUD CoC grants, for a total of $289,354. Nashville also receives significant DOT funding. For example, in May of 2025, Nashville was awarded $13 million for their "We Are Nolensville Pike" project, which would provide for constructing critical improvements along

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 9

a major roadway in Nashville to address safety concerns under the Fiscal Year 2023 Safe Streets and Roads for All Grant program discussed in further detail below. Nashville also relies on $10 million in funding from DOT's Strengthening Mobility and Revolutionizing Transportation (SMART) discretionary grant program, which supports advanced smart community technologies and systems in order to improve transportation efficiency and safety. Nashville brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

18.    Plaintiff Pima County is a political subdivision organized and existing under and by virtue of the constitution and laws of the State of Arizona, and home to more than a million residents. Pima County relies on approximately $2 million each year in direct funding from HUD CoC grant funds. These funds are used to serve Pima County's homeless residents, who number over 2,500 based on information collected by Pima County. Additionally, Pima County relies on federal transportation grants of more than $75 million (approximately $60.1 million federal; approximately $15.6 local matching funds)—including over $240,000 in appropriated FTA grants, over $2.6 million in FAA grants, over $30.6 million in FHWA grants (programmed by Pima Association of Governments (PAG) and administered through a Certified Accepted Agency Agreement with Arizona Department of Transportation (ADOT)), over $35.7 million in FHWA grants (direct), and over $6.5 million through FHWA's Federal Lands Access Program to provide critical transit services and transportation improvements for the benefit of Pima County residents. The funding at risk includes both the federal grant amount and the required local match, $60.1 million and $15.6 million, respectively. The local match comes from a variety sources included Pima County Highway User Revenue Funds, Vehicle License Tax, Impact Fees, and Regional funding including Regional Transportation Authority. Pima County brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 10

19.     Plaintiff County of Sonoma ("Sonoma County") is a political subdivision of the State of California, organized and existing under the laws of California. The county-run Airport receives approximately $7 to $10 million in DOT grants every year, along with a longer-term construction grant totaling approximately $20-$22 million, subject to funding and the number of phases required for completion. These DOT grants account for approximately 40% of the Sonoma County Airport's annual budget. The Sonoma County Airport currently has eight approved active and obligated FAA grants collectively worth more than $11.8 million, of which $8.7 million remains after draw-downs, and six pending grants from the FAA, totaling $7.7 million, for critical infrastructure projects that address critical safety and security issues, including repairs to runways and wildlife fencing. Sonoma County brings the action only as to the unlawful DOT Grant Conditions.

20.     Plaintiff City of Bend ("Bend") is municipal corporation with a home-rule all-powers charter under the laws of the State of Oregon. Bend has been awarded over $33 million in FRA grants to enhance safety and connectivity at roadway-rail crossings. Additionally, in connection with Bend's city-owned and operated airport, Bend anticipates about $10.1 million in federal funds from the FAA for 2025 through 2029. Bend brings the action only as to the unlawful DOT Grant Conditions.

21.     Plaintiff City of Cambridge ("Cambridge") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. Cambridge relies on nearly $6.4 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Cambridge brings the action only as to the unlawful CoC Grant Conditions.

22.     Plaintiff City of Chicago ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois. On average, the

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 11

Chicago Department of Transportation (CDOT) relies on approximately $92 million each year in FTA grants and $74 million each year in FHWA grants. The Chicago Department of Aviation (CDA) likewise relies on millions of dollars in FAA grants. In 2023, CDA received and relied on $94.7 million in FAA awards. In 2024, CDA received and relief on $112.9 million from FAA. These funds are critical to the safety and wellbeing of Chicagoans and people who travel to or through Chicago. Chicago brings the action only as to the unlawful DOT Grant Conditions.

23. Plaintiff City of Culver City ("Culver City") is a charter city and a municipal corporation organized and existing under the Constitution and laws of the State of California. Culver City relies on substantial federal grants—including approximately $40 million in FTA grants—to purchase buses and provide critical transit services for the benefit of Culver City residents. Culver City brings the action only as to the unlawful DOT Grant Conditions.

24. Plaintiff the City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city. Minneapolis is expecting more than $150 million in federal funding for upcoming capital improvement projects, the vast majority of which is from DOT, including grants administered by DOT directly and others administered by the FHWA and FRA. Minneapolis brings the action only as to the unlawful DOT Grant Conditions.

25. Plaintiff City of Pittsburgh ("Pittsburgh") is a home rule charter city organized and exiting under the laws and Constitution of the Commonwealth of Pennsylvania. Pittsburgh is a city of the second class. Pittsburgh is currently relying on nearly $5 million in competitive DOT grant funds to serve its residents by funding necessary infrastructure projects in Pittsburgh. The grant funds from DOT—issued through the FHWA—support improvements to essential infrastructure, such as roads and, notably, bridges. Pittsburgh has hundreds of bridges and such infrastructure

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 12

funding is necessary to the safety of its residents.

26.     Plaintiff City of Portland ("Portland") is a home rule charter city organized and existing under and by virtue of the constitution and laws of the State of Oregon. Portland relies on significant federal funding, including a $500,000 FRA grant, to plan safety improvements at fifteen railroad crossings, and a $9.6 million FHWA grant award. Portland brings the action only as to the unlawful DOT grant conditions.

27.     Plaintiff City of San José ("San José") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California. San José has been awarded approximately $21.4 million in FHWA grants under the Safe Streets and Roads for All program, described further below, to improve street safety and was awarded approximately $8.7 in FRA grants under the Consolidated Rail Infrastructure and Safety Improvements program. In addition, San José's city-operated airport is relying on $31.1 million in FAA grant funding through 2030 for the maintenance and operation of the airport, as well as anticipating $89.2 million in capital improvement funding over the next five years. San José also relies on HUD CoC funds received by Santa Clara to serve the city's homeless population. San José brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

28.     Plaintiff City of Santa Monica ("Santa Monica") is a municipal corporation and California charter city, organized and existing by virtue of the laws of the State of California. Santa Monica relies on approximately $16 million in FTA grant funds to provide transit services for the benefit of Santa Monica residents, workers, and visitors, and has been awarded up to $30 million under CalTrans's Highway Bridge Program funded by FHWA grant funds to improve the over 85-year-old Santa Monica Pier Bridge. Santa Monica brings the action only as to the unlawful DOT Grant Conditions.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 13

29.      Plaintiff City of Pasadena ("Pasadena") is a home rule charter city organized under the laws of the State of California. Pasadena relies on over $5 million each year in HUD CoC grant funds to serve its homeless residents. Pasadena brings the action only as to the unlawful CoC Funding Conditions.

30.      Plaintiff City of Tucson ("Tucson") is a home rule charter city organized and existing under the constitution and laws of the State of Arizona. Tucson receives approximately $20 million in annual formula grants from the FTA for the operation of its transit system. It also relies on substantial FTA discretionary grants to make much-needed improvements to its transit system equipment and infrastructure. That includes approximately $33 million in FY 2023 and FY 2024 grants for new buses and upgrades to bus facilities. Tucson also relies on FHWA formula and discretionary grants for large transportation infrastructure projects and has approximately $45.5 in awarded discretionary grant funds between FY2025 and FY2029. Tucson is the Collaborative Applicant for the CoC for the Tucson metropolitan area, the members of which were collectively awarded more than $14.5 million in CoC funding in January 2025. Of this amount, Tucson is the direct recipient of more than $6.1 million. With a large homeless population and extremely hot summers, combatting homelessness and protecting the unsheltered is both a high priority and a significant challenge for the community. Tucson brings the action as to both the unlawful CoC Grant Conditions and the unlawful DOT Grant Conditions.

31.      Plaintiff City of Wilsonville ("Wilsonville") is a home rule charter city organized and existing under and by virtue of the constitution and laws of the State of Oregon. The City of Wilsonville, through its municipal transit department, South Metro Area Regional Transit, relies on approximately $1 million each year in FTA grant funds to provide critical transit services and improvements for the benefit of Wilsonville residents, employees, employers, and visitors.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 14

Wilsonville also frequently receives competitive grant funds from the FTA. Wilsonville brings the action only as to the unlawful DOT Grant Conditions.

32.     Plaintiff Central Puget Sound Regional Transit Authority ("Sound Transit") is a regional transit authority that serves the Sound Transit District, which encompasses areas in King, Pierce, and Snohomish counties. Sound Transit is organized and existing under and by virtue of the laws of the State of Washington. Sound Transit relies on substantial federal grants— approximately $1 billion in DOT grants in 2025 including from the FTA, FHWA, and FRA—to provide critical transit services and improvements for the benefit of approximately 3,385,200 million people who reside within the Sound Transit District. Sound Transit brings the action only as to the unlawful DOT Grant Conditions.

33.     Plaintiff Intercity Transit is a public transportation agency organized under RCW 36.57A as a municipal corporation and existing under and by virtue of the laws of the State of Washington to serve a Public Transportation Benefit Area (PTBA). Intercity Transit provides transportation and transit options that connect cities and areas within Thurston County, including Olympia, Lacey, Tumwater, and Yelm. Intercity Transit relies on more than $27 million in FTA grant funds to provide critical transit services and improvements for the benefit of residents of the Thurston County PTBA, as well as a $2 million DOT SMART grant. Intercity Transit brings the action only as to the unlawful DOT Grant Conditions.

34.     Plaintiff Port of Seattle is a municipal corporation organized and existing under and by virtue of the laws of the State of Washington. The Port of Seattle owns and operates the Seattle-Tacoma International Airport, the largest airport in the State of Washington and the 11th busiest airport in the country based on 2023 passenger statistics. The Port of Seattle relies on substantial federal grant funding—including more than $164.5 million in appropriated FAA grants—for

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 15

1  critical capital projects. The Port of Seattle brings the action only as to the unlawful DOT Grant

2  Conditions.

3      35.     Plaintiff King County Regional Homelessness Authority ("King County RHA") is

4  a government agency formed by the City of Seattle and King County and is organized and existing

5  under and by virtue of the laws of the State of Washington. King County RHA coordinates the

6  CoC funds for the King County area, including directly administering $26 million of those funds

7  for emergency shelter, transitional housing, and other programs. King County RHA brings the

8  action only as to the unlawful CoC Grant Conditions.

9

10     36.     Plaintiff Santa Monica Housing Authority ("Santa Monica HA") is a housing

11  authority organized under the laws of the State of California and created by resolution of the Santa

12  Monica City Council. Santa Monica HA relies on over $5.6 million annually (as of 2025) in CoC

13  funds to support rental assistance for individuals and families experiencing or formerly

14  experiencing homelessness. Santa Monica HA brings this action only as to the unlawful CoC Grant

15  Conditions.

16     37.     Plaintiff San Francisco County Transportation Authority ("SFCTA") is a county-

17  level transportation agency existing under and by virtue of the laws of the State of California. It is

18  a separate legal entity from the City and County of San Francisco. As the designated county

19  congestion management agency for San Francisco, SFCTA develops long-range countywide

20  transportation plans to guide development of the transportation sector. It also administers the

21  proceeds from San Francisco's dedicated local sales tax for transportation. SFCTA currently relies

22  on more than $107 million in FHWA grants, of which approximately $10.4 million has been

23  programmed but not yet been obligated. SFCTA relies on FHWA funding to provide critical

24  transportation planning and improvements for the benefit of people traveling to, from, and within

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 16

San Francisco. SFCTA has applied for additional FHWA funding and plans to seek further FHWA funding in the future. It anticipates continuing to receive formula subgrants through state and regional entities and applying for additional discretionary competitive grants. SFCTA brings this action only as to the unlawful DOT Grant Conditions.

38.     Plaintiff Treasure Island Mobility Management Agency ("TIMMA") is a transportation agency existing under and by virtue of the laws of the State of California. Pursuant to State law, the San Francisco Board of Supervisors has designated SFCTA as the agency to act as the TIMMA. TIMMA is a separate legal entity from the City and County of San Francisco and from SFCTA. TIMMA is responsible for developing and implementing a comprehensive transportation program for Treasure Island, defined also to include Yerba Buena Island. TIMMA currently relies on funding from FHWA to provide critical transportation improvements. TIMMA brings this action only as to the unlawful DOT Grant Conditions.

39.     Defendant Scott Turner is the Secretary of HUD, the highest ranking official in HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

40.     Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

41.     Defendant Sean Duffy is the Secretary of DOT, the highest ranking official in DOT, and responsible for the decisions of DOT. He is sued in his official capacity.

42.     Defendant DOT is an executive department of the United States federal government. 49 U.S.C. § 102(a). It houses a number of operating administrations, including the FTA, FHWA, FAA, and FRA. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 17

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

43.     Defendant Tariq Bokhari is the acting Administrator of the FTA, the highest ranking official in the FTA, and responsible for the decisions of the FTA. He is sued in his official capacity.

44.     Defendant FTA is an operating administration within DOT. 49 U.S.C. § 107(a). FTA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

45.     Defendant Gloria M. Shepherd is the acting Director of the FHWA, the highest ranking official in the FHWA, and responsible for the decisions of the FHWA. She is sued in her official capacity.

46.     Defendant FHWA is an operating administration within DOT. 49 U.S.C. § 104(a). FHWA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

47.     Defendant Chris Rocheleau is the acting Administrator of the FAA, the highest ranking official in the FAA, and responsible for the decisions of the FAA. He is sued in his official capacity.

48.     Defendant FAA is an operating administration within DOT. 49 U.S.C. § 106(a). FAA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

49.     Defendant Drew Feeley is the acting Administrator of the FRA, the highest ranking official in the FRA, and responsible for the decisions of the FRA. He is sued in his official capacity.

50.     Defendant FRA is an operating administration within DOT. 49 U.S.C. § 103(a). FRA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

### IV.     FACTUAL ALLEGATIONS

### A.     HUD Continuum of Care Grant Program

#### 1.     Congress Authorizes the Establishment of the Continuum of Care Program through the McKinney-Vento Homeless Assistance Act

51.     Congress enacted the McKinney-Vento Homeless Assistance Act (the "Homeless

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 18

Assistance Act") "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b).

52.     Among the programs Congress established through subsequent amendments to the Homeless Assistance Act is the Continuum of Care (CoC) program. *Id.* §§ 11381–89. The CoC program is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers and state and local governments to quickly rehouse homeless individuals and families; to promote access to, and effective utilization of, mainstream programs by homeless individuals and families; and to optimize self-sufficiency among those experiencing homelessness. *Id.* § 11381.

53.     The Homeless Assistance Act directs the Secretary of HUD (the "HUD Secretary") to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id.* § 11382(a). These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient. The CoC program funds a variety of programs that support homeless individuals and families, including through the construction of supportive housing, rehousing support, rental assistance, and supportive services, including child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383.

54.     Grants are awarded to local coalitions, or "Continuums," that may include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and other stakeholders. 24 C.F.R. § 578.3. Each Continuum designates an applicant to apply for CoC funding on behalf of the Continuum. *Id.*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 19

2.    **Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CoC Grant Conditions**

55.    HUD's administration of the CoC program, including the award of CoC grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CoC program, the selection criteria HUD must apply in awarding CoC grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 11383, 11386, 11386a.

56.    Section 422 of the Homeless Assistance Act, 42 U.S.C. § 11382, contains Congress's overarching authorization for HUD to award CoC grants. Subsection (A) of that section states:

> The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies.

57.    Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use. These required criteria include things like the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need within the geographic area for homeless services. *Id.* (b)(1)–(2).

58.    Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere. Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 20

shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers. 42 U.S.C. § 11386(b).

59.     The Homeless Assistance Act does not authorize HUD to condition CoC funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

60.     Congress has authorized the Secretary to promulgate regulations establishing, *inter alia*, other selection criteria and "other terms and conditions" on grant funding "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8), 11386a(b)(1)(G), 11387.

61.     Pursuant to this authority, HUD has promulgated the Continuum of Care Program rule at 24 C.F.R. part 578 (the "Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the CoC grant agreements they execute with HUD. *Id.* § 578.23(c). While the Rule permits HUD to require CoC recipients to comply with additional "terms and conditions," such terms and conditions must be "establish[ed] by" a Notice of Funding Opportunity (NOFO).[2] *Id.* § 578.23(c)(12).

62.     The Rule does not impose any conditions on CoC funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

---

[2] The terms NOFO, "Notice of Funding Availability," and "Funding Opportunity Announcement" refer to a formal announcement of the availability of federal funding. As part of an effort to standardize terminology, most federal agencies now use the term NOFO. For clarity, this Complaint uses the term NOFO.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**3.    Congress Appropriates CoC Grant Funding and Authorizes HUD to Issue a NOFO for Fiscal Years 2024 and 2025**

63.    Funding for CoC grants comes from congressional discretionary appropriations.

64.    Most recently, Congress appropriated funds for the CoC program in the Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25 (the "2024 Appropriations Act").

65.    The 2024 Appropriations Act contains additional directives to HUD regarding CoC funding. For instance, it requires the Secretary to "prioritize funding . . . to continuums of care that have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects," and requires the Secretary to "provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services." *Id.*, 138 Stat. 362–363.

66.    The 2024 Appropriations Act also authorized HUD to issue a two-year NOFO for Fiscal Years 2024 and 2025 program funding. *Id.*, 138 Stat. 386.

67.    By statute, the HUD Secretary must announce recipients within five months after the submission of applications for funding in response to the NOFO. 42 U.S.C. § 11382(c)(2).

68.    The HUD Secretary's announcement is a "conditional award," in that the recipient must meet "all requirements for the obligation of those funds, including site control, matching funds, and environmental review requirements." *Id.* § 11382(d)(1)(A).

69.    Once the recipient meets those requirements, HUD must obligate the funds within 45 days. *Id.* § 11382(d)(2) (providing that "the Secretary shall obligate the funds").

70.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CoC grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 22

prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4.    HUD Conditionally Awards CoC Grants to CoC Plaintiffs

71.    In July 2024, HUD posted a biennial NOFO announcing a competition for CoC funding for Fiscal Years 2024 and 2025 (the "FYs 2024 & 2025 NOFO"). *See* U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

72.    The FYs 2024 & 2025 NOFO directed Continuums to consider policy priorities in their applications, including "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." *Id.* at 9. The FYs 2024 & 2025 NOFO specified that "HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities . . . ." *Id.* The FYs 2024 & 2025 NOFO further specified that "CoC should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation." *Id*.

73.    The NOFO did not include any grant conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

74.    Plaintiffs King County, Pierce County, Snohomish County, San Francisco, Santa Clara, Boston, Columbus, NYC, Nashville, Pima County, Cambridge, Pasadena, San José, Tucson,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 23

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

King County RHA, and Santa Monica HA (collectively, "CoC Plaintiffs"), in coordination with or as part of their respective Continuums, developed their applications in compliance with the FYs 2024 & 2025 NOFO's stated policy priorities. Each CoC Plaintiff Continuum timely submitted its application in response to the FYs 2024 & 2025 NOFO.

75.    On January 17, 2025, HUD announced the conditional award list for FY 2024, which included each of the CoC Plaintiffs.

**5.    CoC Plaintiffs Rely on CoC Grants to Serve their Homeless Residents**

76.    Tens of thousands of individuals and families experiencing homelessness live within CoC Plaintiffs' geographical limits. Many of these individuals rely on services provided by CoC Plaintiffs with funding from the CoC program to access rapid rehousing (which provides short-term rental assistance), permanent and transitional housing services, and case management that supports linkages to healthcare, job training, and other resources that facilitate their ability to obtain and keep their housing.

77.    CoC Plaintiffs historically have applied annually for CoC funds on behalf of Continuums that include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and/or other stakeholders. Grant awards are currently distributed to scores of programs serving homeless individuals and families in each of CoC Plaintiffs' jurisdictions.

78.    CoC grants support permanent supportive housing programs, which provide long-term, affordable housing combined with supportive services for individuals and families experiencing, or at risk of, homelessness. These programs allow participating individuals and families to live independently and stably in their communities.

79.    CoC grants also support rapid rehousing programs, which help individuals and

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 24

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

families exit homelessness and return quickly to permanent housing. Rapid rehousing is a key component of CoC Plaintiffs' response to homelessness because it connects people to housing as quickly as possible by providing temporary financial assistance and other supportive services like housing search and stability case management.

80.    Other programs funded by CoC grants include transitional housing programs that provide temporary, short-term housing for homeless individuals and families who require a bridge to permanent housing; supportive services, which include things like conducting outreach to homeless individuals and families and providing referrals to housing or other needed resources; and operation of systems for collecting and managing data on the provision of housing and services to program participants.

81.    Thousands of CoC Plaintiffs' residents experiencing, or at risk of, homelessness rely on these programs and others funded by the CoC program. The loss of CoC funding threatens the ability of CoC Plaintiffs to provide critical programs and would result in program participants losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence.

82.    For FY 2024, HUD conditionally awarded CoC Plaintiffs hundreds of millions of dollars in CoC grants to continue homelessness assistance programs, ensuring CoC Plaintiffs' ability to serve their residents so they would not experience a sudden drop off in the availability of housing services, permanent and transitional housing, and other assistance.

83.    In reliance on these awards, many CoC Plaintiffs have already notified service providers of forthcoming funding and/or contracted with service providers for homelessness assistance services.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 25

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### B.    DOT Grant Programs

84.    Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government." Department of Transportation Act, 1966, Pub. L. 89-670, 80 Stat. 931. DOT administers both competitive and formula grant programs. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019). Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up). In administering grant programs, DOT often acts through its operating administrations, including the FTA, FHWA, FAA, and FRA. By law, the DOT Secretary is responsible for all acts taken by its operating administrations and the administrators of the FTA, FHWA, FAA, and FRA report directly to the DOT Secretary. 49 U.S.C. §§ 103(b), (d), (g)(1) (FRA); 104(b)(1), (c)(1) (FHWA); 106(b)(1)(E), (f)(3)(A) (FAA); 107(b), (c) (FTA); *see also* 49 C.F.R. Part 1 (organization and authority of DOT).

### 1.    FTA Grant Programs

85.    Congress has established by statute a wide variety of grant programs administered by DOT, acting through the FTA, that provide federal funds to state and local governments for public transit services. These include, but are not limited to, programs codified in title 49, chapter 53 of the U.S. Code, as amended by the Fixing America's Surface Transportation (FAST) Act of 2015, Pub. L. 114-94, 129 Stat. 1312, and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

86.    For instance, section 5307 authorizes the Secretary of DOT (the "DOT Secretary")

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 26

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to make urbanized area formula grants ("UA Formula Grants"), which go toward funding the operating costs of public transit facilities and equipment in urban areas, as well as certain capital, planning, and other transit-related projects. *See* 49 U.S.C. § 5307(a)(1). Section 5307 imposes specific requirements on UA Formula Grant recipients related to the recipient's operation and control of public transit systems. *See id.* § 5307(c). None of these requirements pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

87.    Section 5309 establishes certain fixed guideway capital investment grants ("Fixed Guideway Grants"). *See* 49 U.S.C. § 5309(b). This program funds certain state and local government projects that develop and improve "fixed guideway" systems—meaning public transit systems that operate on a fixed right-of-way, such as rail, passenger ferry, or bus rapid transit systems. *Id.* §§ 5302(8), 5309(b). Section 5309 imposes specific requirements on Fixed Guideway Grant recipients related to, for example, the recipient's capacity to carry out the project, maintain its equipment and facilities, and achieve budget, cost, and ridership outcomes. *See id.* § 5309(c). None of these requirements pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

88.    Section 5337 authorizes grants to fund state and local government capital projects that maintain public transit systems in a state of good repair, as well as competitive grants for replacement of rail rolling stock ("Repair Grants"). *See* 49 U.S.C. § 5337(b), (f). Section 5337 specifically limits what projects may be eligible for Repair Grants, *id.* § 5337(b), and imposes specific requirements on multi-year agreements for competitive rail vehicle replacement grants, *id.* § 5337(f)(7). It does not, however, impose any conditions on Repair Grants related to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

89.    Section 5339 authorizes grants to fund the purchase and maintenance of buses and

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 27

bus facilities ("Bus Grants"). *See* 49 U.S.C. § 5339(a)(2), (b), (c). The Bus Grant program incorporates the specific funding requirements set forth in section 5307 for UA Formula Grants and imposes other requirements on Bus Grant recipients. *See id.* § 5339(a)(3), (7), (b)(6), (c)(3). Section 5339 does not, however, impose any conditions on Bus Grants related to a prohibition on all kinds of DEI or local participation in enforcement of federal immigration laws.

90.    Congress annually appropriates funding for FTA grant programs, including the four identified above. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FTA grants related to a prohibition on DEI or local participation in federal immigration enforcement. *See, e.g.,* Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 334, 342.

91.    Plaintiffs King County, San Francisco, Boston, NYC, Pima County, Denver, Chicago, Culver City, Portland, Santa Monica, Tucson, Wilsonville, Intercity Transit, and Sound Transit operate public transit or are otherwise eligible for FTA grants. These plaintiffs currently rely on billions of dollars in appropriated federal funds from FTA grant programs for transit services and improvements provided or undertaken for the benefit of their residents.

### 2.    FHWA Grant Programs

92.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FHWA, that provide federal funds to state and local governments for road and street infrastructure projects. These include, but are not limited to, programs codified in title

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 28

23 of the U.S. Code and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

93.    For instance, Section 24112(b) of the Infrastructure Investment and Jobs Act, established Safe Streets and Roads for All, or SS4A, a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans. 135 Stat. 815–817. The Act requires the DOT Secretary to consider, among other things, the extent to which applicants and their proposed projects will ensure "equitable investment in the safety needs of underserved communities in preventing transportation-related fatalities and injuries" and "achieve[] such other conditions as the Secretary considers to be necessary." *See id.* § 24112(c)(3). None of these considerations pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

94.    In February 2024, DOT posted a NOFO (updated in April 2024) announcing a competition for SS4A grant funding for Fiscal Year 2024 (the "FY 2024 SS4A NOFO"). *See* U.S. Dep't of Transp., Notice of Funding Opportunity for FY 2024 Safe Streets and Roads for All Funding (Apr. 16, 2024), https://www.transportation.gov/sites/dot.gov/files/2024-04/SS4A-NOFO-FY24-Amendment1.pdf.

95.    The FY 2024 SS4A NOFO directed applicants to consider policy priorities in their applications, including "Equity and Barriers to Opportunity" and "Climate Change and Environmental Justice." *Id.* at 39; *see also id.* at 27, 29 (listing "Equity" as a selection criterion for grants). The FY 2024 SS4A NOFO specified that "[e]ach applicant selected for SS4A grant funding must demonstrate effort to improve equity and reduce barriers to opportunity as described in Section A" and stated "the Department seeks to award funds under the SS4A grant program that will create proportional impacts to all populations in a project area, remove transportation related

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 29

disparities to all populations in a project area, and increase equitable access to project benefits." *Id*. at 12, 39.

96.    The FY 2024 SS4A NOFO strongly emphasized equity considerations throughout. The NOFO defined "equity" as "[t]he consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, Indigenous and Native Americans, Asian Americans and Pacific Islanders, and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality." *Id*. at 4. The NOFO did not include any grant conditions related to prohibiting all kinds of DEI or facilitating enforcement of federal immigration laws.

97.    In addition to SS4A, FHWA administers the Federal Highway-Aid Program, which provides federal formula funding for the construction, maintenance and operation of the country's 3.9-million-mile highway network, including the Interstate Highway System, primary highways, and secondary local roads.

98.    The Infrastructure Investment and Jobs Act authorized $356.5 billion for fiscal years 2022 through 2026 to be used for the Federal Highway-Aid Program. Currently, there are nine core formula funding programs within the Federal Highway-Aid Program: the National Highway Performance Program, 23 U.S.C. § 119; the Surface Transportation Block Grant Program, 23 U.S.C. § 133; the Highway Safety Improvement Program, 23 U.S.C. § 148 and 23 C.F.R. Part 924; the Railway-Highway Crossings Program, 23 U.S.C. § 130 and 23 C.F.R. Part 924; the Congestion Mitigation and Air Quality Improvement Program, 23 U.S.C. § 149; the Metropolitan Planning Program, 23 U.S.C. § 104(d); the National Highway Freight Program, 23

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 30

U.S.C. § 167; the Carbon Reduction Program, 23 U.S.C. § 175; and the PROTECT Formula Program, 23 U.S.C. § 176. None of these statutes authorizes DOT or FHWA to impose a prohibition on DEI or a requirement to facilitate enforcement of federal immigration laws as a precondition to receive federal grants.

99.     Section 11118 of the Infrastructure Investment and Jobs Act created the Bridge Investment Program (BIP) to assist states, tribes, and local governments with rehabilitating or replacing bridges to improve safety and efficiency for people and freight moving across bridges. 23 U.S.C. § 124(b)(2). The Act directs the DOT Secretary to consider factors such as cost considerations, safety benefits, and mobility improvements. *Id*. §§ 124(f)(3)(B); (g)(4)(B). No part of the BIP's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

100.     Section 21203 of the Infrastructure Investment and Jobs Act created the National Culvert Removal, Replacement, and Restoration Grant Program, also known as the Culvert Aquatic Organism Passage Program ("Culvert AOP Program") to assist states, tribes, and local governments with projects that would meaningfully improve or restore passage for anadromous fish (species that are born in freshwater such as streams and rivers, spend most of their lives in the marine environment, and migrate back to freshwater to spawn). 49 U.S.C. § 6703. The Act directs the DOT Secretary to prioritize projects that would improve fish passage for certain categories of anadromous fish stocks or that would open more than 200 meters of upstream habitat before the end of the natural habitat. *Id*. § 6703(e). The FHWA administers some Culvert AOP Program grants on behalf of DOT. No part of the Culvert AOP Program's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

101.     The FHWA also administers the FY 2023-24 Advanced Transportation Technology

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 31

and Innovation (ATTAIN) grant program, as directed by Congress in 23 U.S.C. § 503(c)(4). Section 503(c)(4) directs the DOT Secretary to provide grants "to deploy, install, and operate advanced transportation technologies to improve safety, mobility, efficiency, system performance, intermodal connectivity, and infrastructure return on investment." The DOT Secretary was directed to develop selection criteria that included an enumerated list of considerations, including how the deployment of technology would "improve the mobility of people and goods," "protect the environment and deliver environmental benefits that alleviate congestion and streamline traffic flow," and "reduce the number and severity of traffic crashes and increase driver, passenger, and pedestrian safety." *Id*. Nothing in the statutory provisions authorizing the ATTAIN grant program describes immigration enforcement or ending DEI as considerations for the grant.

102.    In fulfillment of the statutory authorization of FHWA grant programs, including the ones identified above, Congress annually appropriates funding for FHWA grants. In appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FHWA grants related to a prohibition on DEI or local participation in federal immigration enforcement. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1835–1842; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 697–705; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109–5117; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 315–324.

103.    Plaintiffs King County, Pierce County, San Francisco, Santa Clara, Snohomish County, Boston, Columbus, NYC, Denver, Nashville, Pima County, Chicago, Minneapolis, Portland, Pittsburgh, San José, Santa Monica, Sound Transit, Tucson, SFCTA, and TIMMA receive, directly or indirectly, and rely on FHWA formula and discretionary grants of hundreds of

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 32

millions in appropriated funds.

### 3. FAA Grant Programs

104.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FAA, that provide federal funds to public agencies for planning and development of airports. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

105.    For instance, the Airport Improvement Program (AIP) is codified under title 49, chapter 471 of the U.S. Code. Under the AIP, the DOT Secretary is authorized to make formula and discretionary grants to recipients (referred to as "sponsors") for the planning and development of certain public-use airports. 49 U.S.C. 47101 *et seq*. The DOT Secretary may approve AIP grant applications only if the sponsor and project meet certain statutory requirements (for example, consistency with plans for development of the surrounding area, financial capacity, and ability to complete the project "without unreasonable delay"), and only if the sponsor makes certain written assurances based on the type of grant at issue (for example, for airport development grants, assurances such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions"). 49 U.S.C. §§ 47106, 47107.

106.    Congress has been precise in the requirements that attach to grant recipients and has set those forth in statute, which has been implemented by DOT through contractual "Grant Assurances" that are terms of every grant agreement. None of the statutory requirements pertains to a prohibition on DEI or a requirement of local participation in the enforcement of federal

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 33

immigration laws.

107.     AIP funding levels are established periodically by reauthorization acts, such as the FAA Reauthorization Act of 2018, Pub. L. 115-254, 132 Stat. 3186, and the FAA Reauthorization Act of 2024, Pub. L. 118-63, 138 Stat. 1025. The reauthorization acts define the AIP authorization levels, amend the various AIP statutes, and set out directives to the DOT Secretary with respect to airport improvement funding, but they do not impose or authorize directives for or conditions on AIP grants related to a prohibition on DEI or requirement of local participation in federal immigration enforcement.

108.     Similarly, the Airport Infrastructure Grants (AIG) program is authorized under the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 1416–1418. Under the AIG program, the DOT Secretary is authorized to make formula and discretionary grants for runways, taxiways, airport safety and sustainability projects, as well as terminal, airport transit connections, and roadway projects. Grants made under the AIG program are treated as having been made pursuant to the DOT Secretary's authority for project grants issued under the AIP statute. 135 Stat. 1417–1418. The Infrastructure Investment and Jobs Act sets forth the AIG funding levels but does not impose any conditions on AIG grants related to prohibitions on DEI or requirement of local participation in enforcement of federal immigration laws.

109.     In fulfillment of the statutory authorization of FAA grant programs, including the ones identified above, Congress annually appropriates funding for FAA grants. In the annual appropriations legislation, Congress sets forth additional priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing directives for or conditions on FAA grants related to a prohibition on DEI or a requirement of local participation in federal immigration enforcement. *See, e.g.*, Consolidated

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 34

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1830–1835, 1939–1941; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 691–697; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5101–5108; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 307–314.

110.    Plaintiffs King County, Pierce County, Snohomish County, San Francisco, Denver, Pima County, Sonoma County, Bend, Chicago, San José, and Port of Seattle operate airports eligible for FAA grants. Those plaintiffs currently have hundreds of millions in appropriated federal funds from FAA grant programs for airport development and infrastructure projects.

### 4.    FRA Grant Programs

111.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FRA, that provide federal funds to public agencies for rail infrastructure projects. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

112.    For example, the Railroad Crossing Elimination (RCE) Grant Program, authorized in Section 22305 of the Infrastructure Investment and Jobs Act, directed the DOT Secretary, in cooperation with the FRA Administrator, to establish a competitive grant program that provides funds to improve the safety and mobility of people and goods at railway crossings. 49 U.S.C. § 22909. Section 22305 limits eligibility for the RCE program to certain entities such as states and local governments. *Id*. § 22909(c). It also directs that the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or path-way rail crossings"; "improve the mobility of people or goods"; "reduce emissions, protect the environment, and provide community benefits, including

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 35

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

noise reduction"; "improve access to emergency services"; "provide economic benefits"; and "improve access to communities separated by rail crossings." *Id*. § 22909(d), (f). None of these considerations pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

113.    Funding for the RCE program was made available for FY 2024 and 2025 through advance appropriations provided in the Infrastructure Investment and Jobs Act and by remaining unawarded FY 2022 RCE Program balances. 135 Stat. 1436. The appropriations provisions do not impose or authorize directives for or conditions on FRA grants related to prohibiting DEI or to local participation in federal immigration enforcement.

114.    Plaintiffs Bend, Minneapolis, Portland, Sound Transit, and San José currently have millions of dollars in appropriated federal funds from FRA grant programs for rail infrastructure projects.

### 5.    DOT SMART Grant Program

115.    Section 25005 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429, established the Strengthening Mobility and Revolutionizing Transportation (SMART) discretionary grant program with $100 million appropriated annually for fiscal years 2022-2026. 135 Stat. 840–845.

116.    The SMART grant program was established to provide grants to eligible public sector agencies for projects focused on advanced smart community technologies and systems in order to improve transportation efficiency and safety. It is a two-stage program: any eligible entity can apply for a Stage 1 grant, and a Stage 1 grantee can apply for a Stage 2 grant to expand the applicable project.

117.    Section 25005 limits eligibility for the SMART grant program to certain entities such as states and local governments. 135 Stat. 840. It establishes a set of selection criteria, to be

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 36

identified in the NOFO, that include the extent to which the eligible entity or applicable beneficiary community has a public transportation system and has the "functional capacity to carry out the proposed project" as well as the extent to which the proposed project will, among other things, "reduce congestion and delays for commerce and the traveling public"; "improve the safety and integration of transportation facilities and systems for pedestrians, bicyclists, and the broader traveling public"; "improve access to jobs, education, and essential services, including health care"; and "connect or expand access for underserved or disadvantaged populations and reduce transportation costs." *Id*. at 841. Moreover, in providing SMART grants, the DOT Secretary "shall give priority to" projects that would, among other things "promote a skilled workforce that is inclusive of minority or disadvantaged groups." *Id*. at 842. None of the eligibility, selection, or prioritization criteria pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

118.    Section 25005(g) authorizes appropriation of $100 million for each of the first five years of the SMART grant program, and directs that certain percentages of those appropriations be provided to projects benefitting large, mid-sized, and rural communities and regional partnerships. *Id*. at 845. This appropriation provision does not impose or authorize directives for or conditions on SMART grants related to prohibiting DEI or to local participation in federal immigration enforcement.

119.    As required, the SMART grant NOFOs for FY 2024 tracked the statutory description of eligibility, selection criteria, and priorities. For example, the FY 2024 Stage 1 NOFO identified as a "goal or objective of the program" and a program priority to "[c]onnect or expand access for underserved or disadvantaged populations." Nothing in the FY 2024 Stage 1 or Stage 2 NOFOs pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 37

120.    Plaintiffs Boston, Chicago, Minneapolis, Nashville, and Intercity Transit are slated to receive millions of dollars in appropriated funds for the SMART grant program.

### C.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on CoC and DOT Grant Funds.

#### 1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants

121.    Since taking office, President Trump has issued numerous executive orders purporting to direct the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including opposition to all forms of DEI policies and initiatives, participation in aggressive and lawless immigration enforcement, exclusion of transgender people, and cutting off access to lawful abortions. These unlawful conditions are imposed to direct and coerce grant recipients to comply with the President's policy agenda.

122.    The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants. *Id.* § 3(b)(iv).

123.    The DEI Order also directs each agency head to include a term requiring the

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 38

contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id.* § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894 today—plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

124.    The DEI Order does not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

125.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 39

126.    The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status. *See* 8 U.S.C. § 1611(a). In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including . . . PRWORA." *Id.* § 2(i).

127.    On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement. The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials . . . continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits . . . from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf." https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-communities-from-criminal-aliens/. The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 40

engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens." https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

128.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that"'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

129.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order"). The Acting Director of the U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order. Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 41

Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo"). The OMB Memo told agency heads that the Trump Administration's policy is "not to use taxpayer funds to fund, facilitate, *or promote* abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." *Id.* (emphasis added). The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo. *Id.*

### 2.    HUD Attaches New, Unlawful Conditions to CoC Funding

130.    In or around March and April of 2025, following President Trump's issuance of the executive orders described above and Defendant Turner's confirmation as HUD Secretary, HUD presented CoC Plaintiffs with CoC grant agreements (collectively, the "CoC Grant Agreements") for some of the CoC funds CoC Plaintiffs were awarded. These CoC Grant Agreements contain additional grant conditions that were not included in the FYs 2024 & 2025 NOFO, and are not authorized by the Homeless Assistance Act, the Appropriations Act, or the Rule HUD itself promulgated to implement the CoC program. HUD has required CoC Plaintiffs agree to these conditions to receive the CoC funds they are entitled to.

### i.    *Overview of New, Unlawful Conditions*

131.    Each of the CoC Grant Agreements presented to CoC Plaintiffs contains substantially the same unlawful, new terms and conditions, including the following (collectively, the "CoC Grant Conditions"):

132.    First, the CoC Grant Agreements state that "[t]his Agreement, the Recipient's use

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 42

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only certain specified statutes, rules, and grant-related documents, but also by "all current Executive Orders." The CoC Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . other Executive Orders" (together, the "CoC EO Condition").

133.    Second, a grant recipient must certify that:

> it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964.

The recipient must further agree that that this condition is "material" for purposes of the FCA by agreeing that:

> its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA].

(together, the "CoC Discrimination Condition").

134.    While CoC Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Administration's communications to federal grant recipients make clear that the agencies seek compliance with the Trump Administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs. Without Congress passing his anti-DEI agenda, President Trump instead purports to have granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments seeking grant funding.

135.    Third, the CoC Grant Agreements provide:

> No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 43

> effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation . . . .

The CoC Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . [the Immigration Order] . . or immigration laws " (together, the "CoC Enforcement Condition").[3]

136.    Fourth, the CoC Grant Agreements impose requirements purportedly related to PRWORA and other immigration eligibility and verification requirements:

> The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [*sic*] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
>                . . . .
>
> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements (SAVE) system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(the "Verification Condition").

137.    Fifth, the CoC Grant Agreements require the recipient to agree that it "shall not use grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order (the "Gender Ideology Condition").

138.    Finally, the CoC Grant Agreements require the recipient to agree that it "shall not

---

[3] More recent grant agreements contain updated language that precisely recites the Immigration Order. In these, the last part of this condition reads "…or abets *so-called "sanctuary"* policies that seek to shield illegal aliens from deportation.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 44

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

use any Grant Funds to fund or promote elective abortions, as required by" the Abortion Order (the "Abortion Condition").

139.    These conditions are unconstitutional and unlawful for several reasons. As an initial matter, neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any other legislation authorizes HUD to attach these conditions to federal funds appropriated for CoC grants.

### ii.  The CoC EO Condition is unlawful

140.    The CoC EO Condition purports to incorporate *all* executive orders as "govern[ing]" the use of CoC funds and operation of CoC projects. These orders in many ways purport to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws. In so doing, the CoC EO Condition seeks to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means.

141.    Further, the CoC EO Condition is unconstitutionally vague. Executive orders are the President's directives to federal agencies. These orders are unintelligible as applied to grant recipients. Further, the directives as implemented in the unlawful conditions at issue are vague and unintelligible.

### iii.  The CoC Discrimination Condition is unlawful

142.    CoC Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding. But executive agency memoranda and letters make clear that the Trump Administration's conception of an "illegal" DEI program is contrary to actual nondiscrimination statutes and is inconsistent what any court has endorsed when interpreting them.

143.    For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s]

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 45

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history. Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

144.    That broad conception is confirmed in a letter from DOT Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law." Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (April 24, 2025) ("Duffy             Letter"),              https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

145.    Defendant Turner has stated that "HUD is carrying out Present Trump's executive orders, mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's Executive Orders, removing diversity, equity, inclusion (DEI)." Press Release No. 25-059, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https://www.hud.gov/news/hud-no-25-059 (emphasis added).

146.    Taking to the Twitter platform now known as "X," Defendant Turner expressed how his agency intends to enforce the new conditions on HUD CoC Grants, stating, "CoC funds . . . will not promote DEI, enforce 'gender ideology,' support abortion, subsidize illegal immigration, and discriminate against faith-based groups." Scott Turner Post of Mar. 13, 2025, https://x.com/SecretaryTurner/status/1900257331184570703.

147.    Neither the text of Title VI, nor any other statute or other condition enacted by Congress, prohibits recipients of federal funding from according concern to issues of diversity, equity, or inclusion. The Supreme Court has never interpreted Title VI to prohibit diversity, equity,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 46

and inclusion programs. Indeed, existing case law rejects the Trump Administration's expansive views on nondiscrimination law with respect to DEI. For example, this Court recently confirmed the lawfulness of a local government's use of affinity groups and DEI initiatives in a case raising federal nondiscrimination law and equal protection claims. *See generally Diemert v. City of Seattle*, 2:22-CV-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025). The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat. Yet, the DEI Order seeks to impose his views on DEI as if they were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce federal grant recipients into acquiescing in his Administration's unorthodox legal interpretation of nondiscrimination law.

148.    Accepting these conditions would permit Defendants to threaten CoC Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with President Trump's political agenda. This threat is intensified by the CoC Grant Agreements' provision that purports to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim. Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of. *Id.* § 3733.

149.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*iv.  The CoC Enforcement Condition is unlawful*

150.    Congress has not delegated to HUD authority to condition CoC grant funding on a recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation." It also is unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and by giving agencies free rein to arbitrarily enforce it.

151.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties—including Plaintiffs King County, San Francisco, Santa Clara, Minneapolis, Portland, and San José—on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the Administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies." *City & Cnty. of San Francisco v. Trump*, 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause"; "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process"; and "violate[s] the Tenth Amendment because [it] impose[s] [a] coercive condition intended to commandeer local officials into enforcing federal immigration practices and law." *Id.* at *2.

*v.  The Verification Condition is unlawful*

152.    Further, PRWORA does not authorize the Verification Condition for at least two reasons. First, PRWORA explicitly does *not* require states to have an immigration status

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 48

verification system until twenty-four months after the Attorney General promulgates certain final regulations. 8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner." *Id.* § 1642(b)(ii), (iii). The Attorney General has issued interim guidance and a proposed verification rule, but never implemented a final rule. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation. 62 Fed. Reg. at 61348–49. Absent implementing regulations, CoC Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so exceeds the authority created in PRWORA.

153.    Second, SAVE is a database operated by the U.S. Department of Homeland Security, acting through U.S. Citizenship and Immigration Services, that is sometimes used to assist federal immigration enforcement actions. The Verification Condition would require CoC Plaintiffs to gain access to this system, train their own employees how to use the system, and require them to enter immigration information. Such an effort to commandeer local resources for matters related to federal immigration enforcement is counter to federal law, as well as applicable local and state laws precluding local participation in federal immigration enforcement.

### vi.  The Gender Ideology Condition is unlawful

154.    The Gender Ideology Condition improperly seeks to force federal grant recipients

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 49

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology." This violates HUD's own regulations, which mandate "equal access" to CoC "programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity, and in a manner that affords equal access to the individual's family," including facilities with "shared sleeping quarters or shared bathing facilities." 24 C.F.R. § 5.106(b)–(c). HUD regulations also prohibit subjecting an individual "to intrusive questioning or asked to provide anatomical information or documentary, physical, or medical evidence of the individual's gender identity." *Id.* § 5.106(b)(3). While Defendant Turner announced HUD will no longer enforce these regulations, the regulations remain in effect and applicable to the CoC program.

155.    The Gender Ideology Condition is also vague. The definition of "gender ideology" is not only demeaning, but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of homeless services.

156.    The Trump Administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders. For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program. The CDC ended the grant in order to comply with the Gender Ideology Order. *See* Kristen Hwang, *LA clinics lose funding for transgender health care as Trump executive orders take hold*, Cal Matters (Feb. 4,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 50

2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

157.    On February 28, 2025, this Court enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers. *Wash. v. Trump*, 2:25-CV-00244-LK, 2025 WL 659057, at *11–17, *24–25 (W.D. Wash. Feb. 28, 2025). Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers." *Id.* at *11. The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people." *Id.* at *24 (citation omitted).

### *vii. The Abortion Condition is unlawful*

158.    The Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions. While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality it goes well beyond the Hyde Amendment. The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024). But the Hyde Amendment

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 51

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to the 2024 Appropriations Act does not require grant recipients to refrain from "*promot[ing]* abortion"—a vague prohibition that is susceptible to arbitrary enforcement. And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power.

159.    In sum and as further explained below, HUD's imposition of the CoC Grant Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    DOT and its Operating Administrations Attach New, Unlawful Conditions to DOT Grants

160.    Since Secretary Duffy's confirmation, DOT and its operating administrations have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOT Grant Conditions") across the expansive portfolio of DOT grants established by Congress; demanding grant recipients' agreement to those new conditions, sometimes on very short timelines; and issuing agency-wide letters and statements about how DOT will enforce those conditions.

161.    As discussed above, the Duffy Letter issued to "all recipients" of DOT funding announced DOT's "policy" of imposing immigration enforcement and anti-DEI conditions on all DOT-funded grants as a requirement of receiving funding. The Duffy Letter makes clear that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." It further asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 52

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

162.    Pursuant to the new policy set forth in the Duffy Letter, DOT and its operating administrations have, in recent weeks, attached substantially similar conditions relating to discrimination, immigration enforcement, and executive orders to all grant agreements.

a.)    *DOT and the FTA attach new, unlawful conditions to FTA Grants*

163.    For instance, on March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA grant programs discussed above.

164.    The March 26 Master Agreement imposed a new condition on all FTA grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FTA Discrimination Condition"). While FTA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the March 26 Master Agreement provided:

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

165.    That the FTA plans to enforce these new conditions more broadly than current nondiscrimination law is reinforced by the March 26 Master Agreement's requirement that the recipient "comply with other applicable federal nondiscrimination laws, regulations, and

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 53

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

requirements, and follow *federal guidance prohibiting discrimination*."

166.    The FTA Discrimination Condition is in apparent tension with other requirements in the March 26 Master Agreement. For example, the March 26 Master Agreement requires compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

167.    The FTA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

168.    Further, the March 26 Master Agreement defined "Federal Requirement" to include "[a]n applicable federal law, regulation, or *executive order*" (the "FTA EO Condition"). The March 26 Master Agreement refers to President Trump's DEI Order as an executive order "pursuant to" which the recipient must comply and certify, with no explanation of how the DEI Order relates to funding of mass transit.

169.    The Duffy Letter to all recipients of DOT grants (including the FTA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws. The Duffy Letter also

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 54

threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

170.    On April 25, 2025, the FTA issued another updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA grant programs discussed above.

171.    The April 25 Master Agreement ("FTA Master Agreement") contains the same FTA Discrimination Condition and the same FTA EO Condition set forth above. But the FTA Master Agreement contains an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FTA Enforcement Condition").

172.    In particular, the FTA Enforcement Condition amends an existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

173.    The Duffy Letter to all recipients of DOT grants (including the FTA grants) states that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law" and that "[d]eclining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability."

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 55

174.    In May 2025, following this Court's issuance of a temporary restraining order enjoining the FTA from enforcing the FTA Discrimination Condition, the FTA EO Condition, or the FTA Enforcement Condition against King County, King County learned that the FTA had retroactively applied the April 2025 FTA Master Agreement to grants that were executed pursuant to earlier versions of the agreement. By substituting those earlier agreements with the FTA Master Agreement, the FTA purported to unilaterally add new substantive conditions to previously awarded grants without notifying King County.

175.    Plaintiffs have also become aware that the FTA plans to soon publish its annual update to its "Certifications and Assurances" document, which FTA grant recipients must execute before accepting FTA grant awards. Based on the DOT policy announced in the Duffy letter, Plaintiffs expect the new Certifications and Assurances to include terms materially the same as the FTA Discrimination Condition, the FTA EO Condition, and the FTA Enforcement Condition.

176.    Neither the statutory provisions creating the FTA grants, the relevant appropriations acts, nor any other legislation authorizes the FTA to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

177.    In sum and as further explained below, the FTA Discrimination Condition, the FTA EO Condition, and the FTA Enforcement Condition (collectively, the "FTA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 56

1

2

**b.)    DOT and the FHWA attach new, unlawful conditions to FHWA Grants**

3

178.    On March 17, 2025, DOT issued revised General Terms and Conditions applicable

4

to Fiscal Year 2024 SS4A grants ("FY 2024 SS4A General Terms and Conditions").

5

179.    The FY 2024 SS4A General Terms and Conditions imposed a new condition on all

6

Fiscal Year 2024 SS4A grants implementing President Trump's directive, as set out in the DEI

7

Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede

8

this requirement is material for purposes of the FCA ("SS4A Discrimination Condition"). While

9

SS4A grants have long required compliance with nondiscrimination laws and have been subject to

10

the FCA, the FY 2024 SS4A General Terms and Conditions provided:

11

12

(b)    Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

13

14

15

(c)    Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

16

17

18

19

180.    The SS4A Discrimination Condition is in apparent tension with other requirements

20

in the FY 2024 SS4A General Terms and Conditions. For example, the FY 2024 SS4A General

21

Terms and Conditions require compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible,

22

the recipient or subrecipient should ensure that small businesses, minority businesses, women's

23

business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*,

24

"included on solicitation lists" and "solicited" when "deemed eligible."

25

26

181.    The SS4A Discrimination Condition is also in apparent tension with DOT's own

27

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 57

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

182.    The FY 2024 SS4A General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "SS4A Enforcement Condition").

183.    In particular, the SS4A Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

184.    Exhibit A to the FY 2024 SS4A General Terms and Conditions also requires the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "SS4A EO Condition"). While this requirement existed in a similar form in prior agreements, Exhibit A to the FY 2024 SS4A General Terms and Conditions lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to SS4A grant

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 58

agreements, with no explanation of how those Orders or statutes relate to roadway grants or even apply to local governments.

185.    Also on March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2023 SS4A grants and to Fiscal Year 2022 SS4A grants. Those revised General Terms and Conditions, and the revised Exhibit A to each, contain provisions identical to the SS4A Discrimination Condition, the SS4A Immigration Condition, and the SS4A EO Condition discussed above.

186.    On April 22, 2025, the FHWA issued Competitive Grant Program General Terms and Conditions purportedly applicable to all FHWA competitive grants ("2025 FHWA General Terms and Conditions").

187.    The 2025 FHWA General Terms and Conditions imposed a new condition on all FHWA competitive grants (including the BIP, Culvert AOP Program, and ATTAIN program discussed above) implementing President Trump's directive, as set out in the DEI Order and further explained in the Duffy letter, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FHWA Discrimination Condition"). While FHWA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FHWA General Terms and Conditions provide:

> (b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].
>
> (c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 59

and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

188.    The 2025 FHWA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FHWA Enforcement Condition").

189.    In particular, the FHWA Enforcement Condition incorporates immigration enforcement into a provision addressing compliance with federal law and policy as follows (immigration enforcement language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

190.    The Exhibits to the 2025 FHWA General Terms and Conditions—dated April 30, 2025 and applicable to FHWA competitive grants—further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FHWA EO Condition"). The Exhibits list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those Orders or statutes relate to highway grants or even apply to local governments.

191.    Plaintiffs re-allege and incorporate paragraphs 169 and 173 above (describing the

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 60

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FHWA grants).

192.    Neither the statutory provisions creating the FHWA grants, the relevant appropriations acts, nor any other legislation authorizes the FHWA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

193.    In sum and as further explained below, the SS4A Discrimination Condition, the SS4A Enforcement Condition, the SS4A EO Condition, the FHWA Discrimination Condition, the FHWA Enforcement Condition, and the FHWA EO Condition (collectively, the "FHWA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.)    *DOT and the FAA attach new, unlawful conditions to FAA Grants*

194.    Implementing the Duffy Letter and the Trump Administration Executive Orders, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comments on modifications to the Grant Assurances ("2025 FAA Grant Assurances"). In its notice, the FAA stated that the 2025 FAA Grant Assurances would become effective immediately notwithstanding the opportunity to comment.

195.    The 2025 FAA Grant Assurances require the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 61

and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant." While this requirement existed in a similar form in prior versions of the Grant Assurances, the 2025 FAA Grant Assurances list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, even though these Orders on their face do not apply to non-federal entities and do not relate to funding of airport development or infrastructure. Congress has not directed or authorized that the DEI Order, Gender Ideology Order, or Immigration Order be imposed as Grant Assurances.

196.    Implementing the Duffy Letter and the Trump administration Executive Orders, on May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 for AIG grants with added terms and conditions that did not appear in prior iterations of FAA grant agreements ("FY 2025 FAA AIG Grant Template"). The FY 2025 FAA AIG Grant Template has not been circulated for comment, as is statutorily required for changes to Grant Assurances.

197.    The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants that implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede that this requirement is material for purposes of the FCA (the "FAA Discrimination Condition"). While FAA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2025 FAA AIG Grant Template provides:

> Pursuant to Section (3)(b)(iv), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the sponsor:

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 62

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]; and

b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

198.    The FAA Discrimination Condition is in apparent tension with statutorily required Grant Assurances imposed on sponsors with respect to FAA grant funds. For example, one of the statutorily required Grant Assurances sponsors must make for airport development grants is that the airport sponsor will take necessary action to ensure, to the maximum extent possible, that at least 10 percent of all businesses at the airport selling consumer products or providing consumer services to the public are small business concerns owned and controlled by "a socially and economically disadvantaged individual" or other small business concerns in historically underutilized business zones. 49 U.S.C. § 47107(e)(1). "Socially and economically disadvantaged individual" is defined to include "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities," as well as women. 49 U.S.C. § 47113(a)(2); 15 U.S.C. § 637(d).

199.    The FAA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7). And the FAA Discrimination Condition is in tension with other provisions of the FY 2025 FAA AIG Grant Template. For example, the FY 2025 FAA AIG Grant Template states that the "sponsor's

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 63

[Disadvantaged Business Enterprise] and [Airport Concession Disadvantaged Business Enterprise] programs as required by 49 C.F.R. Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement." But 49 C.F.R. 23.25(e), for instance, requires the use of "race-conscious measures" in implementing the Airport Concession Disadvantaged Business Enterprise program when race-neutral measures, standing alone, are not projected to be sufficient to meet an overall goal, and sets forth examples of race-conscious measures airports can implement.

200.    The FY 2025 FAA AIG Grant Template contains an additional condition requiring sponsors to cooperate with enforcement of any federal law, including federal immigration enforcement efforts (the "FAA Enforcement Condition").

201.    In particular, the FAA Enforcement Condition incorporates immigration enforcement into a provision addressing free speech and religious liberty as follows (immigration enforcement language emphasized):

> The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.*

202.    The FY 2025 FAA AIG Grant Template further states with respect to immigration: "Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration. The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter." The FY 2025 FAA AIG Grant Template does not explain how those criminal

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 64

immigration statutes relate to airport grants or even apply to local governments.

203.    The FY 2025 FAA AIG Grant Template also requires the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant" (the "FAA EO Condition"). While this requirement existed in a similar form in prior agreements, the FY 2025 FAA AIG Grant Template lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders relate to funding of airport development or infrastructure.

204.    The FY 2025 FAA AIG Grant Template also states that the "FAA may terminate this agreement and all of its obligations under this agreement" in certain circumstances, including if "FAA determines that termination of this agreement is in the public interest"; and further states that "[i]n terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA" (the "FAA Termination Condition"). The FY 2025 FAA AIG Grant Template does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure.

205.    AIP and AIG grant agreements require sponsors to certify a number of sponsor assurances (i.e., the Grant Assurances described above) that require sponsors to maintain and operate their facilities safely and efficiently and in accordance with specified conditions and include compliance with numerous statutes, agency rules, and executive orders.

206.    Plaintiffs re-allege and incorporate paragraphs 169 and 173 above (describing the

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 65

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FAA grants).

207.    Neither the statutory provisions authorizing the FAA grants, the relevant appropriations acts, nor any other legislation authorizes the FAA or DOT to condition the granting of these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

208.    In sum and as further explained below, the FAA Discrimination Condition, the FAA Enforcement Condition, the FAA EO Condition, the FAA Termination Condition (collectively, the "FAA Grant Conditions"), including in the 2025 Grant Assurances, FAA AIG Grant Template, and any other agreement, template, assurances, or other terms and conditions, violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, and the Fifth Amendment's void-for-vagueness doctrine.

### d.)    DOT and the FRA attach new, unlawful conditions to FRA Grants

209.    Implementing the Duffy Letter and the Trump administration Executive Orders, on April 16, 2025, DOT and FRA issued revised General Terms and Conditions applicable to FRA discretionary grants, including the RCE Grant Program ("2025 FRA General Terms and Conditions").[4]

---

[4] The FRA's website indicates that the 2025 FRA General Terms and Conditions were further revised on April 23, 2025, but the revision is not accessible. *See* https://railroads.dot.gov/grants-loans/fra-discretionary-grant-agreements (last accessed May 19, 2025).

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 66

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

210. The 2025 FRA General Terms and Conditions imposed a new condition on all Fiscal Year 2024 FRA discretionary grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FRA Discrimination Condition"). While FRA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FRA General Terms and Conditions provided:

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

211. The FRA Discrimination Condition is in apparent tension with the goals of the RCE program as set forth by Congress. For example, one goal of the RCE program is "to reduce the impacts that freight movement and railroad operations may have on underserved communities." 49 U.S.C. § 22909(b)(3).

212. The FRA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

213. The FRA Discrimination Condition is also in tension with the RCE NOFO, issued July 10, 2024, which identifies "Equity and Justice" as a priority against which proposed projects

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 67

would be assessed as part of the selection process.

214.    The 2025 FRA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FRA Enforcement Condition").

215.    In particular, the FRA Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

216.    The 2025 FRA General Terms and Conditions incorporate exhibits, which were revised on April 16, 2025 and again on April 30, 2025. Exhibit A requires grantees to certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FRA EO Condition"). While this requirement existed in a similar form in prior versions of the Exhibit, the revised Exhibit (as of April 30, 2025) lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders and statutes relate to funding of railway improvements or even apply to local governments.

217.    Plaintiffs re-allege and incorporate paragraphs 169 and 173 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FRA grants).

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 68

218.    Neither the statutory provisions authorizing the FRA grants, the relevant appropriations acts, nor any other legislation authorizes the FRA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

219.    In sum and as further explained below, the FRA Discrimination Condition, the FRA Enforcement Condition, and the FRA EO Condition (collectively, the "FRA Grant Conditions") violate the Separation of Powers, the Spending Clause, Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### e.)    DOT attaches new, unlawful conditions to SMART Grants

220.    Implementing the Duffy Letter and the Trump administration Executive Orders, on May 9, 2025, DOT issued revised General Terms and Conditions applicable to DOT SMART Grants ("2025 DOT SMART General Terms and Conditions"). The 2025 DOT SMART General Terms and Conditions are incorporated into the grant agreement for FY 2024 SMART Grants.

221.    The 2025 DOT SMART General Terms and Conditions imposed a new condition on all FY 2024 SMART grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("DOT SMART Discrimination Condition"). While DOT grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 DOT SMART General Terms and Conditions provided:

(b)    Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 69

agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

(c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

222. The DOT SMART Discrimination Condition is in apparent tension with the goals of the SMART Grant program as set forth by Congress, which required that the DOT Secretary "shall give priority to" projects that would, among other things "promote a skilled workforce that is inclusive of minority or disadvantaged groups." 135 Stat. at 842.

223. The DOT SMART Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

224. The 2025 DOT SMART General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "DOT SMART Enforcement Condition").

225. In particular, the DOT SMART Enforcement Condition provides:

[T]he recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

226. The 2025 SMART General Terms and Conditions incorporate exhibits, which were

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 70

revised on May 9, 2025. Exhibit A requires grantees to certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" ("DOT SMART EO Condition"). While this requirement existed in a similar form in prior versions of the Exhibit, the revised Exhibit lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders or statutes relate to funding of advanced smart community technologies and systems.

227.    Plaintiffs re-allege and incorporate paragraphs 169 and 173 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the DOT SMART Grants).

228.    Neither the statutory provisions creating the DOT SMART Grants, the relevant appropriations acts, nor any other legislation authorizes DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

229.    In sum and as further explained below, the DOT SMART Discrimination Condition, the DOT SMART Enforcement Condition, and the DOT SMART EO Condition (collectively, the "DOT SMART Grant Conditions") violate the Separation of Powers, the Spending Clause, Tenth Amendment's anti-commandeering principle, the Fifth Amendment's

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 71

void-for-vagueness doctrine, and the APA.

**D.    Plaintiffs with Pass-Through Grants Have a Reasonable Concern that the Challenged Conditions Apply to Them**

230.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a sub-recipient). Where a pass-through entity (for example, a state) provides federal funds to a sub-recipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the sub-recipient complies with applicable federal requirements. *See* 2 C.F.R. §§ 200.332(b)(2) (pass-through entity must provide to the sub-recipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. Part 2400 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by HUD to non-federal entities); 2 C.F.R. Part 1201 (same for DOT).

231.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions at issue in this case incorporate applicable federal requirements against any sub-recipients.

232.    For example, the CoC Grant Agreements provide that the "Recipient must comply with the applicable requirements in 2 CFR part 200, as may be amended from time to time."

233.    The FY 2024 SS4A General Terms and Conditions require that the recipient "monitor activities under this award, including activities under subawards and contracts, to ensure . . . that those activities comply with this agreement," and state that "[i]f the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e)." Exhibit A to the 2024 SS4A General Terms and

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 72

Conditions—which incorporates the DEI and Gender Ideology Orders and two criminal immigration statutes as "applicable provisions" as discussed above—states that "[p]erformance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients." The 2025 FHWA General Terms and Conditions, the 2025 FRA General Terms and Conditions, and the 2025 DOT SMART General Terms and Conditions, and the Exhibits thereto, as well as the 2025 FAA Grant Assurances and FY 2025 FAA AIG Grant Template, contain similar language. And the FTA Master Agreement requires that grant recipients take measures to assure that "Third Party Participants" (defined to include sub-recipients) "comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing."

234.    Plaintiffs who receive CoC or DOT grant funds via pass-through grants (i.e., as sub-recipients) have a reasonable concern, based on the Duffy Letter, applicable regulations, and the grant agreement language discussed above, that the challenged CoC Grant Conditions and DOT Grant Conditions apply to their use of the pass-through funds.

### E.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services

235.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by the poison pill of heightened risk of FCA claims, or forgoing the benefit of grant funds—paid for (at least partially) through local federal taxes—that are necessary for crucial local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

236.    Nor is the heightened FCA risk merely hypothetical. A May 19, 2025 letter from

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws." The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients" (including HUD) and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions." Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action." Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=govdelivery.

237.    Withholding CoC grants from CoC Plaintiffs could result in a loss of hundreds of millions of dollars in funding for housing and other services that those plaintiffs have adopted to meet the basic needs of their homeless residents. It would result in those plaintiffs being unable to serve their residents resulting in the loss of access to housing, healthcare, counseling, and other assistance. The loss of this funding, which represents a significant percentage of those plaintiffs'

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 74

total budgets for homelessness services, would have devastating effects on their residents and communities more broadly.

238.    Withholding DOT grants from Plaintiffs King County, Pierce County, San Francisco, Santa Clara, Snohomish County, Boston, Columbus, NYC, Pima County, Sonoma County, Bend, Denver, Chicago, Culver City, Minneapolis, Nashville, Portland, Pittsburgh, San José, Santa Monica, Tucson, Wilsonville, Intercity Transit, Sound Transit, Port of Seattle, SFCTA, and TIMMA (collectively, the "DOT Plaintiffs") would result in loss of billions of dollars in funding for critical services and projects for their residents. For example:

    a.    Withholding FTA grants from plaintiffs who rely on those funds could result in loss of funding for public transit services, including capital projects, maintenance, and improvements, that will result in long-lasting harm to those plaintiffs' finances and delays to or elimination of critical transit projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for public transit services, would threaten transit improvements and safety initiatives and have severe negative impacts on these services.

    b.    Withholding FHWA grants from plaintiffs who rely on those funds could result in loss of funding for street and roadway improvements, including enhancing pedestrian safety, reconfiguring major roadways to decrease crashes and improve transit, and building bike lanes, that will result in long-lasting harm to those plaintiffs' finances, delays to or elimination of critical infrastructure and safety projects, and diversion of funds from other crucial local projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for street and roadway projects, would threaten roadway improvement and safety

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 75

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

initiatives and have severe negative impacts on these projects.

c. Withholding FAA grants from plaintiffs who rely on those funds could result in a loss of funding for airport projects—including development and improvement of runways, taxiways, terminals, and roadways as well as airport transit, safety, and sustainability projects—that will result in in long-lasting harm to those plaintiffs' finances, delays to or elimination of critical airport infrastructure and safety projects, and diversion of funds from other crucial airport improvement projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for airport development and infrastructure projects, would threaten airport improvement and safety initiatives and have severe negative impacts on these critical projects.

d. Withholding FRA grants from plaintiffs who rely on those funds could result in a loss of funding for rail infrastructure projects, including for railroad crossing projects that seek to improve the safety and mobility of people and goods, that will result in in long-lasting harm to those plaintiffs' finances and delays to or elimination of railway infrastructure and safety projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for railroad projects, would threaten rail-related safety initiatives and have severe negative impacts on these projects.

e. Withholding DOT SMART grants from plaintiffs who rely on those funds could result in a loss of funding for advanced smart community technologies and systems projects, including projects using advanced technology and data methods to improve transportation efficiency and safety. This will result in delays or

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 76

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

elimination of the planned projects, leading to continued and likely worsened inefficiencies, safety risks, and deterioration of air quality. The loss of this funding would threaten these transportation technology and modernization initiatives and have severe negative impacts on these projects.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Grant Conditions)*

239.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

240.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

241.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

242.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

243.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 77

such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

244.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

245.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq*. The President has not done so.

246.    Congress has not conditioned the provision of CoC grants or DOT grants on compliance with a prohibition on all forms of DEI policies and initiatives, nor on promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, and/or cutting off access to information about lawful abortions. Nor has Congress delegated to Defendants the authority to attach the CoC Grant Conditions or the DOT Grant Conditions unilaterally.

247.    By imposing the CoC Grant Conditions and the DOT Grant Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 78

248.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

249.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

250.    For these reasons, HUD's conditioning of CoC grants on compliance with the CoC Grant Conditions violates the separation of powers doctrine.

251.    For the same reasons, DOT Defendants' conditioning of DOT grants on compliance with the DOT Grant Conditions violates the separation of powers doctrine.

## Count 2: Spending Clause
### *(All Grant Conditions)*

252.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

253.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

254.    As described above, Defendants violate the separation of powers because the CoC Grant Conditions and the DOT Grant Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause as well.

255.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 79

256.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

257.    Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* at 210.

258.    Even if Congress had delegated authority to the Executive and HUD to condition CoC grant funding on terms prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions, the grant conditions set forth in the CoC Grant Agreements would violate the Spending Clause by:

   a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

   b.    imposing conditions that are so severe as to be coercive;

   c.    imposing conditions that are not germane to the stated purpose of CoC program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

   d.    with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require CoC grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id.* at 210.

259.    Similarly, even if Congress had delegated authority to the Executive or DOT Defendants to condition transportation, mass transit, highway, airport, and railroad funding on recipients' agreement to terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration or enforcement of federal immigration laws, the DOT Grant Conditions

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 80

would violate the Spending Clause by imposing ambiguous grant conditions and imposing conditions not germane to the purposes of the statutes that authorize the DOT grant programs.

### Count 3: Tenth Amendment
### *(DOT Grant Conditions Only)*

260.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

261.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

262.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012). States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 578.

263.    Even if Congress had delegated authority to the Executive or DOT Defendants to condition transportation, mass transit, highway, airport, and railroad funding on a prohibition on any policy that "promotes" the Administration's conception of an "illegal" DEI program or on participation in the Administration's aggressive enforcement of federal immigration laws, the DOT Grant Conditions would violate the Tenth Amendment by imposing conditions so severe as to coerce plaintiffs receiving such funds to adopt the Administration's reinterpretation of the law. *See id*. at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

### Count 4: Fifth Amendment Due Process (Vagueness)
### *(All Grant Conditions)*

264.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

265.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 81

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

266.    The CoC Grant Conditions and the DOT Grant Conditions are unconstitutionally vague.

267.    Initially, each of the EO Conditions is vague in purporting to incorporate all executive orders. Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients. The purported incorporation of all executive orders into the recipient or sponsor's use of grant funds renders the other new grant conditions vague.

268.    Each of the Discrimination Conditions fails to make clear what conduct is prohibited and fails to specify clear standards for enforcement. This uncertainty is amplified by agency letters and statements, including the Duffy Letter and Turner statements, that are at odds with case law and statutes.

269.    The CoC Enforcement Condition (which incorporates by reference the Immigration Order) fails to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

270.    Similarly, each of the DOT Enforcement Conditions fails to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

271.    Similarly, the FAA Termination Condition does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure, leaving federal grant recipients

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 82

without fair notice of what would trigger termination of their grants.

272.    The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited. By the same token, the Gender Ideology Condition affords unfettered discretion to HUD and other agencies to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

273.    The meaning of the phrase "promote elective abortion" is also vague, leaving federal grant recipients without fair notice of what activities would violate the prohibition and affording HUD and other agencies unfettered discretion.

274.    The vagueness with which the terms and conditions identified above define the conduct they prohibit is likely to chill First Amendment protected expression on matters of public concern.

275.    Thus, the CoC Grant Conditions and the DOT Grant Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious
### *(All Grant Conditions)*

276.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

277.    Defendant HUD and DOT, as well as the DOT OAs (the FTA, the FHWA, the FAA, and the FRA), are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). Additionally, the CoC Grant Agreements, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, the 2025 FRA General Terms and Conditions, and the 2025 DOT SMART General Terms and Conditions are all agency actions subject to review under the

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 83

APA.

278.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

279.    The CoC Grant Agreements are final agency actions of HUD because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal CoC funds. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

280.    Similarly, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, the 2025 FRA General Terms and Conditions, and the 2025 DOT SMART General Terms and Conditions are final agency actions of DOT because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal DOT funds.

281.    These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

282.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 84

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

283.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

284.    HUD has provided no reasoned explanation for its decision to impose conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on CoC funds that have no connection to those issues.

285.    HUD has provided no reasoned basis for withholding funds Congress appropriated for disbursement, except to the extent the CoC Grant Agreements make clear HUD is enacting the President's policy desires, as expressed in Executive Orders 14168, 14173, 14182, and 14218, in place of Congress's intent.

286.    HUD also ignores essential aspects of the "problem" it purports to address via the CoC program, including the CoC Plaintiffs' reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already appropriated funds, and the potential impacts on homeless individuals and families who may be dissuaded from accepting services if they must verify their immigration status or are unable to use their identified gender in doing so.

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

287.    Similarly, neither DOT nor its EOs have provided any reasoned basis for anti-DEI-related conditions to the FTA, FHWA, FAA, FRA, and SMART grants, seeking to impose the Administration's view on all policies and programs, even when they are unrelated to programs receiving such grants. Moreover, DOT and its EOs failed to explain how the DOT Plaintiffs could simultaneously comply with the each of the DOT Discrimination Conditions, while also complying with statutory, regulatory, and other requirements that are in apparent tension with those Conditions.

288.    Nor has DOT or its EOs provided a reasoned basis for imposing conditions related to "cooperation" with federal immigration enforcement on DOT funds that have no connection to that issue.

289.    The DOT and its EOs also have ignored the DOT Plaintiffs' reasonable reliance on awarded, but not yet obligated, funds and the expectation of reimbursement from already appropriated funds.

290.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions and the DOT Grant Conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin DOT Defendants from imposing those Conditions without complying with the APA.

**Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to Constitution**
*(All Grant Conditions)*

291.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

292.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 86

immunity." 5 U.S.C. § 706(2)(B).

293.    As described above, HUD's imposition of the CoC Grant Conditions violates bedrock constitutional provisions and principles including the separation of powers between the President and Congress, the Spending Clause, and the Fifth Amendment.

294.    In addition, the imposition by DOT, including through its OAs, imposition of the DOT Grant Conditions violates the separation of powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

295.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions and the DOT Grant Conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

**Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**In Excess of Statutory Authority**
*(All Grant Conditions)*

296.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

297.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

298.    Defendants may exercise only authority granted to them by statute or the Constitution.

299.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

300.    Neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 87

other legislation authorizes HUD to impose conditions on CoC grant funding related to prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions.

301.    In addition, none of the statutes authorizing the FTA, FHWA, FAA, FRA, and SMART grants, nor the relevant appropriations acts, authorize the DOT or its OAs to impose conditions on transportation, mass transit, highway, airport, or railroad funding related to prohibiting all forms of DEI policies and initiatives or promoting aggressive and lawless immigration enforcement.

302.    Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, DOT attempts to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq.*

303.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions and the DOT Grant Conditions violates the APA because it is in excess of DOT Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin DOT Defendants from imposing those Conditions without complying with the APA.

<u>**Count 8: Administrative Procedure Act, 5 U.S.C. § 706(2)**</u>
<u>**Agency Action Contrary to Regulation**</u>
***(CoC Grant Conditions)***

304.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 88

305.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A).

306.    HUD's Rule implementing the CoC program provides that recipients may be required to sign grant agreements containing terms and additional conditions established by HUD beyond those specifically listed to the extent those terms and conditions are established in the applicable NOFO. 24 C.F.R. § 578.23(c)(12). The NOFO under which the CoC Plaintiffs were awarded CoC funding for FY 2024 contains no terms or conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

307.    By imposing new terms and conditions on the CoC Grant Agreements not included in the NOFO or authorized elsewhere in the Rule or any other regulations, HUD failed to comply with its own regulations governing the formation of CoC grant agreements and failed to observe procedure required by law.

308.    The CoC Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD from imposing the CoC Grant Conditions without complying with the APA.

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 89

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**Count 9: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Without Procedure Required By Law**
***(All Grant Conditions Except FHWA and DOT SMART Grant Conditions)***

309.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

310.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

311.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

312.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

313.    The FTA is subject to statutory notice-and-comment requirements for certain statements pertaining to grants issued under title 49, chapter 53 of the U.S. Code (including the FTA Grants). Specifically, "[t]he Administrator of the [FTA] shall follow applicable rulemaking procedures under section 553 of title 5 before the [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance under this chapter." 49 U.S.C. § 5334(k)(1). For this purpose, "binding obligation" means "a substantive policy statement, rule, or guidance document issued by the [FTA] that grants rights, imposes obligations, produces significant effects on private interests, or effects a significant change in existing policy." *Id.* § 5334(k)(2).

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 90

314.    The FTA, the FAA, and the FRA have also adopted regulations requiring those agencies to proceed by notice-and-comment rulemaking when they promulgate substantive rules. *See* 49 C.F.R. §§ 601.22(a), 601.24–601.28 (FTA); 14 C.F.R. Part 11 (FAA); 49 C.F.R. §§ 211.11–211.33 (FRA).

315.    Through the CoC Grant Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on CoC Grant Agreements that require grant recipients to comply with various Administration directives as a condition to receiving federal CoC funds. These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy. *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules . . . create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

316.    In imposing the CoC Grant Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

317.    Through the FTA Grant Conditions, the FAA Grant Conditions, and the FRA Grant Conditions, the FTA, the FAA, and the FRA have not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new terms and conditions to FTA, FAA, and FRA Grants that require grant recipients to comply with various Administration

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 91

directives as a condition to receiving federal transit, airport, and railroad funds, which are substantive policy statements, rules, or guidance documents that impose obligations or effect significant changes in existing policy, not interpretive rules or general statements of policy.

318.    In imposing the FTA Grant Conditions, the FTA failed to comply with the notice-and-comment requirements set forth in 49 U.S.C. § 5334(k)(1) and its own regulations, and thus failed to observe procedure required by law.

319.    In imposing the FAA Grant Conditions, the FAA failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

320.    In imposing the FRA Grant Conditions, the FRA failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

321.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions, the FTA Grant Conditions, the FAA Grant Conditions, and the FRA Grant Conditions violates the APA because it is without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## VI.    PRAYER FOR RELIEF

WHEREFORE, CoC Plaintiffs request the following relief:

A.    A declaration that the CoC Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.    A preliminary and permanent injunction enjoining HUD from imposing or enforcing the CoC Grant Conditions or any materially similar terms or conditions

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 92

to any CoC funds received by or awarded to, directly or indirectly, those plaintiffs or members of those plaintiffs' Continuums; and

WHEREFORE, DOT Plaintiffs request the following relief:

C.   A declaration that the DOT Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

D.   A preliminary and permanent injunction enjoining DOT Defendants from imposing or enforcing the DOT Grant Conditions or any materially similar terms or conditions to any DOT funds received by or awarded to, directly or indirectly, those plaintiffs; and

WHEREFORE, all Plaintiffs request the following additional relief:

E.   Award Plaintiffs their reasonable costs and attorneys' fees; and

F.   Grant any other further relief that the Court deems fit and proper.

DATED this 21st day of May, 2025.

PACIFICA LAW GROUP LLP

*/s/ Paul J. Lawrence*
Paul J. Lawrence, WSBA #13557
Jamie Lisagor, WSBA #39946
Sarah S. Washburn, WSBA #44418
Meha Goyal, WSBA #56058
Luther Reed-Caulkins, WSBA #62513
*Special Deputy Prosecutors*

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101
T: 206-245-1700
F: 206-245-1750
Paul.Lawrence@PacificaLawGroup.com
Jamie.Lisagor@PacificaLawGroup.com
Sarah.Washburn@PacificaLawGroup.com
Meha.Goyal@PacificaLawGroup.com
Luther.Reed-Caulkins@PacificaLawGroup.com

*Attorneys for All Plaintiffs*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 93

LEESA MANION
King County Prosecuting Attorney

*/s/ David J. Hackett*
David J. Hackett, WSBA #21234
*General Counsel to Executive*
Alison Holcomb, WSBA #23303
*Deputy General Counsel to Executive*
Erin Overbey, WSBA #21907
*Senior Deputy Prosecuting Attorney*
Cristy Craig, WSBA #27451
*Senior Deputy Prosecuting Attorney*
Donna Bond, WSBA #36177
*Senior Deputy Prosecuting Attorney*

Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov
aholcomb@kingcounty.gov
eroverbey@kingcounty.gov
cristy.craig@kingcounty.gov
donna.bond@kingcounty.gov

*Attorneys for Plaintiffs Martin Luther
King, Jr. County*

JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

*/s/ Bridget E. Casey*
Bridget E. Casey, WSBA #30459
Rebecca J. Guadamud, WSBA #39718
Rebecca E. Wendling, WSBA #35887

Snohomish County Prosecuting Attorney's Office
3000 Rockefeller Avenue, M/S 504
Everett, WA 98201-4046
(425) 388-6392
Bridget.Casey@co.snohomish.wa.us
Rebecca.Guadamud@co.snohomish.wa.us
Rebecca.Wendling@co.snohomish.wa.us

*Attorneys for Plaintiff Snohomish County*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 94

1

2   DAVID CHIU
    San Francisco City Attorney
3

4   */s/ David Chiu*
    David Chiu (CA Bar No. 189542)
5   *San Francisco City Attorney*
    Yvonne R. Meré (CA Bar No. 175394)
6   *Chief Deputy City Attorney*
    Mollie M. Lee (CA Bar No. 251404)
7   *Chief of Strategic Advocacy*
    Sara J. Eisenberg (CA Bar No. 269303)
8   *Chief of Complex & Affirmative Litigation*
    Ronald H. Lee (CA Bar No. 238720)
9   *Assistant Chief, Complex & Affirmative Litigation*
    Alexander J. Holtzman (CA Bar No. 311813)
10  *Deputy City Attorney*
    1390 Market Street, 7th Floor
11  San Francisco, CA 94102
    (415) 554-4700
12  Cityattorney@sfcityatty.org
    Yvonne.Mere@sfcityatty.org
13  Mollie.Lee@sfcityatty.org
    Sara.Eisenberg@sfcityatty.org
14  Ronald.Lee@sfcityatty.org
    Alexander.Holtzman@sfcityatty.org
15

16

17  *Attorneys for Plaintiffs City and County of San
    Francisco, San Francisco County Transportation
18  Authority, and Treasure Island Mobility
    Management Agency*
19

20

21  OFFICE OF THE COUNTY COUNSEL,
    COUNTY OF SANTA CLARA
22

23  */s/ Tony LoPresti*
    Tony LoPresti (CA Bar No. 289269)
24  *County Counsel*
    Kavita Narayan (CA Bar No. 264191)
25  *Chief Assistant County Counsel*
    Meredith A. Johnson (CA Bar No. 291018)
26  *Lead Deputy County Counsel*
    Stefanie L. Wilson (CA Bar No. 314899)
27

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 95

Cara H. Sandberg (CA Bar No. 291058)
*Deputy County Counsels*
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
(408) 299-9021
tony.lopresti@cco.sccgov.org
kavita.narayan@cco.sccgov.org
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
cara.sandberg@cco.sccgov.org

*Attorneys for Plaintiff County of Santa Clara*


ADAM CEDERBAUM
Corporation Counsel, City of Boston

*/s/ Samantha H. Fuchs*
Samantha H. Fuchs (MA BBO No. 708216)
*Senior Assistant Corporation Counsel*
Samuel B. Dinning (MA BBO No. 704304)
*Senior Assistant Corporation Counsel*
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
samantha.fuchs@boston.gov
samuel.dinning@boston.gov

*Attorneys for Plaintiff City of Boston*


CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

*/s/ Richard N. Coglianese*
Richard N. Coglianese (OH Bar No. 0066830)
*Assistant City Attorney*
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
(614) 645-0818 Phone
(614) 645-6949 Fax
rncoglianese@columbus.gov

*Attorney for Plaintiff City of Columbus*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 96

PUBLIC RIGHTS PROJECT

*/s/ Sharanya Mohan*
Sharanya (Sai) Mohan (CA Bar No. 350675)
Naomi Tsu (OR Bar No. 242511)
Toby Merrill (MA Bar No. 601071)*
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
sai@publicrightsproject.org
naomi@publicrightsproject.org
toby@publicrightsproject.org

*Counsel for Plaintiffs City of Columbus, City & County of Denver, Metro Government of Nashville & Davidson County, Pima County, County of Sonoma, City of Bend, City of Cambridge, City of Chicago, City of Culver City, City of Minneapolis, City of Pasadena, City of Pittsburgh, City of Portland, City of San José, City of Santa Monica, City of Tucson, City of Wilsonville, and Santa Monica Housing Authority*


MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

*/s/ Doris Bernhardt*
Doris Bernhardt (NY Bar No. 4449385)
Joshua P. Rubin (NY Bar No. 2734051)
Aatif Iqbal (NY Bar No. 5068515)
*Assistant Corporation Counsels*
100 Church Street
New York, NY 10007
(212) 356-1000
dbernhar@law.nyc.gov
jrubin@law.nyc.gov
aiqbal@law.nyc.gov

*Attorneys for Plaintiff City of New York*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 97

ASHLEY M. KELLIHER
Assistant City Attorney

*/s/ Ashley M. Kelliher*
Ashley M. Kelliher (CO Bar No. 40220)*
*Assistant City Attorney*
Denver City Attorney's Office
201 West Colfax Avenue
Denver, Colorado 80202
720-913-3137 (phone)
720-913-3190 (fax)
ashley.kelliher@denvergov.org

DAVID P. STEINBERGER
Assistant City Attorney

*/s/ David P. Steinberger*
David P. Steinberger (CO Bar No. 48530)*
*Assistant City Attorney*
Denver City Attorney's Office
Denver International Airport
8500 Pena Boulevard
Airport Office Building, 9th Floor
Denver, Colorado 80249-6340
303-342-2562 (phone)
david.steinberger@flydenver.com

*Attorneys for Plaintiff City and County of Denver*

LAURA CONOVER
Pima County Attorney

*/s/ Samuel E. Brown*
Samuel E. Brown (AZ Bar No. 027474)*
Bobby Yu (AZ Bar No. 031237)*
Kyle Johnson (AZ Bar No. 032908)*
Pima County Attorney's Office, Civil Division
32 N. Stone, Suite 2100
Tucson, Arizona 85701
Tel: (520) 724-5700
sam.brown@pcao.pima.gov
bobby.yu@pcao.pima.gov
kyle.johnson@pcao.pima.gov

*Attorneys for Plaintiff Pima County*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 98

ROBERT H. PITTMAN, County Counsel

*/s/ Joshua A. Myers*
Joshua A. Myers (CA Bar No. 250988)*
*Chief Deputy County Counsel*
Sonoma County Counsel's Office
575 Administration Drive, Rm. 105A
Santa Rosa, CA 95403
Office: (707) 565-2421
Fax: (707) 565-2624
Joshua.Myers@sonoma-county.org

*Attorneys for Plaintiff County of Sonoma*

OFFICE OF THE CITY ATTORNEY FOR THE
CITY OF BEND

*/s/ Ian M. Leitheiser*
Ian M. Leitheiser (OSB #993106)*
*City Attorney*
Elizabeth Oshel (OSB #104705)*
*Senior Assistant City Attorney*
Michael J. Gaffney (OSB #251680)*
*Senior Assistant City Attorney*
City of Bend
PO Box 431
Bend, OR 97709
(541) 693-2128
ileitheiser@bendoregon.gov
eoshel@bendoregon.gov
mgaffney@bendoregon.gov

*Attorneys for Plaintiff City of Bend*

CITY OF CAMBRIDGE, LAW DEPARTMENT
MEGAN B. BAYER, CITY SOLICITOR

*/s/ Megan B. Bayer*
Megan B. Bayer (MA BBO No. 669494)*
*City Solicitor*
Elliott J. Veloso (MA BBO No. 677292)*
*Deputy City Solicitor*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 99

Diane Pires (MA BBO No. 681713)*
*Assistant City Solicitor*
Cambridge City Hall, 3rd Floor
795 Massachusetts Avenue
Cambridge, MA 02139
(617) 349-4121
mbayer@cambridgema.gov
eveloso@cambridgema.gov
dpires@cambridgema.gov

*Attorneys for Plaintiff City of Cambridge*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

*/s/ Rebecca Hirsch*
Rebecca Hirsch (IL Bar No. 6279592)*
Chelsey Metcalf (IL Bar No. 6337233)*
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-9484
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org

*Attorneys for Plaintiff City of Chicago*

KRISTYN ANDERSON
City Attorney

*/s/ Kristyn Anderson*
Kristyn Anderson (MN Lic. 0267752)*
*City Attorney*
Sara J. Lathrop (MN Lic. 0310232)*
Munazza Humayun (MN Lic. 0390788)*
*Assistant City Attorneys*
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000
kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
munazza.humayun@minneapolismn.gov

*Attorneys for Plaintiff City of Minneapolis*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 100

1    KRYSIA KUBIAK, Esq.
     City Solicitor
2

3    */s/ Julie E. Koren*
     Julie E. Koren (PA Bar No. 309642)*
4    *Associate City Solicitor*
     City of Pittsburgh, Dept. of Law
5    313 City-County Building
     414 Grant Street
6    Pittsburgh, PA 15219
     (412) 255-2025
7    Julie.Koren@pittsburghpa.gov
     Krysia.Kubiak@Pittsburghpa.gov
8

9    *Counsel for Plaintiff City of Pittsburgh*

10

11   ROBERT TAYLOR
     Portland City Attorney
12

13   */s/ Caroline Turco*
     Caroline Turco (OR Bar No. 083813)*
14   *Senior Deputy City Attorney*
     1221 SW Fourth Avenue, Room 430
15   Portland, OR 97204
     Tel: (503) 823-4047
16   Fax: (503) 823-3089
     Caroline.Turco@portlandoregon.gov
17

18   *Attorney for Plaintiff City of Portland*

19   NORA FRIMANN
     City Attorney
20

21   */s/ Nora Frimann*
     Nora Frimann (CA Bar No. 93249)*
22   *City Attorney*
     Elisa Tolentino (CA Bar No. 245962)*
23   *Chief Deputy City Attorney*
     200 E Santa Clara St
24   San José, CA 95113-1905
     Tel: 408-535-1900
25   Fax: 408-998-3131
     cao.main@sanjoseca.gov
26

27   *Attorneys for Plaintiff City of San José*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 101

CITY OF WILSONVILLE

*/s/ Amanda R. Guile-Hinman*
Amanda R. Guile-Hinman, WSBA #46282
29799 SW Town Center Loop E
Wilsonville, OR 97070
guile@wilsonvilleoregon.gov
(503) 570-1509

*Attorneys for the City of Wilsonville*

CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY

*/s/ Andrés Muñoz*
Andrés Muñoz, WSBA #50224

*/s/ Desmond Brown*
Desmond Brown, WSBA #16232

Central Puget Sound Regional Transit Authority
401 S. Jackson St.
Seattle, WA 98104
(206) 665-8989
andres.munoz@soundtransit.org
desmond.brown@soundtransit.org

*Attorneys for the Central Puget Sound Regional
Transit Authority*

LAW, LYMAN, DANIEL, KAMERRER
& BOGDANOVICH, P.S.

*/s/ Jeffrey S. Myers*
Jeffrey S. Myers, WSBA #16390

*/s/ Erin L. Hillier*
Erin L. Hillier, WSBA #42883

*/s/ Jakub Kocztorz*
Jakub Kocztorz, WSBA #61393

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 102

P.O. Box 11880
Olympia, WA 98508
T: (360) 754-3480
F: (360) 357-3511
jmyers@lldkb.com
ehillier@lldkb.com
jkocztorz@lldkb.com

*Attorneys for Plaintiff Intercity Transit*

PORT OF SEATTLE
Anderson & Kreiger LLP

*/s/ Melissa C. Allison*
Melissa C. Allison (MA Bar No. 657470)*
David S. Mackey (MA Bar No. 542277)*
Christina S. Marshall (MA Bar No. 688348)*
Anderson & Kreiger LLP
50 Milk Street, Floor 21
Boston, MA 02109
(617) 621-6500
mallison@andersonkreiger.com
dmackey@andersonkreiger.com
cmarshall@andersonkreiger.com

*Attorneys for Plaintiff Port of Seattle*

KING COUNTY REGIONAL
HOMELESSNESS AUTHORITY

*/s/ Edmund Witter*
Edmund Witter, WSBA #52339
King County Regional Homelessness Authority
400 Yesler Way Suite 600
Seattle, WA 98104
(206) 639-7013
Edmund.witter@kcrha.org

*Attorneys for Plaintiff King County Regional
Homelessness Authority*

*\* Pro Hac Vice application forthcoming*

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 103

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2025, I served a true and correct copy of the Amended Complaint for Declaratory and Injunctive Relief and associated Summonses on the existing parties by the method(s) indicated below:

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants Scott Turner, U.S. Dept. of Housing and Urban Development, Sean Duffy, U.S. Dept. of Transportation, Matthew Welbes, and the Federal Transit Administration* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

I further certify that on May 21, 2025, I served a true and correct copy of the Amended Complaint for Declaratory and Injunctive Relief and associated Summonses on the following parties via certified mail:

| **Summons Directed To:** | **Summons and Amended Complaint Mailed To:** |
|---|---|
| Tariq Bokhari in his official capacity as Acting Administrator of the Federal Transit Administration | Tariq Bokhari, Acting Administrator<br>Federal Transit Administration<br>Office of the General Counsel<br>U.S. Department of Transportation, East Building<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590 |

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 104

| Gloria M. Shepherd in her official capacity as Acting Director of the Federal Highway Administration | Gloria M. Shepherd, Acting Director<br>Federal Highway Administration<br>Office of the General Counsel<br>U.S. Department of Transportation, East Building<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590 |
|---|---|
| Federal Highway Administration | Federal Highway Administration<br>Office of the General Counsel<br>U.S. Department of Transportation, East Building<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590 |
| Chris Rocheleau in his official capacity as Acting Administrator of the Federal Aviation Administration | Chris Rocheleau, Acting Administrator<br>Federal Aviation Administration<br>Office of the Chief Counsel<br>800 Independence Avenue SW<br>Washington, DC 20591 |
| Federal Aviation Administration | Federal Aviation Administration<br>Office of the Chief Counsel<br>800 Independence Avenue SW<br>Washington, DC 20591 |
| Drew Feeley in his official capacity as Acting Administrator of the Federal Railroad Administration | Drew Feeley, Acting Administrator<br>Federal Railroad Administration<br>Office of the Chief Counsel<br>U.S. Department of Transportation<br>1200 New Jersey Ave, SE W-32<br>Washington, DC 20590 |
| Federal Railroad Administration | Federal Railroad Administration<br>Office of the Chief Counsel<br>U.S. Department of Transportation<br>1200 New Jersey Ave, SE W-32<br>Washington, DC 20590 |

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 21st day of May, 2025.

/s/ Gabriela DeGregorio
Gabriela DeGregorio
Litigation Assistant
Pacifica Law Group LLP

AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF - 105