THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR.
COUNTY, et al.,

                    Plaintiffs,

   v.

SCOTT TURNER in his official capacity
as Secretary of the U.S. Department of
Housing and Urban Development, et al.,

              Defendants.

No. 2:25-cv-00814-BJR

DECLARATION OF
JASCHA FRANKLIN-HODGE

I, JASCHA FRANKLIN-HODGE declare as follows:

1.  I am a resident of the State of Massachusetts. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I have been employed as the Chief of the Streets Cabinet of the City of Boston since 2022. In this capacity, I oversee both the City of Boston's Public Works and Transportation Departments. Prior to my role as Chief of the Streets Cabinet, I served as the Executive Director of the Open Mobility Foundation. From 2014 to 2018, I served as the Chief Information Officer for the City of Boston, supervising the Department of Innovation and Technology.

DECLARATION OF JASCHA FRANKLIN-HODGE- 1
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

3. In my capacity as Chief of Streets, I lead the Boston Streets Cabinet, including the Transportation Department ("BTD") and the Public Works Department ("PWD"), in planning, building, and operating our 802 miles of streets in a safe and effective manner for all Bostonians. BTD's Policy and Planning Division, Engineering Team, Operations Team, and PWD's Infrastructure and Design Team all work in tandem to promote ease of access and safety in both residential areas and commercial corridors. The Cabinet's care of the streets stems from its desire to foster the highest quality of life for all those living in, working in, and visiting Boston.

4. As a component of this work, the City of Boston has sought out federal funding for infrastructure projects. Since FY2022, the City of Boston has applied and been selected for eight direct grants from the United States Department of Transportation ("USDOT"). These grants include: the Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") Grant Program; the Safe Streets and Roads for All ("SS4A") Grant Program; the Charging and Fueling Infrastructure Grant Program; the Strengthening Mobility and Revolutionizing Transportation ("SMART") Grant Program; and the Reconnecting Communities Pilot ("RCP") Grant Program. The City of Boston has also acted as a subrecipient for additional federal grants. Some of these grant programs, including SS4A and RCP, awarded several grants to the City of Boston over the FY2022-2025 period.

5. These eight grants alone, excluding additional grants where Boston is a subrecipient, total over $67 million in USDOT funds, administered by both the Federal Highway Administration ("FHWA") and Federal Transit Administration ("FTA").

DECLARATION OF JASCHA FRANKLIN-HODGE- 2
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Docusign Envelope ID: 9614C618-769E-4F23-9881-914C5D827B48

6.  Each of these grants were applied for and awarded through competitive grant programs. These funds provide support for key infrastructure projects, pedestrian, cyclist, and driver safety improvements, and important connectivity upgrades. These are investments in City streets and infrastructure that serve as the foundation of Boston's economy and of the ties among Boston's neighborhoods.

7.  The City of Boston applied for and was awarded a FY2022 RAISE Grant for $20 million. This grant provides funding needed to reconstruct three major corridors within a historically underserved neighborhood of Boston. This reconstruction will add bus priority measures, fully accessible sidewalks and curb ramps, pedestrian safety improvements, upgraded traffic signals, bus shelters, separated bicycle facilities, intersection improvements, increased tree canopy, green infrastructure, and stormwater improvements. The RAISE grant provides for the majority of the funding for the $32.5 million project, which will impact thousands of lives on a daily basis by improving safety and transit outcomes. Under its RAISE Award Letter, attached hereto as **Exhibit A**, the funds must be obligated by September 30, 2026.

8.  Though the City of Boston has yet to receive a finalized grant agreement for this FY2022 award, the RAISE General Terms and Conditions for FY2022, revised on April 23, 2025, contain new terms and conditions that were not contained in the FY2022 Notice of Funding Opportunity ("NOFO"). See RAISE General Terms and Conditions for FY2022, revised on April 23, 2025, and associated exhibits attached hereto as **Exhibit B**.

9.  Without this funding, the City of Boston will not be able to complete the project within the timeframe set out in the grant. In order to obligate funds by Sept. 30, 2026,

DECLARATION OF JASCHA FRANKLIN-HODGE- 3
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Boston needs to finalize construction designs, procure contractors, and negotiate contracts with multiple vendors, a process which normally requires at least a year. Boston cannot responsibly begin this process without assurances that it will receive the RAISE funds that will be used to satisfy these vendor contracts.

10. This project is integral to improving residential quality of life in the neighborhood by creating safer connections to Massachusetts Bay Transportation Authority ("MBTA") Rapid Transit Stations, providing more comfortable bus shelters, and improving bus service to better serve a historically-disadvantaged community.

11. In FY2022, the City of Boston also applied and was selected for a $9 million award from the SS4A Grant Program. The grant, effective as of July 3, 2024, provides for safety improvements for nine key intersections across five neighborhoods in the City. These improvements address speeding, pedestrian crashes, and increasing visibility.

12. On July 3, 2024, the FHWA executed a grant agreement with the City of Boston, noting that the General Terms and Conditions for the grant, dated March 17, 2024, applied to the grant. See FHWA SS4A FY2022 Grant Agreement, attached hereto as **Exhibit C**. Though the City of Boston has not yet been specifically provided an updated version of the General Terms and Conditions associated with the grant, the USDOT website notes that "new versions of the Terms and Conditions are added to this page as they are made available - the most recent version applies." The FY2022 General Terms and Conditions were revised on March 17, 2025, and contain new terms and conditions that were not contained in the FY2022 NOFO. See FY2022 SS4A General Terms and Conditions, revised on March 17, 2025, and associated

DECLARATION OF JASCHA FRANKLIN-HODGE- 4
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exhibits attached hereto as **Exhibit D**. Similarly, the City of Boston must sign

certifications and assurances for this grant on an annual basis.

13. In FY2023, the City of Boston again applied and was selected for a grant from the

SS4A program. The FY2023 grant provided $14.4 million for signal improvements at

approximately 50 locations, which would enhance safety and reduce conflicts

between vehicles, bikes, and pedestrians across the City. More than 70% of the 50

identified priority intersections are located along the Boston High Crash Network, a

group of City streets that have the highest density of fatal and serious injury crashes

over a defined time period.

14. Though the USDOT has yet to send the City of Boston a finalized grant agreement

for FY2023, the SS4A General Terms and Conditions for FY2023, revised on March

17, 2025, contain new terms and conditions that were not contained in the FY2023

NOFO. See FY2023 SS4A General Terms and Conditions, revised on March 17,

2025, and associated exhibits attached hereto as **Exhibit E**.

15. Similarly, in FY2024, the City of Boston applied and was selected for an award from

the SS4A Grant Program. The FY2024 award grants $2,832,532.00 to the City of

Boston for a project to pilot quick-build interventions to improve street safety in East

Boston.

16. Though USDOT has yet to send a finalized grant agreement to the City of Boston for

FY2024, the SS4A General Terms and Conditions for FY2024, revised on March 17,

2025, contain new terms and conditions that were not contained in the FY2024

NOFO. See FY2024 SS4A General Terms and Conditions, revised on March 17,

2025, and associated exhibits attached hereto as **Exhibit F**.

DECLARATION OF JASCHA FRANKLIN-HODGE- 5
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Docusign Envelope ID: 9614C618-769E-4E23-0BB1-014C5D827B48

17. Without the SS4A grants, which total over $26 million, the City of Boston will be unable to complete these essential safety projects without significant delay. These projects are targeted to enhance the safety for residents, workers, and visitors in many of the most-traveled corridors in the City and are necessary to maintain and better the City of Boston's streets. The new grant terms create uncertainty as to application. In order to proceed with the complex construction projects these funds were approved to support, the City must have a stable, confirmed source of funding. The grant terms undercut that. This unpredictability even undermines the certainty of the City of Boston's signed SS4A FY2022 grant agreement, given the potential for an amendment with new terms or new certifications and assurances.

18. For FY2022-2023, the City of Boston also applied and was selected for a Charging and Fueling Infrastructure grant for $15 million. The grant will fund the installation of 300 Level II and III EV charging stations and other alternative fueling infrastructure in multiple communities. USDOT has not yet sent the City of Boston a finalized grant agreement for this project. In the event that the terms provided by the federal government create similar uncertainties in application of those terms, the City may be unable to move forward with the funding. The unpredictability injected into these complex road-safety projects through new grant terms hinders the City of Boston's ability to complete such projects. Specifically, the City is unable to provide stability to its partners in this work, including vendors and other governmental entities. If this occurs for this project, the City of Boston's efforts to make electric vehicle charging conveniently accessible across the City would be severely curtailed,

DECLARATION OF JASCHA FRANKLIN-HODGE- 6
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Docusign Envelope ID: 9614C618-769E-4F27-9881-014C5D827B48

1    thus limiting vehicle choice for our residents. The City of Boston would be unable to

2    complete this project without the promised funding.

3    19. In FY2023, the City of Boston applied and was selected for a SMART Grant Program

4    award. The SMART award provides $1,983,872.00 to the City of Boston for

5    developing a curb data inventory, which can support future policy decisions,

6    including around EV charging stations, increasing our tree canopy, implementing

7    green infrastructure, and mitigating climate change through curb management by

8    installing dedicated bus and bike lanes and short-term pickup zones. The City of

9    Boston and the FHWA have an executed grant agreement, for the period of July 15,

10   2024, through February 14, 2026. In the event that the federal government seeks to

11   amend the terms of the SMART grant, such as by adding grant conditions that are too

12   vague for the City to certify compliance, as the federal government has put forward

13   with respect to other similar grants, the City of Boston may be unable to access the

14   funds. If the City is unable to access these funds, the City of Boston will suffer

15   significant setbacks in its efforts to create comprehensive change in City streets

16   through data management.

17   20. In FY2022, the City of Boston applied and was selected for an award from the RCP

18   Grant Program. The FY2022 award, for $1.8 million, assists the City of Boston in

19   assessing the feasibility of reconnecting the Chinatown neighborhood, which was

20   separated from other core neighborhoods in Boston by the construction of highway I-

21   90. The City of Boston has an executed grant agreement with the FHWA for this

22   award. See FY2022 FHWA RCP Grant Agreement, attached hereto as **Exhibit G**.

DECLARATION OF JASCHA FRANKLIN-HODGE- 7
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

21. Similarly, in FY2024, the City of Boston applied and was selected for a $2 million grant from the RCP Grant Program. The FY2024 grant will help the City to reconstruct a block of Cummins Highway from Fairway Street to Mattapan Square, enabling youth, families, and older adults to safely get to schools, churches, senior centers, small businesses, and Matttapan Station. Over 3,000 people board buses and trolleys at Mattapan Station every day. USDOT has not yet provided the City of Boston with a final FY2024 RCP grant agreement.

22. It is unclear whether or not the federal government will seek to amend or change the terms of the RCP funds. In the event that the federal government seeks to impose similar vague terms, the City of Boston will not be able to access the RCP funds. If the City of Boston is unable to utilize the RCP funds awarded to it in FY2022 and FY2024 for these projects, the City of Boston will not be able to move forward with either project in the same timeframe. This delay will undoubtedly cause economic impacts and safety repercussions to both of the affected neighborhoods.

23. In FY2024, the City of Boston applied for a Congestion Relief Grant in tandem with the Metropolitan Area Planning Council ("MAPC"), the Massachusetts Department of Transportation ("MassDOT"), and a coalition of transportation management associations. The group was selected for an award of $21.6 million, of which the City of Boston will be a subrecipient of a portion of the funds. This grant will reduce congestion in Greater Boston by expanding the number of bicycle sharing Bluebikes and Bluebikes stations, and adding several new shuttle routes to supplement MBTA service.

DECLARATION OF JASCHA FRANKLIN-HODGE- 8
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

24. If the City is unable to move forward with the funding, the City of Boston and its partners will be unable to complete the project in the same timeframe. Instead, Greater Boston will likely encounter greater congestion, creating additional impacts on residential quality of life and commercial progress.

25. In FY2021, the City of Boston, in connection with the MBTA, applied and was selected for a $15 million RAISE grant. The RAISE grant was awarded to redesign Blue Hill Avenue to better serve bus riders, create safe conditions for pedestrians and drivers, increase the tree canopy, and install new amenities for a more vibrant small business corridor. Ultimately, the City requested that the FTA transfer the $15 million in RAISE funds to the MBTA for delivery of high-quality bus priority infrastructure, a key component of the project. If these funds are not accessible, the project will be delayed indefinitely. The project contemplates substantial changes to a heavily-traveled corridor of the City where an estimated 37,000 riders board public transit each weekday. These changes will improve service to these riders, while also addressing safety and crucial pedestrian and vehicle infrastructure needs.

26. In FY2023, the City of Boston applied for and was awarded Congestion Mitigation and Air Quality Improvement Program ("CMAQ") funding through the Boston Region Metropolitan Planning Organization's Regional Target Program. The City of Boston received $816,000 to purchase 610 e-bikes to add to the Region's public bikeshare system. Though the funding is administered by MAPC on MassDOT's behalf, if the City were not able to access these funds, the City of Boston would suffer additional setbacks in making this investment, impacting transportation access, traffic congestion, air quality, and progress towards Boston's climate goals.

DECLARATION OF JASCHA FRANKLIN-HODGE- 9
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

27. In FY2023, the City of Boston, in partnership with the City of Chelsea, applied and was selected for a Reconnecting Communities and Neighborhoods Grant Program grant. The grant, for $2.5 million, is for greening Chelsea Creek Waterfront by planning and designing a critical walking and biking connection between the Mary Ellen Welch Greenway in East Boston and the Chelsea Greenway in Chelsea. Both communities have been disproportionately impacted by environmental challenges. If the City is unable to access the funds, the City of Boston and its partners will be unable to advance the project in the same timeframe.

28. The City of Boston is dedicated to building and maintaining its 802 miles of streets in a manner that supports continued economic growth and maximizes the quality of life for residents, workers, and visitors across the City. Each of these federal grants are integral to achieving those goals and making Boston's streets as safe and efficient as possible. Without these funds, the City of Boston will face serious and dire consequences for pedestrian, cyclist, and vehicle safety. In addition, residents and businesses will experience the negative effects of lost person-hours due to traffic and congestion delays, slower and less reliable transit service, diminished air quality, and reduced mobility.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 19th day of May, 2025.

Signed by:

Jascha Franklin-Hodge

77F5EA73792449D...

JASCHA FRANKLIN-HODGE

DECLARATION OF JASCHA FRANKLIN-HODGE- 10
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

**CERTIFICATE OF SERVICE**

2

3    I hereby certify that on May 21, 2025, I served a true and correct copy of the foregoing

4    document on the following parties by the method(s) indicated below:

5

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants Scott Turner, U.S. Dept. of Housing and Urban Development, Sean Duffy, U.S. Dept. of Transportation, Tariq Bokhari, the Federal Transit Administration, Gloria M. Shepherd, the Federal Highway Administration, Chris Rocheleau, the Federal Aviation Administration, Drew Feeley, the Federal Railroad Administration* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

19    I declare under penalty of perjury under the laws of the United States and the State of

20    Washington that the foregoing is true and correct.

21

22    DATED this 21st day of May, 2025.

23    /s/ Gabriela DeGregorio

24    Gabriela DeGregorio
     Litigation Assistant

25    Pacifica Law Group LLP

26

27

CERTIFICATE OF SERVICE

Franklin-Hodge Ex. A



**U.S. Department of Transportation**

1200 New Jersey Avenue SE
Washington, DC  20590

**Project Name: Roxbury Resilient Transportation Corridors**
**Applicant: City of Boston**
**RAISE Grant Funding:**  $20,000,000 - This award is less than the $25,000,000 requested because the project sponsor will complete the original project scope through additional non-RAISE funding contributions, as documented in a confirmation email.
**Estimated Total Project Costs:** $33,997,896
**Project Description:** This project will reconstruct and upgrade three corridors in the Roxbury neighborhood of Boston, including a 0.88-mile section of Melnea Cass Boulevard; a 0.46-mile section of Malcolm X Boulevard; and a 1.28-mile section of Warren Street. The project will construct dedicated bus corridors, including with a center running dedicated bus lane, new sidewalks, bus shelters, separated bicycle facilities, intersection improvements, green infrastructure, stormwater improvements, and resiliency features.

**Congratulations!** The project above was selected to receive an FY 2022 RAISE grant.

The USDOT Operating Administration overseeing your project will contact you in September regarding next steps to complete the relevant requirements before executing a grant agreement.

This letter DOES NOT authorize the applicant to incur costs to carry out the project. The execution of the grant agreement will obligate RAISE grant funding, making it available to reimburse eligible expenses for the awarded project. Unless authorized by USDOT in writing, any costs incurred prior to that obligation of funds for a project (i.e., "pre-award costs") are ineligible for reimbursement and may be ineligible to count towards non-Federal match requirements. This letter DOES NOT authorize pre-award costs to be eligible. The Department expects all RAISE funding be obligated by September 30, 2026 and expended by September 30, 2031.

If you have any questions about this award, please contact the RAISE Grants Team at
raisegrants@dot.gov

Sincerely,

John Augustine

Director, Office of Infrastructure Finance and Innovation
Office of the Secretary

Franklin-Hodge Ex. B

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2022 REBUILDING AMERICAN INFRASTRUCTURE WITH
SUSTAINABILITY AND EQUITY (RAISE) GRANT PROGRAM:
FTA PROJECTS**

Revision date: April 23, 2025

**Table of Contents**

Article 1 Purpose.............................................................................................................. 6
   1.1   Purpose. ......................................................................................................... 6
Article 2 USDOT ROLE ............................................................................................... 6
   2.1   Division of USDOT Responsibilities. ........................................................... 6
   2.2   USDOT Program Contacts. ............................................................................ 7
Article 3 RECIPIENT ROLE ........................................................................................ 7
   3.1   Statements on the Project. .............................................................................. 7
   3.2   Statements on Authority and Capacity. .......................................................... 7
   3.3   USDOT Reliance. .......................................................................................... 8
   3.4   Project Delivery. ............................................................................................ 8
   3.5   Rights and Powers Affecting the Project. ...................................................... 8
   3.6   Notification of Changes to Key Personnel. ................................................... 8
Article 4 AWARD AMOUNT, OBLIGATION, AND TIME PERIODS .................. 9
   4.1   Federal Award Amount. ................................................................................. 9
   4.2   Federal Funding Source. ................................................................................ 9
   4.3   Federal Obligations. ...................................................................................... 9
   4.4   Budget Period. ............................................................................................... 9
   4.5   Period of Performance. .................................................................................. 9
Article 5 STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ....... 10
   5.1   Notification Requirement. ............................................................................ 10
   5.2   Scope and Statement of Work Changes. ..................................................... 10
   5.3   Schedule Changes. ....................................................................................... 10
   5.4   Budget Changes. .......................................................................................... 10
   5.5   USDOT Acceptance of Changes. ................................................................ 11
Article 6 GENERAL REPORTING TERMS ............................................................. 12
   6.1   Report Submission. ...................................................................................... 12
   6.2   Alternative Reporting Methods. ................................................................... 12
   6.3   Paperwork Reduction Act Notice. ............................................................... 12
Article 7 PROGRESS AND FINANCIAL REPORTING ......................................... 12
   7.1   Quarterly Project Progress Reports and Recertifications. ........................... 12
   7.2   Final Progress Reports and Financial Information. ..................................... 12
Article 8 PERFORMANCE REPORTING ................................................................. 13
   8.1   Baseline Performance Measurement. .......................................................... 13
   8.2   Post-construction Performance Measurement. ............................................ 13
   8.3   Project Outcomes Report. ............................................................................ 13
   8.4   Performance Reporting Survival. ................................................................ 14
Article 9 NONCOMPLIANCE AND REMEDIES ..................................................... 14
   9.1   Noncompliance Determinations. .................................................................. 14
   9.2   Remedies. ..................................................................................................... 15
   9.3   Other Oversight Entities. ............................................................................. 15
Article 10 AGREEMENT TERMINATION ............................................................... 15
   10.1   USDOT Termination. ................................................................................. 15
   10.2   Closeout Termination. ................................................................................ 16
   10.3   Post-Termination Adjustments. .................................................................. 16

10.4   Non-Terminating Events. ............................................................................. 16
10.5   Other Remedies. ......................................................................................... 17
Article 11 MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS.... 17
11.1   Recipient Monitoring and Record Retention. ............................................ 17
11.2   Financial Records and Audits. ................................................................... 17
11.3   Internal Controls. ...................................................................................... 18
11.4   USDOT Record Access. ............................................................................ 18
Article 12 CONTRACTING AND SUBAWARDS ............................................................... 18
12.1   Minimum Wage Rates. ............................................................................. 18
12.2   Buy America. ............................................................................................. 18
12.3   Small and Disadvantaged Business Requirements. .................................... 18
12.4   Engineering and Design Services. .............................................................. 19
12.5   Foreign Market Restrictions. .................................................................... 19
12.6   Prohibition on Certain Telecommunications and Video Surveillance Services or
       Equipment. ................................................................................................. 19
12.7   Pass-through Entity Responsibilities. ......................................................... 19
12.8   Subaward and Contract Authorization. ..................................................... 19
Article 13 COSTS, PAYMENTS, AND UNEXPENDED FUNDS ....................................... 20
13.1   Limitation of Federal Award Amount. ...................................................... 20
13.2   Projects Costs. ........................................................................................... 20
13.3   Timing of Project Costs. ............................................................................ 20
13.4   Recipient Recovery of Federal Funds. ...................................................... 20
13.5   Unexpended Federal Funds. ...................................................................... 20
13.6   Timing of Payments to the Recipient. ....................................................... 20
13.7   Payment Method. ...................................................................................... 20
13.8   Information Supporting Expenditures. ....................................................... 21
13.9   Reimbursement Request Timing Frequency. ............................................ 21
Article 14 LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY ....................... 21
14.1   Liquidation of Recipient Obligations. ....................................................... 21
14.2   Funds Cancellation. ................................................................................... 21
Article 15 AGREEMENT MODIFICATIONS ...................................................................... 22
15.1   Bilateral Modifications. ............................................................................. 22
15.2   Unilateral Contact Modifications. ............................................................. 22
15.3   USDOT Unilateral Modifications. ............................................................ 22
15.4   Other Modifications. ................................................................................. 22
Article 16 RESERVED ....................................................................................................... 22
Article 17 RESERVED ....................................................................................................... 22
Article 18 LABOR AND WORK ........................................................................................ 23
18.1   Labor and Work. ....................................................................................... 23
Article 19 FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL
POLICY REQUIREMENTS ................................................................................................ 23
19.1   Uniform Administrative Requirements for Federal Awards. ...................... 23
19.2   Federal Law and Public Policy Requirements. .......................................... 23
19.3   Federal Freedom of Information Act. ........................................................ 23
19.4   History of Performance. ............................................................................. 24
19.5   Whistleblower Protection. ......................................................................... 24
19.6   External Award Terms and Obligations. .................................................... 24

19.7   Incorporated Certifications...................................................................... 24
Article 20 ASSIGNMENT................................................................................... 25
20.1   Assignment Prohibited............................................................................ 25
Article 21 WAIVER ............................................................................................ 25
21.1   Waivers.................................................................................................... 25
Article 22 ADDITIONAL TERMS AND CONDITIONS................................. 25
22.1   Effect of Urban or Rural Designation. .................................................. 25
22.2   Effect of Historically Disadvantaged Community or Area of Persistent Poverty
          Designation............................................................................................. 25
22.3   Disclaimer of Federal Liability. ............................................................. 26
22.4   Relocation and Real Property Acquisition.............................................. 26
22.5   Equipment Disposition............................................................................ 26
22.6   Environmental Review. ........................................................................... 26
22.7   Federal Transit Program Requirements................................................... 27
Article 23 MANDATORY AWARD INFORMATION .................................... 28
23.1   Information Contained in a Federal Award............................................. 28
23.2   Federal Award Identification Number..................................................... 29
23.3   Recipient's Unique Entity Identifier. ..................................................... 29
Article 24 CONSTRUCTION AND DEFINITIONS ....................................... 29
24.1   Schedules................................................................................................. 29
24.2   Exhibits.................................................................................................... 29
24.3   Construction............................................................................................. 29
24.4   Integration................................................................................................ 30
24.5   Definitions................................................................................................ 30
Article 25 AGREEMENT EXECUTION AND EFFECTIVE DATE ............... 31
25.1   Counterparts. ........................................................................................... 31
25.2   Effective Date.......................................................................................... 31

## <u>Index of Definitions</u>

Administering Operating Administration .......................................................................... 7

Environmental Review Entity .......................................................................................... 26

Federal Share................................................................................................................... 11

FTA .................................................................................................................................... 7

General Terms and Conditions ....................................................................................... 30

NOFO ................................................................................................................................ 6

OMB ................................................................................................................................ 12

Program Statute .............................................................................................................. 30

Project ............................................................................................................................. 30

Project Closeout ............................................................................................................. 16

Project Cost Savings ...................................................................................................... 11

RAISE Grant ................................................................................................................... 30

Recipient................................................................................................Project-Specific Recitals

Technical Application ..................................................................................................... 30

USDOT .............................................................................................................................. 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), and the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022) appropriated funds to the United States Department of Transportation (the "**USDOT**") for fiscal year 2022 under the heading "National Infrastructure Investments." The funds are available to carry out 49 U.S.C. 6702 by providing Federal financial assistance for surface transportation infrastructure projects that will have a significant local or regional impact. The USDOT program administering those funds is the RAISE grant program.

On January 14, 2022, the USDOT posted a funding opportunity at Grants.gov with funding opportunity title "FY 2022 National Infrastructure Investments" and funding opportunity number DTOS59-22-RA-RAISE. The notice of funding opportunity posted at Grants.gov, as amended on March 22, 2022, (the "**NOFO**") solicited applications for Federal financial assistance under the fiscal year 2022 RAISE grant program. On August 11, 2022, the USDOT announced application selections under the NOFO.

These general terms and conditions are incorporated by reference in a project-specific agreement under the fiscal year 2022 RAISE grant program. The term "Recipient" is defined in the project-specific portion of the agreement. The project-specific portion of the agreement includes schedules A through H. The project-specific portion of the agreement may include special terms and conditions in project-specific articles.

## ARTICLE 1
## PURPOSE

1.1     **Purpose.**

The purpose of this award is to fund an eligible project that will have a significant local or regional impact and improve transportation infrastructure. The parties will accomplish that purpose by achieving the following objectives:

(1)     timely completing the Project; and

(2)     ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule D.

## ARTICLE 2
## USDOT ROLE

2.1     **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is responsible for the USDOT's overall administration of the RAISE grant program, the approval of this agreement, and any modifications to this agreement under section 15.1.

(b) The Federal Transit Administration ("**FTA**") will administer this agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FTA.

**2.2    USDOT Program Contacts.**

RAISE Transportation Program Manager
Federal Transit Administration
1200 New Jersey Avenue SE
Washington, DC 20590

and

OST RAISE Grants Coordinator
United States Department of Transportation
Office of the Secretary
1200 New Jersey Avenue SE
Room W84-227
Washington, DC 20590
(202) 366-8914
BUILDGrants@dot.gov

**ARTICLE 3
RECIPIENT ROLE**

**3.1    Statements on the Project.**

The Recipient states that:

(1)    all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)    schedule E documents all material changes in the information contained in that application.

**3.2    Statements on Authority and Capacity.**

The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the total eligible project costs listed in section 3 of schedule D and the RAISE Grant Amount listed in section 1 of schedule D is committed to fund the Project;

(5)     it has sufficient funds available to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)     the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 3 and in section 19.7 on behalf of the Recipient.

**3.3    USDOT Reliance.**

The Recipient acknowledges that:

(1)     the USDOT relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)     the USDOT relied on statements of fact in both the Technical Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)     the USDOT relied on statements of fact in both the Technical Application and this agreement to establish the terms of this agreement; and

(4)     the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4    Project Delivery.**

(a)  The Recipient shall complete the Project under the terms of this agreement.

(b)  The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to projects of the Administering Operating Administration.

**3.5    Rights and Powers Affecting the Project.**

(a)  The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b)  The Recipient shall act promptly, in a manner acceptable to the USDOT, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**3.6    Notification of Changes to Key Personnel.**

The Recipient shall notify all USDOT representatives who are identified in section 5 of schedule A in writing within 30 calendar days of any change in key personnel who are identified in section 4 of schedule A.

## ARTICLE 4
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1     Federal Award Amount.**

The USDOT hereby awards a RAISE Grant to the Recipient in the amount listed in section 1 of schedule D as the RAISE Grant Amount.

**4.2     Federal Funding Source.**

(a) If section 4 of schedule F identifies the Funding Act as "IIJA," then the RAISE Grant is from RAISE grant program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021).

(b) If section 4 of schedule F identifies the Funding Act as "FY2022," then the RAISE Grant is from RAISE grant program funding that was appropriated in the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022).

(c) If section 4 of schedule F contains a table that lists separate amounts for "IIJA" and "FY2022," then the amount listed for "IIJA" is from RAISE grant program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021) and the amount listed for "FY2022" is from RAISE grant program funding that was appropriated in the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022).

**4.3     Federal Obligations.**

This agreement obligates for the budget period the amount listed in section 1 of schedule D as the RAISE Grant Amount.

**4.4     Budget Period.**

The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 1 of schedule C. In this agreement, "budget period" is used as defined at 2 CFR 200.1.

**4.5     Period of Performance.**

The period of performance for this award begins on the date of this agreement and ends on the period of performance end date that is listed in section 1 of schedule C. In this agreement, "period of performance" is used as defined at 2 CFR 200.1.

## ARTICLE 5
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1    Notification Requirement.**

The Recipient shall notify all USDOT representatives who are identified in section 5 of schedule A in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 5.1 is separate from any requirements under this article 5 that the Recipient request modification of this agreement.

**5.2    Scope and Statement of Work Changes.**

If the Project's activities differ from the activities described in schedule B, then the Recipient shall request a modification of this agreement to update schedule B.

**5.3    Schedule Changes.**

If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this agreement to update schedule C:

(1)    a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 2 of schedule C;

(2)    a schedule change would require the budget period to continue after the final budget period end date listed in section 1 of schedule C (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phase, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements); or

(3)    a schedule change would require the period of performance to continue after the period of performance end date listed in section 1 of schedule C.

For other schedule changes, the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

**5.4    Budget Changes.**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient shall request a modification of this agreement to update schedule D if, in

comparing the Project's budget to the amounts listed in section 3 of schedule D:

(1)    the total "Non-Federal Funds" amount decreases; or

(2)    the total eligible project costs amount decreases.

(c)    For budget changes that are not identified in section 5.4(b), the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

(d)    If there are Project Cost Savings, then the Recipient may propose to the USDOT, in writing consistent with the Administering Operating Administration's requirements, to include in the Project specific additional activities that are within the scope of this award, as defined in section 1.1 and schedule B, and that the Recipient could complete with the Project Cost Savings.

In this agreement, "**Project Cost Savings**" means the difference between the actual eligible project costs and the total eligible project costs that are listed in section 3 of schedule D, but only if the actual eligible project costs are less than the total eligible project costs that are listed in section 3 of schedule D. There are no Project Cost Savings if the actual eligible project costs are equal to or greater than the total eligible project costs that are listed in section 3 of schedule D.

(e)    If there are Project Cost Savings and either the Recipient does not make a proposal under section 5.4(d) or the USDOT does not accept the Recipient's proposal under section 5.4(d), then:

(1)    in a request under section 5.4(b), the Recipient shall reduce the Federal Share by the Project Cost Savings; and

(2)    if that modification reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall refund to the USDOT the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the total "RAISE Funds" and "Other Federal Funds" amounts that are listed in section 3 of schedule D.

(f)    The Recipient acknowledges that amounts that are required to be refunded under section 5.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR part 901).

**5.5    USDOT Acceptance of Changes.**

The USDOT may accept or reject modifications requested under this article 5, and in doing so may elect to consider only the interests of the RAISE grant program and the USDOT. The Recipient acknowledges that requesting a modification under this article 5 does not amend, modify, or supplement this agreement unless the USDOT accepts that modification request and the parties modify this agreement under section 15.1.

**ARTICLE 6**
**GENERAL REPORTING TERMS**

**6.1    Report Submission.**

The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 5 of schedule A and all USDOT contacts who are listed in section 2.2.

**6.2    Alternative Reporting Methods.**

The Administering Operating Administration may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the Administering Operating Administration.

**6.3    Paperwork Reduction Act Notice.**

Under 5 CFR 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2105- 0563.

**ARTICLE 7**
**PROGRESS AND FINANCIAL REPORTING**

**7.1    Quarterly Project Progress Reports and Recertifications.**

On or before the 20th day of the first month of each calendar year quarter and until the end of the budget period, the Recipient shall submit to the USDOT a Quarterly Project Progress Report and Recertification in the format and with the content described in exhibit C. If the date of this agreement is in the final month of a calendar year quarter, then the Recipient shall submit the first Quarterly Project Progress Report and Recertification in the second calendar year quarter that begins after the date of this agreement.

**7.2    Final Progress Reports and Financial Information.**

No later than 120 days after the end of the budget period, the Recipient shall submit

(1)    a Final Project Progress Report and Recertification in the format and with the content described in exhibit C for each Quarterly Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2)    any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 8
## PERFORMANCE REPORTING

**8.1    Baseline Performance Measurement.**

If the Capital-Planning Designation in section 2 of schedule F is "Capital," then:

(1)     the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in schedule G, accurate as of the Baseline Measurement Date that is identified in schedule G; and

(2)     on or before the Baseline Report Date that is stated in schedule G, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 8.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in schedule G.

**8.2    Post-construction Performance Measurement.**

If the Capital-Planning Designation in section 2 of schedule F is "Capital," then

(1)     for each performance measure that is identified in the Performance Measure Table in schedule G with quarterly measurement frequency, for each of 12 consecutive calendar quarters, beginning with the first calendar quarter that begins after the Project revenue service date, at least once during the quarter, the Recipient shall collect data for that performance measure;

(2)     for each performance measure that is identified in the Performance Measure Table in schedule G with annual measurement frequency, the Recipient shall collect data for that performance measure on at least three separate occasions: (i) once during the four consecutive calendar quarters that begin after the Project revenue service date; (ii) once during the fourth calendar quarter after the first collection; and (iii) once during the eighth calendar quarter after the first collection; and

(3)     not later than January 31 of each year that follows a calendar year during which data was collected under this section 8.2, the Recipient shall submit to the USDOT a Post-construction Performance Measurement Report containing the data collected under this section 8.2 in the previous calendar year and stating the dates when the data was collected.

If an external factor significantly affects the value of a performance measure collected under this section 8.2, then the Recipient shall identify that external factor in the Post-construction Performance Measurement Report and discuss its influence on the performance measure.

**8.3    Project Outcomes Report.**

If the Capital-Planning Designation in section 2 of schedule F is "Capital," then the Recipient shall submit to the USDOT, not later than January 31 of the year that follows the

final calendar year during which data was collected under  section 8.2, a Project Outcomes Report that contains:

(1)     a narrative discussion detailing project successes and the influence of external factors on project expectations;

(2)     all baseline and post-construction performance measurement data that the Recipient reported in the Baseline Performance Measurement Report and the Post-construction Performance Measurement Reports; and

(3)     an *ex post* examination of project effectiveness relative to the baseline data that the Recipient reported in the Baseline Performance Measurement Report.

**8.4     Performance Reporting Survival.**

The data collection and reporting requirements in this article 8 survive the termination of this agreement.

**ARTICLE 9**
**NONCOMPLIANCE AND REMEDIES**

**9.1     Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 9.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)     accept the remedy;

(2)     acknowledge the noncompliance, but propose an alternative remedy; or

(3)     dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)     after considering the Recipient's response under section 9.1(b); or

14 of 31

(2)    if the Recipient fails to respond under section 9.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

## 9.2    Remedies.

(a) If the USDOT makes a final determination of noncompliance under section 9.1, the USDOT may impose a remedy, including:

(1)    additional conditions on the award;

(2)    any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

(3)    any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 9.2(a), before making a final determination of noncompliance under section 9.1. If it does so, then the notice provided under section 9.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 9.2 or making a public interest determination under section 9.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 9.2 constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR part 901–).

## 9.3    Other Oversight Entities.

Nothing in this article 9 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10
## AGREEMENT TERMINATION

## 10.1    USDOT Termination.

(a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

    (1)    the Recipient fails to obtain or provide any non-RAISE Grant contribution or alternatives approved by the USDOT as provided in this agreement and consistent with schedule D;

    (2)    a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient fails to meet that milestone by six months after the date listed in section 2 of schedule C;

    (3)    the Recipient fails to meet a milestone listed in section 3 of schedule C by the deadline date listed in that section for that milestone;

    (4)    the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the project schedule in schedule C even if it is beyond the reasonable control of the Recipient;

    (5)    circumstances cause changes to the Project that the USDOT determines are inconsistent with the USDOT's basis for selecting the Project to receive a RAISE Grant; or

    (6)    the USDOT determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 10.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 9.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 10.1.

**10.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 CFR 200.344, Project Closeout should occur no later than 120 days after the end of the period of performance.

**10.3    Post-Termination Adjustments.**

The Recipient acknowledges that under 2 CFR 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that the USDOT reimbursed before termination, and recover funds from the Recipient.

**10.4    Non-Terminating Events.**

(a) The end of the budget period described under section 4.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The end of the period of performance described under section 4.5 does not terminate this agreement or the Recipient's obligations under this agreement.

(c) The cancellation of funds under section 14.2 does not terminate this agreement or the Recipient's obligations under this agreement.

**10.5    Other Remedies.**

The termination authority under this article 10 supplements and does not limit the USDOT's remedial authority under article 9 or 2 CFR part 200, including 2 CFR 200.339–200.340.

**ARTICLE 11**
**MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS**

**11.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 CFR 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 CFR 200.334.

**11.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 11.2(a) in accordance with a financial management system that meets the requirements of 2 CFR 200.302–200.307 and 2 CFR 200 subpart F and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2022 RAISE grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 CFR 200 subpart F, including "FY 2022" in the program name; and

17 of 31

(2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2022" in column c ("Additional Award Identification").

## 11.3    Internal Controls.

The Recipient shall establish and maintain internal controls as required under 2 CFR 200.303.

## 11.4    USDOT Record Access.

The USDOT may access Recipient records related to this award under 2 CFR 200.337.

## ARTICLE 12
## CONTRACTING AND SUBAWARDS

## 12.1    Minimum Wage Rates.

The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with the Davis-Bacon Act, 40 U.S.C. 3141–3148, or 23 U.S.C. 113, as applicable, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

## 12.2    Buy America.

(a)    Steel, iron, and manufactured goods used in the Project are subject to 49 U.S.C. 5323(j), as implemented by the Federal Transit Administration at 49 CFR part 661. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. 5323(j)(1) nor a finding under 49 U.S.C. 5323(j)(2).

(b)    Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FTA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c)    Under 2 CFR 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The Recipient shall include the requirements of 2 CFR 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

## 12.3    Small and Disadvantaged Business Requirements.

(a) If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26, including any amendments thereto.

(b) If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**12.4    Engineering and Design Services.**

The Recipient shall award each contract or sub- contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C. 1101-1104, or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**12.5    Foreign Market Restrictions.**

The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**12.6    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**12.7    Pass-through Entity Responsibilities.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR 200.331–200.333.

**12.8    Subaward and Contract Authorization.**

[Reserved]

# ARTICLE 13
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount.**

Under this award, the USDOT shall not provide funding greater than the amount obligated under section 4.3. The Recipient acknowledges that the USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**13.2    Projects Costs.**

This award is subject to the cost principles at 2 CFR 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs.**

(a) The Recipient shall not charge to this award costs that are incurred after the final budget period.

(b) The Recipient shall not charge to this award costs that were incurred before the date of this agreement unless those costs are identified in section 5 of schedule D and would have been allowable if incurred during the budget period. This limitation applies to pre-award costs under 2 CFR 200.458. This agreement hereby terminates and supersedes any previous USDOT approval for the Recipient to incur costs under this award for the Project. Section 5 of schedule D is the exclusive USDOT approval of costs incurred before the date of this agreement.

**13.4    Recipient Recovery of Federal Funds.**

The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**13.5    Unexpended Federal Funds.**

Any Federal funds that are awarded at section 4.1 but not expended on allocable, allowable costs remain the property of the United States.

**13.6    Timing of Payments to the Recipient.**

(a) Reimbursement is the payment method for the RAISE grant program.

(b) The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.7    Payment Method.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "ECHO," then the Recipient shall use the Electronic Clearing House Operation ("**ECHO**") to request reimbursement.

(b) The USDOT may deny a payment request that is not submitted using the method identified in this section 13.7.

**13.8    Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "ECHO," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall retain documentary evidence supporting details of all costs incurred, including the Federal share and the Recipient's share of costs, proof of payment of an invoice, and information demonstrating that the costs are allocable to the Project and allowable under this agreement.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.9    Reimbursement Request Timing Frequency.**

If the USDOT Payment System identified in section 6 of schedule A is "ECHO," the Recipient shall request reimbursement as needed to maintain cash flow sufficient to timely complete the Project.

# ARTICLE 14
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**14.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory funds cancellation date identified in section 14.2.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 CFR 200.344–200.346.

**14.2    Funds Cancellation.**

(a) RAISE grant program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), is canceled by statute after September 30, 2031, and then unavailable for any purpose, including adjustments.

(b) RAISE grant program funding that was appropriated in the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022) remains available until expended.

(c) Section 4.2 identifies the specific source or sources of funding for this award.

**ARTICLE 15**
**AGREEMENT MODIFICATIONS**

**15.1    Bilateral Modifications.**

The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**15.2    Unilateral Contact Modifications.**

(a) The Recipient may update the contacts who are listed in section 3 of schedule A by written notice to all of the USDOT contacts who are listed in section 5 of schedule A and section 2.2.

(b) The USDOT may update the contacts who are listed in section 5 of schedule A and section 2.2 by written notice to all of the Recipient contacts who are listed in section 3 of schedule A.

**15.3    USDOT Unilateral Modifications.**

(a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this agreement under this section 15.3, the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**15.4    Other Modifications.**

The parties shall not amend, modify, or supplement this agreement except as permitted under sections 15.1, 15.2, or 15.3. If an amendment, modification, or supplement is not permitted under section 15.1, not permitted under section 15.2, and not permitted under section 15.3, it is void.

**ARTICLE 16**
**RESERVED**

**ARTICLE 17**
**RESERVED**

## ARTICLE 18
## LABOR AND WORK

**18.1    Labor and Work.**

Schedule H documents the consideration of job quality and labor rights, standards, and protections related to the Project.

## ARTICLE 19
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**19.1    Uniform Administrative Requirements for Federal Awards.**

The Recipient shall comply with the obligations on non-Federal entities under 2 CFR parts 200 and 1201.

**19.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**19.3    Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**19.4    History of Performance.**

Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**19.5    Whistleblower Protection.**

(a)    The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)    The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**19.6    External Award Terms and Obligations.**

(a)    In addition to this document and the contents described in article 24, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)    2 C.F.R part 175: Award Term for  Trafficking in Persons; and

(4)    Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b)    The Recipient shall comply with:

(1)    49 CFR part 20: New Restrictions on Lobbying;

(2)    49 CFR part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)    49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**19.7    Incorporated Certifications.**

The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)    Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

## ARTICLE 20
## ASSIGNMENT

**20.1  Assignment Prohibited.**

The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 21
## WAIVER

**21.1  Waivers.**

(a) A waiver of a term of this agreement granted by the USDOT will not be effective unless it is in writing and signed by an authorized representative of the USDOT.

(b) A waiver of a term of this agreement granted by the USDOT on one occasion will not operate as a waiver on other occasions.

(c) If the USDOT fails to require strict performance of a term of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that term or breach.

## ARTICLE 22
## ADDITIONAL TERMS AND CONDITIONS

**22.1  Effect of Urban or Rural Designation.**

Based on information that the Recipient provided to the USDOT, including the Technical Application, section 1 of schedule F designates this award as an urban award or a rural award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**22.2  Effect of Historically Disadvantaged Community or Area of Persistent Poverty Designation.**

If section 3 of schedule F lists "Yes" for the "HDC or APP Designation," then based on information that the Recipient provided to the USDOT, including the Technical Application, the USDOT determined that the Project will be carried out in a historically disadvantaged community or an area of persistent poverty, as defined in the NOFO. The Recipient shall incur a majority of the costs under this award in historically disadvantaged communities or areas of persistent poverty.

**22.3    Disclaimer of Federal Liability.**

The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**22.4    Relocation and Real Property Acquisition.**

(a) To the greatest extent practicable under State law, the Recipient shall comply with the land acquisition policies in 49 CFR 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 CFR 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR 24 subparts D–E.

(c) The Recipient shall make available to displaced persons comparable replacement dwellings in accordance with 49 CFR 24.

**22.5    Equipment Disposition.**

(a) In accordance with 2 CFR 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project:

    (1)    if the entity that acquired the equipment is a State the State shall dispose of that equipment in accordance with State laws and procedures; and

    (2)    if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR 200.313; and

    (3)    if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity shall request disposition instructions from the Administering Operating Administration.

(b) In accordance with 2 CFR 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR 200.310–200.316 and 2 CFR 1201.313.

(c) The Recipient shall ensure compliance with this section 22.5 for all tiers of subawards under this award.

**22.6    Environmental Review.**

(a) In this section, "**Environmental Review Entity**" means:

    (1)    if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2)    for all other cases, the FTA.

(b)  Except as authorized under section 22.6(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

    (1)    the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

    (2)    if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c)  If the Recipient is using procedures for acquisition of real property under 23 CFR 771.118(c)(6), hardship and protective acquisitions of real property under 23 CFR 771.118(d)(3), early acquisition of right-of way under 49 U.S.C. 5323(q) and FTA guidance, or rolling stock under 49 U.S.C. 5309(l)(6), then the Recipient shall comply with 23 CFR 771.113(d)(1)–(3).

(d)  The Recipient acknowledges that:

    (1)    the Environmental Review Entity's actions under section 22.6(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

    (2)    applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e)  Consistent with 23 CFR 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in schedule B and other information described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with schedule B or other information in this agreement, then:

    (1)    the parties may amend this agreement under section 15.1 for consistency with the selected build alternative; or

    (2)    if the USDOT determines that the condition at section 10.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 10.1(a)(5).

(g)  The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**22.7    Federal Transit Program Requirements.**

(a) If the Project is also funded with Federal transit assistance under chapter 53 of title 49, United States Code, all relevant FTA program requirements apply in addition to the terms and conditions of this agreement.

(b) The Recipient shall comply with the following requirements as if this award were Federal transit assistance for a major capital project under chapter 53 of title 49:

    (1)    49 U.S.C 5331 and implementing regulations at 49 CFR part 655, "Prevention of Alcohol Misuse and Prohibited Drug Use in Transit Operations";

    (2)    49 U.S.C. 5333(b), implementing regulations at 29 CFR part 215, "Guidelines, Section 5333(b), Federal Transit Law," and the terms and conditions of any certification or special warranty provided by the United States Department of Labor;

    (3)    49 U.S.C. 5323(m) and implementing regulations at 49 CFR part 663, "Pre-Award and Post-Delivery Audits of Rolling Stock Purchases";

    (4)    49 CFR part 633, "Project Management Oversight";

    (5)    FTA Circular 5800.1, "Safety and Security Management Guidance for Major Capital Projects";

    (6)    49 U.S.C. 5329(e) and implementing regulations at 49 CFR part 659, "Rail Fixed Guideway Systems; State Safety Oversight," and 49 CFR part 674, "State Safety Oversight";

    (7)    49 U.S.C. 5323(u), "Limitation on Certain Rolling Stock Procurements"; and

    (8)    49 U.S.C. 5323(v), "Cybersecurity Certification for Rail Rolling Stock and Operations."

(c) If the Project is not also funded with Federal transit assistance under chapter 53 of title 49, then, except as otherwise provided in articles 1–25, the Federal Transit Administration Master Agreement is not incorporated in this agreement.

## ARTICLE 23
## MANDATORY AWARD INFORMATION

### 23.1   Information Contained in a Federal Award.

For 2 CFR 200.211:

    (1)    the "Federal Award Date" is the date of this agreement, as defined under section 25.2;

    (2)    the "Assistance Listings Number" is 20.933 and the "Assistance Listings Title" is "National Infrastructure Investments"; and

(3)     this award is not for research and development.

**23.2    Federal Award Identification Number.**

The Federal Award Identification Number is listed in section 8 of schedule A.

**23.3    Recipient's Unique Entity Identifier.**

The Recipient's Unique Entity Identifier, as defined at 2 CFR 25.400, is listed in section 2 of schedule A.

## ARTICLE 24
## CONSTRUCTION AND DEFINITIONS

**24.1    Schedules.**

This agreement includes the following schedules as integral parts:

| | |
|---|---|
| Schedule A | Administrative Information |
| Schedule B | Project Activities |
| Schedule C | Award Dates and Project Schedule |
| Schedule D | Award and Project Financial Information |
| Schedule E | Changes from Application |
| Schedule F | RAISE Program Designations |
| Schedule G | RAISE Performance Measurement Information |
| Schedule H | Labor and Work |

**24.2    Exhibits.**

The following exhibits, which are located in the document titled "Exhibits to FTA Grant Agreements Under the Fiscal Year 2022 RAISE Grant Program," dated April 23, 2025, and available at https://www.transportation.gov/BUILDgrants/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |

**24.3    Construction.**

(a) In these General Terms and Conditions:

(1)     unless expressly specified, a reference to a section or article refers to that section or article in these General Terms and Conditions;

(2)     a reference to a section or other subdivision of a schedule listed in section 24.1 will expressly identify the relevant schedule; and

(3)    there are no references to articles or sections in project-specific portions of the agreement that are not contained in schedules listed in section 24.1.

(b) If a provision in these General Terms and Conditions or the exhibits conflicts with a provision in the project-specific portion of the agreement, then the project-specific portion of the agreement prevails. If a provision in the exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**24.4    Integration.**

This agreement constitutes the entire agreement of the parties relating to the RAISE grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the RAISE grant program and awards under that program.

**24.5    Definitions.**

In this agreement, the following definitions apply:

"**General Terms and Conditions**" means this document, including articles 1–25.

"**Program Statute**" means the collective statutory text:

(1)    at 49 U.S.C. 6702;

(2)    under the heading "Department of Transportation—Office of the Secretary—National Infrastructure Investments" in title VIII of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading; and

(3)    under the heading "Department of Transportation—Office of the Secretary—National Infrastructure Investments" in title I of division L of the Consolidated Appropriations Act, 2022 Pub. L. No. 117-103 (Mar. 15, 2022), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Technical Application, as modified by the negotiated provisions of this agreement, including schedules A–H.

"**RAISE Grant**" means an award of funds that were made available under the NOFO.

"**Technical Application**" means the application identified in section 1 of schedule A, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

**ARTICLE 25**
**AGREEMENT EXECUTION AND EFFECTIVE DATE**

**25.1    Counterparts.**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**25.2    Effective Date.**

The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a RAISE Grant when the USDOT's authorized representative signs it.

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FTA GRANT AGREEMENTS UNDER THE
FISCAL YEAR 2022 RAISE GRANT PROGRAM**

**April 23, 2025**

**EXHIBIT A**
**APPLICABLE FEDERAL LAWS AND REGULATIONS**

By entering into this agreement for a FY 2022 RAISE Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
a. Davis-Bacon Act - 40 U.S.C. §§ 3141, et seq.
b. Federal Fair Labor Standards Act - 29 U.S.C. §§ 201, et seq.
c. Hatch Act - 5 U.S.C. §§ 1501, et seq., but see 49 U.S.C. § 5323(l)(2)
d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 - 42 U.S.C. §§ 4601, et seq.
e. National Historic Preservation Act of 1966 - Section 106 - 54 U.S.C. § 306108
f. Archeological and Historic Preservation Act of 1974 - 54 U.S.C. §§ 312501, et seq.
g. Native American Graves Protection and Repatriation Act - 25 U.S.C. §§ 3001, et seq.
h. Clean Air Act, P.L. 90-148, as amended - 42 U.S.C. §§ 7401, et seq.
i. Section 404 of the Clean Water Act, as amended - 33 U.S.C. § 1344
j. Section 7 of the Endangered Species Act, P.L. 93-205, as amended - 16 U.S.C. § 1536
k. Coastal Zone Management Act, P.L. 92-583, as amended - 16 U.S.C. §§ 1451, et seq.
l. Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. § 4012a
m. Age Discrimination Act of 1975 - 42 U.S.C. §§ 6101, et seq.
n. American Indian Religious Freedom Act, P.L. 95-341, as amended
o. Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. §§ 1101, et seq.
p. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended - 42 U.S.C. §§ 4541, et seq.
q. Sections 523 and 527 of the Public Health Service Act of 1912, as amended, 42 U.S.C. §§ 290dd through 290dd-2
r. Architectural Barriers Act of 1968 - 42 U.S.C. § 4151, et seq.
s. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 - 42 U.S.C. § 8373
t. Contract Work Hours and Safety Standards Act - 40 U.S.C. § 3701, et seq.
u. Copeland Anti-kickback Act, as amended - 18 U.S.C. § 874 and 40 U.S.C. § 3145
v. National Environmental Policy Act of 1969 - 42 U.S.C. §§ 4321, et seq.
w. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. §§ 1271, et seq.
x. Federal Water Pollution Control Act, as amended - 33 U.S.C. §§ 1251-1376
y. Single Audit Act of 1984 - 31 U.S.C. §§ 7501, et seq.
z. Americans with Disabilities Act of 1990 - 42 U.S.C. § 12101, et seq.
aa. Title IX of the Education Amendments of 1972, as amended - 20 U.S.C. § 1681 through § 1683, and § 1685 through § 1687
bb. Section 504 of the Rehabilitation Act of 1973, as amended - 29 U.S.C. § 794
cc. Title VI of the Civil Rights Act of 1964 - 42 U.S.C. §§ 2000d *et seq*.
dd. Title IX of the Federal Property and Administrative Services Act of 1949 - 40 U.S.C.

§§ 1101 -1104, 541, et seq.
ee. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
ff. Freedom of Information Act - 5 U.S.C. § 552, as amended
gg. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. § 1855
hh. Farmland Protection Policy Act of 1981 – 7 U.S.C. § 4201, et seq.
ii. Noise Control Act of 1972 – 42 U.S.C. § 4901, et seq.
jj. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. § 661, et seq.
kk. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 - 33 U.S.C. §§ 401 and 525
ll.   Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. 303 and 23 U.S.C. § 138
mm. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended --42 U.S.C. §§ 9601, et seq.
nn. Safe Drinking Water Act -- 42 U.S.C. §§ 300f to 300j-26
oo. Wilderness Act -- 16 U.S.C. §§ 1131-1136
pp. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 -- 42 U.S.C. § 6901, et seq.
qq. Migratory Bird Treaty Act 16 U.S.C. § 703, et seq.
rr.   The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
ss.  Cargo Preference Act of 1954 – 46 U.S.C. § 55305
tt.   Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
uu. Bringing in and harboring certain aliens – 8 U.S.C. 1324
vv. Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 12372 – Intergovernmental Review of Federal Programs
c. Executive Order 12549 – Debarment and Suspension
d. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
e. Executive Order 14025 – Worker Organizing and Empowerment
f. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
g. Executive Order 14154, Unleashing American Energy
h. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
i. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
j. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**General Federal Regulations**
a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201
b. Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200
c. Investigative and Enforcement Procedures – 14 CFR Part 13

d. Procedures for predetermination of wage rates – 29 CFR Part 1
e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 CFR Part 3
f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 CFR Part 5
g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60, et seq.
h. New Restrictions on Lobbying – 49 CFR Part 20
i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto
j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 CFR Part 24
k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25
l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27
m. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28
n. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 CFR Part 30
o. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32
p. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38
q. Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 CFR Part 26 (as applicable under section 18.3 of this agreement), including any amendments thereto

**Office of Management and Budget Circulars**
a. Any applicable OMB Circular based upon the specific FY 2022 RAISE Grant Recipient.

# EXHIBIT B
## ADDITIONAL STANDARD TERMS

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 CFR Parts 21, 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under the FY 2022 RAISE grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Transit Administration (FTA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 CFR section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

*"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including FTA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

## Specific Assurances

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2022 RAISE grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2022 RAISE Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
   b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing FTA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by FTA. You must keep records, reports, and submit the material for review upon request to FTA, or its designee in a timely, complete, and accurate way.

Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2022 RAISE grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2022 RAISE grant program.

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Transit Administration (FTA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or FTA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or FTA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or FTA may determine to be appropriate, including, but not limited to:

    a. withholding payments to the contractor under the contract until the contractor complies; and/or
    b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant

thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or FTA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

## APPENDIX B

## CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), 49 U.S.C. § 6702, the Regulations for the Administration of FY 2022 RAISE grant program**,** and the policies and procedures prescribed by the Federal Transit Administration (FTA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

### (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The  (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX D

## CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**<u>Pertinent Non-Discrimination Authorities:</u>**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto;
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

**TERM B.2**
**CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER**
**RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS**

**2 CFR Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FTA approval or that is estimated to cost $25,000 or more – as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2022 RAISE grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2022 RAISE Grant, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to

the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FTA approval or estimated to cost $25,000 or more - 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered

transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

   (1) Certify whether the entity has a Tax Delinquency; and

   (2) Certify whether the entity has a Felony Conviction.

4  **Prohibition.** If

   (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

   (2) an entity provides an affirmative response to either certification in section 3; or

   (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

   (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

   (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

   (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

   (1) require the SAM check in section 2;

   (2) require the certifications in section 3;

   (3) include the prohibition in section 4; and

B-18

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While
Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS:**
**FORMAT AND CONTENT**

1.      **Purpose**. The purpose of the Quarterly Project Progress Reports and Recertifications under this agreement for the FY 2022 RAISE grant program are to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

2.      **Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. At the discretion of the USDOT, modifications or additions can be made to produce a quarterly reporting format that will most effectively serve both the Recipient and the USDOT. Some projects will have a more extensive quarterly status than others. For smaller projects, the USDOT may determine that the content of the quarterly reports will be streamlined and project status meetings will be held on a less-frequent basis. The first quarterly progress report should include a detailed description and, where appropriate, drawings of the items funded.

  (a) **Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any deviations from the scope of work, the schedule, or the budget that are described in this agreement.

  (b) **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable Recovery Act requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

  (c) **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction in order to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

  (d) **Project Scope Overview.** The purpose of this section is to provide a further update regarding the project scope. If the original scope contained in the grant agreement is still accurate, this section can simply state that the scope is unchanged.

  (e) **Project Schedule.** An updated master program schedule reflecting the current status of the program activities should be included in this section. A Gantt (bar) type chart is probably the most appropriate for quarterly reporting purposes, with the ultimate

format to be agreed upon between the Recipient and the USDOT. It is imperative that the master program schedule be integrated, i.e., the individual contract milestones tied to each other, such that any delays occurring in one activity will be reflected throughout the entire program schedule, with a realistic completion date being reported. Narratives, tables, and/or graphs should accompany the updated master program schedule, basically detailing the current schedule status, delays and potential exposures, and recovery efforts. The following information should also be included:

- Current overall project completion percentage vs. latest plan percentage.
- Completion percentages vs. latest plan percentages for major activities such as right-of-way, major or critical design contracts, major or critical construction contracts, and significant force accounts or task orders. A schedule status description should also be included for each of these major or critical elements.
- Any delays or potential exposures to milestone and final completion dates. The delays and exposures should be quantified, and overall schedule impacts assessed. The reasons for the delays and exposures should be explained, and initiatives being analyzed or implemented in order to recover the schedule should be detailed.

**(f) Project Cost.** An updated cost spreadsheet reflecting the current forecasted cost vs. the latest approved budget vs. the baseline budget should be included in this section. One way to track project cost is to show: (1) Baseline Budget, (2) Latest Approved Budget, (3) Current Forecasted Cost Estimate, (4) Expenditures or Commitments to Date, and (5) Variance between Current Forecasted Cost and Latest Approved Budget. Line items should include all significant cost centers, such as prior costs, right-of-way, preliminary engineering, environmental mitigation, general engineering consultant, section design contracts, construction administration, utilities, construction packages, force accounts/task orders, wrap-up insurance, construction contingencies, management contingencies, and other contingencies. The line items can be broken-up in enough detail such that specific areas of cost change can be sufficiently tracked and future improvements made to the overall cost estimating methodology. A Program Total line should be included at the bottom of the spreadsheet. Narratives, tables, and/or graphs should accompany the updated cost spreadsheet, basically detailing the current cost status, reasons for cost deviations, impacts of cost overruns, and efforts to mitigate cost overruns. The following information should be provided:

- Reasons for each line item deviation from the approved budget, impacts resulting from the deviations, and initiatives being analyzed or implemented in order to recover any cost overruns.

- Transfer of costs to and from contingency line items, and reasons supporting the transfers.

- Speculative cost changes that potentially may develop in the future, a quantified dollar range for each potential cost change, and the current status of the speculative change. Also, a comparison analysis to the available contingency amounts should be included, showing that reasonable and sufficient amounts of contingency remain to keep the project within the latest approved budget.

- Detailed cost breakdown of the general engineering consultant (GEC) services (if applicable), including such line items as contract amounts, task orders issued (amounts), balance remaining for tasks, and accrued (billable) costs.

- Federal obligations and/or disbursements for the project, compared to planned obligations and disbursements.

**(g) Federal Financial Report (SF-425).** The Federal Financial Report (SF-425) is a financial reporting form used throughout the Federal Government Grant system. Recipients shall complete this form and attach it to each quarterly Project Progress and Monitoring Report. The form is available at https://www.grants.gov/forms/post-award-reporting-forms.html.

**(h) Certifications.**

    **i.** A certification that the Recipient is in compliance with 2 CFR 200.303 (Internal Controls) and 2 CFR Part 200, Subpart F (Audit Requirements).

    **ii.** The certification required under 2 CFR 200.415(a).

Franklin-Hodge Ex. C

1.  **Award No.**

    ▮▮▮▮▮▮▮

2.  **Effective Date**
    See No. 17 Below

3.  **Assistance Listings No.**

    ▮▮▮▮

4.  **Award To**
    City of Boston
    One City Hall Plaza
    Boston, MA 02201-1001
    ▮▮▮▮▮▮▮▮▮▮

5.  **Sponsoring Office**
    U.S. Department of Transportation
    Federal Highway Administration
    Office of Safety
    1200 New Jersey Avenue, SE
    HSSA-1, Mail Drop E71-117
    Washington, DC 20590

6.  **Period of Performance**
    Effective Date of Award – April
    2029

7.  **Total Amount**
    | | |
    |---|---|
    | Federal Share: | $9,000,000 |
    | Recipient Share: | $2,250,000 |
    | Other Federal Funds: | $0 |
    | Other Funds: | $0 |
    | Total: | $11,250,000 |

8.  **Type of Agreement**
    Grant

9.  **Authority**
    Section 24112 of the Infrastructure Investment
    and Jobs Act (Pub. L. 117–58, November 15,
    2021; also referred to as the "Bipartisan
    Infrastructure Law" or "BIL")

10. **Procurement Request No.**

    ▮▮▮▮▮▮

11. **Federal Funds Obligated**
    Base Phase: $987,500

12. **Submit Payment Requests To**
    See article 19.

13. **Payment Office**
    See article 19.

14. **Accounting and Appropriations Data**

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15. **Description of Project**

**RECIPIENT**
16. **Signature of Person Authorized to Sign**

_Signature_                            6/26/24
Signature                              Date
Name: Nicholas Gove
Title: Commissioner, Boston Transportation
Department

**FEDERAL HIGHWAY ADMINISTRATION**
17. **Signature of Agreement Officer**

RYAN JOSEPH BUCK  Digitally signed by RYAN JOSEPH BUCK
Date: 2024.07.03 14 01:54 -04'00'                    7/3/2024

Signature                              Date
Name: Ryan Buck
Title: Agreement Officer

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE**
**FISCAL YEAR 2022 SAFE STREETS AND ROADS FOR ALL GRANT PROGRAM**

This agreement is between the [United States Department of Transportation (the "**USDOT**")]
[Federal Highway Administration (the "FHWA") and the City of Boston (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a Safe Streets and Roads for All
("SS4A") Grant for the Safety at Key Intersections in Boston Project.

The parties therefore agree to the following:

**ARTICLE 1**
**GENERAL TERMS AND CONDITIONS**

    1.1    **General Terms and Conditions.**

(a) In this agreement, "**General Terms and Conditions**" means the content of the document
titled "General Terms and Conditions Under the Fiscal Year 2022 Safe Streets and Roads
for All Grant Program," dated March 07, 2024, which is available at
https://www.transportation.gov/grants/ss4a/grant-agreements. Articles 7–30 are in the
General Terms and Conditions. The General Terms and Conditions are part of this
agreement.

(b) The Recipient states that it has knowledge of the General Terms and Conditions.
Recipient also states that it is required to comply with all applicable Federal laws and
regulations including, but not limited to, the Uniform Administrative Requirements, Cost
Principles, and Audit Requirements for Federal Awards (2 CFR part 200); National
Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.); and Build America, Buy
America Act (BIL, div. G §§ 70901-27).

(c) The Recipient acknowledges that the General Terms and Conditions impose obligations
on the Recipient and that the Recipient's non-compliance with the General Terms and
Conditions may result in remedial action, termination of the SS4A Grant, disallowing
costs incurred for the Project, requiring the Recipient to refund to the FHWA the SS4A
Grant, and reporting the non-compliance in the Federal-government-wide integrity and
performance system.

## ARTICLE 2
## APPLICATION, PROJECT, AND AWARD

**2.1      Application.**

Application Title:      Safety at Key Intersections in Boston Project

Application Date:      September 13, 2022

**2.2      Award Amount.**

SS4A Grant Amount: $9,000,000

**2.3      Federal Obligation Information.**

Federal Obligation Type:      Multiple

| Obligation Condition Table | | |
|---|---|---|
| **Phase of the Project** | **Allocation of the SS4A Grant** | **Obligation Condition** |
| Base Phase: Preliminary Design / NEPA | $987,500 | |

| Phase 1: ROW / Final Design | $1,587,500 | The Recipient shall not expend any funds (Federal or non-Federal) for, seek reimbursement of eligible costs, or otherwise begin any part of the construction or final design and construction of an Implementation Project unless and until: |
|---|---|---|
| | | (1) The requirements of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations have been met; and |
| | | (2) FHWA, or a State with applicable NEPA Assignment authority, has approved the NEPA document for the Project and provided the Recipient with a written notice that the environmental review process is complete; and |
| | | (3) FHWA has obligated additional funds for this phase and notified the Recipient in writing that the Recipient may proceed to the next activity after NEPA approval, and the Recipient has acknowledged receipt in writing of FHWA's notification. Recipient shall not proceed with any such activities until (2) and (3) as described in this section are met. Costs that are incurred before (2) and (3) as described in this section are met are not allowable costs under this agreement. |
| | | Extent of activities that are permissible before NEPA is complete are those activities constituting "preliminary design" as specified in FHWA Order 6640.1A. |
| Phase 2: Construction | $6,425,000 | Recipient shall not expend any funds (Federal or non-Federal) for, seek reimbursement of eligible costs, or otherwise begin any part of the |

| Obligation Condition Table | | |
|---|---|---|
| **Phase of the Project** | **Allocation of the SS4A Grant** | **Obligation Condition** |
| | | construction or final design and construction of an Implementation Project unless and until: |
| | | The requirements of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations have been met; and |
| | | (2) FHWA, or a State with applicable NEPA Assignment authority, has approved the NEPA document for the Project and provided the Recipient with a written notice that the environmental review process is complete; and |
| | | (3) FHWA has obligated additional funds for this phase and notified the Recipient in writing that the Recipient may proceed to the next activity after NEPA approval, and the Recipient has acknowledged receipt in writing of FHWA's notification. Recipient shall not proceed with any such activities until (2) and (3) as described in this section are met. Costs that are incurred before (2) and (3) as described in this section are met are not allowable costs under this agreement. |
| | | Extent of activities that are permissible before NEPA is complete are those activities constituting "preliminary design" as specified in FHWA Order 6640.1A. |

**2.4    Award Dates.**

Period of Performance End Date:

**2.5    Budget Period**

Base Phase Budget Period End Date:  [July 31, 2025]

Option Phase 1 Budget Period End Date:  [reserved]

Option Phase 2 Budget Period End Date:  [reserved]

**2.6    Action Plan Grant or Implementation Grant Designation.**

Designation:   Implementation

**2.7    Federal Award Identification Number.** The Federal Award Identification Number is listed on page 1, line 1.

## ARTICLE 3
## SUMMARY PROJECT INFORMATION

**3.1    Summary of Project's Statement of Work.**

This project will employ low-cost, high-impact strategies for Complete Streets improvements throughout the City of Boston, addressing safety issues with speeding, pedestrian crashes, visibility issues, and blind spots. The project's Proven Safety Countermeasures and other safety improvements include raised crosswalks, pedestrian refuges island, street rightsizing, curb extensions, slow turn wedges, speed humps, and high-visibility crosswalks. The project will improve safety at approximately nine intersections in five distinct neighborhoods, the majority of which are underserved communities where residents face high safety risks on local streets.

The project will be completed in three phases as follows:

Base Phase: Preliminary Design / NEPA:   National Historic Preservation Act (NEPA) and Section 106 review and 30% preliminary design will be needed to conduct this review. Education and Outreach will also be done during this phase.

Phase 1: ROW/Final Design: ROW, final design, plans and specifications for competitive bidding process. Education and Outreach will also be done during this phase. This will occur once:

(1) The requirements of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations have been met; and

(2) FHWA, or a State with applicable NEPA Assignment authority, has approved the NEPA document for the Project and provided the Recipient with a written notice that the environmental review process is complete; and

(3) FHWA has obligated additional funds for this phase and notified the Recipient in writing that the Recipient may proceed to the next activity after NEPA approval, and the Recipient has acknowledged receipt in writing of FHWA's notification. Recipient shall not proceed with any such activities until (2) and (3) as described in this section are met. Costs that are incurred before (2) and (3) as described in this section are met are not allowable costs under this agreement.

Extent of activities that are permissible before NEPA is complete are those activities constituting "preliminary design" as specified in FHWA Order 6640.1A.

Phase 2: Construction: Construction / installation of safety measures at nine intersections directly responsive to localized safety considerations. Education and Outreach will also be done during this phase. Same requirements for use of funds as stated above in Phase 1.

**3.2    Project's Estimated Schedule.**

**IMPLEMENTATION SCHEDULE INVOLVING CONSTRUCTION**

| Milestone | Schedule Date |
|---|---|
| Planned NEPA Completion Date: | July 31, 2025 |
| Planned Construction Start Date | February 28, 2026 |
| Planned Construction Substantial Completion and Open to Public Use Date: | April 30, 2029 |

**IMPLEMENTATION SCHEDULE NON-CONSTRUCTION**

| Milestone | Schedule Date |
|---|---|
| Planned NEPA Completion Date: | July 31, 2025 |
| Planned Activity Completion Date – Education and Outreach: | April 30, 2029 |

**3.3    Project's Estimated Costs.**

(a) Eligible Project Costs

| Eligible Project Costs | |
|---|---|
| SS4A Grant Amount: | $9,000,000 |
| Other Federal Funds:: | $0 |

| | |
|---|---:|
| State Funds: | $0 |
| Local Funds: | $2,250,000 |
| In-Kind Match: | $0 |
| Other Funds: | $0 |
| Total Eligible Project Cost: | $11,250,000 |

(b) Supplemental Estimated Budget

| Cost Element | Federal Share | Non-Federal Share | Total Budget Amount |
|---|---|---|---|
| Direct Labor | $216,000.00 | $54,000.00 | $270,000.00 |
| Fringe Benefits | $54,000.00 | $13,500.00 | $67,500.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual/Consultant* | $1,980,000.00 | $495,000.00 | $2,475,000.00 |
| Construction | $6,300,000.00 | $1,575,000.00 | $7,875,000.00 |
| Other (Education / Outreach) | $450,000.00 | $112,500.00 | $562,500.00 |
| Indirect Costs | $0.00 | $0.00 | $0.00 |
| Total Budget | $9,000,000 | $2,250,000 | $11,250,000 |

* Education and Outreach activities – Per the application, the City of Boston will implement this Project with continued community engagement and outreach to the neighborhoods where each of the nine intersections are located. The City will continue its partnership with Boston's Vision Zero Task Force—a collection of City of Boston departments and local transportation advocacy groups—who were instrumental in the original Vision Zero Action Plan and have continued to advocate for high-impact street treatments.

This Project will coordinate ongoing discussions by transportation planning working groups established in Bowdoin-Geneva and East Boston neighborhoods who have developed action plans to identify traffic calming solutions. Additional neighborhood groups focused on street safety and achieving the City of Boston's Vision Zero goal will be identified through assistance from the Vision Zero Task Force and existing neighborhood slow street programs.

The BTD will work with other State and City departments and agencies such as MassDOT, MBTA, Boston Public Works Department, Boston Planning and Development Agency, and the Mayor's Office of Neighborhood Services to implement and install changes at these nine intersections.

(c) Cost Classification Table -Implementation Grants Only

| Cost Classification | Total Costs | Non-SS4A Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Architectural and engineering fees | $2,250,000 | $0 | **$2,250,000** |
| Other architectural and engineering fees | $562,500 | $0 | **$562,500** |
| Construction | $6,300,000 | $0 | **$6,300,000** |
| Miscellaneous (Education / Outreach) | $562,500 | 0 | **$562,500** |
| Contingency | $1,575,000 | $0 | **$1,575,000** |
| **Project Total** | **$11,250,000** | **$0** | **$11,250,000** |

## ARTICLE 4
## RECIPIENT INFORMATION

**4.1    Recipient's Unique Entity Identifier.**

█████████████

**4.2    Recipient Contact(s).**

Vineet Gupta
Director of Policy and Planning
City of Boston, Streets Cabinet
1 City Hall Square, Boston, MA 02201
617-635-2756
vineet.gupta@boston.gov

**4.3    Recipient Key Personnel.**

| Name | Title or Position |
|---|---|
| Vineet Gupta | Director of Policy and Planning |
| Jen Rowe | Regional Transportation Planner |
| Maria Daniela Castillo | Transportation Planner |

**4.4    USDOT Project Contact(s).**

Caroline Trueman

Safe Streets and Roads for All Program Manager
Federal Highway Administration
Office of Safety
HSSA-1, Mail Stop: E71-117
1200 New Jersey Avenue, S.E.
Washington, DC 20590
(305)745-1946
Caorline.Trueman@dot.gov

and


Agreement Officer (AO)
Federal Highway Administration
Office of Acquisition and Grants Management
HCFA-33, Mail Stop E62-310
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-493-2402
HCFASS4A@dot.gov

and

Joi Singh
Agreement Officer's Representative (AOR)
Division Administrator
FHWA MA Division
220 Binney Street, 9th Floor
Cambridge, Massachusetts 02142
(617) 494-3657
joi.singh@dot.gov

and

Tomasz Janikula
Massachusetts Division Point of Contact
Area Engineer District 6 / Realty Specialist
220 Binney Street, 9th Floor
Cambridge, MA 02142
617-494-2176
Tomasz.janikula@dot.gov

## ARTICLE 5
## USDOT ADMINISTRATIVE INFORMATION

**5.1    Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition and Grants Management

SUBAWARDS AND CONTRACTS APPROVAL

Note: See 2 CFR § 200.331, Subrecipient and contractor determinations, for definitions of subrecipient (who is awarded a subaward) versus contractor (who is awarded a contract).

Note: Recipients with a procurement system deemed approved and accepted by the Government or by the AO are exempt from the requirements of this clause. See 2 CFR 200.317 through 200.327.

Note:  This clause is only applicable to Action Plan Grants.

Unless described in the application and funded in the approved award, the Recipient must obtain prior written approval from the AO for the subaward, transfer, or contracting out of any work under this award above the Simplified Acquisition Threshold. This provision does not apply to the acquisition of supplies, material, equipment, or general support services. Approval of each subaward or contract is contingent upon the Recipient's submittal of a written fair and reasonable price determination, and approval by the AO for each proposed contractor/sub-recipient. Consent to enter into subawards or contracts will be issued through written notification from the AO or a formal amendment to the Agreement.

The following subawards and contracts are currently approved under the Agreement by the AO. This list does not include supplies, material, equipment, or general support services which are exempt from the pre-approval requirements of this clause.

(Fill in at award or by amendment)

**5.2 Reimbursement Requests**

(a) The Recipient may request reimbursement of costs incurred in the performance of this agreement if those costs do not exceed the funds available under section 2.2 and are allowable under the applicable cost provisions of 2 C.F.R. Part 200, Subpart E. The Recipient shall not request reimbursement more frequently than monthly.

(b) The Recipient shall use the DELPHI eInvoicing System to submit requests for reimbursement to the payment office. When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit supporting cost detail with the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs) to clearly document all costs incurred.

11 of 25

(c) The Recipient's supporting cost detail shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, travel, etc., and the Recipient shall identify the Federal share and the Recipient's share of costs. If the Recipient does not provide sufficient detail in a request for reimbursement, the AO may withhold processing that request until the Recipient provides sufficient detail.

(d) The USDOT shall not reimburse costs unless the Agreement Officer's Representative (the "**AOR**") reviews and approves the costs to ensure that progress on this agreement is sufficient to substantiate payment.

(e) The USDOT may waive the requirement that the Recipient use the DELPHI eInvoicing System. The Recipient may obtain waiver request forms on the DELPHI eInvoicing website (http://www.dot.gov/cfo/delphi-einvoicing-system.html) or by contacting the AO. A Recipient who seeks a waiver shall explain why they are unable to use or access the Internet to register and enter payment requests and send a waiver request to

    Director of the Office of Financial Management
    US Department of Transportation,
    Office of Financial Management B-30, Room W93-431
    1200 New Jersey Avenue SE
    Washington DC 20590-0001

    or

    DOTElectronicInvoicing@dot.gov

If the USDOT grants the Recipient a waiver, the Recipient shall submit SF 271s directly to:

    DOT/FAA
    P.O. Box 268865
    Oklahoma City, OK 73125-8865
    Attn: Agreement Officer

(f) The requirements set forth in these terms and conditions supersede previous financial invoicing requirements for Recipients.


## ARTICLE 6
## SPECIAL GRANT TERMS


**6.1**    SS4A funds must be expended within five years after the grant agreement is executed and DOT obligates the funds, which is the budget period end date in section 10.3 of the Terms and Conditions and section [wherever the date it is in this agreement].

**6.2**  The Recipient acknowledges that the Supplemental Action Plan will be made publicly available, and the Recipient agrees that it will publish the final Supplemental Action Plan on a publicly available website.

**6.3**  The Recipient demonstrates compliance with civil rights obligations and nondiscrimination laws, including Titles VI of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act, and accompanying regulations. Recipients of Federal transportation funding will also be required to comply fully with regulations and guidance for the ADA, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and all other civil rights requirements.

**6.4**  The Recipient acknowledges that it is required to conduct certain environmental analyses and to prepare and submit to FHWA, or State with applicable NEPA Assignment authority, documents required under NEPA, and other applicable environmental statutes and regulations before the Government will obligate funds for Option Phase 1 under this agreement and provide the Recipient with a written notice to proceed with Option Phase 1.

**6.5**  The Government's execution of this agreement does not in any way constitute pre-approval or waiver of any of the regulations imposed upon Recipient under the applicable Federal rules, regulations and laws regarding SS4A projects undertaken in accordance with the terms and conditions of this agreement. The Recipient shall comply with all applicable Federal requirements before incurring any costs under this agreement.

**ATTACHMENT A**
**PERFORMANCE MEASUREMENT INFORMATION**

**Study Area:** Nine intersections in the City of Boston in the following neighborhoods: Ashmont, Dorchester, Savin Hill, Roxbury, South Boston, North End, East Boston, and Beachmont.

**Baseline Measurement Date:** January 31, 2026

**Baseline Report Date:** March 30, 2026

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Safety Performance [for Implementation Grants] | Fatalities: Total annual fatalities in the project location(s) | Annually and at the end of the period of performance |
| Safety Performance [for Implementation Grants] | Serious Injuries: Total annual serious injuries in the project location(s) [if available] | Annually and at the end of the period of performance |
| Safety Performance [for Implementation Grants] | Crashes by Road User Category: Total annual crashes in the project location(s) broken out by types of roadway users involved (e.g., pedestrians, bicyclists, motorcyclist, passenger vehicle occupant, commercial vehicle occupant) | Annually and at the end of the period of performance |
| Equity | Percent of Funds to Underserved Communities: Funding amount (of total project amount) benefitting underserved communities, as defined by USDOT | End of period of performance |
| Costs | Project Costs: Quantification of the cost of each eligible project carried out using the grant | End of period of performance |

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Outcomes and Benefits<br><br>[for Implementation Grants] | Quantitative Project Benefits: Quantification of evidence-based projects or strategies implemented (e.g., miles of sidewalks installed, number of pedestrian crossings upgraded, etc.) | End of period of performance |
| Outcomes and Benefits<br><br>[for Implementation Grants] | Qualitative Project Benefits: Qualitative description of evidence-based projects or strategies implemented (e.g., narrative descriptions, testimonials, high-quality before and after photos, etc.) | End of period of performance |
| Outcomes and Benefits<br><br>[for Implementation Grants] | Project Location(s): GIS/geo coordinate information identifying specific project location(s) | End of period of performance |
| Lessons Learned and Recommendations | Lessons Learned and Recommendations: Description of lessons learned and any recommendations relating to future projects of strategies to prevent death and serious injury on roads and streets. | End of period of performance |

**ATTACHMENT B**
**CHANGES FROM APPLICATION**

**INSTRUCTIONS FOR COMPLETING ATTACHMENT B:** Describe all material differences between the scope, schedule, and budget described in the application and the scope, schedule, and budget described in Article 3. The purpose of this attachment B is to document the differences clearly and accurately in scope, schedule, and budget to establish the parties' knowledge and acceptance of those differences. See section 10.1.

**Scope**: None

**Schedule**: Schedule changed to:
    Base Phase Preliminary Design / NEPA: Effective Date of Award – July 2025
    Phase 1. Final Design: July 2025 – February 2026
    Phase 2. Construction – February 2026 – April 2029

**Budget**: None

## ATTACHMENT C
## RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

1.    **Efforts to Improve Racial Equity and Reduce Barriers to Opportunity.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)* |
| | The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)* |
| | The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)* |
| X | The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity, as described in the supporting narrative below. |
| | The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but, before beginning construction of the project, will take relevant actions described in the supporting narrative below |
| | The Recipient has not taken actions related to the Project to improve racial equity and reduce barriers to opportunity and will not take those actions under this award. |

2.    **Supporting Narrative.**

The nine intersections, which will be delivered under one construction project, were chosen for this project using safety and equity filters. An Equity Analysis of Intersection Locations was done and produced the following for the nine intersections:

## TABLE 3: EQUITY ANALYSIS OF INTERSECTION LOCATIONS

| Location | Area Median Household Income | Area Non-White Pop. (% of total) | Area Pop. Under 18 (% of total) | Area Pop. Over 65 (% of total) | Area Pop. with a disability (% of total) | USDOT Underserved Community | Massachusetts Environmental Justice Community Status |
|---|---|---|---|---|---|---|---|
| Bennington Street and Saratoga Street | $59,022 | 55.8% | 15.6% | 10.4% | 10.9% | Yes | Yes (Minority, Income, and English Isolation) |
| Stuart Street and Tremont Street | $49,805 | 52.4% | 8.8% | 17.2% | 13.1% | No | Yes (Minority, Income, and English Isolation) |
| Kneeland Street and Washington Street | $53,962 | 55.1% | 9.7% | 16.3% | 12.0% | No | Yes (Minority, Income, and English Isolation) |
| Dorchester Avenue and Boston Street | $37,583 | 46.9% | 19.6% | 4.9% | 11.0% | No | Yes (Minority, Income, and English Isolation) |
| Seaver Street and Walnut Street | $28,286 | 78.0% | 20.1% | 16.3% | 16.5% | Yes | Yes (Minority, Income, and English Isolation) |
| Blue Hill Avenue and Columbia Road | $33,069 | 96.0% | 26.1% | 13.6% | 19.5% | Yes | Yes (Minority, Income, and English Isolation) |
| Blue Hill Avenue and American Legion Highway | $31,909 | 99.3% | 30.9% | 11.0% | 16.3% | Yes | Yes (Minority, Income, and English Isolation) |
| Claybourne Street and Tonawanda Street | $61,598 | 89% | 23.6% | 11.9% | 15.4% | Yes | Yes (Minority, Income, and English Isolation) |
| Wainwright Street and Brent Street | $54,722 | 69.9% | 21.7% | 12.4% | 16.3% | Yes | Yes (Minority and English Isolation) |
| **City of Boston** | **$76,298** | **55.3%** | **15.7%** | **11.8%** | **11.8%** | **N/A** | **N/A** |

*Numbers in bold denote intersections that exceed the City of Boston's averages

For construction labor used on this project, the City's Mayor's Office of Workforce Development offers several economic empowerment opportunities to invest in high quality workers and to retain people in good-paying jobs. The citywide Greater Boston Equitable Apprenticeship Pathways program was established so that underrepresented populations can progress from pre-apprenticeship into registered apprenticeships. Boston residents can improve their earning capacity, as the program's Equity Partners have

guaranteed jobs and wages to participants. The Program supports Black, Indigenous, People of Color (BIPOC), women, individuals with disabilities, residents who are formerly incarcerated, and others who have historically been under-represented. Infrastructure jobs are the target occupation for this program.

Additionally, the City's Economic Development Office's Equitable Procurement Initiatives has been working to build and expand relationships with a diverse set of vendors. The Supplier Diversity Advisory Council, established through an Executive Order in 2019, ensures equitable procurement and works to address racial and economic disparities for businesses in Boston. Through this Executive Order, the City developed a public-facing directory of small and local businesses, including minority-owned businesses (MBEs), women-owned businesses (WBEs), and veteran-owned small businesses. This also includes the creation of a training program for City employees and departments who manage procurement and the establishment of a procurement plan to prioritize equitable business practices. The City of Boston's Sheltered Market Program, created in 2021, also supports equitable procurement of minority- and women-owned businesses.

*Resilient Boston* outlines a Resilience and Racial Equity Lens process that the City uses to maximize resilience investment and intentionally take actions to address disproportionate impact of climate change and disruptions to transportation on disadvantaged communities. The City has adapted the National Academy of Public Administration framework for evaluating equity and will elevate equity as a core imperative to achieve citywide resilience.

**ATTACHMENT D**
**CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS**

1.    **Consideration of Climate Change and Environmental Justice Impacts.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| X | The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities. *(Identify the tool(s) in the supporting narrative below.)* |
| | The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand. *(Describe that shift in the supporting narrative below.)* |
| | The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions. *(Describe those strategies in the supporting narrative below.)* |
| | The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both. *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | The Project supports the installation of electric vehicle charging stations. *(Describe that support in the supporting narrative below.)* |
| | The Project promotes energy efficiency. *(Describe how in the supporting narrative below.)* |
| | The Project serves the renewable energy supply chain. *(Describe how in the supporting narrative below.)* |
| | The Project improves disaster preparedness and resiliency *(Describe how in the supporting narrative below.)* |
| | The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity. *(Describe how in the supporting narrative below.)* |
| | The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm. *(Describe that infrastructure in the supporting narrative below.)* |
| | The Project supports or incorporates the construction of energy- and location-efficient buildings. *(Describe how in the supporting narrative below.)* |

| | The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
|---|---|
| X | The Recipient has taken other actions to consider climate change and environmental justice impacts of the Project, as described in the supporting narrative below. |
| | The Recipient has not yet taken actions to consider climate change and environmental justice impacts of the Project but, before beginning construction of the Project, will take relevant actions described in the supporting narrative below. |
| | The Recipient has not taken actions to consider climate change and environmental justice impacts of the Project and will not take those actions under this award. |

2.    **Supporting Narrative.**

Climate change is impacting the livability and wellbeing of Bostonians. An increase in flooding and more frequent storms and extreme temperatures will need to be accounted for in transportation access and safety measures. This Project aims to improve environmental sustainability and quality of life with safety measures in all communities, especially in underserved communities. The City's *Resilient Boston* An equitable and Connected City publication includes "advancing resilient transportation systems" as priority target #17. This target aims to, "build a more resilient transportation network by improving access in key corridors, adapting transport infrastructure to climate change, and ensuring equitable distribution of resources." Ensuring safe, comfortable infrastructure for active transportation users will expand its usage and lead to more individuals feeling safe doing so.

Specific strategies that the City intends to include in the safety measures include:

- Planting native plant species on medians to support nature-based solutions and beautify the street.
- Stormwater bump outs to incorporate climate resilience measures and improve stormwater management for the City.
- Silva cells to support lower-carbon pavement materials and improve stormwater management.

The environmental justice tool used USDOT's Equitable Transportation Community (ETC) Explorer to minimize the adverse impacts the Project may have on environmental justice communities.

*Resilient Boston* outlines a Resilience and Racial Equity Lens process that the City uses to maximize resilience investment and intentionally take actions to address disproportionate impact of climate change and disruptions to transportation on disadvantaged communities. The City has adapted the National Academy of Public Administration framework for evaluating equity and will elevate equity as a core imperative to achieve citywide resilience.

**ATTACHMENT E**
**LABOR AND WORKFORCE**

1.    **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Recipient demonstrate, to the full extent possible consistent with the law, an effort to create good-paying jobs with the free and fair choice to join a union and incorporation of high labor standards. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted the use of local and economic hiring preferences in the overall delivery and implementation of the Project. *(Describe the relevant provisions in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted the use of registered apprenticeships in the overall delivery and implementation of the Project. *(Describe the use of registered apprenticeship in the supporting narrative below.)* |
| X | The Recipient or a project partner will provide training and placement programs for underrepresented workers in the overall delivery and implementation of the Project. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will support free and fair choice to join a union in the overall delivery and implementation of the Project by investing in workforce development services offered by labor-management training partnerships or setting expectations for contractors to develop labor-management training programs. *(Describe the workforce development services offered by labor-management training partnerships in the supporting narrative below.)* |
| | The Recipient or a project partner will provide supportive services and cash assistance to address systemic barriers to employment to be able to participate and thrive in training and employment, including childcare, emergency cash assistance for items such as tools, work clothing, application fees and other costs of apprenticeship or required pre-employment training, transportation and travel to training and work sites, and services aimed at helping to retain underrepresented groups like mentoring, support groups, and peer networking. *(Describe the supportive services and/or cash assistance provided to trainees and employees in the supporting narrative below.)* |
| | The Recipient or a project partner has documented agreements or ordinances in place to hire from certain workforce programs that serve underrepresented groups. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |

22 of 25

| | |
|---|---|
| X | The Recipient or a project partner participates in a State/Regional/Local comprehensive plan to promote equal opportunity, including removing barriers to hire and preventing harassment on work sites, and that plan demonstrates action to create an inclusive environment with a commitment to equal opportunity, including:<br><br>a. affirmative efforts to remove barriers to equal employment opportunity above and beyond complying with Federal law;<br>b. proactive partnerships with the U.S. Department of Labor's Office of Federal Contract Compliance Programs to promote compliance with EO 11246 Equal Employment Opportunity requirements and meet the requirements as outlined in the Notice of Funding Opportunity to make good faith efforts to meet the goals of 6.9 percent of construction project hours being performed by women and goals that vary based on geography for construction work hours and for work being performed by people of color;<br>c. no discriminatory use of criminal background screens and affirmative steps to recruit and include those with former justice involvement, in accordance with the Fair Chance Act and equal opportunity requirements;<br>d. efforts to prevent harassment based on race, color, religion, sex, sexual orientation, gender identity, and national origin;<br>e. training on anti-harassment and third-party reporting procedures covering employees and contractors; and<br>f. maintaining robust anti-retaliation measures covering employees and contractors.<br>*(Describe the equal opportunity plan in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the project, will take relevant actions described in the supporting narrative below. |
| | The Recipient has not taken actions related to the Project to improving good-paying jobs and strong labor standards and will not take those actions under this award. |

2. **Supporting Narrative.**

For construction labor used on this project, the City's Mayor's Office of Workforce Development offers several economic empowerment opportunities to invest in high quality workers and to retain people in good-paying jobs. The citywide Greater Boston Equitable Apprenticeship Pathways program was established so that underrepresented populations can progress from pre-apprenticeship into registered apprenticeships. Boston residents can improve their earning capacity, as the program's Equity Partners have guaranteed jobs and wages to participants. The Program supports Black, Indigenous,

People of Color (BIPOC), women, individuals with disabilities, residents who are formerly incarcerated, and others who have historically been under-represented. Infrastructure jobs are the target occupation for this program.

Additionally, the City's Economic Development Office's Equitable Procurement Initiatives has been working to build and expand relationships with a diverse set of vendors. The Supplier Diversity Advisory Council, established through an Executive Order in 2019, ensures equitable procurement and works to address racial and economic disparities for businesses in Boston. Through this Executive Order, the City developed a public-facing directory of small and local businesses, including minority-owned businesses (MBEs), women-owned businesses (WBEs), and veteran-owned small businesses. This also includes the creation of a training program for City employees and departments who manage procurement and the establishment of a procurement plan to prioritize equitable business practices. The City of Boston's Sheltered Market Program, created in 2021, also supports equitable procurement of minority- and women-owned businesses.

The City of Boston is proud to be an Equal Opportunity Employer. The City is committed to creating a diverse and inclusive environment. Therefore, qualified applicants will be considered regardless of their sex, race, age, religion, color, national origin, ancestry, physical or mental disability, genetic information, marital status, sexual orientation, gender identity, gender expression, military and veteran status, or other protected category. The City's Executive Order on Valuing Diversity and Equality can be found at this link:
https://www.boston.gov/sites/default/files/file/document_files/2018/05/diversity_and_equality_statement.pdf

**ATTACHMENT F**
**CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE**

1.    **Efforts to strengthen the Security and Resilience of Critical Infrastructure against both Physical and Cyber Threats.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Recipient demonstrates, prior to the signing of this agreement, effort to consider and address physical and cyber security risks relevant to the transportation mode and type and scale of the activities. |
| X | The Recipient appropriately considered and addressed physical and cyber security and resilience in the planning, design and oversight of the project, as determined by the Department and the Department of Homeland Security. |
| X | The Recipient complies with 2 CFR 200.216 and the prohibition on certain telecommunications and video surveillance services or equipment. |
| X | For projects in floodplains:  The Recipient appropriately considered whether the project was upgraded consistent with the Federal Flood Risk Management Standard, to the extent consistent with current law, in Executive Order 14030, Climate-Related Financial Risk (86 FR 27967), and Executive Order 13690, Establishing a Federal Flood Risk Management Standard and a Process for Further Solicit and Considering Stakeholder Input (80 FR 6425). |

2.    **Supporting Narrative.**

The City of Boston ensures that the networks, computers, and systems that support the City are secure and effective. The City controls and maintain online security within the City of Boston and have policies and guidelines in place to do so. We also encourage residents to make sure they're taking precautions online. Cyber and physical security was considered in the planning and will be considered as the City implements the SS4A project and improves its intersections.

The City attests that it complies with 2 CFR 200.216 and the prohibition on certain telecommunications and video surveillance services and equipment. It further attests that it appropriately considered whether the project upgraded is consistent with the Federal Flood Risk Management Standard.

25 of 25

Franklin-Hodge Ex. D

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2022 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT
PROGRAM:
FHWA PROJECTS**

Original:  February 8, 2023
Revision 1: March 28, 2023
Revision 2:  August 1, 2023
Revision 3:  October 1, 2024
Revision 4:  March 17, 2025

# Table of Contents

Article 7 Purpose.................................................................................................................... 6
  7.1  Purpose............................................................................................................................. 6
Article 8 USDOT Role........................................................................................................... 6
  8.1  Division of USDOT Responsibilities............................................................................ 6
  8.2  USDOT Program Contacts.............................................................................................. 7
Article 9 Recipient Role........................................................................................................ 7
  9.1  Statements on the Project............................................................................................... 7
  9.2  Statements on Authority and Capacity......................................................................... 7
  9.3  USDOT Reliance............................................................................................................. 8
  9.4  Project Delivery.............................................................................................................. 8
  9.5  Rights and Powers Affecting the Project...................................................................... 8
  9.6  Notification of Changes to Key Personnel................................................................... 9
Article 10 Award Amount, Obligation, and Time Periods ................................................ 9
  10.1  Federal Award Amount................................................................................................ 9
  10.2  Federal Obligations....................................................................................................... 9
  10.3  Budget Period................................................................................................................ 10
  10.4  Period of Performance.................................................................................................. 10
Article 11 Statement of Work, Schedule, and Budget Changes ..................................... 11
  11.1  Notification Requirement.............................................................................................. 11
  11.2  Statement of Work Changes........................................................................................ 11
  11.3  Schedule Changes......................................................................................................... 11
  11.4  Budget Changes............................................................................................................ 11
  11.5  USDOT Acceptance of Changes.................................................................................. 12
Article 12 General Reporting Terms................................................................................... 13
  12.1  Report Submission........................................................................................................ 13
  12.2  Alternative Reporting Methods.................................................................................... 13
  12.3  Paperwork Reduction Act Notice................................................................................ 13
Article 13 Progress and Financial Reporting .................................................................... 13
  13.1  Quarterly Program Performance Reports.................................................................... 13
  13.2  Quarterly Financial Status............................................................................................ 13
Article 14 Performance Reporting ...................................................................................... 13
  14.1  Baseline Performance Measurement............................................................................ 13
  14.2  Section 24112(h) Report............................................................................................... 14
  14.3  Performance Measurement Information.......................................................................14
  14.4  Performance Reporting Survival..................................................................................14
  14.5  Program Evaluation.......................................................................................................14
Article 15 Noncompliance and Remedies .......................................................................... 15
  15.1  Noncompliance Determinations................................................................................... 15
  15.2  Remedies........................................................................................................................ 15
  15.3  Other Oversight Entities............................................................................................... 16
Article 16 Agreement Termination ..................................................................................... 16
  16.1  USDOT Termination..................................................................................................... 16
  16.2  Closeout Termination.................................................................................................... 17
  16.3  Post-Termination Adjustments..................................................................................... 17
  16.4  Non-Terminating Events............................................................................................... 17
  16.5  Other Remedies............................................................................................................. 17

Article 17 Monitoring, Financial Management, Controls, and Records .................................... 18
    17.1    Recipient Monitoring and Record Retention. ................................................. 18
    17.2    Financial Records and Audits. ....................................................................... 18
    17.3    Internal Controls. .......................................................................................... 18
    17.4    USDOT Record Access. ................................................................................ 19
Article 18 Contracting and Subawards ................................................................................. 19
    18.1    Build America, Buy America. ....................................................................... 19
    18.2    Small and Disadvantaged Business Requirements. ....................................... 22
    18.3    Engineering and Design Services. ................................................................ 22
    18.4    Foreign Market Restrictions. ........................................................................ 22
    18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 22
    18.6    Recipient Responsibilities For Subawards. ................................................... 22
    18.7    Subaward and Contract Authorization. .......................................................... 22
Article 19 Costs, Payments, and Unexpended Funds ........................................................... 22
    19.1    Limitation of Federal Award Amount. .......................................................... 22
    19.2    Projects Costs. ............................................................................................... 23
    19.3    Timing of Project Costs. ............................................................................... 23
    19.4    Recipient Recovery of Federal Funds. .......................................................... 23
    19.5    Unexpended Federal Funds. .......................................................................... 23
    19.6    Timing of Payments to the Recipient. ........................................................... 23
    19.7    Payment Method. ........................................................................................... 23
    19.8    Information Supporting Expenditures. ........................................................... 23
    19.9    Reimbursement Frequency. ........................................................................... 24
Article 20 Liquidation, Adjustments, and Funds Availability .............................................. 24
    20.1    Liquidation of Recipient Obligations. ........................................................... 24
Article 21 Agreement Modifications .................................................................................... 24
    21.1    Bilateral Modifications. ................................................................................ 24
    21.2    Unilateral Contact Modifications. ................................................................. 24
    21.3    USDOT Unilateral Modifications. ................................................................ 24
    21.4    Other Modifications. ..................................................................................... 24
Article 22 [RESERVED] ...................................................................................................... 25
    22.1    [RESERVED]. ............................................................................................... 25
Article 23 [RESERVED] ...................................................................................................... 25
    23.1    [RESERVED]. ............................................................................................... 25
Article 24 Federal Financial Assistance, Administrative, and National Policy Requirements .... 25
    24.1    Uniform Administrative Requirements for Federal Awards. .......................... 25
    24.2    Federal Law and Public Policy Requirements. .............................................. 25
    24.3    Federal Freedom of Information Act. ............................................................ 25
    24.4    History of Performance. ................................................................................ 26
    24.5    Whistleblower Protection. ............................................................................. 26
    24.6    External Award Terms and Obligations. ....................................................... 26
    24.7    Incorporated Certifications. .......................................................................... 26
Article 25 Assignment ......................................................................................................... 27
    25.1    Assignment Prohibited. ................................................................................. 27
Article 26 Waiver ................................................................................................................. 27
    26.1    Waivers. ........................................................................................................ 27
Article 27 Additional Terms and Conditions ....................................................................... 27
    27.1    Effect of Action Plan or Implementation Plan. ............................................. 27
    27.2    Disclaimer of Federal Liability. .................................................................... 27
    27.3    Environmental Review. ................................................................................. 27

27.4   Railroad Coordination...................................................................................................... 29
27.5   Relocation and Real Property Acquisition........................................................................ 29
27.6   Equipment Disposition..................................................................................................... 29
Article 28 Mandatory Award Information ...................................................................................... 30
28.1   Information Contained in a Federal Award. ..................................................................... 30
Article 29 Construction and Definitions ........................................................................................ 30
29.1   Attachments. ..................................................................................................................... 30
29.2   Exhibits. ............................................................................................................................ 30
29.3   Construction. ..................................................................................................................... 30
29.4   Integration. ........................................................................................................................ 30
29.5   Definitions......................................................................................................................... 31
Article 30 Agreement Execution and Effective Date .................................................................... 31
30.1   Counterparts. ..................................................................................................................... 31
30.2   Effective Date. .................................................................................................................. 31

## Index of Definitions

Administering Operating Administration ........................................................................... 7
Environmental Review Entity………………………………………………………...27
Federal Share ...................................................................................................................... 12
FHWA .................................................................................................................................. 7
NOFO ................................................................................................................................... 6
OMB ................................................................................................................................... 13
Program Statute .................................................................................................................. 30
Project…………………………………………………………………………………...21
Project Closeout ................................................................................................................. 17
SS4A Grant ........................................................................................................................ 30
USDOT ................................................................................................................................. 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act (IIJA; Pub. L. 117–58, November 15, 2021) established the Safe Streets and Roads for All (SS4A) Discretionary Grant Program (BIL Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2022 for the SS4A Discretionary Grant Program (87 Fed. Reg. 31606 (May 24, 2022; subsequently amended in 87 Fed. Reg. 47818 on August 4, 2022).

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2022 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through D are project-specific attachments.

## ARTICLE 7
## PURPOSE

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

## ARTICLE 8
## USDOT ROLE

8.1    **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b) The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2     USDOT Program Contacts.**

FHWA Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2201

and

[enter FHWA Division Office lead point of contact]
[enter address]
[enter email address]
[enter telephone]


**ARTICLE 9**
**RECIPIENT ROLE**


**9.1     Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)     Attachment B documents all material changes in the information contained in that application.

**9.2     Statements on Authority and Capacity.** The Recipient states that:

(1)     it has the authority to receive Federal financial assistance under this agreement;

(2)     It has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable.

(3)     it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)     not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)     it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)     the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 24.7 on behalf of the Recipient.

**9.3**    **USDOT Reliance.** The Recipient acknowledges that:

(1)     the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)     the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)     the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)     the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4**    **Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c) The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d) The Recipient shall provide access to records as provided at 2 CFR 200.337.

**9.5**    **Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6    Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.4 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.3.

## ARTICLE 10
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**10.1    Federal Award Amount.** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in Section 2.2 as the SS4A Grant Amount.

**10.2    Federal Obligations.**

This agreement obligates for the budget period listed in section 2.5 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," then an amount up to the Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.3(c)–10.3(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant among separate portions of the Project for the purpose of the Federal obligation of funds. The scope of each portion of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.5 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

(1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

(2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

(1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

(2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

## 10.3    Budget Period

The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 2.5, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

## 10.4    Period of Performance.

(a) The period of performance for this award begins on the effective date of award listed in page 1 item 2 and ends on the period of performance end date that is listed in Section 2.3.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

**ARTICLE 11**
**STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES**

11.1    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

11.2    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

11.3    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant dates:

(1)    a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed in section 2.4 (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase  budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements)..

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

11.4    **Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)     the "Total Eligible Project Cost" amount decreases.

(c)  For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

(1)     in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2)     if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Action Plan or Implementation Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3.

(f)  The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5    USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

## ARTICLE 12
## GENERAL REPORTING TERMS

12.1    **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.4.  Reports will be added to a central repository maintained by FHWA.

12.2    **Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

12.3    **Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

## ARTICLE 13
## PROGRESS AND FINANCIAL REPORTING

13.1    **Quarterly Program Performance Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Project Progress Report in the format and with the content described in Exhibit C (SF-PPR). If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Project Progress Report in the second calendar year quarter that begins after the date of this agreement.

13.2    **Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year, the Recipient shall submit a Federal Financial Report using SF-425.

## ARTICLE 14
## PERFORMANCE REPORTING

14.1    **Baseline Performance Measurement.** If the Designation in Section 2.5 is "Implementation," then:

(1)    the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)     on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2    Section 24112(h) Report:** The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report that describes, consistent with section 24112(h) of IIJA:

(1)     the costs of carrying out the project;

(2)     the outcomes and benefits that each eligible project generated as identified in the grant application and measured by data to the maximum extent practicable (i.e. number of fatalities and serious injuries that occurred within the limits of the project location); and

(3)     the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3    Performance Measurement Information.**

For each performance measure that is identified in the Performance Measure Table in Attachment A, not later than January 31 of each year that follows a calendar year within the period of performance during which data was collected, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4    Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5    Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

**ARTICLE 15**
**NONCOMPLIANCE AND REMEDIES**

**15.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

   (1)    accept the remedy;

   (2)    acknowledge the noncompliance, but propose an alternative remedy; or

   (3)    dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

   (1)    after considering the Recipient's response under section 15.1(b); or

   (2)    if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

   (1)    additional conditions on the award;

   (2)    any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C. F. R. part 901).

## 15.3    Other Oversight Entities.

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 16
## AGREEMENT TERMINATION

## 16.1    USDOT Termination.

(a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(1)     the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.2 table (a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

(2)     a construction start date for the Project or Strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(3)      a substantial completion date for the Project or Strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4)      the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(5)      the USDOT determines that termination of this agreement is in the public interest.

(6)      the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5    Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

**ARTICLE 17**
**MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS**

**17.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2022 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2022" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2022" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

## ARTICLE 18
## CONTRACTING AND SUBAWARDS

**18.1    Build America, Buy America.**  This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184 and Office of Management and Budget (OMB) Memorandum M-24-02, "Initial Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1) applying the domestic content procurement preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"Construction materials" means articles, materials, or supplies— that consist of only one of the items listed below in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material:

(1) The listed Items are:
  • non-ferrous metals;
  • plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
  • glass (including optic glass);
  • fiber optic cable (including drop cable)
  • optical fiber;
  • lumber;
  • engineered wood; and
  • drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"Domestic content procurement preference" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"Iron or steel products" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"Manufactured products" means:

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"Predominantly of iron or steel or a combination of both" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

"**Project**" means the temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"Section 70917(c) materials" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as applicable, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c)  Under 2 C.F.R. 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

18.2    **Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

18.3    **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under 2 CFR 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

18.4    **Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

18.5    **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

18.6    **Recipient Responsibilities For Subawards.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

18.7    **Subaward and Contract Authorization.** If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f) (6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

19.1    **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11,

Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**19.2    Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3    Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b)  The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement, unless there has been an approval pre-award costs under 2 C.F.R. 200.458. pre-award costs under 2 C.F.R. 200.458.

**19.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6    Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7    Payment Method.**  The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8    Information Supporting Expenditures**

(a)  If the USDOT Payment System identified in section 5.2 is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 270 (Request for Advance or Reimbursement), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b)  If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9    Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.

**ARTICLE 20**
**LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY**

**20.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

**ARTICLE 21**
**AGREEMENT MODIFICATIONS**

**21.1    Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**

(a) The USDOT may update the contacts who are listed in sections 4.4 by written notice to all of the Recipient contacts who are listed in section 4.3.

**21.3    USDOT Unilateral Modifications.**

(a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this agreement under this section 21.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, or 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**
**[RESERVED]**

**ARTICLE 23**
**[RESERVED]**

**ARTICLE 24**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

24.1    **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

24.2    **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

24.3    **Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

24.4    **History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

24.5    **Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

24.6    **External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 29, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

(3)    2 C.F.R part 175: Award Term for Trafficking in Persons; and

(4)    Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 C.F.R. part 20: New Restrictions on Lobbying;

(2)    49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)    49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

24.7    **Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)    Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

**ARTICLE 25**
**ASSIGNMENT**

**25.1 Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

**ARTICLE 26**
**WAIVER**

**26.1 Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

**ARTICLE 27**
**ADDITIONAL TERMS AND CONDITIONS**

**27.1 Effect of Action Plan or Implementation Plan.** Based on information that the Recipient provided to the USDOT, including the Technical Application, at indicated in section 2.5, this agreement designates this award as an Action Plan award or a Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**27.2 Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**27.3 Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 27.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

  (1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370-12, and any other applicable environmental laws and regulations; and

  (2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

  (1) the Environmental Review Entity's actions under section 27.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

  (2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

  (1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

  (2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

27.4    **Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

27.5    **Relocation and Real Property Acquisition.**

(a)   The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b)   The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c)   The Recipient shall make available to displaced persons comparable replacement dwellings in accordance with 49 C.F.R. part 24.

27.6    **Equipment Disposition.**

(a)   In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b)   In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.310–200.316 and 2 C.F.R. 1201.313.

(c)   The Recipient shall ensure compliance with this section 27.6 for all tiers of subawards under this award.

**ARTICLE 28**
**MANDATORY AWARD INFORMATION**

28.1    **Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)     the "Federal Award Date" is the date of this agreement, as defined under section 30.2;

(2)     the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)     this award is not for research and development.

## ARTICLE 29
## CONSTRUCTION AND DEFINITIONS

29.1    **Attachments.** This agreement includes the following attachments as integral parts:

|  |  |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | [RESERVED] |
| Attachment D | [RESERVED] |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |

29.2    **Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2022 SS4A Grant Program", dated March 17, 2025, and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

|  |  |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

29.3    **Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1-28, then the provision in articles 1-28 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

29.4    **Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

29.5    **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the IIJA section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement, including article 3 and Attachments A–D.

"**SS4A Grant**" means an award of funds that were made available under the NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

### ARTICLE 30
### AGREEMENT EXECUTION AND EFFECTIVE DATE

**30.1    Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**30.2    Effective Date.** The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE
FISCAL YEAR 2022 SAFE STREETS AND ROADS FOR ALL GRANT PROGRAM**

**February 8, 2023
Revised:  March 17, 2025**

# EXHIBIT A
# APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this agreement for a FY 2022 Safe Streets and Roads for All Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
a. Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
b. Hatch Act – 5 U.S.C. 1501, et seq.
c. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
d. National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
e. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
f. Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
g. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
h. Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
i. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
j. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
k. Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
l. Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
m. American Indian Religious Freedom Act, P.L. 95-341, as amended
n. Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
o. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
p. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
q. Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
r. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
s. Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
t. Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
u. National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
v. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
w. Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
x. Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
y. Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
z. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
aa. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
bb. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
cc. Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C. 1101 -1104, 541, et seq.
dd. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and

Financial Transactions – 31 U.S.C. 1352
ee. Freedom of Information Act – 5 U.S.C. 552, as amended
ff. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855
gg. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.
hh. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.
ii. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.
jj. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525
kk. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303
ll. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.
mm. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26
nn. Wilderness Act – 16 U.S.C. 1131-1136
oo. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
pp. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.
qq. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
rr. Cargo Preference Act of 1954 – 46 U.S.C. 55305
ss. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
tt. Bringing in and harboring certain aliens – 8 U. S. C. 1324
uu. Aiding or assisting certain aliens to enter – 8 U. S. C. 1327

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 11988 – Floodplain Management
c. Executive Order 12372 – Intergovernmental Review of Federal Programs
d. Executive Order 12549 – Debarment and Suspension
e. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 – Worker Organizing and Empowerment
g. Executive Order 14149 - Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14154 - Unleashing American Energy
i. Executive Order 14151 - Ending Radical and Wasteful Government DEI Programs and Preferencing
j. Executive Order 14168 - Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173 - Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**General Federal Regulations**
a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201
b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200
c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13
d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1
e. Contractors and subcontractors on public building or public work financed in whole or

part by loans or grants from the United States – 29 C.F.R. Part 3

f.  Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5

g.  Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.

h.  New Restrictions on Lobbying – 49 C.F.R. Part 20

i.  Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21, including any amendments thereto

j.  Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24

k.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25

l.  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27

m.  DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35

n.  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28

o.  Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30

p.  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32

q.  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38

r.  Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26, including any amendments thereto (as applicable under section 18.3 of this agreement)

**Office of Management and Budget Circulars**

a.  Any applicable OMB Circular based upon the specific FY 2022 Safe Streets and Roads for All Grant Recipient.

**Highway Federal Legislation**

a.  Agreements relating to the use of an access to rights-of-way—Interstate System, 23 U.S.C. 111

b.  Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

c.  Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.

d.  Efficient Environmental Reviews - 23 U.S.C. 139

e.  Policy on lands, wildlife and waterfowl refuges, and historic sites - 49 U.S.C. 303

**Federal Highway Regulations**
    a.  Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
    b.  National Highway System Design Standards – 23 C.F.R. Part 625
    c.  Location and Hydraulic Design of Encroachments on Flood Plains – 23 C.F.R. Part 650 Subpart A
    d.  Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655
    e.  Length, Width and Weight Limitations – 23 C.F.R. Part 658
    f.  Environmental Impact and Related Procedures – 23 C.F.R. Part 771
    g.  Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(f)) – 23 C.F.R. Part 774
    h.  Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122

Specific assurances required to be included in the FY 2022 Safe Streets and Roads for All Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

A-4

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under the FY 2022 Safe Streets and Roads for All (SS4A) grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*, 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

## Specific Assurances

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2022 SS4A grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. Part 21, including any amendments there to, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2022 SS4A Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

> *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
   b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

B-3

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2022 SS4A grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2022 SS4A grant program.

## APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as

the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), 49 U.S.C. § 6702, the Regulations for the Administration of FY 2022 SS4A grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation, including any amendments thereto, in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

B-7

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

**APPENDIX C**

**CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM**

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

    1. In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

B-10

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

## TERM B.2
## CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 C.F.R. Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2022 SS4A grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2022 SS4A Grant, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or

contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is

erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;

    (2) require the certifications in section 3;

    (3) include the prohibition in section 4; and

    (4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While
Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
    (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS:**
**FORMAT AND CONTENT**

**1.      Purpose**. The purpose of the Quarterly Project Progress Reports and Recertifications under this agreement for the FY 2022 SS4A grant program are to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

**2.      Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. At the discretion of the USDOT, modifications or additions can be made to produce a quarterly reporting format that will most effectively serve both the Recipient and the USDOT. Some projects will have a more extensive quarterly status than others. For smaller projects, the USDOT may determine that the content of the quarterly reports will be streamlined and project status meetings will be held on a less-frequent basis. The first quarterly progress report should include a detailed description and, where appropriate, drawings of the items funded.

> **(a)  Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any deviations from the scope of work, the schedule, or the budget that are described in this agreement.

> **(b)  Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable Recovery Act requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

> **(c)  Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction in order to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

> **(d)  Project Scope Overview.** The purpose of this section is to provide a further update regarding the project scope. If the original scope contained in the grant agreement is still accurate, this section can simply state that the scope is unchanged.

> **(e)  Project Schedule.** An updated master program schedule reflecting the current status of the program activities should be included in this section. A Gantt (bar) type chart is probably the most appropriate for quarterly reporting purposes, with the ultimate format to be agreed upon between the Recipient and the USDOT. It is imperative that the master program schedule be integrated, i.e., the individual contract milestones tied

to each other, such that any delays occurring in one activity will be reflected throughout the entire program schedule, with a realistic completion date being reported. Narratives, tables, and/or graphs should accompany the updated master program schedule, basically detailing the current schedule status, delays and potential exposures, and recovery efforts. The following information should also be included:

- Current overall project completion percentage vs. latest plan percentage.
- Completion percentages vs. latest plan percentages for major activities such as right-of-way, major or critical design contracts, major or critical construction contracts, and significant force accounts or task orders. A schedule status description should also be included for each of these major or critical elements.
- Any delays or potential exposures to milestone and final completion dates. The delays and exposures should be quantified, and overall schedule impacts assessed. The reasons for the delays and exposures should be explained, and initiatives being analyzed or implemented in order to recover the schedule should be detailed.

**(f) Project Cost.** An updated cost spreadsheet reflecting the current forecasted cost vs. the latest approved budget vs. the baseline budget should be included in this section. One way to track project cost is to show: (1) Baseline Budget, (2) Latest Approved Budget, (3) Current Forecasted Cost Estimate, (4) Expenditures or Commitments to Date, and (5) Variance between Current Forecasted Cost and Latest Approved Budget. Line items should include all significant cost centers, such as prior costs, right-of-way, preliminary engineering, environmental mitigation, general engineering consultant, section design contracts, construction administration, utilities, construction packages, force accounts/task orders, wrap-up insurance, construction contingencies, management contingencies, and other contingencies. The line items can be broken-up in enough detail such that specific areas of cost change can be sufficiently tracked and future improvements made to the overall cost estimating methodology. A Program Total line should be included at the bottom of the spreadsheet. Narratives, tables, and/or graphs should accompany the updated cost spreadsheet, basically detailing the current cost status, reasons for cost deviations, impacts of cost overruns, and efforts to mitigate cost overruns. The following information should be provided:

- Reasons for each line item deviation from the approved budget, impacts resulting from the deviations, and initiatives being analyzed or implemented in order to recover any cost overruns.

- Transfer of costs to and from contingency line items, and reasons supporting the transfers.

- Speculative cost changes that potentially may develop in the future, a quantified dollar range for each potential cost change, and the current status of the speculative change. Also, a comparison analysis to the available contingency amounts should be included, showing that reasonable and

sufficient amounts of contingency remain to keep the project within the latest approved budget.

- Detailed cost breakdown of the general engineering consultant (GEC) services (if applicable), including such line items as contract amounts, task orders issued (amounts), balance remaining for tasks, and accrued (billable) costs.

- Federal obligations and/or disbursements for the project, compared to planned obligations and disbursements.

**(g) Federal Financial Report (SF-425).** The Federal Financial Report (SF-425) is a financial reporting form used throughout the Federal Government Grant system. Recipients shall complete this form and attach it to each quarterly Project Progress and Monitoring Report. The form is available at https://www.grants.gov/forms/post-award-reporting-forms.html.

**(h) Certifications.**

    **i.**    A certification that the Recipient is in compliance with 2 C.F.R. 200.303 (Internal Controls) and 2 C.F.R. Part 200, Subpart F (Audit Requirements).

    ii.    The certification required under 2 C.F.R. 200.415(a).

**EXHIBIT D**
**FORM FOR SUBSEQUENT OBLIGATION OF FUNDS**

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

This instrument obligates **[$XXX]** for **[insert portion of project listed in the Agreement]**.

**[Recipient name]** states that:

    (1)      the Agreement accurately describe the Project's activities;

    (2)      for each completion date listed in the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in the Agreement;

    (3)      comparing the Project's current budget with the amounts listed in the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

    (4)      under the terms of article 21 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

By:

| | |
|---|---|
| Date | Signature of Recipient's Authorized Representative |
| | **[insert name]** |
| | Name |
| | **[insert title]** |
| | Title |

D-1

The USDOT has determined that all applicable Federal requirements for obligating these funds are satisfied.

By:

_____    Signature of USDOT's Authorized Representative
Date

**[insert name]**

Name

**[insert title]**

Title

Franklin-Hodge Ex. E

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2023 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT**
**PROGRAM:**
**FHWA PROJECTS**

**Date: January 4, 2024**
**Revised:  October 1, 2024**
**Revised:    March 17, 2025**

# Table of Contents

Article 7 Purpose......................................................................................................6
   7.1   Purpose..............................................................................................................6
Article 8 USDOT Role..............................................................................................6
   8.1   Division of USDOT Responsibilities................................................................6
   8.2   USDOT Program Contact..................................................................................7
Article 9 Recipient Role............................................................................................7
   9.1   Statements on the Project..................................................................................7
   9.2   Statements on Authority and Capacity..............................................................7
   9.3   USDOT Reliance................................................................................................8
   9.4   Project Delivery................................................................................................8
   9.5   Rights and Powers Affecting the Project..........................................................8
   9.6   Notification of Changes to Key Personnel........................................................8
Article 10 Award Amount, Obligation, and Time Periods .........................................9
   10.1   Federal Award Amount ...................................................................................9
   10.2   Federal Obligations..........................................................................................9
   10.3   Budget Period ................................................................................................10
   10.4   Period of Performance....................................................................................10
Article 11 Statement of Work, Schedule, and Budget Changes ............................... 11
   11.1   Notification Requirement................................................................................11
   11.2   Statement of Work Changes............................................................................11
   11.3   Schedule Changes...........................................................................................11
   11.4   Budget Changes..............................................................................................11
   11.5   USDOT Acceptance of Changes.....................................................................12
Article 12 General Reporting Terms........................................................................ 13
   12.1   Report Submission..........................................................................................13
   12.2   Alternative Reporting Methods.......................................................................13
   12.3   Paperwork Reduction Act Notice...................................................................13
Article 13 Progress and Financial Reporting ........................................................... 13
   13.1   Quarterly Performance Progress Reports........................................................13
   13.2   Quarterly Financial Status...............................................................................13
Article 14 Performance Reporting ........................................................................... 13
   14.1   Baseline Performance Measurement...............................................................13
   14.2   SS4A Final Report .........................................................................................14
   14.3   Performance Measurement Information………………………………………14
   14.4   Performance Reporting Survival……………………………………………..14
   14.5   Program Evaluation……………………………………………………………15
Article 15 Noncompliance and Remedies ................................................................ 15
   15.1   Noncompliance Determinations......................................................................15
   15.2   Remedies........................................................................................................16
   15.3   Other Oversight Entities.................................................................................16
Article 16 Agreement Termination .......................................................................... 16
   16.1   USDOT Termination......................................................................................16
   16.2   Closeout Termination.....................................................................................17
   16.3   Post-Termination Adjustments........................................................................17
   16.4   Non-Terminating Events.................................................................................17
   16.5   Other Remedies..............................................................................................18

Article 17 Monitoring, Financial Management, Controls, and Records .................... 18
   17.1   Recipient Monitoring and Record Retention...................................................18

17.2    Financial Records and Audits. ..............................................................................18
17.3    Internal Controls. ..................................................................................................19
17.4    USDOT Record Access. ........................................................................................19
Article 18 Contracting and Subawards .............................................................................. 19
18.1    Build America, Buy America ...............................................................................19
18.2    Small and Disadvantaged Business Requirements. .............................................21
18.3    Engineering and Design Services. ........................................................................21
18.4    Foreign Market Restrictions. ...............................................................................22
18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment. ..22
18.6    Recipient Responsibilities for Subawards. ...........................................................22
18.7    Subaward and Contract Authorization. .................................................................22
Article 19 Costs, Payments, and Unexpended Funds ........................................................ 23
19.1    Limitation of Federal Award Amount. .................................................................22
19.2    Projects Costs. ......................................................................................................22
19.3    Timing of Project Costs. .......................................................................................23
19.4    Recipient Recovery of Federal Funds. .................................................................23
19.5    Unexpended Federal Funds. ..................................................................................23
19.6    Timing of Payments to the Recipient. ..................................................................23
19.7    Payment Method. ..................................................................................................23
19.8    Information Supporting Expenditures ...................................................................23
19.9    Reimbursement Frequency. ..................................................................................23
19.10   Match. ...................................................................................................................23
Article 20 Liquidation, Adjustments, and Funds Availability .......................................... 24
20.1    Liquidation of Recipient Obligations. ..................................................................24
Article 21 Agreement Modifications ................................................................................. 24
21.1    Bilateral Amendments. .........................................................................................24
21.2    Unilateral Contact Modifications. ........................................................................24
21.3    USDOT Unilateral Modifications. .......................................................................24
21.4    Other Modifications. .............................................................................................24
Article 22 [RESERVED] .................................................................................................... 26
22.1    [RESERVED]. ......................................................................................................26
Article 23 [RESERVED] .................................................................................................... 26
23.1    [RESERVED]. ......................................................................................................26
Article 24 Federal Financial Assistance, Administrative, and National Policy Requirements .... 25
24.1    Uniform Administrative Requirements for Federal Awards. ...............................25
24.2    Federal Law and Public Policy Requirements. .....................................................25
24.3    Federal Freedom of Information Act. ...................................................................25
24.4    History of Performance. ........................................................................................26
24.5    Whistleblower Protection. ....................................................................................26
24.6    External Award Terms and Obligations. ..............................................................26
24.7    Incorporated Certifications. ..................................................................................26
Article 25 Assignment ....................................................................................................... 27
25.1    Assignment Prohibited. .........................................................................................27
Article 26 Waiver ............................................................................................................... 27
26.1    Waivers. ................................................................................................................27
Article 27 Additional Terms and Conditions .................................................................... 27
27.1    Effect of Planning and Demonstration or Implementation Award. ......................27
27.2    Disclaimer of Federal Liability. ...........................................................................27
27.3    Environmental Review .........................................................................................27
27.4    Railroad Coordination. .........................................................................................30
27.5    Relocation and Real Property Acquisition. ..........................................................30
27.6    Equipment Disposition. ........................................................................................30

Article 28 Mandatory Award Information ................................................................ 30
   28.1   Information Contained in a Federal Award. ....................................................30
Article 29 Construction and Definitions ............................................................... 31
   29.1   Attachments. ...............................................................................................31
   29.2   Exhibits. ......................................................................................................31
   29.3   Construction. ...............................................................................................31
   29.4   Integration. ..................................................................................................30
   29.5   Definitions. ..................................................................................................30
Article 30 Agreement Execution and Effective Date ............................................ 31
   30.1   Counterparts. ..............................................................................................31
   30.2   Effective Date. .............................................................................................31

## Index of Definitions

Administering Operating Administration ........................................................................ 7
Environmental Review Entity……………………………………………………………...28
Federal Share ................................................................................................ 12
FHWA ........................................................................................................... 7
NOFO ........................................................................................................... 6
OMB ........................................................................................................... 13
Program Statute ............................................................................................ 31
Project……………………………………………………………………………………….22
Project Closeout ........................................................................................... 18
SS4A Grant .................................................................................................. 31
USDOT ......................................................................................................... 6

**GENERAL TERMS AND CONDITIONS**

The Infrastructure Investment and Jobs Act (IIJA; Pub. L. 117–58, November 15, 2021) established the Safe Streets and Roads for All (the "SS4A") Discretionary Grant Program (IIJA Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2023 for the SS4A Discretionary Grant Program (88 Fed. Reg. 22090, April 12, 2023).

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2023 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F are project-specific attachments.

**ARTICLE 7**
**PURPOSE**

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

**ARTICLE 8**
**USDOT ROLE**

8.1    **Division of USDOT Responsibilities.**

(a)    The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b)    The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2     USDOT Program Contact.**

Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2822

# ARTICLE 9
# RECIPIENT ROLE

**9.1     Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)     Attachment B documents all material changes in the information contained in that application.

**9.2     Statements on Authority and Capacity.** The Recipient states that:

(1)     it has the authority to receive Federal financial assistance under this agreement;

(2)     it has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable;

(3)     it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)     not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)     it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 24.7 on behalf of the Recipient.

**9.3    USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c) The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d) The Recipient shall provide access to records as provided at 2 C.F.R. 200.337.

**9.5    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6    Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.3 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.2.

**ARTICLE 10**
**AWARD AMOUNT, OBLIGATION, AND TIME PERIODS**

**10.1**    **Federal Award Amount** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in section 2.2 as the SS4A Grant Amount.

**10.2**    **Federal Obligations.**

This agreement obligates funds for the period of performance listed on Page 1, Block 6 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," (for phased agreements) then an amount up to the Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.2(c)–10.2(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant funds among separate phases of the Project for the purpose of the Federal obligation of funds. The scope of each phase of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.4 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

> (1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

(2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

(1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

(2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

## 10.3    Budget Period

The budget period for this award begins on the effective date of this agreement and ends on the budget period end date that is listed in section 2.4, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

## 10.4    Period of Performance.

(a) The period of performance for this award begins on the effective date of award listed in page 1 item 2 and ends on the period of performance end date that is listed in Page 1, Block 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

## ARTICLE 11
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

11.1    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

11.2    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

11.3    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant dates:

(1)    a substantial completion date for the Project or a component of the Project that is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed on Page 1, Block 6.  (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements).

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

11.4    **Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)　the "Total Eligible Project Cost" amount decreases.

(c) For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

(1)　in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2)　if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3(a).

(f) The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5　USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

**ARTICLE 12**
**GENERAL REPORTING TERMS**

**12.1    Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.4.  Reports will be added to a central repository maintained by FHWA.

**12.2    Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

**12.3    Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

**ARTICLE 13**
**PROGRESS AND FINANCIAL REPORTING**

**13.1    Quarterly Performance Progress Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Performance Progress Report in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Performance Progress Report in the second calendar year quarter that begins after the date of this agreement.

**13.2    Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit a Federal Financial Report using SF-425.

**ARTICLE 14**
**PERFORMANCE REPORTING**

**14.1    Baseline Performance Measurement.** Recipients of Implementation Grants or Planning and Demonstration Grants with demonstration activities shall:

(1)    collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)     on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2    SS4A Final Report:** The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report in the format specified by FHWA and with the content described in Attachment A that describes, consistent with sections 24112(g)-(h) of IIJA:

(1)     the costs of each eligible project and strategy carried out using the grant;

(2)     the roadway safety outcomes and any additional benefits (e.g., increased walking, biking, or transit use without a commensurate increase in serious and fatal crashes, etc.) that each such project and strategy has generated, as—

- identified in the grant application; and

- measured by data to the maximum extent practicable; and

(3)     [RESERVED]

(4)     the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3    Performance Measurement Information.**

For each performance measure identified to be submitted annually in the Performance Measure Table in Attachment A, not later than January 31 of each year, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4    Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5    Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant

recipients, before/after photographs of the sites, qualitative activities such as videos describing the project and its impact on the community, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

## ARTICLE 15
## NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)    accept the remedy;

(2)    acknowledge the noncompliance, but propose an alternative remedy; or

(3)    dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)    after considering the Recipient's response under section 15.1(b); or

(2)    if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the basis for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

  (1)    additional conditions on the award;

  (2)    any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

  (3)    any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**15.3    Other Oversight Entities.**

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

**ARTICLE 16**
**AGREEMENT TERMINATION**

**16.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all its obligations under this agreement if any of the following occurs:

(1)     the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.3(a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

(2)     a construction start date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(3)     a substantial completion date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4)     the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(5)     the USDOT determines that termination of this agreement is in the public interest.

(6)     the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

16.5    **Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

## ARTICLE 17
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

17.1    **Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

17.2    **Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the project, and the amount or nature of that portion of the cost of the project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2023 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2023" in the program name; and

(2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2023" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

# ARTICLE 18
# CONTRACTING AND SUBAWARDS

**18.1    Build America, Buy America.** This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184, and Office of Management and Budget (OMB) Memorandum M-24-02, "Initial Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1)    all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2)    all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3)    all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure

project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1)     applying the domestic content procurement preference would be inconsistent with the public interest;

(2)     the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3)     the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"Construction materials" means articles, materials, or supplies —that consist of only one of the items listed below in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material:

 (1) The listed Items are:
  • non-ferrous metals;
  • plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
  • glass (including optic glass);
  • fiber optic cable (including drop cable)
  • optical fiber;

- lumber;
- engineered wood; and
- drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"Domestic content procurement preference" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"Iron or steel products" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"Manufactured products" means:

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"Predominantly of iron or steel or a combination of both" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Project"** means temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"Section 70917(c) materials" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

**18.2    Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

**18.3    Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering,

surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under 2 C.F.R. 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

18.4    **Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

18.5    **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

18.6    **Recipient Responsibilities for Subawards.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

18.7    **Subaward and Contract Authorization.** If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f)(6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

19.1    **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated. The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

19.2    **Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3  Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b)  The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement, unless there has been an approval of pre-award costs under 2 C.F.R. 200.458.

**19.4  Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5  Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6  Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall    not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7  Payment Method.** The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8  Information Supporting Expenditures**

(a)  If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b)  If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9  Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then the Recipient shall not request reimbursement more frequently than monthly.

**19.10  Match.** The recipient should show on each request for reimbursement that at least 20 percent of the incurred costs will count towards match. If the recipient intends to vary the match percentage over the life of the project, it must communicate its plan to

USDOT. The recipient is responsible for tracking match according to the plan.  At the completion of the grant award, the cost share requirement must be met, and Federal funds must not exceed the project's Federal share.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Amendments.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**

(a)  The USDOT may update the contacts who are listed in sections 4.4 by written notice to all of the Recipient contacts who are listed in section 4.3.

**21.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 21.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, or 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**
**[RESERVED]**


**ARTICLE 23**
**[RESERVED]**


**ARTICLE 24**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

24.1    **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

24.2    **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

24.3    **Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**24.4    History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**24.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**24.6    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 29, this agreement includes the following additional terms as integral parts:

    (1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

    (2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

    (3)    2 C.F.R part 175: Award Term for Trafficking in Persons; and

    (4)    Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

    (1)    49 C.F.R. part 20: New Restrictions on Lobbying;

    (2)    49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

    (3)    49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

    (4)    Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**24.7    Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

    (1)    Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).

**ARTICLE 25**
**ASSIGNMENT**

25.1  **Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

**ARTICLE 26**
**WAIVER**

26.1  **Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

**ARTICLE 27**
**ADDITIONAL TERMS AND CONDITIONS**

27.1  **Effect of Planning and Demonstration or Implementation Award.** Based on information that the Recipient provided to the USDOT, including the Grant Application, as indicated in section 2.5, this agreement designates this award as a Planning and Demonstration award or an Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation as listed in the FY 2023 Notice of Funding Opportunity for Safe Streets and Roads for All.

27.2  **Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

27.3  **Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 27.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

    (1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

    (2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

    (1) the Environmental Review Entity's actions under section 27.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

    (2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

    (1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

    (2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**27.4    Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**27.5    Relocation and Real Property Acquisition.**

(a)  The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b)  The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c)  The Recipient shall make available to displaced persons, comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**27.6    Equipment Disposition.**

(a)  In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b)  In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.310–200.316 and 2 C.F.R. 1201.313.

(c)  The Recipient shall ensure compliance with this section (27.6) for all tiers of subawards under this award.

## ARTICLE 28
## MANDATORY AWARD INFORMATION

**28.1    Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)  the "Federal Award Date" is the date of this agreement, as defined under section 30.2;

(2)  the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)  this award is not for research and development.

**ARTICLE 29**
**CONSTRUCTION AND DEFINITIONS**

29.1    **Attachments.** This agreement includes the following attachments as integral parts unless Attachment D is not required for certain Grants:

|                |                                            |
|----------------|--------------------------------------------|
| Attachment A   | Performance Measurement Information         |
| Attachment B   | Changes from Application                     |
| Attachment C   | [RESERVED]                                   |
| Attachment D   | [RESERVED]                                   |
| Attachment E   | Labor and Workforce                          |
| Attachment F   | Critical Infrastructure Security and Resilience |

29.2    **Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2023 SS4A Grant Program", dated March 17, 2025 and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

|           |                                                      |
|-----------|------------------------------------------------------|
| Exhibit A | Applicable Federal Laws and Regulations               |
| Exhibit B | Additional Standard Terms                             |
| Exhibit C | Quarterly Performance Progress Reports: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds               |

29.3    **Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–2830, then the provision in articles 1–2830 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

29.4    **Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

29.5    **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the IIJA section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement.

"**SS4A Grant**" means an award of funds that were made available under the SS4A NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 30
## AGREEMENT EXECUTION AND EFFECTIVE DATE

30.1    **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

30.2    **Effective Date.** The agreement will become effective when all parties have signed it. The effective date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE
FISCAL YEAR 2023 SAFE STREETS AND ROADS FOR ALL (SS4A) GRANT
PROGRAM**

**January 4, 2024**
Revised:  March 17, 2025

# EXHIBIT A
## APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this agreement for a FY 2023 Safe Streets and Roads for All Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
a.  Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
b.  Hatch Act – 5 U.S.C. 1501, et seq.
c.  Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
d.  National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
e.  Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
f.  Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
g.  Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
h.  Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
i.  Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
j.  Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
k.  Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
l.  Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
m.  American Indian Religious Freedom Act, P.L. 95-341, as amended
n.  Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
o.  The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
p.  Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
q.  Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
r.  Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
s.  Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
t.  Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
u.  National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
v.  Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
w.  Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
x.  Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
y.  Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
z.  Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
aa.  Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
bb.  Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
cc.  Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C. 1101 -1104, 541, et seq.
dd.  Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and

Financial Transactions – 31 U.S.C. 1352
ee. Freedom of Information Act – 5 U.S.C. 552, as amended
ff. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855
gg. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.
hh. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.
ii. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.
jj. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525
kk. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303
ll. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.
mm. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26
nn. Wilderness Act – 16 U.S.C. 1131-1136
oo. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
pp. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.
qq. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
rr. Cargo Preference Act of 1954 – 46 U.S.C. 55305
ss. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
tt. Bringing in and harboring certain aliens – 8 U.S.C. 1324
uu. Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 11988 – Floodplain Management
c. Executive Order 12372 – Intergovernmental Review of Federal Programs
d. Executive Order 12549 – Debarment and Suspension
e. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 – Worker Organizing and Empowerment
g. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14154, Unleashing American Energy
i. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
j. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**Presidential Policy Directives and Memorandums**
a. Presidential Policy Directive 21 – Critical Infrastructure Security and Resilience
b. National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Systems

**General Federal Regulations**
    a.  Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201
    b.  Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200
    c.  Investigative and Enforcement Procedures – 14 C.F.R. Part 13
    d.  Procedures for predetermination of wage rates – 29 C.F.R. Part 1
    e.  Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3
    f.  Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5
    g.  Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.
    h.  New Restrictions on Lobbying – 49 C.F.R. Part 20
    i.  Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21, including any amendments thereto
    j.  Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24
    k.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25
    l.  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27
    m.  DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35
    n.  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28
    o.  Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30
    p.  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32
    q.  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38
    r.  Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26, including any amendments thereto (as applicable under section 18.3 of this agreement)

**Office of Management and Budget Circulars**
    a.  Any applicable OMB Circular based upon the specific FY 2023 Safe Streets and Roads for All Grant Recipient.

**Highway Federal Legislation**
    a.  Agreements relating to the use of an access to rights-of-way—Interstate System, 23 U.S.C. 111

    b.  Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

    c.  Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.

    d.  Efficient Environmental Reviews - 23 U.S.C. 139

    e.  Policy on lands, wildlife and waterfowl refuges, and historic sites - 49 U.S.C. 303

**Federal Highway Regulations**

    a.  Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

    b.  National Highway System Design Standards – 23 C.F.R. Part 625

    c.  Location and Hydraulic Design of Encroachments on Flood Plains – 23 C.F.R. Part 650 Subpart A

    d.  Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655

    e.  Environmental Impact and Related Procedures – 23 C.F.R. Part 771

    f.  Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(f)) – 23 C.F.R. Part 774

    g.  Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122

Specific assurances required to be included in the FY 2023 Safe Streets and Roads for All Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37, and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under the FY 2023 Safe Streets and Roads for All (SS4A) grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

B-1

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2023 SS4A grant program:

1.  The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2.  The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2023 SS4A Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

    > *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3.  The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4.  The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer

of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
   b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely,

complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2023 SS4A grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2023 SS4A grant program.

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

    a.  withholding payments to the contractor under the contract until the contractor complies; and/or
    b.  cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as

B-5

the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

## APPENDIX B

## CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), 49 U.S.C. § 6702, the Regulations for the Administration of FY 2023 SS4A grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

### (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

    1.   In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.   With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.   With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**APPENDIX E**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

**TERM B.2**
**CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS**

**2 C.F.R. Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements,

consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2023SS4A grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2023 SS4A Grant, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

> (1) Certify whether the entity has a Tax Delinquency; and

> (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If:

> (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

> (2) an entity provides an affirmative response to either certification in section 3; or

> (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

> (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

> (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

> (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

> (1) require the SAM check in section 2;

> (2) require the certifications in section 3;

> (3) include the prohibition in section 4; and

> (4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
> (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
>> (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
>> (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
> (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PERFORMANCE PROGRESS REPORTS:**
**FORMAT AND CONTENT**

**1.    Purpose**. The purpose of the Quarterly Performance Progress Reports under this agreement for the FY 2023 SS4A grant program is to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

**2.    Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. The first Quarterly Performance Progress Report should include a detailed description of the items funded.

   **(a) Project Information.**  This section provides the name of the project, the State, the federal agency to which the report is submitted, submission date, award number, name of the recipient, report year and quarter and NOFO funding year.

   **(b) Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any significant activities and issues, action items and outstanding issues.

      i.    **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable IIJA or NOFO requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

      ii.   **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

   **(c) Milestones.**  This section documents progress of the milestones outlined in Section 3.2.  The Recipient should include the baseline date (when the project is projected to begin) of each milestone, amendments to those dates (if applicable) and the actual/expected date of completion.  There are Milestone charts for action plans, supplemental planning activities, demonstration activity projects and implementation (both construction and non-construction) projects.

**EXHIBIT D**
**FORM FOR SUBSEQUENT OBLIGATION OF FUNDS**

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

This instrument obligates **[$XXX]** for **[insert portion of project listed in the Agreement]**.

**[Recipient name]** states that:

(1)     the Agreement accurately describe the Project's activities;

(2)     for each completion date listed in the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in the Agreement;

(3)     comparing the Project's current budget with the amounts listed in the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

(4)     under the terms of article 21 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

By:

| | |
|---|---|
| Date | Signature of Recipient's Authorized Representative |
| | **[insert name]** |
| | Name |
| | **[insert title]** |
| | Title |

D-1

The USDOT has determined that all applicable Federal requirements for obligating these funds are satisfied.

By:

| | |
|---|---|
| Date | Signature of USDOT's Authorized Representative |

**[insert name]**

Name

**[insert title]**

Title

Franklin-Hodge Ex. F

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT**
**PROGRAM:**
**FHWA PROJECTS**

**Date: June 13, 2024**
**Revised:  October 1, 2024**
**Revised:  March 17, 2025**

## Table of Contents

Article 7 Purpose.................................................................................................................... 6
   7.1   Purpose............................................................................................................... 6
Article 8 USDOT Role........................................................................................................... 6
   8.1   Division of USDOT Responsibilities.................................................................. 6
   8.2   USDOT Program Contact.................................................................................... 7
Article 9 Recipient Role......................................................................................................... 7
   9.1   Statements on the Project.................................................................................... 7
   9.2   Statements on Authority and Capacity................................................................ 7
   9.3   USDOT Reliance................................................................................................. 8
   9.4   Project Delivery.................................................................................................. 8
   9.5   Rights and Powers Affecting the Project............................................................ 8
   9.6   Notification of Changes to Key Personnel......................................................... 9
Article 10 Award Amount, Obligation, and Time Periods .................................................... 9
   10.1   Federal Award Amount....................................................................................... 9
   10.2   Federal Obligations............................................................................................. 9
   10.3   Budget Period.................................................................................................... 10
   10.4   Period of Performance....................................................................................... 10
Article 11 Statement of Work, Schedule, and Budget Changes ......................................... 11
   11.1   Notification Requirement................................................................................... 11
   11.2   Statement of Work Changes............................................................................. 11
   11.3   Schedule Changes.............................................................................................. 11
   11.4   Budget Changes................................................................................................ 11
   11.5   USDOT Acceptance of Changes....................................................................... 12
Article 12 General Reporting Terms.................................................................................... 12
   12.1   Report Submission............................................................................................ 12
   12.2   Alternative Reporting Methods......................................................................... 13
   12.3   Paperwork Reduction Act Notice...................................................................... 13
Article 13 Progress and Financial Reporting ...................................................................... 13
   13.1   Quarterly Performance Progress Reports.......................................................... 13
   13.2   Quarterly Financial Status................................................................................. 13
   13.3   Final Performance Progress Reports and Financial Status……………………..13
Article 14 Performance Reporting ....................................................................................... 14
   14.1   Baseline Performance Measurement................................................................. 14
   14.2   SS4A Final Report:........................................................................................... 14
   14.3   Performance Measurement Information……………………………………….15
   14.4   Performance Reporting Survival…………………………………………….…15
   14.5   Program Evaluation……………………………………………………………15
Article 15 Noncompliance and Remedies............................................................................ 15
   15.1   Noncompliance Determinations........................................................................ 15
   15.2   Remedies........................................................................................................... 16
   15.3   Other Oversight Entities................................................................................... 17
Article 16 Agreement Termination……………………………………………………….…17
   16.1   USDOT Termination.......................................................................................... 17
   16.2   Closeout Termination........................................................................................ 18
   16.3   Post-Termination Adjustments.......................................................................... 18
   16.4   Non-Terminating Events.................................................................................... 18
   16.5   Other Remedies................................................................................................. 18

Article 17 Monitoring, Financial Management, Controls, and Records ....................................... 18
  17.1   Recipient Monitoring and Record Retention. ................................................................. 18
  17.2   Financial Records and Audits. ...................................................................................... 19
  17.3   Internal Controls. ......................................................................................................... 19
  17.4   USDOT Record Access. ................................................................................................ 19
Article 18 Contracting and Subawards ...................................................................................... 19
  18.1   Build America, Buy America. ........................................................................................ 19
  18.2   Small and Disadvantaged Business Requirements. ...................................................... 22
  18.3   Engineering and Design Services. ................................................................................ 22
  18.4   Foreign Market Restrictions. ........................................................................................ 23
  18.5   Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 23
  18.6   Recipient Responsibilities for Subawards. .................................................................... 23
  18.7   Subaward and Contract Authorization. ......................................................................... 23
Article 19 Costs, Payments, and Unexpended Funds ................................................................ 23
  19.1   Limitation of Federal Award Amount. ........................................................................... 23
  19.2   Projects Costs. .............................................................................................................. 23
  19.3   Timing of Project Costs. ............................................................................................... 23
  19.4   Recipient Recovery of Federal Funds. .......................................................................... 24
  19.5   Unexpended Federal Funds. ......................................................................................... 24
  19.6   Timing of Payments to the Recipient. ........................................................................... 24
  19.7   Payment Method. .......................................................................................................... 24
  19.8   Information Supporting Expenditures. .......................................................................... 24
  19.9   Reimbursement Frequency. .......................................................................................... 24
  19.10  Match. .......................................................................................................................... 24
Article 20 Liquidation, Adjustments, and Funds Availability ..................................................... 25
  20.1   Liquidation of Recipient Obligations. ........................................................................... 25
Article 21 Agreement Modifications .......................................................................................... 25
  21.1   Bilateral Amendments. ................................................................................................. 25
  21.2   Unilateral Contact Modifications. ................................................................................. 25
  21.3   USDOT Unilateral Modifications. .................................................................................. 25
  21.4   Other Modifications. ..................................................................................................... 25
Article 22 [RESERVED] ............................................................................................................. 25
  22.1   [RESERVED]. ................................................................................................................ 25
Article 23 [RESERVED] ............................................................................................................. 26
  23.1   [RESERVED]. ................................................................................................................ 26
Article 24  Labor and Workforce ............................................................................................... 26
  24.1   Labor and Workforce .................................................................................................... 26
Article 25 Critical Infrastructure Security and Resilience .......................................................... 26
  25.1   Critical Infrastructure Security and Resilience .............................................................. 26
Article 26  Civil Rights and Title VI ........................................................................................... 26
  26.1   Civil Rights and Tile VI ................................................................................................. 26
Article 27 Federal Financial Assistance, Administrative, and National Policy Requirements .... 27
  27.1   Uniform Administrative Requirements for Federal Awards. ........................................... 27
  27.2   Federal Law and Public Policy Requirements. ............................................................... 27
  27.3   Federal Freedom of Information Act. ............................................................................. 28
  27.4   History of Performance. ................................................................................................ 28
  27.5   Whistleblower Protection. ............................................................................................. 28
  27.6   External Award Terms and Obligations. ........................................................................ 28
  27.7   Incorporated Certifications. .......................................................................................... 29

Article 28 Assignment ......................................................................................................... 29
   28.1  Assignment Prohibited.............................................................................................. 29
Article 29 Waiver ................................................................................................................ 29
   29.1  Waivers. .................................................................................................................. 29
Article 30  Additional Terms and Conditions ..................................................................... 30
   30.1  Effect of Planning and Demonstration or Implementation Award. ......................... 30
   30.2  Disclaimer of Federal Liability. ............................................................................... 30
   30.3  Environmental Review.............................................................................................. 30
   30.4  Railroad Coordination. ............................................................................................. 31
   30.5  Relocation and Real Property Acquisition. .............................................................. 32
   30.6  Equipment Disposition. ............................................................................................ 32
Article 31 Mandatory Award Information ........................................................................... 32
   31.1  Information Contained in a Federal Award. ............................................................. 32
Article 32 Construction and Definitions .............................................................................. 33
   32.1  Attachments. ............................................................................................................ 33
   32.2  Exhibits. ................................................................................................................... 33
   32.3  Construction. ............................................................................................................ 33
   32.4  Integration. ............................................................................................................... 33
   32.5  Definitions................................................................................................................ 33
Article 33 Agreement Execution and Effective Date .......................................................... 34
   33.1  Counterparts. ............................................................................................................ 34
   33.2  Effective Date. ......................................................................................................... 34

## Index of Definitions

Administering Operating Administration ........................................................................... 7
Environmental Review Entity……………………………………………………………...29
Federal Share ................................................................................................................. 12
FHWA............................................................................................................................. 7
NOFO............................................................................................................................. 6
OMB ............................................................................................................................... 13
Program Statute................................................................................................................ 32
Project…………………………………………………………………………………22
Project Closeout .............................................................................................................. 18
SS4A Grant ..................................................................................................................... 32
USDOT ........................................................................................................................... 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act (Pub. L. 117–58, November 15, 2021; also referred to as the "IIJA") established the Safe Streets and Roads for All (the "SS4A") Discretionary Grant Program (IIJA Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2024 for the SS4A Discretionary Grant Program.

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2024 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F are project-specific attachments.

## ARTICLE 7
## PURPOSE

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

## ARTICLE 8
## USDOT ROLE

8.1    **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b) The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2    USDOT Program Contact.**

Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2822

## ARTICLE 9
## RECIPIENT ROLE

**9.1    Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)    Attachment B documents all material changes in the information contained in that application.

**9.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)    it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the

recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 27.7 on behalf of the Recipient.

**9.3    USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c) The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d) The Recipient shall provide access to records as provided at 2 C.F.R. 200.337.

**9.5    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6**    **Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.3 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.2.

**ARTICLE 10**
**AWARD AMOUNT, OBLIGATION, AND TIME PERIODS**

**10.1**    **Federal Award Amount** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in section 2.2 as the SS4A Grant Amount.

**10.2**    **Federal Obligations.**

This agreement obligates funds for the period of performance listed on Page 1, Block 6 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in Section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," (for phased agreements) then an amount up to the Grant Amount listed in Section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.2(c)–10.2(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant funds among separate phases of the Project for the purpose of the Federal obligation of funds. The scope of each phase of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.4 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

    (1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

    (2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

    (1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

    (2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

    (3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

**10.3    Budget Period**

The budget period for this award begins on the effective date of this agreement and ends on the budget period end date that is listed in section 2.4, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

**10.4    Period of Performance.**

(a) The period of performance for this award begins on the effective date of award listed in page 1, Block 2 and ends on the period of performance end date that is listed in Page 1, Block 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

**ARTICLE 11**
**STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES**

11.1    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.3 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

11.2    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

11.3    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant date(s):

(1)    a substantial completion date for the Project or a component of the Project that is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed on Page 1, Block 6 (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements).

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

11.4    **Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c)  For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

    (1)    in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

    (2)    if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3(a).

(f)  The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5**  **USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

**ARTICLE 12**
**GENERAL REPORTING TERMS**

12.1  **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.3.  Reports will be added to a central repository maintained by FHWA.

12.2  **Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

12.3  **Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

**ARTICLE 13**
**PROGRESS AND FINANCIAL REPORTING**

13.1  **Quarterly Performance Progress Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Performance Progress Report in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Performance Progress Report in the second calendar year quarter that begins after the date of this agreement.

13.2  **Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit a Federal Financial Report using SF-425.

13.3  **Final Performance Progress Reports and Financial Status.** No later than 120 days after the end of the period of performance, the Recipient shall submit:

(1)    a Final Performance Progress Report in the format and with the content described in Exhibit C for each Quarterly Performance Progress Report, including a final Federal Financial Report (SF-425); and

(2)    any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 14
## PERFORMANCE REPORTING

**14.1    Baseline Performance Measurement.** Recipients of Implementation Grants or Planning and Demonstration Grants with demonstration activities shall:

(1)    collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)    on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2    SS4A Final Report.**

The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report in the format specified by FHWA and with the content described in Attachment A that describes, consistent with sections 24112(g)-(h) of IIJA:

(1)    the costs of each eligible project and strategy carried out using the grant;

(2)    the roadway safety outcomes and any additional benefits (e.g., increased walking, biking, or transit use without a commensurate increase in serious and fatal crashes, etc.) that each such project and strategy has generated, as—

- identified in the grant application; and

- measured by data to the maximum extent practicable;

(3) [RESERVED]

(4)    the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3    Performance Measurement Information.**

For each performance measure identified to be submitted annually in the Performance Measure Table in Attachment A, not later than January 31 of each year, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4    Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5    Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, before/after photographs of the sites, qualitative activities such as videos describing the project and its impact on the community, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

# ARTICLE 15

# NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)     accept the remedy;

(2)     acknowledge the noncompliance, but propose an alternative remedy; or

(3)     dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)     after considering the Recipient's response under section 15.1(b); or

(2)     if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the basis for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

(1)     additional conditions on the award;

(2)     any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the

Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**15.3    Other Oversight Entities.**

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

### ARTICLE 16
### AGREEMENT TERMINATION

**16.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all its obligations under this agreement if any of the following occurs:

    (1)    the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.3(a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

    (2)    a construction start date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

    (3)    a substantial completion date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

    (4)    the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

    (5)    the USDOT determines that termination of this agreement is in the public interest.

    (6)    the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2   Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3   Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4   Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5   Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

## ARTICLE 17
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**17.1   Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

　　(1)　　that those activities comply with this agreement; and

　　(2)　　that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2    Financial Records and Audits.**

(a)  The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the project, and the amount or nature of that portion of the cost of the project supplied by other sources, and any other financial records related to the project.

(b)  The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c)  The Recipient shall separately identify expenditures under the fiscal year 2024 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2024" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2024" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.


### ARTICLE 18
### CONTRACTING AND SUBAWARDS


**18.1    Build America, Buy America.**  This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184, and Office of Management and Budget (OMB) Memorandum M-24-02, "Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards for each construction material are provided at 2 CFR 184.6.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a domestic content procurement preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.*

An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) manufactured products; (iii) construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated. An article, material, or supply incorporated into an infrastructure project must meet the requirements for only the single category in which it is classified.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1) applying the domestic content procurement preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"**Construction materials**" means articles, materials, or supplies that consist of only one of the items listed in paragraph (21) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material.

(1) The listed items are:
- non-ferrous metals;
- plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
- glass (including optic glass);
- fiber optic cable (including drop cable)
- lumber;
- engineered wood; and
- drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"**Domestic content procurement preference**" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"**Iron or steel products**" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"**Manufactured products**" means

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"**Predominantly of iron or steel or a combination of both**" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

"**Project**" means the development of a safety action plan (including supplemental and topical plans) or the temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"**Section 70917(c) materials**" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

18.2    **Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

18.3    **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract

for architectural and engineering services is negotiated under 2 C.F.R. 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

18.4   **Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

18.5   **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

18.6   **Recipient Responsibilities for Subawards.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R.  parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

18.7   **Subaward and Contract Authorization.**

If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f) (6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.


## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS


19.1   **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

19.2   **Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

19.3   **Timing of Project Costs.**

   (a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b) The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement unless there has been an approval of pre-award costs under 2 C.F.R. 200.458.

**19.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6    Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7    Payment Method.** The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8    Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9    Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then the Recipient shall not request reimbursement more frequently than monthly.

**19.10 Match.** The recipient should show on each request for reimbursement that at least 20 percent of the incurred costs will count towards match. If the recipient intends to vary the match percentage over the life of the project, it must communicate its plan to USDOT. The recipient is responsible for tracking match according to the plan.  At the completion of the grant award, the cost share requirement must be met, and Federal funds must not exceed the project's Federal share.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Amendments.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**  The USDOT may update the contacts who are listed in section 4.3 by written notice to all the Recipient contacts who are listed in sections 4.1 and 4.2.

**21.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 20.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications. T**he parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**

[RESERVED]

**ARTICLE 23**

[RESERVED]

**ARTICLE 24**
**LABOR AND WORKFORCE**

**24.1 Labor and Workforce.** Attachment E documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**ARTICLE 25**
**CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE**

**25.1 Critical Infrastructure Security and Resilience.**

Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project. Attachment F documents the consideration of critical security infrastructure for projects that include the purchase of information technology and/or operational technology.

**ARTICLE 26**
**CIVIL RIGHTS AND TITLE VI**

**26.1    Civil Rights and Title VI**

(a) The purpose of sections 26.1(b)–26.1(c) is to ensure that the Recipient has a plan to comply with civil rights obligations and nondiscrimination laws, including Title VI and 49 C.F.R. part 21, including any amendments thereto.

(b) If the Recipient is an Existing Recipient, the Recipient shall submit to the USDOT either:

(1) not later than one month after the date of this agreement, documentation showing that the Recipient has complied with all reporting requirements under the Administering Operating Administration's implementation of Title VI; or

(2) not later than six months after the date of this agreement, both a Title VI Plan and a Community Participation Plan, as those plans are described in chapter II, sections 3–4 of DOT Order 1000.12C.

(c) If the Recipient is "New," then the Administering Operating Administration completed a Title VI Assessment of the Recipient, as described in chapter II, section 2 of DOT Order 1000.12C., before entering this agreement.

(d) In this section 26.1:

(1) "**Title VI**" means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

(2) **"Existing"** means a prior recipient of DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

(3) **"New"** means a recipient who has not received DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

## ARTICLE 27
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**27.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**27.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* the Recipient agrees that its compliance in all respects with all

applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**27.3   Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**27.4   History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**27.5   Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**27.6   External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 32, this agreement includes the following additional terms as integral parts:

    (1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

    (2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

    (3)    2 C.F.R part 175: Award term for Trafficking in Persons; and

    (4)      Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

    (1)      49 C.F.R. part 20: New Restrictions on Lobbying;

    (2)      49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

    (3)      49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

    (4)      Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**27.7  Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

    (1)      Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).

## ARTICLE 28
## ASSIGNMENT

**28.1 Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 29
## WAIVER

**29.1  Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

# ARTICLE 30
## ADDITIONAL TERMS AND CONDITIONS

**30.1   Effect of Planning and Demonstration or Implementation Award.** Based on information that the Recipient provided to the USDOT, including the Grant Application, as indicated in section 2.5, this agreement designates this award as a Planning and Demonstration award or an Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation as listed in the FY 2024 Notice of Funding Opportunity for Safe Streets and Roads for All.

**30.2   Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**30.3 Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 30.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

(2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

(1) the Environmental Review Entity's actions under section 30.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

(2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

(1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

(2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**30.4 Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**30.5 Relocation and Real Property Acquisition.**

(a) The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, , comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**30.6 Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.313–200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 30.6 for all tiers of subawards under this award.

## ARTICLE 31
## MANDATORY AWARD INFORMATION

**31.1    Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 33.2;

(2)    the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)    this award is not for research and development.

## ARTICLE 32
## CONSTRUCTION AND DEFINITIONS

**32.1    Attachments.** This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | Reserved |
| Attachment D | Reserved |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |
| Attachment G | Reserved |

**32.2    Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2024 SS4A Grant Program", dated March 17, 2025, and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Performance Progress Reports: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**32.3  Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–30, then the provision in articles 1–30 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

**32.4  Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

**32.5  Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the BIL section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement.

"**SS4A Grant**" means an award of funds that were made available under the SS4A NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 33
## AGREEMENT EXECUTION AND EFFECTIVE DATE

**33.1  Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**33.2  Effective Date.** The agreement will become effective when all parties have signed it. The effective date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE**
**FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL (SS4A) GRANT**
**PROGRAM**

**June 13, 2024**
**Revised:  March 17, 2025**

**EXHIBIT A**
**APPLICABLE FEDERAL LAWS AND REGULATIONS**

By entering into this agreement for a FY 2024 Safe Streets and Roads for All Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
a. Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
b. Hatch Act – 5 U.S.C. 1501, et seq.
c. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
d. National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
e. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
f. Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
g. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
h. Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
i. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
j. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
k. Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
l. Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
m. American Indian Religious Freedom Act, P.L. 95-341, as amended
n. Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
o. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
p. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
q. Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
r. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
s. Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
t. Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
u. National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
v. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
w. Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
x. Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
y. Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
z. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
aa. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
bb. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
cc. Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C.

1101 -1104, 541, et seq.
dd. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. 1352
ee. Freedom of Information Act – 5 U.S.C. 552, as amended
ff. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855
gg. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.
hh. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.
ii. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.
jj. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525
kk. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303
ll. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.
mm. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26
nn. Wilderness Act – 16 U.S.C. 1131-1136
oo. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
pp. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.
qq. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
rr. Cargo Preference Act of 1954 – 46 U.S.C. 55305
ss. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 11988 – Floodplain Management
c. Executive Order 12372 – Intergovernmental Review of Federal Programs
d. Executive Order 12549 – Debarment and Suspension
e. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 – Worker Organizing and Empowerment
g. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14154, Unleashing American Energy
i. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
j. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**Presidential Policy Directives and Memorandums**
a. Presidential Policy Directive 21 – Critical Infrastructure Security and Resilience
b. National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Systems

**General Federal Regulations**

    a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201

    b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200

    c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13

    d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1

    e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3

    f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5

    g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.

    h. New Restrictions on Lobbying – 49 C.F.R. Part 20

    i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21

    j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24

    k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25

    l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27

    m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35

    n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28

    o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30

    p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32

    q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38

    r. Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26 (as applicable under section 18.3 of this agreement)

**Office of Management and Budget Circulars**

    a. Any applicable OMB Circular based upon the specific FY 2024 Safe Streets and Roads for All Grant Recipient.

**Highway Federal Legislation**

    a. Agreements relating to the use of an access to rights-of-way—Interstate System, 23

U.S.C. 111
b. Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
c. Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.
d. Efficient Environmental Reviews - 23 U.S.C. 139
e. Policy on lands, wildlife and waterfowl refuges, and historic sites - 49 U.S.C. 303

**Federal Highway Regulations**
a. Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
b. National Highway System Design Standards – 23 C.F.R. Part 625
c. Location and Hydraulic Design of Encroachments on Flood Plains – 23 C.F.R. Part 650 Subpart A
d. Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655
e. Environmental Impact and Related Procedures – 23 C.F.R. Part 771
f. Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(f)) – 23 C.F.R. Part 774
g. Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122

Specific assurances required to be included in the FY 2024 Safe Streets and Roads for All Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37, and 38

### The United States Department of Transportation (USDOT)

### Standard Title VI/Non-Discrimination Assurances

### DOT Order No. 1050.2A

By signing and submitting the Technical Application and by entering into this agreement under the FY 2024 Safe Streets and Roads for All (SS4A) grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

### Statutory/Regulatory Authorities

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2024 SS4A grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. § 21 will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2024 SS4A Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

> *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3.  The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4.  The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5.  That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6.  That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7.  That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

    a.  for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
    b.  for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8.  That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
    b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

B-3

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2024 SS4A grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2024 SS4A grant program.

# APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant

thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), the Consolidated Appropriations Act, 2024, Pub. L. No. 118-122 (Mar. 9, 2024) , the Regulations for the Administration of FY 2024 SS4A grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the

absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

   1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns. *

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

### **Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

## TERM B.2
## CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 C.F.R. Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements,

consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2024 SS4A grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2024 SS4A Grant, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;

    (2) require the certifications in section 3;

    (3) include the prohibition in section 4; and

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PERFORMANCE PROGRESS REPORTS:**
**FORMAT AND CONTENT**

1.      **Purpose**. The purpose of the Quarterly Performance Progress Reports under this agreement for the FY 2024 SS4A grant program is to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

2.      **Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. The first Quarterly Performance Progress Report should include a detailed description of the items funded.

    **(a) Project Information.**  This section provides the name of the project, the State, the federal agency to which the report is submitted, submission date, award number, name of the recipient, report year and quarter and NOFO funding year.

    **(b) Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any significant activities and issues, action items and outstanding issues.

        i.  **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable IIJA or NOFO requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

        ii.  **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

    **(c) Milestones.**  This section documents progress of the milestones outlined in Section 3.2.  The Recipient should include the baseline date (when the project is projected to begin) of each milestone, amendments to those dates (if applicable) and the actual/expected date of completion.  There are Milestone charts for action plans, supplemental planning activities, demonstration activity projects and implementation (both construction and non-construction) projects.

**EXHIBIT D**
**FORM FOR SUBSEQUENT OBLIGATION OF FUNDS**

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

This instrument obligates **[$XXX]** for **[insert portion of project listed in the Agreement]**.

**[Recipient name]** states that:

    (1)    the Agreement accurately describe the Project's activities;

    (2)    for each completion date listed in the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in the Agreement;

    (3)    comparing the Project's current budget with the amounts listed in the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

    (4)    under the terms of article 21 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

_____By:  _____
Date                                      Signature of Recipient's Authorized Representative

                                               **[insert name]**
                                               Name

                                               **[insert title]**
                                               Title

The USDOT has determined that all applicable Federal requirements for obligating these funds are satisfied.

By:

_____          _____
Date                                Signature of USDOT's Authorized Representative

                                    **[insert name]**
                                    _____
                                    Name

                                    **[insert title]**
                                    _____
                                    Title

Franklin-Hodge Ex. G

| | | |
|---|---|---|
| 1. **Award No.**<br>▓▓▓▓▓▓▓ | 2. **Effective Date**<br>See No. 17 Below | 3. **Assistance Listings No.**<br>▓▓▓▓▓ |
| 4. **Award To**<br>City of Boston<br>1 City Hall Square, Suite 500<br>Boston, MA 02201-2013<br>▓▓▓▓▓▓▓▓▓▓▓ | 5. **Sponsoring Office**<br>U.S. Department of Transportation<br>Federal Highway Administration<br>Office of Acquisition & Grants Management<br>1200 New Jersey Avenue, SE<br>HCFA-32, Mail Drop E62-204<br>Washington, DC 20590 | |

6. **Period of Performance**
Effective Date of Award through 24
months after the Effective Date

7. **Total Amount**

| | |
|---|---|
| Federal Share: | $1,800,000 |
| Recipient Share: | $450,000 |
| Total: | $2,250,000 |

8. **Type of Agreement**
Grant

9. **Authority**
Infrastructure Investment and Jobs Act (Pub.
L. No. 117-58, div. A § 11509 & div. J, tit.
VIII, "Department of Transportation—
Federal Highway Administration—Highway
Infrastructure Programs" ¶ 7, Nov. 15, 2021)

10. **Procurement Request No.**
HEPP240033PR

11. **Federal Funds Obligated**
$1,800,000

12. **Submit Payment Requests To**
See Article 13 of the General Terms and
Conditions.

13. **Payment Office**
See Article 13 of the General Terms and
Conditions.

14. **Accounting and Appropriations Data**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15. **Description of Project**
Reconnecting Chinatown RCP Planning Grant
The project will assess the feasibility of reconnecting the Chinatown neighborhood bisected by the
construction of Interstate 90 in the 1960s. The project will develop a plan to connect across the
open-cut highway by building over Parcel 21 to create open space for the community and prepare
design guidelines for Parcels 19, 20, and 22 to link the surrounding streets and facilities.

| **RECIPIENT** | **FEDERAL HIGHWAY ADMINISTRATION** |
|---|---|
| 16. **Signature of Person Authorized to Sign** | 17. **Signature of Agreement Officer** |
| *[signature]* 5/24/24 | RYAN JOSEPH BUCK — Digitally signed by RYAN JOSEPH BUCK Date: 2024.05.28 13:26:17 -04'00'    5/28/2024 |
| Signature                        Date | Signature                        Date |
| Name: Nicholas Gove | Name: |
| Title: Commissioner, Boston Transportation<br>Department | Title: Agreement Officer |

1 of 20

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE**
**FISCAL YEAR 2022 RECONNECTING COMMUNITIES PILOT PROGRAM**

This agreement is between the United States Department of Transportation (the "**USDOT**") and the City of Boston (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive an RCP Grant for the Reconnecting Chinatown RCP Planning Grant.

If schedule A to this agreement identifies a Designated Subrecipient, that Designated Subrecipient is also a party to this agreement, and the parties want the Designated Subrecipient to carry out the project with the Recipient's assistance and oversight.

The parties therefore agree to the following:

**ARTICLE 1**
**GENERAL TERMS AND CONDITIONS.**

**1.1     General Terms and Conditions.**

(a)  In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under the Fiscal Year 2022 Reconnecting Communities Pilot Program: FHWA Projects," dated April 24, 2023, which is available at https://www.transportation.gov/grants/reconnecting-communities/reconnecting-communities-grant-agreements. The General Terms and Conditions reference the information contained in the schedules to this agreement. The General Terms and Conditions are part of this agreement.

(b)  The Recipient states that it has knowledge of the General Terms and Conditions.

(c)  The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RCP Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RCP Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

**ARTICLE 2**
**SPECIAL TERMS AND CONDITIONS.**

There are no special terms for this award.

**SCHEDULE A**
**ADMINISTRATIVE INFORMATION**

1.    **Application.**

Application Title:    Reconnecting Chinatown RCP Planning Grant

Application Date:    October 13, 2022

2.    **Recipient's Unique Entity Identifier.** ███████████

See section 24.3 of the General Terms and Conditions.

3.    **Recipient Contact(s).**

Vineet Gupta
Director of Policy and Planning
City of Boston, Streets Cabinet
1 City Hall Square, Boston, MA 02201
617-635-2756
vineet.gupta@boston.gov

4.    **Recipient Key Personnel.**

| Name | Title or Position |
|---|---|
| Vineet Gupta | Director of Policy and Planning |
| Wenzheng Wang | Transportation Planner |

5.    **USDOT Project Contact(s).**

Ryan Buck
Agreement Officer (AO)
Federal Highway Administration
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-310
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-4229
Ryan.Buck@dot.gov

and

Division Administrator
Agreement Officer Representative (AOR)
Massachusetts Division Office
220 Binney Street, 9th Floor
Cambridge, MA 02142

617-494-3657
Massachusetts.fhwa@dot.gov

and

Cassandra Ostrander
Massachusetts Division Office Point of Contact
Program Development Team Leader
220 Binney Street, 9th Floor
Cambridge, MA 02142
617-494-3113
Cassandra.ostrander@dot.gov

and

Kenneth Petty
FHWA RCP Program Manager – Planning Grants
Federal Highway Administration
Office of Planning, Environment, and Realty
1200 New Jersey Avenue SE
Room E72-330
Washington, DC 20590
(202) 366-6654
Kenneth.Petty@dot.gov

**6.      Payment System.**

USDOT Payment System:      DELPHI eInvoicing

**7.      Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition and Grants Management

**8.      Federal Award Identification Number.**

See section 24.2 of the General Terms and Conditions.

**9.      Designated Subrecipient.**

Designated Subrecipient:      None

**SCHEDULE B**
**PROJECT ACTIVITIES**


1.      **General Project Description.**

The project will assess the feasibility of reconnecting the Chinatown neighborhood bisected by the construction of Interstate 90 in the 1960s. The project will develop a plan to connect across the open-cut highway by building over Parcel 21 to create open space for the community and prepare design guidelines for Parcels 19, 20, and 22 to link the surrounding streets and facilities.

2.      **Statement of Work.**

The project aims to be completed in two years– the first year will be focused on hiring a manager for this project, issuing a request for proposal (RFP), developing and carrying out a community engagement plan while establishing the planning context. The Reconnecting Chinatown Project will allocate funds for community engagement, specifically for paying community leaders on steering committees and advisory boards. Existing conditions analysis will be conducted in the first year to assess the conditions of the four roads surrounding the Parcel 21 including all intersections where Tremont Street, Shawmut Avenue, Washington Street and Harrison Avenue meet Marginal Road and Herald Street. A detailed community engagement process will be designed and initiated.

The second year will focus on developing short term improvements and a long-term vision for Parcel 21 and the surrounding street network bounded by Tremont Street, E. Berkeley Street, Harrison Avenue, Stuart Street and Kneeland Street. Additionally, the City will prepare guidelines for Parcels 19, 20, and 22 to link the surrounding streets. First a planning study will be conducted, followed by a technical feasibility analysis of implementing the proposed improvements.

**SCHEDULE C**
**AWARD DATES AND PROJECT SCHEDULE**

1.    **Award Dates.**

Budget Period End Date:          June 1, 2026

Period of Performance End Date:   See section 4.5 of the General Terms and
                                  Conditions

2.    **Estimated Project Schedule.**

| Milestone | Schedule Date |
|---|---|
| Planned Project Completion Date: | December 1, 2025 |

3.    **Special Milestone Deadlines.**

None.

4.    **Mandatory Prerequisite Dates.**

| Milestone | Date |
|---|---|
| Added to Unified Planning Work Program (UPWP) | June 21, 2023 |

**SCHEDULE D**
**AWARD AND PROJECT FINANCIAL INFORMATION**

1.      **Award Amount.**

RCP Grant Amount:   $1,800,000

2.      **Federal Obligation Information.**

Federal Obligation Type:      Single

3.      **Approved Project Budget.**

| Eligible Project Costs | |
|---|---|
| | **Total** |
| RCP Funds: | $1,800,000 |
| Other Federal Funds: | $0 |
| Non-Federal Funds: | $450,000 |
| Total: | $2,250,000 |

4.      Cost Classification Table

| Cost Classification | Total Costs | Non-RCP Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Administrative and legal expenses | $188,175 | 0 | **$188,175** |
| Architectural and engineering fees | $2,061,825 | 0 | **$2,061,825** |
| **Project Total** | **$2,250,000** | **0** | **$2,250,000** |

5.      **Approved Pre-award Costs**

**None.** The USDOT has not approved under this award any pre-award costs under 2 C.F.R. 200.458.

**SCHEDULE E**
**CHANGES FROM APPLICATION**

**INSTRUCTIONS FOR COMPLETING SCHEDULE E:** Describe all material differences between the scope, schedule, and budget described in the application and the scope, schedule, budget described in schedules B–D. The purpose of this schedule E is to clearly and accurately document the differences in scope, schedule, and budget to establish the parties' knowledge and acceptance of those differences. If there are notable changes in aspects of the Project other than scope, schedule, and budget (*e.g.,* recipient changes), those changes should also be described. See section 3.1 of the General Terms and Conditions.

**Scope**: None

**Schedule**: None

**Budget**: Decrease in federal award and subsequent 20% non-federal match as shown below

The table below provides a summary comparison of the Project budget.

| Fund Source | Application $ | % | Schedule D $ | % |
|---|---|---|---|---|
| **Previously Incurred Costs** | | | | |
| Federal Funds | 0 | 0 | 0 | 0 |
| Non-Federal Funds | 0 | 0 | 0 | 0 |
| Total Previously Incurred Costs | 0 | 0 | 0 | 0 |
| **Future Eligible Project Costs** | | | | |
| RCP Funds | $2,000,000 | 83.3% | $1,800,000 | 80% |
| Other Federal Funds | 0 | 0 | 0 | 0 |
| Non-Federal Funds | $400,000 | 16.7% | $450,000 | 20% |
| Total Future Eligible Project Costs | $2,400,000 | 100% | $2,250,000 | 100% |
| Total Project Costs | $2,400,000 | 100% | $2,250,000 | 100% |

**Other:**

**SCHEDULE F**
**RCP PROGRAM DESIGNATIONS**

1.      **Capital Construction or Planning Designation.**

Capital-Planning Designation:          Planning

2.      **Economically Disadvantaged Community Designation.**

Economically Disadvantaged Community Designation:      Yes

3.      **Funding Source.**

Funding Source:          General Fund

4.      **Security Risk Designation.**

Security Risk Designation:     Low

**SCHEDULE G**
**RCP PERFORMANCE MEASUREMENT INFORMATION**

**Reserved.**

**SCHEDULE H**
**CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS**

1.    **Consideration of Climate Change and Environmental Justice Impacts.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| X | The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities. *(Identify the tool(s) in the supporting narrative below.)* |
| | The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand. *(Describe that shift in the supporting narrative below.)* |
| | The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions. *(Describe those strategies in the supporting narrative below.)* |
| | The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both. *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | The Project supports the installation of electric vehicle charging stations. *(Describe that support in the supporting narrative below.)* |
| | The Project promotes energy efficiency. *(Describe how in the supporting narrative below.)* |
| | The Project serves the renewable energy supply chain. *(Describe how in the supporting narrative below.)* |
| | The Project improves disaster preparedness and resiliency *(Describe how in the supporting narrative below.)* |

| | |
|---|---|
| | The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity. *(Describe how in the supporting narrative below.)* |
| | The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm. *(Describe that infrastructure in the supporting narrative below.)* |
| | The Project supports or incorporates the construction of energy- and location-efficient buildings. *(Describe how in the supporting narrative below.)* |
| | The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
| X | The Recipient has taken other actions to consider climate change and environmental justice impacts of the Project. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions to consider climate change and environmental justice impacts of the Project but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |
| | The Recipient has not taken actions to consider climate change and environmental justice impacts of the Project and will not take those actions under this award. |

2.    **Supporting Narrative.**

Climate change is impacting the livability and wellbeing of Bostonians. An increase in flooding and more frequent storms and extreme temperatures will need to be accounted for in transportation access and safety measures. This Project aims to improve environmental sustainability and quality of life for residents in the project area, which is within underserved communities. The City's "Resilient Boston: An Equitable and Connected City" publication includes "advancing resilient transportation systems" as priority target #17. This target aims to, "build a more resilient transportation network by improving access in key corridors, adapting transport infrastructure to climate change, and ensuring equitable distribution of resources." Ensuring safe, connected infrastructure for active transportation users will expand its usage and lead to more individuals feeling safe doing so.

The EJ Screen was used to identify Socio-Economic Indicators including the 80-90 percentile range in the Low-Income State Percentiles and 70-80 percentile range in the National Percentiles

The EJ Mapper was used to identify EJ Characteristics for the block group as Minority Population 94%, Median Household Income: $17,132, which is 20% of Massachusetts' MHHI, and Households with Language Isolation at 70%

The EJScreen was used to compare the income level of Chinatown in Boston with the United States. The Massachusetts Environmental Justice mapper tool was critical in this analysis as Massachusetts has designated EJ populations. By proposing to build a deck over transportation infrastructure, the Reconnecting Chinatown project will reduce the impact of polluting emissions, noise, and visual blight resulting from highway traffic on the adjacent EJ communities. In addition, proposed streetscape improvements on Washington Street, Shawmut Avenue, Herald Street and Marginal Road will provide shade with tree plantings and a stress-free environment for pedestrians and bicyclists with sidewalk and intersection improvements. With these improvements in place, EJ communities will have improved access to the Quincy School, the Tufts Medical Center, and ethnic grocery stores in the area.

**SCHEDULE I**
**RACIAL EQUITY AND BARRIERS TO OPPORTUNITY**

1.    **Efforts to Improve Racial Equity and Reduce Barriers to Opportunity.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)* |
| | The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)* |
| | The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)* |
| X | The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |
| | The Recipient has not taken actions related to the Project to improve racial equity and reduce barriers to opportunity and will not take those actions under this award. |

2.      **Supporting Narrative.**

The environmental justice tool used USDOT's Equitable Transportation Community (ETC) Explorer to minimize the adverse impacts the Project may have on environmental justice communities.

Resilient Boston outlines a Resilience and Racial Equity Lens process that the City uses to maximize resilience investment and intentionally take actions to address disproportionate impact of climate change and disruptions to transportation on disadvantaged communities. The City has adapted the National Academy of Public Administration framework for evaluating equity and will elevate equity as a core imperative to achieve citywide resilience.

3.      **Community Engagement Activities.**

The Chinatown Master Plan, published every ten years, advocates for and organizes the community around these key issues and provides policy recommendations. Since 1990, it has been a community written and driven development plan to serve to educate policymakers and developers. The 2020 Master Plan prioritized improving the health and wellbeing of Chinatown residents, and stated the community's desire to continue preventative care strategies through educational and awareness programs around Chinatown. Residents expressed their strong desire to collaborate with City of Boston departments to gain access to open space and improve general walkability and connectivity.

This Project will address and build upon this key element of the Chinatown Master Plan. Increasing the amount of greenery and safe and accessible walking routes will improve safety, lead to a decrease in single use motorized vehicles, and ensure more people are getting outside.

The Project team will engage with local community organizations including the Chinatown Main Street, Asian Community Development Corporation (ACDC), the Chinatown Business Association as well as with abutters such as the Josiah Quincy School, the Wang YMCA of Chinatown and the Castle Square Tenants Association. In addition, multilingual outreach will be conducted to engage neighborhood residents and small business owners. Transportation advocacy groups lead by LivableStreets and the Boston Cyclists Union will participate. Starting in late Spring 2024, a stakeholder group will be convened for meetings every two months until the project is completed. In addition, direct outreach will be undertaken through pop-ups, office hours, in-person interviews at locations throughout the neighborhoods. Draft reports will be released for public review at key milestones. The City will maintain a bilingual project website.

4.      **Activities to Safeguard Affordability.**

The plans that will be considered and developed for this park will not displace residents or other community members. Recommendations may include rerouting or redesigning adjacent and proximate roads in the vicinity to accommodate safer mobility options. The

Project will be informed by existing frameworks for equitable development and resilience defined in the Resilient Boston and Climate Ready Boston reports.

Incorporating perspectives from long standing community led processes, including the Chinatown Master Plan, is crucial to ensuring that this project addresses community identified needs. In addition to a literature review of relevant plans, this Planning Grant would include a robust community engagement process to co-design Parcel 21 and develop guidelines for the adjacent parcels, ensuring that marginalized voices are centered and compensated for their work and involvement in the process.

**SCHEDULE J**
**LABOR AND WORK**

1.    **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Recipient or a project partner has adopted the use of project labor agreements in the overall delivery and implementation of the Project. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted the use of local and economic hiring preferences in the overall delivery and implementation of the Project, subject to all applicable State and local laws, policies, and procedures. *(Describe the relevant provisions in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted the use of registered apprenticeships in the overall delivery and implementation of the Project. *(Describe the use of registered apprenticeship in the supporting narrative below.)* |
| X | The Recipient or a project partner will provide training and placement programs for underrepresented workers in the overall delivery and implementation of the Project. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will support free and fair choice to join a union in the overall delivery and implementation of the Project by investing in workforce development services offered by labor-management training partnerships or setting expectations for contractors to develop labor-management training programs. *(Describe the workforce development services offered by labor-management training partnerships in the supporting narrative below.)* |
| | The Recipient or a project partner will provide supportive services and cash assistance to address systemic barriers to employment to be able to participate and thrive in training and employment, including childcare, emergency cash assistance for items such as tools, work clothing, application fees and other costs of apprenticeship or required pre-employment training, transportation and travel to training and work sites, and services aimed at helping to retain underrepresented groups like mentoring, support groups, and peer networking. *(Describe the supportive services and/or cash assistance provided to trainees and employees in the supporting narrative below.)* |

| | The Recipient or a project partner has documented agreements or ordinances in place to hire from certain workforce programs that serve underrepresented groups. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |
|---|---|
| X | The Recipient or a project partner participates in a State/Regional/Local comprehensive plan to promote equal opportunity, including removing barriers to hire and preventing harassment on work sites, and that plan demonstrates action to create an inclusive environment with a commitment to equal opportunity, including: <br>    a. affirmative efforts to remove barriers to equal employment opportunity above and beyond complying with Federal law; <br>    b. proactive partnerships with the U.S. Department of Labor's Office of Federal Contract Compliance Programs to promote compliance with EO 11246 Equal Employment Opportunity requirements; <br>    c. no discriminatory use of criminal background screens and affirmative steps to recruit and include those with former justice involvement, in accordance with the Fair Chance Act and equal opportunity requirements; <br>    d. efforts to prevent harassment based on race, color, religion, sex, sexual orientation, gender identity, and national origin; <br>    e. training on anti-harassment and third-party reporting procedures covering employees and contractors; and <br>    f. maintaining robust anti-retaliation measures covering employees and contractors. <br><br> *(Describe the equal opportunity plan in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |
| | The Recipient has not taken actions related to the Project to improving good-paying jobs and strong labor standards and will not take those actions under this award. |

2.    **Supporting Narrative.**

The City's Mayor's Office of Workforce Development offers several economic empowerment opportunities to invest in high quality workers and to retain people in good-paying jobs. The citywide Greater Boston Equitable Apprenticeship Pathways program was established so that underrepresented populations can progress from pre-

apprenticeship into registered apprenticeships. Boston residents can improve their earning capacity, as the program's Equity Partners have guaranteed jobs and wages to participants. The Program supports Black, Indigenous, People of Color (BIPOC), women, individuals with disabilities, residents who are formerly incarcerated, and others who have historically been under-represented. Infrastructure jobs are the target occupation for this program.

Additionally, the City's Economic Development Office's Equitable Procurement Initiatives has been working to build and expand relationships with a diverse set of vendors. The Supplier Diversity Advisory Council, established through an Executive Order in 2019, ensures equitable procurement and works to address racial and economic disparities for businesses in Boston. Through this Executive Order, the City developed a public-facing directory of small and local businesses, including minority-owned businesses (MBEs), women-owned businesses (WBEs), and veteran-owned small businesses. This also includes the creation of a training program for City employees and departments who manage procurement and the establishment of a procurement plan to prioritize equitable business practices. The City of Boston's Sheltered Market Program, created in 2021, also supports equitable procurement of minority- and women-owned businesses. The City acknowledges that local M/WBE contracting programs cannot be used on federally-assisted contracts.

The City of Boston is proud to be an Equal Opportunity Employer. The City is committed to creating a diverse and inclusive environment. Therefore, qualified applicants will be considered regardless of their sex, race, age, religion, color, national origin, ancestry, physical or mental disability, genetic information, marital status, sexual orientation, gender identity, gender expression, military and veteran status, or other protected category. The City's Executive Order on Valuing Diversity and Equality can be found at this link: https://www.boston.gov/sites/default/files/file/document_files/2018/05/diversity_and_equality_statement.pdf.