THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR.
COUNTY, et al.,

                    Plaintiffs,

    v.

SCOTT TURNER in his official capacity
as Secretary of the U.S. Department of
Housing and Urban Development, et al.,

                  Defendants.

No. 2:25-cv-00814-BJR

DECLARATION OF AMY FORD,
EXECUTIVE DIRECTOR OF THE
DEPARTMENT OF
TRANSPORTATION AND
INFRASTRUCTURE, CITY AND
COUNTY OF DENVER

I, AMY FORD declare as follows:

1.     I am over eighteen years of age. I have personal knowledge of the facts contained in this declaration and am otherwise competent to testify to the matters in this declaration.

2.     I am the Executive Director of the City of Denver's Department of Transportation & Infrastructure (DOTI). In this role, I oversee approximately 1,200 DOTI employees and am responsible for the department's approximately $340,000,000 annual budget. I was appointed to this position in January of 2024.

3.     DOTI's responsibilities include Denver's transportation system, construction of public facilities, maintaining sanitary and sewer systems, and providing solid waste removal, recycling, and composting services.

4.     The City of Denver is Colorado's most populous city. The City of Denver is home

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1  to over 700,000 people and is the economic engine for the region. A healthy transportation

2  system is essential to the economic health of the City of Denver and the regional economy.

3      5.      DOTI has competed for and received grant funding from the Federal government

4  for decades. Federal grant funds are embedded in Denver's planning and budgeting process

5  along with the expectation that it will continue to receive federal grant funds. DOTI is currently

6  the recipient of approximately $300M in federal funds. The cost and scale of infrastructure

7  projects, which ensure the city and region has a safe, efficient, and modern transportation system

8  that improves the quality of life and enhances the productivity of businesses, are too large to

9  fund with only local sources. These critical safety and mobility projects will not happen without

10  federal grant awards.

11      6.      Denver has maintained a strong partnership with the U.S. Department of

12  Transportation for decades, carrying out strategic projects that range from local safety

13  improvements to projects that are of regional significance and priority for the U.S. Denver relies

14  on federal grants to improve and maintain 2,000 miles of streets, in coordination with our

15  regional transportation partners the Colorado Department of Transportation (CDOT) and the

16  Regional Transportation District (RTD.)  Federal grants are crucial to system improvements,

17  funding street reconstruction projects, safety upgrades, and rebuilding infrastructure that has

18  reached the end of its useful life. The cost of these infrastructure improvements cannot be

19  shouldered by the city alone; without federal grant investment, these critical investments will not

20  be possible. The loss of federal grants funds would impact Denver's economy, the economy of

21  the Front Range urban corridor and millions of people who live and work in the region.

22      7.      Denver receives federal grant funds as a sub recipient and as a direct recipient.

23  When Denver is a sub recipient, paid invoices are submitted to the overseeing agency (RTD or

DECLARATION OF AMY FORD - 2
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

CDOT) for review and reimbursement via their approved payment systems.  Once approved, Denver receives grant funds through a reimbursement process from federal agencies including FHWA and FTA.  For direct recipient grants, Denver receives grant funds directly from the granting agency.

8.      Denver relies on federal grant awards to fund critical infrastructure projects. Without these funds, these projects will not advance as no other source of funding exists large enough to cover the cost of implementation.

9.      Between 2017 and 2021, Denver allocated an average of $222,000,000 a year to transportation improvements, maintenance, and operations. Approximately, 19% of this funding came from federal or state grants, with state grants sponsored primarily by the federal government. I estimate that that level has remained consistent.

10.     Most of DOTI's revenue covers routine capital maintenance of its assets, as well as the staff, equipment, and technology necessary to operate the system. Given these rather fixed costs, federal grants represent a significant portion of the funding needed to make improvements and major rehabilitations to Denver's transportation infrastructure. The limited local capital improvement funding for DOTI  is insufficient to cover these major expenditures.

11.     The Washington Street Livability Project is an example of a project that is at risk. (See Ford Exhibits A through C)  Denver was awarded a RAISE grant for the Washington Street Livability Project under a Grant Agreement dated November 27, 2023, as amended on November 27, 2024, for a total award amount of $13,993,113.

12.     Of the total grant amount for the Washington Street Livability Project, approximately $10,880,225 has not yet been invoiced or reimbursed to Denver.

13.     The total project cost for Washington Street Livability Project in the grant

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

application was estimated to be $36,795,178. Therefore, the federal grant funding commitment comprises approximately 38% of the total project funding.

14.     The Washington Street corridor is heavily utilized by freight-trucks entering industrial land uses, serving as an important north-south route for the movement of goods into, out of, and through Denver via regional access to I-70 and across the country. American manufacturing, distribution, and warehousing jobs are adjacent to the corridor such as an Amazon Distribution Center and Superior Farms. Washington Street was identified as a priority corridor for investment because of the importance to the local, regional, and national economy. It also does not have basic safety infrastructure such as sidewalks, bike lanes, and transit priority to serve the community.

15.     The Washington St project consists of a full depth reconstruction of the roadway to include operational and safety improvements, upgrading traffic signals with new signal infrastructure at 50th, improving the railroad crossing, expansion of the ROW to better align with the safety of pedestrian use, multi-use sidewalks, significant sewer and storm drainage improvements, green infrastructure planting areas, pedestrian lighting along the corridor.

16.     If the grant funding is reduced or terminated, the Washington Street Project would have to be delayed until either the federal funding is restored or until Denver has the ability to financially backfill the budget shortfall. The congestion and safety conditions in the corridor would continue to directly impact operations of both the local transit services, as well as the critical freight employers in the corridor. For example, Superior Farms, an employee-owned and operated company vital to the United States lamb industry and responsible for nearly 25 percent of federally-inspected lamb processing is located along the Washington Street corridor. Superior Farms relies on the Washington Street corridor for safe transit of its products. Additionally,

DECLARATION OF AMY FORD - 4
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

every month that Washington Street Project is delayed there is a projected cost escalation of approximately $120,000/month. Lastly, the Washington Street project is also a critical "waterfall" project, and its delay or cancellation will impact many of the other 55 infrastructure improvements planned in the Globeville-Elyria-Swansea area.

17.    The Safe Streets for America (SS4A) grant is another specific example of Denver's reliance on DOT funds.  (See Ford Exhibits D through H) The project funded by the SS4A grant, which was awarded September 2024, will target proven safety measures to save lives on arterial streets which carry a significant proportion of Denver's traffic and are where the majority of serious traffic deaths and injuries occur. The downtown Denver area has a much higher traffic fatality rate than the citywide average, as it accounts for over 20% of all fatalities in the city despite occupying less than 2% of the city's land area. Downtown Denver also hosts over 140,000 jobs, making it the largest employment center in the state as well as accounting for 20% of Denver's jobs. Funds from the SS4A grant will be focused on safety improvements in the downtown area.

18.    The total grant amount for the SS4A Grant Application is $8,444,524, of which $1,688,905 is local-match and $6,755,619 would be federally funded by the grant.

19.    DOTI does not have local resources to implement the projects included in the grant application. While some improvements could be implemented with the local match dollars alone, these would be non-infrastructure investments (i.e. signal timing) and the impact of those improvements on saving lives and reducing injuries on Denver's streets are lower. The projects included in the grant have the highest life-savings/injury reduction potential.

20.    The impact of not obtaining these grant dollars would contribute to further loss of life and injury on Denver's streets. Ensuring safe streets within the City's downtown is a critical

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    part of retaining and growing the State's regional economic hub, with a safe and convenient

2    transportation system critical to sustaining both Denver's downtown and regional economy. The

3    loss of federal grant dollars will have an immediate and lasting negative impact on both the

4    safety and economic vitality of Denver and the Front Range region.

5

6        I declare under penalty of perjury that the foregoing is true and correct.

7

8        EXECUTED this 19th day of May, 2025.

9

10

11

12                                                        _Amy Ford_

13                                                        AMY FORD

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF AMY FORD - 6
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

2

**CERTIFICATE OF SERVICE**

3

    I hereby certify that on May 21, 2025, I served a true and correct copy of the foregoing

4

document on the following parties by the method(s) indicated below:

5

6

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants Scott Turner, U.S.*<br>*Dept. of Housing and Urban Development,*<br>*Sean Duffy, U.S. Dept. of Transportation,*<br>*Tariq Bokhari, the Federal Transit*<br>*Administration, Gloria M. Shepherd, the*<br>*Federal Highway Administration, Chris*<br>*Rocheleau, the Federal Aviation*<br>*Administration, Drew Feeley, the Federal*<br>*Railroad Administration* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

7

8

9

10

11

12

13

14

15

16

17

18

19

    I declare under penalty of perjury under the laws of the United States and the State of

20

Washington that the foregoing is true and correct.

21

22

    DATED this 21ˢᵗ day of May, 2025.

23

                            */s/ Gabriela DeGregorio*
                            Gabriela DeGregorio

24

                            Litigation Assistant

25

                            Pacifica Law Group LLP

26

27

CERTIFICATE OF SERVICE

# EXHIBIT A

| 1. | **Award No.** | | 2. | **Effective Date** | 3. | **Assistance** |
|---|---|---|---|---|---|---|

1. **Award No.**
   693JJ32440094

2. **Effective Date**
   See No. 17 Below

3. **Assistance Listings No.**
   20.933

4. **Award To**
   City and County of Denver
   Department of Transportation &
   Infrastructure
   200 West Colfax Ave, Denver, CO, 80202

   Unique Entity Id.: JL75DFB1NLR4
   TIN No.: 846000580

5. **Sponsoring Office**
   U.S. Department of Transportation
   Federal Highway Administration
   Office of Acquisition & Grants Management
   1200 New Jersey Avenue, SE
   HCFA-32, Mail Drop E62-204
   Washington, DC 20590

6. **Period of Performance**
   Effective Date of Award–June 9,
   2027

7. **Total Amount**
   Federal Share:           $13,993,113
   Recipient Share:         $19,068,109
   Total:                   $33,061,222

8. **Type of Agreement**
   Grant

9. **Authority**
   Consolidated Appropriations Act, 2021 (Pub.
   L. 116-260, Dec. 27, 2020)

10. **Procurement Request No.**
    HOFM240004PR

11. **Federal Funds Obligated**
    Base Phase: $5,000,599
    Subject to the Availability of Funds (SAF):
    Option Phase 1: $8,992,514
    Total RAISE Funding Value: $13,993,113
    Match Funds (Non-Federal): $19,068,109
    Total Eligible Project Cost: $33,061,222

12. **Submit Payment Requests To**
    See article 20.

13. **Payment Office**
    See article 20.

14. **Accounting and Appropriations Data**
    1540C74E50.2021.070RA02500.7001000000.41050.61006600

15. **Description of Project**
    Washington Street Livability Project

| **RECIPIENT** | **FEDERAL HIGHWAY ADMINISTRATION** |
|---|---|
| 16. **Signature of Person Authorized to Sign (see page 2** | 17. **Signature of Agreement Officer** |

_____
Signature                                          Date
Name: David J. Villalobos
Title: Agreement Officer

**Contract Control Number:**  DOTI-202369923-00
**Contractor Name:**  FEDERAL HIGHWAY ADMINISTRATION

IN WITNESS WHEREOF, the parties have set their hands and affixed their seals at
Denver, Colorado as of: 11/14/2023 | 3:23 PM PST



**SEAL**

**CITY AND COUNTY OF DENVER:**

**ATTEST:**

By: *Michael C. Johnston*
5DC361FDC863466...
Mayor
Michael C. Johnston

*Audrey Kline*
E0F80F841070488...
Deputy Clerk and Recorder
Audrey Kline

**APPROVED AS TO FORM:**

**REGISTERED AND COUNTERSIGNED:**

Attorney for the City and County of Denver

By: *John McGrath*
E6825B8FF80A43C...
Assistant City Attorney
John McGrath

By: *Nicole Doheny*
A3CE12EB736D4D9...
Chief Financial Officer
Nicole Doheny

By: 
0269594F8B7845D...
Auditor
Timothy O'Brien

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE**
**FISCAL YEAR 2021 RAISE GRANT PROGRAM**

This agreement is between the United States Department of Transportation (the "**USDOT**") and the City and County of Denver (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a RAISE Grant for the Washington Street Livability Project.

The parties therefore agree to the following:

**ARTICLE 1**
**GENERAL TERMS AND CONDITIONS**

**1.1    General Terms and Conditions.**

    (a)  In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under The Fiscal Year 2021 Rebuilding American Infrastructure with Sustainability and Equity (RAISE) Grant Program: FHWA Projects," dated June 6, 2022, which is available at http://go.usa.gov/xJKa5. Articles 8–31 are in the General Terms and Conditions. The General Terms and Conditions are part of this agreement.

    (b)  The Recipient states that it has knowledge of the General Terms and Conditions.

    (c)  The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

**ARTICLE 2**
**APPLICATION, PROJECT, AND AWARD**

**2.1    Application.**

    Application Title:    Washington Street Livability Project

    Application Date:    July 12, 2021

**2.2**    **Award Amount.**

RAISE Grant Amount:        $13,993,113

Federal Obligation Type:        Multiple

| RAISE Grant Allocation Table | |
|---|---|
| **Portion of the Project** | **Allocation from RAISE Grant** |
| Base Phase: Right of Way Acquisition | $5,000,599 |
| Option Phase 1: Construction | $8,992,514 |

| Future Obligation Conditions Table | |
|---|---|
| **Portion of the Project** | **Condition** |
| Option Phase 1: Construction | If FHWA Colorado Division Office approves the PS&E for the Project and the Recipient has met all the applicable Federal, State, and Local requirements. |

**2.3**    **Award Dates.**

Budget Period End Date:                June 9, 2027

Period of Performance End Date:        June 9, 2027

**2.4**    **Urban or Rural Designation.**

Urban-Rural Designation:        Urban

**2.5**    **Capital or Planning Designation.**

Capital-Planning Designation:        Capital

**2.6**    **Federal Award Identification Number.** The Federal Award Identification Number is listed on page 1, line 1.

# ARTICLE 3
## SUMMARY PROJECT INFORMATION

**3.1**    **Summary of Project's Statement of Work.**

This project will modernize Washington Street from 47th Avenue to 52nd Street and implement a multi-modal, more efficient lane configuration including widened sidewalks, bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

**3.2**    **Project's Estimated Schedule.**

| Milestone | Schedule Date |
|---|---|
| Planned Right-of-Way Certification Date: | July 9, 2024 |
| Planned Construction Substantial Completion and Open to Traffic Date: | December 9, 2026 |

3.3    **Project's Estimated Budget.**

| Eligible Project Costs | |
|---|---|
| RAISE Grant Amount: | $13,993,113 |
| Other Federal Funds: | $0 |
| Non-Federal Funds: | $19,068,109 |
| **Total Eligible Project Cost:** | **$33,061,222** |

# ARTICLE 4
## CRITICAL MILESTONE DEADLINES

**4.1**    **Critical Milestone Deadlines.**

| Milestone | Deadline Date |
|---|---|
| Standard Railroad Agreement with BNSF Railroad | July 9, 2024 |

DocuSign Envelope ID: CAE78D76235A2470DB91CC-B34BC29A2152

# ARTICLE 5
## PARTY INFORMATION

**5.1    Recipient's Unique Entity Identifier.**

Recipient's Unique Entity Identifier: JL75DFB1NLR4

**5.2    Recipient Contact(s).**

David Nemovitz
Deputy City Engineer
City and County of Denver,
Department of Transportation & Infrastructure
201 W Colfax Ave., Denver, CO 80203
720-913-0229
David.nemovitz@denvergov.org

**5.3    Recipient Key Personnel.**

| Name | Title or Position |
|------|-------------------|
| Deborah Turner, P.E. | Senior Manager |

**5.4    USDOT Project Contact(s).**

David J. Villalobos
Agreement Officer (AO)
Federal Highway Administration
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-310
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-7430
david.villalobos@dot.gov

and

Travis Wheeler
Agreement Specialist (AS)
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-204
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-8887
travis.wheeler@dot.gov

DocuSign Envelope ID: C2E78D76-35A2-4706-B1CC-D38BC29A5152

and

Chris Horn
Agreement Officer Representative (AOR)
Senior Area Engineer
Colorado Division
HDA-CO
12300 W. Dakota Avenue, Suite 180
720-963-3017
Chris.Horn@dot.gov

## ARTICLE 6
## USDOT ADMINISTRATIVE INFORMATION

**6.1**    **Payment System.**

USDOT Payment System:      DELPHI eInvoicing

**6.2**    **Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition
and Grants Management

## ARTICLE 7
## SPECIAL GRANT TERMS

There are no other special terms for this award.

**ATTACHMENT A**
**STATEMENT OF WORK**

This project will modernize Washington Street from 47th Avenue to 52nd Street and implement a multi-modal, more efficient lane configuration including widened sidewalks, bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

Right of Way Acquisition - The base phase of this project includes the acquisition of the temporary construction easements, permanent easements and/or fee simple property that are necessary to construct the Project.

Construction - Reconstruct and/or resurface Washington Street from 47th Avenue to 52nd Street including widening sidewalks, adding bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

## ATTACHMENT B
## ESTIMATED PROJECT BUDGET

1.      **Supplementary Fund Source Table(s)**

The following tables supplement the budget information in section 3.3.

| Non-RAISE Previously Incurred Costs | |
|---|---|
| Non-Federal Funds: | $3,733,956 |
| **Total:** | **$3,733,956** |

| | Eligible Costs | | |
|---|---|---|---|
| | **Base Phase: ROW** | **Option Phase 1: Construction** | **Total** |
| RAISE Funds: | $5,000,599 | $8,992,514 | **$13,993,113** |
| Other Federal Funds: | $0 | $0 | **$0** |
| Non-Federal Funds: | $1,918,000 | $17,150,109 | **$19,068,109** |
| **Total:** | **$6,918,599** | **$26,142,623** | **$33,061,222** |

2.      **Cost Classification Table**

| Cost Classification | Total Costs | Non-RAISE Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Land, structures, rights-of-way, appraisals, etc. | $6,918,599 | $0 | **$6,918,599** |
| Architectural and engineering fees | $3,733,956 | $3,733,956 | **$0** |
| Construction | $23,629,634 | $0 | **$23,629,634** |
| Contingency | $2,512,989 | $0 | **$2,512,989** |
| **Project Total** | **$36,795,178** | **$3,733,956** | **$33,061,222** |

# ATTACHMENT C
# PERFORMANCE MEASUREMENT INFORMATION

**Study Area:** Data will be collected from locations in the area bounded by Washington Street between 47th Avenue and 52nd Avenue within the City and County of Denver.

**Baseline Measurement Date:**    July 9, 2024

**Baseline Report Date:**    October 30, 2024

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Auto Crash Rates by Type/Severity | Safety<br><br>Crash rates will be measured and reported as crashes per 100 million VMT and identified by the following severity categories: fatal, injury, and property-damage-only (PDO) crashes. | Quarterly |
| Average Daily Traffic (ADT) | Economic Competitiveness, Quality of Life<br><br>The total volume of vehicle traffic on a highway or road segment per day as defined by the project study area. | Quarterly |

# ATTACHMENT D
# CHANGES FROM APPLICATION

**Scope**: The removed Design and Environmental phase has already started and must be removed from the grant scope in order for the City and County of Denver to begin right-of-way acquisition and start construction within the fund obligation deadline. The project improvements as described in the application remain unchanged.

**Schedule**: The schedule change from completion in December 2026 to Spring 2026 is due to the accelerated timeline to obligate the funds; therefore, the project will be fully constructed six months prior to the original application date.

**Budget**: The total eligible project costs have decreased by $3,733,956, as these costs are now a previously incurred cost that is funding the PS&E portion of the project. These costs represent the costs to complete the Design and Environmental – NEPA phases, which were initiated before the project was selected for a RAISE award. The City and County of Denver are using Non-Federal fund sources to complete the Design and Environmental – NEPA phases.

The table below provides a summary comparison of the project budget.

| Fund Source | Application $ | % | Section 3.3 and Attachment B $ | % |
|---|---|---|---|---|
| **Previously Incurred Costs** | | | | |
| Federal Funds | 0 | N/A | 0 | 0 |
| Non-Federal Funds | 0 | N/A | 3,733,956 | 10 |
| Total Previously Incurred Costs | 0 | N/A | 3,733,956 | 10 |
| **Future Eligible Project Costs** | | | | |
| RAISE Funds | 16,993,113 | 46 | 13,993,113 | 38 |
| Other Federal Funds | 0 | 0 | 0 | 0 |
| Non-Federal Funds | 19,802,065 | 54 | 19,068,109 | 52 |
| Total Future Eligible Project Costs | 36,795,178 | 100 | 33,061,222 | 90 |
| Total Project Costs | 36,795,178 | 100 | 36,795,178 | 100 |

## ATTACHMENT E
## APPROVED PRE-AWARD COSTS

**None.** The USDOT has not approved under this award any pre-award costs under 2 C.F.R. 200.458. Because unapproved costs incurred before the date of this agreement are not allowable costs under this award, the USDOT will neither reimburse those costs under this award nor consider them as a non-Federal cost sharing contribution to this award. Costs incurred before the date of this agreement are allowable costs under this award only if approved in writing by USDOT before being included the project costs and documented in this Attachment E. See section 20.2(b).

## ATTACHMENT F
## CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS

1.      **Consideration of Climate Change and Environmental Justice Impacts.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| X | The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities. *(Identify the tool(s) in the supporting narrative below.)* |
| | The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand. *(Describe that shift in the supporting narrative below.)* |
| | The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions. *(Describe those strategies in the supporting narrative below.)* |
| | The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both. *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | The Project supports the installation of electric vehicle charging stations. *(Describe that support in the supporting narrative below.)* |
| | The Project promotes energy efficiency. *(Describe how in the supporting narrative below.)* |
| | The Project serves the renewable energy supply chain. *(Describe how in the supporting narrative below.)* |
| | The Project improves disaster preparedness and resiliency *(Describe how in the supporting narrative below.)* |

| |
|---|
| The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity. *(Describe how in the supporting narrative below.)* |
| The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm. *(Describe that infrastructure in the supporting narrative below.)* |
| The Project supports or incorporates the construction of energy- and location-efficient buildings. *(Describe how in the supporting narrative below.)* |
| The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
| The Recipient has taken other actions to consider climate change and environmental justice impacts of the Project, as described in the supporting narrative below. |
| The Recipient has not yet taken actions to consider climate change and environmental justice impacts of the Project but, before beginning construction of the Project, will take relevant actions described in Attachment A. *(Identify the relevant actions from Attachment A in the supporting narrative below.)* |
| The Recipient has not taken actions to consider climate change and environmental justice impacts of the Project and will not take those actions under this award. |

2.      **Supporting Narrative.**

**Row Description:  The Project directly supports a Local Climate Action Plan that results in lower greenhouse gas emissions.**

*Denver's Climate Action Plan* (2018) presents a City-wide goal to reduce GHG emissions from 2019 levels. This project directly supports the City's goal to dedicate 50% of Climate Action funding to directly benefit people of color, Indigenous people, low-income households, people living with chronic health conditions, children, older adults, and others most impacted by climate change.

In addition, *Denver Moves Everyone2050* is a citywide plan that prioritizes equitable and safe solutions and seeks to improve the movement of goods and services. The plan focuses on improving rolling, walking, bicycling, transit, and driving. This project furthers *Denver Moves Everyone2050* by improving narrow and missing sidewalks, improving transit stops, and adding landscaping; adding turn lanes to improve traffic flow; replacing existing streetlights with energy

efficient LEDs along the corridor; and installing improved drainage and stormwater functions to improve water quality and address continued local drainage and regional flooding from the nearby South Platte River.

**<u>Row Description: The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities.</u>**

Denver used EJSCREEN as a basis for public outreach during the NEPA phase to solicit feedback that will identify community-preferred methods to avoid, minimize, or mitigate adverse impacts of the project on the neighborhood community.

## ATTACHMENT G
## RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

**1.      Efforts to Improve Racial Equity and Reduce Barriers to Opportunity.**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)* |
| | The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)* |
| | The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity, as described in the supporting narrative below. |
| | The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but, before beginning construction of the project, will take relevant actions described in Attachment A. *(Identify the relevant actions from Attachment A in the supporting narrative below.)* |
| | The Recipient has not taken actions related to the Project to improve racial equity and reduce barriers to opportunity and will not take those actions under this award. |

2.      **Supporting Narrative.**

**Row descriptions - A racial equity impact analysis has been completed for the Project**.

A racial equity impact analysis was completed for this project using a tool developed by the Denver Department of Public Health and Environment called ***Neighborhood Equity Index analysis.*** The project area is an area of the most inequity, scoring 2.1 out of 5.

**Row description - The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project.**

Denver's Department of Transportation and Infrastructure is actively participating in the Construction Empowerment Initiative (CEI), Conference of Minority Transportation Officials and Hispanic Contractors of Colorado meetings to encourage minority-owned business involvement. In addition, Denver will utilize the Denver Economic Development Office's Construction Careers Pilot program, WORKNOW, which seeks to uplift employees with skills training and support, MWBEs and SBEs, and provide support to small businesses.

# EXHIBIT B

## AMENDMENT TO THE GRANT AGREEMENT

**1. AMENDMNET NO.:** 1                          **EFFECTIVE DATE:** See No.14 below

**2. PROCUREMENT REQUEST NO.:** HOFM240084PR

**3. AMENDMENT OF AGREEMENT NO.:** 693JJ32440094

| | |
|---|---|
| 4. **ISSUED BY:** | **5. NAME AND ADDRESS OF RECIPIENT** |
| Federal Highway Administration Office of Acquisition and Grants Management 1200 New Jersey Avenue, SE HCFA-41 Mail Stop E65-119 Washington, DC 20590 | City and County of Denver 200 West Colfax Ave Denver, CO 80202 UEI No.: JL75DFB1NLR4 TIN: 846000580 |

**6. ACCOUNTING AND APPROPRIATION DATA** *(if required):*
1540C74E50.2021.070RA02500.7001000000.41010.61006600

**7. DOLLAR AMOUNT OF AMENDENT:** $8,992,514.00

**8. DESCRIPTION OF AMENDMENT:**

The purpose of this amendment is issued to: 1. Article 2.3: Updated Project's Award Dates, 2. Article 3.2: Updated the Project's Estimated Schedule. 3. Article 5.2: Updated the Recipient's Contact Information, 4. Article 5.3: Updated Recipient's Key Personnel, 5. Attachment B: Updated Cost Classification Table, 6. Attachment C: Updated the Performance Measurement Information, 7. Attachment D: Updated Changes from Original Agreement.

The Agreement is amended as follows (refer to page 2):

**9. NAME AND TITLE OF SIGNER OFFICER**                    **11. NAME OF AGREEMENT**

**10. RECIPIENT**                                           **12. FEDERAL HIGHWAY ADMINSTRATION**

*(Signature of person authorized to sign)* *(Signature of Agreement Officer)*

**13. DATE SIGNED:** 9/9/24          **14. DATE SIGNED:** _____

]U.S. DEPARTMENT OF TRANSPORTATION

**FIRST AMENDED AND RESTATED GRANT AGREEMENT UNDER THE
FISCAL YEAR 2021 RAISE GRANT PROGRAM**

This agreement is between the United States Department of Transportation (the "**USDOT**") and the City and County of Denver (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a RAISE Grant for the Washington Street Livability Project.

The USDOT and Recipient executed a grant agreement on November 27, 2023 ("the Original Grant Agreement"). This agreement amends and restates in its entirety and replaces the Original Grant Agreement.

The parties therefore agree to amend and restate the grant agreement to read in its entirety as follows:

**Article 1
General Terms and Conditions**

**1.1    General Terms and Conditions.**

(a) In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under The Fiscal Year 2021 Rebuilding American Infrastructure with Sustainability and Equity (RAISE) Grant Program: FHWA Projects," dated June 6, 2022, which is available at http://go.usa.gov/xJKa5. Articles 8–31 are in the General Terms and Conditions. The General Terms and Conditions are part of this agreement.

(b) The Recipient states that it has knowledge of the General Terms and Conditions.

(c) The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

**Article 2**
**Application, Project, and Award**

**2.1     Application.**

Application Title:        Washington Street Livability Project
Application Date:        July 12, 2021

**2.2     Award Amount.**

RAISE Grant Amount:        $13,993,113
Federal Obligation Type:        Multiple

| RAISE Grant Allocation Table | |
|---|---|
| **Portion of the Project** | **Allocation from RAISE Grant** |
| Base Phase: Right of Way Acquisition | $5,000,599 |
| Option Phase 1: Construction | $8,992,514 |

| Future Obligation Conditions Table | |
|---|---|
| **Portion of the Project** | **Condition** |
| Option Phase 1: Construction | If FHWA Colorado Division Office approves the PS&E for the Project and the Recipient has met all the applicable Federal, State, and Local requirements. |

**2.3     Award Dates.**

Budget Period End Date:                June 30, 2028

Period of Performance End Date:        June 30, 2028

**2.4     Urban or Rural Designation.**

Urban-Rural Designation:        Urban

**2.5** **Capital or Planning Designation.**

Capital-Planning Designation:    Capital

**2.6** **Federal Award Identification Number.** The Federal Award Identification Number is listed on page 1, line 1.

**Article 3**
**Summary Project Information**

**3.1** **Summary of Project's Statement of Work.**

This project will modernize Washington Street from 47th Avenue to 52nd Street and implement a multi-modal, more efficient lane configuration including widened sidewalks, bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

**3.2** **Project's Estimated Schedule.**

| Milestone | Schedule Date |
|---|---|
| Planned Right-of-Way Certification Date: | July 9, 2024 |
| Planned Construction Substantial Completion and Open to Traffic Date: | June 30, 2027 |

**3.3** **Project's Estimated Budget.**

| Eligible Project Costs | |
|---|---|
| RAISE Grant Amount: | $13,993,113 |
| Other Federal Funds: | $0 |
| Non-Federal Funds: | $19,068,109 |
| **Total Eligible Project Cost:** | **$33,061,222** |

**Article 4**
**Critical Milestone Deadlines**

**4.1** **Critical Milestone Deadlines.**

| Milestone | Deadline Date |
|---|---|
| Standard Railroad Agreement with BNSF Railroad | July 9, 2024 |

**Article 5**
**Party Information**

5.1     **Recipient's Unique Entity Identifier.**

Recipient's Unique Entity Identifier: JL75DFB1NLR4

5.2     **Recipient Contact(s).**

Deborah Turner
Senior Manager
City and County of Denver,
Department of Transportation & Infrastructure
201 W Colfax Ave., Denver, CO 80203
720-913-4512
deborah.turner@denvergov.org

5.3     **Recipient Key Personnel.**

| Name | Title or Position |
|---|---|
| Jennifer Bartlett | Principal City Planner |
| Mark Gonzales | Senior Engineer |

5.4     **USDOT Project Contact(s).**

David J. Villalobos
Agreement Officer (AO)
Federal Highway Administration
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-310
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-7430
david.villalobos@dot.gov

and

Travis Wheeler
Agreement Specialist (AS)
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-204
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-8887
travis.wheeler@dot.gov

and

Chris Horn
Agreement Officer Representative (AOR)
Senior Area Engineer
Colorado Division
HDA-CO
12300 W. Dakota Avenue, Suite 180
720-963-3017
Chris.Horn@dot.gov


**Article 6**
**USDOT Administrative Information**


**6.1    Payment System.**

USDOT Payment System:    DELPHI eInvoicing

**6.2    Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition
and Grants Management


**Article 7**
**Special Grant Terms**


There are no other special terms for this award.

**ATTACHMENT A**
**STATEMENT OF WORK**

This project will modernize Washington Street from 47th Avenue to 52nd Street and implement a multi-modal, more efficient lane configuration including widened sidewalks, bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

Right of Way Acquisition - The base phase of this project includes the acquisition of the temporary construction easements, permanent easements and/or fee simple property that are necessary to construct the Project.

Construction - Reconstruct and/or resurface Washington Street from 47th Avenue to 52nd Street including widening sidewalks, adding bicycle paths, energy-efficient lighting, streetscaping treatments, and improved access to transit.

## ATTACHMENT B
## ESTIMATED PROJECT BUDGET

### *1. SUPPLEMENTARY FUND SOURCE TABLE(S)*

The following tables supplement the budget information in section 3.3.

| Non-RAISE Previously Incurred Costs | |
|---|---|
| Non-Federal Funds: | $3,733,956 |
| Total: | $3,733,956 |

| | Eligible Costs | | |
|---|---|---|---|
| | **Base Phase: ROW** | **Option Phase 1: Construction** | **Total** |
| RAISE Funds: | $5,000,599 | $8,992,514 | **$13,993,113** |
| Other Federal Funds: | $0 | $0 | **$0** |
| Non-Federal Funds: | $1,918,000 | $17,150,109 | **$19,068,109** |
| Total: | $6,918,599 | $26,142,623 | $33,061,222 |

### *2. COST CLASSIFICATION TABLE*

| Cost Classification | Total Costs | Non-RAISE Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Land, structures, rights-of-way, appraisals, etc. | $6,918,599 | $0 | **$6,918,599** |
| Architectural and engineering fees | $3,733,956 | $3,733,956 | **$0** |
| Construction | $ 26,142,623 | $0 | **$26,142,623** |
| Contingency | $ 0 | $0 | **$ 0** |
| **Project Total** | **$36,795,178** | **$3,733,956** | **$33,061,222** |

## ATTACHMENT C
## PERFORMANCE MEASUREMENT INFORMATION

**Study Area:** Data will be collected from locations in the area bounded by Washington Street between 47th Avenue and 52nd Avenue within the City and County of Denver.

**Baseline Measurement Date:**     November 9, 2024

**Baseline Report Date:**     January 9, 2025

## TABLE 1: PERFORMANCE MEASURE TABLE

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Auto Crash Rates by Type/Severity | Safety<br><br>Crash rates will be measured and reported as crashes per 100 million VMT and identified by the following severity categories: fatal, injury, and property-damage-only (PDO) crashes. | Quarterly |
| Average Daily Traffic (ADT) | Economic Competitiveness, Quality of Life<br><br>The total volume of vehicle traffic on a highway or road segment per day as defined by the project study area. | Quarterly |

## ATTACHMENT D
## CHANGES FROM ORIGINAL GRANT AGREEMENT

**Scope**: No change to the scope of the project

**Schedule**: The schedule change which updates completion from December 9, 2026, to June 30, 2028 is due to a constructability review which was completed during the design and NEPA process to more accurately reflect the time for a contractor to complete construction.

**Budget**: No change.

## CHANGES FROM APPLICATION

**Scope**: The removed Design and Environmental phase has already started and must be removed from the grant scope in order for the City and County of Denver to begin right-of-way acquisition and start construction within the fund obligation deadline. The project improvements as described in the application remain unchanged.

**Schedule**: The schedule change from completion in December 2026 to Spring 2026 is due to the accelerated timeline to obligate the funds; therefore, the project will be fully constructed six months prior to the original application date.

**Budget**: The total eligible project costs have decreased by $3,733,956, as these costs are now a previously incurred cost that is funding the PS&E portion of the project. These costs represent the costs to complete the Design and Environmental – NEPA phases, which were initiated before the project was selected for a RAISE award. The City and County of Denver are using Non-Federal fund sources to complete the Design and Environmental – NEPA phases.

The table below provides a summary comparison of the project budget.

| Fund Source | Application | | Section 3.3 and Attachment B | |
|---|---|---|---|---|
| | $ | % | $ | % |
| **Previously Incurred Costs** | | | | |
| Federal Funds | 0 | N/A | 0 | 0 |
| Non-Federal Funds | 0 | N/A | 3,733,956 | 10 |
| Total Previously Incurred Costs | 0 | N/A | 3,733,956 | 10 |
| **Future Eligible Project Costs** | | | | |
| RAISE Funds | 16,993,113 | 46 | 13,993,113 | 38 |
| Other Federal Funds | 0 | 0 | 0 | 0 |
| Non-Federal Funds | 19,802,065 | 54 | 19,068,109 | 52 |
| Total Future Eligible Project Costs | 36,795,178 | 100 | 33,061,222 | 90 |

| Fund Source | Application | | Section 3.3 and Attachment B | |
|---|---|---|---|---|
| | $ | % | $ | % |
| Total Project Costs | 36,795,178 | 100 | 36,795,178 | 100 |

**ATTACHMENT E**
**APPROVED PRE-AWARD COSTS**

**None.** The USDOT has not approved under this award any pre-award costs under 2 C.F.R. 200.458. Because unapproved costs incurred before the date of this agreement are not allowable costs under this award, the USDOT will neither reimburse those costs under this award nor consider them as a non-Federal cost sharing contribution to this award. Costs incurred before the date of this agreement are allowable costs under this award only if approved in writing by USDOT before being included the project costs and documented in this Attachment E. See section 20.2(b).

## ATTACHMENT F
## CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS

*1.  CONSIDERATION OF CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS.*

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| X | The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities. *(Identify the tool(s) in the supporting narrative below.)* |
| | The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand. *(Describe that shift in the supporting narrative below.)* |
| | The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions. *(Describe those strategies in the supporting narrative below.)* |
| | The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both. *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | The Project supports the installation of electric vehicle charging stations. *(Describe that support in the supporting narrative below.)* |
| | The Project promotes energy efficiency. *(Describe how in the supporting narrative below.)* |
| | The Project serves the renewable energy supply chain. *(Describe how in the supporting narrative below.)* |
| | The Project improves disaster preparedness and resiliency *(Describe how in the supporting narrative below.)* |

| |
|---|
| The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity. *(Describe how in the supporting narrative below.)* |
| The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm. *(Describe that infrastructure in the supporting narrative below.)* |
| The Project supports or incorporates the construction of energy- and location-efficient buildings. *(Describe how in the supporting narrative below.)* |
| The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
| The Recipient has taken other actions to consider climate change and environmental justice impacts of the Project, as described in the supporting narrative below. |
| The Recipient has not yet taken actions to consider climate change and environmental justice impacts of the Project but, before beginning construction of the Project, will take relevant actions described in Attachment A. *(Identify the relevant actions from Attachment A in the supporting narrative below.)* |
| The Recipient has not taken actions to consider climate change and environmental justice impacts of the Project and will not take those actions under this award. |

## 2. *SUPPORTING NARRATIVE.*

**Row Description:  The Project directly supports a Local Climate Action Plan that results in lower greenhouse gas emissions.**

*Denver's Climate Action Plan* (2018) presents a City-wide goal to reduce GHG emissions from 2019 levels. This project directly supports the City's goal to dedicate 50% of Climate Action funding to directly benefit people of color, Indigenous people, low-income households, people living with chronic health conditions, children, older adults, and others most impacted by climate change.

In addition, *Denver Moves Everyone2050* is a citywide plan that prioritizes equitable and safe solutions and seeks to improve the movement of goods and services. The plan focuses on improving rolling, walking, bicycling, transit, and driving. This project furthers *Denver Moves*

*Everyone2050* by improving narrow and missing sidewalks, improving transit stops, and adding landscaping; adding turn lanes to improve traffic flow; replacing existing streetlights with energy efficient LEDs along the corridor; and installing improved drainage and stormwater functions to improve water quality and address continued local drainage and regional flooding from the nearby South Platte River.

**<u>Row Description: The Recipient or a project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities.</u>**

Denver used EJSCREEN as a basis for public outreach during the NEPA phase to solicit feedback that will identify community-preferred methods to avoid, minimize, or mitigate adverse impacts of the project on the neighborhood community.

# ATTACHMENT G
# RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

### 1. *EFFORTS TO IMPROVE RACIAL EQUITY AND REDUCE BARRIERS TO OPPORTUNITY.*

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)* |
| X | The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)* |
| | The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)* |
| | The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity, as described in the supporting narrative below. |
| | The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but, before beginning construction of the project, will take relevant actions described in Attachment A. *(Identify the relevant actions from Attachment A in the supporting narrative below.)* |
| | The Recipient has not taken actions related to the Project to improve racial equity and reduce barriers to opportunity and will not take those actions under this award. |

2.  *SUPPORTING NARRATIVE.*

**Row descriptions - A racial equity impact analysis has been completed for the Project**.
A racial equity impact analysis was completed for this project using a tool developed by the
Denver Department of Public Health and Environment called ***Neighborhood Equity Index
analysis.*** The project area is an area of the most inequity, scoring 2.1 out of 5.

**Row description - The Recipient or a project partner has adopted an equity and inclusion
program/plan or has otherwise instituted equity-focused policies related to project
procurement, material sourcing, construction, inspection, hiring, or other activities
designed to ensure racial equity in the overall delivery and implementation of the Project.**

Denver's Department of Transportation and Infrastructure is actively participating in the
Construction Empowerment Initiative (CEI), Conference of Minority Transportation Officials
and Hispanic Contractors of Colorado meetings to encourage minority-owned business
involvement. In addition, Denver will utilize the Denver Economic Development Office's
Construction Careers Pilot program, WORKNOW, which seeks to uplift employees with skills
training and support, MWBEs and SBEs, and provide support to small businesses.

**Contract Control Number:**      DOTI-202475271-01 [202369923-01]
**Contractor Name:**      FEDERAL HIGHWAY ADMINISTRATION

IN WITNESS WHEREOF, the parties have set their hands and affixed their seals at Denver, Colorado as of: 8/22/2024 | 9:48 AM MDT

**SEAL**

**ATTEST:**

Clerk and Recorder/Public Trustee
Paul Lopez

**APPROVED AS TO FORM:**

Attorney for the City and County of Denver

By: Assistant City Attorney
John McGrath

**CITY AND COUNTY OF DENVER:**

By: Mayor
Michael Johnston

**REGISTERED AND COUNTERSIGNED:**

By: Chief Financial Officer
Nicole Doheny

By: Auditor
Timothy O'Brien

**Contract Control Number:**   DOTI-202475271-01 [202369923-01]
**Contractor Name:**   FEDERAL HIGHWAY ADMINISTRATION


By: __***See signature on page 1***_____


Name: _____
     (please print)

Title: _____
     (please print)



ATTEST: [if required]


By: _____


Name: _____
     (please print)

Title: _____
     (please print)

# EXHIBIT C

**U.S. DEPARTMENT OF TRANSPORTATION**


**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2021 REBUILDING AMERICAN INFRASTRUCTURE WITH
SUSTAINABILITY AND EQUITY (RAISE) GRANT PROGRAM:
FHWA PROJECTS**



Revision date: June 6, 2022

**Table of Contents**

Article 8 Purpose...........................................................................................................6
  8.1    Purpose. ...............................................................................................................6
Article 9 USDOT Role ..................................................................................................6
  9.1    Division of USDOT Responsibilities. ...............................................................6
  9.2    USDOT Program Contacts. ...............................................................................7
Article 10 Recipient Role ..............................................................................................7
  10.1   Statements on the Project. .................................................................................7
  10.2   Statements on Authority and Capacity .............................................................7
  10.3   USDOT Reliance. ..............................................................................................8
  10.4   Project Delivery ................................................................................................8
  10.5   Rights and Powers Affecting the Project. .........................................................8
  10.6   Notification of Changes to Key Personnel. ......................................................8
Article 11 Award Amount, Obligation, and Time Periods ............................................9
  11.1   Federal Award Amount .....................................................................................9
  11.2   Federal Obligations. ..........................................................................................9
  11.3   Budget Period. .................................................................................................10
  11.4   Period of Performance. ....................................................................................10
Article 12 Statement of Work, Schedule, and Budget Changes ..................................10
  12.1   Notification Requirement. ...............................................................................10
  12.2   Statement of Work Changes. ...........................................................................11
  12.3   Schedule Changes. ..........................................................................................11
  12.4   Budget Changes. ..............................................................................................11
  12.5   USDOT Acceptance of Changes. ....................................................................12
Article 13 General Reporting Terms............................................................................12
  13.1   Report Submission. .........................................................................................12
  13.2   Alternative Reporting Methods. ......................................................................12
  13.3   Paperwork Reduction Act Notice....................................................................12
Article 14 Progress and Financial Reporting ..............................................................13
  14.1   Quarterly Project Progress Reports and Recertifications. ...............................13
  14.2   Final Progress Reports and Financial Information. .........................................13
Article 15 Performance Reporting ...............................................................................13
  15.1   Baseline Performance Measurement. ..............................................................13
  15.2   Post-construction Performance Measurement..................................................13
  15.3   Project Outcomes Report. ................................................................................14
  15.4   Performance Reporting Survival. ....................................................................14
Article 16 Noncompliance and Remedies ....................................................................15
  16.1   Noncompliance Determinations.......................................................................15
  16.2   Remedies. .........................................................................................................15
  16.3   Other Oversight Entities. .................................................................................16
Article 17 Agreement Termination ..............................................................................16
  17.1   USDOT Termination. ......................................................................................16
  17.2   Closeout Termination. .....................................................................................17
  17.3   Post-Termination Adjustments. .......................................................................17
  17.4   Non-Terminating Events. .................................................................................17
  17.5   Other Remedies. ..............................................................................................17

Article 18 Monitoring, Financial Management, Controls, and Records ...................................... 18
  18.1   Recipient Monitoring and Record Retention. ................................................................ 18
  18.2   Financial Records and Audits. ..................................................................................... 18
  18.3   Internal Controls. ......................................................................................................... 18
  18.4   USDOT Record Access. ............................................................................................... 19
Article 19 Contracting and Subawards ......................................................................................... 19
  19.1   Minimum Wage Rates. ................................................................................................. 19
  19.2   Buy America. ................................................................................................................ 19
  19.3   Small and Disadvantaged Business Requirements. ..................................................... 19
  19.4   Engineering and Design Services. ................................................................................ 19
  19.5   Foreign Market Restrictions. ....................................................................................... 20
  19.6   Prohibition on Certain Telecommunications and Video Surveillance Services or
         Equipment. ................................................................................................................... 20
  19.7   Pass-through Entity Responsibilities. .......................................................................... 20
  19.8   Subaward and Contract Authorization. ........................................................................ 20
Article 20 Costs, Payments, and Unexpended Funds ................................................................... 20
  20.1   Limitation of Federal Award Amount. ......................................................................... 20
  20.2   Projects Costs. .............................................................................................................. 20
  20.3   Timing of Project Costs. .............................................................................................. 21
  20.4   Recipient Recovery of Federal Funds. ......................................................................... 21
  20.5   Unexpended Federal Funds. ......................................................................................... 21
  20.6   Timing of Payments to the Recipient. .......................................................................... 21
  20.7   Payment Method. .......................................................................................................... 21
  20.8   Information Supporting Expenditures. .......................................................................... 22
  20.9   Reimbursement Frequency ........................................................................................... 22
Article 21 Liquidation, Adjustments, and Funds Availability ...................................................... 22
  21.1   Liquidation of Recipient Obligations. .......................................................................... 22
  21.2   Funds Cancellation. ...................................................................................................... 22
Article 22 Agreement Modifications ............................................................................................ 22
  22.1   Bilateral Modifications. ................................................................................................ 22
  22.2   Unilateral Contact Modifications. ................................................................................ 23
  22.3   USDOT Unilateral Modifications. ............................................................................... 23
  22.4   Other Modifications. ..................................................................................................... 23
Article 23 Climate Change and Environmental Justice ................................................................ 23
  23.1   Climate Change and Environmental Justice. ................................................................ 23
Article 24 Racial Equity and Barriers to Opportunity .................................................................. 23
  24.1   Racial Equity and Barriers to Opportunity. .................................................................. 23
Article 25 Federal Financial Assistance, Administrative, and National Policy Requirements .... 24
  25.1   Uniform Administrative Requirements for Federal Awards. ........................................ 24
  25.2   Federal Law and Public Policy Requirements. ............................................................ 24
  25.3   Federal Freedom of Information Act. ............................................................................ 24
  25.4   History of Performance. ............................................................................................... 24
  25.5   Whistleblower Protection. ............................................................................................ 24
  25.6   External Award Terms and Obligations. ...................................................................... 24
  25.7   Incorporated Certifications. .......................................................................................... 25
Article 26 Assignment .................................................................................................................. 25

26.1   Assignment Prohibited. ............................................................................ 25
Article 27 Waiver ............................................................................................... 25
27.1   Waivers. ................................................................................................. 25
Article 28 Additional Terms and Conditions ..................................................... 26
28.1   Effect of Urban or Rural Designation. .................................................. 26
28.2   Disclaimer of Federal Liability. ........................................................... 26
28.3   Relocation and Real Property Acquisition. ........................................... 26
28.4   Equipment Disposition. ......................................................................... 26
Article 29 Mandatory Award Information .......................................................... 27
29.1   Information Contained in a Federal Award .......................................... 27
Article 30 Construction and Definitions ............................................................ 27
30.1   Attachments. .......................................................................................... 27
30.2   Exhibits. ................................................................................................. 27
30.3   Construction. ......................................................................................... 27
30.4   Integration. ............................................................................................ 28
30.5   Definitions. ............................................................................................ 28
Article 31 Agreement Execution and Effective Date ......................................... 28
31.1   Counterparts. ......................................................................................... 28
31.2   Effective Date. ....................................................................................... 28

## Index of Definitions

Administering Operating Administration ...................................................................... 7

Federal Share .............................................................................................................. 12

FHWA ........................................................................................................................... 7

NOFO ........................................................................................................................... 6

OMB ........................................................................................................................... 13

Program Statute .......................................................................................................... 28

Project ........................................................................................................................ 28

Project Closeout ......................................................................................................... 17

RAISE Grant .............................................................................................................. 28

Recipient ................................................................................... Project-Specific Recitals

Technical Application ................................................................................................ 28

USDOT ......................................................................................................................... 6

**GENERAL TERMS AND CONDITIONS**

The Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) appropriated funds to the United States Department of Transportation (the "**USDOT**") under the heading "National Infrastructure Investments." The funds are available to provide Federal financial assistance for surface transportation infrastructure projects that will have a significant local or regional impact. The USDOT program administering those funds is the RAISE grant program.

The USDOT published a "Notice of Funding Opportunity for the Department of Transportation's National Infrastructure Investments (i.e., the Rebuilding American Infrastructure With Sustainability and Equity (RAISE) Grant Program) Under the Consolidated Appropriations Act, 2021," 86 Fed. Reg. 21,794 (April 23, 2021) (the "**NOFO**") to solicit applications for Federal financial assistance.

These general terms and conditions are incorporated by reference in a project-specific agreement under the fiscal year 2021 RAISE grant program. Articles 1–7 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through G are project-specific attachments.

## ARTICLE 8
## PURPOSE

8.1 **Purpose.** The purpose of this award is to advance capital investments in surface transportation infrastructure that will have a significant local or regional impact. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by section 3.3 and Attachment B.

## ARTICLE 9
## USDOT ROLE

9.1 **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is responsible for the USDOT's overall administration of the RAISE grant program, the approval of this agreement, and any modifications to this agreement under section 22.1.

(b) The Federal Highway Administration (the "**FHWA**") will administer this agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**9.2**    **USDOT Program Contacts.**

FHWA RAISE Program Manager
Federal Highway Administration
Office of Freight Management and Operations
1200 New Jersey Avenue SE
Room E84-429
Washington, DC 20590
(202) 366-2639 or (202) 366-1200
FHWA-TIGER.Reports@dot.gov

and

OST RAISE Grants Coordinator
United States Department of Transportation
Office of the Secretary
1200 New Jersey Avenue SE
Room W84-227
Washington, DC 20590
(202) 366-8914
RAISEGrants@dot.gov

# ARTICLE 10
# RECIPIENT ROLE

**10.1    Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)    Attachment D documents all material changes in the information contained in that application.

**10.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the "Total Eligible Project Cost" and the "RAISE Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)    it has sufficient funds available to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 10 and in section 25.7 on behalf of the Recipient.

**10.3   USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Technical Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Technical Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**10.4   Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to projects of the Administering Operating Administration.

**10.5   Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, to promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**10.6   Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in section 5.4 in writing within 30 calendar days of any change in key personnel who are identified in section 5.3.

# ARTICLE 11
# AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**11.1**    **Federal Award Amount** The USDOT hereby awards a RAISE Grant to the Recipient in the amount listed in section 2.2 as the RAISE Grant Amount.

**11.2**    **Federal Obligations.**

(a) If the Federal Obligation Type identified in section 2.2 is "Single," then this agreement obligates for the budget period the amount listed in section 2.2 as the RAISE Grant Amount and sections 11.2(c)–11.2(h) do not apply to this agreement.

(b) If the Federal Obligation Type identified in section 2.2 is "Multiple," then an amount up to the RAISE Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 11.2(c)–11.2(h).

(c) The RAISE Grant Allocation Table in section 2.2 allocates the RAISE Grant among separate portions of the Project for the purpose of obligations. The scope of each portion of the Project that is identified in that table is described in Attachment A.

(d) This agreement obligates for the budget period only the amounts allocated in the RAISE Grant Allocation Table in section 2.2 to the portions of the Project that are not listed in the Future Obligation Conditions Table in section 2.2.

(e) This agreement does not obligate amounts allocated in the RAISE Grant Allocation Table in section 2.2 to the portions of the Project that are listed in the Future Obligation Conditions Table in section 2.2. The parties may obligate the amounts allocated to those portions of the Project only as described in section 11.2(f) or by modifying this agreement under article 22.

(f) For each portion of the Project that is listed in the Future Obligation Conditions Table in section 2.2, the amount allocated to that portion of the Project in RAISE Grant Allocation Table in section 2.2 is obligated if, not later than September 30, 2024, the parties execute an instrument, in the form provided in Exhibit D, documenting that:

(1)    the USDOT determines that all of the conditions associated with that portion in the Future Obligation Conditions Table are satisfied;

(2)    the USDOT determines that all applicable Federal requirements for obligating the amount are satisfied; and

(3)    the Recipient states that it is not required to request a modification of this agreement under article 12.

(g) The Recipient shall not request reimbursement of costs for a portion of the Project that is listed in the Future Obligation Conditions Table in section 2.2 unless the amount

allocated to that portion of the Project in the RAISE Grant Allocation Table in section 2.2 is obligated under section 11.2(f).

(h) The Recipient acknowledges that:

    (1)    the USDOT is not liable for payments for a portion of the Project that is listed in in the Future Obligation Conditions Table in section 2.2 unless the amount allocated to that portion of the Project in the RAISE Grant Allocation Table in section 2.2 is obligated under section 11.2(f);

    (2)    any portion of the RAISE Grant that is not obligated under this section 11.2 before October 1, 2024, lapses on that date and becomes unavailable for the Project; and

    (3)    the USDOT may consider the failure to obligate funds before October 1, 2024, to be a basis for terminating this agreement under section 17.1.

**11.3**    **Budget Period.** The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 2.3. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

**11.4**    **Period of Performance.**

(a) If the USDOT Payment System identified in section 6.1 is "FMIS," then the period of performance for this award begins on the date of this agreement and ends on project end date in FMIS.

(b) If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the period of performance for this award begins on the date of this agreement and ends on the period of performance end date that is listed in section 2.3.

(c) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

## ARTICLE 12
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**12.1**    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 5.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 12.1 is separate from any requirements under this article 12 that the Recipient request modification of this agreement.

**12.2**    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment A, then the Recipient shall request a modification of this agreement to update section 3.1 and Attachment A.

**12.3**    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this agreement to update the relevant dates:

(1)    a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2;

(2)    a schedule change would require the budget period to continue after the budget period end date listed in section 2.3; or

(3)    the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing" and a schedule change would require the period of performance to continue after the period of performance end date listed in section 2.3.

For other schedule changes, the Recipient shall request a modification of this agreement unless the USDOT has consented, in writing consistent with the Administering Operating Administration's requirements, to the change.

**12.4**    **Budget Changes.**

(a)    The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b)    The Recipient shall request a modification of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c)    For budget changes that are not identified in section 12.4(b), the Recipient shall request a modification of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with the Administering Operating Administration's requirements, to the change.

(d)    If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with the Administering Operating Administration's requirements, specific additional activities that are within the scope of this award, as defined in sections 8.1 and 3.1, and

that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 12.4(d) or the USDOT does not accept the Recipient's proposal under section 12.4(d), then:

    (1) in a request under section 12.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

    (2) if that modification reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall refund to the USDOT the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the "RAISE Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3.

(f) The Recipient acknowledges that amounts that are required to be refunded under section 12.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

**12.5**    **USDOT Acceptance of Changes.** The USDOT may accept or reject modifications requested under this article 12, and in doing so may elect to consider only the interests of the RAISE grant program and the USDOT. The Recipient acknowledges that requesting a modification under this article 12 does not amend, modify, or supplement this agreement unless the USDOT accepts that modification request and the parties modify this agreement under section 22.1.

# ARTICLE 13
# GENERAL REPORTING TERMS

**13.1**    **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 5.4 and all USDOT contacts who are listed in section 9.2.

**13.2**    **Alternative Reporting Methods.** The Administering Operating Administration may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the Administering Operating Administration.

**13.3**    **Paperwork Reduction Act Notice.** Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control

number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2105-0563.

## ARTICLE 14
## PROGRESS AND FINANCIAL REPORTING

14.1 **Quarterly Project Progress Reports and Recertifications.** On or before the 20th day of the first month of each calendar year quarter and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Project Progress Report and Recertification in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year quarter, then the Recipient shall submit the first Quarterly Project Progress Report and Recertification in the second calendar year quarter that begins after the date of this agreement.

14.2 **Final Progress Reports and Financial Information.** No later than 120 days after the end of the period of performance, the Recipient shall submit

(1) a Final Project Progress Report and Recertification in the format and with the content described in Exhibit C for each Quarterly Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2) any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 15
## PERFORMANCE REPORTING

15.1 **Baseline Performance Measurement.** If the Capital-Planning Designation in section 2.5 is "Capital," then:

(1) the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in Attachment C, accurate as of the Baseline Measurement Date that is identified in Attachment C; and

(2) on or before the Baseline Report Date that is stated in Attachment C, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 15.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment C.

15.2 **Post-construction Performance Measurement.** If the Capital-Planning Designation in section 2.5 is "Capital," then

13 of 28

(1)     for each performance measure that is identified in the Performance Measure Table in Attachment C with quarterly measurement frequency, for each of 12 consecutive calendar quarters, beginning with the first calendar quarter that begins after the Project substantial completion date, at least once during the quarter, the Recipient shall collect data for that performance measure;

(2)     for each performance measure that is identified in the Performance Measure Table in Attachment C with annual measurement frequency, the Recipient shall collect data for that performance measure on at least three separate occasions: (i) once during the four consecutive calendar quarters that begin after the Project substantial completion date; (ii) once during the fourth calendar quarter after the first collection; and (iii) once during the eighth calendar quarter after the first collection; and

(3)     not later than January 31 of each year that follows a calendar year during which data was collected under this section 15.2, the Recipient shall submit to the USDOT a Post-construction Performance Measurement Report containing the data collected under this section 15.2 in the previous calendar year and stating the dates when the data was collected.

If an external factor significantly affects the value of a performance measure collected under this section 15.2, then the Recipient shall identify that external factor in the Post-construction Performance Measurement Report and discuss its influence on the performance measure.

**15.3    Project Outcomes Report.** If the Capital-Planning Designation in section 2.5 is "Capital," then the Recipient shall submit to the USDOT, not later than January 31 of the year that follows the final calendar year during which data was collected under section 15.2, a Project Outcomes Report that contains:

(1)     a narrative discussion detailing project successes and the influence of external factors on project expectations;

(2)     all baseline and post-construction performance measurement data that the Recipient reported in the Baseline Performance Measurement Report and the Post-construction Performance Measurement Reports; and

(3)     an *ex post* examination of project effectiveness relative to the baseline data that the Recipient reported in the Baseline Performance Measurement Report.

**15.4    Performance Reporting Survival.** The data collection and reporting requirements in this article 15 survive the termination of this agreement.

# ARTICLE 16
# NONCOMPLIANCE AND REMEDIES

**16.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 16.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)    accept the remedy;

(2)    acknowledge the noncompliance, but propose an alternative remedy; or

(3)    dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)    after considering the Recipient's response under section 16.1(b); or

(2)    if the Recipient fails to respond under section 16.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

**16.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 16.1, the USDOT may impose a remedy, including:

(1)    additional conditions on the award;

(2)    any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

    (3)      any other remedy legally available.

(b)  To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c)  If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 16.2(a), before making a final determination of noncompliance under section 16.1. If it does so, then the notice provided under section 16.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d)  In imposing a remedy under this section 16.2 or making a public interest determination under section 16.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e)  The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 16.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

**16.3**    **Other Oversight Entities.** Nothing in this article 16 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 17
## AGREEMENT TERMINATION

**17.1**    **USDOT Termination.**

(a)  The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

    (1)      the Recipient fails to obtain or provide any non-RAISE Grant contribution or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

    (2)      a construction start date for the Project or a component of the Project is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

    (3)      a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4)    the Recipient fails to meet a milestone listed in section 4.1 by the deadline date listed in that section for that milestone;

(5)    the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(6)    the USDOT determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 17.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 16.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 17.1.

## 17.2    Closeout Termination.

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

## 17.3    Post-Termination Adjustments. The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

## 17.4    Non-Terminating Events.

(a) The end of the budget period described under section 11.3 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The end of the period of performance described under section 11.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(c) The cancellation of funds under section 21.2 does not terminate this agreement or the Recipient's obligations under this agreement.

## 17.5    Other Remedies. The termination authority under this article 17 supplements and does not limit the USDOT's remedial authority under article 16 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

# ARTICLE 18
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**18.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(d).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**18.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 18.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.301–200.303, 2 C.F.R. 200 subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2021 RAISE grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. 200 subpart F, including "FY 2021" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2021" in column c ("Additional Award Identification").

**18.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

18.4    **USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

# ARTICLE 19
# CONTRACTING AND SUBAWARDS

19.1    **Minimum Wage Rates.** The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with the Davis-Bacon Act, 40 U.S.C. 3141–3148, or 23 U.S.C. 113, as applicable, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

19.2    **Buy America.**

(a)    Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b)    Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c)    Under 2 C.F.R. 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

19.3    **Small and Disadvantaged Business Requirements.** If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 C.F.R. part 26 ("Participation by disadvantaged business enterprises in Department of Transportation financial assistance programs"). The Recipient shall expend all other funds under this award in compliance with the requirements at 2 C.F.R. 200.321 ("Contracting with small and minority businesses, women's business enterprises, and labor surplus area firms").

19.4    **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C.

1101-1104 as implemented in 23 U.S.C. 112(b)(2), or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**19.5**  **Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**19.6**  **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 C.F.R. 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**19.7**  **Pass-through Entity Responsibilities.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

**19.8**  **Subaward and Contract Authorization.**

(a) If the USDOT Office for Subaward and Contract Authorization identified in section 6.2 is "FHWA Division," then the Recipient shall comply with subaward and contract authorization requirements under 23 C.F.R chapter I, subchapter G.

(b) If the USDOT Office for Subaward and Contract Authorization identified in section 6.2 is "FHWA Office of Acquisition and Grants Management," then the Recipient shall obtain prior written approval from the USDOT agreement officer for the subaward or contracting out of any work under this agreement. That approval will be contingent upon a fair and reasonable price determination on the part of the Recipient and the agreement officer's concurrence on that determination.

## ARTICLE 20
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**20.1**  **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated under section 11.2. The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**20.2**  **Projects Costs.** This award is subject to the cost principles at 2 C.F.R. 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**20.3    Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the budget period.

(b)  The Recipient shall not charge to this award costs that were incurred before the date of this agreement unless those costs are identified in Attachment E and would have been allowable if incurred during the budget period. This limitation applies to costs incurred under an advance construction authorization (23 U.S.C. 115), costs incurred prior to authorization (23 C.F.R. 1.9(b)), and pre-award costs under 2 C.F.R. 200.458. This agreement hereby terminates and supersedes any previous USDOT approval for the Recipient to incur costs under this award for the Project. Attachment E is the exclusive USDOT approval of costs incurred before the date of this agreement.

**20.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**20.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 11.1 but not expended on allocable, allowable costs remain the property of the United States.

**20.6    Timing of Payments to the Recipient.**

(a)  Reimbursement is the payment method for the RAISE grant program.

(b)  The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**20.7    Payment Method.**

(a)  If the USDOT Payment System identified in section 6.1 is "FMIS," then the Recipient shall follow FMIS procedures to request and receive reimbursement payments under this award.

(b)  If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method.

(c)  The USDOT may deny a payment request that is not submitted using the method identified in this section 20.7.

**20.8    Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**20.9    Reimbursement Frequency.** If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.

## ARTICLE 21
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**21.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory funds cancellation date identified in section 21.2.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

**21.2    Funds Cancellation.** Outstanding FY 2021 RAISE Grant balances are canceled by statute after September 30, 2029, and are then unavailable for any purpose, including adjustments.

## ARTICLE 22
## AGREEMENT MODIFICATIONS

**22.1    Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**22.2    Unilateral Contact Modifications.**

(a) The Recipient may update the contacts who are listed in section 5.2 by written notice to all of the USDOT contacts who are listed in sections 5.4 and 9.2.

(b) The USDOT may update the contacts who are listed in sections 5.4 and 9.2 by written notice to all of the Recipient contacts who are listed in section 5.2.

**22.3    USDOT Unilateral Modifications.**

(a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this agreement under this section 22.3, the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**22.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 22.1, 22.2, or 22.3. If an amendment, modification, or supplement is not permitted under section 22.1, not permitted under section 22.2, and not permitted under section 22.3, it is void.


## ARTICLE 23
## CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE

**23.1    Climate Change and Environmental Justice.** Consistent with Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" (Jan. 27, 2021), Attachment F documents the consideration of climate change and environmental justice impacts of the Project.


## ARTICLE 24
## RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

**24.1    Racial Equity and Barriers to Opportunity.** Consistent with Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government" (Jan. 20, 2021), Attachment G documents activities related to the Project to improve racial equity and reduce barriers to opportunity.

**ARTICLE 25**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

**25.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**25.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination.

(b) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**25.3    Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**25.4    History of Performance.** Under 2 C.F.R 200.206, any Federal awarding agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**25.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**25.6    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 30, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

     (2)      Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

     (3)      2 C.F.R 175.15(b): Trafficking in Persons; and

     (4)      Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

     (1)      49 C.F.R. part 20: New Restrictions on Lobbying;

     (2)      49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

     (3)      49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

     (4)      Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**25.7**    **Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

     (1)      Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

### ARTICLE 26
### ASSIGNMENT

**26.1**    **Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

### ARTICLE 27
### WAIVER

**27.1**    **Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

## ARTICLE 28
## ADDITIONAL TERMS AND CONDITIONS

**28.1**   **Effect of Urban or Rural Designation.** Based on information that the Recipient provided to the USDOT, including the Technical Application, at section 2.4 this agreement designates this award as an urban award or a rural award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**28.2**   **Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**28.3**   **Relocation and Real Property Acquisition.**

(a) To the greatest extent practicable under State law, the Recipient shall comply with the land acquisition policies in 49 C.F.R. 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, within a reasonable period of time prior to displacement, comparable replacement dwellings in accordance with 49 C.F.R. 24 subpart E.

**28.4**   **Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project:

    (1)   if the entity that acquired the equipment is a State or a subrecipient of a State, that entity shall dispose of that equipment in accordance with State laws and procedures; and

    (2)   if the entity that acquired the equipment is neither a State nor a subrecipient of a State, that entity shall request disposition instructions from the Administering Operating Administration.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.313–200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 28.4 for all tiers of subawards under this award.

## ARTICLE 29
## MANDATORY AWARD INFORMATION

**29.1    Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 31.2;

(2)    the "Assistance Listings Number" is 20.933 and the "Assistance Listings Title" is "National Infrastructure Investments"; and

(3)    this award is not for research and development.

## ARTICLE 30
## CONSTRUCTION AND DEFINITIONS

**30.1    Attachments.** This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Statement of Work |
| Attachment B | Estimated Project Budget |
| Attachment C | Performance Measurement Information |
| Attachment D | Changes from Application |
| Attachment E | Approved Pre-Award Costs |
| Attachment F | Climate Change and Environmental Justice Impacts |
| Attachment G | Racial Equity and Barriers to Opportunity |

**30.2    Exhibits.** The following exhibits, which are located in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2021 RAISE Grants Program," dated June 6, 2022, and available at http://go.usa.gov/xJBSS, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**30.3    Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–31, then the provision in articles 1–31 prevails. If a provision in the

attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

30.4  **Integration.** This agreement constitutes the entire agreement of the parties relating to the RAISE grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the RAISE grant program and awards under that program.

30.5  **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the statutory text under the heading "Department of Transportation—Office of the Secretary—National Infrastructure Investments" in title I of division L of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Technical Application, as modified by the negotiated provisions of this agreement, including article 3 and Attachments A–E.

"**RAISE Grant**" means an award of funds that were made available under the NOFO.

"**Technical Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

# ARTICLE 31
# AGREEMENT EXECUTION AND EFFECTIVE DATE

31.1  **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

31.2  **Effective Date.** The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a RAISE Grant when the USDOT's authorized representative signs it.

# EXHIBIT D

| | |
|---|---|
| **From:** | Mulbarger, Matthew J. - CAO Assistant City Attorney Section Supervisor |
| **To:** | Mulbarger, Matthew J. - CAO Assistant City Attorney Section Supervisor |
| **Subject:** | FW: FY24 City and County of Denver grant agreement with template revisions - to be reviewed by |
| **Date:** | Monday, May 19, 2025 4:10:30 PM |
| **Attachments:** | Letter to Grant Applicants_final.pdf |
| | SS4A FY24 Terms and Conditions_3172025.pdf |
| | SS4A FY24 Exhibits_3172025.pdf |
| | SS4A FY24 Grant Agreement template (06-13-24) Denverv1 clean.docx |

**From:** Hu, Ajin (FHWA) <ajin.hu@dot.gov>
**Sent:** Tuesday, May 6, 2025 4:23 PM
**To:** Turner, Deborah A. - DOTI Engineer-Architect Manager Senior
<Deborah.Turner@denvergov.org>; Eisinger, John R. - DOTI CE2777 Manager Engineering and
Science <John.Eisinger@denvergov.org>
**Cc:** Schiebel, Bill (FHWA) <william.schiebel@dot.gov>
**Subject:** [EXTERNAL] FW: FY24 City and County of Denver grant agreement with template revisions -
to be reviewed by

---

**This Message Is From an External Sender**
This message came from outside your organization.

| Report Suspicious |

---

Deb and John,

Thank you very much for your patience. Please see attached the **updated 2024 SS4A Grant
Agreement, General Terms and Conditions, and Exhibits.** I transferred your project information
from the earlier grant agreement template into the new one **with track changes**.

Please:

- Review the revised Terms and Conditions. Article 24 include language related to the letter
  issued by the US. Secretary of Transportation on April 24, 2025 (attached).
- Review the revised FHWA Exhibits.
- Review the proposed schedule/ period of performance and adjust, as needed.
- Make a new selection and review the narrative for Attachment E. The language in the table is
  has been entirely updated.
- Review all other project information and update, as needed.
- Once the Town reviews the documentation and complete updates, return the final draft
  Grant Agreement (with Track Changes) back to me and I'll coordinate with the Program Office
  for final approval for a version for the Town to sign.

OST approved to move forward with 600+ SS4A projects. Denver's project is on the list. We look
forward to continuing to work with you on this important project.

Thanks.

**Ajin Hu, PE, PTOE**
Grants Program Manager & Region 2 Area Engineer
Federal Highway Administration Colorado Division
12300 W. Dakota Avenue, Suite 180
Lakewood, CO 80228
Ph:  (720) 963-3071
Email:  ajin.hu@dot.gov

# EXHIBIT E



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq*.) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq*.), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq*.).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

DOT remains committed to advancing a transportation system that serves the public interest effi-
ciently and unleashes economic prosperity and a superior quality of life for American families.
This mission depends upon your strict adherence to the legal framework governing our partner-
ship, and I trust you will take all necessary steps to comply with Federal law and satisfy your le-
gal obligations.

Sincerely,

Sean P. Duffy

# EXHIBIT F

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT**
**PROGRAM:**
**FHWA PROJECTS**

**Date: June 13, 2024**
**Revised:  October 1, 2024**
**Revised:  March 17, 2025**

## Table of Contents

Article 7 Purpose.................................................................................................6
  7.1   Purpose...........................................................................................6
Article 8 USDOT Role...........................................................................................6
  8.1   Division of USDOT Responsibilities...................................................6
  8.2   USDOT Program Contact.................................................................7
Article 9 Recipient Role.........................................................................................7
  9.1   Statements on the Project...................................................................7
  9.2   Statements on Authority and Capacity..................................................7
  9.3   USDOT Reliance............................................................................8
  9.4   Project Delivery.............................................................................8
  9.5   Rights and Powers Affecting the Project...............................................8
  9.6   Notification of Changes to Key Personnel............................................9
Article 10 Award Amount, Obligation, and Time Periods...............................................9
  10.1  Federal Award Amount....................................................................9
  10.2  Federal Obligations.........................................................................9
  10.3  Budget Period..............................................................................10
  10.4  Period of Performance....................................................................10
Article 11 Statement of Work, Schedule, and Budget Changes........................................11
  11.1  Notification Requirement.................................................................11
  11.2  Statement of Work Changes.............................................................11
  11.3  Schedule Changes.........................................................................11
  11.4  Budget Changes............................................................................11
  11.5  USDOT Acceptance of Changes.......................................................12
Article 12 General Reporting Terms........................................................................12
  12.1  Report Submission........................................................................12
  12.2  Alternative Reporting Methods.........................................................13
  12.3  Paperwork Reduction Act Notice.......................................................13
Article 13 Progress and Financial Reporting..............................................................13
  13.1  Quarterly Performance Progress Reports..............................................13
  13.2  Quarterly Financial Status...............................................................13
  13.3  Final Performance Progress Reports and Financial Status...........................13
Article 14 Performance Reporting...........................................................................14
  14.1  Baseline Performance Measurement....................................................14
  14.2  SS4A Final Report:.......................................................................14
  14.3  Performance Measurement Information.................................................15
  14.4  Performance Reporting Survival........................................................15
  14.5  Program Evaluation.......................................................................15
Article 15 Noncompliance and Remedies...................................................................15
  15.1  Noncompliance Determinations.........................................................15
  15.2  Remedies....................................................................................16
  15.3  Other Oversight Entities.................................................................17
Article 16 Agreement Termination...........................................................................17
  16.1  USDOT Termination......................................................................17
  16.2  Closeout Termination.....................................................................18
  16.3  Post-Termination Adjustments..........................................................18
  16.4  Non-Terminating Events.................................................................18
  16.5  Other Remedies...........................................................................18

Article 17 Monitoring, Financial Management, Controls, and Records ...................................... 18
   17.1   Recipient Monitoring and Record Retention. ..................................................... 18
   17.2   Financial Records and Audits. ........................................................................ 19
   17.3   Internal Controls. ........................................................................................... 19
   17.4   USDOT Record Access. .................................................................................. 19
Article 18 Contracting and Subawards ............................................................................... 19
   18.1   Build America, Buy America. ......................................................................... 19
   18.2   Small and Disadvantaged Business Requirements. .......................................... 22
   18.3   Engineering and Design Services. ................................................................... 22
   18.4   Foreign Market Restrictions. .......................................................................... 23
   18.5   Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment...23
   18.6   Recipient Responsibilities for Subawards. ...................................................... 23
   18.7   Subaward and Contract Authorization. ........................................................... 23
Article 19 Costs, Payments, and Unexpended Funds ........................................................... 23
   19.1   Limitation of Federal Award Amount. ............................................................ 23
   19.2   Projects Costs. ............................................................................................... 23
   19.3   Timing of Project Costs. ................................................................................. 23
   19.4   Recipient Recovery of Federal Funds. ............................................................ 24
   19.5   Unexpended Federal Funds. ........................................................................... 24
   19.6   Timing of Payments to the Recipient. ............................................................ 24
   19.7   Payment Method. ........................................................................................... 24
   19.8   Information Supporting Expenditures. ............................................................ 24
   19.9   Reimbursement Frequency. ............................................................................ 24
   19.10  Match. .......................................................................................................... 24
Article 20 Liquidation, Adjustments, and Funds Availability...…………………………...…..25
   20.1   Liquidation of Recipient Obligations. ............................................................ 25
Article 21 Agreement Modifications .................................................................................. 25
   21.1   Bilateral Amendments. .................................................................................. 25
   21.2   Unilateral Contact Modifications. ................................................................... 25
   21.3   USDOT Unilateral Modifications. .................................................................. 25
   21.4   Other Modifications. ...................................................................................... 25
Article 22 [RESERVED] .................................................................................................. 25
   22.1   [RESERVED]. ............................................................................................... 25
Article 23 [RESERVED] .................................................................................................. 26
   23.1   [RESERVED]. ............................................................................................... 26
Article 24 Labor and Workforce...……………………………………………………………  26
   24.1   Labor and Workforce...…………………………………………………………….26
Article 25 Critical Infrastructure Security and Resilience.………………………...……..…26
   25.1   Critical Infrastructure Security and Resilience.……………………………………26
Article 26 Civil Rights and Title VI...……………………………………………………..…26
   26.1   Civil Rights and Tile VI...…………………………………………………………..26
Article 27 Federal Financial Assistance, Administrative, and National Policy Requirements .... 27
   27.1   Uniform Administrative Requirements for Federal Awards. ............................. 27
   27.2   Federal Law and Public Policy Requirements. ............................................... 27
   27.3   Federal Freedom of Information Act. ............................................................. 28
   27.4   History of Performance. ................................................................................. 28
   27.5   Whistleblower Protection. .............................................................................. 28
   27.6   External Award Terms and Obligations. ......................................................... 28
   27.7   Incorporated Certifications. ............................................................................ 29

Article 28 Assignment .......................................................................................................... 29
   28.1   Assignment Prohibited. ............................................................................................ 29
Article 29 Waiver ................................................................................................................. 29
   29.1   Waivers. ..................................................................................................................... 29
Article 30  Additional Terms and Conditions ..................................................................... 30
   30.1   Effect of Planning and Demonstration or Implementation Award. ...................... 30
   30.2   Disclaimer of Federal Liability. .............................................................................. 30
   30.3   Environmental Review. ............................................................................................ 30
   30.4   Railroad Coordination. ............................................................................................ 31
   30.5   Relocation and Real Property Acquisition. ............................................................ 32
   30.6   Equipment Disposition. ........................................................................................... 32
Article 31 Mandatory Award Information .......................................................................... 32
   31.1   Information Contained in a Federal Award. .......................................................... 32
Article 32 Construction and Definitions ............................................................................ 33
   32.1   Attachments. ............................................................................................................ 33
   32.2   Exhibits. .................................................................................................................... 33
   32.3   Construction. ............................................................................................................ 33
   32.4   Integration. ............................................................................................................... 33
   32.5   Definitions. ................................................................................................................ 33
Article 33 Agreement Execution and Effective Date ....................................................... 34
   33.1   Counterparts. ........................................................................................................... 34
   33.2   Effective Date. .......................................................................................................... 34

## Index of Definitions

Administering Operating Administration ........................................................................ 7
Environmental Review Entity…………………………………………………………...29
Federal Share ........................................................................................................ 12
FHWA ........................................................................................................................ 7
NOFO ........................................................................................................................ 6
OMB ........................................................................................................................ 13
Program Statute........................................................................................................ 32
Project………………………………………………………………………………….22
Project Closeout ...................................................................................................... 18
SS4A Grant ............................................................................................................ 32
USDOT ...................................................................................................................... 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act (Pub. L. 117–58, November 15, 2021; also referred to as the "IIJA") established the Safe Streets and Roads for All (the "SS4A") Discretionary Grant Program (IIJA Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2024 for the SS4A Discretionary Grant Program.

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2024 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F are project-specific attachments.

## ARTICLE 7
## PURPOSE

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

## ARTICLE 8
## USDOT ROLE

8.1    **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b) The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2    USDOT Program Contact.**

Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2822

**ARTICLE 9
RECIPIENT ROLE**

**9.1    Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)    Attachment B documents all material changes in the information contained in that application.

**9.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)    it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the

recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)     the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 27.7 on behalf of the Recipient.

**9.3     USDOT Reliance.** The Recipient acknowledges that:

(1)     the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)     the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)     the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)     the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4     Project Delivery.**

(a)  The Recipient shall complete the Project under the terms of this agreement.

(b)  The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c)  The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d)  The Recipient shall provide access to records as provided at 2 C.F.R. 200.337.

**9.5     Rights and Powers Affecting the Project.**

(a)  The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b)  The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6**    **Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.3 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.2.

## ARTICLE 10
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**10.1**    **Federal Award Amount** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in section 2.2 as the SS4A Grant Amount.

**10.2**    **Federal Obligations.**

This agreement obligates funds for the period of performance listed on Page 1, Block 6 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in Section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," (for phased agreements) then an amount up to the Grant Amount listed in Section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.2(c)–10.2(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant funds among separate phases of the Project for the purpose of the Federal obligation of funds. The scope of each phase of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.4 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

> (1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

> (2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

> (1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

> (2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

> (3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

## 10.3    Budget Period

The budget period for this award begins on the effective date of this agreement and ends on the budget period end date that is listed in section 2.4, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

## 10.4    Period of Performance.

(a) The period of performance for this award begins on the effective date of award listed in page 1, Block 2 and ends on the period of performance end date that is listed in Page 1, Block 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

**ARTICLE 11**
**STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES**

11.1    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.3 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

11.2    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

11.3    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant date(s):

(1)    a substantial completion date for the Project or a component of the Project that is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed on Page 1, Block 6 (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements).

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

11.4    **Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c)  For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e)  If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

(1)    in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2)    if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, **Federal Share** means the sum of the "SS4A Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3(a).

(f)  The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5**    **USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

## ARTICLE 12
## GENERAL REPORTING TERMS

**12.1**  **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.3.  Reports will be added to a central repository maintained by FHWA.

**12.2**  **Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

**12.3**  **Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

## ARTICLE 13
## PROGRESS AND FINANCIAL REPORTING

**13.1**  **Quarterly Performance Progress Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Performance Progress Report in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Performance Progress Report in the second calendar year quarter that begins after the date of this agreement.

**13.2**  **Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit a Federal Financial Report using SF-425.

**13.3**  **Final Performance Progress Reports and Financial Status.** No later than 120 days after the end of the period of performance, the Recipient shall submit:

(1)     a Final Performance Progress Report in the format and with the content described in Exhibit C for each Quarterly Performance Progress Report, including a final Federal Financial Report (SF-425); and

(2)     any other information required under the Administering Operating Administration's award closeout procedures.

# ARTICLE 14
# PERFORMANCE REPORTING

**14.1    Baseline Performance Measurement.** Recipients of Implementation Grants or Planning and Demonstration Grants with demonstration activities shall:

(1)     collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)     on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2    SS4A Final Report.**

The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report in the format specified by FHWA and with the content described in Attachment A that describes, consistent with sections 24112(g)-(h) of IIJA:

(1)     the costs of each eligible project and strategy carried out using the grant;

(2)     the roadway safety outcomes and any additional benefits (e.g., increased walking, biking, or transit use without a commensurate increase in serious and fatal crashes, etc.) that each such project and strategy has generated, as—

- identified in the grant application; and

- measured by data to the maximum extent practicable;

(3) [RESERVED]

(4)     the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3    Performance Measurement Information.**

For each performance measure identified to be submitted annually in the Performance Measure Table in Attachment A, not later than January 31 of each year, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4    Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5    Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, before/after photographs of the sites, qualitative activities such as videos describing the project and its impact on the community, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

# ARTICLE 15

# NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a)    If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b)    If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)     accept the remedy;

(2)     acknowledge the noncompliance, but propose an alternative remedy; or

(3)     dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)     after considering the Recipient's response under section 15.1(b); or

(2)     if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the basis for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

(1)     additional conditions on the award;

(2)     any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the

Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**15.3    Other Oversight Entities.**

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 16
## AGREEMENT TERMINATION

**16.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all its obligations under this agreement if any of the following occurs:

  (1)    the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.3(a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

  (2)    a construction start date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

  (3)    a substantial completion date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

  (4)    the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

  (5)    the USDOT determines that termination of this agreement is in the public interest.

  (6)    the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5    Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

## ARTICLE 17
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**17.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the project, and the amount or nature of that portion of the cost of the project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2024 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2024" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2024" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

**ARTICLE 18**
**CONTRACTING AND SUBAWARDS**

**18.1    Build America, Buy America.** This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184, and Office of Management and Budget (OMB) Memorandum M-24-02, "Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards for each construction material are provided at 2 CFR 184.6.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a domestic content procurement preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.*

An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) manufactured products; (iii) construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated. An article, material, or supply incorporated into an infrastructure project must meet the requirements for only the single category in which it is classified.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1) applying the domestic content procurement preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"**Construction materials**" means articles, materials, or supplies that consist of only one of the items listed in paragraph (21) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material.

(1) The listed items are:
- non-ferrous metals;
- plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
- glass (including optic glass);
- fiber optic cable (including drop cable)
- lumber;
- engineered wood; and
- drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"**Domestic content procurement preference**" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"**Iron or steel products**" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"**Manufactured products**" means

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"**Predominantly of iron or steel or a combination of both**" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

"**Project**" means the development of a safety action plan (including supplemental and topical plans) or the temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"**Section 70917(c) materials**" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

18.2    **Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

18.3    **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract

for architectural and engineering services is negotiated under 2 C.F.R. 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

**18.4    Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**18.6    Recipient Responsibilities for Subawards.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R.  parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

**18.7    Subaward and Contract Authorization.**

If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f) (6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**19.1    Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**19.2    Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3    Timing of Project Costs.**

(a) The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b) The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement unless there has been an approval of pre-award costs under 2 C.F.R. 200.458.

**19.4   Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5   Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6   Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7   Payment Method.** The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8   Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9   Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then the Recipient shall not request reimbursement more frequently than monthly.

**19.10 Match.** The recipient should show on each request for reimbursement that at least 20 percent of the incurred costs will count towards match. If the recipient intends to vary the match percentage over the life of the project, it must communicate its plan to USDOT. The recipient is responsible for tracking match according to the plan. At the completion of the grant award, the cost share requirement must be met, and Federal funds must not exceed the project's Federal share.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Amendments.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**  The USDOT may update the contacts who are listed in section 4.3 by written notice to all the Recipient contacts who are listed in sections 4.1 and 4.2.

**21.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 20.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications. T**he parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**

[RESERVED]

**ARTICLE 23**

[RESERVED]

**ARTICLE 24**
**LABOR AND WORKFORCE**

**24.1 Labor and Workforce.** Attachment E documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**ARTICLE 25**
**CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE**

**25.1 Critical Infrastructure Security and Resilience.**

Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project. Attachment F documents the consideration of critical security infrastructure for projects that include the purchase of information technology and/or operational technology.

**ARTICLE 26**
**CIVIL RIGHTS AND TITLE VI**

**26.1    Civil Rights and Title VI**

(a) The purpose of sections 26.1(b)–26.1(c) is to ensure that the Recipient has a plan to comply with civil rights obligations and nondiscrimination laws, including Title VI and 49 C.F.R. part 21, including any amendments thereto.

(b) If the Recipient is an Existing Recipient, the Recipient shall submit to the USDOT either:

(1) not later than one month after the date of this agreement, documentation showing that the Recipient has complied with all reporting requirements under the Administering Operating Administration's implementation of Title VI; or

(2) not later than six months after the date of this agreement, both a Title VI Plan and a Community Participation Plan, as those plans are described in chapter II, sections 3–4 of DOT Order 1000.12C.

(c) If the Recipient is "New," then the Administering Operating Administration completed a Title VI Assessment of the Recipient, as described in chapter II, section 2 of DOT Order 1000.12C., before entering this agreement.

(d) In this section 26.1:

(1) "**Title VI**" means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

(2) **"Existing"** means a prior recipient of DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

(3) **"New"** means a recipient who has not received DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.


## ARTICLE 27
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**27.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**27.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* the Recipient agrees that its compliance in all respects with all

applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**27.3   Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**27.4   History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**27.5   Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**27.6   External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 32, this agreement includes the following additional terms as integral parts:

    (1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

    (2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

    (3)    2 C.F.R part 175: Award term for Trafficking in Persons; and

(4)    Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 C.F.R. part 20: New Restrictions on Lobbying;

(2)    49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)    49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**27.7  Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)    Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).


### ARTICLE 28
### ASSIGNMENT

**28.1 Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.


### ARTICLE 29
### WAIVER

**29.1  Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

**ARTICLE 30**
**ADDITIONAL TERMS AND CONDITIONS**

**30.1 Effect of Planning and Demonstration or Implementation Award.** Based on information that the Recipient provided to the USDOT, including the Grant Application, as indicated in section 2.5, this agreement designates this award as a Planning and Demonstration award or an Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation as listed in the FY 2024 Notice of Funding Opportunity for Safe Streets and Roads for All.

**30.2 Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**30.3 Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 30.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

(2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

(1) the Environmental Review Entity's actions under section 30.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

(2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

(1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

(2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**30.4 Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**30.5 Relocation and Real Property Acquisition.**

(a) The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, , comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**30.6 Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.313–200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 30.6 for all tiers of subawards under this award.

## ARTICLE 31
## MANDATORY AWARD INFORMATION

**31.1   Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 33.2;

(2)    the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)    this award is not for research and development.

## ARTICLE 32
## CONSTRUCTION AND DEFINITIONS

**32.1   Attachments.** This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | Reserved |
| Attachment D | Reserved |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |
| Attachment G | Reserved |

**32.2    Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2024 SS4A Grant Program", dated March 17, 2025, and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Performance Progress Reports: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**32.3**  **Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–30, then the provision in articles 1–30 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

**32.4**  **Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

**32.5**  **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the BIL section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement.

"**SS4A Grant**" means an award of funds that were made available under the SS4A NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.


**ARTICLE 33**
**AGREEMENT EXECUTION AND EFFECTIVE DATE**


**33.1**  **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**33.2**  **Effective Date.** The agreement will become effective when all parties have signed it. The effective date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

# EXHIBIT G

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE
FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL (SS4A) GRANT
PROGRAM**

**June 13, 2024**
**Revised:  March 17, 2025**

**EXHIBIT A**
**APPLICABLE FEDERAL LAWS AND REGULATIONS**

By entering into this agreement for a FY 2024 Safe Streets and Roads for All Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
    a.  Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
    b.  Hatch Act – 5 U.S.C. 1501, et seq.
    c.  Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
    d.  National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
    e.  Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
    f.  Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
    g.  Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
    h.  Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
    i.  Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
    j.  Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
    k.  Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
    l.  Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
    m.  American Indian Religious Freedom Act, P.L. 95-341, as amended
    n.  Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
    o.  The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
    p.  Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
    q.  Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
    r.  Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
    s.  Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
    t.  Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
    u.  National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
    v.  Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
    w.  Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
    x.  Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
    y.  Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
    z.  Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
    aa.  Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
    bb.  Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
    cc.  Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C.

1101 -1104, 541, et seq.
dd. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. 1352
ee. Freedom of Information Act – 5 U.S.C. 552, as amended
ff. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855
gg. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.
hh. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.
ii. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.
jj. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525
kk. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303
ll. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.
mm. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26
nn. Wilderness Act – 16 U.S.C. 1131-1136
oo. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
pp. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.
qq. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
rr. Cargo Preference Act of 1954 – 46 U.S.C. 55305
ss. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 11988 – Floodplain Management
c. Executive Order 12372 – Intergovernmental Review of Federal Programs
d. Executive Order 12549 – Debarment and Suspension
e. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 – Worker Organizing and Empowerment
g. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14154, Unleashing American Energy
i. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
j. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**Presidential Policy Directives and Memorandums**
a. Presidential Policy Directive 21 – Critical Infrastructure Security and Resilience
b. National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Systems

**General Federal Regulations**

a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201

b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200

c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13

d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1

e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3

f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5

g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.

h. New Restrictions on Lobbying – 49 C.F.R. Part 20

i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21

j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24

k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25

l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27

m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35

n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28

o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30

p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32

q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38

r. Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26 (as applicable under section 18.3 of this agreement)

**Office of Management and Budget Circulars**

a. Any applicable OMB Circular based upon the specific FY 2024 Safe Streets and Roads for All Grant Recipient.

**Highway Federal Legislation**

a. Agreements relating to the use of an access to rights-of-way—Interstate System, 23

      U.S.C. 111

b. Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

c. Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.

d. Efficient Environmental Reviews - 23 U.S.C. 139

e. Policy on lands, wildlife and waterfowl refuges, and historic sites - 49 U.S.C. 303

**Federal Highway Regulations**

a. Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

b. National Highway System Design Standards – 23 C.F.R. Part 625

c. Location and Hydraulic Design of Encroachments on Flood Plains – 23 C.F.R. Part 650 Subpart A

d. Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655

e. Environmental Impact and Related Procedures – 23 C.F.R. Part 771

f. Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(f)) – 23 C.F.R. Part 774

g. Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122

Specific assurances required to be included in the FY 2024 Safe Streets and Roads for All Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37, and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under the FY 2024 Safe Streets and Roads for All (SS4A) grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2024 SS4A grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. § 21 will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2024 SS4A Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

> *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3.  The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4.  The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5.  That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6.  That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7.  That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

    a.  for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
    b.  for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8.  That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
    b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

B-3

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2024 SS4A grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2024 SS4A grant program.

## APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant

thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), the Consolidated Appropriations Act, 2024, Pub. L. No. 118-122 (Mar. 9, 2024) , the Regulations for the Administration of FY 2024 SS4A grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the

absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

   1.   In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.   With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.   With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns. *

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX D

## CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

## TERM B.2
## CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 C.F.R. Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements,

consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2024 SS4A grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2024 SS4A Grant, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

B-12

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

B-14

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY**
**CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;

    (2) require the certifications in section 3;

    (3) include the prohibition in section 4; and

B-17

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PERFORMANCE PROGRESS REPORTS:**
**FORMAT AND CONTENT**

**1.    Purpose**. The purpose of the Quarterly Performance Progress Reports under this agreement for the FY 2024 SS4A grant program is to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

**2.    Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. The first Quarterly Performance Progress Report should include a detailed description of the items funded.

   **(a) Project Information.**  This section provides the name of the project, the State, the federal agency to which the report is submitted, submission date, award number, name of the recipient, report year and quarter and NOFO funding year.

   **(b) Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any significant activities and issues, action items and outstanding issues.

   i.   **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable IIJA or NOFO requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

   ii.  **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

   **(c) Milestones.**  This section documents progress of the milestones outlined in Section 3.2.  The Recipient should include the baseline date (when the project is projected to begin) of each milestone, amendments to those dates (if applicable) and the actual/expected date of completion.  There are Milestone charts for action plans, supplemental planning activities, demonstration activity projects and implementation (both construction and non-construction) projects.

**EXHIBIT D**
**FORM FOR SUBSEQUENT OBLIGATION OF FUNDS**

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

This instrument obligates **[$XXX]** for **[insert portion of project listed in the Agreement]**.

**[Recipient name]** states that:

(1)     the Agreement accurately describe the Project's activities;

(2)     for each completion date listed in the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in the Agreement;

(3)     comparing the Project's current budget with the amounts listed in the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

(4)     under the terms of article 21 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

_____By: _____
Date                                                 Signature of Recipient's Authorized Representative

                                                      **[insert name]**
                                                      _____
                                                      Name

                                                      **[insert title]**
                                                      _____
                                                      Title

The USDOT has determined that all applicable Federal requirements for obligating these funds are satisfied.


_____By:    _____
Date                                 Signature of USDOT's Authorized Representative

                                     **[insert name]**
                                     _____
                                     Name

                                     **[insert title]**
                                     _____
                                     Title

# EXHIBIT H

| | | | |
|---|---|---|---|
| **1.   Federal Award No.** | | **2.   Effective Date**<br>See No. 16 Below | **3.   Assistance<br>Listings No.**<br>20.939 |

| | |
|---|---|
| **4.   Award To**<br>City and County of Denver<br>201 W Colfax Ave<br>Denver, CO 80202 | **5.   Sponsoring Office**<br>U.S. Department of Transportation<br>Federal Highway Administration<br>Office of Safety<br>1200 New Jersey Avenue, SE<br>HSSA-1, Mail Drop E71-117<br>Washington, DC 20590 |

Unique Entity Id.: JHZYLXQAY33
TIN No.: 84-6000850

**6.   Period of Performance**
Effective Date of Award – 60 Months

**7.   Total Amount**

| | |
|---|---|
| Federal Share: | $6,755,619 |
| Recipient Share: | $1,688,905 |
| Other Federal Funds: | $0 |
| Other Funds: | $0 |
| Total: | $8,444,524 |

**8.   Type of Agreement**
Grant

**9.   Authority**
Section 24112 of the Infrastructure Investment
and Jobs Act (IIJA, Pub. L. 117–58, November
15, 2021~~, also referred to as the "Bipartisan
Infrastructure Law" or "BIL"~~)

**10.   Procurement Request No.**
[insert PR Number]

**11.   Federal Funds Obligated**
Base Phase: (Pre-NEPA)  $2,045,752
Option Phase 1: (Final design, right-of-way)
Option Phase 2: (Construction)

**12.   Submit Payment Requests To**
See Article 5.

**13.   Accounting and Appropriations Data**
[insert Data]

**14.   Description of the Project**
This project will fund installation and evaluation of temporary
proven safety countermeasures at critical locations in
downtown Denver.

1 of 26

**RECIPIENT**

**15.  Signature of Person Authorized to Sign**

_____

Signature                                    Date

Deborah Turner

Title:  Senior Engineering Manager

**FEDERAL HIGHWAY ADMINISTRATION**

**16.  Signature of Agreement Officer**

_____

Signature                                    Date

Name:

Title: Agreement Officer

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE**
**FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL GRANT PROGRAM**

This agreement is between the United States Department of Transportation's (the "**USDOT**") Federal Highway Administration (the "**FHWA**") and the City and County of Denver (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a Safe Streets and Roads for All ("**SS4A**") Grant for the Denver's Safety Revolution: Making Streets Safer for All.

The parties therefore agree to the following:

**ARTICLE 1**
**GENERAL TERMS AND CONDITIONS**

**1.1     General Terms and Conditions.**

(a) In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under the Fiscal Year 2024 Safe Streets and Roads for All Grant Program," which is available at https://www.transportation.gov/grants/ss4a/grant-agreements under "Fiscal Year 2024." Articles 7–30 are in the General Terms and Conditions. The General Terms and Conditions are part of this agreement.

(b) The Recipient acknowledges that it has knowledge of the General Terms and Conditions. Recipient also states that it is required to comply with all applicable Federal laws and regulations including, but not limited to, the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200); National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.); and Build America, Buy America Act (IIJA~~BIL~~, div. G §§ 70901-27).

(c) The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, termination of the SS4A Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the FHWA the SS4A Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

**ARTICLE 2**
**APPLICATION, PROJECT, AND AWARD**

**2.1    Application.**

Application Title:    Denver's Safety Revolution: Making Streets Safer for All

Application Date:    06/27/2024

**2.2    Award Amount.**

SS4A Grant Amount: $6,755,619

**2.3    Federal Obligation Information.**

Federal Obligation Type:    Multiple

| Obligation Condition Table | | |
|---|---|---|
| **Phase the Project** | **Allocation of the SS4A Grant** | **Obligation Condition** |
| Base Phase: Pre-NEPA (Preliminary Design and NEPA) | $2,045,752 |  |

| Obligation Condition Table | | |
|---|---|---|
| **Phase the Project** | **Allocation of the SS4A Grant** | **Obligation Condition** |
| Option Phase 1: Final Design, Right-of-Way, and Utility Relocation | $410,485 | The Recipient shall not expend any funds (Federal or non-Federal) for, seek reimbursement of eligible costs, or otherwise begin any part of the final design and construction of an Implementation Project unless and until:<br><br>(1) The requirements of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations have been met; and<br><br>(2) FHWA, or a State with applicable NEPA Assignment authority, has approved the NEPA document for the Project and provided the Recipient with a written notice that the environmental review process is complete; and<br><br>(3) FHWA has obligated additional funds for this phase and notified the Recipient in writing that the Recipient may proceed to the next activity after NEPA approval, and the Recipient has acknowledged receipt in writing of FHWA's notification. Recipient shall not proceed with any such activities until (2) and (3) as described in this section are met. Costs that are incurred before (2) and (3) as described in this section are met are not allowable costs under this agreement.<br><br>Extent of activities that are permissible before NEPA is complete are those activities constituting "preliminary design" as specified in FHWA Order 6640.1A. |

| Obligation Condition Table | | |
|---|---|---|
| **Phase the Project** | **Allocation of the SS4A Grant** | **Obligation Condition** |
| Option Phase 2: Construction | $4,299,382 | The Recipient shall not expend any funds (Federal or non-Federal) for, seek reimbursement of eligible costs, or otherwise begin any part of the construction or final design and construction of an Implementation Project unless and until:<br><br>(1)    The requirements of the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations have been met; and<br><br>(2) FHWA, or a State with applicable NEPA Assignment authority, has approved the NEPA document for the Project and provided the Recipient with a written notice that the environmental review process is complete; and<br><br>(3) FHWA has obligated additional funds for this phase and notified the Recipient in writing that the Recipient may proceed to the next activity after NEPA approval, and the Recipient has acknowledged receipt in writing of FHWA's notification. Recipient shall not proceed with any such activities until (2) and (3) as described in this section are met. Costs that are incurred before (2) and (3) as described in this section are met are not allowable costs under this agreement.<br><br>Extent of activities that are permissible before NEPA is complete are those activities constituting "preliminary design" as specified in FHWA Order 6640.1A. |

**2.4    Budget Period.**

Budget Period:  See Block 6 of Page 1

Base Phase Budget Period:  See Block 6 of Page 1

Option Phase 1 Budget Period:  Reserved

Option Phase 2 Budget Period:  Reserved

**2.5     Grant Designation.**

Designation:   Planning and Demonstration

**ARTICLE 3**
**SUMMARY PROJECT INFORMATION**

**3.1     Summary of Project's Statement of Work.**

This project will fund installation and evaluation of temporary proven safety countermeasures such as hardened centerlines, painted/pre-cast concrete pedestrian refuges, bike corral bump outs for daylighting, re-timing of pedestrian countdown signals to increase walk times at key intersections to/from high ridership transit stops, increased signal visibility, and protected left turns.  Evaluation results are anticipated to inform changes to the Action Plan as well as future project.


The project will be completed in three phases.

Base Phase: Pre-NEPA:  In this phase, DOTI will complete up to 60% design and NEPA,

Option Phase 1: Final Design, Right-of-Way, and Utility Relocation: In this phase, DOTI will complete final design and right of way plans for any temporary right-of-way needs.

Option Phase 2: Construction: In this phase, DOTI will complete construction of the demonstration activities, as well as evaluation that will inform the update to the Vision Zero Action Plan.


**3.2     Project's Estimated Schedule.**

**Demonstration Activity Schedule**

| Milestone | Schedule Date |
|---|---|
| Planned NEPA Completion Date: | November 30,2026 |
| Planned Construction Substantial Completion and Open to Public Use Date: | December 31,2028 |
| Planned SS4A Final Report Date: | December 31, 2029 |

**3.3     Project's Estimated Costs.**

(a)  Eligible Project Costs

| Eligible Project Costs | |
|---|---|
| SS4A Grant Amount: | $6,755,619 |
| Other Federal Funds: | $0 |
| State Funds: | $0 |
| Local Funds: | $1,688,905 |
| In-Kind Match: | $0 |

| | | |
|---|---|---|
| Other Funds: | | $0 |
| Total Eligible Project Cost: | | $8,444,524 |

(b) Cost Classification Table – For Planning and Demonstration Grants with demonstration activities and Implementation Grants Only

| Cost Classification | Total Costs | Non-SS4A Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Architectural and engineering fees | 3,070,297 | | **3,070,297** |
| Construction | 5,374,227 | | **5,374,227** |
| Miscellaneous | | | |
| Contingency | | | |
| **Project Total** | **8,444,524** | | **8,444,524** |

(c) Indirect Costs

Indirect costs are allowable under this Agreement in accordance with 2 CFR part 200 and the Recipient's approved Budget Application.  In the event the Recipient's indirect cost rate changes, the Recipient will notify FHWA of the planned adjustment and provide supporting documentation for such adjustment. This Indirect Cost provision does not operate to waive the limitations on Federal funding provided in this document. The Recipient's indirect costs are allowable only insofar as they do not cause the Recipient to exceed the total obligated funding.

## ARTICLE 4

## CONTACT INFORMATION

**4.1     Recipient Contact(s).**

Deborah Turner
Senior Engineer
City and County of Denver
201 W Colfax Ave, Suite 500
720-913-4512
Deborah.turner@denvergov.org

**4.2     Recipient Key Personnel.**

| Name | Title or Position |
|---|---|
| Bryan Meyer | Engineer |
| Jennifer Bartlett | Capital Planning |

**4.3     USDOT Project Contact(s).**

Safe Streets and Roads for All Program Manager
Federal Highway Administration
Office of Safety
HSSA-1, Mail Stop:  E71-117
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-366-2822
SS4A.FHWA@dot.gov

and

Agreement Officer (AO)
Federal Highway Administration
Office of Acquisition and Grants Management
HCFA-42, Mail Stop E62-310
1200 New Jersey Avenue, S.E.
Washington, DC 20590
202-493-2402
HCFASS4A@dot.gov

and

Division Administrator – Colorado
Agreement Officer's Representative (AOR)
12300 W. Dakota Avenue, Suite 180
Lakewood, CO 80228
CO-DIV@dot.gov

and

Ajin Hu
FHWA Colorado Division Office Lead Point of Contact
Grants Program Manager
12300 W. Dakota Avenue, Suite 180
Lakewood, CO 80228
(720) 963-3071
ajin.hu@dot.gov

**ARTICLE 5**
**USDOT ADMINISTRATIVE INFORMATION**

**5.1    Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition and Grants Management

SUBAWARDS AND CONTRACTS APPROVAL

Note: See 2 CFR § 200.331, Subrecipient and contractor determinations, for definitions of subrecipient (who is awarded a subaward) versus contractor (who is awarded a contract).

Note: Recipients with a procurement system deemed approved and accepted by the Government or by the Agreement Officer (the "AO") are exempt from the requirements of this clause. See 2 CFR 200.317 through 200.327. Note:  This clause is only applicable to grants that do not include construction.

In accordance with 2 CFR 200.308(c)(6), unless described in the application and funded in the approved award, the Recipient must obtain prior written approval from the AO for the subaward, transfer, or contracting out of any work under this award above the Simplified Acquisition Threshold. This provision does not apply to the acquisition of supplies, material, equipment, or general support services. Approval will be issued through written notification from the AO or a formal amendment to the Agreement.

The following subawards and contracts are currently approved under the Agreement by the AO. This list does not include supplies, material, equipment, or general support services which are exempt from the pre-approval requirements of this clause.

**5.2    Reimbursement Requests**

(a)  The Recipient may request reimbursement of costs incurred within the budget period of this agreement if those costs do not exceed the amount of funds obligated and are allowable under the applicable cost provisions of 2 C.F.R. Part 200, Subpart E. The Recipient shall not request reimbursement more frequently than monthly.

(b)  The Recipient shall use the DELPHI iSupplier System to submit requests for reimbursement to the payment office. When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit supporting cost detail with the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs) to clearly document all costs incurred.

(c)  The Recipient's supporting cost detail shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, travel, etc., and the Recipient shall identify the Federal share and the Recipient's share of costs. If the Recipient does not provide sufficient detail in a request for reimbursement, the Agreement Officer's Representative (the "**AOR**") may withhold processing that request until the Recipient provides sufficient detail.

(d) The USDOT shall not reimburse costs unless the AOR reviews and approves the costs to ensure that progress on this agreement is sufficient to substantiate payment.

(e) In the rare instance the Recipient is unable to receive electronic funds transfers (EFT), payment by EFT would impose a hardship on the Recipient because of their inability to manage an account at a financial institution, and/or the Recipient is unable to use the DELPHI iSupplier System to submit their requests for disbursement, the FHWA may waive the requirement that the Recipient use the DELPHI iSupplier System. The Recipient shall contact the Division Office Lead Point of Contact for instructions on and requirements related to pursuing a waiver.

(f) The requirements set forth in these terms and conditions supersede previous financial invoicing requirements for Recipients.

## ARTICLE 6
## SPECIAL GRANT TERMS

**6.1**    SS4A funds must be expended within five years after the grant agreement is executed and DOT obligates the funds, which is the budget period end date in section 10.3 of the Terms and Conditions and section 2.4 in this agreement.

**6.2**    The Recipient demonstrates compliance with civil rights obligations and nondiscrimination laws, including Titles VI of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act, and accompanying regulations. Recipients of Federal transportation funding will also be required to comply fully with regulations and guidance for the ADA, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and all other civil rights requirements.

**6.3**    SS4A Funds will be allocated to the Recipient and made available to the Recipient in accordance with FHWA procedures.

**6.4**    The Recipient of a Planning and Demonstration Grant that involves a demonstration activity agrees to provide an assessment of each demonstration activity and update the existing Action Plan, which will incorporate the information gathered in the Action Plan's list of projects or strategies and/or inform another part of the existing Action Plan.  The Recipient also agrees that demonstration activities are temporary in nature and must be removed and/or ended following the conclusion of the project if the assessment of the demonstration activities does not affirm that the activities provide safety benefits.

**6.5**    The Recipient acknowledges that it is required to conduct certain environmental analyses and to prepare and submit to FHWA, or State with applicable NEPA Assignment authority, documents required under NEPA, and other applicable environmental statutes and regulations before the Government will obligate funds for Option Phase 1 under this agreement and provide the Recipient with a written notice to proceed with Option Phase 1.

**6.6**    The Government's execution of this agreement does not in any way constitute pre-approval or waiver of any of the regulations imposed upon Recipient under the applicable Federal rules, regulations and laws regarding SS4A projects undertaken in accordance with the terms and conditions of this agreement. The Recipient shall comply with all applicable Federal requirements before incurring any costs under this agreement.

**6.7**    There are no other special grant requirements.

**ATTACHMENT A**
**PERFORMANCE MEASUREMENT INFORMATION**

**Study Area:** Central Business District, Five Points, Union Station Neighborhoods
**Baseline Measurement Date:** July 31, 2026
**Baseline Report Date:** September 30, 2026

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency and Reporting Deadline |
|---|---|---|
| Safety Performance | Fatalities:  Total annual fatalities in the project location(s) | Annually and within 120 days after the end of the period of performance |
| Safety Performance | Serious Injuries:  Total annual serious injuries in the project location(s) [if available] | Annually and within 120 days after the end of the period of performance |
| Safety Performance | Crashes by Road User Category:  Total annual crashes in the project location(s) broken out by types of roadway users involved (e.g., pedestrians, bicyclists, motorcyclist, passenger vehicle occupant, commercial vehicle occupant) | Annually and within 120 days after the end of the period of performance |
| ~~Equity~~ | ~~Percent of Funds to Underserved Communities:  Funding amount (of total project amount) benefiting underserved communities, as defined by USDOT~~ | ~~Within 120 days after the end of the period of performance~~ |
| Costs | Project Costs:  Quantification of the cost of each eligible project carried out using the grant | Within 120 days after the end of the period of performance |
| Outcomes and Benefits |  |  |

12 of 26

| Measure | Category and Description | Measurement Frequency and Reporting Deadline |
|---|---|---|
| | Quantitative Project Benefits: Quantification of evidence-based projects or strategies implemented (e.g., miles of sidewalks installed, number of pedestrian crossings upgraded, etc.) | Within 120 days after the end of the period of performance |
| Outcomes and Benefits | Qualitative Project Benefits:  Qualitative description of evidence-based projects or strategies implemented (e.g., narrative descriptions, testimonials, high-quality before and after photos, etc.) | Within 120 days after the end of the period of performance |
| Outcomes and Benefits | Project Location(s):  GIS/geo coordinate information identifying specific project location(s) | Within 120 days after the end of the period of performance |
| Lessons Learned and Recommendations | Lessons Learned and Recommendations: Description of lessons learned and any recommendations relating to future projects or strategies to prevent death and serious injury on roads and streets. | Within 120 days after the end of the period of performance |

**ATTACHMENT B**
**CHANGES FROM APPLICATION**

Describe all material differences between the scope, schedule, and budget described in the application and the scope, schedule, and budget described in Article 3. The purpose of Attachment B is to clearly and accurately document any differences in scope, schedule, and budget to establish the parties' knowledge and acceptance of those differences. See Article 11 for the Statement of Work, Schedule, and Budget Changes. If there are no changes, please insert "N/A" after "Scope," "Schedule," or "Budget." If there are changes to the budget, please complete the table below. Otherwise, leave the table below blank.

**Scope**: No changes

**Schedule**: The schedule presented in the application was accelerated to meet language in the NOFO. This acceleration is not needed so the schedule for delivery has been revised as follows:

Procurement for the design consultant will occur after the grant agreement is signed, rather than while the grant agreement is being developed. This shifts the entire schedule forward by 2 quarters. Design for the demonstration activities is anticipated to take 18 months, including a 6-month NEPA phase. Installation is anticipated to take 12-18 months to account for the seasonal nature of the area's construction cycle. The schedule also includes 3 months for evaluation data collection after installation that will inform the update to the Vision Zero action plan.

**Budget**: Denver was awarded only Demonstration funds. The revised budget reflects changes in Future Eligible Project Costs to reflect only Demonstration activities.

The table below provides a summary comparison of the project budget.

| Fund Source | Application $ | Application % | Award $ | Award % | Section 3.3 $ | Section 3.3 % |
|---|---|---|---|---|---|---|
| **Previously Incurred Costs (Non-Eligible Project Costs)** | | | | | | |
| Federal Funds | | | | | | |
| Non-Federal Funds | | | | | | |
| Total Previously Incurred Costs | | | | | | |
| **Future Eligible Project Costs** | | | | | | |
| SS4A Funds | 14,490,378 | 80 | 6,755,619 | 80 | 6,755,619 | 80 |
| Other Federal Funds | | | | | | |
| Non-Federal Funds | 3,662,595 | 20 | 1,688,905 | 20 | 1,688,905 | 20 |
| Total Future Eligible Project Costs | 18,112,973 | | 8,444,524 | | 8,444,524 | |
| Total Project Costs | 18,112,973 | | 8,444,524 | | 8,444,524 | |

**ATTACHMENT C**

(RESERVED)~~RACIAL EQUITY AND BARRIERS TO OPPORTUNITY~~

**1.** ~~Efforts to Improve Racial Equity and Reduce Barriers to Opportunity.~~

~~The Recipient states that rows marked with "X" in the following table align with the application:~~

| | |
|---|---|
| | ~~A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)*~~ |
| ~~x~~ | ~~The Recipient or a project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)*~~ |
| | ~~The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)*~~ |
| | ~~The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)*~~ |
| | ~~The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)*~~ |
| | ~~The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity, as described in the supporting narrative below.~~ |
| | ~~The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but intends to take relevant actions described in the supporting narrative below.~~ |
| | ~~The Recipient has not taken actions related to the Project to improve racial equity and reduce barriers to opportunity and will not take those actions under this award.~~ |

~~**2.** Supporting Narrative.~~

~~The City and County is committed to the small, minority- and women-owned business community and will continue to advance consistent reporting, outreach, and awareness. The Project is aligned with the mission of DEDO's Division of Small Business Opportunity (DSBO) to strengthen small, minority, and women-owned businesses by working to ensure that certified businesses are actively participating on bond projects at all tiers and phases.~~

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

**ATTACHMENT D**

(RESERVED)CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS

1.    ~~Consideration of Climate Change and Environmental Justice Impacts.~~
~~The Recipient states that rows marked with "X" in the following table align with the application:~~

**Formatted:** Attachment Heading

| | |
|---|---|
| | ~~The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions.~~ *(Identify the plan in the supporting narrative below.)* |
| | ~~The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions.~~ *(Identify the plan in the supporting narrative below.)* |
| | ~~The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions.~~ *(Identify the plan in the supporting narrative below.)* |
| * | ~~The Recipient or a project partner used environmental justice tools, such as the EJScreen, to minimize adverse impacts of the Project on environmental justice communities.~~ *(Identify the tool(s) in the supporting narrative below.)* |
| | ~~The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand.~~ *(Describe that shift in the supporting narrative below.)* |
| | ~~The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions.~~ *(Describe those strategies in the supporting narrative below.)* |
| | ~~The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both.~~ *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | ~~The Project supports the installation of electric vehicle charging stations.~~ *(Describe that support in the supporting narrative below.)* |
| | ~~The Project promotes energy efficiency.~~ *(Describe how in the supporting narrative below.)* |
| | ~~The Project serves the renewable energy supply chain.~~ *(Describe how in the supporting narrative below.)* |
| | ~~The Project improves disaster preparedness and resiliency~~ *(Describe how in the supporting narrative below.)* |
| | ~~The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity.~~ *(Describe how in the supporting narrative below.)* |
| | ~~The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm.~~ *(Describe that infrastructure in the supporting narrative below.)* |
| | ~~The Project supports or incorporates the construction of energy- and location-efficient buildings.~~ *(Describe how in the supporting narrative below.)* |

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

Formatted: Attachment Heading

| The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
| The Recipient has taken other actions to consider climate change and environmental justice impacts of the Project, as described in the supporting narrative below. |
| The Recipient has not yet taken actions to consider climate change and environmental justice impacts of the Project but will take relevant actions described in the supporting narrative below. |
| The Recipient has not taken actions to consider climate change and environmental justice impacts of the Project and will not take those actions under this award. |



**Formatted:** Attachment Heading

**Formatted:** Attachment Heading

**Formatted:** Attachment Heading

**Formatted:** Attachment Heading

**Formatted:** Attachment Heading

2.      Supporting Narrative.

The city used mapped existing hardships at the state-level through additional review via the USDOT Equitable Transportation Community (ETC) Explorer and the Colorado Department of Public Health and Environment (CDPHE) Environmental Justice Mapping Tool (EnviroScreen); and at the local level through the Denver Neighborhood Equity Index and defined Environmental Justice communities.

**ATTACHMENT E**
**LABOR AND WORKFORCE**

1.     **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table align with the application:

| |
|---|
| The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. *(Describe robust job creation and identify the good-paying jobs in the supporting narrative below.)* |
| The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. *(Describe the training programs in the supporting narrative below.)* |
| The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. *(Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.)* |
| The Recipient or a project partner will partner and engage with local unions or other worker-based organizations in the development and lifecycle of the project, including through evidence of project labor agreements and/or community benefit agreements. *(Describe the partnership or engagement with unions and/or other worker-based organizations and agreements in the supporting narrative below.)* |
| The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. *(Describe the partnership and workforce strategies in the supporting narrative below.)* |
| The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |
| The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

22 of 26

| | |
|---|---|
| | The Recipient demonstrates, to the full extent possible consistent with the law, an effort to create good-paying jobs with the free and fair choice to join a union and incorporation of high labor standards. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |
| x | The Recipient or a project partner has adopted the use of local and economic hiring preferences in the overall delivery and implementation of the Project. *(Describe the relevant provisions in the supporting narrative below.)* |
| | The Recipient or a project partner has adopted the use of registered apprenticeships in the overall delivery and implementation of the Project. *(Describe the use of registered apprenticeship in the supporting narrative below.)* |
| | The Recipient or a project partner will provide training and placement programs for underrepresented workers in the overall delivery and implementation of the Project. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will support free and fair choice to join a union in the overall delivery and implementation of the Project by investing in workforce development services offered by labor-management training partnerships or setting expectations for contractors to develop labor-management training programs. *(Describe the workforce development services offered by labor-management training partnerships in the supporting narrative below.)* |
| | The Recipient or a project partner will provide supportive services and cash assistance to address systemic barriers to employment to be able to participate and thrive in training and employment, including childcare, emergency cash assistance for items such as tools, work clothing, application fees and other costs of apprenticeship or required pre-employment training, transportation and travel to training and work sites, and services aimed at helping to retain underrepresented groups like mentoring, support groups, and peer networking. *(Describe the supportive services and/or cash assistance provided to trainees and employees in the supporting narrative below.)* |
| | The Recipient or a project partner has documented agreements or ordinances in place to hire from certain workforce programs that serve underrepresented groups. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |

| | |
|---|---|
| x | The Recipient or a project partner participates in a State/Regional/Local comprehensive plan to promote equal opportunity, including removing barriers to hire and preventing harassment on work sites, and that plan demonstrates action to create an inclusive environment with a commitment to equal opportunity, including:<br><br>a. affirmative efforts to remove barriers to equal employment opportunity above and beyond complying with Federal law;<br>b. proactive partnerships with the U.S. Department of Labor's Office of Federal Contract Compliance Programs to promote compliance with EO 11246 Equal Employment Opportunity requirements and meet the requirements as outlined in the Notice of Funding Opportunity to make good faith efforts to meet the goals of 6.9 percent of construction project hours being performed by women and goals that vary based on geography for construction work hours and for work being performed by people of color;<br>c. no discriminatory use of criminal background screens and affirmative steps to recruit and include those with former justice involvement, in accordance with the Fair Chance Act and equal opportunity requirements;<br>d. efforts to prevent harassment based on race, color, religion, sex, sexual orientation, gender identity, and national origin;<br>e. training on anti-harassment and third-party reporting procedures covering employees and contractors; and<br>f. maintaining robust anti-retaliation measures covering employees and contractors.<br>*(Describe the equal opportunity plan in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the project, will take relevant actions described in the supporting narrative below. |
| | The Recipient has not taken actions related to the Project to improving good-paying jobs and strong labor standards and will not take those actions under this award. |

**2.** **Supporting Narrative.** *(Please edit the narrative to support what you select the new ones)*

Formatted: Highlight

The Project commits to advancing the City's vision for increasing minority and small business equity and development. As part of this Project, the City and County of Denver will implement ongoing strategies to maximize the use of local labor for construction of the Project and promote the well-being of people so that they can continue to advance their professions and seek higher-paying jobs.

• DEDO's Denver Construction Careers Pilot (DCCP) program is the next step in the City and County's efforts to strengthen training and job placement for large public projects, building Denver's workforce of the future.

• The City and County has partnered with an employment platform WORKNOW. Members also participate in upskilling courses such as OSHA 10 and Blueprint Reading.

• As part of the Project procurement process, the City and County will actively maximize the use of goods, products, and materials produced – and services offered – in the United States according to

Executive Order 14005, January 25, 2021. Preferential hiring provisions would be authorized and comply with Sec. 199B of the FY2021 Appropriations Act.

**ATTACHMENT F**
**CRITICAL SECURITY INFRASTRUCTURE AND RESILIENCE**

1.    **Efforts to strengthen the Security and Resilience of Critical Infrastructure against both Physical and Cyber Threats.**

The Recipient states that rows marked with "X" in the following table are accurate:

| x | The Recipient demonstrates, prior to the signing of this agreement, effort to consider and address physical and cyber security risks relevant to the transportation mode and type and scale of the activities. |
|---|---|
|   | The Recipient appropriately considered and addressed physical and cyber security and resilience in the planning, design and oversight of the project, as determined by the Department and the Department of Homeland Security. |
|   | For projects in floodplains:  The Recipient appropriately considered whether the project was upgraded consistent with the Federal Flood Risk Management Standard, to the extent consistent with current law, in Executive Order 14030, Climate-Related Financial Risk (86 FR 27967), and Executive Order 13690, Establishing a Federal Flood Risk Management Standard and a Process for Further Solicit and Considering Stakeholder Input (80 FR 6425). |

2.    **Supporting Narrative.**

Denver is addressing physical security at the cabinet and cyber security of the transportation network using the following:

Physical Security – access at the cabinet

- Password protection to access the cabinet as well as alerts and tracking when cabinets are opened in the field, as well as multiple keys needed to unlock the cabinets.

Cyber Security – access to the network

- We are in the process of restructuring the network by re-IPing and introducing new a new VLAN structure
- We utilize 16 characters or more for passwords, disable insecure protocols  and disable unused network ports and modules
- New devices are approved by Technology Services according to the Internet of Things (IoT), and Vendor Risk Assessment (VRA) Policies
- We maintain firewalls between the Denver's OT network and their various internal and external partners

**ATTACHMENT G**
(RESERVED)CIVIL RIGHTS AND TITLE VI

1. ~~Recipient Type Designation.~~

~~Recipient Type Designation:  Existing~~

~~Existing Award Program: FY21 RAISE grant—Washington Street Livability Project~~

~~2.      Title VI Assessment Information.~~

~~This section is not applicable because the Recipient Type Designation is "Existing."~~

Formatted: Level 2, Indent: Left:  0", Hanging:  0.5", Keep with next

Formatted: Level 2, Indent: Left:  0", Hanging:  0.5", Keep with next