1

2

THE HONORABLE BARBARA J. ROTHSTEIN

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

MARTIN LUTHER KING, JR.
COUNTY, et al.,

9

No. 2:25-cv-00814-BJR

Plaintiffs,

10

v.

DECLARATION OF TIMOTHY
SEXTON

11

12

SCOTT TURNER in his official capacity
as Secretary of the U.S. Department of
Housing and Urban Development, et al.,

13

14

Defendants.

15

I, TIMOTHY SEXTON, declare as follows:

16

17

1.      I am over 18 years of age. I have personal knowledge of the facts contained in this

18

declaration and am otherwise competent to testify to the matters in this declaration.

19

2.      I earned my Bachelor of Arts, Master of Science, and Master of Public Health

20

degrees from the University of Iowa.

21

3.      For more than eight years I worked for the Washington State Department of

22

Transportation, in roles including Transportation Planning Specialist, and Manager of Air Quality,

23

Noise, Energy and Climate Policy.

24

4.      For more than nine years I worked for the Minnesota Department of Transportation,

25

26

in roles including Office Director, Transit and Active Transportation; Assistant Commissioner and

27

DECLARATION OF TIMOTHY SEXTON - 1
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Chief Sustainability Officer, Sustainability and Public Health; Assistant Commissioner, Sustainability, Planning, and Program Management.

5.    Since May 2024, I have served as the Director of the Minneapolis Department of Public Works. The Public Works Department's budget represents approximately 24% of the City's overall budget.  Public Works includes several divisions, including Transportation Planning and Programming, Transportation Engineering and Design, Traffic and Parking Services, Transportation Maintenance and Repair, Water Treatment and Distribution, Fleet Services, Solid Waste and Recycling, and Surface Water and Sewers. Public Works builds, operates and maintains public infrastructure, facilities, and services that are of vital importance to the communities we serve. The City is currently planning its budget for 2026.

6.    Minneapolis's population is approximately 430,000 people.  It is home to several Fortune 500 companies in assorted industries and is an economic driver of the entire upper Midwest region. Minneapolis has been recognized for its thriving arts and culinary scene, for having the best park system in the country, and is home to two professional sports team stadiums. Minneapolis's infrastructure is essential to the economy and wellbeing of the entire region. Transportation investments in Minneapolis have a greater impact because the city is a regional economic hub and destination.  The opposite is true that reductions in federal transportation investments have a greater negative impact on people and commerce.

7.    Minneapolis's Mayor must deliver a proposed budget to the City Council by August 2025.  Not knowing whether certain federal funds will be available will create uncertainty about the services and projects our city and region depends on. The loss of its anticipated federal grant funding would force the City to choose between cuts to municipal services or imposition of a historically large tax levy on its residents.

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

8.      One of the City's adopted goals is "Equity." The City Council has adopted the following goal language: "City government works side-by-side with community members to engage all voices, creatively problem solve, and build trust, particularly with those who have been most impacted by inequities. This helps to ensure that opportunities are accessible to everyone."

9.      United States Department of Transportation (DOT) funding plays a central role in the services Public Works provides. Minneapolis is expecting approximately $150,000,000 in federal funding for upcoming capital improvement projects, the vast majority of which is from DOT. These funds are committed by formula and competitive grants and include funding passed through state and local agencies to Minneapolis and funds awarded directly to the city.

10.     **Surface Transportation Block Grant Program.** The largest source of DOT funds that Minneapolis receives comes from the Surface Transportation Block Grant Program (STBG), operated by the DOT through the FHWA. Minneapolis currently holds tens of millions of dollars in active STBG awards. STBG provides funding to "[s]tates and localities for projects to preserve and improve the conditions and performance on any Federal-aid highway, bridge and tunnel projects on any public road, pedestrian and bicycle infrastructure, and transit capital projects...." https://www.fhwa.dot.gov/specialfunding/stp/. The program outlines various requirements that grant recipients must abide by, including grant eligible entities, qualifying projects, required elements of a Metropolitan Planning Organization's ("MPO") competitive process, and annual reports to the Secretary.

11.     STBG is a formula grant program, not a competitive funding program. Pursuant to law, Minnesota's MPO is guaranteed a set percentage of the annual program funds. Municipalities then compete for pass-through funding from the MPO.

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

12.    In Minneapolis, STBG funds support a large number of transportation projects. They include sidewalk projects that help kids safely walk to school, retiming traffic signals, improving traffic safety, and bridge and road construction so people and commerce can efficiently move around and through the city, just to name a few.

13.    Minneapolis has assigned and obligated previously awarded federal funding to projects already underway and has incorporated these funds into the city's six-year capital improvement program. These funds have significant economic impact on the Minneapolis and Twin Cities region because of the funds spent from the projects on suppliers and contractors.

14.    These funds are crucial for safety and the maintenance of transportation infrastructure, which is how freight is moved, how children get to school, and how people get to their jobs. Proper management of infrastructure calls for the right fix at the right time and if maintenance is delayed, the cost to improve or repair infrastructure. If the City did not have access to these federal funds, many projects throughout the city would not be completed or would be completed many years from now. This includes at least one arterial bridge that would close to traffic in 2030. The City would need to identify the highest-priority projects for public safety and determine which of those could be funded with only local funds, which projects to delay or cancel. Uncertainty about access to previously committed to federal funds creates chaos for planning and sequencing projects now and in the future. The communities served by the City depend on these projects and have invested their time and expertise through community participation in project selection and project design. Changes to project construction timing or modifications to project design with the loss of federal dollars impacts trust between people, business, and all levels of government.

DECLARATION OF TIMOTHY SEXTON - 4
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

15.    **The Highway Safety Improvement Program** Minneapolis holds tens of millions in grant funding from the Highway Safety Improvement Program (HSIP). Administered by the DOT through the FHWA, HSIP is a core federal-aid program that aims to significantly reduce traffic fatalities and serious injuries on all public roads. Like the STBG, HSIP funding is provided to the state based on a formula which guarantees apportioned funds calculated based on a percentage specified in law. Following apportionment, cities compete for funding from the state. The program requires state departments of transportation to develop and continually update a strategic highway safety plan that identifies highway safety issues and guides investment decisions towards strategies with the most potential to save lives and prevent injuries.

16.    HSIP funds safety improvement projects such as signal upgrades, which increases pedestrian safety and accessibility. These are competitive grants the City applies for to address the most dangerous conditions at intersections based on historical crash data. These projects are data-driven safety improvements and have a superb record of decreasing injuries and even fatalities. Similar to other programs, the federal funds require a local match of funds provided by the City, and through that partnership, the City can improve far more safety infrastructure than it would be able to do without federal funds. Historically, the local match requirement has been at least 10% of the federal funds; therefore, without the federal funds, up to 90% of the improved safety infrastructure on roads funded with this partnership could be lost.

17.    The loss of federal funds to Minneapolis would cause a rippling negative economic impact to the City, the state of Minnesota, and the upper-Midwest. In Minneapolis and the immediate area, fewer city projects would damage the labor market as contractors, subcontractors, and their employees would have less work. As the economic backbone for the state and region, our transportation infrastructure serves far more than just our residents. Our transportation system

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

serves a huge number of domestic and international tourists arriving at Minneapolis-St. Paul International Airport, an enormous agricultural industry that flows through Minneapolis to the rest of the world, and the 15 Fortune 500 companies headquartered in Minnesota that rely on our high quality multi-modal transportation system to serve their operational and workforce needs. Put simply, if Minneapolis' transportation infrastructure falters, so will the rest of the state.

18.    **Bridge Investment Program Via the Federal Infrastructure Investment and Jobs Act.** The Bridge Investment Program (BIP) is the source of the City's largest single transportation infrastructure grant. BIP is administered by the DOT through the FHWA. It provides competitive grants to improve bridge condition and safety. https://www.fhwa.dot.gov/bridge/bip/.

19.    Built in the 1920s, the Nicollet Avenue Bridge over Minnehaha Creek is eligible for listing in the National Register of Historic Places, and is the last of four historic concrete arch bridges to be slated for rehabilitation in the City of Minneapolis. Rehabilitation will allow this bridge to continue as an important transportation artery for at least 65 years. The bridge accommodates a local bus route that provides a key transit connection between the City of Bloomington and downtown Minneapolis. A significant thruway for both motorized and non-motorized travelers, the bridge supports access to emergency services, jobs, schools, and local businesses.

20.    The rehabilitation project includes removing and replacing the bridge deck, beams, and columns, as well as concrete repair. These improvements will enhance capacity for heavy loading and reduce the need for long-term maintenance; prevent a total bridge closure and the rerouting of emergency, transit, and personal vehicles that a bridge closure would necessitate; and promote access to opportunity and support a competitive economy and labor market (including historically underrepresented groups of workers).

DECLARATION OF TIMOTHY SEXTON - 6
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

21.     The total estimated cost of the bridge rehabilitation is $60 million.  The federal funds are planned to be used for building materials including steel, concrete, and mortar, and labor to construct the bridge. The project provides work for suppliers and contractors, supplying a much-needed direct economic benefit as well.

22.     On October 31, 2024, the City learned that it had been selected for a $34,303,583 state pass-through grant from the Federal Highway Administration Bridge Investment Program for the Nicollet Avenue bridge project described above. In May 2025, the City received the grant documents from the state for this grant.

23.     The Federal Highway Administration Exhibits to Competitive Grant Agreements dated April 30, 2025, incorporate by reference numerous executive orders in their entirety, a long list of federal legislation, regulations, and executive orders, including Executive Order 14168 – Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Executive Order 14173 – Ending Illegal Discrimination and Restoring Merit-based Opportunity.  Attached hereto as **Exhibit A** are Schedules A to H of the Grant Agreement, which require Minneapolis to certify "that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws. This certification is repeated in the Competitive Grant Program General Terms and Conditions dated April 22, 2025, which also require certification that compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions, require funds to be expended in compliance with laws and "public policy . . . protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination", and require "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE)

DECLARATION OF TIMOTHY SEXTON - 7
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    and other Federal offices and components of the Department of Homeland Security in the

2    enforcement of Federal immigration law." The schedules also included a note from the FHWA

3    stating, "Recipient: Please review [project narrative] and revise to align with Executive Orders.

4    Also, see Article 18 of the General T&C for additional requirements regarding this schedule and

5    EO 14173." The representative from the state informed City representatives that the grant would

6    move forward quickly and that the City needed to quickly respond.

7

8        24.    The City has not yet responded to the state or FWHA regarding the grant conditions

9    documents. Without receipt of federal funds for this project, the City would be forced to close the

10   Nicollet Avenue bridge in 2030 due to the bridge's structural condition. The City does not have

11   replacement funds for the bridge if the federal funding is lost.  The uncertainty over whether the

12   City will receive the federal funding delays the replacement of this bridge for the communities the

13   City serves.  The uncertainty also causes difficulty in internal planning for City staff.

14

15       25.    The City takes bridge safety projects seriously, especially since the tragic I-35W

16   bridge collapse in 2007, which killed 13 people and injured 145, occurred in the heart of

17   Minneapolis. This history makes receipt of these funds all the more critical.

18       26.    There is significant urgency related to this grant. On May 2, 2025, FHWA wrote

19   the State of Minnesota (the direct grant recipient) advising that the federal government "is looking

20   to act quickly on these projects and have the GA [Grant Agreement] ready for execution in two

21   weeks," a period that expired last Friday.  The Minnesota Department of Transportation advised

22   the City regarding the grant agreement, "[r]eminder that this is going to be a very quick

23   turnaround."  Last week, when City staff met with Minnesota Department of Transportation staff

24   about the grant agreement documents, the state representative reiterated that the documents were

25   due May 16 (last Friday).

26

27

DECLARATION OF TIMOTHY SEXTON - 8
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

27.    **Railroad Crossing Elimination Program.** The Railroad Crossing Elimination Program (RCEP), administered by DOT's Federal Railroad Administration (FRA), awards funds for railroad crossing projects that seek to improve the safety and mobility of people and goods. RCEP is a competitive grant program. Minneapolis is slated to receive a $2 million RCEP grant to study and plan the feasibility of railroad projects at three locations in north Minneapolis that experience some of the longest and most frequent train blockages in the nation. The City committed matching funds of $450,000 for the project, and Canadian Pacific Kansas City (CPKC) railway committed $50,000 to fund the project.

28.    The RCEP grant award to Minneapolis is for a project called Connecting Camden. This project aims to improve the health, safety, and connectivity of the Camden neighborhood of North Minneapolis. Camden has a high concentration of Black, Indigenous, and People of Color (BIPOC) residents. Trains frequently block traffic at the rail crossings in this neighborhood, causing long delays for ambulances, fire trucks, buses, and cars. Delays of more than 15 minutes are common, and residents sometimes experience train stoppages of 30 to 60 minutes. These extended closures often lead to frustration for residents when they are trying to get to work, school, doctor's appointments, or the grocery store. Some residents avoid going to local coffee shops and other businesses in the Camden neighborhood because they don't want to get stuck at a railroad crossing. The blockages also lead to dangerous behaviors, such as pedestrians and bicyclists climbing in between stopped train cars to cross the tracks and motorists driving around crossing gates just moments before a train arrives. The RCEP-funded Connecting Camden project aims to provide a different grade level (i.e., an underpass or overpass) for the roadways currently crossing the trains, and/or remove one or more of the highway-rail crossings at three intersections.

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    29.    The RCEP grant of $2 million is intended to fund 80 percent of the project planning,

2    design, and preliminary engineering work for the Connecting Camden project. Without this federal

3    funding, the City would not be able to remove or change the three crossings, and this underserved

4    community will continue to suffer excessive commuter delays, obstruction of emergency response

5    vehicles, limited access to needed services and businesses, and dangerous conditions around the

6    train tracks.

7

8    30.    On January 10, 2025, the City was notified that it had been selected to receive a

9    Railroad Crossing Elimination Program grant for $2 million for the work described above. On

10   April 17, 2025, the FRA sent the City RCEP grant documents and a list of questions. The FRA

11   requested that these documents be reviewed in an effort to advance City's grant towards obligation,

12   and asked that the City send concurrence by April 22, 2025 -- which was nearly a month ago.

13   Attached hereto as **Exhibit B** is a true and correct copy of "Attachment 1" which is entitled "U.S.

14   Department of Transportation Federal Railroad Administration Attachment 1 General Terms and

15   Conditions Revision Date April 16, 2025," sent with these grant documents, which contained in

16   Section 20.2 the requirement that the recipient of funding will ensure that federal funding is

17   expended in full accordance with "public policy" requirements, and that the recipient would

18   cooperate with Federal officials in the enforcement of federal law including cooperating with ICE

19   and DHS in the enforcement of federal immigration law. Attached hereto as **Exhibit C** is a true

20   and correct copy of "Exhibits" sent with these grant documents and which was internally entitled

21   "Exhibit A: Applicable Federal Laws and Regulations." In the list of applicable Executive Orders,

22   it listed Executive Order 14168 – Defending Women from Gender Ideology Extremism and

23   Restoring Biological Truth to the Federal Government; and Executive Order 14173 – Ending

24   Illegal Discrimination and Restoring Merit-Based Opportunity at page 4 of the document.

25

26

27

DECLARATION OF TIMOTHY SEXTON - 10
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

31.     On April 22, 2025, the City sent the federal government responses to the list of questions, and proposed changes to Attachment 1, Articles 20.2(a) and 24.7 (the Severability provision), and updates to Executive Orders listed in Exhibits, Exhibit A: Applicable Federal Laws and Regulations. On April 23, 2025, the federal government responded and acknowledged receipt. Since that time, the City has not received further communication regarding this grant, which is concerning because the federal government's deadline for concurrence with its grant documents was nearly a month ago.

32.     **Strengthening Mobility and Revolutionizing Transportation (SMART) grant.** The Strengthening Mobility and Revolutionizing Transportation (SMART) Grant Program, administered by the DOT Office of the Secretary of Research, provides competitive grants to public agencies for projects focused on demonstrating advanced smart community technologies to improve transportation efficiency and safety. https://www.transportation.gov/grants/. SMART is designed as a two-stage program, where up to $2 million is awarded for initial design and research work in Stage 1, and up to $15 million for Stage 2 implementation projects. Only recipients who have received a Stage 1 grant are eligible for Stage 2 funds.

33.     In mid-December 2024, Minneapolis was notified that DOT would jointly award Minneapolis and Seattle a SMART Stage 2 grant of $14,849,730. This funding was awarded for a project led by the City of Minneapolis called Smart Curbs for Better Access: A Digital, Data-Driven Approach Across Cities. Minneapolis is one of only eight recipients of SMART Stage 2 funding from DOT.

34.     This Minneapolis-led project would build data-driven solutions to improve transportation efficiency and safety in increasingly busy business districts. With the surge in use of food-delivery services and e-commerce, businesses receive more deliveries and send out more

DECLARATION OF TIMOTHY SEXTON - 11
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

products for delivery.  Residents and visitors also increasingly use rideshare services.  As a result, demand for limited curb parking space has grown, and data shows an increase in curb parking violations, circling and rerouting when delivery drivers cannot find available parking in load zones, and delays in deliveries to businesses.

35.    Minneapolis plans to use SMART Stage 2 grant funds to create cutting-edge digital tools to better manage curb space.  The planned project includes expanding the use of sensors and cameras to continuously measure curb usage, and development of apps that would provide real-time information to delivery drivers and others about the availability, occupancy, and pricing of curb parking space.  These tools will benefit residents and visitors to the city by reducing traffic congestion, and emissions from motorists searching for parking. Improved curb management will also promote economic activity through better access to adjacent businesses.  In addition, the project plan includes development of resources and a toolkit for other cities based on lessons Minneapolis and Seattle learn as they implement the shared project.

36.    Loss of the SMART Stage 2 grant would mean eliminating the planned project. Not only would this mean continued and likely worsened inefficiencies, safety risks, and deterioration of air quality as drivers, pedestrians, and others compete for limited curb resources in Minneapolis and Seattle, it would also jeopardize curb modernization in other cities by depriving them of the resources and materials Minneapolis and Seattle would have developed and shared as part of the project.  Uncertainty about whether Minneapolis would receive the SMART Stage 2 funds would result in delay and disruption to the planned project, because the City cannot move forward with hiring the three full-time personnel or purchasing the cameras, sensors, and other equipment needed to implement the project if the availability of funds is uncertain.

DECLARATION OF TIMOTHY SEXTON - 12
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

37.     On May 13, 2025, DOT sent Minneapolis a proposed grant agreement for the City to sign.  The proposed agreement incorporates by reference several executive orders in their entirety, including Executive Order 14168 (Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); and Executive Order 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity).  Attached hereto as **Exhibit D** is a true and correct copy of the U.S. Department of Transportation Exhibits to Ost-R Smart Grant Agreements dated May 09, 2025, and the General Terms and Conditions Articles 7-30 dated May 09, 2025.

38.     The city has not yet responded to these grant documents.  There is significant urgency related to the SMART grant funding.  When the City was notified about the grant award on March 28, 2025, DOT advised the City that it wanted the documents signed "immediately."  In fact, the period of performance listed in the grant agreement started May 15, 2025, which was last week.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this _19_ day of May, 2025 in Minneapolis, Minnesota

Timothy Sexton

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

**CERTIFICATE OF SERVICE**

2

3    I hereby certify that on May 21, 2025, I served a true and correct copy of the foregoing

4    document on the following parties by the method(s) indicated below:

5

| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants Scott Turner, U.S.*<br>*Dept. of Housing and Urban Development,*<br>*Sean Duffy, U.S. Dept. of Transportation,*<br>*Tariq Bokhari, the Federal Transit*<br>*Administration, Gloria M. Shepherd, the*<br>*Federal Highway Administration, Chris*<br>*Rocheleau, the Federal Aviation*<br>*Administration, Drew Feeley, the Federal*<br>*Railroad Administration* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |
| --- | --- |

19    I declare under penalty of perjury under the laws of the United States and the State of

20

21    Washington that the foregoing is true and correct.

22    DATED this 21st day of May, 2025.

23                                   */s/ Gabriela DeGregorio*
                                      Gabriela DeGregorio
24                                    Litigation Assistant
                                      Pacifica Law Group LLP
25

26

27

CERTIFICATE OF SERVICE

PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# Exhibit A to Declaration of Timothy Sexton

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
***Updated April 16, 2025***
*Remove this header when Schedules are finalized*

***Note:*** *Prior to completing and submitting the Bridge Investment Program Grant Agreement Schedules, please review the Drafting Instructions and Additional Information sheet. Insert the required information as directed in the* **Red Font** *brackets. There should be no edits to the language in* ***Black Font*** *which is required language for this competitive grant program.*

### FEDERAL HIGHWAY ADMINISTRATION

### BRIDGE INVESTMENT PROGRAM

### SCHEDULES A TO H TO THE GRANT AGREEMENT WITH THE MINNESOTA DEPARTMENT OF TRANSPORTATION FOR THE

### NICOLLET AVENUE BRIDGE OVER MINNEHAHA CREEK REHABILITATION

Only language marked with an "X" is applicable.

__X___ Schedules A to H of the Federal Highway Administration (FHWA) Grant Agreement

_____ Grant Agreement Amendment [insert amendment number]

1 of 16

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

**SCHEDULE A**
**ADMINISTRATIVE INFORMATION**

Only language marked with an "X" is applicable.

__X___ Schedules A to H of the Federal Highway Administration (FHWA) Grant Agreement

_____ Grant Agreement Amendment [insert amendment number]

1.    **Application.**

       See GrantSolutions, Schedule E, and section 23.5 of the General Terms and Conditions.

2.    **Recipient's Unique Entity Identifier.**

       See GrantSolutions and section 22.3 of the General Terms and Conditions.

3.    **Recipient Contact(s).**

       See GrantSolutions.

4.    **FHWA Project Contact(s).**

       See GrantSolutions.

5.    **Payment System.**

       Only language marked with an "X" is applicable.

       USDOT Payment System:

       __X__ FMIS Current Bill (State DOT Recipient)   ____ DELPHI eInvoicing (non-State DOT Recipient )

6.    **Office for Subaward and Contract Authorization.**

       Only language marked with an "X" is applicable.

       For a State DOT Recipient:

       __X___ USDOT Office for Subaward and Contract Authorization: FHWA Division Office

       For a non-State DOT Recipient:

       _____ FHWA Office for Subaward and Contract Authorization:  FHWA Office of Acquisition and Grants Management

2 of 16

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

7.      **Designated Subrecipient.**

Only language marked with an "X" is applicable.

__X___ There is no Designated Subrecipient.

_____ The Designated Subrecipient is: [insert the name of the Designated Subrecipient]

8.      **Progress and Financial Reporting.**

Only language marked with an "X" is applicable.

__X___ Quarterly    _____ Semiannual    _____ Annual

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

**SCHEDULE B**
**PROJECT ACTIVITIES**

1. **General Project Description.**

   All Project description changes from the application must be documented in Schedule E. See the application in GrantSolutions.

2. **Statement of Work.**

   All changes to the statement of work (scope) from the application must be documented in Schedule E. This includes changes to the Project development phases and/or Project components described in the grant application. See the application in GrantSolutions.

GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR
EXECUTION WITHOUT MODIFICATION
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

## SCHEDULE C
## AWARD DATES AND PROJECT SCHEDULE

Only language marked with an "X" is applicable.

__X___ Schedules A to H of the Federal Highway Administration (FHWA) Grant Agreement

_____ Grant Agreement Amendment [insert amendment number]

1. **Award Dates.**

   Budget Period End Date:

   The budget period identifies the period of time from the start date of a funded portion of the award to the end date of that funded portion when eligible costs can be incurred (work performed) on a project for reimbursement with Grant funds under this agreement (2 CFR 200.1). See the Drafting Instructions and Additional Information sheet for more details.

   Only language marked with an "X" is applicable.

   __X___ Federal Obligation Type is Single. Budget Period End Date: [insert month, date, and year].

   _____ Federal Obligation Type is Multiple. See Table.

| Fund Obligation | Budget Period Start Date | Budget Period End Date |
|---|---|---|
| First Fund Obligation [list project development phases using grant funds] | Effective Date of Grant Agreement | [insert month, date, and year] |
| Second Fund Obligation [list project development phases using grant funds] | Effective Date of Grant Agreement Amendment | [insert month, date, and year] |

   Period of Performance End Date:      November 30, 2030.  Also see FMIS.

   The period of performance means the interval between the start and end date of a Federal award. 2 C.F.R. 200.1. See the Drafting Instructions and Additional Information sheet for more details.

2. **Estimated Project Schedule.**

   All changes to the Project schedule in the application must be documented in Schedule E. See the Drafting Instructions and Additional Information sheet for more details.

**Commented [F1]:** Recipient: Please confirm the recipient would be able to use FY 2022 BIP General Funds and obligate ALL BIP grant funds before the September 30, 2025 obligation deadline. If that is the case, the Budget Period End Date cannot be later than the cancellation date in section 7 of schedule F for the FY22 BIP General Funds (September 30, 2030).

**Commented [F2]:** Recipient: This date should be the same date as the Project End Date in FMIS and, as noted in the instruction sheet, the Period of Performance End Date is the final date to incur costs for ALL fund sources necessary to complete the grant project scope of work.

If the FY 2022 BIP General Funds are used, these funds are available for expenditure until their cancellation date on September 30, 2030 as noted in section 7 of schedule F. Please review this date and concur that there are other funds available after September 30, 2030 to cover items between this date and November 30, 2030. Alternatively, this date can be adjusted to match the cancellation date for FY22 BIP General funds (September 30, 2030).

Please review this date and update, as needed.

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
***Updated April 16, 2025***
*Remove this header when Schedules are finalized*

Only language marked with an "X" in the table is applicable.

| Selection | Grant Type | Milestone | Date |
|---|---|---|---|
| X | Capital/Construction | Planned Substantial Completion and Open to Traffic Date: | 11/30/2027 |
|  | Planning | Planned Project Completion Date: | [insert month and year] |
|  | Non-Construction | Planned Project Completion Date: | [insert month and year] |

> **Commented [F3]:** Recipient: Please review this date and update, if needed.

3. **Special Milestone Deadlines.**

If the additional critical dates include railroad coordination agreements that need to be executed for this Project, add a milestone for each agreement, prefixed with "Railroad Coordination Agreement:" See section 21.6 of the General Terms and Conditions.

| Milestone | Deadline Date |
|---|---|
| NEPA Completion Date | [insert month and year] |
| [insert milestone] | [insert month and year] |

> **Commented [F4]:** Recipient: Enter the NEPA Completion Date.

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

## SCHEDULE D
## AWARD AND PROJECT FINANCIAL INFORMATION

Only language marked with an "X" is applicable.

__X___ Schedules A to H of the Federal Highway Administration (FHWA) Grant Agreement

_____ Grant Agreement Amendment [insert amendment number]

1.    **Award Amount.**

Grant Amount:        $34,303,583

2.    **Federal Obligation Information.**

Only language marked with an "X" is applicable.

__X___ Under this grant agreement, the **Federal Obligation Type is Single** and all of the grant funds will be obligated in one obligation.

_____ Under this grant agreement the **Federal Obligation Type is Multiple** and the grant funds will be obligated as identified in the Fund Obligation Table in accordance with section 4.2 of the General Terms and Conditions.

If there are more than two fund obligations, add as many rows as needed.

| Fund Obligation Table | |
|---|---|
| **Portion of the Project** | **Portion of the Grant Amount** |
| First Fund Obligation | [$XXX] |
| Second Fund Obligation | [$XXX] |

3.    **Approved Project Budget.**

Only language marked with an "X" is applicable.

__X___ The Recipient is a State DOT and the Approved Project Budget is in FMIS. Also see schedule E for changes to the Project budget described in the application.

_____ The Recipient is a non-State DOT and the Approved Project Budget is in the Eligible Project Costs table below.

If there is only a single Project component, use only the total column and remove other columns. If there are more than two Project components, add columns.

GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR
EXECUTION WITHOUT MODIFICATION
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

**Eligible Project Costs**

|  | [Project Component 1] | [Project Component 2] | Total |
|---|---|---|---|
| Grant Funds: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| Other Federal Funds: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| State Funds: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| Local Funds: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| In-Kind Match: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| Other Funds: | [ $XXX ] | [ $XXX ] | [ $XXX ] |
| Total: | [ $XXX ] | [ $XXX ] | [ $XXX ] |

> **Commented [F5]:** Recipient: This information is not needed for a project that will be administered in FMIS; therefore, it was not carried over from the draft grant agreement submitted in the previous grant agreement template.

4.    **Approved Pre-award Costs**

Only language marked with an "X" is applicable.

__X___ **None.** The FHWA has not approved under this award any costs incurred under an advanced construction authorization (23 U.S.C. 115), any costs incurred prior to authorization (23 C.F.R. 1.9(b)), or any pre-award costs under 2 C.F.R. 200.458.

_____ **Yes.** The FHWA authorized advance construction. See FMIS.

_____ **Yes.** On [insert month, date, and year], [Recipient] sent a written request to the FHWA for pre-award approval under 2 C.F.R. 200.458 for costs to [insert activity]. The pre-award approval request would allow the Recipient to [describe the reason for pre-award authority]. [Recipient] requested pre-award approval for $XXX in [insert grant program name] Grant funds or non-Federal funds for match.

The FHWA Office of Acquisition and Grants Management determined that the pre-award costs were incurred directly pursuant to the negotiation and in anticipation of the Federal award and were necessary for efficient and timely performance of the scope of work. That office issued a notice to proceed with pre-award costs on [insert month, date, and year].

5.    **General Terms and Conditions.**

(a) In this agreement, "**General Terms and Conditions**" means the content of the document titled "Federal Highway Administration Competitive Grant Program General Terms and Conditions" dated April 22, 2025, which is available at https://www.fhwa.dot.gov/pgc/. The General Terms and Conditions reference the information contained in the schedules A - H to this agreement. The General Terms and Conditions are part of this agreement.

(b) The Recipient states that it has knowledge of the General Terms and Conditions.

(c) The Recipient acknowledges that the General Terms and Conditions impose legally binding terms on the Recipient and that the Recipient's non-compliance with the General Terms and

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

Conditions may result in remedial action which may include but is not limited to terminating the Grant under this grant agreement, disallowing costs incurred for the Project, requiring the Recipient to refund to the FHWA the  Grant under this grant agreement, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

6.      **Special Terms and Conditions.**

Only language marked with an "X" is applicable.

__X___ There are no special terms and conditions.

_____ There are special terms and conditions for this Grant. For each condition, identify the special term title and insert the special term text. Repeat and modify as needed.

**[Special Term Title].**

[special term text]

7.      **Information Contained in the Federal Award**

Notice of Funding Opportunity (NOFO):      693JJ324NF00006      December 20, 2023

Assistance Listings Number (ALN):          20.205 – Highway Planning and Construction

GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR
EXECUTION WITHOUT MODIFICATION
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

### SCHEDULE E
### PROJECT CHANGES

Only language marked with an "X" is applicable.

_____ **No Changes from Application:** If this option is selected, then only complete section 1 of
schedule E.

__X___ **Changes From Application:** The purpose of this section is to clearly and accurately
document the changes in scope, schedule, and budget to establish the parties' knowledge and
acceptance of the changes.

_____ **Grant Agreement Amendment [insert amendment number]:** The purpose of this section is
to clearly and accurately document the changes in scope, schedule, and budget to establish the
parties' knowledge and acceptance of the changes.

1. **Federal Award Description:** Refer to the The Nicollet Avenue Bridge over Minnehaha Creek
   Rehabilitation Project grant application submitted on March 19, 2024 which is incorporated by
   reference to the grant agreement.

2. **Project Changes**

**Scope:** (*see Drafting Instructions and Additional Information sheet for how to document scope
changes*):

**Schedule:** (*see Drafting Instructions and Additional Information sheet for how to document schedule
changes*):

> **Commented [F6]:** Recipient: Following the *Drafting Instructions and Additional Information sheet,* describe the changes here and provide an explanation of the cause of those changes.

The table below compares the Project milestone dates.

Only language marked with an "X" in the table is applicable.

| Selection | Grant Type | Milestone | Application | Agreement | Amendment [insert number] |
|---|---|---|---|---|---|
| X | Capital/ Construction | Planned Substantial Completion and Open to Traffic Date: | 5/31/2027 | 11/30/2027 | [insert month and year] |
| | Planning | Planned Project Completion Date: | [insert month and year] | [insert month and year] | [insert month and year] |

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
***Updated April 16, 2025***
*Remove this header when Schedules are finalized*

| Selection | Grant Type | Milestone | Application | Agreement | Amendment **[insert number]** |
|---|---|---|---|---|---|
| | Non-Construction | Planned Project Completion Date: | [insert month and year] | [insert month and year] | [insert month and year] |

**Budget**: (*see Drafting Instructions and Additional Information sheet for how to document budget changes*):

The table below provides a summary comparison of the Project budget.

| Fund Source | Application $ | % | Agreement $ | % | Amendment [insert number] | |
|---|---|---|---|---|---|---|
| **Previously Incurred Costs** | | | | | | |
| Federal Funds | | | | | | |
| Non-Federal Funds | | | | | | |
| Total Previously Incurred Costs | | | | | | |
| **Future Eligible Project Costs** | | | | | | |
| Grant Funds | | | | | | |
| Other Federal Funds | | | | | | |
| Non-Federal Funds | | | | | | |
| Total Future Eligible Project Costs | | | | | | |
| Total Project Costs | | | | | | |

**Other:** (*see Drafting Instructions and Additional Information sheet for how to document other changes*):

11 of 16

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

**SCHEDULE F**
**GRANT PROGRAM DESIGNATIONS**

1.     **Urban or Rural Designation**

   Only language marked with an "X" is applicable.

   _____ Not Applicable        __X___ Urban        _____ Rural

2.     **Funding Source.**

   Only language marked with an "X" is applicable.

   _____ Highway Trust Fund        __X___ General Funds

   _____ Multiple Fund Sources (see table below)

| Fiscal Year | Fund Source | Amount |
|---|---|---|
|  |  | [ $XXX ] |
|  |  | [ $XXX ] |

3.     **Security Risk Designation.**

   Security Risk Designation:   Low designated in accordance with section 17.1 of the General Terms and Conditions.

4.     **Project Designation.**

   Designation:   Capital/Construction

5.     **Funding Act.**

   Infrastructure Investment and Jobs Act (Pub. L. 117–58, November 15, 2021), Section 11118, codified at 23 U.S.C. 124; and

   Highway Infrastructure Program (HIP) General Funds (IIJA, division J, title VIII, HIP heading, paragraph (4)).

6.     **Funds Obligation.**

   FY 2022 Funds Obligation Deadline: September 30, 2025 for all sources of FY 2022 BIP funds

**Commented [F7]:** Recipient: Please confirm the recipient would be able to obligate all BIP grant funds before the September 30, 2025 deadline.

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

7.      **Cancellation Date.**

IIJA/BIP General Funds for FY 2022: September 30, 2030

**Commented [F8]:** Recipient: Please confirm the recipient would be able to expend all BIP grant funds before the September 30, 2030 cancellation date.

GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR
EXECUTION WITHOUT MODIFICATION
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

## SCHEDULE G
## GRANT PERFORMANCE MEASUREMENT INFORMATION

Only language marked with an "X" is applicable.

__X___  Schedules A to H of the Federal Highway Administration (FHWA) Grant Agreement

_____  Grant Agreement Amendment [insert amendment number]

**Study Area:** Nicollet Avenue Bridge over Minnehaha Creek in Minneapolis. The bridge deck condition will be used as a performance measure.  The condition of the bridge is assessed during each bridge safety inspection (NBI Item 58 Deck Condition Rating).  The current deck condition code on a scale of 0 to 9 is a 4.  A condition rating of a 4 represents a component in "POOR CONDITION – advanced section loss, deterioration, spalling or scour.

**Baseline Measurement Date:** The last bridge safety inspection prior to construction activities will be in July/August of 2025.  That assessment will be used as the baseline measurement. [insert month, date, and year]

**Baseline Report Date:** September/October of 2025 should reflect the baseline report date. [insert month, date, and year]

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Bridge Deck Condition | NBI Ratings<br><br>Examine and report on the condition of the bridge(s) using FHWA performance measures for bridges classified in Good, Fair and Poor condition by deck area | Annual |
| [Insert Performance Measure] | [Performance Measure Category]<br><br>[Performance Measure Description] | [quarterly or annual] |

**Commented [F9]:** Recipient: The purpose of this section is to describe where you plan to collect the data for the performance measure. Please confirm if this description of the project location is where you plan to collect the performance measure data, or modify, as needed.

**Commented [F10]:** Recipient: Please review these dates and provide a date in month, day, and year format as indicated in the template.

**GRANTSOLUTIONS BRIDGE INVESTMENT PROGRAM SCHEDULES TEMPLATE. NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Updated April 16, 2025*
*Remove this header when Schedules are finalized*

**SCHEDULE H**
**LABOR AND WORK**

1.    **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| | The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. *(Describe robust job creation and identify the good-paying jobs in the supporting narrative below.)* |
| X | The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. *(Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.)* |
| | The Recipient or a project partner will partner and engage with local unions or other worker-based organizations in the development and lifecycle of the project, including through evidence of project labor agreements and/or community benefit agreements. *(Describe the partnership or engagement with unions and/or other worker-based organizations and agreements in the supporting narrative below.)* |
| | The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. *(Describe the partnership and workforce strategies in the supporting narrative below.)* |
| | The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described in schedule E. *(Identify the relevant* |

15 of 16

|  | *actions from schedule E in the supporting narrative below. See the Drafting Instructions and Additional Information sheet for more information.)* |
|---|---|
|  | The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

2.    **Supporting Narrative.**

The City of Minneapolis maintains programs to promote workforce development through its public works projects. For example, the CareerWorks program connects job applicants to coaches that help with determining eligibility and general aid through the application process. The program aims to empower disenfranchised applicants with the tools to overcome barriers to employment, enroll in training, and contribute to life-long career goals. The City's Public Works trainee programs enable hands-on meaningful experience and expands access to gain qualifications for future public works employment and beyond. In addition, the trainee programs offer full-time paid and traditional city benefits to appropriately and fairly compensate trainees.

Commented [F11]: Recipient: Please review and revise to align with Executive Orders.  Also, see Article 18 of the General T&C for additional requirements regarding this schedule and EO 14173.

# Exhibit B to Declaration of Timothy Sexton


U.S. Department of Transportation
**Federal Railroad Administration**

---

## Attachment 1

---

# GENERAL TERMS AND CONDITIONS

Revision Date: April 16, 2025



**U.S. Department of Transportation**
**Federal Railroad Administration**

# General Terms and Conditions
# Table of Contents

ATTACHMENT 1 ........................................................................................................................... 7

ARTICLE 1:  TERMS AND CONDITIONS ....................................................................................... 7

    1.1    General Terms and Conditions ..................................................................................... 7

    1.2    Project-Specific Terms and Conditions ........................................................................ 7

    1.3    Program-Specific Clauses ............................................................................................ 7

    1.4    Exhibits ......................................................................................................................... 8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES ...................................................................... 8

    2.1    FRA Role ....................................................................................................................... 8

    2.2    FRA Professional Staff .................................................................................................. 8

ARTICLE 3:  RECIPIENT ROLE .................................................................................................... 9

    3.1    Representations and Acknowledgments on the Project ............................................... 9

    3.2    Representations on Authority and Capacity ................................................................. 9

    The Recipient represents that: ................................................................................................ 9

    3.3    FRA Reliance .............................................................................................................. 10

    3.4    Project Delivery .......................................................................................................... 10

    3.5    Rights and Powers Affecting the Project ................................................................... 10

    3.6    Notification of Changes to Key Personnel ................................................................. 11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS .......................................... 11

    4.1    Federal Award Amount ............................................................................................... 11

    4.2    Federal Obligations .................................................................................................... 11

    4.3    Maximum Funding Amount ......................................................................................... 11

    4.4    Budget Period .............................................................................................................. 11

    4.5    Period of Performance ................................................................................................ 11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ............................. 11

    5.1    Notification Requirement ............................................................................................. 11

    5.2    Scope and Statement of Work Changes ..................................................................... 12

    5.3    Schedule Changes ...................................................................................................... 12

    5.4    Budget Changes .......................................................................................................... 12

    5.5    Project Cost Savings ................................................................................................... 13

    5.6    FRA Acceptance of Changes ...................................................................................... 13



U.S. Department of Transportation
**Federal Railroad Administration**

ARTICLE 6:  GENERAL REPORTING TERMS ....................................................................................... 14

  6.1   Alternative Reporting Methods ............................................................................... 14

  6.2   Paperwork Reduction Act Notice ............................................................................ 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING ................................................................. 14

  7.1   Quarterly Project Progress Reports and Recertifications ........................................ 14

  7.2   Final Progress Reports and Financial Information ................................................... 15

  7.3   Real Property Reporting .......................................................................................... 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING ............................................... 15

  8.1   Baseline Performance Measurement ...................................................................... 15

  8.2   Post-Project Performance Measurement ................................................................ 15

  8.3   Project Outcomes Report ........................................................................................ 16

  8.4   General Performance Measurement Requirements ................................................ 16

  8.5   Outcome Measurement and Reporting Survival ..................................................... 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES ........................................................................... 16

  9.1   Noncompliance Determinations ............................................................................. 16

  9.2   Remedies ................................................................................................................ 17

  9.3   Other Oversight Entities .......................................................................................... 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION ................................................... 18

  10.1  Suspension of Award Activities ............................................................................... 18

  10.2  FRA Termination ..................................................................................................... 19

  10.3  Closeout Termination .............................................................................................. 19

  10.4  Post-Termination Adjustments ............................................................................... 19

  10.5  Non-Terminating Events .......................................................................................... 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS ........................... 20

  11.1  Recipient Monitoring and Record Retention .......................................................... 20

  11.2  Financial Records and Audits .................................................................................. 20

  11.3  Internal Controls ..................................................................................................... 21

  11.4  FRA Record Access .................................................................................................. 21

  11.5  Site Visits ................................................................................................................ 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING ...................................................................... 21

  12.1  Buy America ............................................................................................................ 21

  12.2  Small and Disadvantaged Business Requirements .................................................. 22

  12.3  Engineering and Design Services [Reserved] .......................................................... 22



U.S. Department of Transportation
**Federal Railroad Administration**

12.4   Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ...22

12.5   Pass-Through Entity Responsibilities .............................................................. 22

12.6   Local Hiring Preference for Construction Jobs............................................... 22

12.7   Procurement ....................................................................................................... 22

ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS ............................................ 23

13.1   Limitation of Federal Award Amount ............................................................. 23

13.2   Project Costs ....................................................................................................... 23

13.3   Timing of Project Costs ..................................................................................... 23

13.4   Recipient Recovery of Federal Funds............................................................. 23

13.5   Unexpended Agreement Federal Funds ........................................................ 23

13.6   Interest Earned .................................................................................................. 24

13.7   Timing of Payments to the Recipient............................................................. 24

13.8   Payment Method ............................................................................................... 24

13.9   Information Supporting Expenditures ........................................................... 24

13.10  Reimbursement Request Timing Frequency................................................. 24

13.11  Program Income ................................................................................................ 24

ARTICLE 14:  PROPERTY AND EQUIPMENT ......................................................................... 25

14.1   General Requirements ...................................................................................... 25

14.2   Relocation and Real Property Acquisition .................................................... 25

14.3   Use for Originally Authorized Purpose.......................................................... 25

14.4   Maintenance ...................................................................................................... 25

14.5   Real Property Disposition................................................................................. 26

14.6   Equipment Disposition ..................................................................................... 26

14.7   Recordkeeping ................................................................................................... 26

14.8   Encumbrance ..................................................................................................... 26

ARTICLE 15:  AMENDMENTS ............................................................................................... 27

15.1   Bilateral Amendments ..................................................................................... 27

15.2   FRA Unilateral Amendments .......................................................................... 27

15.3   Other Amendments .......................................................................................... 27

ARTICLE 16:  [RESERVED] .................................................................................................... 27

ARTICLE 17:  [RESERVED] .................................................................................................... 27

ARTICLE 18:  LABOR AND WORK ........................................................................................ 27

18.1   Labor and Work.................................................................................................. 27

**U.S. Department of Transportation**
**Federal Railroad Administration**

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ........................................... 28

19.1   Critical Infrastructure Security and Resilience ............................................................... 28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY
REQUIREMENTS ........................................................................................................................ 28

20.1   Uniform Administrative Requirements for Federal Awards ...................................... 28

20.2   Federal Law and Public Policy Requirements ........................................................... 28

20.3   Federal Freedom of Information Act ......................................................................... 29

20.4   History of Performance ............................................................................................ 29

20.5   Whistleblower Protection ......................................................................................... 29

20.6   External Award Terms and Obligations .................................................................... 30

20.7   Incorporated Certifications ...................................................................................... 30

ARTICLE 21:  ASSIGNMENT ...................................................................................................... 30

21.1   Assignment Prohibited ............................................................................................. 30

ARTICLE 22:  WAIVER .............................................................................................................. 30

22.1   Waivers ..................................................................................................................... 30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS .............................................................. 31

23.1   Disclaimer of Federal Liability .................................................................................. 31

23.2   Environmental Review .............................................................................................. 31

23.3   Project Maintenance Requirement ........................................................................... 32

23.4   Appropriations Act Requirements ............................................................................ 32

23.5   Standards of Conduct ............................................................................................... 32

23.6   Changed Conditions of Performance ........................................................................ 33

23.7   Litigation .................................................................................................................. 33

23.8   [Reserved] ................................................................................................................ 33

23.9   Equipment and Supplies ........................................................................................... 33

23.10  Safety and Technology Data ..................................................................................... 33

23.11  Intellectual Property ................................................................................................ 33

23.12  Liquidation of Recipient Obligations ........................................................................ 33

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS ..................................................................... 34

24.1   Agreement ................................................................................................................ 34

24.2   Construction ............................................................................................................. 34

24.3   Integration ................................................................................................................ 34

24.4   Definitions ................................................................................................................ 34

U.S. Department of Transportation
**Federal Railroad Administration**

24.5    Calendar Dates ........................................................................................................ 35

24.6    Communication in Writing ...................................................................................... 35

24.7    Severability ............................................................................................................. 35

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE ..................................................... 35

25.1    Counterparts .......................................................................................................... 35

25.2    Effective Date ......................................................................................................... 36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ................................................................................. 36

26.1    Interstate Rail Compacts Grant Program ............................................................... 36

26.2    Railroad Crossing Elimination Program Clauses .................................................... 38

26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses.............................. 40

26.4    Restoration and Enhancement Grants Clauses........................................................ 42

26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses ..................................................................................................... 45

U.S. Department of Transportation
**Federal Railroad Administration**

# ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 C.F.R. part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 C.F.R. part 1201.

# ARTICLE 1:  TERMS AND CONDITIONS

**1.1     General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2     Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3     Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

U.S. Department of Transportation
**Federal Railroad Administration**

(e) For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

**1.4    Exhibits**

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

**2.1    FRA Role**

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

**2.2    FRA Professional Staff**

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3:  RECIPIENT ROLE

**3.1        Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2        Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3    FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4    Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5    Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

10

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  The Recipient will act promptly, in a manner acceptable to FRA, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this Agreement.

**3.6    Notification of Changes to Key Personnel**

The Recipient will notify the FRA Grant Manager in writing within 30 days of any change in key personnel who are identified in the Application, which may require an amendment to this Agreement.

## ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1    Federal Award Amount**

Under this Agreement, FRA awards a Grant to the Recipient in the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.2    Federal Obligations**

This Agreement obligates for the budget period the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.3    Maximum Funding Amount**

This Agreement funds the Project at the lesser amount of the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement, or the FRA maximum contribution percentage of the total Project cost identified in Article 6.5 of Attachment 2 of this Agreement.

**4.4    Budget Period**

The budget period for this award begins on the date of this Agreement and ends on the end date that is listed in Section 5 on the Agreement cover sheet. In this Agreement, "budget period" is used as defined at 2 C.F.R. § 200.1.

**4.5    Period of Performance**

The Period of Performance for this award is listed in Section 4 on the Agreement cover sheet. In this Agreement, "Period of Performance" is used as defined at 2 C.F.R. § 200.1.

## ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1    Notification Requirement**

The Recipient will notify the FRA Grant Manager and Project Manager by electronic correspondence within 30 days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project, including change in authority. In that notification, the Recipient will describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this Section 5.1 is separate from any requirements under this Article 5 that the Recipient request an amendment to this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

5.2     **Scope and Statement of Work Changes**

If the Project's activities differ from the activities described in Article 4 of Attachment 2 of this Agreement, then the Recipient will notify FRA in writing of the change, which may require an amendment to this Agreement.

5.3     **Schedule Changes**

If one or more of the following conditions are satisfied, then the Recipient will request an amendment to this Agreement to update the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement:

(a)  a completion date for the Project or a component of the Project is listed in the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed;

(b)  a schedule change would require the budget period to continue after the end of the budget period defined in Section 4.4; or

(c)  a schedule change would require the Period of Performance to continue after the end of the Period of Performance defined in Section 4.5. The Recipient must submit requests to extend the Period of Performance not later than 90 days before the end of the Period of Performance.

For other schedule changes, the Recipient will notify the Grant Manager in writing.

5.4     **Budget Changes**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)  that increase does not affect the Recipient's obligation under this Agreement to complete the Project;

(2)  any additional funds the Recipient contributes to complete the Project are subject to the requirements of this Agreement in the same manner as the Non-Federal Funds identified in Article 6.5 of Attachment 2 of this Agreement; and

(3)  FRA will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient will notify FRA in writing if the total Project cost, as described in Table 6-A of Attachment 2 of this Agreement, amount increases, which may result in an amendment to this Agreement.

(c)  The Recipient will notify FRA in writing if the Non-Federal Funds amount decreases, which may result in an amendment to this Agreement.

(d)  For all other budget changes, the Recipient will follow the applicable procedures and document the changes in writing.

12

U.S. Department of Transportation
**Federal Railroad Administration**

5.5    **Project Cost Savings**

(a)  If there are Project Cost Savings, then the Recipient may notify FRA in writing of its intent to include in the Project and complete with the Project Cost Savings the additional activities within the scope of this award that are specified in the Additional Task(s) in Article 4 of Attachment 2 of this Agreement. The Recipient will complete the Additional Task(s) after FRA provides a written approval. An amendment to this Agreement is not required to proceed with the Additional Task(s).

(b)  If there are Project Cost Savings, and there are not Additional Task(s) identified in Article 4 of Attachment 2 of this Agreement, then the Recipient may propose a new task that is within the scope of this award and request an amendment to add the new task to this Agreement and complete it with Project Cost Savings.

(c)  In this Agreement, **"Project Cost Savings"** means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs. There are no Project Cost Savings prior to completion of the Project or if the actual costs to complete the Project are equal to or greater than the total Project cost listed in Section 6.5 of Attachment 2 of this Agreement.

(d)  If there are Project Cost Savings and either the Recipient does not make a proposal or FRA does not accept the Recipient's proposal under (a) of this Section 5.5, then:

(1)  The Recipient will provide written notice to FRA and reduce the Federal Share by the Project Cost Savings, which may result in an amendment to this Agreement; and

(2)  If the reduced Federal Share reduces this award and the Recipient received reimbursed costs exceeding the appropriate amount under the reduced award, the Recipient will refund the difference between the reimbursed costs and the reduced award.

(e)  In this Agreement, "Federal Share" means the sum of the Agreement Federal Funds and Other Federal Funds amounts that are identified in the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement.

(f)  The Recipient acknowledges that amounts that are required to be refunded under this Section constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

5.6    **FRA Acceptance of Changes**

FRA may accept or reject changes requested under this Article 5, and in doing so may elect to consider only the interests of the grant program and FRA. The Recipient acknowledges that any request under this Article 5 does not amend, modify, or supplement this Agreement unless FRA

**U.S. Department of Transportation**
**Federal Railroad Administration**

accepts the request and the parties amend this Agreement under Section 15.1 of this Attachment 1.

## ARTICLE 6:  GENERAL REPORTING TERMS

**6.1    Alternative Reporting Methods**

FRA may establish processes for the Recipient to submit reports required by this Agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient will use the processes required by FRA.

**6.2    Paperwork Reduction Act Notice**

Under 5 C.F.R. § 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (OMB). Notwithstanding any other term of this Agreement, the due date for any information collections required under this Agreement, including the reporting requirements in Articles 7 and 8, is the later of (1) the due date stated with the requirement and (2) the 30th day after OMB approves that information collection.

## ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING

**7.1    Quarterly Project Progress Reports and Recertifications**

(a)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a complete FRA Form 34[1] Quarterly Project Progress Report and Recertification that contains, for the previous quarter:

(1)  a certification that the Recipient is in compliance with 2 C.F.R. § 200.303 (Internal Controls) and 2 C.F.R. part 200, Subpart F (Audit Requirements);

(2)  the certification required under 2 C.F.R. § 200.415(a); and

(3)  a certification that the Recipient is complying with any environmental mitigation commitments and Section 106 compliance obligations.

If the date of this Agreement is in the final month of a quarter, then the Recipient will submit the first Quarterly Project Progress Report and Recertification in the quarter that begins after the date of this Agreement.

(b)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a Federal Financial Report (SF-425) covering the previous quarter.

---

[1] FRA Form 34 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

U.S. Department of Transportation
**Federal Railroad Administration**

**7.2    Final Progress Reports and Financial Information**

No later than 120 days after the end of the Period of Performance, the Recipient will submit:

(a)  a final Quarterly Project Progress Report and Recertification in the format and with the content described in Section 7.1(a) of this Attachment 1 for each Quarterly Project Progress Report and Recertification;

(b)  a final SF-425 through GrantSolutions;

(c)  a Final Performance Report FRA Form 33 as provided by FRA[2] ; and

(d)  any other information required under FRA's award closeout procedures.

**7.3    Real Property Reporting**

The Recipient will comply with the reporting obligations in 2 C.F.R. § 200.330, as directed by FRA.

## ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING

**8.1    Baseline Performance Measurement**

Within one year before the start of work on the Project, the Recipient will collect baseline data for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement. Within six months of the start of the Period of Performance, the Recipient will submit to FRA a Baseline Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure. The Recipient will also provide FRA access to the data collected in machine-readable format.

**8.2    Post-Project Performance Measurement**

For each performance measure that is listed in Article 7 of Attachment 2 of this Agreement, the Recipient will collect data and submit to FRA a Post-Project Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure, at the frequency and for the duration identified in Article 7 of Attachment 2 of this Agreement. The Recipient will also provide FRA access to the data collected in machine-readable format. If an external factor affects a performance measure, the Recipient will identify that external factor in the Post-Project Performance Measurement Report and discuss the external factor's influence on the performance measure. In the Post-Project Performance Report, the Recipient will compare the actual project performance against the pre-project (baseline) performance and expected post-project performance as described in Table 7-A of Attachment 2 of this Agreement.

---

[2]FRA Form 33 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

U.S. Department of Transportation
**Federal Railroad Administration**

8.3     **Project Outcomes Report**

Where indicated in Article 7 of Attachment 2 of this Agreement, the Recipient will submit to FRA, not later than January 31st of the year that follows the final year during which data were collected, a Project Outcomes Report that contains:

(a)  an analysis of the impacts of the Project, including a comparison of the baseline performance measurement data collected under Section 8.1 of this Attachment 1 with the post-project performance measurement data that the Recipient reported in the final Post-Project Performance Measurement Report required under Section 8.2 of this Attachment 1;

(b)  for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement, an analysis of the accuracy of the projected outcome; and

(c)  all data collected under Sections 8.1 and 8.2 of this Attachment 1;

(d)  additional information as directed.

8.4     **General Performance Measurement Requirements**

The Recipient will ensure that all data collection for each performance measure identified in Article 7 of Attachment 2 of this Agreement is completed in a manner consistent with the description, location, and other attributes associated with that performance measure.

8.5     **Outcome Measurement and Reporting Survival**

The data collection and reporting requirements in Article 8 of this Attachment 1 survive the termination of this Agreement. FRA may consider the Recipient's compliance with this requirement after closeout of the grant in its evaluation of future applications for Federal financial assistance.

## ARTICLE 9:  NONCOMPLIANCE AND REMEDIES

9.1     **Noncompliance Determinations**

(a)  Notice of Proposed Determination. If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1)  explains the noncompliance;

(2)  describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3)  describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

16

U.S. Department of Transportation
**Federal Railroad Administration**

(4)  if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b)  Response to Notice of Proposed Determination. The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)  accept the proposed remedy;

(2)  acknowledge the noncompliance, but propose an alternative remedy;

(3)  acknowledge the noncompliance and agree to cure or take corrective action; or

(4)  dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c)  Notice of Final Determination. After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination. To make a final determination, FRA must provide a written notice to the Recipient that:

(1) states what the final determination is (e.g., noncompliance or compliance);

(2) states the basis for the final determination; and

(3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e)  FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.

**9.2    Remedies**

(a)  If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

(1)  additional conditions on the award;

(2)  requiring the Recipient to prepare and implement a corrective action plan;

17

U.S. Department of Transportation
**Federal Railroad Administration**

(3) directing the Recipient to stop work;

(4) any remedy permitted under 2 C.F.R. §§ 200.339–200.340, including withholding of payments ; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(5) any other remedy legally available.

(b) The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

(c) Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 C.F.R. part 200, including 2 C.F.R. §§ 200.339-200.240.  FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.

**9.3    Other Oversight Entities**

Nothing in Article 9 of this Attachment 1 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION

**10.1    Suspension of Award Activities**

(a) If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b) If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of non-compliance under Section 9.1 of this Attachment 1:

(1) what project activities, if any, will take place during the period of suspension;

(2) what costs FRA will reimburse if the suspension is lifted and the award resumed;

(3) what corrective actions must occur during the suspension; and

(4) FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

U.S. Department of Transportation
**Federal Railroad Administration**

(c)  The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.

**10.2    FRA Termination**

(a)  FRA may terminate this Agreement and all its obligations under this Agreement if any of the following occurs:

(1)  the Recipient fails to obtain or contribute the required Non-Federal Funds, or alternatives approved by FRA, as provided in this agreement and consistent with Article 6 of Attachment 2 of this Agreement;

(2)  the Recipient fails to meet a milestone by six months after the completion date listed in Article 5 of Attachment 2 of this Agreement and the Recipient fails to request an amendment to this Agreement pursuant to Section 5.3 of this Attachment 1;

(3)  the Recipient fails to comply with the terms and conditions of this Agreement;

(4)  there are changes to the Project that FRA determines are inconsistent with FRA's basis for selecting the Project to receive the award; or

(5)  FRA determines that termination of this Agreement is in the public interest.

(b)  The Recipient may request that FRA terminate the Agreement, which may result in FRA determining noncompliance and imposing remedies pursuant to Article 9 of this Attachment 1.

**10.3    Closeout Termination**

(a)  This Agreement terminates on Project Closeout.

(b)  In this Agreement, "Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 C.F.R. § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

**10.4    Post-Termination Adjustments**

The Recipient acknowledges that under 2 C.F.R. §§ 200.345–200.346, termination of this Agreement does not extinguish FRA's authority to disallow costs, including costs that FRA reimbursed before termination, and recover funds from the Recipient.

**10.5    Non-Terminating Events**

(a)  The end of the budget period described under Section 4.4 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

19

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  The end of the Period of Performance described under Section 4.5 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

## ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1      Recipient Monitoring and Record Retention**

(a)  The Recipient will monitor activities under this award, including activities under subawards and contracts, to ensure:

(1)  that those activities comply with this agreement; and

(2)  that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient will monitor the activities of the Subrecipient in compliance with 2 C.F.R. §200.332(e).

(c)  The Recipient will retain and provide access to records relevant to the award during the course of the Project and for three years after closeout or longer, as required under 2 C.F.R. § 200.334.

(d)  The Recipient will adhere to the recording and recordkeeping requirements set forth in 2 C.F.R. §§ 200.334–200.338.  Project Closeout does not alter these requirements.

**11.2      Financial Records and Audits**

(a)  The Recipient will keep all Project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the Project.

(b)  The Recipient will keep accounts and records described under Section 11.2(a) of this Attachment 1 in accordance with a financial management system that meets the requirements of 2 C.F.R. §§ 200.302–200.307 and 2 C.F.R. part 200, subpart F and will facilitate an effective audit in accordance with 31 U.S.C. §§ 7501–7506.

(c)  The Recipient will separately identify expenditures under the award in financial records required for audits under 31 U.S.C. §§ 7501–7506. Specifically, the Recipient will:

(1)  list expenditures separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including the fiscal year in the format "FY 202X" in the program name; and

(2)  list expenditures on a separate row under Part II, Item 1 (Federal Awards Expended During Fiscal Period) of Form SF-SAC, including "FY 202X" in Column C (Additional Award Identification).

U.S. Department of Transportation
**Federal Railroad Administration**

(d) If the Recipient expends $1,000,000 or more in Federal awards during the Recipient's fiscal year, a single or program audit will be conducted for that year, consistent with 2 C.F.R. §§ 200.501(a) and 200.512(c).

**11.3    Internal Controls**

The Recipient will establish and maintain internal controls as required under 2 C.F.R. § 200.303.

**11.4    FRA Record Access**

FRA may access Recipient records related to this award under 2 C.F.R. § 200.337.

**11.5    Site Visits**

FRA may conduct site visits to review Project activities, accomplishments, and management control systems and to provide technical assistance to the Recipient. The Recipient will provide or ensure reasonable, safe, and convenient access to FRA for any such site visit. FRA will conduct all site visits in such a manner as will not unduly delay work conducted by the Recipient, Subrecipient, or contractor.

## ARTICLE 12:  CONTRACTING AND SUBAWARDING

**12.1    Buy America**

(a)  For infrastructure projects, steel, iron, manufactured goods, and construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act (Buy American Act), Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(b)  For all other projects, the Recipient's acquisition of steel, iron, and manufactured goods with funding provided through this Agreement is subject to the requirements set forth in the Buy American Act, 41 U.S.C. §§ 8301-8305. The Recipient also represents that it has never been convicted of violating the Buy American Act nor will it make funding received under this Agreement available to any person or entity who has been convicted of violating the Buy American Act.

(c)  Under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(d)  Under 2 C.F.R. § 200.322, the Recipient should, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders f under this award.

U.S. Department of Transportation
**Federal Railroad Administration**

**12.2    Small and Disadvantaged Business Requirements**

The Recipient will expend all funds under this award in compliance with the requirements at 2 C.F.R. § 200.321 (Contracting with small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms).

**12.3    Engineering and Design Services [Reserved]**

**12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 C.F.R. § 200.216 prohibit the Recipient and all Subrecipients from procuring or obtaining certain telecommunications and video surveillance equipment or services under this award.

**12.5    Pass-Through Entity Responsibilities**

(a)  If the Recipient makes a subaward under this award, the Recipient will comply with the requirements for pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. §§ 200.331–200.333, regardless of whether the Recipient is also a Pass-Through Entity as defined in 2 C.F.R. § 200.1.

(b)  The Recipient will report any subaward obligation of $30,000 or more in Federal funds in USASpending.gov consistent with the Federal Funding Accountability and Transparency Act, Pub. L. 109-282.

(c)  The Recipient is accountable for performance under this award, the appropriate expenditure of funds, and other requirements under this Agreement. The Recipient is responsible for any non-compliance under the award and for compliance with any remedies imposed.

**12.6    Local Hiring Preference for Construction Jobs**

Under Section 25019 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, div. B, tit. V (2021), a Recipient or Subrecipient may implement a local or other geographical or economic hiring preference relating to the use of labor for construction of a project funded by this grant if funded under title 49 or 23 United States Code, including prehire agreements, subject to any applicable State and local laws, policies, and procedures. The use of such a local or other geographical or economic hiring preference in any bid for a contract for the construction of a project funded by this grant shall not be considered to unduly limit competition. Project labor agreements should be consistent with the definition and standards outlined in Executive Order 13502. For additional information, see https://www.transportation.gov/sites/dot.gov/files/2023-05/Creating-Local-Construction-Workforce.pdf.

**12.7    Procurement**

The Recipient may acquire property, goods, or services in connection with the Project. If the Recipient is a State or Indian Tribe, then it will follow the same policies and procedures it uses for procurements with non-Federal funds in compliance with 2 C.F.R. § 200.317. A Subrecipient of a State will follow the policies and procedures allowed by that State when procuring property

**U.S. Department of Transportation**
**Federal Railroad Administration**

and services under this award consistent with 2 C.F.R. § 1201.317, notwithstanding 2 C.F.R. § 200.317. An entity that is not a State or Indian Tribe, or Subrecipient of a State or Indian Tribe, will comply with 2 C.F.R. §§ 200.318–200.327, and applicable supplementary USDOT or FRA directives and regulations. The Recipient will provide technical specifications and requirements to FRA for review upon request.

## ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount**

Under this award, FRA will not provide funding in an amount greater than the Agreement Federal Funds. The Recipient acknowledges that FRA is not liable for payments exceeding that amount, and the Recipient will not request reimbursement of costs exceeding that amount.

**13.2    Project Costs**

This award is subject to the cost principles at 2 C.F.R. part 200, subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs**

(a)  The Recipient will not charge to this award costs that are incurred after the budget period.

(b)  The Recipient will not charge to this award costs that were incurred before the date of this Agreement unless those costs are identified as approved pre-award costs in Section 6.6 of Attachment 2 of this Agreement and would have been allowable if incurred during the budget period. This limitation applies to pre-award costs under 2 C.F.R. § 200.458. This agreement hereby terminates and supersedes any previous FRA approval for the Recipient to incur costs under this award for the Project. Section 6.6 of Attachment 2 of this Agreement is the exclusive FRA approval of costs incurred before the date of this Agreement.

(c)  The Recipient may request approval of pre-award costs in a written request that demonstrates the purpose and amount of the costs, compliance with 2 C.F.R. § 200.458, and whether such costs would otherwise serve as Non-Federal Funds.

**13.4    Recipient Recovery of Federal Funds**

The Recipient will make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if FRA determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner. The Recipient will not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by FRA.

**13.5    Unexpended Agreement Federal Funds**

Any Agreement Federal Funds that are obligated but not expended on allocable, allowable costs remain the property of the United States.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**13.6    Interest Earned**

Interest earned on advances of Agreement Federal Funds is not program income.

**13.7    Timing of Payments to the Recipient**

(a)  Reimbursement is the payment method, unless otherwise approved by FRA.

(b)  The Recipient will not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.8    Payment Method**

(a)  The Recipient will use the DELPHI e-Invoicing System (https://www.dot.gov/cfo/delphi-einvoicing-system.html) to request reimbursement under this award. FRA will provide access to that system upon request by the Recipient.

(b)  FRA may deny a payment request that is not submitted using the method identified in this Section.

**13.9    Information Supporting Expenditures**

(a)  When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient will electronically submit the SF 270 (Request for Advance or Reimbursement) and will submit supporting cost detail to document clearly all costs incurred. As supporting cost detail, the Recipient will include a detailed breakout of all costs incurred and classify all costs by task and by Agreement Federal Funds and Agreement Non-Federal Funds.

(b)  Unless FRA and the Recipient agree otherwise in writing, the Recipient will ensure that the proportion of expenditure of Agreement Federal Funds to Agreement Non-Federal Funds is not more than the maximum percent of total Project cost FRA will contribute identified in Section 6.5 of Attachment 2 of this Agreement. The Recipient will ensure the proportional expenditure of funds is reflected in the detailed breakout of costs supporting the SF 270.

(c)  If the Recipient submits a request for reimbursement that FRA determines does not include or is not supported by sufficient detail, FRA may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.10    Reimbursement Request Timing Frequency**

The Recipient will request reimbursement as needed to maintain cash flow sufficient to timely complete the Project. The Recipient will not submit any single payment request exceeding $99,999,999.99. The Recipient will not submit a payment request exceeding $50,000,000.00 unless the Recipient notifies FRA six days before submitting the request.

**13.11    Program Income**

The Recipient is encouraged to earn income to defray Project costs, where appropriate, and will work with FRA to determine how income may be applied to the grant, in accordance with 2

U.S. Department of Transportation
**Federal Railroad Administration**

C.F.R. § 200.307 and 2 C.F.R. § 1201.80. Program income not deducted from total allowable costs may be used only for the purposes and under the terms and conditions established in this Agreement. The Recipient will maintain records of all program income.

## ARTICLE 14: PROPERTY AND EQUIPMENT

**14.1    General Requirements**

The Recipient will comply with the property standards of 2 C.F.R. §§ 200.310–200.316 and will ensure compliance with these standards for all tiers of subawards and contracts under this award.

**14.2    Relocation and Real Property Acquisition**

The Recipient will comply with the land acquisition policies and relocation requirements in 42 U.S.C. § 4601 et seq. and 49 C.F.R. part 24, subparts A–F, as applicable. At a minimum, under this section, the Recipient will:

(a)  comply with the land acquisition policies in 49 C.F.R. part 24, subpart B and will pay or reimburse property owners for necessary expenses as specified in that subpart;

(b)  provide a relocation assistance program offering the services described in 49 C.F.R. part 24, subpart C and provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24, subparts D–E; and

(c)  make available to displaced persons comparable replacement dwellings in accordance with 49 C.F.R. part 24.

(d)  provide to FRA a real estate acquisition and management plan prior to beginning real property acquisition if the Project is designated a Major Project in Article 1 of Attachment 2 of this Agreement, or if the total Project cost in Section 6.5 of Attachment 2 of this Agreement is greater than $300 million and the Project is also receiving financial assistance from the Federal Transit Administration (FTA).

**14.3    Use for Originally Authorized Purpose**

The Recipient will ensure that property and equipment funded under this Agreement is used for the originally authorized purpose. If necessary to satisfy this obligation, the Recipient will enter into appropriate arrangements with the entity or entities using, or with the owner of right-of-way used by, the property and/or equipment funded under this Agreement.

**14.4    Maintenance**

The Recipient will ensure that any property, improvements to property, and any equipment funded under this Agreement are maintained in good working order and in accordance with FRA regulations, guidelines, and directives.

U.S. Department of Transportation
**Federal Railroad Administration**

**14.5    Real Property Disposition**

In accordance with 2 C.F.R. § 200.311, when real property acquired or improved under this award is no longer used for its originally intended purpose, the Recipient will request disposition instructions from FRA.

**14.6    Equipment Disposition**

(a)  In accordance with 2 C.F.R. §§ 200.313 and 1201.313, when equipment acquired under this award is no longer needed for the Project:

(1)  if the entity that acquired the equipment is a State or a Subrecipient of a State, that entity will dispose of that equipment in accordance with State laws and procedures;

(2) if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 C.F.R. 200.313; and

(3)  if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity will request disposition instructions from FRA. In accordance with 2 C.F.R. § 200.313(f), FRA may permit the Recipient or Subrecipient to retain equipment.

(b)  In accordance with 2 C.F.R. §200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. §§ 200.313–200.316 and 2 C.F.R. § 1201.313.

**14.7    Recordkeeping**

The Recipient will keep records regarding the operation and maintenance of property, improvements to property, equipment, and supplies funded under this Agreement and will provide them to FRA upon request.

**14.8    Encumbrance**

The Recipient will not create an obligation, such as a transfer of title, lease, lien, mortgage, or encumbrance, that would dispose of or encumber the Recipient's title or other interest in property, improvements to property, equipment or supplies funded under this Agreement without prior written approval from FRA.

The Recipient will not take any action that would adversely affect FRA's interest or impair the Recipient's continuing control over the use of the property, improvements to property, equipment, or supplies funded under the Agreement without prior written approval from FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 15:  AMENDMENTS

**15.1     Bilateral Amendments**

The parties may amend, modify, or supplement this Agreement by mutual agreement in writing signed by FRA and the Recipient. Either party may request to amend, modify, or supplement this Agreement by written notice to the other party.

**15.2     FRA Unilateral Amendments**

(a)  FRA may unilaterally amend this Agreement for the following reasons:

(1)  to comply with Federal law;

(2)  at closeout or in anticipation of closeout; and

(3)  other non-substantive changes, such as to correct typographical errors, as deemed appropriate by FRA.

(b)  To unilaterally amend this Agreement under Section 15.3 of this Attachment 1, FRA will provide a written notice to the Recipient that includes the amendment and the date that the amendment is effective.

(c)  Except at closeout or in anticipation of closeout, FRA may not unilaterally amend the Statement of Work, this Agreement's monetary amount, the delivery schedule, the Period of Performance, or other terms or conditions of this Agreement.

**15.3     Other Amendments**

The parties will not amend, modify, or supplement this Agreement except as permitted under Sections 15.1, 15.2, or 15.3 of this Attachment 1. If an amendment, modification, or supplement is not permitted under Section 15.1, 15.2, or 15.3 of this Attachment 1, it is void.

## ARTICLE 16:  [RESERVED]

## ARTICLE 17:  [RESERVED]

## ARTICLE 18:  LABOR AND WORK

**18.1     Labor and Work**

The Recipient will document its consideration of job quality and labor standards related to the Project in Article 9 of Attachment 2 of this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1**    **Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1**    **Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 C.F.R. § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2**    **Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

**U.S. Department of Transportation**
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a) FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b) The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 C.F.R. § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a) The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

U.S. Department of Transportation
**Federal Railroad Administration**

**20.6    External Award Terms and Obligations**

(a)  In addition to this document and the contents described in Article 25 of this Attachment 1, this Agreement includes the following additional terms as integral parts:

(1)  Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2)  Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

(3)  2 C.F.R. part 175: Award Term for Trafficking in Persons; and

(4)  Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b)  The Recipient will comply with:

(1)  49 C.F.R. part 20: New Restrictions on Lobbying;

(2)  49 C.F.R. part 21: Nondiscrimination in Federally Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)  49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)  Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**20.7    Incorporated Certifications**

The Recipient makes the representations in the following certifications, which are incorporated by reference:

(a)  Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).

## ARTICLE 21:  ASSIGNMENT

**21.1    Assignment Prohibited**

The Recipient will not transfer to any other entity any discretion granted under this Agreement, any right to satisfy a condition under this Agreement, any remedy under this Agreement, or any obligation imposed under this Agreement.

## ARTICLE 22:  WAIVER

**22.1    Waivers**

(a)  A waiver of a term of this Agreement authorized by law and granted by FRA will not be effective unless it is in writing and signed by an authorized representative of FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  A waiver of a term of this Agreement granted by FRA on one occasion will not operate as a waiver on other occasions.

(c)  If FRA fails to require strict performance of a term of this Agreement, fails to exercise a remedy for a breach of this Agreement, or fails to reject a payment during a breach of this Agreement, that failure does not constitute a waiver of that term or breach.

## ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS

**23.1  Disclaimer of Federal Liability**

FRA will not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this Agreement.

**23.2  Environmental Review**

(a)  Except as authorized by law or under 23 C.F.R. § 771.113(d)(4), the Recipient will not begin final design activities; acquire real property, construction materials, or equipment, including rolling stock; begin construction; or take other actions that would have an adverse environmental impact or limit the choice of reasonable alternatives for the Project unless and until FRA complies with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA), and any other applicable environmental laws and regulations. In addition, the Recipient will not begin project development that involves ground disturbing activity prior to FRA compliance with NEPA and any other applicable environmental laws and regulations.

(b)  The Recipient acknowledges that:

(1)  FRA's actions under Section 23.2(a) of this Attachment 1 may depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to FRA; and

(2)  applicable environmental statutes and regulations may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(c)  Consistent with 23 C.F.R. § 771.105(a), to the maximum extent practicable and consistent with Federal law, the Recipient will coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in Article 4 of Attachment 2 of this Agreement and other information described in this Agreement may inform environmental decision-making processes, but the parties do not intend this Agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with Article 4 of Attachment 2 of this Agreement or other information in this Agreement, then FRA will either:

(1)  amend this Agreement under Section 15.1 of this Attachment 1 for consistency with the selected build alternative; or

31

**U.S. Department of Transportation**
**Federal Railroad Administration**

(2)  if FRA determines that the condition at Section 10.1(a)(5) of this Attachment 1 is satisfied, terminate this Agreement under Section 10.1(a)(5) of this Attachment 1; or

(3) take other action as deemed appropriate by FRA.

(g)  The Recipient will complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project. Article 4 of Attachment 2 of this Agreement identifies documents describing mitigation activities, but the absence of a document from that section does not relieve the Recipient of any compliance obligations.

**23.3    Project Maintenance Requirement**

The Recipient will ensure that any property and equipment funded within this Agreement is operated and maintained in good operating order and in accordance with 2 C.F.R. §§ 200.310–200.316, 1201.313 and any guidelines, directives, or regulations that FRA may issue.

**23.4    Appropriations Act Requirements**

The Recipient will comply with applicable requirements of the appropriations act identified in Section 6.3 of Attachment 2 of this Agreement.

**23.5    Standards of Conduct**

The Recipient will comply with the following standards of conduct:

(a)  Standards of Conduct. The Recipient will maintain a written code or standards of conduct governing the performance of its officers, employees, board members, or agents engaged in the award and administration of contracts or agreements supported by the Federal contribution provided through this Agreement. The code or standards will provide that the Recipient's officers, employees, board members, or agents may neither solicit nor accept gratuities, favors, or anything of monetary value from present or potential Subrecipients or contractors. The Recipient may set minimum rules where the financial interest is not substantial, or the gift is an unsolicited item of nominal intrinsic value. As permitted by state or local law or regulations, such code or standards will provide for penalties, sanctions, or other disciplinary actions for violations by the Recipient's officers, employees, board members, or agents, or by Subrecipients or their agents.

(b)  Personal Conflict of Interest. The Recipient's code or standards must provide that no employee, officer, board member, or agent of the Recipient may participate in the selection, award, or administration of a contract supported by the Federal contribution if a real or apparent conflict of interest would be involved. Such a conflict of interest would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

U.S. Department of Transportation
**Federal Railroad Administration**

(c)  Organizational Conflicts of Interest. The Recipient's code or standards of conduct must include procedures for identifying and preventing real and apparent organizational conflicts of interests. An organizational conflict of interest exists when the nature of the work to be performed under a proposed contract, may, without some restrictions on future activities, result in an unfair competitive advantage to the contractor or impair the contractor's objectivity in performing the contract work.

(d)  Existing Codes or Standards. This Section does not require the Recipient to implement a new code or standards of conduct where a state statute, or written code or standards of conduct, already effectively covers all of the required elements.

(e)  Disclosure of Conflicts. The Recipient will disclose in writing any potential conflict of interest to FRA or pass-through entity.

**23.6    Changed Conditions of Performance**

The Recipient will notify FRA of any event that may affect its ability to perform the Project in accordance with the terms of this Agreement.

**23.7    Litigation**

The Recipient will notify FRA in writing of any decision pertaining to the Recipient's conduct of litigation that may affect FRA's interests in the Project or FRA's administration or enforcement of applicable Federal laws or regulations. The Recipient will inform FRA in writing before naming FRA as a party to any type of litigation for any reason in any forum.

**23.8    [Reserved]**

**23.9    Equipment and Supplies**

The Recipient will maintain written policies and procedures that address acquisition, classification, and management of all equipment and supplies acquired or used under this award.

**23.10    Safety and Technology Data**

The Recipient will ensure that FRA has access to safety and technology relevant data generated by the Recipient under the award, in a machine-readable format, where specified in Article 4 of Attachment 2 of this Agreement.

**23.11    Intellectual Property**

The Recipient agrees to the standard patent rights clauses issued by the Department of Commerce at 37 C.F.R. Part 401, as applicable.

**23.12    Liquidation of Recipient Obligations**

(a)  The Recipient will liquidate all obligations of award funds under this Agreement not later than 120 days after the end of the Period of Performance.

(b)  Liquidation of obligations and adjustment of costs under this Agreement follow the requirements of 2 C.F.R. §§ 200.344–200.346.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 24:  CONSTRUCTION AND DEFINITIONS

**24.1    Agreement**

This Agreement consists of the following:

(a)  Agreement Cover Sheet

(b)  Attachment 1: General Terms and Conditions

(c)  Attachment 2: Project-Specific Terms and Conditions

(d)  Exhibit A: Applicable Federal Laws and Regulations

(e)  Exhibit B: Additional Standard Terms

(f)  Exhibit C: Quarterly Project Progress Reports and Recertifications

**24.2    Construction**

(a)  In these General Terms and Conditions, there are no references to articles or sections in project-specific portions of this Agreement that are not contained in Attachments or Exhibits listed in Section 24.1.

(b)  If a provision in these General Terms and Conditions or the Exhibits conflicts with a provision in the Project-Specific Terms and Conditions in Attachment 2 of this Agreement, then the relevant portion in Attachment 2 prevails. If a provision in the Exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**24.3    Integration**

This Agreement constitutes the entire agreement of the parties relating to the Project and supersedes any previous agreements, oral or written, relating to the Project.

**24.4    Definitions**

This Section defines terms used in this Agreement. Additional definitions found in 2 C.F.R. § 200.1 are incorporated by reference into this Agreement.

"Agreement Federal Funds" means the total amount of Federal funds obligated under this Agreement. This is the amount shown in Section 6.1 of Attachment 2 of this Agreement.

"Application" means the application identified in Article 3 of Attachment 2 of this Agreement, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

"Construction Substantial Completion" means the stage of the Project when all construction tasks are complete such that the Recipient can use the Project for its intended use and only closeout activities remain. Activity to address or complete closeout activities will not prevent or disrupt use of the Project.

**U.S. Department of Transportation**
**Federal Railroad Administration**

"Contingent Commitment" means the unobligated amounts of future available budget authority specified in law that FRA commits to obligate under the terms of this Agreement.

"Federal Share" means the sum of Agreement Federal Funds and Other Federal Funds. If there are no Other Federal Funds, the Federal Share is the same as the Agreement Federal Funds.

"General Terms and Conditions" means this Attachment 1.

"Other Federal Funds" means Federal funds that are part of the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement for the Project but are not obligated under this Agreement.

"Project" means the project proposed in the Application, as modified by the negotiated provisions of this Agreement, including Attachment 2 of this Agreement.

"Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 C.F.R. § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

"Project Cost Savings" means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs.

"Rural Area" means any area that is not within an area designated as an urbanized area by the Bureau of the Census.

**24.5    Calendar Dates**

Unless otherwise specified, all dates and durations are in calendar days, calendar quarters, or calendar years, as appropriate.

**24.6    Communication in Writing**

Unless otherwise specified, all written communication may be provided by electronic mail.

**24.7    Severability**

If any provision of this Agreement is found to be invalid, illegal, or unenforceable, the validity, legality, or enforceability of the remaining provisions of this Agreement is not affected or impaired by such finding.  A provision held to be unenforceable as applied to any party or circumstance remains applicable to other parties and circumstances.

## ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE

**25.1    Counterparts**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

U.S. Department of Transportation
**Federal Railroad Administration**

**25.2    Effective Date**

The agreement will become effective when all parties have signed it. The date of this Agreement will be the date this Agreement is signed by the last party to sign it.

## ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES

**26.1    Interstate Rail Compacts Grant Program**

The Recipient agrees to comply with the clauses in Section 26.1 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.1 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Non-Federal Match. The Recipient will provide a Non-Federal match of not less than 50 percent of the eligible expenses under the grant.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1, the Recipient will comply with the following clauses, as applicable:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under Section 26.1 of this Attachment 1, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders under this award.



U.S. Department of Transportation
**Federal Railroad Administration**

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.1(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

U.S. Department of Transportation
**Federal Railroad Administration**

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Operator Limitation. Recipient's eligible expenses must be related to intercity passenger rail service to be operated by Amtrak.

(i)  Reporting. As requested by FRA, the Recipient will report on:

> (1)  the status of the planning efforts and coordination funded by the grant award;

> (2)  plans for continued implementation of the interstate rail compact;

> (3)  the status of, and data regarding, any new, restored, or enhanced rail services initiated under the interstate rail compact; and

> (4)  other data and information as requested by FRA.

**26.2    Railroad Crossing Elimination Program Clauses**

The Recipient agrees to comply with the clauses in Section 26.2 of this Attachment 1.

Consistent with 49 U.S.C. §§ 22905(e) & 22909(j), clauses (b), (c), (d), and (g) of Section 26.2 of this Agreement 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law. In addition, clause (f) does not apply to: 1) the Alaska Railroad or its contractors; or 2) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:

> (1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

> (2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).


U.S. Department of Transportation
**Federal Railroad Administration**

(3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.2(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Impacted Rail Carrier or Real Property Owner Approvals. In accordance with 49 U.S.C. § 22909(e)(2)(A), prior to proceeding with the construction of the Project funded by this Agreement, if applicable, Recipient will obtain necessary approvals to commence construction from any impacted rail carriers or real property owners. If the Project is a planning project, as described in 49 U.S.C. § 22909(d)(6), the Recipient agrees to work collaboratively with rail carriers and right-of-way owners.

(f)  Labor Protective Arrangements

U.S. Department of Transportation
**Federal Railroad Administration**

(1)  Notwithstanding 49 U.S.C. § 22905(e)(1), and in accordance with 49 U.S.C. § 22909(j)(3), any employee covered by the Railway Labor Act (45 U.S.C. § 151 et seq.) and the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.) who is adversely affected by actions taken in connection with the project financed in whole or in part by such grant shall be covered by employee protective arrangements required to be established under  49 U.S.C. § 22905(c)(2)(B). In accordance with 49 U.S.C. § 22905(c)(2)(B), the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404, as such protective arrangements are described in the final FRA guidance titled Equivalent Protections for Railroad Employees and effective December 28, 2022, included herein in Exhibit B.

(2)  In accordance with 49 U.S.C. § 22909(j)(3), Recipient, and any successors, assigns, and contractors of Recipient:

> i.    shall be bound by the employee protective arrangements required under subparagraph (1); and

> ii.   shall be responsible for the implementation of such arrangements and for the obligations under such arrangements, but may arrange for another entity to take initial responsibility for compliance with the conditions of such arrangement.

(3)  Labor protections required pursuant to Subsection (f) of Section 26.2 of this Attachment 1 shall be documented consistent with Article 18 of this Attachment 1.

(g)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(h)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

## 26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses

The Recipient agrees to comply with the clauses in Section 26.3 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.3 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49



U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

> (1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. §22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

> (2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

> (3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

> (4)  for all projects, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes:



compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.3(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.4    Restoration and Enhancement Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.4 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.4 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right-of -way and facilities under current law.

U.S. Department of Transportation
**Federal Railroad Administration**

(a)  Maximum Funding Limitation. A grant authorized by 49 U.S.C. § 22908 may not exceed:

> (1) 90 percent of the projected net operating costs for the first year of service;
>
> (2) 80 percent of the projected net operating costs for the second year of service;
>
> (3) 70 percent of the projected net operating costs for the third year of service;
>
> (4) 60 percent of the projected net operating costs for the fourth year of service;
>
> (5) 50 percent of the projected net operating costs for the fifth year of service; and
>
> (6) 30 percent of the projected net operating costs for the sixth year of service.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:

> (1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).
>
> (2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).
>
> (3)  under Section 26.4 of this Attachment 1, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.
>
> (4)  for all projects, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the

43

**U.S. Department of Transportation**
**Federal Railroad Administration**

Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.4(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Route Reporting. The Recipient will provide similar information regarding the route performance, financial, and ridership projections, and capital and business plans that Amtrak is required to provide, and such other data and information as is required by Article 4 of Attachment 2 of this Agreement.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(i) Termination. In addition to the terms of this Attachment 1, FRA may terminate this Agreement upon the cessation of service, or the violation of any other term of this Agreement.

## 26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses

The Recipient agrees to comply with the clauses in Section 26.5 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.5 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4) for all projects, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable  and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. §

45



**U.S. Department of Transportation**
**Federal Railroad Administration**

10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.5(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

U.S. Department of Transportation
**Federal Railroad Administration**

(h)  Northeast Corridor Cost Allocation. For projects located on the Northeast Corridor, as that term is defined in 49 U.S.C. § 24911(a)(4), Amtrak and the public authorities providing commuter rail passenger transportation at the Project location on the Northeast Corridor must remain in compliance with 49 U.S.C. § 24905(c)(2).

(i)  Interest and Financing Costs. Pursuant to 49 U.S.C. § 24911(g)(2), interest and other financing costs of efficiently carrying out a part of the Project within a reasonable time are a cost of carrying out the Project under a Phased Funding Agreement, except that eligible costs may not be more than the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing. The Recipient will certify to FRA's satisfaction that the Recipient has shown reasonable diligence in seeking the most favorable financing terms.

###

# Exhibit C to Declaration of Timothy Sexton


U.S. Department of Transportation
**Federal Railroad Administration**

# Exhibits

Revision Date: April 16, 2025



## Table of Contents

EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS ........................................................ 3

   GENERAL FEDERAL LEGISLATION ............................................................................................. 3

   EXECUTIVE ORDERS ................................................................................................................. 4

   GENERAL FEDERAL REGULATIONS ........................................................................................... 4

EXHIBIT B: ADDITIONAL STANDARD TERMS .......................................................................... 6

   EXHIBIT B.1: TITLE VI ASSURANCES ....................................................................................... 7

   EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS ...................................................................... 16

   EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW ................................................................................................... 20

   EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING ........................... 22

   EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B) ................ 24

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS ......................... 33



U.S. Department of Transportation
**Federal Railroad Administration**

## EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this Agreement, the Recipient assures and certifies, with respect to this award, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this Agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this Agreement include, but are not limited to, the following:

**GENERAL FEDERAL LEGISLATION**

a. Davis-Bacon Act – 40 U.S.C. § 3141 et seq.
b. Federal Fair Labor Standards Act – 29 U.S.C. § 201 et seq.
c. Hatch Act – 5 U.S.C. § 1501 et seq.
d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. § 4601 et seq.
e. National Historic Preservation Act of 1966 (Section 106) – 54 U.S.C. § 306108
f. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. §§ 312501-312508
g. Native American Graves Protection and Repatriation Act – 25 U.S.C. § 3001 et seq.
h. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401 et seq.
i. Clean Water Act, as amended – 33 U.S.C. § 1251 et seq.
j. Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. § 1536 et seq.
k. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. § 1451 et seq.
l. Flood Disaster Protection Act of 1973, Section 102(a) – 42 U.S.C. § 4012a
m. Age Discrimination Act of 1975 – 42 U.S.C. § 6101 et seq.
n. American Indian Religious Freedom Act, as amended – P.L. 95-341
o. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. §§ 290dd–290dd-2
p. Architectural Barriers Act of 1968 – 42 U.S.C. § 4151 et seq.
q. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42, Section 403 – 42 U.S.C. § 8373
r. Contract Work Hours and Safety Standards Act – 40 U.S.C. § 3701 et seq.
s. Copeland Anti-kickback Act, as amended – 18 U.S.C. § 874 and 40 U.S.C. § 3145
t. National Environmental Policy Act of 1969 – 42 U.S.C. § 4321 et seq.
u. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. § 1271 et seq.
v. Single Audit Act of 1984 – 31 U.S.C. § 7501 et seq.
w. Americans with Disabilities Act of 1990 – 42 U.S.C. § 12101 et seq.
x. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. §§ 1681–1683 and §§ 1685–1687
y. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. § 794
z. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. § 2000d et seq.
aa. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
bb. Freedom of Information Act, as amended – 5 U.S.C. § 552
cc. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. § 1801 et seq.
dd. Farmland Protection Policy Act of 1981 – 7 U.S.C. § 4201 et seq.
ee. Noise Control Act of 1972 – 42 U.S.C. § 4901 et seq.
ff. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. § 661 et seq.
gg. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. §§ 401 and

U.S. Department of Transportation
**Federal Railroad Administration**

525

hh.  Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303
ii.  Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. §§ 9601–9657
jj.  Safe Drinking Water Act – 42 U.S.C. §§ 300f–300j-26
kk.  The Wilderness Act – 16 U.S.C. §§ 1131-1136
ll.  Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. § 6901 et seq.
mm. Migratory Bird Treaty Act – 16 U.S.C. § 703 et seq.
nn.  The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109-282, as amended by Section 6202 of Public Law 110-252)
oo.  Cargo Preference Act of 1954 – 46 U.S.C. § 55305
pp.  Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
qq.  Efficient Environmental Reviews – 23 U.S.C. § 139
rr.  Grant Conditions – 49 U.S.C. § 22905
ss.  Build America, Buy America Act – Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298

**EXECUTIVE ORDERS**
a.  Executive Order 11990 – Protection of Wetlands
b.  Executive Order 11988 – Floodplain Management
c.  Executive Order 12372 – Intergovernmental Review of Federal Programs
d.  Executive Order 12549 – Debarment and Suspension
e.  Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f.  Executive Order 14025 – Worker Organizing and Empowerment
g.  Executive Order 14149 – Restoring Freedom of Speech and Ending Federal Censorship
h.  Executive Order 14154 – Unleashing American Energy
i.  Executive Order 14168 – Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
j.  Executive Order 14173 – Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**GENERAL FEDERAL REGULATIONS**
a.  Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201
b.  Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200
c.  Investigative and Enforcement Procedures – 14 C.F.R. Part 13
d.  Procedures for predetermination of wage rates – 29 C.F.R. Part 1
e.  Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3
f.  Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5
g.  Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60 et seq.
h.  New Restrictions on Lobbying – 49 C.F.R. Part 20
i.  Nondiscrimination in Federally Assisted Programs of the Department of Transportation –

U.S. Department of Transportation
**Federal Railroad Administration**

Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21

j.  Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24

k.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25

l.  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27

m.  DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35

n.  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28

o.  Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30

p.  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32

q.  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38

r.  Environmental Impact and Related Procedures – 23 C.F.R. Part 771

s.  Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 C.F.R. Part 774

Specific assurances required to be included in the Agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

EXHIBIT B: ADDITIONAL STANDARD TERMS

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.1: TITLE VI ASSURANCES**

### TITLE VI ASSURANCE
**Implementing Title VI of the Civil Rights Act of 1964, as amended**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Application and by entering into this Agreement, the Recipient **HEREBY AGREES THAT**, as a condition to receiving Federal financial assistance from the Federal Railroad Administration (FRA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. Section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including FRA.*

7



U.S. Department of Transportation
**Federal Railroad Administration**

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**<u>Specific Assurances</u>**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. § 21 will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

**U.S. Department of Transportation**
**Federal Railroad Administration**

    a.  for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

    b.  for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

    b.  the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing FRA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by FRA. You must keep records, reports, and submit the material for review upon request to FRA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the FRA under this Agreement. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the program or project funded under this Agreement.


U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally assisted programs of the U.S. Department of Transportation, Federal Railroad Administration (FRA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or FRA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or FRA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or FRA may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or

10



U.S. Department of Transportation
**Federal Railroad Administration**

FRA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), 23 U.S.C. § 117 and the policies and procedures prescribed by the Federal Railroad Administration (FRA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX C**

**CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM**

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

> 1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)



**U.S. Department of Transportation**
**Federal Railroad Administration**

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**U.S. Department of Transportation**
**Federal Railroad Administration**

**APPENDIX E**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

<u>**Pertinent Non-Discrimination Authorities:**</u>

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 et seq.), (prohibits discrimination on the basis of sex) (as applicable);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 et seq.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 et seq.), (prohibits discrimination on the basis of age);
- The Civil Rights Restoration Act of 1987, (P.L. 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131–12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq.).

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS**

### 2 C.F.R. Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FRA approval or that is estimated to cost $25,000 or more—as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Application and by entering into this Agreement, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

16



**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust

**U.S. Department of Transportation**
**Federal Railroad Administration**

statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**2. Instructions for Certification − Lower Tier Participants:**

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FRA approval or estimated to cost $25,000 or more − 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.



**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by Sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

**U.S. Department of Transportation**
**Federal Railroad Administration**

      (1)  Certify whether the entity has a Tax Delinquency; and

      (2)  Certify whether the entity has a Felony Conviction.

4   **Prohibition.** If

      (1)  the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

      (2)  an entity provides an affirmative response to either certification in section 3; or

      (3)  an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.  **Mandatory Notice to the USDOT.**

   (a)  If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

   (b)  If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

   (c)  If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.  **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

      (1)  require the SAM check in section 2;

      (2)  require the certifications in section 3;

      (3)  include the prohibition in section 4; and

      (4)  require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.



**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
    (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—
        (i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and
        (ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.



U.S. Department of Transportation
**Federal Railroad Administration**

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B)**

This Exhibit provides guidance on the protective arrangements equivalent to the protective arrangements established under Section 504 of the Railroad Revitalization Reform Act of 1976, with respect to employees affected by actions taken in connection with a Project financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B). Fluctuations and changes in volume or character of employment brought about solely by other causes are not within the scope of this Exhibit.

      **1.**      **Definitions.** Whenever used in this Exhibit, capitalized terms shall have the meanings below:

      (a)      "Average Monthly Compensation" means the total compensation received by a Displaced Employee or a Dismissed Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement or dismissal, divided by twelve (12). The Average Monthly Compensation shall be adjusted to reflect subsequent general wage increases.

      (b)      "Average Monthly Time" means the total number of hours worked by a Displaced Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement, divided by twelve (12).

      (c)      "Day" means one 24-hour calendar day (including holidays and weekends) for purposes of calculating deadlines and other timeframes in this Exhibit.

      (d)      "Displaced Employee" means a Protected Employee who remains employed by a Railroad but, as a result of a Project, is placed in a worse position with respect to compensation and rules governing working conditions. A Protected Employee's status as a Displaced Employee begins on the date said employee is harmed.

      (e)      "Dismissed Employee" means a Protected Employee who: (1) as a result of a Project, is deprived of employment with the Railroad because (i) the Railroad eliminates the Protected Employee's position, or (ii) the Railroad eliminates another employee's position (and that employee's exercise of seniority rights results in the Protected Employee's inability to secure another position by the exercise of the Protected Employee's seniority rights); and (2) is unable to secure another position by exercise of their seniority rights A Protected Employee's status as a Dismissed Employee begins on the date said employee is deprived of employment.

      (f)      "Project" means any action financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B).

      (g)      "Protected Employee" means an employee of a Railroad who is affected by actions taken pursuant to a Project, whether the Project is initiated by a Railroad or a Recipient. If a Railroad rearranges or adjusts its forces in anticipation of a Project with the purpose or effect of depriving an employee of benefits to which they otherwise would have become entitled under this Exhibit, then that employee is a Protected Employee under this Exhibit. An employee's status as a Protected Employee shall continue for the duration of the applicable Protective Period. An employee who solely benefitted as a result of a Project shall not be a Protected Employee under this Exhibit.

      (h)      "Protective Period" means that period during which a Displaced Employee or a Dismissed Employee is provided the protections described in this Exhibit. The Protective Period begins

**U.S. Department of Transportation**
**Federal Railroad Administration**

on the date an employee of a Railroad is displaced or dismissed and ends after six (6) years. However, the Protective Period for any particular employee shall not continue longer than the period of time the Railroad employed the employee prior to the date of their displacement or dismissal. For purposes of this Exhibit, an employee's length of service shall be determined in accordance with the provisions of Section 7(b) of the Washington Job Protection Agreement of May 1936, as amended.

(i)        "Recipient" means any person or entity receiving financial assistance subject to the requirements of 49 U.S.C. § 22905(c), including grantees, subrecipients, contractors, and subcontractors.

(j)        "Railroad" means (1) a railroad carrier as defined in 49 U.S.C. § 20102(3), or (2) any person deemed a rail carrier pursuant to 49 U.S.C. § 22905(b).

**2.        Flow Down.**

(a)        In accepting financial assistance for a Project, the Recipient is responsible for ensuring the compliance with the protections provided in this Exhibit. The Recipient shall make the acceptance of this Exhibit a condition of any new contract (or incorporate its terms into any existing contract by amendment) that uses funds subject to the requirements of 49 U.S.C. § 22905(c). These conditions shall apply to a Recipient, any Railroad and any contractor of any tier with which the Recipient contracts using funds subject to the requirements of 49 U.S.C. § 22905(c).

(b)        The Recipient shall require in an agreement (either in a new agreement or as an amendment to an existing agreement) with a Railroad owning the right-of-way to be improved by a Project that the Railroad notify its employees (or their representatives) of the Project being funded with financial assistance subject to 49 U.S.C. § 22905(c) and the applicability of these protections.

(c)        Any Railroad employee (or their representatives) may notify a Recipient of a dispute or controversy relating to the requirements of this Exhibit to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

**3.        Collective Bargaining Agreements.**

(a)        **Existing Agreements**. The rates of pay, rules, working conditions, and all collective bargaining and other rights, privileges, and benefits (including continuation of pension rights and benefits) of a Railroad's employees under applicable laws, regulations, and/or existing collective bargaining agreements shall be preserved and remain applicable unless changed by future collective bargaining agreements or applicable statutes or regulations. As applied to the regulation of subcontracting by the Railroads of a Project, the provisions of this section shall mean that a determination of whether or not such work validly may be subcontracted by a Railroad shall not be affected by the fact that the work is being financed by funds subject to the requirements of 49 U.S.C. § 22905(c)(2)(B). Nothing in this Exhibit shall be construed as depriving any Railroad employee of any rights or benefits or eliminating any obligations that such employee may have under any existing contractual or statutory arrangement, including job security agreements, protective conditions, or arrangements.

(b)        **Election by Protected Employee**. Where a Protected Employee is eligible for protections under both this Exhibit and another contractual or statutory arrangement, the Protected Employee shall elect between the protection under this Exhibit and protection under such other arrangement. After

**U.S. Department of Transportation**
**Federal Railroad Administration**

such an election, the Protected Employee shall be protected only by the arrangement that they elect. The Protected Employee shall not be entitled to any protection or benefit (regardless of whether such benefit is duplicative) under the arrangement that they do not elect. However, if the elected protection expires pursuant to the terms of the arrangement that governs the elected protection, the Protected Employee is entitled to protection under the arrangement not originally elected for the remainder, if any, of the Protective Period.

### 4.    Change in Operations, Services, Facilities, or Equipment.

(a)    **Notice**. When a Railroad contemplates a change or changes in its operations, services, facilities, or equipment as a result of a Project, which may cause the dismissal or displacement of Protected Employees or rearrangement of forces involving such employees, it shall give at least sixty (60) days' written notice of such intended changes to both Protected Employees and their duly authorized representatives (if applicable). Such notice shall contain a full and adequate description of the proposed changes, including an estimate of the number of Protected Employees of each class affected by the intended changes.

(b)    **Negotiations**.

(i)    Initiation of Negotiation. Within sixty (60) days after the Railroad issues a notice under Section 4(a) of this Exhibit, the Railroad or the Protected Employees (or their representatives) may, by written notice to the other party, request a meeting and opportunity to negotiate an agreement with respect to the application of the terms and conditions of this Exhibit. These negotiations shall commence within fourteen (14) days from the receipt of such request.

(ii)    Subject of Negotiations. Each change to rail operations, services, facilities, infrastructure, or equipment (including rights-of-way, track, and signal and crossing systems) that may result in dismissal or displacement of Protected Employees or rearrangement of forces involving such employees shall be subject to review and negotiation by the parties, but only to the extent necessary to ensure compliance with this Exhibit. For any contemplated rearrangement of rail forces, the Railroad and the representative(s) of the Protected Employees shall agree on the method of selection of employees to be moved, and the assignment of those employees to new roles.

(c)    **Arbitration**. If the Railroad and the representative(s) of the Protected Employees fail to agree within forty-five (45) days from the initial meeting and opportunity to negotiate, either party may submit the dispute for arbitration in accordance with the following procedures:

(i)    Notice & Selection of Arbitrator. Within ten (10) days after either party has notified the other in writing of their desire to submit the dispute for arbitration, the parties shall select a neutral arbitrator. If the parties cannot agree upon the selection of said arbitrator, then the parties shall submit a request to the National Mediation Board to appoint an arbitrator. In either case, a hearing shall be scheduled no later than thirty (30) days after an arbitrator has been appointed.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(ii)    <u>Binding Decision</u>. The decision of the arbitrator shall be final, binding, and conclusive and shall be rendered within thirty (30) days from the date of the commencement of the hearing of the dispute.

(iii)    <u>Expenses</u>. The salary and expenses of the arbitrator shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.

(d)    **Implementation**. If a notice is issued under Section 4(a), the Railroad shall not implement such a change or changes until: (i) sixty (60) days after the notice in accordance with Section 4(a), if no party requests a meeting and opportunity to negotiate; (ii) the parties reach agreement pursuant to Section 4(b), if a party requests a meeting and opportunity to negotiate; or (iii) a referee has rendered a decision pursuant to Section 4(c).

**5.    Protections for Displaced Employees**

(a)    **Displacement Allowances**.

(i)    <u>In General</u>. If a Displaced Employee is unable, in the normal exercise of such employee's seniority rights under existing agreements, rules and practices, to obtain a position that is compensated equal to or exceeding the compensation the Displaced Employee received in the position from which such employee was displaced, then the Displaced Employee shall, during the Protective Period, be paid a monthly displacement allowance equal to the difference between the monthly compensation received by the Displaced Employee in the position in which such employee is retained and the Average Monthly Compensation received by the Displaced Employee in the position from which such employee was displaced (the "Displacement Allowance").

(ii)    <u>Application of Displacement Allowance</u>. If a Displaced Employee's compensation in that employee's retained position is less in any month in which such employee performs work than the Average Monthly Compensation, then the Displaced Employee shall be paid the difference between the current compensation and the Average Monthly Compensation. However, the Displacement Allowance shall be reduced by the Displaced Employee's time lost as a result of voluntary absences, to the extent that the Displaced Employee is not available for service equivalent to the Displaced Employee's Average Monthly Time. If, on the other hand, the Displaced Employee, in such employee's retained position, works in excess of the Average Monthly Time in any given month, then the Displaced Employee shall be additionally compensated for such excess time at the rate of pay of the employee's retained position. If a Displaced Employee fails to exercise their seniority rights to secure another position available to the employee which does not require a change in such employee's place of residence, to which the employee is entitled under the working agreement, and which carries a rate of pay and compensation exceeding those of the position that the employee elects to retain, then the Displaced Employee shall thereafter be treated for the purposes of this section as occupying the position such employee elects to decline.

(iii)    <u>Early Expiration</u>. The Displacement Allowance shall cease prior to the expiration of the Protective Period in the event of the Displaced Employee's resignation, death, retirement, or dismissal for justifiable cause.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)    **Moving Expenses**. Any Protected Employee retained in the service of a Railroad, or who is later restored to service after being entitled to receive a Dismissal Allowance, and is required to change the point of such employee's employment as a result of the Project, and within the employee's Protective Period is required to move the employee's place of residence, shall be reimbursed for all expenses of moving the employee's household and other personal effects, including travel expenses, temporary living expenses, and any actual wage loss during the time necessary to make the move, and for a reasonable time thereafter, not to exceed five (5) days.

(i)    Prior Agreement. The exact extent of the responsibility of a Railroad under this Section and the ways and means of transportation shall be agreed upon in advance by the Railroad and the Protected Employee or their representatives.

(ii)    Exception. Changes in residence that are not a result of a Project, which are made after the initial change and that grow out of the normal exercise of seniority rights, are not within the purview of this Section.

(iii)    Furloughed Employees. The Railroad shall, to the same extent provided above, assume the moving expenses outlined in Section 5(b) for an employee furloughed within three (3) years after changing such employee's point of employment as a result of a Project, who elects to move their place of residence back to their original point of employment.

(iv)    Reimbursement. A claim for reimbursement shall be paid under the provisions of this Section within sixty (60) days after it is submitted, unless disputed by the Railroad, but no claim shall be paid if presented to the Railroad more than ninety (90) days after the date on which the expenses were incurred.

(c)    **Losses from Home Sale or Contract Termination**. Any Displaced Employee who is retained in the service of a Railroad (or who is later restored to service after being entitled to receive a dismissal allowance), and who is required to change the point of such employee's employment during the Protective Period as a result of a Project, is entitled to the following:

(i)    Home Sale for Less Than Fair Market Value. If the Displaced Employee owns their place of residence in the locality from which such employee is required to move, then at the Displaced Employee's option, the Railroad shall reimburse the Displaced Employee for the difference between the actual sale price and the fair market value of the employee's place of residence. The Railroad shall pay such difference within sixty (60) days after the Displaced Employee has filed a claim for such loss in accordance with Section 5(c)(vi), unless a controversy arises as to which Section 5(c)(vii) applies. In each case, the fair market value of the home in question shall be determined without consideration of the Project. The Railroad shall in each instance be afforded an opportunity to purchase the home at such fair market value before it is sold by the Displaced Employee to any other person.

(ii)    Election to Receive Closing Costs. The Displaced Employee may elect to waive the provisions of Section 5(c)(i) and to receive, in lieu thereof, an amount equal to the closing costs that are customarily paid for and assumed by a seller of real estate in the jurisdiction in which the employee's residence is located. Such costs shall include customary fees paid to a licensed realtor (not to exceed six percent (6%) of the final sale price) and any prepayment penalty required by any mortgagor or beneficiary of a deed of trust. Such costs shall not include

U.S. Department of Transportation
**Federal Railroad Administration**

the payment of any mortgage discount points or similar interest discount fees by the Displaced Employee.

(iii)    <u>Pending Contract to Purchase</u>. If a Displaced Employee has entered into a contract to purchase a place of residence, but due to a Project must cancel that contract, the Railroad shall indemnify the Displaced Employee against any losses due to such cancellation, and shall relieve the Displaced Employee from any further obligation under the contract.

(iv)    <u>Unexpired Lease</u>. If the Displaced Employee holds an unexpired lease of a dwelling as the employee's primary place of residence, and the Displaced Employee must cancel the lease due to a Project, the Railroad shall indemnify the Displaced Employee from all costs and liability arising from said cancellation.

(v)    <u>Exclusions</u>. Any change in residence that is not due to or caused by a Project, or that resulted from the normal exercise of a Protected Employee's seniority rights, shall not be within the purview of this Section.

(vi)    <u>Notification of Claims</u>. A Displaced Employee shall notify, in writing, the Railroad of such employee's claim arising from this Section 5(c) within one (1) year of the date the Displaced Employee's claim accrues.

(vii)    <u>Home Value Disagreements</u>. In the event of disagreement between a Railroad and a Displaced Employee as to the value of a Displaced Employee's claim, either party (or their representatives) may request, in writing, a joint conference to resolve the disagreement.

    A.  <u>Real Estate Appraisers</u>. If the parties are unable to resolve the disagreement, either party may refer the disagreement to two licensed real estate appraisers, one of whom shall be selected by the Displaced Employee (or such employee's representatives), and one of whom shall be selected by the Railroad. If the two selected real estate appraisers are unable to agree on a valuation within thirty (30) days, the selected real estate appraisers shall designate (or agree to a method by which to select) a third licensed real estate appraiser within ten (10) days. If unable to agree on a selection, either party may request the National Mediation Board to designate within twenty (20) days a third licensed real estate appraiser. A decision by two of the three licensed real estate appraisers shall be required to determine the value in dispute. Said decision shall be final and conclusive.

    B.  <u>Payment of Expenses</u>. The salary and expenses of the third or neutral appraiser shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

(d)    **Failure to Exercise Seniority Rights**. If a Displaced Employee is able but does not exercise such employee's seniority rights to secure another position that does not require a change in the employee's primary place of residence, the Displaced Employee shall not be entitled to moving expenses or protections due to the sale of a home outlined in Sections 5(b)&(c).



**U.S. Department of Transportation**
**Federal Railroad Administration**

**6.      Protections for Dismissed Employees.**

(a)      **Dismissal Allowance**. A Dismissed Employee shall be paid a monthly dismissal allowance from the date they are deprived of employment through the Protective Period.

(i)      Monthly Dismissal Allowance Calculation. The monthly dismissal allowance shall be equivalent to the Average Monthly Compensation received by the Dismissed Employee in the last twelve (12) months of employment prior to the employee's dismissal.

(ii)      Submission of Claim. A claim for the initial month of a dismissal allowance shall be paid within ninety (90) days and a claim for a subsequent month shall be paid within sixty (60) days after the claim is filed by the Dismissed Employee, unless the claim is disputed by the Railroad pursuant to Section 8 of this Exhibit.

(iii)      Reduction or Suspension of Dismissal Allowance. If a Dismissed Employee accepts new employment (or reemployment by the dismissing Railroad) during the Protective Period, the dismissal allowance shall be reduced such that the accepted monthly compensation at the then-current position (including any unemployment insurance compensation received) plus the dismissal allowance is equivalent to the Dismissed Employee's Average Monthly Compensation. If the compensation of the Dismissed Employee's then-current employment is greater than the dismissal allowance, the dismissal allowance shall be suspended. Such reduction or suspension shall continue for the duration of the Protective Period, unless and until the Dismissed Employee's then-current compensation is reduced or eliminated. Prior to dismissal, such Dismissed Employee (or their representative) and the dismissing Railroad shall agree upon a procedure by which such Railroad shall be informed of the earnings and benefits of such Dismissed Employee in their new position of employment.

(iv)      Early Termination. The dismissal allowance shall cease prior to the expiration of the Protective Period in the event of the Dismissed Employee's resignation, death, retirement, dismissal for justifiable cause under existing agreements, failure without good cause to return to service after being notified in accordance with an applicable working agreement, or failure without good cause to accept a comparable position that does not require a change of residence, for which the Dismissed Employee is qualified and eligible with the Railroad from which such employee was dismissed after being notified, if the employee's return does not infringe upon employment rights of other employees under a working agreement.

(b)      **Separation Allowance**. A Dismissed Employee may, at such employee's option, within seven (7) days of dismissal or an arbitration award establishing the employee's status as a Dismissed Employee, resign and (in lieu of all other benefits and protections provided in this Exhibit) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May 1936, as amended.

(c)      **Priority of Employment or Re-Employment**. Any Protected Employee whose employment is terminated or who is furloughed as a result of a Project shall, if they so request, be granted priority of employment or re-employment to fill a position comparable to that which they held on the Railroad (even if in a different craft or class), so long as they are qualified, or by training or retraining can become physically and mentally qualified, for the position. However, such priority of

**U.S. Department of Transportation**
**Federal Railroad Administration**

employment or re-employment must not be in contravention of any relevant collective bargaining agreements.

(i)      **Training or Re-Training**. In the event such training or retraining is requested by a Protected Employee pursuant to Section 6(c), the Railroad shall provide such training or retraining at no cost to the Protected Employee.

(ii)      **Waiver of Protections**. If a Protected Employee who has made a request under Section 6(c) fails without good cause within ten (10) days to accept an offer of a comparable position for which such employee has satisfactorily completed such training, the Protected Employee shall, upon the expiration of such ten (10) day period, forfeit all rights and benefits under this Exhibit.

**7.      Fringe Benefits.** No Protected Employee shall be deprived during the Protective Period of any (non-salary) rights, privileges, or benefits attached to such employee's previous employment under the terms and conditions of an existing employment agreement (including, but not limited to, free transportation, hospitalization, pensions, insurance, or vacation benefits), so long as such rights, privileges, or benefits continue to be accorded to other employees of the Railroad, in active service or on furlough as the case may be, to the extent that such rights, privileges, or benefits can be so maintained under present authority of law, corporate action, or through future authorization.

**8.      Arbitration of Disputes.**

(a)      **Scope**. Any dispute under these conditions not settled by the relevant parties will be resolved in arbitration as provided herein. In the event a Railroad and the Protected Employee(s) (or their representatives) cannot settle a dispute or controversy with respect to the interpretation, application, or enforcement of any provision of this Exhibit (other than those Sections of this Exhibit that provide for another means of dispute resolution) within thirty (30) days after the dispute arises, either party may refer the dispute to an arbitration committee. The affected Protected Employee(s) (or their representatives) may notify a Recipient of a dispute or controversy under this Section 8 to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

(b)      **Notice**. The party referring the dispute to an arbitration committee shall notify the other party in writing of its intent to refer a dispute or controversy to an arbitration committee.

(c)      **Selection of Members**. Within ten (10) days of receipt of the written notice, each party to the arbitration shall select one (1) member of the committee, and the members thus chosen shall select an additional, neutral member to serve as chairman. If any party fails to select its member of the arbitration committee within the prescribed time limit, the general chairman of the involved labor organization or a senior officer designated by the Railroad or the Recipient, as the case may be, shall be deemed the selected member. Should the members be unable to agree upon the appointment of the neutral member within ten (10) days, the parties shall then within an additional ten (10) days agree to a method by which a neutral member shall be appointed; failing such agreement, either party may request the National Mediation Board to designate within twenty (20) days the neutral member whose designation will be binding upon the parties.

(d)      **Multiple Representatives**. In the event a dispute involves more than one labor organization, each will be entitled to a representative on the arbitration committee, in which event the Railroad or Recipient may appoint additional representatives equivalent to the number of labor


U.S. Department of Transportation
**Federal Railroad Administration**

organization representatives; provided, however, that the decision in such case shall be made by the neutral member.

(e)     **Decisions Binding**. The decision, by majority vote except as provided otherwise in paragraph (d) of this Section, of the arbitration committee shall be final, binding, conclusive, and rendered within forty-five (45) days after the hearing of the dispute or controversy has been concluded and the record closed.

(f)     **Expenses**. The salaries and expenses of the neutral member shall be borne equally by the parties to the proceeding, and all other expenses shall be paid by the party incurring them.

**9.     Classification of a Protected Employee.** In the event an employee (or their representatives) cannot settle a dispute or controversy with the Railroad or the Recipient as to whether or not a particular employee would be affected by a Project, either party may refer the dispute to an arbitration committee within thirty (30) days after the dispute arises pursuant to the arbitration procedures in Section 8. For any such dispute, the employee of a Railroad shall have the burden to identify, with reasonable specificity, the Project that allegedly affected them, and to specify the pertinent facts of that Project, including the change or changes resulting from the Project that allegedly affected them. The burden shall then shift to the Railroad or Recipient to show that factors other than a change resulting from the Project affected the employee. The employee shall prevail on this issue if it is established that the Project had an effect upon the employee, even if other factors also may have affected the employee.

**10.     Resolution of Disputes for Non-Bargaining Unit Protected Employees.** Any Protected Employee who is not represented by a labor organization shall be afforded substantially the same levels of protection as are afforded to members of labor organizations under this Exhibit. In the event any dispute arises between a Railroad and an employee not represented by a labor organization with respect to the interpretation, application, or enforcement of any provision of this Exhibit that cannot be settled by the parties within thirty (30) days after the dispute arises, either party may, as an alternative to the dispute resolution procedures outlined in this Exhibit, refer the dispute within ninety (90) days after the dispute arises to the Secretary of Labor for determination. The determination of the Secretary of Labor, or their designated representative, shall be final and binding on the parties.

**11.     Severability.** In the event any provision of this Exhibit is held to be invalid or otherwise unenforceable under applicable law, the remaining provisions of this Exhibit shall not be affected.


U.S. Department of Transportation
**Federal Railroad Administration**

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS

# Exhibit D to Declaration of Timothy Sexton

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO OST-R SMART GRANT AGREEMENTS**

**Version Date: May 09, 2025**

**EXHIBIT A        APPLICABLE FEDERAL LAWS AND REGULATIONS**

By entering into this agreement for a SMART Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

1. **General Federal Legislation**
   - Federal Fair Labor Standards Act - 29 U.S.C. §§ 201, et seq.
   - Hatch Act - 5 U.S.C. §§ 1501, et seq.
   - Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. §§ 4601, et seq.
   - National Historic Preservation Act of 1966 - 54 U.S.C. § 306108
   - Archeological and Historic Preservation Act of 1974 - 54 U.S.C. §§ 312501, et seq.
   - Native American Graves Protection and Repatriation Act - 25 U.S.C. §§ 3001, et seq.
   - Clean Air Act – 42 U.S.C. §§ 7401, et. seq.
   - Clean Water Act - 33 U.S.C. §§ 1251, et seq.
   - Endangered Species Act – 16 U.S.C. §§ 1531 et seq.
   - Coastal Zone Management Act – 16 U.S.C. §§ 1451 et seq.
   - Flood Disaster Protection Act of 1973 – 42 U.S.C. §§ 4001 et seq.
   - Age Discrimination Act of 1975, as amended - 42 U.S.C. §§ 6101, et seq.
   - American Indian Religious Freedom Act, 42 U.S.C. 1996
   - Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. §§ 1101, et seq.
   - The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended - 42 U.S.C. §§ 4541, et seq.
   - Sections 523 and 527 of the Public Health Service Act of 1912, as amended, 42 U.S.C. §§ 290dd through 290dd-2.
   - Architectural Barriers Act of 1968 - 42 U.S.C. §§ 4151, et seq.

- Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 - 42 U.S.C. § 8373
- Contract Work Hours and Safety Standards Act - 40 U.S.C. §§ 3701, et seq.
- Copeland Anti-kickback Act, as amended - 18 U.S.C. § 874 and 40 U.S.C. § 3145
- National Environmental Policy Act of 1969 - 42 U.S.C. §§ 4321, et seq.
- Wild and Scenic Rivers Act – 16 U.S.C. §§ 1271, et seq.
- Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376.
- Single Audit Act of 1984 - 31 U.S.C. §§ 7501, et seq.
- Americans with Disabilities Act of 1990 - 42 U.S.C. § 12101, et seq.
- Title IX of the Education Amendments of 1972, as amended - 20 U.S.C. §§ 1681–1683 and §§ 1685–1687
- Section 504 of the Rehabilitation Act of 1973, as amended - 29 U.S.C. § 794
- Title VI of the Civil Rights Act of 1964 - 42 U.S.C. §§ 2000d, et seq.
- Title IX of the Federal Property and Administrative Services Act of 1949 - 40 U.S.C. §§ 1101–1104.
- Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
- Freedom of Information Act - 5 U.S.C. § 552, as amended.
- Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. §§ 1801, et seq.
- Farmland Protection Policy Act of 1981 – 7 U.S.C. §§ 4201, et seq.
- Noise Control Act of 1972 – 42 U.S.C. §§ 4901, et seq.
- Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. §§ 661, et seq.
- Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 - 33 U.S.C. §§ 401 and 525.
- Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 and 23 U.S.C. § 138.
- Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) – 42 U.S.C. §§ 9601, et seq.
- Safe Drinking Water Act – 42 U.S.C. §§ 300f, et seq.
- The Wilderness Act – 16 U.S.C. §§ 1131, et seq.
- Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
- Migratory Bird Treaty Act 16 U.S.C. §§ 703, et seq.
- The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252).
- Cargo Preference Act of 1954 – 46 U.S.C. § 55305.
- Build America, Buy America Act – Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1298.

- Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
- Bringing in and harboring certain aliens – 8 U.S.C. 1324
- Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

2. **Executive Orders**
- Executive Order 11990 – Protection of Wetlands
- Executive Order 12372 – Intergovernmental Review of Federal Programs.
- Executive Order 12549 – Debarment and Suspension
- Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
- Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
- Executive Order 14154, Unleashing American Energy
- Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
- Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
- Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

3. **General Federal Regulations**
- Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201
- Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200
- Investigative and Enforcement Procedures – 14 CFR Part 13
- Procedures for predetermination of wage rates – 29 CFR Part 1
- Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 CFR Part 3
- Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provision applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 CFR Part 5
- Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60, et seq.
- New Restrictions on Lobbying – 49 CFR Part 20
- Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto.

- Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 CFR Part 24
- Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25
- Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27
- DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 CFR Part 35
- Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28
- Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 CFR Part 30
- Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32
- DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38
- Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 CFR Part 26 (as applicable under section 18.3 of this agreement), including any amendments thereto.
- Specific assurances required to be included in the SMART Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

## EXHIBIT B    ADDITIONAL STANDARD TERMS

## TERM B.1    Title VI Assurance

(Implementing Title VI of the Civil Rights Act of 1964, as amended)

**Assurance Concerning Nondiscrimination In Federally-Assisted Programs And Activities Receiving Or Benefiting From Federal Financial Assistance**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act, as amended)

**49 CFR Parts 21, 25, 27, 37 and 38**

**DOT Order No. 1050.2A Standard Title VI/Non-Discrimination Assurances**

By signing and submitting the Technical Application and by entering into this agreement under the SMART Grant Program, the Recipient HEREBY AGREES THAT, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the

Office of the Secretary (OST), it is subject to and will comply with the following, including any amendments thereto:

Statutory/Regulatory Authorities

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin)
- 49 CFR Part 21 (entitled Non-discrimination in Federally-Assisted Programs of The Department of Transportation—Effectuation of Title VI of the Civil Rights Act Of 1964), including any amendments thereto.
- 28 CFR section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964)

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT.

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

SMART Grant recipients should demonstrate compliance with civil rights obligations and nondiscrimination laws, including Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act, and implementing regulations. This should include a current Title VI plan, completed Community Participation Plan, and a plan to address any legacy infrastructure or facilities that are not compliant with ADA standards. The Department's and the applicable Operating Administrations' Offices of Civil Rights may work with awarded grant recipients to ensure full compliance with Federal civil rights requirements.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally-assisted SMART Grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR § 21 will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the SMART Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:
   "The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award".

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal Financial Assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal Financial Assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:
   a) for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b) for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal Financial Assistance is extended to the program, except where the Federal Financial Assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or

structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a) the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

   b) the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

11. The Recipient shall retain all documents relevant to this Grant Agreement and the Grant Project for a period of three (3) years after completion of all projects undertaken pursuant to the Grant Agreement and receipt of final reimbursement from the U.S. Treasury, whichever is later. It shall furnish DOT, upon request, all documents and records pertaining to the determination of the amount of the Federal share or to any settlement, litigation, negotiation, or other efforts taken to recover such funds. All settlements or other final positions of the Recipient, in court or otherwise, involving the recovery of such Federal share shall be approved in advance by DOT.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing DOT/OST's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by DOT/OST. You must keep records, reports, and submit the material for review upon request to DOT/OST, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the SMART Grant Program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the SMART Grant Program.

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. Compliance with Regulations: The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, (DOT/OST), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. Non-discrimination: The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. Solicitations for Subcontracts, Including Procurements of Materials and Equipment: In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. Information and Reports: The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or DOT/OST to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or DOT/OST, as appropriate, and will set forth what efforts it has made to obtain the information.

5. Sanctions for Noncompliance: In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or DOT/OST may determine to be appropriate, including, but not limited to:
   a) withholding payments to the contractor under the contract until the contractor complies; and/or
   b) cancelling, terminating, or suspending a contract, in whole or in part.

6. Incorporation of Provisions: The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant

thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or DOT/OST may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**APPENDIX B    Clauses For Deeds Transferring United States Property**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

NOW, THEREFORE, the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Consolidated Appropriations Act, 2022 (Pub. L. 116-260, Dec. 27, 2020) the Regulations for the Administration of the SMART Grant Program, and the policies and procedures prescribed by the Maritime Administration (DOT/OST) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

(HABENDUM CLAUSE)

TO HAVE AND TO HOLD said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that:

1. no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination

with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed, and

2. the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non- discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, , and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C    Clauses For Transfer Of Real Property Acquired Or Improved Under The Activity, Facility, Or Program

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

1. The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that in the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

2. With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non- discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

3. With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities

thereon, and the above-described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns. *

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX D    Clauses For Construction/Use/Access To Real Property Acquired Under The Activity, Facility Or Program

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

1. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

2. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

3. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns. *

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

Pertinent Non-Discrimination Authorities:

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects)
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 et seq.), (prohibits discrimination on the basis of sex)
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 et seq.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 et seq.), (prohibits discrimination on the basis of age)
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex)
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not)
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex)
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

### TERM B.2    Certification Regarding Debarment, Suspension, And Other Responsibility Matters -- Primary Covered Transactions

2 CFR Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring DOT/OST approval or that is estimated to cost $25,000 or more – as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the SMART grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the SMART Grant, as set out below:

1. Instructions for Certification – First Tier Participants
   (Applicable to all first-tier subawards regardless of potential value and require first tier-subrecipients and lower-tier subrecipients to similarly check SAM.gov; and, for all first-tier procurement contracts with a value of $25,000 or more and all lower tiers of subcontracts under covered non-procurement transactions (2 CFR § 180.220).

   a) The prospective first tier participant is providing the certification set out below.

   b) The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

   c) The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

   d) The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

   e) The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f)  The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g)  The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h)  A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i)  Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j)  Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

1.  The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

    a)  Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency

    b)  Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property

    c)  Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

    d)  Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

2.  Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior DOT/OST approval or estimated to cost $25,000 or more - 2 CFR Parts 180 and 1200)

    a)  The prospective lower tier participant is providing the certification set out below.

    b)  The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

    c)  The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

    d)  The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered

Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e) The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f) The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g) A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i) Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.
2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3     Requirements Regarding Delinquent Tax Liability Or A Felony Conviction Under Any Federal Law**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023 (Pub. L. 116-260), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

1. Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or
2. Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. Definitions. For the purposes of this exhibit, the following definitions apply: "Covered Transaction" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

"Execution of Grant Agreement" Signing of this Grant Agreement by DOT and the Recipient.

"Felony Conviction" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of

the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

"Participant" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

"Tax Delinquency" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. Mandatory Check in the System for Award Management. Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "SAM") at http://www.sam.gov/ for an entry describing that entity.

3. Mandatory Certifications. Before entering a Covered Transaction with another entity, a Participant shall require that entity to:
    a) Certify whether the entity has a Tax Delinquency; and
    b) Certify whether the entity has a Felony Conviction.

4. Prohibition. If
    a) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction
    b) an entity provides an affirmative response to either certification in section 3; or
    c) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. Mandatory Notice to the USDOT
    a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.
    b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.
    c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. Flow Down. For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:
    a) require the SAM check in section 2
    b) require the certifications in section 3
    c) include the prohibition in section 4; and

    d)   require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**    **Recipient Policy To Ban Text Messaging While Driving**

Definitions.

The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.3, "Motor Vehicles" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.3, "Driving" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.3, "Text messaging" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.3, the "Government" includes the United States Government and State, local, and tribal governments at all levels.

Workplace Safety. In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

1.  adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
    a)  Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
    b)  Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
2.  Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—
    a)  Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and
    b)  Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.
    c)  Subawards and Contracts. To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

## EXHIBIT C    QUARTERLY REPORTS AND RECERTIFICATIONS: FORMAT AND CONTENT

1.  Purpose.
    The purpose of the Quarterly Reports and Recertifications under this agreement for the SMART Grant Program are to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.
2.  Format and Content. The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. At the discretion of the USDOT, modifications or additions can be made to produce a quarterly reporting format that will most effectively serve both the Recipient and the USDOT. Some projects will have a more extensive quarterly status than others. For smaller projects, the USDOT may determine that the content of the quarterly reports will be streamlined, and project status meetings will be held on a less-frequent basis.
    a)  Project Overall Status. This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any deviations from the scope of work, the schedule, or the budget that are described in this agreement.
    b)  Project Significant Activities and Issues. This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance. This

section should specifically address progress towards compliance and issues related to the National Environmental Policy Act (NEPA), the Build America Buy America Act.

c) Action Items/Outstanding Issues. This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction in order to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

d) Project Scope Overview. The purpose of this section is to provide a further update regarding the project scope. If the original scope contained in the grant agreement is still accurate, this section can simply state that the scope is unchanged.

e) Project Schedule. An updated master program schedule reflecting the current status of the program activities should be included in this section. The quarterly reporting format currently requests this in the form of the ten major project milestones. It is imperative that the master program schedule be integrated, i.e., the individual contract milestones tied to each other, such that any delays occurring in one activity will be reflected throughout the entire program schedule, with a realistic completion date being reported. This section should also detail the current schedule status, delays and potential exposures, and recovery efforts. The following information should also be included:

- Current overall project completion percentage vs. latest plan percentage.
- Completion percentages vs. latest plan percentages for major activities such as right-of-way, major or critical design contracts, major or critical construction contracts, and significant force accounts or task orders. A schedule status description should also be included for each of these major or critical elements.
- Any delays or potential exposures to milestone and final completion dates. The delays and exposures should be quantified, and overall schedule impacts assessed. The reasons for the delays and exposures should be explained, and initiatives being analyzed or implemented in order to recover the schedule should be detailed.

f. Project Cost. An updated cost spreadsheet reflecting the current forecasted cost vs. the latest approved budget vs. the baseline budget should be included in this section. One way to track project cost is to show: (1) Baseline Budget, (2) Latest Approved Budget, (3)

Current Forecasted Cost Estimate, (4) Expenditures or Commitments to Date, and (5) Variance between Current Forecasted Cost and Latest Approved Budget. Line items should include all significant cost centers, such as prior costs, right-of-way, preliminary engineering, environmental mitigation, general engineering consultant, section design contracts, construction administration, utilities, construction packages, force accounts/task orders, wrap-up insurance, construction contingencies, management contingencies, and other contingencies. The line items can be broken-up in enough detail such that specific areas of cost change can be sufficiently tracked, and future improvements made to the overall cost estimating methodology. A Program Total line should be included at the bottom of the spreadsheet. Narratives, tables, and/or graphs should accompany the updated cost spreadsheet, basically detailing the current cost status, reasons for cost deviations, impacts of cost overruns, and efforts to mitigate cost overruns. The following information should be provided:

- Reasons for each line-item deviation from the approved budget, impacts resulting from the deviations, and initiatives being analyzed or implemented in order to recover any cost overruns.
- Transfer of costs to and from contingency line items, and reasons supporting the transfers.
- Speculative cost changes that potentially may develop in the future, a quantified dollar range for each potential cost change, and the current status of the speculative change. Also, a comparison analysis to the available contingency amounts should be included, showing that reasonable and sufficient amounts of contingency remain to keep the project within the latest approved budget.
- Detailed cost breakdown of the general engineering consultant (GEC) services (if applicable), including such line items as contract amounts, task orders issued (amounts), balance remaining for tasks, and accrued (billable) costs.
- Federal obligations and/or disbursements for the project, compared to planned obligations and disbursements.

g. Certifications.
   a) A certification that the Recipient is in compliance with 2 CFR 200.303 (Internal Controls) and 2 CFR Part 200, Subpart F (Audit Requirements).
   b) The certification required under 2 CFR 200.415(a).

3. Recipients are required to complete post-award reports per the terms and conditions of the award. The types of reports include financial, performance, and other types of required reports.

4. End dates for reporting periods are 3/31, 6/30, 9/30, or 12/31, regardless of budget period start dates. Deadlines for quarterly and semi-annual reports are no later than 30 days after the end of the reporting period. Annual reports are due no later than 90 days

after the end of the reporting period. The Recipient shall provide all reporting deliverables detailed below:

Deliverables

a) Milestone Progress Performance Reports
Submit progress reports to monitor project progress and ensure accountability and financial transparency, as well as to document activities performed, anticipated activities, and any changes to schedule or anticipated issues.
Quarterly (or semi- annual if directed).

b) Federal Financial Report (FFR) (SF-425)
The Federal Financial Report (SF-425) is a financial reporting form used throughout the Federal Government Grant system. Recipients shall complete this form and attach it to each quarterly Milestone Progress Performance Reports. The form is available at https://www.grants.gov/forms/post-award-reporting-forms.html.

c) Quarterly (or semi- annual if directed)

d) Evaluation Plan
The Recipient shall submit an evaluation plan and data management plan that provides an overview of how the project will be evaluated and how the data collected will be managed and stored. The Evaluation plan and Data Management plan shall include the following three sections:

- An overview of how the proof-of-concept or prototype will be evaluated and how the data collected will be managed and stored.
- A description of the anticipated impact areas (i.e. goals) of the project if implemented at scale and the methods that will be used to estimate the anticipated benefits and costs associated with implementation.
- Robust performance metrics and measurable targets based on the project goals to inform whether the proof-of-concept or prototype meets expectations and whether full implementation would meet program goals.
- The baseline data for each performance measure that is identified in the Performance Measure Table in Attachment A and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure.    Within 90 calendar days after execution of this Agreement.

e) Data Management Plan

f) Applicants are expected to account for data and performance reporting including:

- Default to open access when appropriate (exceptions include protecting personally identifiable information [PII], Indigenous data sovereignty, or confidential business information [CBI]).
- Protect PII, intellectual property rights, and CBI.
- Utilize, when possible, open licenses and protect USDOT's non-exclusive copyright to data and corresponding outputs.
- Make the source code or tools necessary to analyze the data available to the public, if relevant.
- Provide relevant metadata (in a DCAT-US file, and, optionally, a discipline-appropriate metadata standard file), and data documentation (README.txt files, data dictionaries, code books, supporting files, imputation tables, etc.); and,
- Where applicable, consider contributing data to voluntary resources such as NHTSA's AV TEST Initiative.
- Projects should implement data management best practices including, but not limited to, implementation of published data specifications and standards (formal and informal); increasing data discoverability and data sharing; and enabling interaction of systems, interoperability, and integration of data system

g) Implementation Report

- The Recipient shall submit an Implementation report that assesses the anticipated costs and benefits of the project and demonstrates the feasibility of at-scale implementation. The Implementation Report shall include the following five sections:    Annual- Stage 1 grants require a Draft report due within 1 year of the grant award.
- Annual- Stage 2 grants will submit an annual Implementation Report for each of the three years of the grant. This report will replace the Quarterly Milestone Report for the fourth quarter of every year.
- A description of the anticipated deployment and operational costs of the project as compared to the benefits and savings from the project if implemented at scale.
- The means by which the project has met the original expectation, as projected in the grant application, including data describing the means by which the project met the specific goals.
- Lessons learned and recommendations for future deployment strategies to optimize transportation efficiency and multimodal system performance.
- For Stage 1 projects: A description of the requirements for a successful at-scale deployment and an assessment of the feasibility of at-scale implementation. For Stage 2 projects: An assessment of the at-scale

deployment thus far compared to the requirements for success, and continued feasibility of the deployment.

- For Stage 1 projects: An analysis of the success, challenges and validity of the initial approach, any changes or improvements they would make in Stage 2 if recommended for award and any challenges to continued maintenance and operations in stage 2. For Stage 2 projects: An analysis of the success, challenges and validity of the initial approach, any changes or improvements they would make going forward in future years of deployment or suggestions to others implementing a similar project.
- The performance measurement data for each performance measure that is identified in the Performance Measure Table in Attachment A.

h) Tangible Personal Property Report (SF-428)
    The recipient must report on the status of personal property in which the Federal Government retains an interest. Interim property reports may be required at DOT discretion. A final personal property report is required at closeout. As applicable

i) Real Property Status Report (SF-429)
    The report is a multi-purpose form that DOT may require for general reporting about real property acquired or constructed under a federal award, as well as for recipients to make a request related to acquisition or improvement of real property or to request disposition instructions. If applicable, recipients shall submit this report in accordance with the terms provided in 2 CFR § 200.329, no less frequently than annually. As applicable

j) Final Report
    The Recipient shall submit (in a format to be provided by DOT) the Recipient's assessment of the Grant Project to DOT within the Closeout process of the grant agreement Final report shall be submitted not later than 120 days after the end of the period of performance

k) Additional Reporting may be required, as applicable.

**Program Evaluation**

As a condition of grant award, grant recipients may be required to participate in an evaluation undertaken by USDOT or another agency or partner. Evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all the selected sites within or across grant recipients, or a benefit/cost analysis or assessment of return on investment. As a part of the evaluation, as a condition of award, grant recipients must agree to:

1. Make records available to the evaluation contractor or USDOT staff.
2. Provide access to program records, and any other relevant documents to calculate costs and benefits.
3. In case of an impact analysis, facilitate the access to relevant information as requested.

4.  Follow evaluation procedures as specified by the evaluation contractor or USDOT staff, as applicable

**Reporting of Matters Related to Recipient Integrity and Performance**

If the total value of a selected applicant's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the applicant during that period of time must maintain the currency of information reported to the SAM that is made available in the designated integrity and performance system (currently FAPIIS) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition.

This is a statutory requirement under section 872 of Public Law 110- 417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111- 212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available. As applicable

**EXHIBIT D      CERTIFICATION REGARDING INFLUENCING ACTIVITIES**

**Certification For Contracts, Grants, Loans, And Cooperative Agreements**

The undersigned certifies, to the best of his or her knowledge and belief, that:

1.  No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.
2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Influencing Activities," in accordance with its instructions.
3.  The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**EXHIBIT E    FAA REGULATIONS**

Innovative aviation projects must comply with all FAA and other federal, state, and local regulations relevant to the technologies and usages thereof. For instance, in the case of innovative aviation projects involving small, unmanned aircraft systems (UAS), applicants are responsible for complying with regulations which may include, and are not limited to the following, as necessary to achieve desired outcomes:

- 14 CFR Part 91 General Operating and Flight Rules
- 14 CFR Part 107 small UAS rule; Small UAS
- UAS Operations over People rule; Operations Over People General Overview
- UAS Remote identification rule; UAS Remote Identification Overview

Proponents of innovative aviation projects are also responsible for using U.S. government tools and resources which may include, and are not limited to the following, as necessary to fulfill requirements to operate technologies and achieve desired outcomes:

- FAA DroneZone, used to register UAS
- FAA Low Altitude Authorization and Notification Capability (LAANC), used to obtain airspace authorization to fly in controlled airspace
- Part 107 Waiver Resources, used to enable more complex UAS operations

**EXHIBIT F    COMMUNICATIONS TECHNOLOGY**

Projects that use communications technologies must either:

1. use Vehicle-to-Everything (V2X) services that utilize Cellular Vehicle-to-Everything (C-V2X) based technology designed to operate within the 30 MHz of spectrum (5.895 - 5.925 GHz) that are consistent with the rules established in waivers associated with Federal Communications Commission (FCC) ET Docket No. 19-138 and future Report and Orders effective at the time when the Department selects projects for funding under the FY22 SMART Grants Program; or
2. leverage other communications technologies that can support V2X services and operate in spectrum outside of the 5.895 -5.925 GHz range.

**EXHIBIT G    EQUIPPING OR RETROFITTING MOTOR VEHICLES**

Projects that involve equipping or retrofitting motor vehicles with additional technologies are only eligible if the vehicles are publicly owned, leased, or used in a contracted service;

equipping privately owned and operated vehicles outside of a leased or contracted service is not an eligible activity. Projects involving motor vehicles must involve only vehicles that comply with all applicable Federal Motor Vehicle Safety Standards (FMVSSs) and Federal Motor Carrier Safety Regulations (FMCSRs), or vehicles that are exempt from the requirements in a manner that allows for the legal acquisition and operation of the vehicles in the proposed project.

**EXHIBIT H    ELIGIBLE COSTS**

Broadly, eligible activity costs must comply with the cost principles set forth in 2 CFR Part 200, Subpart E (i.e., 2 CFR § 200.403 and § 200.405). USDOT reserves the right to make cost eligibility determinations on a case-by-case basis. Eligible development and construction activities for grant funding are the following:

- planning
- feasibility analyses
- revenue forecasting
- environmental review
- permitting
- preliminary engineering and design work
- systems development or information technology work
- acquisition of real property (including land and improvements to land relating to an eligible project)
- construction
- reconstruction
- rehabilitation
- replacement
- environmental mitigation
- construction contingencies
- acquisition of equipment, including vehicles.

The following are not eligible costs for SMART Grants Program funding:

- reimbursement of any pre-award costs or application preparation costs of the SMART grant application
- traffic or parking enforcement activity
- purchase or lease of a license plate reader.

Federal funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**EXHIBIT I    DATA COLLECTION REQUIREMENTS DATA MANAGEMENT**

To fulfill the reporting requirements and in accordance with the USDOT Public Access Plan, award recipients must consider, budget for, and implement appropriate data management for

data and information outputs acquired or generated during the grant. Applicants are expected to account for data and performance reporting in their budget submission. Projects must:

- Defaulting to open access when appropriate (exceptions include protecting personally identifiable information [PII], Indigenous data sovereignty, or confidential business information [CBI])
- Protecting PII, intellectual property rights, and CBI
- Utilize, when possible, open licenses and protect USDOT's non-exclusive copyright to data and corresponding outputs
- Make the source code or tools necessary to analyze the data available to the public, if relevant
- Provide relevant metadata (in a DCAT-US file, and, optionally, a discipline-appropriate metadata standard file), and data documentation (README.txt files, data dictionaries, code books, supporting files, imputation tables, etc.)
- Where applicable, consider contributing data to voluntary resources such as NHTSA's AV TEST Initiative.

Projects should implement data management best practices including, but not limited to, implementation of published data specifications and standards (formal and informal); increasing data discoverability and data sharing; and enabling interaction of systems, interoperability, and integration of data system.

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE STRENGTHENING MOBILITY AND REVOLUTIONIZING TRANSPORTATION (SMART) GRANT PROGRAM**

**GENERAL TERMS AND CONDITIONS Articles 7-30**
**Version Date: May 09, 2025**

The Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117–58, November 15, 2021) established the Strengthening Mobility and Revolutionizing Transportation (**SMART**) Discretionary Grant Program (IIJA Section 25005) and appropriated additional funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to conduct demonstration projects focused on advanced smart city or community technologies and systems in a variety of communities to improve transportation efficiency and safety. The program funds projects that are focused on using technology interventions to solve real-world challenges and build data and technology capacity and expertise in the public sector.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal Financial assistance for the **SMART** program.

These general terms and conditions are incorporated by reference in a project-specific Financial Assistance agreement under the SMART Grants Program. The project specific portion of the agreement can be found in the document titled "Specific Terms and Conditions Articles 1-6". The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F in Article 6 of that document are project-specific attachments.

**ARTICLE 7      PURPOSE**

**7.1      Purpose.**

The purpose of this award is to is to conduct demonstration projects focused on advanced smart city or community technologies and systems in a variety of communities to improve transportation efficiency and safety. The program funds projects that are focused on using technology interventions to solve real-world challenges and build data and technology capacity and expertise in the public sector. The parties will accomplish that purpose by achieving the following objectives:

  a)  timely completing the Project; and

  b)  ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by Attachment B in Article 6 of the Specific Terms and Conditions Articles 1-6.

## ARTICLE 8    USDOT ROLE

### 8.1    Division of USDOT Responsibilities.

The Office of the Secretary of Transportation—Research and Technology (OST-R) is ultimately responsible for the USDOT's administration of the SMART Grant Program.

### 8.2    USDOT Program Contacts.

> U.S. Department of Transportation
> Office of the Assistant Secretary for Research and Technology
> 1200 New Jersey Avenue, SE
> Washington, DC 20590 SMART@dot.gov

## ARTICLE 9    RECIPIENT ROLE

### 9.1    Statements on the Project

The Recipient states that:

a) all material statements of fact in the Grant Application were accurate when the application was submitted; and

b) Attachment B of Article 6 in the Specific Terms and Conditions Articles 1-6 documents all material changes in the information contained in that application.

### 9.2    Statements on Authority and Capacity

The Recipient states that:

a) it has the authority to receive Federal Financial Assistance under this agreement, and it has the legal authority to complete the Project

b) it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement

c) not less than the difference between the "Total Eligible Project Cost" and the SMART "Award  Amount" listed in Article 2 of the Specific Terms and Conditions Articles 1-6 are committed to fund the Project

d) the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this Article 9 and in Article 24.7 on behalf of the Recipient.

### 9.3    USDOT Reliance

The Recipient acknowledges that:

a) the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award

b) the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO

c) the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

d) the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4     Project Delivery**

a) the Recipient shall complete the Project under the terms of this agreement

b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies

c) the Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies

d) the Recipient shall provide access to records as provided at 2 CFR 200.337.

**9.5     Rights and Powers Affecting the Project**

a) the Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT

b) the Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement

c) the Recipient shall ensure that the funds provided by USDOT are not misappropriated or misdirected to any other account, need, project, line-item, or the like.

**9.6     Notification of Changes to Key Personnel.**

The Recipient shall notify all USDOT representatives who are identified in section 4 of Article 4 in the Specific Terms and Conditions Articles 1-6 in writing within 30 calendar days of any change in key personnel who are identified in section 3 of Article 4.

**ARTICLE 10     AWARD AMOUNT, OBLIGATION, AND TIME PERIODS**

**10.1     Federal Award Amount**

The USDOT hereby awards to the Recipient the amount listed in section 2 of Article 2 in the Specific Terms and Conditions Articles 1-6 as the SMART Grant amount.

**10.2    Federal Obligations.**

This agreement obligates funds for the Period of Performance listed in section 2 of Article 3 in the Specific Terms and Conditions Articles 1-6.

**10.3    Budget Period**

The Budget Period for this award begins on the date of this agreement and ends on the budget period end date as specified in section 3 of Article 2 in the Specific Terms and Conditions Articles 1-6.

In this agreement, "Budget Period" is used as defined at 2 CFR 200.1.

**10.4    Period of Performance**

This award begins on the "Effective date" and ends on the" End date" as specified in section 2 of Article 3 in the Specific Terms and Conditions Articles 1-6.

In this agreement, "Period of Performance" is used as defined at 2 CFR 200.1.

**ARTICLE 11    STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES**

**11.1    Notification Requirement**

The Recipient shall notify all USDOT representatives who are identified in section 4 of Article 4 in the Specific Terms and Conditions Articles 1-6 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project.

**11.2    Statement of Work Changes**

If the Project's activities differ from the statement of work that is described in section 3 of Article 3 and Attachment B of Article 6 in the Specific Terms and Conditions Articles 1-6, then the Recipient shall request an amendment of this agreement.

**11.3    Schedule Changes**

If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement:

   a)   a substantial completion date for the Project or a component of the Project

b) a schedule change would require the Period of Performance to continue after the period of performance end date listed in Section 2 of Article 3 in the Specific Terms and Conditions Articles 1-6**.**

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

**11.4    Budget Changes**

a) the Recipient acknowledges that if the cost of completing the Project increases:

1. that increase does not affect the Recipient's obligation under this agreement to complete the Project

2. the USDOT will not increase the amount of this award to address any funding shortfall

b) For budget changes, the Recipient shall request an amendment of this agreement to update section 2 of Article 2 unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

c) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 2 of Article 2 in the Specific Terms and Conditions Articles 1-6, the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in section 1 of Article 7.

d) If the actual eligible project costs are less than the "Total Eligible Project Cost" and the Recipient does not make a proposal in accordance with the guidance in Article 11 or the USDOT does not accept the Recipient's proposal, then:

1. in a request accordance with section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" and the actual eligible project costs; and

2. if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SMART Action Plan or Implementation Grant Amount" and the "Other Federal Funds" amounts that are listed in section 2 of Article 2 in the Specific Terms and Conditions Articles 1-6.

a) The Recipient acknowledges unexpended amounts are required to be refunded, and constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–999)

b) The Recipient shall ensure compliance with Federal regulations requiring conduct of a Federally approved audit of any expenditure of funds of $750,000 or more in a year in Federal awards.

## 11.5   USDOT Acceptance of Changes

The USDOT may accept or reject amendments requested under this Article 11, and in doing so may elect to consider only the interests of the SMART grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this Article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement per guidance provided in Article 21, Agreement Modifications.

## ARTICLE 12     GENERAL REPORTING TERMS

### 12.1   Report Submission

The Recipient shall send all reports required by this agreement in accordance with the instructions provided in the SMART Reporting Requirements Checklist.

### 12.2   Paperwork Reduction Act Notice

Under 5 CFR 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "OMB"). Collections of information conducted under this agreement are approved under OMB Control No. 2105-0520.

## ARTICLE 13     PROGRESS AND FINANCIAL REPORTING

### 13.1   Quarterly Program Performance Reports

The recipient shall submit to USDOT Quarterly Project Progress Reports in the format and with the content described in Exhibit C of the Program Exhibits attachment.

Due dates for reporting periods are **3/31, 6/30, 9/30, or 12/31**, regardless of budget period start dates. Recipients shall submit quarterly reports are no later than **30 days after** the end of the reporting period. Annual reports are due no later than **90 days after** the end of the reporting period.

### 13.2   Quarterly Financial Status

Recipient shall submit a Federal Financial Report using SF- 425 in accordance with specified due dates.

## ARTICLE 14     PERFORMANCE REPORTING

### 14.1   Evaluation and Data Management Plans

The Recipient shall submit to the USDOT, no later than **90 days after** receiving the award, a report that provides an overview of how the project will be evaluated ('Evaluation Plan') and a report that describes how the data collected will be managed and stored ('Data management Plan') including:

a) an overview of how the proof-of-concept or prototype will be evaluated and how the data collected will be managed and stored

b) a description of the anticipated impact areas (i.e. goals) of the project if implemented at scale and the methods that will be used to estimate the anticipated benefits and costs associated with implementation

c) robust performance metrics and measurable targets based on the project goals to inform whether the proof-of-concept or prototype meets expectations and whether full implementation would meet program goals, and

d) the baseline data for each performance measure that is identified in the Performance Measure Table in Attachment A of Article 6, accurate as of the Baseline Measurement Date that is identified in Attachment A and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

Guidance on the preparation and submission of each of these reports is available on the SMART Grants website under 'Resources for all Grantees'.

**14.2    Implementation Report**

The Recipient shall submit to the USDOT, not later than **1 year after** receiving the grant award, a report that describes, consistent with section 25005(f) of IIJA:

a) the deployment and operational costs of the project, as compared to the benefits and savings from the project

b) the means by which the project has met the original expectation, as projected in the SMART grant application, including data describing the means by which the project met the specific goals for the project

c) lessons learned and recommendations for future deployment strategies to optimize transportation efficiency and multimodal system performance

d) a description of the requirements for a successful at-scale deployment, an assessment of the feasibility of at-scale implementation, and an analysis of the success, challenges, and validity of the initial approach

e) the performance measurement data for each performance measure that is identified in the Performance Measure Table in Attachment A of Article 6 in the Specific Terms and Conditions Articles 1-6**.**

   **\*\*Implementation Report. A final version of this report is due at the end of the Period of Performance.**

**14.3    Performance Reporting Survival**

The data collection and reporting requirements in this Article 14 survive three years post period of performance.

**14.4    Program Evaluation**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across Grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor or USDOT staff; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

**ARTICLE 15    NONCOMPLIANCE AND REMEDIES**

**15.1    Noncompliance Determinations**

a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or any of the Terms and Conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

b) If the USDOT notifies the Recipient of a proposed determination of noncompliance, the Recipient may, no later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

   1. accept the remedy

   2. acknowledge the noncompliance, but propose an alternative remedy; or

3. dispute the noncompliance.

**To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

c) The USDOT may make a final determination of noncompliance only:
   1. after considering the Recipient's response in accordance 15.1(b);

   2. if the Recipient fails to respond under in accordance with 15.1(b), after the time for that response has passed.

d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

**15.2    Remedies.**

a) If the USDOT makes a final determination of noncompliance under in accordance with 15.1(d), the USDOT may impose a remedy, including:

   1. additional conditions on the award

   2. any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments, disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180

   3. requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

   4. any other remedy legally available.

b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

d) In imposing a remedy or making a public interest determination under section 15.2, USDOT may elect to consider the interests of only the USDOT

e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under section 15.2 constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims Federal Claims Collection Standards (31 CFR Part 901).

### 15.3    Other Oversight Entities

Nothing in this Article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

### ARTICLE 16    AGREEMENT TERMINATION

### 16.1    USDOT Termination

a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

1. Recipient fails to meet any milestone by six months

2. the Recipient fails to comply with the Terms and Conditions of this agreement, including a material failure to comply, even if it is beyond the reasonable control of the Recipient; or

3. the USDOT determines that termination of this agreement is in the public interest.

4. the Recipient fails to expend the funds within 2 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

d) The Recipient may request that the USDOT terminate the agreement.

### 16.2    Closeout Termination

a) This agreement terminates on Project Closeout.

b) In this agreement, "Project Closeout" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 CFR 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

### 16.3    Post-Termination Adjustments

The Recipient acknowledges that under 2 CFR 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events**

e) The end of the Period of Performance does not terminate this agreement or the Recipient's obligations under this agreement.

f) The liquidation of funds as specified in section 1 of Article 20 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5    Other Remedies.**

The termination authority under this Article 16 supplements and does not limit the USDOT's remedial authority under Article 15 or 2 CFR Part 200, including 2 CFR 200.339–200.340.

**ARTICLE 17        MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS**

**17.1    Recipient Monitoring and Record Retention**

a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

   1. that those activities comply with this agreement

   2. that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 CFR 200.332(e).

c) The Recipient shall retain records relevant to the award as required under 2 CFR 200.334.

**17.2    Financial Records and Audits**

a) the Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

b) the Recipient shall keep accounts and records described in section 17.2(a) in accordance with a financial management system that meets the requirements of 2 CFR 200.301– 200.307, 2 CFR Part 200 subpart F, will facilitate an effective audit in accordance with 31 U.S.C. 7501– 7506

c) the Recipient shall separately identify expenditures under the SMART program, a grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

1. list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 CFR Part 200, subpart F, including "DOT SMART" in the program name; and

2. list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "DOT SMART" in column c ("Additional Award Identification").

## 17.3    Internal Controls.

The Recipient shall establish and maintain internal controls as required under 2 CFR 200.303.

## 17.4    USDOT Record Access

The USDOT may access Recipient records related to this award under 2 CFR 200.337.

## ARTICLE 18    CONTRACTING AND SUBAWARDS

For domestic sourcing compliance purposes and to ensure proper procurement, recipients shall coordinate with the SMART Program office to identify if their project is considered an Infrastructure project.  If USDOT determines that a project is a "project for infrastructure," the recipient will comply with Build America Buy America requirements. If USDOT determines that a project is not a "project for infrastructure," the recipient will comply with Buy American Act requirements. The Recipient may participate in planning activities before project identification, as long as it does not include the purchasing of physical materials or a commitment to do so.

## 18.1    Build America, Buy America.

This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021). and Office of Management and Budget (OMB) Memorandum M-24-02, "Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

For BABA compliance purposes and to ensure proper procurement, recipients shall coordinate with the SMART Program office to identify if their project is considered an Infrastructure project. If USDOT determines that a project is a "project for infrastructure," the recipient will comply with Build America Buy America requirements. If USDOT determines that a project is not a "project for infrastructure," the recipient will comply with Buy American Act requirements. The Recipient may participate in planning activities before project identification, as long as it does not include the purchasing of physical materials or a commitment to do so.

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States

b) all manufactured products used in the project are produced in the United States— this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

### *Inapplicability*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

### *Waivers*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

a) applying the domestic content procurement preference would be inconsistent with the public interest

b) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality

c) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

### Definitions

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material:

(i) Non-ferrous metals
(ii) Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables)
(iii) Glass (including optic glass)
(iv) Fiber optic cable (including drop cable)
(v) Optical fiber
(vi) Lumber
(vii) Engineered wood
(viii) Drywall

"Predominantly of iron or steel" means that the cost of the iron and steel content in the article, material, or supply exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

"Infrastructure Project" means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project.

"Project" means the construction, alteration, maintenance, or repair of infrastructure in the United States.

a) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117- 58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1294 (2021), as implemented by OMB, USDOT, and OST. The Recipient acknowledges that this agreement is neither  a waiver of § 70914(a) nor a finding under § 70914(b).

b) Under 2 CFR 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United

States. The Recipient shall include the requirements of 2 CFR 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

**18.2    Buy American Act**

The Recipient shall apply, comply with, and implement all provisions of the Buy American Act, 41 U.S.C. §§ 8301-8305.

For the purpose of Article 18 of this agreement, the Project is deemed a public work of the Federal Government under 41 U.S.C. § 8301.

Article 18 implements 41 U.S.C. §§ 8301-8305, the Buy American Act, by providing a preference for domestic construction material.

The Recipient shall not use foreign construction materials in performing this agreement, except that:

- a) the Recipient may use a commercially available off-the-shelf item under 41 U.S.C. § 1907 regardless of its components if the item is manufactured in the United States

- b) the Recipient may use information technology that is a commercial item

- c) the Recipient may use foreign construction materials that are listed at 48 CFR 25.104

- d) the Recipient may use foreign construction materials if the USDOT has authorized their use under subsection (d) of Article 18.

If the Recipient uses foreign construction material in violation of Article 18, the USDOT may disallow and deny reimbursement of costs incurred by the Recipient and take other remedial actions under Article 15 and 2 CFR 200.339.

- a) The USDOT may authorize the Recipient to use foreign construction material, if the USDOT determines that:

    - 1. applying the Buy American statute to the construction material would be impracticable or inconsistent with the public interest

    - 2. the construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality

    - 3. the cost of domestic construction material is unreasonable. To determine if a cost is unreasonable, the USDOT will follow processes described in 48 CFR 25.106.

The Recipient may request that the USDOT authorize the Recipient to use foreign construction materials. The Recipient shall provide adequate information for the USDOT to evaluate the request, including:

a) a description of the foreign and domestic construction materials

b) unit of measure

c) quantity

d) price, including all delivery costs to the construction site and any applicable duty (whether or not a duty-free certificate may be issued)

e) time of delivery or availability

f) location of the construction project

g) name and address of the proposed supplier

h) a detailed justification of the reason for use of foreign construction materials identifying the specific basis for an exception under subsection (d) of this term

i) if the Recipient requests authorization under subsection (d)(3) of Article 18, a reasonable survey of the market and a full price comparison measuring the relative costs of the available domestic and foreign construction materials; and

j) if the Recipient submits the request after contract award, an explanation why the Recipient could not have, before contract award:

 1. reasonably foreseen the need for the determination and

 2. requested the determination.

The Recipient acknowledges that:

a) this agreement is not a Government procurement contract

b) acquisitions of supplies, services, or construction materials by the Recipient under this agreement are not acquisitions by the Government

c) the Free Trade Agreement exceptions to the Buy American Act as provided by 48 CFR Part 25, Subpart 25.4 are inapplicable to this agreement.

In Article 18, the following definitions apply:

*"Commercially Available Off-The-Shelf (COTS) Item"* means

a) any item of supply (including construction material) that is:

 1. a commercial item as defined by 48 CFR § 2.101

 2. sold in substantial quantities in the commercial marketplace

3. offered to the Government, under an agreement, without modification, in the same form in which it is sold in the commercial marketplace; and

b) does not include bulk cargo, as defined in 46 U.S.C. § 40102(4), such as agricultural products and petroleum products. "construction material" means an article, material, or supply brought to the construction site by the Recipient for incorporation into the building or work. The term also includes an item brought to the site preassembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete systems incorporated into a public building or work and that are produced as complete systems, are evaluated as a single and distinct construction material regardless of when or how the individual parts or components of those systems are delivered to the construction site.

*"Cost Of Components" means*

b) For components purchased by the Recipient, the acquisition cost, including transportation costs to the place of incorporation into the construction material (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

c) For components manufactured by the Recipient, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (1) of this definition, plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the construction material.

*"Domestic Construction Material" means*

a) for construction material that does not consist wholly or predominantly of iron or steel or a combination of both

1. an unmanufactured construction material mined or produced in the United States; or

2. a construction material manufactured in the United States, if:

   i. the cost of its components mined, produced, or manufactured in the United States exceeds 60 percent of the cost of all its components, except that the percentage will be 65 percent for items delivered in calendar years 2024 through 2028 and 75 percent for items delivered in calendar year 2029 or later. Components of foreign origin of the same class or kind for which nonavailability determinations have been made are treated as domestic; or

   ii. the construction material is a COTS item manufactured in the United States

b) for construction material that consists wholly or predominantly of iron or steel or a combination of both, a construction material manufactured in the United States if the cost

of foreign iron and steel constitutes less than 5 percent of the cost of all the components used in such construction material. The cost of foreign iron and steel includes but is not limited to the cost of foreign iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the construction material and a good faith estimate of the cost of all foreign iron or steel components excluding COTS fasteners. Iron or steel components of unknown origin are treated as foreign. If the construction material contains multiple components, the cost of all the materials used in such construction material is calculated in accordance with the definition of "cost of components" in this term.

*"Foreign Construction Material"* means a construction material other than a domestic construction material.

*"predominantly of iron or steel or a combination of both"* means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components excluding COTS fasteners.

"United States" means the 50 States, the District of Columbia, and outlying areas.

**18.3    Small and Disadvantaged Business Requirements.**

a) If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR Part 26, including any amendments thereto.

b) If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**18.4    Engineering and Design Services.**

The Recipient shall award each contract or sub- contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under 2 CFR 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

**18.5    Foreign Market Restrictions.**

The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by

the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**18.6    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 CFR 200.216 and 2 CFR 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**18.7    Recipient Responsibilities for Subawards.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 CFR Parts 200 and 1201, including 2 CFR 200.331–200.333.

**ARTICLE 19    COSTS, PAYMENTS, AND UNEXPENDED FUNDS**

**19.1    Limitation of Federal Award Amount.**

Under this award, the USDOT shall not provide funding greater than the "Funds Obligated" amount, as specified on the SMART Assistance Agreement.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**19.2    Projects Costs**

This award is subject to the cost principles at 2 CFR part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3    Timing of Project Costs**

a) The Recipient shall not charge to this award costs that are incurred after the period of performance.

b) The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement.

**19.4    Recipient Recovery of Federal Funds**

The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in

court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

### 19.5    Unexpended Federal Funds

Any Federal funds that are awarded but not expended on allocable, allowable costs remain the property of the United States.

### 19.6    Timing of Payments to the Recipient

a)  When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

b)  Pursuant to 2 CFR 200.305, advance payments to Recipient must be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements of the Recipient in carrying out the purpose of the approved program or project. The timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements by the Recipient for direct program or project costs and the proportionate share of any allowable indirect costs. The Recipient must make timely payment to contractors in accordance with the contract provisions.

### 19.7    Payment Method

a)  the Recipient shall use the DELPHI e-Invoicing System to request reimbursement or advance payment under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method

b)  the USDOT may deny a payment request that is not submitted using the method identified in section 2 of Article 5 in the Specific Terms and Conditions Articles 1-6.

### 19.8    Information Supporting Expenditures

a)  the Recipient shall electronically submit the SF-270 (Outlay Report and Request for Advance or Reimbursement for Non-Construction Program) or the SF-271 (Outlay Report and Request for Advance or Reimbursement for Non-Construction Program) to identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, travel, etc.

b)  If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

### 19.9    Reimbursement Frequency

The Recipient shall not request reimbursement more frequently than monthly.

**ARTICLE 20      LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY**

**20.1    Liquidation of Recipient Obligations**

a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than 120 days after the end of the Period of Performance.

b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 CFR 200.344–200.346.

**ARTICLE 21      AGREEMENT MODIFICATIONS**

**21.1    Bilateral Modifications.**

The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications**

The USDOT may update the contacts who are listed in section 4 of Article 4 in the Specific Terms and Conditions Articles 1-6 by written notice to all of the Recipient contacts.

**21.3    USDOT Unilateral Modifications**

a)  the USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute

b)  to unilaterally modify this agreement, the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications.**

The parties shall not amend, modify, or supplement this agreement except as permitted under Articles 21.1, 21.2, or 21.3. If an amendment, modification, or supplement is not permitted under Article 21.1, not permitted under ~~Sections~~ Article 21.2, and not permitted under ~~Sections~~ Article 21.3, it is void.

**ARTICLE 22      Reserved**

**ARTICLE 23      Reserved**

**ARTICLE 24      ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

**24.1    Uniform Administrative Requirements for Federal Awards.**

The Recipient shall comply with the obligations on non-Federal entities under 2 CFR Parts 200 and 1201.

**24.2    Federal Law and Public Policy Requirements.**

The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and

a) the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**24.3    Federal Freedom of Information Act**

a) the USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

b) the Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**24.4    History of Performance**

Under 2 C.F.R 200.206, any Federal awarding agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**24.5    Whistleblower Protection**

a) the Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

b) the Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**24.6    External Award Terms and Obligations**

a) In addition to this document and the contents described in Article 29, this agreement includes the following additional terms as integral parts:

1. Appendix A to 2 CFR Part 25: System for Award Management and Universal Identifier Requirements

2. Appendix A to 2 CFR Part 170: Reporting Subawards and Executive Compensation

3. 2 C.F.R 175: Award Term for Trafficking in Persons; and

4. Appendix XII to 2 CFR Part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

b) The purpose of this section is to ensure that the Recipient has a plan to comply with Title VI and 49 CFR Part 21, including any amendments thereto.

The Recipient shall comply with:

1. 49 CFR Part 20: New Restrictions on Lobbying

2. 49 CFR Part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto.

3. 49 CFR Part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

4. Subpart B of 49 CFR Part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**24.7    Incorporated Certifications**

The Recipient makes the statements in the following certifications, which are incorporated by reference:

    1. Appendix A to 49 CFR Part 20 (Certification Regarding Lobbying).

## ARTICLE 25    ASSIGNMENT

### 25.1    Assignment Prohibited

The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 26    WAIVER

### 26.1    Waivers

a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT

b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

## ARTICLE 27    ADDITIONAL TERMS AND CONDITIONS

### 27.1    Disclaimer of Federal Liability.

The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement. Environmental Review

a) In this section, "Environmental Review Entity" means:

    1. if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

    2. for all other cases, an operating agency within the Department of Transportation will be identified to conduct NEPA evaluations.

b) Except as authorized under Article 27.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

1. the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

2. if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

c) If the Recipient is using procedures for early acquisition of real property under 23 CFR 710.501 or hardship and protective acquisitions of real property 23 CFR 710.503, the Recipient shall comply with 23 CFR 771.113(d)(1).

d) The Recipient acknowledges that:

1. the Environmental Review Entity's actions under Article 27.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

2. applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

e) Consistent with 23 CFR 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

f) The activities described in this agreement may inform environmental decision- making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

1. the parties may amend this agreement under Article 21.1 for consistency with the selected build alternative; or

2. if the USDOT determines that the condition at Article 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under Article 16.1(a)(5).

g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

h) The Recipient may not expend any of the funds provided in this Agreement or incur expenses under this Agreement on final design, construction, or other activities that represent an irretrievable commitment of resources unless and until it complies with the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) ("NEPA"), Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) ("NHPA"), and any other applicable environmental laws and regulations, and DOT has provided the Recipient with a written notice that the environmental review process is complete. At that time, DOT may authorize the distribution and expenditure of funds.  The Recipient may not obligate or

expend any funds (federal, state or private) for final design, construction, or other activities that represent an irretrievable commitment of resources for the Project, or commence any part of final design, construction, or other activities that represent an irretrievable commitment of resources for the Project or any component of the Project, without receiving such written confirmation from DOT. The Recipient may participate in planning activities, as long as they do not constitute an irretrievable commitment to a specific course of action. Depending on the outcome of the environmental review process, DOT may rescind this Agreement or may pursue any other permissible remedy under 2 CFR § 200.338-200.342.

## 27.2    Railroad Coordination

If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 CFR 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of- way.

## 27.3    Relocation and Real Property Acquisition

a) the Recipient shall comply with the land acquisition policies in 49 CFR Part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

b) the Recipient shall provide a relocation assistance program offering the services described in 49 CFR Part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR Part 24 subparts D–E.

c) the Recipient shall make available to displaced persons, within a reasonable period of time prior to displacement, comparable replacement dwellings in accordance with 49 CFR Part 24 subpart E.

## 27.4    Equipment Disposition

a) In accordance with 2 CFR 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the awarding agency.

b) In accordance with 2 CFR 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR 200.313–200.316 and 2 CFR 1201.313.

c) the Recipient shall ensure compliance with this Article for all tiers of subawards under this award.

**ARTICLE 28     MANDATORY AWARD INFORMATION**

**28.1     Information Contained in a Federal Award**

For 2 CFR 200.211

a)  the "Federal Award Date" is the date of this agreement, as defined under Article 30.2

b)  the Assistance Listings Number is 20.941 and the Assistance Listings Title is "Strengthening Mobility and Revolutionizing Transportation (SMART) Grants Program"

c)  this award is not for research and development.

**ARTICLE 29     CONSTRUCTION AND DEFINITIONS**

**29.1     Attachments.**

This agreement includes the following attachments as integral parts:

- Attachment A  Performance Measurement Information (Article 6)

- Attachment B  Changes from Application (Article 6)

- Attachment C  Reserved

- Attachment D  Reserved

- Attachment E  Labor and Workforce

- Attachment F  Reserved

**29.2     Exhibits**

The following exhibits, which are in the document titled "Exhibits to Grant Agreements Under the SMART Grant Program", available at https://www.transportation.gov/grants/SMART, are part of this agreement:

- Exhibit A Applicable Federal Laws and Regulations

- Exhibit B Additional Standard Terms

- Exhibit C Quarterly Reports and Recertifications: Format and Content

- Exhibit D Certification for Contracts, Grants, Loans, And Cooperative Agreements

- Exhibit E FAA Regulations

- Exhibit F Communications Technology

- Exhibit G Equipping or Retrofitting Motor Vehicles

- Exhibit H Eligible Costs

- Exhibit I Data Collection Requirements

**29.3  Construction**

a)  If a provision in the exhibits or the attachments conflicts with a provision in articles 1–30, then the provision in articles 1–30 prevails. If a provision in the attachment(s) conflicts with a provision in the exhibits, then the provision in the attachments prevails.

**29.4  Integration**

This agreement constitutes the entire agreement of the parties relating to the SMART grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SMART grant program and awards under that program.

**29.5  Definitions**

In this agreement, the following definitions apply:

*"Program Statute"* means the Section 25005 of the Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117–58, November 15, 2021; and statutory text under the heading "Strengthening mobility and revolutionizing transportation grant program" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021) and all other provisions of that act that apply to amounts appropriated under that heading.

*"Project"* means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement, including "Specific Terms and Conditions Articles 1-6**,**" Article ~~article~~ 3 and Attachments A-E.

*"SMART Grant"* means an award of funds that were made available under the NOFO.

*"Grant Application"* means the application identified in Article 2.1 of the Specific Terms and Conditions Articles 1-6**,** including Standard Form 424 and all information and attachments submitted with that form through ValidEval.

**ARTICLE 30    AGREEMENT EXECUTION AND EFFECTIVE DATE**

**30.1  Counterparts.**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**30.2   Effective Date**

The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SMART Grant when the USDOT's authorized representative signs it.

**30.3   Termination**

Should this Grant Agreement be terminated prior to the end date of the Period of Performance, USDOT reserves the right to require that the Recipient return to USDOT any of the funds reimbursed for expenses subsequently deemed ineligible.