1
2
3
4
5

THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7
8

MARTIN LUTHER KING, JR.
COUNTY; PIERCE COUNTY;
SNOHOMISH COUNTY; CITY AND
COUNTY OF SAN FRANCISCO;
COUNTY OF SANTA CLARA; CITY
OF BOSTON; CITY OF COLUMBUS;
CITY OF NEW YORK; CITY &
COUNTY OF DENVER;
METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY;
PIMA COUNTY; COUNTY OF
SONOMA; CITY OF BEND; CITY OF
CAMBRIDGE; CITY OF CHICAGO;
CITY OF CULVER CITY; CITY OF
MINNEAPOLIS; CITY OF PASADENA;
CITY OF PITTSBURGH; CITY OF
PORTLAND; CITY OF SAN JOSÉ;
CITY OF SANTA MONICA; CITY OF
TUCSON; CITY OF WILSONVILLE;
CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY; INTERCITY
TRANSIT; SAN FRANCISCO COUNTY
TRANSPORTATION AUTHORITY;
TREASURE ISLAND MOBILITY
MANAGEMENT AGENCY; PORT OF
SEATTLE; KING COUNTY REGIONAL
HOMELESSNESS AUTHORITY;
SANTA MONICA HOUSING
AUTHORITY; COUNTY OF
ALAMEDA; CITY OF
ALBUQUERQUE; MAYOR AND CITY
COUNCIL OF BALTIMORE; CITY OF
BELLEVUE; CITY OF BELLINGHAM;

No. 2:25-cv-00814-BJR

SECOND AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 1

1  CITY OF BREMERTON; COUNTY OF
   DANE; CITY OF EUGENE; CITY OF
2  HEALDSBURG; COUNTY OF
   HENNEPIN; KITSAP COUNTY; CITY
3  OF LOS ANGELES; CITY OF
   MILWAUKEE; MILWAUKEE
4  COUNTY; MULTNOMAH COUNTY;
   CITY OF OAKLAND; CITY OF
5  PACIFICA; CITY OF PETALUMA;
   RAMSEY COUNTY; CITY OF
6  ROCHESTER; CITY OF ROHNERT
   PARK; CITY OF SAN DIEGO; SAN
7  MATEO COUNTY; CITY OF SANTA
   ROSA; CITY OF WATSONVILLE;
8  CULVER CITY HOUSING
   AUTHORITY; PUGET SOUND
9  REGIONAL COUNCIL; SONOMA
   COUNTY TRANSPORTATION
10 AUTHORITY; and SONOMA COUNTY
   COMMUNITY DEVELOPMENT
11 COMMISSION,
12
13                          Plaintiffs,
14 vs.
15
16 SCOTT TURNER in his official capacity
   as Secretary of the U.S. Department of
17 Housing and Urban Development; the
   U.S. DEPARTMENT OF HOUSING
18 AND URBAN DEVELOPMENT; SEAN
   DUFFY in his official capacity as
19 Secretary of the U.S. Department of
   Transportation; the U.S. DEPARTMENT
20 OF TRANSPORTATION; TARIQ
   BOKHARI in his official capacity as
21 acting Administrator of the Federal
   Transit Administration; the FEDERAL
22 TRANSIT ADMINISTRATION;
   GLORIA M. SHEPHERD in her official
23 capacity as acting Director of the Federal
   Highway Administration; the FEDERAL
24 HIGHWAY ADMINISTRATION;
   CHRIS ROCHELEAU in his official
25 capacity as acting Administrator of the
   Federal Aviation Administration; the
26

27 SECOND AMENDED COMPLAINT FOR
   DECLARATORY JUDGMENT AND
   INJUNCTIVE RELIEF - 2

FEDERAL AVIATION
ADMINISTRATION; DREW FEELEY in
his official capacity as acting
Administrator of the Federal Railroad
Administration; the FEDERAL
RAILROAD ADMINISTRATION;
ROBERT F. KENNEDY, JR. in his
official capacity as Secretary of the U.S.
Department of Health and Human
Services; and the U.S. DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

                    Defendants.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 3

## I.    INTRODUCTION

1.    It is not the prerogative of the President "to make laws or a law of the United States," which would plainly "invade the domain of power expressly committed by the constitution exclusively to congress." *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). Rather, it is the duty of the President, and, by extension, the executive branch agencies he administers, to "take care that the laws are faithfully executed." U.S. Const. art. II, sec. 3. Among other things, this duty requires the executive branch to respect the powers granted to Congress and those reserved to the states, while carefully administering statutes enacted through the legislative process.

2.    In authorizing federal grant dispersals, Congress exercised its spending power to establish permissible conditions that agencies may impose on a grant award. An agency lacks authority to impose grant conditions beyond what Congress has authorized, and such "conditions are ultra vires." *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019). In short, an agency's power to condition grants is wholly dependent on the existence of statutory authority. *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

3.    Moreover, Congress's power to attach conditions to federal grants is constrained by the Constitution. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The Executive's power to attach conditions to federal grants thus is further restricted by these limits on congressional power.

4.    Here, the U.S. Department of Housing and Urban Development (HUD), often acting through its program offices; the U.S. Department of Transportation (DOT), often acting through its operating administrations, including the Federal Transit Administration (FTA), the Federal Highway Administration (FHWA), the Federal Aviation Administration (FAA), and the Federal Railroad Administration (FRA) (collectively, the "DOT Defendants"); and the U.S.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 4

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Department of Health and Human Services (HHS), often acting through its operating divisions and agencies,[1] seek to impose conditions on funding, provided through congressionally authorized federal grant programs, to coerce grant recipients that rely on federal funds into implementing President Trump's policy agenda, and direct them to adopt his legal positions, contrary to settled law. By unilaterally imposing grant conditions Congress has not authorized and that even Congress could not constitutionally enact, Defendants usurp Congress's power of the purse. These conditions bear little or no connection to the purposes of the grant programs Congress established. They also contravene bedrock separation of powers principles and violate numerous other constitutional and statutory protections, including (among others) the Spending Clause, the Tenth Amendment's anti-commandeering principle, and the Fifth Amendment's void-for-vagueness doctrine, as well as the Administrative Procedure Act (APA).

5.    In sum, Defendants' unlawful attempts to repurpose federal grant programs established by Congress harm Plaintiffs by threatening *__more than $12 billion__* in already-awarded and soon to be awarded funds they need to support critical programs and services for their residents, including permanent and transitional housing, transit services and improvements, airports, health care, and more. Allowing the unlawful grant conditions to stand would negatively impact Plaintiffs' committed budgets, force reductions in their workforce, and undermine their ability to determine for themselves how to meet their communities' unique needs. As such,

---

[1] Plaintiffs refer herein to the HUD, DOT, and HHS subdivisions using each agency's terminology. Thus, for DOT, Plaintiffs use the term "operating administrations" or "OAs," *see* 49 C.F.R. § 1.2(b); for HHS, "operating divisions and agencies," *see* HHS Agencies & Offices, https://www.hhs.gov/about/agencies/hhs-agencies-and-offices/index.html (last visited June 27, 2025); and for HUD, "program offices" or simply "offices," *see* U.S. Dep't of Housing & Urban Dev., Programs of HUD, 2025, https://www.hud.gov/sites/dfiles/Main/documents/HUDPrograms2025.pdf.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 5

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Plaintiffs seek an order declaring the grant conditions at issue unlawful, void, and unenforceable and enjoining their imposition and enforcement.

## II.        JURISDICTION AND VENUE

6.        The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

7.        Venue properly lies within the Western District of Washington because this is an action against an officer or employee of the United States and an agency of the United States, there are Plaintiffs residing in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

## III.        PARTIES

8.        Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

9.        King County relies on nearly $67 million each year in HUD Continuum of Care (CoC) grant funds to serve its homeless residents, who numbered almost 17,000 during a recent count. King County also receives millions of dollars in other HUD funding, such as approximately $5.6 million annually in Community Development Block Grant (CDBG) funds, approximately $3.4 million annually in HOME Investment Partnerships (HOME) funds, and approximately $295,000 annually in Emergency Solutions Grant (ESG) funds. These dollars, in turn, critical housing, community development, and human services programs, including infrastructure repairs to maintain the habitability of existing housing, senior center and other community facility capital repairs, multi-family affordable housing developments, and temporary shelter.  King County also provides approximately $2.6 million in pass-through funding from CDBG.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 6

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

10.     Additionally, King County relies on substantial federal grants—including over $446 million in appropriated FTA grants—to provide critical transit services and improvements for the benefit of King County residents. And King County also relies on significant federal funding—including over $7 million in FAA entitlement grants awarded in 2023 and 2024 (with over $6.6 million remaining to be disbursed) and a projected $9.5–$15.3 million in FAA entitlement grant funding for 2025–2029—in operating, maintaining, and improving the King County International Airport/Boeing Field in Seattle, Washington. Finally, King County relies on approximately $84 million in grants administered by FHWA, including discretionary grants awarded directly to King County and formula grants awarded to the Washington State Department of Transportation ("WSDOT") and the Puget Sound Regional Council and allocated to King County, for highways, roads, tunnels, bridges, and other transit capital projects.

11.     Finally, King County receives funding from HHS through over 80 federal grant programs. For example, HHS funding through Health Resources and Services Administration (HRSA) supports health centers for underserved populations. King County was awarded $5.5 million for FY 2025 and the same amount for FY 2026. King County also receives funding through Ryan White HIV/AIDS (RWHA) program Part A to provide quality medical care and essential support services for low-income individuals living with HIV who are uninsured or underinsured. King County has applied for funding through this program in the amount of $7,712,292 to cover the period March 1, 2025–February 28, 2026, and has so far received notices of awards totaling $3,316,948 for that period.

12.     King County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions as further defined below.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 7

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

13.     Plaintiff Pierce County is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

14.     Pierce County relies on just over $4.9 million annually (as of 2025) in CoC funds to support permanent supportive housing and rapid rehousing projects for individuals and families experiencing homelessness throughout the county. Pierce County also receives approximately $41 million in additional HUD grant funding to address housing instability, support vulnerable populations, and invest in community development, among other critical programs and services.

15.     Pierce County also relies on substantial transportation grants, including more than $14 million in FHWA grants and at least $696,000 in FAA grants, some of which are passed through from WSDOT.

16.     Pierce County also receives approximately $75 million in grant funding from HHS, which it relies on to deliver critical health and human services to the county's vulnerable populations, promote community resilience, and improve outcomes for individuals and families.

17.     Pierce County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

18.     Plaintiff Snohomish County is a home rule charter county organized and existing under and by virtue of the constitution and the laws of the State of Washington.

19.     Snohomish County relies on nearly $16.7 million each year in CoC grant funds to serve its homeless residents. Snohomish County annually receives formula grant funding from the CDBG, ESG, and HOME programs and also applies for additional HUD funding from time to time.

20.     While the amount varies from year to year, Snohomish County relies on millions of dollars in FAA grant funds annually to cover the costs of airport improvements at Paine Field

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 8

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Airport. Snohomish County relies on DOT grant funds, including FHWA grant funds, every year and has applied for $34 million in FHWA grant funds and $2 million in other DOT grant funds. These grant funds would fund projects related to road and bridge improvements and improvements to a solid waste rail facility.

21.    Snohomish County relies on direct and pass-through HHS funds, totaling over $29 million dollars in 2024, to fund HEAD Start and other services to seniors, individuals with disabilities, and low-income residents throughout Snohomish County, as well as another $9.4 million in HHS grant funds in 2025 and 2026 for public health services such as childhood lead prevention and monitoring, opioid overdose prevention and treatment, tuberculosis treatment and monitoring, and sexually transmitted infections treatment and contact tracing. Additional HHS pass-through grant funds in the amount of nearly $2.7 million dollars fund Snohomish County's child support enforcement.

22.    Snohomish County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

23.    Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California.

24.    San Francisco relies on approximately $240 million in active HUD entitlement and discretionary grant funds to expand affordable housing opportunities, provide services to maintain housing stability and reduce displacement for low- and moderate-income residents, and provide housing and emergency shelter services to homeless residents, who numbered 8,323 during the most recent count.

25.    San Francisco also relies on nearly $2.3 billion in DOT funding. This funding includes nearly $1.3 billion in FTA grants and nearly $170 million in FHWA grants to provide

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 9

critical transit services and street improvements for the benefit of people traveling to, from, and within San Francisco. Additionally, San Francisco anticipates receiving $803 million in funding from the FAA as part of its current capital improvement plan to fund critical rehabilitation, replacement, and reconstruction projects related to taxiways, runways, terminals, and other airport infrastructure.

26.     San Francisco further relies on approximately $325 million in active non-Medicaid and Medicare HHS grant funding from virtually all HHS operating divisions, including approximately $148 million from the Administration for Children and Families (ACF), $90 million from the Centers for Disease Control and Prevention (CDC), $48 million from HRSA, and $19 million from the Substance Abuse and Mental Health Services Administration (SAMHSA). This funding provides critical financial assistance and/or other supportive services to assist low-income families, foster families, and other vulnerable residents, such as refugees and asylees, those experiencing homelessness, and those suffering from mental illness or substance abuse disorders. In addition, HHS funding supports vital work to monitor, intervene, and respond to public health concerns, such as the transmission of HIV, other sexually transmitted infections, and tuberculosis.

27.     San Francisco brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

28.     Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

29.     Santa Clara administers tens of millions of dollars each year in HUD grant funds to serve the region's approximately 10,000 homeless residents. Most recently, the Santa Clara County Continuum of Care was awarded approximately $47 million in grant funding in HUD CoC funds, of which the County of Santa Clara is the direct recipient for approximately $33 million. Santa

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 10

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Clara annually receives approximately $2–3 million in CDBG and HOME program funds administered by HUD for programs that support community and economic development projects that benefit low- and moderate- income residents, seniors, people with disabilities, and other vulnerable populations. For the upcoming fiscal year, Santa Clara expects approximately an additional $9 million in funding administered by HUD, including CDBG, HOME, and other grants.

30.     As relevant for purposes of this litigation, Santa Clara also has approximately $208 million in grants and other funding for the present fiscal year from HHS that goes to Santa Clara's Social Services Agency to support child abuse prevention efforts, programs for foster youth, adoption services, and programs for aging and/or disabled residents; in addition, as required by California law, the Social Services Agency administers HHS grant-funded public benefits, such as Temporary Assistance for Needy Families (TANF, known as "CalWORKS" in California). Santa Clara's healthcare system also receives at least $68 million in HHS funding for public health programs to prevent and address infectious disease, respond to toxins and biohazards, and support maternal and child health; provide behavioral health services; and support the operations of Santa Clara's safety-net hospitals and clinics, including for the most vulnerable residents such as those experiencing homelessness and those newly arriving as refugees and asylees.

31.     Additionally, Santa Clara relies on significant federal funding from FHWA for projects like bridge rehabilitation and repair, for which it currently has approximately $140 million in programmed federal funds and $55 million in obligated federal funds, of which approximately $11.2 million has not yet been invoiced for reimbursement. Santa Clara receives these grant funds indirectly pursuant to an agreement with the California Department of Transportation ("CalTrans").

32.     Santa Clara brings this action as to the unlawful HUD Grant Conditions, the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 11

unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

33.    Plaintiff City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

34.    Boston relies on nearly $48 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Boston also receives approximately $27 million in HUD formula grants, including through the CDBG program, the HOME program, the Housing Opportunities for Persons with AIDS (HOPWA) program, and the ESG program.

35.    Boston also has applied for and received eight grants from DOT over the past four years, and utilizes and relies upon over $67 million in DOT funds administered by both the FHWA and the FTA. These funds provide support for key infrastructure projects, pedestrian and vehicle safety improvements, revitalization initiatives in underserved areas, and important connectivity upgrades. These investments in city streets and infrastructure serve as the foundation of Boston's economy and of the ties among Boston's neighborhoods.

36.    Boston also receives millions of dollars through HHS and the CDC, largely as a subrecipient of the Massachusetts Executive Office of Elder Affairs, to its Age Strong Commission and the Boston Public Schools.

37.    Boston brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

38.    Plaintiff City of Columbus ("Columbus") is a municipal corporation organized under Ohio law, see Ohio Const. art. XVIII. It is the capital of Ohio, its largest city, and the fifteenth largest city in the United States, with a population of over 905,000 according to the 2020 U.S. Census.

39.    Columbus receives millions of dollars from HUD, including through the CDBG,

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

HOME, HOPWA, and ESG programs. Columbus's Community Shelter Board, Columbus's CoC designee, directly receives HUD CoC grant funds and receives an additional approximately $1 million per year of HUD grant funds from the ESG and HOME programs which are passed through from Columbus in order to provide crucial services to the city's and county's homeless residents. Columbus also provides $10 million annually to the Community Shelter Board from its general revenue fund. Columbus additionally receives direct HUD funding for lead safety and for healthy homes.

40.    Since 2020, Columbus has been awarded over $200 million from the FHWA in both formula funding grants and discretionary grants.

41.    Finally, Columbus receives millions in funding from HHS, including $8 million to its Central Ohio Area Agency on Aging from the Nutritional Services Incentive Program, and $3.3 million from the RWHA program to Columbus's Department of Public Health, which helps residents of the multi-county region living with HIV to achieve viral suppression. The RWHA Part A program funds medical and supportive services, such as primary care, case management, and housing programs.

42.    Columbus brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

43.    Plaintiff City of New York ("NYC") is a municipal corporation organized and existing under the laws of the State of New York.

44.    NYC, through its Department of Housing Preservation and Development, receives approximately $53 million in CoC funds to provide rental assistance for chronically homeless households to reside in permanent supportive housing. As the collaborative applicant and Homeless Management Information System (HMIS) lead agency for the New York City

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 13

Continuum of Care ("NYC CoC"), NYC, through its Department of Social Services ("NYC DSS"), receives an additional approximately $6 million in grants to provide technical and administrative support to all of the programs in the NYC CoC. Additionally, NYC, through NYC HPD, NYC DSS, NYC's Department of Health and Mental Hygiene ("NYC DOHMH"), and other NYC agencies, receives millions more in annual HUD funding through various programs, including the ESG, CDBG, HOME, and HOPWA programs.

45.    NYC, through several of its agencies, also receives hundreds of millions of dollars in federal funding from components of the federal DOT, such as the FHWA and FTA, including well over $500 million to the New York City Department of Transportation ("NYC DOT") as a direct recipient or subrecipient of competitive and formula grants.

46.    NYC receives millions of dollars in funding from HHS as well, including through NYC DOHMH. This funding includes grants from HRSA to support HIV care and treatment and supportive services for people with HIV/AIDS, a grant from CDC to support HIV prevention and surveillance, grants from both HRSA and CDC to support NYC's work on the federal Ending the HIV Epidemic initiative, and multiple other grants from the CDC, SAMHSA, Administration for Strategic Preparedness and Response (ASPR), and Office of the Assistant Secretary for Health (OASH). Federal funds from HHS also flow and have flowed to NYC through other HHS agencies, such as the ACF, National Institutes of Health (NIH), and Administration for Community Living (ACL), including through competitive grants, formula funding, and/or block grant funding.

47.    NYC brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

48.    Plaintiff City & County of Denver ("Denver") is a home rule city and county

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 14

organized and existing under the constitution and laws of the State of Colorado and the Denver City Charter. Denver is the capital city of Colorado and the state's largest city and county with a population of 714,000 according to 2023 census data.

49.     Denver, through its Department of Aviation, is the owner and operator of the Denver International Airport, the third busiest airport in the United States, and the sixth busiest airport in the world. Denver receives hundreds of millions of dollars in FAA grant funds, $130 million in FHWA grant funds, and also relies on approximately $167 million in FTA grant funds to provide critical transit services and improvements.

50.     Denver also receives multiple grants from HHS, including funding through the RWHA program. In recent years, Denver has received over $7 million in RWHA Part A grants each fiscal year. Through its Department of Public Health and Environment, Denver uses these funds to provide essential public health services to community members throughout the Denver region.

51.     Denver brings the action as to the unlawful DOT Grant Conditions and the unlawful HHS Grant Conditions.

52.     Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee.

53.     On March 11, 2025, Nashville received a notice of award for two FY 2024 HUD CoC grants, for a total of $289,354.

54.     Nashville also receives significant DOT funding. For example, in May of 2025, Nashville was awarded $13 million for their "We Are Nolensville Pike" project, which would provide for constructing critical improvements along a major roadway in Nashville to address

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 15

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

safety concerns under the Fiscal Year 2023 Safe Streets and Roads for All Grant program discussed in further detail below. Nashville also relies on $10 million in funding from DOT's Strengthening Mobility and Revolutionizing Transportation (SMART) discretionary grant program, which supports advanced smart community technologies and systems in order to improve transportation efficiency and safety.

55.    Nashville brings the action as to both the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

56.    Plaintiff Pima County is a political subdivision organized and existing under and by virtue of the constitution and laws of the State of Arizona, and home to more than a million residents.

57.    Pima County relies on approximately $2 million each year in direct funding from HUD CoC grant funds. These funds are used to serve Pima County's homeless residents, who number over 2,500 based on information collected by Pima County. Pima County also receives approximately $2.6 million in CDBG funds and approximately $225,000 in ESG funds, both from HUD.

58.    Additionally, Pima County relies on federal transportation grants of more than $75 million (approximately $60.1 million federal; approximately $15.6 local matching funds)—including over $240,000 in appropriated FTA grants, over $2.6 million in FAA grants, over $30.6 million in FHWA grants (programmed by Pima Association of Governments (PAG) and administered through a Certified Accepted Agency Agreement with Arizona Department of Transportation (ADOT)), over $35.7 million in FHWA grants (direct), and over $6.5 million through FHWA's Federal Lands Access Program to provide critical transit services and transportation improvements for the benefit of Pima County residents. The funding at risk includes

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 16

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

both the federal grant amount and the required local match, $60.1 million and $15.6 million, respectively. The local match comes from a variety sources included Pima County Highway User Revenue Funds, Vehicle License Tax, Impact Fees, and Regional funding including Regional Transportation Authority.

59.     Pima County also relies on HHS grants valued annually at more than $21 million, with approximately $7 million in direct grants and more than $14 million in pass-through grants.

60.     Pima County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

61.     Plaintiff County of Sonoma ("Sonoma County") is a political subdivision of the State of California, organized and existing under the laws of California.

62.     In its role as collaborative applicant, the County of Sonoma Department of Health Services ("Sonoma DHS") holds three active HUD CoC grants totaling more than $1 million (CY 2025–2026). Sonoma DHS also oversees annual CoC project submissions in e-snaps, representing approximately $4.6 million in funding, the majority of which supports permanent supportive housing for individuals who are chronically homeless, disabled, and have extended histories of homelessness.

63.     The county-run Airport receives approximately $7 to $10 million in DOT grants every year, along with a longer-term construction grant totaling approximately $20-$22 million, subject to funding and the number of phases required for completion. These DOT grants account for approximately 40% of the Sonoma County Airport's annual budget. The Sonoma County Airport currently has eight approved active and obligated FAA grants collectively worth more than $11.8 million, of which $8.7 million remains after draw-downs, and six pending grants from the FAA, totaling $7.7 million, for critical infrastructure projects that address critical safety and

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 17

security issues, including repairs to runways and wildlife fencing.

64.    Sonoma County brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

65.    Plaintiff City of Bend ("Bend") is municipal corporation with a home-rule all-powers charter under the laws of the State of Oregon.

66.    Bend applied for and was awarded $5 million from HUD through its Pathways to Remove Obstacles to Housing (PRO Housing) grant, most of which is made available to applicants for various housing-related costs. Bend has been a CDBG entitlement jurisdiction since 2004; to date, Bend has used over $13.8 million in CDBG awards for critical city efforts related to domestic violence and homeless services. Bend anticipates receiving an additional $603,000 in CDBG funds upon approval of its 2025–26 CDBG Annual Action Plan.

67.    Bend has been awarded over $33 million in FRA grants to enhance safety and connectivity at roadway-rail crossings. Additionally, in connection with Bend's city-owned and operated airport, Bend anticipates about $10.1 million in federal funds from the FAA for 2025 through 2029.

68.    Bend brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

69.    Plaintiff City of Cambridge ("Cambridge") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

70.    Cambridge relies on nearly $6.4 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Cambridge also receives significant funding from several other HUD grants in FY 2024 and FY 2025, which support programs and services that directly benefit the city and its residents. These funds include a $2,638,641 CDBG grant allocation for FY

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 18

2025, and a $2,395,799 HOPWA grant allocation for FY 2025.

71.    Cambridge also receives federal funding from DOT, which supports a variety of public infrastructure projects. Cambridge recently received, through DOT, a Reconnecting Communities & Neighborhoods (RCN) grant to design a pedestrian and bicycle bridge over the Fitchburg MZBTA Commuter Rail tracks in North Cambridge. The area is currently difficult for residents and pedestrians to travel due to adjacent roadways and the MBTA rail tracks.

72.    In addition, Cambridge also receives federal funding from HHS's Low-Income Home Energy Assistance Program (LIHEAP) as a pass-through grant from the Massachusetts Executive Office of Housing and Livable Communities (EOHLC). This funding is vital to support fuel assistance programs for low-income residents.

73.    Cambridge brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Conditions, and the unlawful HHS Grant Conditions.

74.    Plaintiff City of Chicago ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

75.    On average, the Chicago Department of Transportation (CDOT) relies on approximately $92 million each year in FTA grants and $74 million each year in FHWA grants. The Chicago Department of Aviation (CDA) likewise relies on millions of dollars in FAA grants. In 2023, CDA received and relied on $94.7 million in FAA awards. In 2024, CDA received and relief on $112.9 million from FAA. These funds are critical to the safety and wellbeing of Chicagoans and people who travel to or through Chicago.

76.    Chicago also relies on millions of dollars in grants from HUD and HHS each year. For FY 2025, Chicago anticipates receiving $329,849,000 in HUD funds (including carryover amounts) and $668,884,000 in HHS funds (including carryover amounts). These funding sources

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 19

support several citywide programs for vulnerable Chicagoans. For example, in 2024, Chicago's Department of Family and Support Services (DFSS) used HUD funding from CDBG, ESG, and HOME grants to serve 435,225 at-risk Chicagoans by supporting food banks, homeless shelters, and developing affordable rental housing options. Chicago also receives HRSA grants in the amount of $27,817,885 million from the HIV Emergency Relief Project and $4,653,437 from the RWHA program. These funds are used to provide clinical and non-clinical services for people with HIV and to engage individuals with HIV into care and medical treatment.

77.    Chicago brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

78.    Plaintiff City of Culver City ("Culver City") is a charter city and a municipal corporation organized and existing under the Constitution and laws of the State of California.

79.    Culver City has been awarded approximately $177,484 from HUD through the CDBG Program for FY 2025–26.

80.    Additionally, Culver City relies on substantial federal grants—including approximately $40 million in FTA grants—to purchase buses and provide critical transit services for the benefit of Culver City residents.

81.    Culver City brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

82.    Plaintiff the City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

83.    Minneapolis receives approximately $17 million each year in formula grant funding HUD, primarily through four key HUD programs: CDBG, ESG, HOPWA, and HOME. HUD

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 20

funds support numerous important city projects, including building new and rehabilitating existing affordable housing, addressing blight, youth violence intervention services, and lead poisoning response and hazard reduction.

84.     Minneapolis is expecting more than $150 million in federal funding for upcoming capital improvement projects, the vast majority of which is from DOT, including grants administered by DOT directly and others administered by the FHWA and FRA.

85.     Every year, Minneapolis has been awarded federal grant funds to support public health in Minneapolis, including from HHS, and currently Minneapolis is supporting programs and services with more than $20 million in grants from HHS and its operating divisions and agencies. For example, Minneapolis currently has a grant from the CDC in the amount of $5,757,591, to develop foundational public health infrastructure, focus on developing and retaining the public health workforce, and increase the capacity to meet the public health needs over several years. Minneapolis also has a $3.9 million grant from the ACF, passed through the Minnesota Department of Health. This funding supports family home visiting, teen pregnancy prevention, and/or Women, Infants, Children (WIC) nutritional services to families at or below 200 percent of federal poverty guidelines who are at risk of child abuse and neglect.

86.     Minneapolis brings this action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

87.     Plaintiff City of Pittsburgh ("Pittsburgh") is a home rule charter city organized and exiting under the laws and Constitution of the Commonwealth of Pennsylvania. Pittsburgh is a city of the second class.

88.     Pittsburgh receives approximately $18 million in HUD block grant funds annually, including through the CDBG, ESG, and HOME programs, as well as other direct HUD funding.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 21

89.     Pittsburgh is currently relying on nearly $5 million in competitive DOT grant funds to serve its residents by funding necessary infrastructure projects in Pittsburgh. The grant funds from DOT—issued through the FHWA—support improvements to essential infrastructure, such as roads and, notably, bridges. Pittsburgh has hundreds of bridges and such infrastructure funding is necessary to the safety of its residents.

90.     Pittsburgh brings this action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

91.     Plaintiff City of Portland ("Portland") is a home rule charter city organized and existing under and by virtue of the constitution and laws of the State of Oregon.

92.     Portland relies on significant federal funding, including over $130 million in grants from HUD and over $193 million in grants from DOT. By way of example, Portland has over $14 million in annual distributions of HUD grants for affordable housing and supportive services for low-income people and people living with disabilities, as well as for small business and economic development programs.

93.     Portland's DOT grants include a $500,000 FRA grant, to plan safety improvements at fifteen railroad crossings, and a $9.6 million FHWA grant award.

94.     Portland brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

95.     Plaintiff City of San José ("San José") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

96.     San José has been awarded approximately $21.4 million in FHWA grants under the Safe Streets and Roads for All program, described further below, to improve street safety and was awarded approximately $8.7 in FRA grants under the Consolidated Rail Infrastructure and Safety

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 22

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Improvements program. In addition, San José's city-operated airport is relying on $31.1 million in FAA grant funding through 2030 for the maintenance and operation of the airport, as well as anticipating $89.2 million in capital improvement funding over the next five years.

97.    San José receives funding from HUD in the form of CDBG, HOME, ESG, and HOPWA grants. It relies on this funding to provide services to its community, and it anticipates receiving approximately $52 million in HUD funding through 2033. San José also relies on HUD CoC funds received by Santa Clara to serve the city's homeless population.

98.    San José brings the action as to both the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

99.    Plaintiff City of Santa Monica ("Santa Monica") is a municipal corporation and California charter city, organized and existing by virtue of the laws of the State of California.

100.    Santa Monica relies on approximately $16 million in FTA grant funds to provide transit services for the benefit of Santa Monica residents, workers, and visitors, and has been awarded up to $30 million under CalTrans's Highway Bridge Program funded by FHWA grant funds to improve the over 85-year-old Santa Monica Pier Bridge.

101.    Santa Monica additionally relies on over $1.1 million in HUD CDBG funding for projects to provide lower- and moderate-income households with viable communities, including a suitable living environment and expanded economic opportunities, and over $500,000 in HUD HOME funding for rental subsidies for qualifying low-income families at risk of losing housing.

102.    Santa Monica brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

103.    Plaintiff City of Pasadena ("Pasadena") is a home rule charter city organized under the laws of the State of California.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 23

104.    Pasadena relies on over $37 million annually in funding from HUD grants, including over $5 million each year in HUD CoC grant funds to serve its homeless residents, as well as CDBG, ESG, HOPWA, HOME, and Section 8 Housing Choice Voucher grants to support numerous housing initiatives within the city.

105.    Pasadena also relies on over $6 million in funding from DOT grants, including FHWA's Safe Streets and Roads for All grants, to provide critical transportation services and improvements within the city.

106.    Pasadena brings the action as to both the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

107.    Plaintiff City of Tucson ("Tucson") is a home rule charter city organized and existing under the constitution and laws of the State of Arizona.

108.    Tucson receives approximately $20 million in annual formula grants from the FTA for the operation of its transit system. It also relies on substantial FTA discretionary grants to make much-needed improvements to its transit system equipment and infrastructure. That includes approximately $33 million in FY 2023 and FY 2024 grants for new buses and upgrades to bus facilities. Tucson also relies on FHWA formula and discretionary grants for large transportation infrastructure projects and has approximately $45.5 in awarded discretionary grant funds between FY2025 and FY2029.

109.    Tucson receives approximately $75–80 million in HUD funding per year. For example, Tucson is the Collaborative Applicant for the CoC for the Tucson metropolitan area, the members of which were collectively awarded more than $14.5 million in CoC funding in January 2025. Of this amount, Tucson is the direct recipient of more than $6.1 million. With a large homeless population and extremely hot summers, combatting homelessness and protecting the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 24

unsheltered is both a high priority and a significant challenge for the community. Tucson also is awarded approximately $10.5 million in HUD formula grants (CDBG, ESG, HOME, and HOPWA) each year. The Tucson-Pima County public housing programs, which are administered by Tucson, receive approximately $66.5 million in annual HUD funding. Tucson also receives various discretionary grants from time to time; one recent example is a 2024 $4,050,000 Lead Hazard Reduction Program grant.

110.    Tucson brings the action as to both the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

111.    Plaintiff City of Wilsonville ("Wilsonville") is a home rule charter city organized and existing under and by virtue of the constitution and laws of the State of Oregon.

112.    The City of Wilsonville, through its municipal transit department, South Metro Area Regional Transit, relies on approximately $1 million each year in FTA grant funds to provide critical transit services and improvements for the benefit of Wilsonville residents, employees, employers, and visitors. Wilsonville also frequently receives competitive grant funds from the FTA.

113.    Wilsonville's Community Center, managed by its Parks and Recreation Department, also receives pass-through funds from the HHS ACL pursuant to the Older Americans Act to provide nutrition services, outreach, assessment, information and assistance, case management, reassurance, health promotion and legal consultation for Clackamas County residents aged 60 and older. For FY 2024–25, Wilsonville was awarded $135,320 in HHS pass-through funds, and was awarded a total of $254,520 through FY 2026–27.

114.    Wilsonville brings the action as to the unlawful DOT Grant Conditions and the unlawful HHS Grant Conditions.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 25

115.    Plaintiff Central Puget Sound Regional Transit Authority ("Sound Transit") is a regional transit authority that serves the Sound Transit District, which encompasses areas in King, Pierce, and Snohomish counties. Sound Transit is organized and existing under and by virtue of the laws of the State of Washington.

116.    Sound Transit relies on substantial federal grants—approximately $1 billion in DOT grants in 2025 including from the FTA, FHWA, and FRA—to provide critical transit services and improvements for the benefit of approximately 3,385,200 million people who reside within the Sound Transit District.

117.    Sound Transit brings the action only as to the unlawful DOT Grant Conditions.

118.    Plaintiff Intercity Transit is a public transportation agency organized under RCW 36.57A as a municipal corporation and existing under and by virtue of the laws of the State of Washington to serve a Public Transportation Benefit Area (PTBA).

119.    Intercity Transit provides transportation and transit options that connect cities and areas within Thurston County, including Olympia, Lacey, Tumwater, and Yelm. Intercity Transit relies on more than $27 million in FTA grant funds to provide critical transit services and improvements for the benefit of residents of the Thurston County PTBA, as well as a $2 million DOT SMART grant.

120.    Intercity Transit brings the action only as to the unlawful DOT Grant Conditions.

121.    Plaintiff Port of Seattle is a municipal corporation organized and existing under and by virtue of the laws of the State of Washington.

122.    The Port of Seattle owns and operates the Seattle-Tacoma International Airport, the largest airport in the State of Washington and the 11th busiest airport in the country based on 2023 passenger statistics. The Port of Seattle relies on substantial federal grant funding—including more

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 26

than $164.5 million in appropriated FAA grants—for critical capital projects.

123.    The Port of Seattle brings the action only as to the unlawful DOT Grant Conditions.

124.    Plaintiff King County Regional Homelessness Authority ("King County RHA") is a government agency formed by the City of Seattle and King County and is organized and existing under and by virtue of the laws of the State of Washington.

125.    King County RHA coordinates the CoC funds for the King County area, including directly administering $26 million of those funds for emergency shelter, transitional housing, and other programs.

126.    King County RHA brings the action only as to the unlawful HUD Grant Conditions.

127.    Plaintiff Santa Monica Housing Authority ("Santa Monica HA") is a housing authority organized under the laws of the State of California and created by resolution of the Santa Monica City Council.

128.    Santa Monica HA relies on over $22 million annually in funding for Section 8 Housing Choice Vouchers, over $1 million annually in funding for Emergency Housing Vouchers, and $5.6 million annually (as of 2025) in CoC funds to support rental assistance for individuals and families experiencing or formerly experiencing homelessness.

129.    Santa Monica HA brings this action only as to the unlawful HUD Grant Conditions.

130.    Plaintiff San Francisco County Transportation Authority ("SFCTA") is a county-level transportation agency existing under and by virtue of the laws of the State of California. It is a separate legal entity from the City and County of San Francisco.

131.    As the designated county congestion management agency for San Francisco, SFCTA develops long-range countywide transportation plans to guide development of the transportation sector. It also administers the proceeds from San Francisco's dedicated local sales

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 27

tax for transportation. SFCTA currently relies on more than $107 million in FHWA grants, of which approximately $10.4 million has been programmed but not yet been obligated. SFCTA relies on FHWA funding to provide critical transportation planning and improvements for the benefit of people traveling to, from, and within San Francisco. SFCTA has applied for additional FHWA funding and plans to seek further FHWA funding in the future. It anticipates continuing to receive formula subgrants through state and regional entities and applying for additional discretionary competitive grants.

132.    SFCTA brings this action only as to the unlawful DOT Grant Conditions.

133.    Plaintiff Treasure Island Mobility Management Agency ("TIMMA") is a transportation agency existing under and by virtue of the laws of the State of California. Pursuant to State law, the San Francisco Board of Supervisors has designated SFCTA as the agency to act as the TIMMA. TIMMA is a separate legal entity from the City and County of San Francisco and from SFCTA.

134.    TIMMA is responsible for developing and implementing a comprehensive transportation program for Treasure Island, defined also to include Yerba Buena Island. TIMMA currently relies on funding from FHWA to provide critical transportation improvements.

135.    TIMMA brings this action only as to the unlawful DOT Grant Conditions.

136.    Plaintiff County of Alameda ("Alameda County") is a charter county and political subdivision of the State of California.

137.    Alameda County relies HUD grant funds to serve its most vulnerable residents, including an estimated 9,450 homeless residents. For example, Alameda County budgeted for more than $40 million in HUD grants annually in fiscal years 2024–25 and 2025–26. HUD also provides additional funds to Alameda County, which the county administers and distributes to

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 28

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

cities, community based organizations, and other community partners serving its residents. A significant portion of Alameda County's HUD funding comes from the CoC program.

138.    Alameda County also relies on funding from DOT, largely provided indirectly through the State of California, to support a number of infrastructure projects, including road, shoulder, and sidewalk repair, updating drainage inlets, and developing traffic and water pollution control plans. For example, Alameda County budgeted for well over $10 million in DOT funding in fiscal years 2024–25 and 2025–26. Because some projects supported by DOT funds progress over multiple years, some DOT funds may not be spent during a fiscal year in which they are budgeted, in which case those funds are budgeted for use in the next fiscal year.

139.    Alameda County also relies on funding from HHS to support a variety of programs and services, including substance abuse treatment, housing support, behavioral and mental health programs, food insecurity initiatives, and child and family support services, to name just a few. For example, Alameda County budgeted for more than $60 million in HHS grants annually in fiscal years 2024–25 and 2025–26. Alameda County also receives substantial funding indirectly from HHS, including HHS funds passed through the State of California. In fiscal years 2024–25 and 2025–26, Alameda County budgeted for more than $200 million in such indirect HHS funds.

140.    Alameda County brings this action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

141.    Plaintiff City of Albuquerque ("Albuquerque") is a municipal corporation organized and existing under the laws of the State of New Mexico. Albuquerque is the largest municipality in the State of New Mexico, serving more than 560,000 residents.

142.    Albuquerque administers more than $10.3 million in HUD grant funding, including direct and pass-through grants, including $3.7 million in CoC grant funds, $4.4 million in the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 29

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

CDBG grant funds, $1.9 million in HOME grant funds, more than $370,000 in ESG grant funds, and more. These funds are used to support services and housing vouchers for Albuquerque's unhoused and precariously housed residents.

143.    Albuquerque also relies on more than $10 million in federal DOT grants from the FTA and FHWA, including direct and pass-through grants, to improve and maintain Albuquerque's roads and transit infrastructure.

144.    Albuquerque brings this action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

145.    Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, and entrusted with all of the powers of local self-government and home rule afforded by those articles.

146.    Baltimore's current open grants with the federal government include HUD grants in the amount of $514,491,841, HHS grants in the amount of $399,736,406, and DOT grants in the amount of $184,000,000. These funds support an array of critical programs.

147.    For example, Baltimore, through its Mayor's Office of Homeless Services ("Baltimore MOHS"), receives approximately $33 million in HUD CoC funds to provide permanent supportive housing, rapid rehousing, and transitional housing programs to individuals experiencing homelessness. Baltimore MOHS also receives approximately $7 million in HOPWA funding from HUD to help house low-income persons that are medically diagnosed with HIV/AIDS and their families.

148.    Additionally, Baltimore's Department of Transportation relies on significant federal funding from FHWA for infrastructure and traffic-related projects, receiving approximately $42 million annually, along with supplemental grants—like a recent $85.5 million Reconnecting

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 30

Communities Grant—for specific repair and rehabilitation projects.

149.    Lastly, Baltimore's Health Department receives approximately $16 million in RWHA Part A funding from HHS to ensure access to essential care and services for the over 11,000 individuals living with HIV who are un- or under-insured.

150.    Baltimore brings this action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

151.    Plaintiff City of Bellevue ("Bellevue") is a municipal corporation organized under the laws of the State of Washington.

152.    Bellevue relies on a number of federal grant programs to serve its approximately 160,000 residents and support the economic vitality of the Puget Sound Region. Bellevue receives HUD funding through the CDBG program, including $879,477 approved and expected for FY 2025. This funding will support vital programs such as a home repair assistance program and public services to homeless individuals in the community. Bellevue was also awarded $500,000 for FY 2024 through HUD's Community Project Funding.

153.    Bellevue receives approximately $4 million in direct funding from DOT and FHWA for FY 2024 and earlier grants, and relies on its ability to continue to draw down on these funds to improve roadway safety in the region through road safety audits, speed studies, developing separated bike lanes, supporting traffic signal enhancements for pedestrians and bicyclists, and developing speed safety camera procedures. Bellevue has also been awarded almost $34 million in pass-through funding for FY 2025–2027 from DOT and FHWA through regional and state grant programs. This funding provides vital financial support to transportation projects supporting pedestrian accessibility and safety, as well as local and regional trails and bridges. Bellevue is also receiving over $26 million in DOT pass-through funding for FY 2024 and earlier.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 31

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

154. Bellevue brings this action as to the unlawful HUD Grant Conditions and unlawful DOT Grant Conditions.

155. Plaintiff City of Bellingham ("Bellingham") is a municipal corporation organized and existing under the laws of the State of Washington.

156. Bellingham, through its Planning and Community Development Department, Housing and Services Program, receives approximately $1,323,865 in HUD funds for its CDBG and HOME programs. CDBG funds provide basic needs services, including food distribution, basic chore assistance for homebound seniors and disabled persons, support for children who have experienced violence or neglect, and domestic violence prevention for the benefit of low-income individuals and households. CDBG funds also provide home rehabilitation, and community facilities improvements for the benefit of low-income households and individuals. HOME funds provide housing services, including rental assistance, housing case management, downpayment assistance for first-time homebuyers, and capital development for affordable housing to benefit low-income individuals and households.

157. Bellingham also receives approximately $4.3 million annually in federal funding from DOT and its OAs, almost exclusively as a pass-through from Washington State DOT. Further, Bellingham's Police Department has just applied for $3 million in DOT Safe Streets and Roads for All (SS4A) funding to implement a program to prevent traffic deaths.

158. Bellingham brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

159. Plaintiff City of Bremerton ("Bremerton") is a first-class charter city organized and existing under the laws of the State of Washington.

160. Bremerton, through its Department of Community Development, receives and

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 32

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

administers approximately $381,000 in HUD CDBG funds to assist in community development capital improvements, home weatherization, and job training programs. Bremerton also receives approximately $212,000 in HUD HOME grants to assist in the development of housing.

161.    Bremerton relies on DOT formula and discretionary grants administered through FHWA for transportation infrastructure projects, as both a direct recipient and subrecipient, including $3.3 million in FHWA grant funds through Fiscal Year 2028 and additional grants expected.

162.    Bremerton brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

163.    Plaintiff County of Dane ("Dane County") is a political subdivision organized and operating under the laws of the State of Wisconsin.

164.    Dane County relies on approximately $1,670,021 each year in HUD CoC grant funds to serve its homeless residents. Dane County receives another approximately $7,789,468 in HUD grant funding through the CDBG and HOME programs.

165.     Dane County's Department of Human Services also relies on millions of dollars in funding from HHS, including $13,735,370 from Social Services Block Grants and $1,554,631 from Child Care and Development Block Grants. These funds are used to support child welfare, services for older adults and individuals with disabilities, and child care assistance for low-income families. Dane County also uses $1,831,770 of HHS funding to support Area Agency on Aging supportive services, nutrition and meals programs, family caregiver support, and disease prevention.

166.    Additionally, Dane County receives approximately $15 million annually in FAA grants to fund improvements at the Dane County Regional Airport, and approximately $400,000

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 33

1    in FHWA grant funds from the DOT for a Comprehensive Highway Safety Action Plan.

2        167.    Dane County brings this action to challenge the unlawful HUD Grant Conditions,

3    unlawful DOT Grant Conditions, and unlawful HHS Grant Conditions.

4        168.    Plaintiff City of Eugene ("Eugene") is a home rule charter city organized and

5    existing under and by virtue of the constitution and laws of the State of Oregon.

6        169.    Through FY 2023–2027, Eugene received, or expects to receive, over $61 million

7    in DOT grants administered by the FHWA for transportation and infrastructure projects that

8    benefit Eugene residents, businesses, and visitors. As the sponsor of the Eugene Airport, Eugene

9    also receives approximately $9.2 million in annual DOT grants for airport operations and, between

10   2025–2029, expects to receive more than $49 million in additional DOT funding for programmed

11   airport infrastructure projects.

12       170.    Eugene also relies on HUD CDBG and HOME grants to further local housing

13   opportunities. For FY 2025, HUD has confirmed Eugene's eligibility for CDBG formula grants of

14   $1,483,454 and, as the lead agency for the Eugene-Springfield HOME Consortium, an additional

15   $1,150,062 in HOME formula grants on behalf of consortium members.

16       171.    Eugene also receives millions in federal assistance through HHS to fund critical

17   public health initiatives.

18       172.    Eugene brings the action as to the unlawful HUD Grant Conditions, the unlawful

19   DOT Grant Conditions, and the unlawful HHS Grant Conditions.

20       173.    Plaintiff City of Healdsburg ("Healdsburg") is a municipal corporation and general

21   law city organized and existing under and by virtue of the laws of the State of California.

22       174.    Healdsburg has current grant agreements for approximately $861,820 in DOT

23   funds supporting infrastructure projects improving the streets in Healdsburg to contribute to the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 34

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

safety and well-being of drivers and pedestrians who live in and visit Healdsburg. In addition, Healdsburg anticipates receiving approximately $2.2 million in DOT grants to help fund two large projects upgrading streets throughout Healdsburg to improve the safety and public health of all community members; without these funds, Healdsburg cannot complete these projects. Healdsburg also regularly receives DOT and FAA grant funding for maintenance and improvements at the Healdsburg Municipal Airport, which is used for private aviation, as well as for staging, landing and take-off by firefighters and other emergency personnel for emergency events in all of Sonoma County. Healdsburg has submitted DOT grant applications and received a preliminary notice of approval for nearly $600,000 for critical improvements and rehabilitation of the airport runways.

175.    Healdsburg brings this action only as to the unlawful DOT Grant Conditions.

176.    Plaintiff County of Hennepin ("Hennepin County") is a political subdivision of the State of Minnesota.

177.    Hennepin County's calendar year 2025 budget includes $271,751,382 in direct federal funding. Of this amount, Hennepin County budgeted $16,812,799 from HUD to fund services such as emergency shelter, rapid rehousing, and lead abatement in homes; $15,838,367 from DOT to fund various road projects; and $136,093,272 in non-Medicaid funds from HHS for critical safety net services and to administer federal programs. Hennepin County receives additional federal funding, including from HUD, DOT, and HHS, through grants administered by the State of Minnesota and its political subdivisions.

178.    Hennepin County brings this action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

179.    Plaintiff Kitsap County is a county organized and existing under and by virtue of the constitution and laws of the State of Washington.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 35

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

180.     Kitsap County relies on $1.76 million annually (as of 2025) in HUD CDBG and HOME funds—$1,093,594 in CDBG and $668,553 in HOME—to support services for low- and very low-income households. These funds are used for downpayment assistance, creation and preservation of affordable rental housing, homeownership rehabilitation and weatherization, food banks, childcare and afterschool programs, and microenterprise business assistance.

181.     In addition, Kitsap County's Transportation Improvement Program for 2025–2030 identifies $68.9 million in total federal transportation grant funding, including $5.26 million in currently obligated grants, $35.16 million in awarded but not yet obligated funding, and $28.5 million in anticipated future awards. These DOT funds, representing approximately 47% of the county's Transportation Improvement Program budget, support critical infrastructure projects, pedestrian and vehicle safety improvements, and revitalization initiatives in underserved areas.

182.     Kitsap County brings the action as to both the unlawful HUD Conditions and the unlawful DOT Grant Conditions.

183.     Plaintiff City of Los Angeles ("Los Angeles") is a charter city and municipal corporation organized and existing under the constitution and laws of the State of California and the Los Angeles City Charter. Los Angeles is home to nearly 4 million people and hosts about 50 million visitors per year.

184.     Los Angeles is relying on nearly $100 million in HUD grants to address the housing and community development needs of the city's most vulnerable populations, specifically through CDBG, HOME, ESG, and HOPWA funding. These programs provide emergency shelter and support for low- and moderate-income individuals at risk of falling into homelessness, which is of paramount importance to Los Angeles' ongoing response to the homelessness crisis.

185.     Los Angeles also counts on federal funding to operate, maintain, and improve its

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 36

vital transportation systems to serve the needs of its residents and visitors. In 2024, Los Angeles received $127.5 million in federal DOT grants which were used to operate and maintain the city's airports, including Los Angeles International Airport, and to make necessary safety and efficiency improvements and enhancements to this vital international hub. For 2025 and future years, DOT has awarded, but not yet obligated, more than $55 million to Los Angeles for its airports, and a request for more than $65 million in grant funding is pending. Los Angeles has also been awarded over $124 million in obligated FTA grants, and has been allocated $72,964,700 in FTA formula grants for fiscal years 2020 through 2025.

186.    Los Angeles brings this action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

187.    Plaintiff City of Milwaukee ("Milwaukee") is a municipal corporation organized and existing under the laws of the State of Wisconsin.

188.    Based on information prepared for Milwaukee's 2024 Single Audit Report, Milwaukee administers approximately $206 million direct, active HUD grant awards. These funds are used, for example, for affordable housing, emergency housing, continuum of care services, and housing for people with HIV/AIDS, and lead hazard reduction.

189.    Based on departmental records, Milwaukee currently administers approximately $16 million in direct, active grant awards from HHS, and while the number fluctuates, currently another $11 million federal pass-through HHS funds. These funds are used, for example, to manage health disparities, expand public health infrastructure, respond and prepare for infectious disease, prevent violence, and advance health literacy.

190.    Based on information prepared for Milwaukee's 2024 Single Audit Report, Milwaukee administers approximately $74 million direct, active grant awards from DOT. Based

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 37

on departmental records, Milwaukee also administers between approximately $25 million to $65 million annually in DOT pass through funding. These funds support highway planning and construction, refuse packing, public transportation, traffic speed and safety enforcement, and addressing impaired driving. The Port of Milwaukee also administers a subset of these DOT funds for port infrastructure work.

191.    Milwaukee brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

192.    Plaintiff Milwaukee County is a municipal body corporate and political subdivision organized and existing under the laws of the State of Wisconsin.

193.    Milwaukee County, through its Department of Transportation, owns and operates the Milwaukee Mitchell International Airport ("MKE"). MKE is the largest airport in Wisconsin, with approximately 6.3 million passengers traveling from MKE in 2024. Milwaukee County relies on substantial federal grant funding for critical capital projects at MKE to serve the traveling public. These needs are both long-term and immediate. For example, in federal fiscal years 2025 and 2026, Milwaukee County's plan of financing is premised on federal grants providing over $57 million in capital funding for projects including terminal redevelopment and airfield rehabilitation and improvements.

194.    Milwaukee County brings the action only as to the unlawful DOT Grant Conditions.

195.    Plaintiff Multnomah County is a charter home rule county organized under the laws of the State of Oregon.

196.    Multnomah County relies on over $39 million each year in HUD CoC grant funds, that flow either directly to Multnomah County's Homeless Services Department or to community nonprofit providers, to house nearly 2,500 individuals and operate the county's homeless services

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

infrastructure. These grant funds are critical to supporting the 15,000 unhoused residents of Multnomah County with rental assistance and supportive services.

197.    Multnomah County's Department of Community Services also receives federal DOT dollars, directly and through pass-through/intergovernmental agreements. For FY 2025 Multnomah County budgeted for approximately $8 million in DOT grant funds to fund capital improvements to roads and bridges and for planning of upcoming renovation of the Burnside Bridge. For FY 2026, Multnomah County has budgeted for $25.6 million in DOT grant funds.

198.    Multnomah County funds its clinical operations and programs using HHS grant funds, in particular through HRSA grants. For FY 2025, Multnomah County has approximately $13 million in active HRSA grants, the majority of which are dedicated to operating the Community Health Centers that provide safety net medical services to vulnerable residents.

199.    Multnomah County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

200.    Plaintiff City of Oakland ("Oakland") is a charter city formed under the California Constitution, with a population of approximately 440,000 people.

201.    More than 5,000 residents of Oakland are homeless. Oakland relies, in part, on federal funds, including CoC grants, to attempt to alleviate this problem. In 2025 and 2026, Oakland has been awarded $5.4 million in CoC grants for leasing shelter for homeless persons, administering the HMIS, providing supportive services, and providing rental assistance, among other services. Further, in fiscal year 2024–2025, Oakland departments received over $14 million in HUD formula grant awards, including CDBG, HOME, HOPWA, and ESG funds, to support affordable housing homelessness response efforts and other community development activities. In fiscal year 2025–2026, Oakland has been awarded over $14 million from these same HUD formula

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 39

grants. Oakland also receives a $7 million one-time award from the competitive PRO Housing HUD grant program to support the development of affordable housing over multiple years.

202.    Through the Oakland Department of Transportation ("OakDOT"), Oakland envisions, plans, builds, operates, and maintains the city's transportation system. To do so, it relies in part on millions of dollars in federal funding from DOT OAs, such as the FHWA and FTA. OakDOT was competitively awarded approximately $13.8 million as part of DOT's 2021 RAISE Grant Program to make street improvements, and $1 million from the DOT's 2024 Safe Streets and Roads for All program, and has applied for an additional $5 million from the 2025 Safe Streets and Roads for All program.

203.    Oakland relies on millions of dollars per year from HHS, including through its Human Services Department, which receives over $13 million dollars per year in direct HHS funds for HEAD Start. In addition, Oakland also currently receives $1 million dollars per year for each of the five fiscal years 2021–2026 in HHS funds (through SAMHSA) to fund the ReCAST Project, which improves behavioral health outcomes and access to evidenced-based promising practices for high risk youth and families most impacted by civil unrest and violence.

204.    Oakland brings this action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

205.    Plaintiff City of Pacifica ("Pacifica") is a municipal corporation and general law city organized and existing under and by virtue of the laws of the State of California.

206.    Pacifica receives approximately $110,000 in funds from DOT, passed through the State of California Office of Traffic Safety and National Highway Traffic Safety Administration (NHTSA), for traffic enforcement/safety support programs and services. Pacifica is also currently applying for a $3.5 million grant from DOT to support key planning and infrastructure to prevent

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 40

death and serious injury on roads and streets involving all roadway users, including pedestrians, bicyclists, public transportation, personal conveyance, and micromobility users, motorists, and commercial vehicle operators.

207.    Additionally, Pacifica receives over $500,000 from HHS for programs and services that assist its low-income and marginalized communities, including senior transportation, meals on wheels, and childcare support.

208.    Pacifica brings this action as to the unlawful DOT Grant Conditions and the unlawful HHS Grant Conditions.

209.    Plaintiff the City of Petaluma ("Petaluma") is a municipal corporation existing under and by virtue of the constitution and laws of the State of California. Petaluma is a charter city.

210.    FTA currently has committed a total of $10,002,326 for Petaluma programs, including transit facility improvements, paratransit and fixed-route transit vehicles, and paratransit operations. Petaluma also expects $3,362,690 from FAA for Petaluma programs, including airport taxiway, runway, and hangar ramp rehabilitation and other improvements.

211.    Petaluma has current direct HUD awards equal to or exceeding $2,335,254 for resiliency center, back-up generator, sea level rise mapping, and building seismic retrofit disaster mitigation projects. Petaluma also receives at least $240,000 as a member of Sonoma County's Continuum of Care. This funding supports mental health services for sheltered and unsheltered persons, and street outreach programs for chronically unsheltered persons.

212.    Petaluma brings this action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

213.    Plaintiff Ramsey County is a political subdivision of the State of Minnesota, with

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 41

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

its county seat in Saint Paul.

214.    Ramsey County receives over $70 million annually from HHS in both direct and pass-through awards to, among other programs, help families avoid involvement with the child welfare system, serve justice-involved and unsheltered people with substance use disorder and mental health conditions, and provide wrap-around sexual health services to low-income families.

215.    Ramsey County also receives over $2.5 million annually from HUD, both directly and as a subrecipient, including for the CDBG, HOME, and PRO Housing programs, some of which fund the rehabilitation of group homes for people with disabilities and other affordable housing. Ramsey County is also a collaborative applicant and the lead agency for Heading Home Ramsey, Ramsey County's Continuum of Care, which receives over $8 million in HUD funding per grant cycle to assist those at risk of or experiencing homelessness.

216.    Finally, the federal DOT has awarded over $40 million in funding to Ramsey County as a subrecipient for current and upcoming projects, including Public Works bridge and road improvements and multi-use trail development by Parks and Recreation.

217.    Ramsey County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

218.    Plaintiff the City of Rochester ("Rochester") is a municipal entity organized and existing under and by virtue of the laws of the State of New York.

219.    A significant portion of Rochester's budget is derived from federal funds. Those federal dollars deliver critical resources to some of the most at-risk members of its community. For example, in the calendar year 2024, Rochester received awards of $12,388,321 in HUD funds. That included a $8,201,087 CDBG grant and $1,132,150 in HOPWA funds. Those HOPWA funds provided for subsidies and support services to 148 households that have at least one person living

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 42

with HIV/AIDS.

220.    Rochester also received $8,465,163 from DOT in the fiscal year ending June 30, 2024, which included $52,828 in Pedestrian Safety Program funds.

221.    In the 2023–2024 fiscal year, Rochester received $596,896 in HHS funds which covered pregnancy prevention grants and sexual risk avoidance grants.

222.    Rochester brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

223.    Plaintiff City of Rohnert Park ("Rohnert Park") is a municipal corporation, general law city, organized and existing under and by virtue of the laws of the State of California.

224.    Rohnert Park receives approximately $3.4 million in DOT funds administered by FHWA. Rohnert Park is currently applying for $840,000 from DOT under the SS4A program for roadway safety through the Sonoma County Transportation & Climate Authorities ("SCTCA") to support key planning and infrastructure. In addition to SS4A, in August 2025, Rohnert Park will submit funding applications to SCTCA for $21 million, funded in part by FHWA grants, for traffic safety and infrastructure improvements.

225.    Rohnert Park brings this action only as to the unlawful DOT Grant Conditions.

226.    Plaintiff City of San Diego ("San Diego") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

227.    San Diego is a direct recipient of approximately $225 million in active HUD grant funding to support a wide range of housing and community development initiatives. San Diego anticipates receiving an additional $25 million in HUD funding. By way of example, San Diego uses HUD funding through the CDBG, HOME, and ESG programs to create affordable housing, provide rental assistance, and address homelessness in the region. San Diego also depends on other

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 43

HUD grants to develop and improve libraries, community centers, and parks, subsidize childcare costs, manage energy costs for residents, and support mobile solar panel electric vehicle charging systems to increase its share of zero-emissions vehicles.

228.    Additionally, San Diego relies on around $137 million in awarded DOT grants administered by FHWA as a direct recipient or subrecipient. San Diego anticipates receiving an additional $73 million in DOT funding. FHWA funds primarily support San Diego's key capital improvement projects, which involve substantial undertakings that often span several years to improve critical infrastructure, such as bridge rehabilitation and street repairs.

229.    San Diego brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

230.    Plaintiff County of San Mateo ("San Mateo County") is a charter county and political subdivision of the State of California.

231.    San Mateo County administers millions of dollars each year in federal funding from HUD, DOT, and HHS. With respect to HUD grant funds, San Mateo County Continuum of Care was awarded approximately $14 million in grant funding in HUD CoC funds to serve the region's approximately 1,800 homeless residents. Additionally, San Mateo County expects to receive approximately $3,774,761 million in HUD grant funding through the CDBG, HOME, and ESG programs.

232.    San Mateo County's Department of Public Works ("DPW") also relies heavily on significant federal funding from FAA for projects like runway repair and airport upgrades/airfield work. Without federal funding it would be difficult to maintain or improve local airports. Moreover, DPW relies on FHWA and DOT funding for road repair and bridge projects among other roadway infrastructure projects. DPW currently has approximately $2.4 million in awarded

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 44

federal funds.

233.    In addition to the HUD and DOT funding, San Mateo County annually receives tens of millions of dollars from HHS for critical public services, including TANF, foster care programming, and public health initiatives. These public health initiatives include disease control and prevention, treatment of substance-use disorders, provision of services to persons with serious mental illnesses, and programming that supports maternal and infant well-being. For example, each year, San Mateo County receives approximately $2.8 million from HRSA to provide medical, dental, and behavioral health services to about 3,800 individuals experiencing homelessness and 1,000 farmworkers and their family members.

234.    San Mateo County brings the action as to the unlawful HUD Grant Conditions, the unlawful DOT Grant Conditions, and the unlawful HHS Grant Conditions.

235.    Plaintiff City of Santa Rosa ("Santa Rosa") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

236.    Santa Rosa receives a total of more than $24 million in federal funds from DOT and approximately $5.8 million in federal funds from HUD. These funds ensure ongoing maintenance of Santa Rosa's transit system, including maintenance of city streets, replacement of its aging buses, funding of transit employee positions, and support to public safety and wildfire prevention initiatives and important homelessness and housing insecurity programs.

237.    Santa Rosa brings the action as to the unlawful HUD Grant Conditions and the unlawful DOT Grant Conditions.

238.    Plaintiff City of Watsonville ("Watsonville") is a municipal corporation and general law city organized and existing under and by virtue of the laws of the State of California.

239.    Watsonville receives approximately $1.1 million in DOT funds administered by

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 45

FAA, FHWA, and NHTSA. FHWA and NHTSA funds support public safety programs to reduce the number of persons killed and injured in crashes involving alcohol and other primary crash factors; efforts related to traffic enforcement and public awareness in areas with a high number of bicycle and pedestrian crashes; and the Safe Routes to School initiatives and Safe System Approach to prevent fatalities and injuries of vulnerable non-motorized road users. Additionally, DOT FAA grants support the Watsonville Airport, and fund services related to public health emergencies at the airport, including reimbursement of costs related to operations, personnel, cleaning sanitation, and personal protective equipment for combating the spread of pathogens. Further, FAA Zero Emissions Vehicle program grants fund the Watsonville Airport's efforts to improve airport air quality and facilitate the use of zero-emissions technologies.

240.    Watsonville receives a Community Development Block (CDBG) Grant from HUD totaling $634,804 which funds services and program for youth center staffing, code enforcement, small business assistance, Ramsay Park and housing program administration funds.

241.    Watsonville brings this action only as to the unlawful HUD Grant Conditions and DOT Grant Conditions.

242.    Plaintiff Culver City Housing Authority ("CCHA") is a public body corporate and politic organized and exiting under the California Health and Safety Code Sections 34200, *et seq*.

243.    CCHA has been appropriated or awarded approximately $1.3 million in Section 8 funds from HUD for FY 2025–26.

244.    CCHA brings this action as to the unlawful HUD Grant Conditions.

245.    Plaintiff Puget Sound Regional Council ("PSRC") is a regional planning agency formed under Washington's Interlocal Cooperation Act, Revised Code of Washington chapter 39.34, and has been designated the metropolitan planning organization for King, Kitsap, Pierce,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 46

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and Snohomish counties pursuant to 23 U.S.C. § 134 and 49 U.S.C. § 5303.

246.    PSRC members currently include the four counties, 77 cities and towns, four port districts, the region's transit agencies, WSDOT, the Washington Transportation Commission, the Muckleshoot Indian Tribe, the Puyallup Tribe of Indians, the Suquamish Tribe, and the Tulalip Tribes. PSRC develops long-range transportation plans and transportation improvement programs for its planning area to guide the funding and development of future transportation projects. PSRC relies on more than $32 million in DOT grants, including more than $9 million in FTA grants and more than $22 million in FHWA grants, some of which are passed through from WSDOT.

247.    PSRC brings the action only as to the unlawful DOT Grant Conditions.

248.    Plaintiff Sonoma County Transportation Authority ("SCTA") was created by County of Sonoma Board of Supervisors Resolution No. 90-1522 on August 7, 1990, pursuant to California Public Utilities Code section 180000, otherwise known as the Local Transportation Authority and Improvement Act, and acts as the countywide planning and fund programming agency for transportation and performs a variety of important functions related to advocacy, project management, planning, finance, grant administration and research.

249.    SCTA receives federal transportation funding from DOT. Annually, SCTA is a subrecipient of federal transportation planning funds administered through the CalTrans based on CalTrans' delegated authority from the FHWA. SCTA, in partnership with the cities of Santa Rosa, Petaluma, Rohnert Park, Cotati, and the Town of Windsor has been awarded $4,580,000 in 2024 from FHWA's Safe Streets and Roads For All program. These funds will be used to deliver demonstration activities and complete a supplemental planning project related to transportation safety.

250.    SCTA brings the action only as to the unlawful DOT Grant Conditions.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 47

251.    Sonoma County Community Development Commission ("SCCDC") is a public entity, formed in 1984 pursuant to California Health and Safety Code section 34110, et seq. SCCDC oversees affordable housing and community infrastructure projects and supports non-profit organizations that serve low-income populations in Sonoma County. To date, SCCDC has assisted in the development and preservation of 3,352 affordable housing units through local, state, and federal grants.

252.    Since its inception, SCCDC has had a long history of partnering with HUD, leveraging federal grants to improve the lives of low-income households in Sonoma County through the provision of funds to aid in development of affordable housing, funds for critical community services, and rental assistance paid to private property owners on behalf of low-income tenants. Additionally, federal grants assist in the improvement of public infrastructure systems and support the local economies in Sonoma County by providing assistance to small business entities. SCCDC receives and administers HUD funded programs, including four primary grant sources: CDBG, HOME, ESG, and the housing choice voucher program. For FY 2025–2026, these HUD funds have been allocated to various eligible projects and activities, including affordable rental housing projects, a micro-enterprise entity, a public water infrastructure project, and service providers to support homeless populations, including households at-risk of becoming homeless.

253.    SCCDC brings this brings the action only as to the unlawful HUD Grant Conditions.

254.    Defendant Scott Turner is the Secretary of HUD, the highest ranking official in HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

255.    Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 48

§ 551(1).

256.    Defendant Sean Duffy is the Secretary of DOT, the highest ranking official in DOT, and responsible for the decisions of DOT. He is sued in his official capacity.

257.    Defendant DOT is an executive department of the United States federal government. 49 U.S.C. § 102(a). It houses a number of operating administrations, including the FTA, FHWA, FAA, and FRA. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

258.    Defendant Tariq Bokhari is the acting Administrator of the FTA, the highest ranking official in the FTA, and responsible for the decisions of the FTA. He is sued in his official capacity.

259.    Defendant FTA is an operating administration within DOT. 49 U.S.C. § 107(a). FTA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

260.    Defendant Gloria M. Shepherd is the acting Director of the FHWA, the highest ranking official in the FHWA, and responsible for the decisions of the FHWA. She is sued in her official capacity.

261.    Defendant FHWA is an operating administration within DOT. 49 U.S.C. § 104(a). FHWA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

262.    Defendant Chris Rocheleau is the acting Administrator of the FAA, the highest ranking official in the FAA, and responsible for the decisions of the FAA. He is sued in his official capacity.

263.    Defendant FAA is an operating administration within DOT. 49 U.S.C. § 106(a). FAA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

264.    Defendant Drew Feeley is the acting Administrator of the FRA, the highest ranking

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 49

official in the FRA, and responsible for the decisions of the FRA. He is sued in his official capacity.

265.    Defendant FRA is an operating administration within DOT. 49 U.S.C. § 103(a). FRA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

266.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS, the highest ranking official in HHS, and responsible for the decisions of HHS. He is sued in his official capacity.

267.    Defendant HHS is an executive department of the United States federal government. 42 U.S.C. § 3501. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## IV.    FACTUAL ALLEGATIONS

### A.    HUD Grant Programs

268.    Congress established HUD in 1965 to promote the "sound development of the Nation's communities and metropolitan areas" by, among other things, administering programs that "provide assistance for housing" and "development." Department of Housing and Urban Development Act, 1965 § 2, Pub. L. 89-175, 79 Stat. 667. HUD administers both competitive and formula grant programs. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019). Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up). HUD administers grants directly and through its program offices, including the Office of Community Planning & Development (CPD), and regional field offices. *See* 24 C.F.R. subchapter C (CPD-administered programs); *id.* § 982.101 (allocating budget authority for Section 8 Housing Choice Voucher program to field

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 50

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

offices).

### 1.    Continuum of Care Grant Program

#### a.)    *Congress Authorizes the Establishment of the Continuum of Care Program through the McKinney-Vento Homeless Assistance Act*

269.    Congress enacted the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act") "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b).

270.    Among the programs Congress established through subsequent amendments to the Homeless Assistance Act is the Continuum of Care (CoC) program. *Id.* §§ 11381–89. The CoC program is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers and state and local governments to quickly rehouse homeless individuals and families; to promote access to, and effective utilization of, mainstream programs by homeless individuals and families; and to optimize self-sufficiency among those experiencing homelessness. *Id.* § 11381.

271.    The Homeless Assistance Act directs the Secretary of HUD (the "HUD Secretary") to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id.* § 11382(a). These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient. The CoC program funds a variety of programs that support homeless individuals and families, including through the construction of supportive housing, rehousing support, rental assistance, and supportive services, including child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 51

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

272.    Grants are awarded to local coalitions, or "Continuums," that may include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and other stakeholders. 24 C.F.R. § 578.3. Each Continuum designates an applicant to apply for CoC funding on behalf of the Continuum. *Id.*

### b.)    Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CoC Grant Conditions

273.    HUD's administration of the CoC program, including the award of CoC grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CoC program, the selection criteria HUD must apply in awarding CoC grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 11383, 11386, 11386a.

274.    Section 422 of the Homeless Assistance Act, 42 U.S.C. § 11382, contains Congress's overarching authorization for HUD to award CoC grants. Subsection (A) of that section states:

> The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies.

275.    Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use. These required criteria include things like the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need within the geographic area for homeless services. *Id.* (b)(1)–(2).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 52

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

276.    Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere. Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers. 42 U.S.C. § 11386(b).

277.    The Homeless Assistance Act does not authorize HUD to condition CoC funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

278.    Congress has authorized the Secretary to promulgate regulations establishing, *inter alia*, other selection criteria and "other terms and conditions" on grant funding "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8), 11386a(b)(1)(G), 11387.

279.    Pursuant to this authority, HUD has promulgated the Continuum of Care Program rule at 24 C.F.R. part 578 (the "CoC Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the CoC grant agreements they execute with HUD. *Id.* § 578.23(c). While the CoC Rule permits HUD to require CoC recipients to comply with additional "terms and conditions," such terms and conditions must be "establish[ed] by" a Notice of Funding Opportunity (NOFO).[2] *Id.* § 578.23(c)(12).

---

[2] The terms NOFO, "Notice of Funding Availability," and "Funding Opportunity Announcement" refer to a formal announcement of the availability of federal funding. As part of an effort to standardize terminology, most federal agencies now use the term NOFO. For clarity, this Complaint uses the term NOFO.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 53

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

280.    The CoC Rule does not impose any conditions on CoC funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

### c.)    Congress Appropriates CoC Grant Funding and Authorizes HUD to Issue a NOFO for Fiscal Years 2024 and 2025

281.    Funding for CoC grants comes from congressional discretionary appropriations.

282.    Most recently, Congress appropriated funds for the CoC program in the Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25 (the "2024 Appropriations Act").

283.    The 2024 Appropriations Act contains additional directives to HUD regarding CoC funding. For instance, it requires the Secretary to "prioritize funding . . . to continuums of care that have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects," and requires the Secretary to "provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services." *Id.*, 138 Stat. 362–363.

284.    The 2024 Appropriations Act also authorized HUD to issue a two-year NOFO for Fiscal Years 2024 and 2025 program funding. *Id.*, 138 Stat. 386.

285.    By statute, the HUD Secretary must announce recipients within five months after the submission of applications for funding in response to the NOFO. 42 U.S.C. § 11382(c)(2).

286.    The HUD Secretary's announcement is a "conditional award," in that the recipient must meet "all requirements for the obligation of those funds, including site control, matching funds, and environmental review requirements." *Id.* § 11382(d)(1)(A).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 54

287.    Once the recipient meets those requirements, HUD must obligate the funds within 45 days. *Id.* § 11382(d)(2) (providing that "the Secretary shall obligate the funds").

288.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CoC grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### d.)    HUD Conditionally Awards CoC Grants to CoC Plaintiffs

289.    In July 2024, HUD posted a biennial NOFO announcing a competition for CoC funding for Fiscal Years 2024 and 2025 (the "FYs 2024 & 2025 NOFO"). *See* U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

290.    The FYs 2024 & 2025 NOFO directed Continuums to consider policy priorities in their applications, including "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." *Id.* at 9. The FYs 2024 & 2025 NOFO specified that "HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities . . . ." *Id.* The FYs 2024 & 2025 NOFO further specified that "CoC should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation." *Id.*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 55

291.    The NOFO did not include any grant conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

292.    Existing plaintiffs King County, Pierce County, Snohomish County, San Francisco, Santa Clara, Boston, Columbus, NYC, Nashville, Pima County, Cambridge, Pasadena, San José, Tucson, King County RHA, and Santa Monica HA, as well as plaintiffs Alameda County, Albuquerque, Baltimore, Dane County, Hennepin County, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, San Mateo County, and Sonoma County (collectively, the "CoC Plaintiffs"), in coordination with or as part of their respective Continuums, developed their applications in compliance with the FYs 2024 & 2025 NOFO's stated policy priorities. Each CoC Plaintiff Continuum timely submitted its application in response to the FYs 2024 & 2025 NOFO.

293.    On January 17, 2025, HUD announced the conditional award list for FY 2024, which included each of the CoC Plaintiffs.

### e.)    CoC Plaintiffs Rely on CoC Grants to Serve their Homeless Residents

294.    Tens of thousands of individuals and families experiencing homelessness live within CoC Plaintiffs' geographical limits. Many of these individuals rely on services provided by CoC Plaintiffs with funding from the CoC program to access rapid rehousing (which provides short-term rental assistance), permanent and transitional housing services, and case management that supports linkages to healthcare, job training, and other resources that facilitate their ability to obtain and keep their housing.

295.    CoC Plaintiffs historically have applied annually for CoC funds on behalf of Continuums that include representatives from local governments, nonprofits, faith-based

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 56

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

organizations, advocacy groups, public housing agencies, universities, and/or other stakeholders. Grant awards are currently distributed to scores of programs serving homeless individuals and families in each of CoC Plaintiffs' jurisdictions.

296.    CoC grants support permanent supportive housing programs, which provide long-term, affordable housing combined with supportive services for individuals and families experiencing, or at risk of, homelessness. These programs allow participating individuals and families to live independently and stably in their communities.

297.    CoC grants also support rapid rehousing programs, which help individuals and families exit homelessness and return quickly to permanent housing. Rapid rehousing is a key component of CoC Plaintiffs' response to homelessness because it connects people to housing as quickly as possible by providing temporary financial assistance and other supportive services like housing search and stability case management.

298.    Other programs funded by CoC grants include transitional housing programs that provide temporary, short-term housing for homeless individuals and families who require a bridge to permanent housing; supportive services, which include things like conducting outreach to homeless individuals and families and providing referrals to housing or other needed resources; and operation of systems for collecting and managing data on the provision of housing and services to program participants.

299.    Thousands of CoC Plaintiffs' residents experiencing, or at risk of, homelessness rely on these programs and others funded by the CoC program. The loss of CoC funding threatens the ability of CoC Plaintiffs to provide critical programs and would result in program participants losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 57

300.    For FY 2024, HUD conditionally awarded CoC Plaintiffs hundreds of millions of dollars in CoC grants to continue homelessness assistance programs, ensuring CoC Plaintiffs' ability to serve their residents so they would not experience a sudden drop off in the availability of housing services, permanent and transitional housing, and other assistance.

301.    In reliance on these awards, many CoC Plaintiffs have already notified service providers of forthcoming funding and/or contracted with service providers for homelessness assistance services.

### 2.    Community Development Block Grant Program

302.    Congress established the Community Development Block Grant (CDBG) program through Title I of the Housing and Community Development Act of 1974 (the "HCD Act"), Pub. L. 93-383, 88 Stat. 633, and subsequent amendments. The program's stated "primary objective" is to promote "development of viable urban communities" through "decent housing," a "suitable living environment," and "expan[sion of] economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). Specific objectives include "conserv[ing] and expan[ding] the Nation's housing stock" especially for low- and moderate-income households, promoting mixed-income communities, and enhancing the "diversity and vitality of neighborhoods" by eliminating slums or blight and revitalizing "deteriorating or deteriorated neighborhoods," among other goals. *Id.* § 5301(c)(1), (c)(3), (c)(6).

303.    The CDBG program is codified at title 42, chapter 69 of the U.S. Code. The program provides flexible funding through annual block grants awarded on a formula basis to state and local governments for purposes related to economic and community development. In enacting the program, Congress consolidated "a number of complex and overlapping" grant programs such that funding would be provided "on an annual basis, with maximum certainty and minimum

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 58

delay," and communities could "rely [on funding] in their planning." *Id.* § 5301(d). The HCD Act permits communities to tailor program activities to meet local needs so long as they advance national objectives identified by Congress, including benefiting low- and moderate-income persons, preventing or eliminating slums or blight, or, in certain cases, responding to serious and immediate threats to community health or welfare where other funds are unavailable. *Id.* §§ 5301(c), 5304(b)(4).

304.    The HCD Act authorizes the HUD Secretary to award CDBG funds using statutorily prescribed selection criteria. 42 U.S.C. §§ 5303–04. The HUD Secretary must distribute funds annually using a formula that considers population and measures of distress including poverty, age of housing, housing overcrowding, and growth lag. *Id.* §§ 5303–04, 5306. These grants fund vital urban community development projects and public services administered by grant recipients either directly or through service providers contracted by the grant recipient. *See id.* § 5305 (listing activities eligible for assistance).

### a.) *Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CDBG Grant Conditions*

305.    HUD's administration of the CDBG program, including the award of block grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CDBG program, the selection criteria HUD must apply in awarding CDBG grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 5301, 5304–05.

306.    Section 103 of the HCD Act, *id.* § 5303, contains Congress's overarching authorization to award CDBG funding. That provision states in relevant part: "The Secretary is authorized to make grants to States, units of general local government, and Indian tribes to carry

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 59

out activities in accordance with the provisions of this chapter."

307.    In addition to the statutory objectives and allocation formula discussed above, Congress has imposed other requirements on CDBG funds. For instance, 42 U.S.C. § 5305 limits the use of CDBG funds to enumerated eligible activities. The HCD Act also mandates that recipients use at least 70% of CDBG funds on activities that principally benefit low- and moderate-income persons, *id.* § 5301(c), and prescribes eligibility criteria for such activities, *id.* § 5305(c). Grant recipients must also submit annual plans to the HUD Secretary describing their priority nonhousing community development needs eligible for CDBG funding pursuant to procedures set out in the HCD Act. *Id.* § 5304(m). Finally, Congress has enumerated various certifications that CDBG recipients must make as a condition of receiving funds, including that the recipient will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds are consistent with the HCD Act's objectives, and administer programs in conformity with nondiscrimination laws. *Id.* § 5304(a)(3), (b).

308.    The HCD Act does not authorize HUD to condition CDBG funding on opposition to all forms of DEI policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, verification of immigration status, exclusion of transgender people, or cutting off access to information about lawful abortions.

309.    The HCD Act indicates congressional intent to benefit historically disadvantaged groups. For example, the Act *requires* the Secretary to set aside some of the funds appropriated for the CDBG program for "special purpose grants," which may include, among other things, grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2). The Act further provides that, of the amount set aside for special purpose grants, the Secretary "shall" make grants to institutions of higher education "for the purpose of providing assistance to economically disadvantaged and

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 60

minority students who participate in community development work study programs and are

enrolled in" qualifying degree programs. *Id*. § 5307(c). The Act also authorizes urban development

action grants to cities and urban counties experiencing severe economic distress, but only if the

HUD Secretary determines the city or county has "demonstrated results in," among other things,

"providing equal opportunity in housing and employment for low- and moderate-income persons

and members of minority groups." *Id*. § 5318(a)–(b).

310.    Congress has authorized the HUD Secretary to promulgate "rules and regulations"

necessary to carrying out the Secretary's "functions, powers, and duties." 42 U.S.C. § 3535(d).

311.    Pursuant to this authority, HUD has promulgated the CDBG program rule at 24

C.F.R. part 570 (the "CDBG Rule"), which, among other things, imposes additional restrictions

on the use of CDBG funds. *See* 24 C.F.R. § 570.207. The CDBG Rule also obligates grant

recipients to submit annual consolidated plans in accordance with 24 C.F.R. part 91. 24 C.F.R.

§ 570.302. These annual consolidated plans must include additional certifications enumerated in

HUD regulations, including that the recipient complies with lead-based paint procedures and has

policies barring the use of excessive force against non-violent civil rights demonstrators. 24 C.F.R.

§ 91.225.

312.    The CDBG Rule does not impose any conditions on CDBG funding related to

prohibiting all forms of DEI policies and initiatives through the guise of federal nondiscrimination

law, participating in aggressive and lawless immigration enforcement, verification of immigration

status, opposing transgender acceptance, or cutting off access to information about lawful

abortions.

### b.)    *Congress Appropriates CDBG Grant Funding*

313.    Funding for CDBG grants comes from congressional discretionary appropriations.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 61

314.    Most recently, Congress appropriated funds for the CDBG program in the 2024 Appropriations Act. The 2024 Appropriations Act contains additional directives to HUD regarding CDBG funding. For instance, it requires that no more than 20% of any grant under the CDBG program may be expended for certain planning and administrative purposes and imposes limitations on funds provided to for-profit entities. 138 Stat. 358–59.

315.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CDBG grant conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 3.    Emergency Solutions Grant Program

#### a.)    *Congress Authorizes the Establishment of the Emergency Solutions Grant Program Through the HEARTH Act*

316.    In 2009, Congress established the Emergency Solutions Grant (ESG) program through the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, Pub. L. 111-22, 123 Stat. 1663. *See* 42 U.S.C. §§ 11371–11378. In enacting the HEARTH Act, Congress sought to remedy the "lack of affordable housing and limited scale of housing assistance programs" that it found to be "the primary causes of homelessness" and "establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." HEARTH Act, § 1002, 123 Stat. 1664.

317.    The HEARTH Act amended the Homeless Assistance Act to expand what had been known as the Emergency Shelter Grant program, which provided formula funding to state and local governments for the short-term needs of homeless individuals. Reflecting a broadened focus on factors that lead to homelessness, the HEARTH Act expanded the activities eligible for funding

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 62

under the new ESG program to include short- or medium-term rental assistance and housing relocation and stabilization services, in addition to emergency shelters, homelessness prevention, and supportive services, which had been covered under the original program. *See* 42 U.S.C. § 11374(a).

318.    The Homeless Assistance Act, as amended by the HEARTH Act, directs the Secretary of HUD to award ESG grants to cities, urban counties, and states on a non-competitive basis using HUD's formula for allocating CDBG funds, discussed above. *Id.* §§ 11372, 11373(a). These grants fund programs that address the most critical and immediate needs of those experiencing or at risk of homelessness, including programs for preventing homelessness, immediately rehousing individuals who become homeless, and providing emergency shelter to those experiencing homelessness. *Id.* § 11374(a).

### b.)    *Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding ESG Grant Conditions*

319.    HUD's administration of the ESG program, including the award of ESG funds, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the ESG program, the responsibilities of ESG recipients, and specific certifications ESG recipients must agree to as a condition of receiving funds. *Id.* §§ 11374(a), 11375.

320.    Congress's overarching direction to HUD to award ESG grants is codified at 42 U.S.C. § 11372, which provides:

> The Secretary shall make grants to States and local governments (and to private nonprofit organizations providing assistance to persons experiencing homelessness or at risk of homelessness, in the case of grants made with reallocated amounts) for the purpose of carrying out activities described in section 11374 of this title.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 63

321.    Section 11374 of Title 42 limits the activities for which ESG funds may be used to specific services: maintaining, operating, or renovating emergency shelters; providing supportive services related to emergency shelter or street outreach; paying short- or medium-term rental assistance; and providing housing relocation or stabilization services for homeless or at-risk individuals and families.

322.    Section 11375 of Title 42 sets forth certifications that recipients must make to the Secretary of HUD regarding their use of ESG funds. Recipients must certify that, among other things, they will operate facilities that receive funding as homeless shelters for a specified number of years, any ESG-funded renovation will be sufficient to ensure the shelter is safe and sanitary, they will assist homeless individuals in obtaining permanent housing and services such as medical and mental health treatment and counseling, and they will involve homeless individuals and families through employment, volunteer services, or otherwise, in constructing and operating shelters to the maximum extent practicable. 42 U.S.C. § 11375(c).

323.    The HEARTH Act does not authorize HUD to condition ESG funding on opposition to all forms of DEI policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, verification of immigration status, exclusion of transgender people, or cutting off access to information about lawful abortions.

324.    Section 11376 of Title 42 authorizes the Secretary of HUD "by notice" to "establish such requirements as may be necessary to carry out the provisions of" the ESG program. "Such requirements shall be subject to section 553 of title 5," which requires rulemaking to occur pursuant to notice and comment procedures. 42 U.S.C. § 11376.

325.    Pursuant to this authority, HUD has promulgated the ESG Rule at 24 C.F.R. part

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 64

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

576, which sets forth additional requirements and conditions on ESG funding. *See* 24 C.F.R. §§ 576.400–576.409. For instance, the ESG Rule requires ESG recipients to meet minimum safety, sanitation, and privacy standards for emergency shelters; integrate ESG services with other programs targeted to homeless individuals in the area; coordinate with local Continuums; conduct initial evaluations of program participants consistent with HUD requirements; and abide by recordkeeping and reporting requirements. *Id.* §§ 576.400, 576.401, 576.403(b), 576.500.

326.    The ESG Rule also obligates ESG recipients to submit and obtain HUD approval of a consolidated plan in accordance with the requirements in 24 C.F.R. part 91. *Id.* § 576.200. HUD's consolidated planning regulations set forth additional certifications that must be included in a consolidated plan, including that the jurisdiction will affirmatively further fair housing, is in compliance with anti-lobbying requirements, and possesses the legal authority to carry out programs for which it is seeking funding, among other certifications. *Id.* § 91.225(a).

327.    Neither the ESG Rule nor HUD's consolidated planning regulations impose any conditions on ESG funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

328.    Funding for the ESG program comes from congressional discretionary appropriations.

329.    Most recently, Congress appropriated funds for the ESG program in the 2024 Appropriations Act, 138 Stat. at 362.

330.    Nothing in the 2024 Appropriations Act or any other legislation authorizes HUD to impose ESG grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 65

of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4.  HOME Investment Partnerships Program

331.    Congress established the HOME program through the HOME Investment Partnerships Act (HOME Act), under Title II of the Cranston-Gonzalez National Affordable Housing Act (NAHA), Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments. The HOME program is a formula grant program that aims to help state and local governments implement local housing strategies to increase affordable housing opportunities for low-income families. The HOME program requires the HUD Secretary "to make funds available to participating jurisdictions for investment to increase the number of families served with decent, safe, sanitary, and affordable housing and expand the long-term supply of affordable housing." 42 U.S.C. §§ 12741, 12747(b).

332.    Participating jurisdictions may use HOME grants for a variety of housing activities. These include providing "incentives to develop and support affordable rental housing and homeownership affordability through the acquisition, new construction, reconstruction, or moderate or substantial rehabilitation of affordable housing." *Id.* § 12742(a)(1).

333.    Participating jurisdictions must allocate matching funds to affordable housing projects equivalent to at least 25 percent of the HOME funds the jurisdictions use. *Id.* § 12750.

#### a.)    *Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding HOME Grant Conditions*

334.    HUD's administration of the HOME program is authorized and governed by statutory directives. The HOME Act specifies the eligibility requirements to become a participating jurisdiction, the permissible and prohibited uses of HOME funds, the maximum

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 66

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

incomes of families who may receive HOME funds, and what housing qualifies as affordable for purposes of the program. *Id.* §§ 12742, 12744, 12475, 12476.

335.    The HOME Act does not grant HUD discretion in designating which jurisdictions may participate and under what circumstances those jurisdictions shall receive HOME funds. It instead directs the HUD Secretary to establish by regulation the statutorily specified procedures with which states and local governments must comply to be designated as participating jurisdictions and receive allocations of HOME funds. *Id.* § 12746. The HOME Act provides that such regulations "shall *only* provide for the" requirements for allocation, eligibility, notification, submission, reallocation, revocation, and reduction of funds listed in the statute. *Id.* § 12746(1)–(10) (emphasis added). Once a jurisdiction meets the statutory formula and complies with the listed requirements, HUD "*shall* designate" it "a participating jurisdiction" and the jurisdiction "shall remain a participating jurisdiction for subsequent fiscal years" unless certain revocation conditions are met. *Id.* § 12746(7)–(8) (emphasis added).

336.    The HOME Act further directs the HUD Secretary to "establish by regulation an allocation formula that reflects each jurisdiction's share of total need among eligible jurisdiction[s] for an increased supply of affordable housing for very low-income and low-income families of different size." *Id.* § 12747(b)(1)(A). This formula must be based on the "objective measures" specified in the HOME Act. *Id.*

337.    The Home Act further directs the HUD Secretary to establish a HOME Investment Trust Fund for each participating jurisdiction, along with a line of credit that includes the participating jurisdiction's allocated HOME funds. *Id.* § 12748(a)–(b).

338.    As directed by Congress, HUD promulgated the HOME program rule at 24 C.F.R. part 92 (the "HOME Rule"). The HOME Rule implements the allocation formula prescribed by

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 67

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Congress, along with the eligibility and related requirements listed in the HOME Act. *See, e.g.*, 24 C.F.R. §§ 92.50, 92.102–07, 92.150, 92.200–22. The HOME Rule also lists other federal requirements with which participating jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD Programs, listed at 24 C.F.R. § 5.105(a), as well as the nondiscrimination requirements in the HOME Act, 42 U.S.C. § 12832, addressed below. 24 C.F.R. § 92.350.

339.    Neither Congress nor HUD's regulations authorize HUD to condition HOME funding on opposition to all forms of DEI policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, verification of immigration status, exclusion of transgender people, or cutting off access to information about lawful abortions.

340.    NAHA and the HOME Act indicate congressional intent to benefit historically disadvantaged groups. One of Congress's objectives in enacting NAHA was to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis." 42 U.S.C. § 12702(3). The HOME Act requires participating jurisdictions "to establish and oversee a minority outreach program . . . to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women . . . in all contracts[] entered into by the participating jurisdiction . . . to provide affordable housing authorized under this Act." 42 U.S.C. § 12831(a). The HOME Act also forbids participating jurisdictions from denying benefits to or otherwise discriminating against any person "on the grounds of race, color, national origin, religion, or sex." 42 U.S.C. § 12832.

341.    In January 2025, HUD issued a final rule amending the HOME Rule "to update, simplify, or streamline requirements, better align the program with other Federal housing

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 68

programs, and implement recent amendments to the HOME statute." HOME Investment Partnerships Program: Program Updates and Streamlining, 90 Fed. Reg. 746, 746 (Jan. 6, 2025). The revised HOME Rule does not add any grant conditions related to DEI, immigration enforcement, verification of immigration status, "gender ideology," or abortion. The revised HOME Rule was originally set to become effective February 5, 2025, but HUD delayed parts of the Rule until October 2025. HOME Investment Partnerships Program: Program Updates and Streamlining—Delay of Effective Date, Withdrawal, and Correction, 90 Fed. Reg. 16085 (Apr. 17, 2025).

### b.)    *Congress Appropriates HOME Grant Funding*

342.    Funding for the HOME program comes from congressional discretionary appropriations.

343.    Most recently, Congress appropriated $1,250,000,000 for the HOME program in the 2024 Appropriations Act. 38 Stat. 360. The 2024 Appropriations Act contains additional directives to HUD regarding HOME funding. For instance, it extends the statutory deadline for participating jurisdictions to draw funds from their HOME Investment Trust Fund. *Id.*

344.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOME grant conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 5.    The Housing Opportunities for Persons with AIDS Program

345.    Congress established the Housing Opportunities for Persons with AIDS (HOPWA) program through the AIDS Housing Opportunity Act, Subtitle D of Title VIII of NAHA, Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments. The objective of the HOPWA program

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 69

is to "to provide States and localities with the resources and incentives to devise long-term comprehensive strategies for meeting the housing needs of persons with acquired immunodeficiency syndrome and families of such persons." 42 U.S.C. § 12901. To meet this aim, the program authorizes formula grants and competitively awarded grants to provide housing assistance and related supportive services to meet the housing needs of low-income persons living with HIV or AIDS and their families.

346.    The HOPWA program permits grant recipients to use HOPWA funds for a number of housing programs for persons living with HIV or AIDS, including providing information and services, short-term housing, rental assistance, development of single room occupancy dwellings, and development and operation of community residences. *Id.* §§ 12906–910.

347.    Ninety percent of HOPWA funds must be allocated pursuant to a statutory formula based on total population, the number of persons living with HIV or AIDS, fair market rents, and poverty data. *Id.* § 12903(c)(1)(A). The HUD Secretary must award the remaining 10 percent of grant funds on a competitive basis to states and local governments not eligible for a formula grant, or to states, local governments, or nonprofits seeking funding for "special projects of national significance." *Id.* § 12903(c)(5)(A), (C).

> **a.)    *Congress Imposes Legislative Directives, and HUD Promulgates Rules Regarding HOPWA Grant Conditions***

348.    To be eligible for HOPWA funds, states and local governments must submit an application for the HUD Secretary's approval. *Id.* § 12903(d). Congress instructed the HUD Secretary to establish by regulation procedures for the submission of applications using specified requirements. *Id.* § 12903(d)(1)–(6). Congress also permitted the HUD Secretary to require "other information or certifications" but only to the extent "necessary to achieve the purposes of this

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 70

section," *i.e.*, to award formula and competitive grants pursuant to the statutorily listed criteria. *Id.* § 12903(d)(6).

349.    Pursuant to this authority, HUD promulgated the HOPWA program rule at 24 C.F.R. part 574 (the "HOPWA Rule"). The HOPWA Rule implements the allocation formula prescribed in the statute, as well as the permissible uses of HOPWA funds. 24 C.F.R. §§ 574.110, 130, 300. The Rule also creates an application process for competitive grants, requiring applications "comply with the provisions of the Department's Notice of Funding Availability (NOFA) for the fiscal year." *Id.* § 574.240. The HOPWA Rule also sets out conditions grantees and project sponsors must agree to, including compliance with HUD regulations and "such other terms and conditions . . . as HUD may establish for purposes of carrying out the program *in an effective and efficient manner*." *Id.* § 574.500 (emphasis added). The HOPWA Rule further lists other federal requirements with which participating jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD programs listed at 24 C.F.R. § 5.105(a). 24 C.F.R. § 574.603

350.    Neither NAHA nor the HOPWA Rule permit HUD to condition HOPWA funding on opposition to all forms of DEI policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, verification of immigration status, exclusion of transgender people, or cutting off access to information about lawful abortions.

351.    As discussed above, NAHA, which established the HOPWA program, indicates congressional intent to benefit historically disadvantaged groups, including the aim to "improve housing opportunities for . . . members of disadvantaged minorities." 42 U.S.C. § 12702(3).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 71

**b.)    *Congress Appropriates HOPWA Grant Funding***

352.    Funding for HOPWA grants comes from congressional discretionary appropriations. *See id.* § 12912.

353.    Most recently, Congress appropriated $505,000,000 for the HOPWA program in the 2024 Appropriations Act. 38 Stat. 358. The 2024 Appropriations Act contains additional directives to HUD regarding HOPWA funding. For instance, it instructs HUD to "renew or replace all expiring contracts for permanent supportive housing . . . before awarding funds for new contracts." *Id.*

354.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOPWA grant conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

**6.    Numerous Plaintiffs Rely on HUD Block Grants to Serve their Communities**

355.    Numerous plaintiffs rely on HUD block grant programs, including the block programs described above (CDBG, ESG, HOME, and HOPWA), to provide decent, affordable housing and a suitable living environment, and to increase economic opportunities for low- and moderate-income persons throughout their jurisdictions. The programs that these grants support are extensive and essential. These funds are used for programs like the creation and preservation of affordable rental housing, homeownership rehabilitation and weatherization, food banks, childcare and afterschool programs, community development capital improvements, home weatherization, and job training programs. They help those plaintiffs provide basic needs services, including food distribution, basic chore assistance for homebound seniors and disabled persons,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 72

support for children who have experienced violence or neglect, and domestic violence prevention for the benefit of low-income individuals and households. They also help those plaintiffs provide housing services, including rental assistance, housing case management, downpayment assistance for first-time homebuyers, and capital development for affordable housing to benefit low-income individuals and households and to create affordable housing, provide rental assistance, and address homelessness in the region. They help prevent and address homelessness, including by supporting emergency shelter services. HOPWA funds provide for subsidies and support services to households that have at least one person living with HIV/AIDS.

### 7. Other HUD Grants

356. HUD and its program offices administer a range of other competitive and formula grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HUD grants related to a prohibition on all kinds of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

357. Congress annually appropriates funding for HUD grant programs. In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HUD with respect to funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HUD grants related to a prohibition on all kinds of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1865–1902; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 725–766; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 73

5139–5181; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 344–386.

358.    Plaintiffs King County, Pierce County, Snohomish County, Boston, Columbus, San Francisco, Santa Clara, NYC, Bend, Cambridge, Chicago, Culver City, Minneapolis, Nashville, Pasadena, Pima County, Pittsburgh, Portland, San José, Santa Monica, Tucson, King County RHA, Santa Monica HA, Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Dane County, Eugene, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, Rochester, San Diego, San Mateo County, Santa Rosa, Sonoma County, Watsonville, CCHA, and SCCDC (collectively, the "HUD Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive HUD grants, including CoC grants, CDBG grants, ESG grants, HOME grants, HOPWA grants, and/or other HUD grant funding. These Plaintiffs rely on over $2.5 billion in appropriated federal funds from HUD grant programs, including for homelessness, housing, and development-related projects and programs undertaken for the benefit of their communities.

### B.    DOT Grant Programs

359.    Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government." Department of Transportation Act, 1966, Pub. L. 89-670, 80 Stat. 931. DOT administers both competitive and formula grant programs. In administering grant programs, DOT often acts through its operating administrations, including the FTA, FHWA, FAA, and FRA. By law, the DOT Secretary is responsible for all acts taken by its operating administrations and the administrators of the FTA, FHWA, FAA, and FRA report directly to the DOT Secretary. 49 U.S.C. §§ 103(b), (d), (g)(1) (FRA); 104(b)(1), (c)(1) (FHWA); 106(b)(1)(E), (f)(3)(A) (FAA); 107(b), (c) (FTA); *see also* 49 C.F.R. Part 1 (organization and authority of DOT).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 74

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

### 1.    FTA Grant Programs

2

360.    Congress has established by statute a wide variety of grant programs administered

3

by DOT, acting through the FTA, that provide federal funds to state and local governments for

4

public transit services. These include, but are not limited to, programs codified in title 49, chapter

5

53 of the U.S. Code, as amended by the Fixing America's Surface Transportation (FAST) Act of

6

2015, Pub. L. 114-94, 129 Stat. 1312, and the Infrastructure Investment and Jobs Act of 2021, Pub.

7

L. 117-58, 135 Stat. 429.

8

361.    For instance, section 5307 authorizes the Secretary of DOT (the "DOT Secretary")

9

to make urbanized area formula grants ("UA Formula Grants"), which go toward funding the

10

operating costs of public transit facilities and equipment in urban areas, as well as certain capital,

11

planning, and other transit-related projects. *See* 49 U.S.C. § 5307(a)(1). Section 5307 imposes

12

specific requirements on UA Formula Grant recipients related to the recipient's operation and

13

control of public transit systems. *See id.* § 5307(c). None of these requirements pertain to a

14

prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

15

362.    Section 5309 establishes certain fixed guideway capital investment grants ("Fixed

16

Guideway Grants"). *See* 49 U.S.C. § 5309(b). This program funds certain state and local

17

government projects that develop and improve "fixed guideway" systems—meaning public transit

18

systems that operate on a fixed right-of-way, such as rail, passenger ferry, or bus rapid transit

19

systems. *Id.* §§ 5302(8), 5309(b). Section 5309 imposes specific requirements on Fixed Guideway

20

Grant recipients related to, for example, the recipient's capacity to carry out the project, maintain

21

its equipment and facilities, and achieve budget, cost, and ridership outcomes. *See id.* § 5309(c).

22

None of these requirements pertain to a prohibition on all kinds of DEI or facilitating enforcement

23

of federal immigration laws.

24

25

26

27

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 75

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

363.    Section 5337 authorizes grants to fund state and local government capital projects that maintain public transit systems in a state of good repair, as well as competitive grants for replacement of rail rolling stock ("Repair Grants"). *See* 49 U.S.C. § 5337(b), (f). Section 5337 specifically limits what projects may be eligible for Repair Grants, *id.* § 5337(b), and imposes specific requirements on multi-year agreements for competitive rail vehicle replacement grants, *id.* § 5337(f)(7). It does not, however, impose any conditions on Repair Grants related to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

364.    Section 5339 authorizes grants to fund the purchase and maintenance of buses and bus facilities ("Bus Grants"). *See* 49 U.S.C. § 5339(a)(2), (b), (c). The Bus Grant program incorporates the specific funding requirements set forth in section 5307 for UA Formula Grants and imposes other requirements on Bus Grant recipients. *See id.* § 5339(a)(3), (7), (b)(6), (c)(3). Section 5339 does not, however, impose any conditions on Bus Grants related to a prohibition on all kinds of DEI or local participation in enforcement of federal immigration laws.

365.    Congress annually appropriates funding for FTA grant programs, including the four identified above. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FTA grants related to a prohibition on DEI or local participation in federal immigration enforcement. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 334, 342.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 76

## 2.    FHWA Grant Programs

366.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FHWA, that provide federal funds to state and local governments for road and street infrastructure projects. These include, but are not limited to, programs codified in title 23 of the U.S. Code and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

367.    For instance, Section 24112(b) of the Infrastructure Investment and Jobs Act, established Safe Streets and Roads for All, or SS4A, a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans. 135 Stat. 815–817. The Act requires the DOT Secretary to consider, among other things, the extent to which applicants and their proposed projects will ensure "equitable investment in the safety needs of underserved communities in preventing transportation-related fatalities and injuries" and "achieve[] such other conditions as the Secretary considers to be necessary." *See id.* § 24112(c)(3). None of these considerations pertain to a prohibition on all kinds of DEI or facilitating enforcement of federal immigration laws.

368.    In February 2024, DOT posted a NOFO (updated in April 2024) announcing a competition for SS4A grant funding for Fiscal Year 2024 (the "FY 2024 SS4A NOFO"). *See* U.S. Dep't of Transp., Notice of Funding Opportunity for FY 2024 Safe Streets and Roads for All Funding (Apr. 16, 2024), https://www.transportation.gov/sites/dot.gov/files/2024-04/SS4A-NOFO-FY24-Amendment1.pdf.

369.    The FY 2024 SS4A NOFO directed applicants to consider policy priorities in their applications, including "Equity and Barriers to Opportunity" and "Climate Change and Environmental Justice." *Id.* at 39; *see also id.* at 27, 29 (listing "Equity" as a selection criterion for

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 77

grants). The FY 2024 SS4A NOFO specified that "[e]ach applicant selected for SS4A grant funding must demonstrate effort to improve equity and reduce barriers to opportunity as described in Section A" and stated "the Department seeks to award funds under the SS4A grant program that will create proportional impacts to all populations in a project area, remove transportation related disparities to all populations in a project area, and increase equitable access to project benefits." *Id.* at 12, 39.

370.    The FY 2024 SS4A NOFO strongly emphasized equity considerations throughout. The NOFO defined "equity" as "[t]he consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, Indigenous and Native Americans, Asian Americans and Pacific Islanders, and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality." *Id.* at 4. The NOFO did not include any grant conditions related to prohibiting all kinds of DEI or facilitating enforcement of federal immigration laws.

371.    In addition to SS4A, FHWA administers the Federal Highway-Aid Program, which provides federal formula funding for the construction, maintenance and operation of the country's 3.9-million-mile highway network, including the Interstate Highway System, primary highways, and secondary local roads.

372.    The Infrastructure Investment and Jobs Act authorized $356.5 billion for fiscal years 2022 through 2026 to be used for the Federal Highway-Aid Program. Currently, there are nine core formula funding programs within the Federal Highway-Aid Program: the National Highway Performance Program, 23 U.S.C. § 119; the Surface Transportation Block Grant

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 78

Program, 23 U.S.C. § 133; the Highway Safety Improvement Program, 23 U.S.C. § 148 and 23 C.F.R. Part 924; the Railway-Highway Crossings Program, 23 U.S.C. § 130 and 23 C.F.R. Part 924; the Congestion Mitigation and Air Quality Improvement Program, 23 U.S.C. § 149; the Metropolitan Planning Program, 23 U.S.C. § 104(d); the National Highway Freight Program, 23 U.S.C. § 167; the Carbon Reduction Program, 23 U.S.C. § 175; and the PROTECT Formula Program, 23 U.S.C. § 176. None of these statutes authorizes DOT or FHWA to impose a prohibition on DEI or a requirement to facilitate enforcement of federal immigration laws as a precondition to receive federal grants.

373.    Section 11118 of the Infrastructure Investment and Jobs Act created the Bridge Investment Program (BIP) to assist states, tribes, and local governments with rehabilitating or replacing bridges to improve safety and efficiency for people and freight moving across bridges. 23 U.S.C. § 124(b)(2). The Act directs the DOT Secretary to consider factors such as cost considerations, safety benefits, and mobility improvements. *Id.* §§ 124(f)(3)(B); (g)(4)(B). No part of the BIP's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

374.    Section 21203 of the Infrastructure Investment and Jobs Act created the National Culvert Removal, Replacement, and Restoration Grant Program, also known as the Culvert Aquatic Organism Passage Program ("Culvert AOP Program") to assist states, tribes, and local governments with projects that would meaningfully improve or restore passage for anadromous fish (species that are born in freshwater such as streams and rivers, spend most of their lives in the marine environment, and migrate back to freshwater to spawn). 49 U.S.C. § 6703. The Act directs the DOT Secretary to prioritize projects that would improve fish passage for certain categories of anadromous fish stocks or that would open more than 200 meters of upstream habitat before the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 79

end of the natural habitat. *Id*. § 6703(e). The FHWA administers some Culvert AOP Program grants on behalf of DOT. No part of the Culvert AOP Program's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

375.    The FHWA also administers the FY 2023-24 Advanced Transportation Technology and Innovation (ATTAIN) grant program, as directed by Congress in 23 U.S.C. § 503(c)(4). Section 503(c)(4) directs the DOT Secretary to provide grants "to deploy, install, and operate advanced transportation technologies to improve safety, mobility, efficiency, system performance, intermodal connectivity, and infrastructure return on investment." The DOT Secretary was directed to develop selection criteria that included an enumerated list of considerations, including how the deployment of technology would "improve the mobility of people and goods," "protect the environment and deliver environmental benefits that alleviate congestion and streamline traffic flow," and "reduce the number and severity of traffic crashes and increase driver, passenger, and pedestrian safety." *Id*. Nothing in the statutory provisions authorizing the ATTAIN grant program describes immigration enforcement or ending DEI as considerations for the grant.

376.    In fulfillment of the statutory authorization of FHWA grant programs, including the ones identified above, Congress annually appropriates funding for FHWA grants. In appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FHWA grants related to a prohibition on DEI or local participation in federal immigration enforcement. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1835–1842; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 697–705; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109–5117; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 315–324.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 80

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### 3.    FAA Grant Programs

377.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FAA, that provide federal funds to public agencies for planning and development of airports. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

378.    For instance, the Airport Improvement Program (AIP) is codified under title 49, chapter 471 of the U.S. Code. Under the AIP, the DOT Secretary is authorized to make formula and discretionary grants to recipients (referred to as "sponsors") for the planning and development of certain public-use airports. 49 U.S.C. 47101 *et seq*. The DOT Secretary may approve AIP grant applications only if the sponsor and project meet certain statutory requirements (for example, consistency with plans for development of the surrounding area, financial capacity, and ability to complete the project "without unreasonable delay"), and only if the sponsor makes certain written assurances based on the type of grant at issue (for example, for airport development grants, assurances such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions"). 49 U.S.C. §§ 47106, 47107.

379.    Congress has been precise in the requirements that attach to grant recipients and has set those forth in statute, which has been implemented by DOT through contractual "Grant Assurances" that are terms of every grant agreement. None of the statutory requirements pertains to a prohibition on DEI or a requirement of local participation in the enforcement of federal immigration laws.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 81

380.    AIP funding levels are established periodically by reauthorization acts, such as the FAA Reauthorization Act of 2018, Pub. L. 115-254, 132 Stat. 3186, and the FAA Reauthorization Act of 2024, Pub. L. 118-63, 138 Stat. 1025. The reauthorization acts define the AIP authorization levels, amend the various AIP statutes, and set out directives to the DOT Secretary with respect to airport improvement funding, but they do not impose or authorize directives for or conditions on AIP grants related to a prohibition on DEI or requirement of local participation in federal immigration enforcement.

381.    Similarly, the Airport Infrastructure Grants (AIG) program is authorized under the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 1416–1418. Under the AIG program, the DOT Secretary is authorized to make formula and discretionary grants for runways, taxiways, airport safety and sustainability projects, as well as terminal, airport transit connections, and roadway projects. Grants made under the AIG program are treated as having been made pursuant to the DOT Secretary's authority for project grants issued under the AIP statute. 135 Stat. 1417–1418. The Infrastructure Investment and Jobs Act sets forth the AIG funding levels but does not impose any conditions on AIG grants related to prohibitions on DEI or requirement of local participation in enforcement of federal immigration laws.

382.    In fulfillment of the statutory authorization of FAA grant programs, including the ones identified above, Congress annually appropriates funding for FAA grants. In the annual appropriations legislation, Congress sets forth additional priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing directives for or conditions on FAA grants related to a prohibition on DEI or a requirement of local participation in federal immigration enforcement. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1830–1835, 1939–1941; Consolidated

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 82

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 691–697; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5101–5108; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 307–314.

### 4.    FRA Grant Programs

383.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FRA, that provide federal funds to public agencies for rail infrastructure projects. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

384.    For example, the Railroad Crossing Elimination (RCE) Grant Program, authorized in Section 22305 of the Infrastructure Investment and Jobs Act, directed the DOT Secretary, in cooperation with the FRA Administrator, to establish a competitive grant program that provides funds to improve the safety and mobility of people and goods at railway crossings. 49 U.S.C. § 22909. Section 22305 limits eligibility for the RCE program to certain entities such as states and local governments. *Id.* § 22909(c). It also directs that the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or path-way rail crossings"; "improve the mobility of people or goods"; "reduce emissions, protect the environment, and provide community benefits, including noise reduction"; "improve access to emergency services"; "provide economic benefits"; and "improve access to communities separated by rail crossings." *Id.* § 22909(d), (f). None of these considerations pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

385.    Funding for the RCE program was made available for FY 2024 and 2025 through advance appropriations provided in the Infrastructure Investment and Jobs Act and by remaining

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 83

unawarded FY 2022 RCE Program balances. 135 Stat. 1436. The appropriations provisions do not impose or authorize directives for or conditions on FRA grants related to prohibiting DEI or to local participation in federal immigration enforcement.

### 5.    DOT SMART Grant Program

386.    Section 25005 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429, established the Strengthening Mobility and Revolutionizing Transportation (SMART) discretionary grant program with $100 million appropriated annually for fiscal years 2022-2026. 135 Stat. 840–845.

387.    The SMART grant program was established to provide grants to eligible public sector agencies for projects focused on advanced smart community technologies and systems in order to improve transportation efficiency and safety. It is a two-stage program: any eligible entity can apply for a Stage 1 grant, and a Stage 1 grantee can apply for a Stage 2 grant to expand the applicable project.

388.    Section 25005 limits eligibility for the SMART grant program to certain entities such as states and local governments. 135 Stat. 840. It establishes a set of selection criteria, to be identified in the NOFO, that include the extent to which the eligible entity or applicable beneficiary community has a public transportation system and has the "functional capacity to carry out the proposed project" as well as the extent to which the proposed project will, among other things, "reduce congestion and delays for commerce and the traveling public"; "improve the safety and integration of transportation facilities and systems for pedestrians, bicyclists, and the broader traveling public"; "improve access to jobs, education, and essential services, including health care"; and "connect or expand access for underserved or disadvantaged populations and reduce transportation costs." *Id.* at 841. Moreover, in providing SMART grants, the DOT Secretary "shall

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 84

give priority to" projects that would, among other things "promote a skilled workforce that is inclusive of minority or disadvantaged groups." *Id.* at 842. None of the eligibility, selection, or prioritization criteria pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

389.    Section 25005(g) authorizes appropriation of $100 million for each of the first five years of the SMART grant program, and directs that certain percentages of those appropriations be provided to projects benefitting large, mid-sized, and rural communities and regional partnerships. *Id.* at 845. This appropriation provision does not impose or authorize directives for or conditions on SMART grants related to prohibiting DEI or to local participation in federal immigration enforcement.

390.    As required, the SMART grant NOFOs for FY 2024 tracked the statutory description of eligibility, selection criteria, and priorities. For example, the FY 2024 Stage 1 NOFO identified as a "goal or objective of the program" and a program priority to "[c]onnect or expand access for underserved or disadvantaged populations." Nothing in the FY 2024 Stage 1 or Stage 2 NOFOs pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

391.    Plaintiffs Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Cambridge, Dane County, Eugene, Healdsburg, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Milwaukee County, Multnomah County, Oakland, Pacifica, Pasadena, Petaluma, PSRC, Ramsey County, Rochester, Rohnert Park, San Diego, San Mateo County, Santa Rosa, SCTA, and Watsonville join existing plaintiffs King County, Pierce County, Snohomish County, San Francisco, Santa Clara, Boston, Columbus, NYC, Bend, Chicago, Culver City, Denver, Minneapolis, Nashville, Pima County, Pittsburgh, Portland, San José, Santa Monica, Sonoma County, Tucson, Wilsonville, Intercity Transit, Port of Seattle, SFCTA, Sound Transit,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 85

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and TIMMA (collectively, the "DOT Plaintiffs"). Each of these Plaintiffs have previously received, currently receive, or are otherwise eligible to receive DOT grants, directly and/or on a pass-through basis. DOT Plaintiffs rely on over $7 billion in appropriated federal funds from DOT grant programs for transportation-related projects undertaken for the benefit of their communities.

## C.    HHS Grant Programs

392.    Congress established the precursor to HHS—the cabinet-level Department of Health, Education, and Welfare—in 1953. After a separate Department of Education was created in 1979, HHS took its current name. Today, HHS is the largest grant-making agency in the United States. It administers both competitive grant programs and formula and block grant programs that provide funds to local governments to enhance the health and well-being of their communities. In administering grant programs, HHS often acts through its operating divisions and agencies, such as the Administration for Children and Families (ACF), the Centers for Disease Control and Prevention (CDC), the Centers for Medicare & Medicaid Services (CMS), the Health Resources and Services Administration (HRSA), the Substance Abuse and Mental Health Services Administration (SAMHSA), and the National Institutes of Health (NIH), among others. *See* U.S. Dep't Health & Hum. Servs., HHS Agencies & Offices, https://www.hhs.gov/about/agencies/hhs-agencies-and-offices/index.html (last visited June 27, 2025). The Secretary of HHS is responsible for overseeing the actions of its operating divisions and agencies. *See, e.g.*, 42 U.S.C. §§ 12311, 12312 (establishment of ACF within HHS; functions of ACF Commissioner); 42 U.S.C. § 290aa (similar for SAMHSA and its head; authority of HHS Secretary); 42 U.S.C. § 242c (appointment and authority of CDC Director; functions of HHS Secretary); 42 U.S.C. § 282 (appointment and authority of NIH Director; functions of HHS Secretary); 42 U.S.C. §§ 202–203 (organization of Public Health Service, which includes NIH, within HHS); 42 U.S.C. § 1317 (appointment of CMS

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Administrator); U.S. Dep't Health & Hum. Servs., Centers for Medicare & Medicaid Services, 66 Fed. Reg. 35437 (Jul. 5, 2001) (establishing CMS and delegating authority from HHS Secretary to CMS Administrator). Some examples of the grants administered by HHS and its operating divisions and agencies are discussed below.

### 1.    Administration for Children and Families Programs

393.    ACF administers discretionary and formula grants to support programs that serve children and families. Grants administered by ACF include funds authorized by Congress under Title IV and Title XX of the Social Security Act of 1935 (the "Social Security Act").

#### a.)    *Temporary Assistance for Needy Families Program*

394.    In 1996, Congress enacted PRWORA and authorized the block grant of the Temporary Assistance for Needy Families (TANF), Pub. L. 104-193, 110 Stat. 2105, codified at 42 U.S.C. §§ 601-619. In enacting TANF, Congress replaced Aid to Families with Dependent Children and revised Title IV-A of the Social Security Act.

395.    The TANF program is one of the nation's primary economic security and stability programs for low-income children and families. Awarded as a block grant to states and then to local jurisdictions, TANF is used to provide income support to low-income families with children, as well as services including childcare and refundable tax credits. U.S. Dep't Health & Hum. Servs., Admin. for Children & Families, Office of Family Assistance, https://acf.gov/ofa/programs/tanf/about (last updated Sept. 27, 2024).

396.    The Office of Family Assistance—an office of ACF—administers Title IV-A funds through the TANF program.

397.    The statutory purpose of TANF "is to increase the flexibility of states" to achieve four statutory goals: (1) provide assistance to needy families so children can be cared for in their

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 87

own homes or the homes of relatives; (2) end dependence of parents on government benefits; (3) reduce the incidence of out-of-wedlock pregnancies; and (4) promote the formation and maintenance of two-parent families. 42 U.S.C. § 601(a). States have authority to use federal TANF funds "in any manner that is reasonably calculated to accomplish" the statutory purpose. 42 U.S.C. § 604(a)(1).

398.    45 C.F.R. § 260 sets forth the regulations that apply to TANF. Section 260 does not authorize conditions on TANF grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

399.    42 U.S.C. § 608 sets forth requirements for states that receive TANF block grants, including the requirement to prevent unauthorized spending of benefits, 42 U.S.C. § 608 (a)(12), and the development of individual responsibility plans, *id.* § 608(b). It further identifies prohibitions—and exceptions to certain prohibitions—for a state's use of TANF funds. Section 608 does not authorize conditions on TANF grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

400.    Section 1912 of the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, funds TANF through September 30, 2025. Section 1912 does not authorize conditions on grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### b.)    *Title IV-B Program*

401.    Title IV-B of the Social Security Act, first established in 1935, provides funding

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 88

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to states for child welfare services. Title IV-B provides funds to strengthen child welfare service programs and promote the development and expansion of coordinated child and family services programs.

402.    On January 4, 2025, Congress reauthorized and amended child welfare programs under Title IV-B through the Supporting America's Children and Families Act, Pub. L. 118-258, 138 Stat. 2947. The Supporting America's Children and Families Act reauthorized appropriations for Title IV-B programs through fiscal year 2029.

403.    The Children's Bureau—an office of ACF—provides Title IV-B grants to support programs that serve children and families. Among the Title IV-B grant programs are the Stephanie Tubbs Jones Child Welfare Services Program and the MaryLee Allen Promoting Safe and Stable Families (PSSF) program.

404.    The Stephanie Tubbs Jones Child Welfare Services Program, Title IV-B Subpart 1, provides formula grants to develop and expand child and family services programs. Congress authorized the program under Title IV, Part B, Subpart 1, sections 421–420 of the Social Security Act. The program is codified at 42 U.S.C. §§ 621–625 & § 628.

405.    The purpose of the Stephanie Tubbs Jones Child Welfare Services Program is to "promote State flexibility in the development and expansion of a coordinated child and family services program that utilizes community-based agencies and ensures all children are raised in safe, loving families" by protecting and promoting the welfare of children; preventing neglect, abuse or exploitation of children; supporting at-risk families through services that allow children to remain with or return to their families; promoting the safety, permanency, and well-being of children in foster care and adoptive families; and providing training, professional development and support to ensure a well-qualified workforce. 42 U.S.C. § 621. Funds may be used to support the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 89

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

program purposes. U.S. Dep't Health & Hum. Servs., Admin. For Children & Families, Children's Bureau, https://acf.gov/cb/grant-funding/90tephanie-tubbs-jones-child-welfare-services-program-title-iv-b-subpart-1-child (last updated April 22, 2019).

406.     Program specific implementing regulations for the Stephanie Tubbs Jones Child Welfare Services Program are located at 45 C.F.R. parts 1355 and 1357. These regulations do not authorize conditions on the Stephanie Tubbs Jones Child Welfare Services Program related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant. Section 1357.30 sets forth the requirements for Stephanie Tubbs Jones Child Welfare Services Program funds allotted or reallotted to states. Section 1357.30 does not authorize conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

407.     The PSSF program provides formula grants with the purpose of preventing child maltreatment and the unnecessary separation of children from their families. Congress authorized the PSSF program under Title IV, Part B, Subpart 2, sections 430–437 of the Social Security Act. The program is codified at 42 U.S.C. § 629, *et seq*.

408.     The PSSF program's purpose is "to enable States to develop and establish, and to operate coordinated programs of community-based family support services" for family preservation, family reunification, adoption promotion and support services. 42 U.S.C. § 629.

409.     42 U.S.C. § 629b sets forth requirements for states that receive PSSF program funds. Section 629b does not authorize conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 90

410.     Implementing regulations for the PSSF program are located at 45 C.F.R. parts 1355 and 1357. These regulations do not authorize conditions on PSSF program funds related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

411.     Section 1357.32 sets forth the requirements for PSSF program funds allocated to states. Section 1357.32 does not authorize conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

412.     Section 103 of the Supporting America's Children and Families Act, which reauthorized funding for Title IV-B programs through FY2029, does not authorize conditions on grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### c.)     Title IV-E Program

413.     In 1980, Congress enacted the Adoption Assistance and Child Welfare Amendments of 1980, establishing a new Title IV-E Foster Care and Adoption Assistance entitlement program.

414.     The Children's Bureau administers Title IV-E grants to support programs that serve children and families. The purpose of Title IV-E is to enable states to provide "foster care and transitional independent living programs," "adoption assistance for children with special needs," and "kinship guardian assistance." 42 U.S.C. § 670. The administration of these programs is authorized by Congress under Part E, Sections 470–479B of Title IV of the Social Security Act and codified at 42 U.S.C. §§ 670–679c. Among the Title IV-E grant programs are the Foster Care program and the Adoption Assistance program.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 91

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

415.     The Foster Care program provides funding to states to provide safe and stable out-of-home care for eligible children and youth until they are safely returned home, placed permanently with adoptive families or legal guardians, or placed in other planned arrangements for permanency. U.S. Dep't Health & Hum. Servs., Admin. for Children & Families, Children's Bureau, https://acf.gov/cb/grant-funding/title-iv-e-foster-care (last updated June 28, 2024).

416.     42 U.S.C. § 672 sets forth the requirements for Foster Care program funding eligibility. Section 672 does not authorize conditions on grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

417.     The Adoption Assistance program, section 473 of Title IV-E, provides funds to states to facilitate the timely placement of children whose special needs or circumstances would otherwise make their placement with adoptive families difficult. U.S. Dep't Health & Hum. Servs., Admin. for Children & Families, Children's Bureau, https://acf.gov/cb/grant-funding/title-iv-e-adoption-assistance (last updated June 27, 2024).

418.     42 U.S.C. § 673 sets forth the requirements for Adoption Assistance program funding eligibility. Section 673 does not authorize conditions on grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

419.     Regulations applicable to Title IV-E are located at 45 CFR Part 1356. These regulations do not authorize conditions on PSSF program funds related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

420.     Section 1109(b)(4) of the Full-Year Continuing Appropriations and Extensions

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 92

Act, 2025,Pub. L. 119-4, 139 Stat. 9, funds Title IV-E through September 30, 2025. Section 1109(b)(4) does not authorize conditions on grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### d.)    Title XX Social Services Block Grant

421.    Title XX of the Social Security Act, first established in 1975, allocates federal funding for social services to the states according to population size. In 1981, Congress amended Title XX of the Social Security Act through the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, 95 Stat. 172. This amendment established the Social Services Block Grant (SSBG), codified at 42 U.S.C. §§ 1397–1397i.

422.    The Office of Community Services—an office of ACF—administers the SSBG.

423.    The SSBG supports the provision of social services directed at the following goals: (1) achieving or maintaining economic self-support, (2) achieving or maintaining self-sufficiency, (3) preventing or remedying the neglect or abuse of children and adults, (4) providing community-based and home-based alternatives to institutional care, and (5) securing referral or admission for institutional care when alternative forms of care are not appropriate. 42 U.S.C. § 1397. States have broad discretion in using SSBG funds to meet these goals. *Id.* (describing one purpose of the SSBG as "increasing State flexibility in using social service grants"); U.S. Dep't of Health & Hum. Servs., Admin. for Children & Families, Office of Community Services, https://acf.gov/ocs/programs/ssbg/about (last updated June 10, 2019).

424.    Program-specific implementing regulations for the SSBG are located at 45 CFR §§ 96.70–96.74. These regulations, which principally set forth the transferability of funds and annual reporting requirements, do not authorize conditions on the SSBG related to prohibiting all

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 93

forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

425.    Statutory restrictions on the SSBG are located at 42 U.S.C. §§ 1397c–1397e. Sections 1397c and 1397e impose reporting, audit, and accounting requirements on the states. Section 1397d prohibits the use of SSBG funds for a limited set of purposes, including buying or improving land, paying room and board outside of rehabilitation or temporary emergency shelter, paying wages, and providing medical care. None of these statutory restrictions authorize conditions on the SSBG related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

## 2.    Health Resources and Services Administration Programs

426.    The Health Resources and Services Administration (HRSA) within HHS awards grant funding to more than 3,000 recipients, including state and local governments, to support health services projects, such as training health care workers and providing specific health services. Elayne J. Heisler, Cong. Rsch. Serv., R46001, Health Resources and Services Administration (HRSA) FY2020 President's Budget Request and Agency Funding History: In Brief (Nov. 12, 2019).

427.    HRSA awards a variety of competitive and formula grants in several program areas, including Primary Care/Health Centers, Health Workforce Training, HIV/AIDS, Organ Donation, Maternal and Child Health, Rural Health, and other areas. Grants, U.S. Dep't Health & Hum. Servs., Health Res. & Servs. Admin., https://data.hrsa.gov/topics/grants (last updated May 20, 2025).

428.    Among HRSA's largest grant programs are the Health Center Program (HCP) and

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 94

the Ryan White HIV/AIDS (RWHA) program.

### a.)    The Health Center Program

429.    Congress authorized the federal HCP program through Section 330 of the Public Health Service Act (PHSA), as amended. 42 U.S.C. § 254b. The HCP program funds grants to support qualified outpatient facilities that provide primary care to low-income individuals and other underserved communities, as specified in the statute.

430.    In particular, the HCP program supports four types of health centers: (1) community health centers (CHCs), (2) health centers for the homeless (HCHs), (3) health centers for residents of public housing, and (4) migrant health centers. *See id.* §254b(a), (g), (h), (i). The majority of these are CHCs, which must provide "primary health services" to medically underserved populations and serve all residents of the CHC's services area. *Id.* § 2549(a). HCHs provide services to individuals experiencing or at risk of homelessness and are required to provide all services CHCs provide as well as substance abuse treatment. *Id.* § 2549(h). Health centers for residents of public housing are located in, and offer primary care services to those who reside in or near, public housing facilities. *Id.* § 2549(i). Finally, migrant health centers provide care to migratory and seasonal agricultural workers and their families. *Id.* § 2549(g).

431.    Funding for the HCP program comes from a combination of discretionary funding, appropriated by Congress each year, and mandatory funding from the Community Health Center Fund. By statue, HCH programs receive 8.7% of HCP funds.

432.    In addition to the HCP grants themselves, health centers that receive funding under Section 330 of the PHSA become eligible for other congressionally authorized benefits. For instance, such health centers are eligible for designation as Federally Qualified Health Centers (FQHCs), which entitles them to higher, cost-based Medicare and Medicaid reimbursement rates.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 95

*Id.* §§ 1395i(a)(1)(z), 1395m(o), 1395x(aa)(3). FQHCs may also receive drug discounts under Section 340B of the PHSA. *Id.* § 256b.

433.    Section 330 of the PHSA sets out numerous requirements that health centers must meet to ensure that HCP-funded facilities serve as part of a safety net for underserved communities. In addition to the requirements set forth above, Congress requires that HCP-funded health centers provide services to all patients regardless of ability to pay. 42 U.S.C. § 254b(k)(3). Recipients must therefore have fee schedules consistent with locally prevailing wages while covering operating costs, and must offer discounts based on the patient's ability to pay. *Id.* § 254b(k)(3)(G). They must also be located in areas or serve populations that the HHS Secretary has designated as "medically underserved." *Id.* § 254b(a)(1), (b)(3), (c)(1), (e)(1)(A). The statute sets forth additional detailed funding conditions concerning Medicaid coordination and reimbursement, governance, provision of services, reporting, and quality assurance. *Id.* § 254b(b)(1), (k)(3)(C), (F), (H), (I), (q).

434.    Section 330 of the PHSA does not authorize conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, denying services to immigrants, or incorporating executive orders unrelated to providing health care to underserved populations.

435.    The HHS Secretary has promulgated regulations further governing the HCP program at 42 C.F.R. parts 51c and 56 (the "HCP Rule"). Among other things, the HCP Rule sets forth additional limitations on the use of HCP funds, 42 C.F.R. § 51c.107, and enumerates project requirements and criteria the HHS Secretary will consider in awarding grants based on the purpose of the funds, *id.* §§ 51c.203, 51c.204, 51c.303, 51c.305, 51c.403, 51c.404., 51c.504. For instance, in reviewing proposals to plan or develop new health centers, the HHS Secretary must consider the relative need of the population to be served by the proposed project, the health center's

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 96

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

potential for developing new and effective methods for providing services, and the distribution of resources across the country. *Id.* § 51c.204. The HCP Rule also sets forth specific requirements for migrant health centers, including a requirement that they provide specific services to migrant and seasonal agricultural workers' needs, such as supportive services, environmental health services, accident prevention, and prevention and treatment of health conditions related to pesticide exposure. 42 C.F.R. § 56.102(g).

436.    The HCP Rule does not impose any conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, or incorporating executive orders unrelated to providing health care to underserved populations.

### b.)    *Ryan White HIV/AIDS Program*

437.    In 1990, Congress established the Ryan White HIV/AIDS (RWHA) program as part of the Ryan White Comprehensive AIDS Resources Emergency Act, Pub. L. 101-381, 104 Stat. 576, and has revised and extended it several times, including in the Ryan White HIV/AIDS Treatment Modernization Act of 2006, Pub. L. 109-415, 120 Stat. 2767, and the Ryan White HIV/AIDS Treatment Extension Act of 2009, Pub. L. 111-87, 123 Stat. 2885. The program is codified at Title 42, Subchapter XXIV of the U.S. Code and contains four major parts. Among these are Part A, which provides grants to urban areas and mid-sized cities, 42 U.S.C. §§ 300ff-11 to 300ff-20; Part B, which provides grants to states and territories, *id.* §§ 300ff-21 to 300ff-38; and Part C, which funds HIV outpatient primary care to low-income and medically underserved people living with HIV/AIDS, *id.* §§ 300ff–51 to 300ff–67.

### (i.)    *RWHA Part A Program*

438.    Part A of the RWHA program provides grants for medical and support services to eligible metropolitan areas with high levels of reported AIDS cases in the previous five years. *Id.*

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

§ 300ff-11(a). HRSA distributes two-thirds of appropriated Part A grants non-competitively to eligible metropolitan areas based on a statutory formula, *id.* § 300ff-13(a)(2)–(3), and the remaining one-third via competitive supplemental grants awarded based on the applicant's demonstrated need, *id.* § 300ff-13(b). With respect to the two-thirds comprised of formula grants, the Secretary has no discretion to withhold funding and is required to allocate grants based on a formula that considers how many individuals are living with HIV/AIDS in the jurisdiction. *See id.* § 300ff-13(a)(2), (3).

439.    Congress has imposed detailed conditions on RWHA Part A grants. For instance, Part A grant recipients must spend 75% of awarded funds on "core medical services," which are defined to include outpatient/ambulatory medical care services, AIDS pharmaceutical assistance, home health care, and mental health and substance abuse outpatient services, among others. *Id.* § 300ff-14(c). The remaining Part A funds must go toward "support services," such as outreach, medical transportation, and referrals, as well as statutorily permitted administrative expenses. *Id.* § 300ff-14(c)(1), (d). Congress has also mandated that grant recipients establish HIV Health Services Planning Councils to set priorities for care delivery and has prescribed several related requirements. *Id.* § 300ff-12(b).

440.    Congress has also enacted statutory factors that HRSA must consider in awarding competitive supplemental grants to applicants based on demonstrated need. These include the rates of HIV/AIDS, impacts of co-morbid factors, and prevalence of homelessness in the applicant's area. *Id.* § 300ff-13(b)(2)(B).

441.    Neither the statutes governing the RWHA Part A program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 98

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

unrelated to providing health services for low-income individuals with HIV/AIDS.

### (ii.)    RWHA Part B Program

442.    The RWHA Part B program provides grants to each of the 50 states, the District of

Columbia, Guam, and the Virgin Islands for services such as drug treatments, home and

community-based health care, support services, or health insurance coverage for low income

individuals living with HIV/AIDS, among other services. 42 U.S.C. §§ 30ff-22–26. Some of these

states and territories pass through RWHA Part B funds to subrecipients, including local

governments. One portion of RWHA Part B is the AIDS Drug Assistance Program (ADAP), which

receives separate appropriations from Congress. *Id.* § 300ff-26. The remaining funding goes

toward Part B base grants and supplemental grants. Base grants are awarded pursuant to a formula

based on the number of individuals living with HIV/AIDS cases in the state or territory relative to

various comparators. *Id.* § 300ff-28. Supplemental grants under RWHA Part B are awarded to

states and territories with a demonstrated need based on increasing rates of HIV/AIDS cases,

unmet needs for services, and other factors. *Id.* § 300ff-29a.

443.    Congress has imposed detailed conditions on RWHA Part B grants. For instance,

as in the Part A program, recipients of Part B funds must spend 75% of awarded funds on "core

medical services" and 25% on "support services," which are each limited to specifically defined

activities. *Id.* § 300ff-22. The Part B program also authorizes states and territories to award grants

to subrecipients and imposes additional requirements on such sub-awards based on the type of

services the subrecipient will provide. *See id.* §§ 300ff-23–24. For example, Congress has

authorized states and territories to award grants for home- and community-based health services,

but requires states and territories to prioritize providers who serve low-income individuals with

HIV/AIDS and participate in an HIV care consortium. *Id.* § 300ff-24(b).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 99

444.    The statute authorizes the Secretary of HHS to require other "agreements, assurances, and information" from states and territories, but only to the extent "necessary to carry out" the Secretary's authority to "make grants to . . . enable . . . States to improve the quality, availability and organization of health care and support services for individuals and families with HIV/AIDS." *Id.* §§ 300ff-27(a), 300ff-21.

445.    Congress has also authorized states and territories to award grants using RWHA Part B funds to certain associations, called HIV care consortia, comprised of public or private service providers and community based organizations in areas most affected by HIV/AIDS. 42 U.S.C. § 300ff-23. In doing so, Congress set forth specific agreements and assurances related to the purposes of the Part B program that HIV care consortia must make as a condition to receiving funds. For instance, HIV care consortia must "agree to use such assistance for the planning, development and delivery . . . of comprehensive outpatient health and support services for individuals with HIV/AIDS." *Id.* § 300ff-23(a)(2).

446.    The assurances and application requirements Congress specified for HIV care consortia under RWHA Part B indicate a statutory purpose to address the needs of minority and underserved communities. For instance, each HIV care consortium must provide an assurance that "the populations and subpopulations of individuals and families with HIV/AIDS have been identified by the consortium, particularly those experiencing disparities in access and services and those who reside in historically underserved communities." *Id.* § 300ff-23(b)(1)(A). The consortium must also provide an assurance that it has established a service plan that "addresses the special care and service needs of" such historically underserved communities. *Id.* § 300ff-23(b)(1)(B). Finally, Congress specified grant application requirements that HIV care consortia must meet to be eligible for funding, including that the application "demonstrates that adequate

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 100

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

planning occurred to address disparities in access and services and historically underserved communities." *Id.* § 300ff-23(c)(1)(F).

447. Neither the statutes governing the RWHA Part B program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to providing health services for low-income individuals with HIV/AIDS.

### (iii.) RWHA Part C Program

448. RWHA Part C grants emphasize services designed to intervene early to improve health outcomes for low-income individuals with HIV/AIDS. HRSA awards RWHA Part C grants competitively to eligible facilities, including municipal health facilities, that serve medically underserved populations. 42 U.S.C. § 300ff-52(a). Congress has mandated that HRSA prioritize applicants experiencing increased burdens on HIV/AIDS services when awarding RWHA Part C grants. *Id.* § 300ff-53.

449. Like Part A and Part B grants, Part C grants are subject to specific statutory requirements. For instance, Part C grant recipients must also provide a mix of statutorily prescribed "core services" and "supportive serves." *Id.* § 300ff-51(b)(1). At least half of allocated funding must go toward such services that focus on early intervention, including HIV/AIDS testing and referrals. *Id.* § 300ff-51(b)(2). The statute also requires applicants to agree to certain funding conditions, including that the applicant will only use funds for statutorily authorized purposes, will establish fiscal control and accounting procedures, and will establish a clinical quality management program, among others. *Id.* § 300ff-64(g). Finally, Congress has mandated conditions on the use of funds for HIV/AIDS counseling, including that counseling programs may not directly promote intravenous drug use or sexual activity and must educate patients on the availability of hepatitis a

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 101

and b vaccines. *Id.* § 300ff-67.

450.    Neither the statutes governing the RWHA Part C program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, or adherence to executive orders unrelated to providing early intervention services for low-income individuals with HIV/AIDS.

### 3.    Substance Abuse and Mental Health Services Administration Programs

451.    The Substance Abuse and Mental Health Services Administration (SAMHSA) within HHS, "funds organizations providing substance use and mental health services, research, technical assistance, and training to advance the behavioral health and to improve the lives of individuals living with mental and substance use disorders, and their families." *Grants*, SAMHSA, https://www.samhsa.gov/grants (last visited July 1, 2025). SAMHSA administers both competitive, discretionary grant programs and "noncompetitive, formula grant" programs "mandated by the U.S. Congress." *Id.* Examples of these noncompetitive block grants include the Community Mental Health Services Block Grant and the Substance Use Prevention, Treatment, and Recovery Services Block Grant.

452.    One key discretionary SAMHSA grant program is the Substance Abuse and Mental Health Services Projects of Regional and National Significance. For example, plaintiff San Francisco receives funds under this program for its Building City-Wide Capacity for Community and Traditional First Responders in Overdose Response grant ("First Responders Grant"). The First Responder Grant is used to train first responders to treat those experiencing an overdose, an unfortunate reality of the ongoing opioid epidemic.

453.    Authority for SAMHSA to issue grants under the Substance Abuse and Mental

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Health Services Projects of Regional and National Significance program comes, for example, from 42 U.S.C. § 290ee-1, titled "First responder training." This statute lists the required criteria for a grant application and allowable uses for grant funds. *Id.* Neither the criteria for the grant application nor the listed uses for grant funds authorize conditions on these grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

454.    One of the requirements in SAMHSA's Notice of Award (NOA) under this program is a "Disparity Impact Statement (DIS)," which needs to include "[a] quality improvement plan for how [recipients will use program data] to monitor and manage program outcomes by race, ethnicity, and LGBT status, when possible." SAMHSA also required the quality improvement plan to "include strategies for how processes and/or programmatic adjustments will support efforts to reduce disparities for the identified sub-populations." The NOA does not include any grant conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to overdose response.

455.    SAMHSA grants also support other programs that provide emergency mental and behavioral health services, all of which are subject to statutory directives and conditions. *See* 42 U.S.C. §§ 290dd-3 to 290ee-2, 290ee-3 to 290ee-3a, 290ee-5 to 290ee-5a, 290ee-7 to 290ee-10. None of the statutes establishing these programs authorize conditions on these grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### 4.    Centers for Disease Control and Prevention Grant Programs

456.    The Centers for Disease Control and Prevention (CDC) within HHS describes itself as "the nation's leading science-based, data-driven, service organization that protects the public's

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 103

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

health." *Home*, CDC, https://www.cdc.gov/ (last accessed June 30, 2025). CDC provides much of the funding to support public health systems and activities by state and local governments. Josh Michaud, et al., *CDC's Funding for State and Local Public Health: How Much and Where Does it Go?*, KFF, https://www.kff.org/other/issue-brief/cdcs-funding-for-state-and-local-public-health-how-much-and-where-does-it-go/ (Apr. 7, 2025). In FY 2023, CDC obligated almost $15 billion to state and local jurisdictions. *Id.* The CDC's funding supports a range of programs including HIV/AIDS, Viral Hepatitis, STI, and TB Prevention; Chronic Disease Prevention and Health Promotion; Public Health Preparedness and Response; and Injury Prevention and Control. *Grant Funding Profiles – Funding Category View*, CDC, https://fundingprofiles.cdc.gov/Category/Category (last visited June 30, 2025).

457.    For example, one of the grants awarded by CDC is the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant, which is a part of CDC's funding for HIV/AIDS, Viral Hepatitis, STI, and TB Prevention. As explained by the most recent 2024 NOFO for this program, the grant funds recipients "to implement a comprehensive, person-centered HIV prevention and surveillance program to prevent new HIV infections and improve the health of people with HIV."

458.    The NOFO for this program includes as a *required* element, "Addressing Social and Structural Factors." The NOFO recognizes that "[t]he impact of racism, homophobia, transphobia, and stigma significantly exacerbates the health disparities experienced among communities disproportionately affected by HIV. Health equity is a desirable goal that entails special efforts to improve the health of those who have experienced social or economic disadvantage." With respect to the "Population(s) of Focus," the NOFO explains that "Applicants must provide HIV services to populations within the jurisdiction that are disproportionately

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 104

impacted by HIV as identified by their epidemiological data, gaps in services, or need," and "Examples to consider based on national and local data, include transgender women, cisgender Black or African American women, gay and bisexual men, American Indian or Alaska Native gay and bisexual men, people who inject drugs (PWID), youth, pregnant and postpartum persons and their infants, and other populations with disproportionately higher rates of HIV diagnosis including individuals involved in the justice system and people experiencing housing insecurity."

459.    The NOFO did not include any grant conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

460.    Statutory authority for the Fiscal Year 2024 High-Impact HIV Prevention and Surveillance Programs for Health Departments grant comes from 42 U.S.C. § 247c(b)–(c) and the Consolidated Appropriations Act of 2016, Pub. L. 114-113, 129 Stat. 2242. 42 U.S.C. § 247c authorizes HHS to make grants like the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant. It also identifies authorized conditions on the grants, including recordkeeping requirements, 42 U.S.C. § 247c(e)(3), and patient confidentiality mandates, *id.* § 247c(e)(5). Neither 42 U.S.C. § 247c nor the Consolidated Appropriations Act of 2016 authorize or impose conditions on this grant related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

### 5.    Teen Pregnancy Prevention Program

461.    In 2009, Congress established the Teen Pregnancy Prevention (TPP) program "to fund competitive contracts and grants to public and private entities" for "medically accurate and age appropriate programs that reduce teen pregnancy." Consolidated Appropriations Act of 2010,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 105

Pub. L. 111-117, 123 Stat. 3034, 3253 (2009). The TPP program is administered by the Office of Population Affairs (OPA), a division of HHS's Office of the Assistant Secretary for Health. About, U.S. Dep't Health & Hum. Servs., Off. Population Affs., https://opa.hhs.gov/about (last visited June 16, 2025).

462.    TPP grants are competitively awarded to public and private entities to implement a range of evidence-based and innovative approaches for influencing youth to make healthy decisions that reduce unintended teen pregnancy and associated risk behaviors. Since establishing the program, Congress has continuously funded TPP grants at approximately consistent levels and with the same statutory requirements. *See* Pub. L. 118-47, 138 Stat. 460, 671 (2024); Pub. L. 117-328, 136 Stat. 4459, 4876 (2022); Pub. L. 117-103, 136 Stat. 49, 463 (2022); Pub. L. 116-260, 134 Stat. 1182, 1587 (2020); Pub. L. 116-94, 133 Stat. 2534, 2575 (2019); Pub. L. 115-245, 132 Stat. 2981, 3087 (2018); Pub. L. 115-31, 131 Stat. 135, 536 (2017); Pub. L. 114-113, 129 Stat. 2242, 2617 (2015); Pub. L. 113-76, 128 Stat. 5, 380 (2014); Pub. L. 113-6, 127 Stat. 198, 412–13 (2013) (carrying forward prior year's provisos); Pub. L. 112-74, 125 Stat. 786, 1080 (2011); Pub. L. 112-10, 125 Stat. 38, 161-62 (2011); Pub. L. 111-117, 123 Stat. 3034, 3253 (2009).

463.    Through these appropriations laws, Congress has established specific requirements for the TPP program. These requirements group TPP grants into two categories, which HHS refers to as "Tier 1" and "Tier 2" grants. Jessica Tollestrup, Cong. Rsch. Serv., R45183, *Adolescent Pregnancy: Federal Prevention Programs*, at 7 (Aug. 22, 2024), https://www.congress.gov/crs_external_products/R/PDF/R45183/R45183.11.pdf.

464.    Congress has allocated 75% of TPP funds (after administration costs) to Tier 1 grants, which must be used to "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 106

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

pregnancy, or other associated risk factors." Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 671.

465.    The remaining 25% of TPP funds must go toward Tier 2 grants, which are "research and demonstration grants" intended "to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.*

466.    The appropriations laws that establish and fund the TPP program do not authorize HHS to condition Tier 1 or Tier 2 TPP funds on opposition to all forms of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders with no connection to evidence-based prevention of teen pregnancy.

467.    TPP grant recipients receive funding through two processes: a competitive award cycle, in which they propose and are awarded funding for Tier 1 or Tier 2 programs over a multi-year period, and an annual non-competitive continuing award process in which recipients apply to HHS to receive a one-year continuing award as part of the multi-year project period. HHS regulations codify the procedures governing this practice.

468.    These regulations are primarily codified at 45 C.F.R. Part 75, which governs the award of grants and cooperative agreements by HHS and its agencies. Pursuant to 45 C.F.R. § 75.203, HHS announces competitions for grants and cooperative agreements, including TPP funding, via a public NOFO.

469.    HHS regulations do not impose any conditions on TPP funding related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to teen pregnancy prevention.

470.    In March 2023, OPA posted a NOFO ("Tier 2 NOFO") announcing a competitive process for Tier 2 TPP cooperative agreement awards for Fiscal Years 2023–2028. U.S. Dep't

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 107

Health & Hum. Servs., Off. Population Affs., Notice of Funding Opportunity: Teen Pregnancy Prevention Tier 2 Rigorous Evaluation Cooperative Agreements (Mar. 14, 2023), https://apply07.grants.gov/apply/opportunities/instructions/PKG00280464-instructions.pdf.

471.    The Tier 2 NOFO stated HHS's goal of using "new and innovative approaches" to "equitably bolster adolescent health outcomes and advance health equity," which HHS stated "requires valuing everyone equally with focused and ongoing societal efforts to address avoidable inequalities, historical and contemporary injustices, and the elimination of health and health care disparities." *Id.* at 6.

472.    The Tier 2 NOFO did not include any grant conditions or indicate that awards would be conditioned on acceptance of conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to teen pregnancy prevention.

### 6.    Other HHS Grants

473.    HHS and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

474.    Congress annually appropriates funding for HHS grant programs. In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HHS with respect to funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HHS grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 108

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

of the grant. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1523–28, 1567–98; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 397–402, 441–74; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4808–13, 4854–87; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 272–77, 397–419.

475.    Plaintiffs King County, Pierce County, Snohomish County, Boston, Columbus, NYC, San Francisco, Santa Clara, Cambridge, Chicago, Denver, Minneapolis, Wilsonville, Alameda County, Baltimore, Cambridge, Dane County, Eugene, Hennepin County, Milwaukee, Multnomah County, Oakland, Pacifica, Pima County, Ramsey County, Rochester, San Mateo County, and Wilsonville (collectively, the "HHS Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive HHS grants. These Plaintiffs rely on over $2 billion in appropriated federal funds from HHS direct or pass-through grant programs for health and human services-related projects undertaken for the benefit of their communities.

### D.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on HUD, DOT, and HHS Grant Funds.

#### 1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants

476.    Since taking office, President Trump has issued numerous executive orders purporting to direct the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including opposition to all forms of DEI policies and initiatives, participation in aggressive and lawless immigration enforcement,

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exclusion of transgender people, and cutting off access to lawful abortions. These unlawful conditions are imposed to direct and coerce grant recipients to comply with the President's policy agenda.

477. The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants. *Id*. § 3(b)(iv).

478. The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id*. § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894 today—plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 110

479.    The DEI Order does not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

480.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

481.    The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status. *See* 8 U.S.C. § 1611(a). In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including . . . PRWORA." *Id.* § 2(i).

482.    On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement. The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials . . . continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 111

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits . . . from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf." https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-communities-from-criminal-aliens/. The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens." https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

483.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It goes on to state that "[g]ender

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 112

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

484.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order"). The Acting Director of the U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order. Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo"). The OMB Memo told agency heads that the Trump Administration's policy is "not to use taxpayer funds to fund, facilitate, *or promote* abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." *Id.* (emphasis added). The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo. *Id.*

### 2.    HUD and Its Program Offices Attach New, Unlawful Conditions to HUD Grants

485.    HUD and its program offices have implemented President Trump's Executive Orders by making changes to HUD policy and attaching, or announcing that it will attach, new

and unlawful conditions (collectively, the "HUD Grant Conditions") across the expansive portfolio of HUD grants established by Congress and demanding grant recipients' agreement to those new conditions in grant application and agreements.

### a.)     HUD attaches new, unlawful conditions to CoC grants

486.     In or around March and April of 2025, following President Trump's issuance of the executive orders described above and Defendant Turner's confirmation as HUD Secretary, HUD presented CoC Plaintiffs with CoC grant agreements (collectively, the "CoC Grant Agreements") for some of the CoC funds CoC Plaintiffs were awarded. These CoC Grant Agreements contain additional grant conditions that were not included in the FYs 2024 & 2025 NOFO, and are not authorized by the Homeless Assistance Act, the Appropriations Act, or the Rule HUD itself promulgated to implement the CoC program. HUD has required CoC Plaintiffs agree to these conditions to receive the CoC funds they are entitled to.

### (i.)     Overview of New, Unlawful Conditions

487.     Each of the CoC Grant Agreements presented to CoC Plaintiffs contains substantially the same unlawful, new terms and conditions, including the following (collectively, the "CoC Grant Conditions"):

488.     First, the CoC Grant Agreements state that "[t]his Agreement, the Recipient's use of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only certain specified statutes, rules, and grant-related documents, but also by "all current Executive Orders." The CoC Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time comply with . . . other Executive Orders" (together, the "CoC EO Condition").

489.     Second, a grant recipient must certify that:

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 114

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> it does not operate any programs that violate any applicable Federal
> anti-discrimination laws, including Title VI of the Civil Rights Act
> of 1964.

The recipient must further agree that that this condition is "material" for purposes of the FCA by agreeing that:

> its compliance in all respects with all applicable Federal anti-
> discrimination laws is material to the U.S. Government's payment
> decisions for purposes of [the FCA].

(together, the "CoC Discrimination Condition").

490.    While CoC Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Administration's communications to federal grant recipients make clear that the agencies seek compliance with the Trump Administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs. Without Congress passing his anti-DEI agenda, President Trump instead purports to have granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments seeking grant funding.

491.    Third, the CoC Grant Agreements provide:

> No state or unit of general local government that receives funding
> under this grant may use that funding in a manner that by design or
> effect facilitates the subsidization or promotion of illegal
> immigration or abets policies that seek to shield illegal aliens from
> deportation . . . .

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 115

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

The CoC Grant Agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . [the Immigration Order] . . or immigration laws " (together, the "CoC Enforcement Condition").[3]

492.    Fourth, the CoC Grant Agreements impose requirements purportedly related to PRWORA and other immigration eligibility and verification requirements:

> The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [*sic*] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
>                       . . . .
>
> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements (SAVE) system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(the "CoC Verification Condition").

493.    Fifth, the CoC Grant Agreements require the recipient to agree that it "shall not use grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order (the "CoC Gender Ideology Condition").

494.    Finally, the CoC Grant Agreements require the recipient to agree that it "shall not use any Grant Funds to fund or promote elective abortions, as required by" the Abortion Order

---

[3] More recent grant agreements contain updated language that precisely recites the Immigration Order. In these, the last part of this condition reads "…or abets *so-called "sanctuary"* policies that seek to shield illegal aliens from deportation.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 116

(the "CoC Abortion Condition").

495.    These conditions are unconstitutional and unlawful for several reasons. As an initial matter, neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any other legislation authorizes HUD to attach these conditions to federal funds appropriated for CoC grants.

### (ii.)    *The CoC EO Condition is unlawful*

496.    The CoC EO Condition purports to incorporate *all* executive orders as "govern[ing]" the use of CoC funds and operation of CoC projects. These orders in many ways purport to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws. In so doing, the CoC EO Condition seeks to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means.

497.    Further, the CoC EO Condition is unconstitutionally vague. Executive orders are the President's directives to federal agencies. These orders are unintelligible as applied to grant recipients. Further, the directives as implemented in the unlawful conditions at issue are vague and unintelligible.

### (iii.)    *The CoC Discrimination Condition is unlawful*

498.    CoC Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding. But executive agency memoranda and letters make clear that the Trump Administration's conception of an "illegal" DEI program is contrary to actual nondiscrimination statutes and is inconsistent what any court has endorsed when interpreting them.

499.    For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 117

history. Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

500.    That broad conception is confirmed in a letter from DOT Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law." Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (April 24, 2025) ("Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

501.    Defendant Turner has stated that "HUD is carrying out Present Trump's executive orders, mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's Executive Orders, removing diversity, equity, inclusion (DEI)." Press Release No. 25-059, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https://www.hud.gov/news/hud-no-25-059 (emphasis added).

502.    Taking to the Twitter platform now known as "X," Defendant Turner expressed how his agency intends to enforce the new conditions on HUD CoC Grants, stating, "CoC funds . . . will not promote DEI, enforce 'gender ideology,' support abortion, subsidize illegal immigration, and discriminate against faith-based groups." Scott Turner Post of Mar. 13, 2025, https://x.com/SecretaryTurner/status/1900257331184570703.

503.    Neither the text of Title VI, nor any other statute or other condition enacted by Congress, prohibits recipients of federal funding from according concern to issues of diversity, equity, or inclusion. The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs. Indeed, existing case law rejects the Trump Administration's expansive

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

views on nondiscrimination law with respect to DEI. For example, this Court recently confirmed the lawfulness of a local government's use of affinity groups and DEI initiatives in a case raising federal nondiscrimination law and equal protection claims. *See generally Diemert v. City of Seattle*, 2:22-CV-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025). The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat. Yet, the DEI Order seeks to impose his views on DEI as if they were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce federal grant recipients into acquiescing in his Administration's unorthodox legal interpretation of nondiscrimination law.

504.    Accepting these conditions would permit Defendants to threaten CoC Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with President Trump's political agenda. This threat is intensified by the CoC Grant Agreements' provision that purports to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim. Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of. *Id.* § 3733.

505.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.

(iv.)    *The CoC Enforcement Condition is unlawful*

506.    Congress has not delegated to HUD authority to condition CoC grant funding on a

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 119

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation." It also is unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and by giving agencies free rein to arbitrarily enforce it.

507.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties—including Plaintiffs King County, San Francisco, Santa Clara, Minneapolis, Portland, and San José—on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the Administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies." *City & Cnty. of San Francisco v. Trump*, 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause"; "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process"; and "violate[s] the Tenth Amendment because [it] impose[s] [a] coercive condition intended to commandeer local officials into enforcing federal immigration practices and law." *Id.* at *2.

(v.)    *The CoC Verification Condition is unlawful*

508.    Further, PRWORA does not authorize the CoC Verification Condition for at least two reasons. First, PRWORA explicitly does *not* require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations. 8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 120

by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner." *Id.* § 1642(b)(ii), (iii). The Attorney General has issued interim guidance and a proposed verification rule, but never implemented a final rule. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation. 62 Fed. Reg. at 61348–49. Absent implementing regulations, CoC Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so exceeds the authority created in PRWORA.

509.    Second, SAVE is a database operated by the U.S. Department of Homeland Security, acting through U.S. Citizenship and Immigration Services, that is sometimes used to assist federal immigration enforcement actions. The CoC Verification Condition would require CoC Plaintiffs to gain access to this system, train their own employees how to use the system, and require them to enter immigration information. Such an effort to commandeer local resources for matters related to federal immigration enforcement is counter to federal law, as well as applicable local and state laws precluding local participation in federal immigration enforcement.

(vi.)    *The CoC Gender Ideology Condition is unlawful*

510.    The CoC Gender Ideology Condition improperly seeks to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology." This violates HUD's own regulations, which mandate

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 121

"equal access" to CoC "programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity, and in a manner that affords equal access to the individual's family," including facilities with "shared sleeping quarters or shared bathing facilities." 24 C.F.R. § 5.106(b)–(c). HUD regulations also prohibit subjecting an individual "to intrusive questioning or" asking individuals "to provide anatomical information or documentary, physical, or medical evidence of the individual's gender identity." *Id.* § 5.106(b)(3). While Defendant Turner announced HUD will no longer enforce these regulations, the regulations remain in effect and applicable to the CoC program.

511.    The CoC Gender Ideology Condition is also vague. The definition of "gender ideology" is not only demeaning, but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of homeless services.

512.    The Trump Administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders. For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program. The CDC ended the grant in order to comply with the Gender Ideology Order. *See* Kristen Hwang, *LA clinics lose funding for transgender health care as Trump executive orders take hold*, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

513.    On February 28, 2025, this Court enjoined enforcement of the Gender Ideology

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 122

Order in part (including parts the Gender Ideology Condition incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers. *Wash. v. Trump*, 2:25-CV-00244-LK, 2025 WL 659057, at *11–17, *24–25 (W.D. Wash. Feb. 28, 2025). Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers." *Id.* at *11. The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people." *Id.* at *24 (citation omitted).

(vii.)    *The CoC Abortion Condition is unlawful*

514.    The CoC Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions. While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality it goes well beyond the Hyde Amendment. The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024). But the Hyde Amendment to the 2024 Appropriations Act does not require grant recipients to refrain from "*promot[ing]* abortion"—a vague prohibition that is susceptible to arbitrary enforcement. And in doing so, the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 123

Abortion Condition usurps Congress's spending, appropriations, and legislative power.

515.    In sum and as further explained below, HUD's imposition of the CoC Grant Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### b.) *HUD issues new policy terms for all financial assistance incorporating the unlawful conditions*

516.    In or around April 2025, HUD amended its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (the "HUD Policy Terms"), which set forth "various laws and policies that may apply to recipients of" HUD grant awards. This document is posted on HUD's website at https://www.hud.gov/sites/default/files/CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf. Among such potentially applicable policies, the document lists several of President Trump's executive orders as well as language materially the same as the CoC Grant Conditions.

517.    For example, in a section labelled "Compliance with Immigration Requirements," the HUD Policy Terms list the Immigration Order and summarize the potentially applicable policy in materially identical language as the CoC Verification Condition:

> The recipient must administer its award in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> . . . .

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 124

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> Subject to the exceptions provided by PRWORA, the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

518. In the same section, the HUD Policy Terms include a policy substantially identical to the CoC Enforcement Condition:

> No state or unit of general local government that receives HUD funding under may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

519. Next, in a section labelled "Other Presidential Executive Actions Affecting Federal Financial Assistance Programs," HUD Policy Terms state that "Recipients of Federal Awards *must* comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to . . . :" (emphasis added), followed by a "non-exhaustive list" of nine executive orders—including the Immigration Order, the Abortion Order, the DEI Order, and the Gender Ideology Order—as "applicable" conditions.

520. The HUD Policy Terms then summarize the potentially applicable policies reflected in those executive orders in language materially similar to several CoC Grant Conditions:

a. First, the HUD Policy Terms state that the Immigration Order "prohibits taxpayer resources and benefits from going to unqualified aliens."

b. Second, the HUD Policy Terms summarize the Abortion Order as "prohibit[ing] the use of Federal taxpayer dollars to fund or promote elective abortion."

c. Third, the HUD Policy Terms state that the DEI Order "requires Federal agencies to terminate all discriminatory and illegal preferences."

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 125

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

d. Fourth, the HUD Policy Terms summary the Gender Ideology Order as "set[ting] forth U.S. policy recognizing two sexes, male and female."

521. These requirements outlined in the HUD Policy Terms are unlawful for the same reasons the nearly identical CoC Grant Conditions are unlawful, as explained above. In particular, and as explained further below, the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.) *HUD attaches a new, unlawful anti-DEI certification to its standard assurances and certifications*

522. In or around May 2025, HUD updated its standard Applicant and Recipient Assurances and Certifications (the "HUD Certifications") on Form HUD-424-B, which must be submitted as part of any application for HUD funding or post-award submission. These changes implemented President Trump's executive orders, including the DEI Order, by imposing a new anti-DEI certification that is not authorized by any of the statutes that establish HUD grant programs, any appropriations law appropriating funds for HUD grant programs, or HUD's own regulations. In particular, the HUD Certifications require HUD grant applicants to certify that the applicant:

> Will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws.

523. This certification is unlawful for the same reasons as the nearly identical CoC DEI Condition. In particular, and as explained further below, the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 126

### d.) *HUD announces it will attach new, unlawful conditions to Office of Community Planning and Development grants*

524.    In or around June 2025, HUD's Office of Community Planning and Development (CPD), which administers the CoC, CDBG, ESG, HOME, and HOPWA programs, among others, issued guidance announcing that it will attach new conditions substantially identical to the CoC Grant Conditions to Fiscal Year 2025 agreements governing all CPD-administered grants.

525.    In particular, on June 5, 2025, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs (the "Fernandez Letter"). The Fernandez Letter states that CPD "[g]rantees are . . . encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans," which are required under the CDBG, HOME, HOPWA, and ESG programs. Letter from Claudette Fernandez, Acting Director, CPD General Deputy Assistant Secretary, to Council of State Community Development Agencies and National Community Development Association (June 5, 2025), https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

526.    The Fernandez Letter goes on to state that "FY2025 grant agreement[s]" that are issued after a recipient submits their consolidated and action plans will "emphasize conformity with applicable Administration priorities and executive orders." It clarifies that, "[u]nder the FY 2025 grant agreement, conformity means" that the recipient will be required to abide by a list of specific conditions. These include the following (collectively, the "CPD Grant Conditions"):

527.    First, grant recipients will be required to agree not to "not use grant funds to promote 'gender ideology,' as defined in [the Gender Ideology Order]" (the "CPD Gender Ideology Condition").

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 127

528.    Second, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964." Each recipient must also "agree[] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA]" (together, the "CPD Discrimination Condition").

529.    Third, grant recipients must agree that:

> [i]f applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

(the "CPD Enforcement Condition").

530.    Fourth, each recipient must agree to conditions purportedly related to PRWORA and other immigration eligibility and verification requirements, specifically:

> The Grantee must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> . . . .
>
> Unless excepted by PRWORA, the Grantee must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(together, the "CPD Verification Condition").

531.    Fifth, "[u]nless excepted by PRWORA," grant recipients "must use SAVE, or an

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 128

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

532.    Finally, grant recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as required by [the Abortion Order]" (the "CPD Abortion Condition").

533.    In addition to imposing these conditions through grant agreements, HUD is threatening to disapprove consolidated plans—including plans that have already been submitted—unless jurisdictions resubmit revised plans that (1) include assurances that the jurisdictions will comply with the CPD Grant Conditions and (2) strip the plans of certain words that HUD claims, in and of themselves, violate the related EOs, such as "equity" and "environmental justice." HUD is requiring these revisions and commitments with as little as 24 hours' notice.

534.    The CPD Grant Conditions are unlawful for the same reasons the nearly identical CoC Grant Conditions are unlawful, as explained above. In particular, and as explained further below, the CPD Grant Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    DOT and its Operating Administrations Attach New, Unlawful Conditions to DOT Grants

535.    Since Secretary Duffy's confirmation, DOT and its operating administrations have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOT Grant Conditions") across the expansive portfolio of DOT grants established by Congress; demanding grant recipients' agreement to those new conditions, sometimes on very short timelines; and issuing agency-wide letters and statements about how DOT

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 129

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

will enforce those conditions.

536.    As discussed above, the Duffy Letter issued to "all recipients" of DOT funding announced DOT's "policy" of imposing immigration enforcement and anti-DEI conditions on all DOT-funded grants as a requirement of receiving funding. The Duffy Letter makes clear that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." It further asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

537.    Pursuant to the new policy set forth in the Duffy Letter, DOT and its operating administrations have, in recent weeks, attached substantially similar conditions relating to discrimination, immigration enforcement, and executive orders to all grant agreements.

### a.) *DOT and the FTA attach new, unlawful conditions to FTA Grants*

538.    For instance, on March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA grant programs discussed above.

539.    The March 26 Master Agreement imposed a new condition on all FTA grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FTA Discrimination Condition"). While FTA grants have long required

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 130

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

compliance with nondiscrimination laws and have been subject to the FCA, the March 26 Master

Agreement provided:

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

540.    That the FTA plans to enforce these new conditions more broadly than current

nondiscrimination law is reinforced by the March 26 Master Agreement's requirement that the

recipient "comply with other applicable federal nondiscrimination laws, regulations, and

requirements, and follow *federal guidance prohibiting discrimination*."

541.    The FTA Discrimination Condition is in apparent tension with other requirements

in the March 26 Master Agreement. For example, the March 26 Master Agreement requires

compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient

should ensure that small businesses, minority businesses, women's business enterprises, veteran-

owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and

"solicited" when "deemed eligible."

542.    The FTA Discrimination Condition is also in apparent tension with DOT's own

regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior

discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude

individuals from participation in, to deny them the benefits of, or to subject them to discrimination

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 131

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

543.    Further, the March 26 Master Agreement defined "Federal Requirement" to include "[a]n applicable federal law, regulation, or *executive order*" (the "FTA EO Condition"). The March 26 Master Agreement refers to President Trump's DEI Order as an executive order "pursuant to" which the recipient must comply and certify, with no explanation of how the DEI Order relates to funding of mass transit.

544.    The Duffy Letter to all recipients of DOT grants (including the FTA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws. The Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

545.    On April 25, 2025, the FTA issued another updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the four FTA grant programs discussed above.

546.    The April 25 Master Agreement ("FTA Master Agreement") contains the same FTA Discrimination Condition and the same FTA EO Condition set forth above. But the FTA Master Agreement contains an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FTA Enforcement Condition").

547.    In particular, the FTA Enforcement Condition amends an existing provision

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 132

addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

548. The Duffy Letter to all recipients of DOT grants (including the FTA grants) states that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law" and that "[d]eclining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability."

549. In May 2025, following this Court's issuance of a temporary restraining order enjoining the FTA from enforcing the FTA Discrimination Condition, the FTA EO Condition, or the FTA Enforcement Condition against King County, King County learned that the FTA had retroactively applied the April 2025 FTA Master Agreement to grants that were executed pursuant to earlier versions of the agreement. By substituting those earlier agreements with the FTA Master Agreement, the FTA purported to unilaterally add new substantive conditions to previously awarded grants without notifying King County.

550. Neither the statutory provisions creating the FTA grants, the relevant appropriations acts, nor any other legislation authorizes the FTA to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this

prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

551.    In sum and as further explained below, the FTA Discrimination Condition, the FTA EO Condition, and the FTA Enforcement Condition (collectively, the "FTA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### b.)    DOT and the FHWA attach new, unlawful conditions to FHWA Grants

552.    On March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2024 SS4A grants ("FY 2024 SS4A General Terms and Conditions").

553.    The FY 2024 SS4A General Terms and Conditions imposed a new condition on all Fiscal Year 2024 SS4A grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("SS4A Discrimination Condition"). While SS4A grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2024 SS4A General Terms and Conditions provided:

> (b) Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI)

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 134

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

initiatives that violate any applicable Federal anti-discrimination law.

554.    The SS4A Discrimination Condition is in apparent tension with other requirements in the FY 2024 SS4A General Terms and Conditions. For example, the FY 2024 SS4A General Terms and Conditions require compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

555.    The SS4A Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

556.    The FY 2024 SS4A General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "SS4A Enforcement Condition").

557.    In particular, the SS4A Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 135

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*components of the Department of Homeland Security in the enforcement of Federal immigration law.*

558.    Exhibit A to the FY 2024 SS4A General Terms and Conditions also requires the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "SS4A EO Condition"). While this requirement existed in a similar form in prior agreements, Exhibit A to the FY 2024 SS4A General Terms and Conditions lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to SS4A grant agreements, with no explanation of how those Orders or statutes relate to roadway grants or even apply to local governments.

559.    Also on March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2023 SS4A grants and to Fiscal Year 2022 SS4A grants. Those revised General Terms and Conditions, and the revised Exhibit A to each, contain provisions identical to the SS4A Discrimination Condition, the SS4A Immigration Condition, and the SS4A EO Condition discussed above.

560.    On April 22, 2025, the FHWA issued Competitive Grant Program General Terms and Conditions purportedly applicable to all FHWA competitive grants ("2025 FHWA General Terms and Conditions").

561.    The 2025 FHWA General Terms and Conditions imposed a new condition on all FHWA competitive grants (including the BIP, Culvert AOP Program, and ATTAIN program discussed above) implementing President Trump's directive, as set out in the DEI Order and

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 136

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

further explained in the Duffy letter, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FHWA Discrimination Condition"). While FHWA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FHWA General Terms and Conditions provide:

> (b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].
>
> (c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

562. The 2025 FHWA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FHWA Enforcement Condition").

563. In particular, the FHWA Enforcement Condition incorporates immigration enforcement into a provision addressing compliance with federal law and policy as follows (immigration enforcement language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 137

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

564.    The Exhibits to the 2025 FHWA General Terms and Conditions—dated April 30, 2025 and applicable to FHWA competitive grants—further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FHWA EO Condition"). The Exhibits list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those Orders or statutes relate to highway grants or even apply to local governments.

565.    Plaintiffs re-allege and incorporate paragraphs 544 and 548 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FHWA grants).

566.    Neither the statutory provisions creating the FHWA grants, the relevant appropriations acts, nor any other legislation authorizes the FHWA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

567.    In sum and as further explained below, the SS4A Discrimination Condition, the SS4A Enforcement Condition, the SS4A EO Condition, the FHWA Discrimination Condition, the FHWA Enforcement Condition, and the FHWA EO Condition (collectively, the "FHWA Grant

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 138

Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.)    DOT and the FAA attach new, unlawful conditions to FAA Grants

568.    Implementing the Duffy Letter and the Trump Administration Executive Orders, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comments on modifications to the Grant Assurances ("2025 FAA Grant Assurances"). In its notice, the FAA stated that the 2025 FAA Grant Assurances would become effective immediately notwithstanding the opportunity to comment.

569.    The 2025 FAA Grant Assurances require the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant." While this requirement existed in a similar form in prior versions of the Grant Assurances, the 2025 FAA Grant Assurances list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, even though these Orders on their face do not apply to non-federal entities and do not relate to funding of airport development or infrastructure. Congress has not directed or authorized that the DEI Order, Gender Ideology Order, or Immigration Order be imposed as Grant Assurances.

570.    Implementing the Duffy Letter and the Trump administration Executive Orders, on May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 for AIG

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 139

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

grants with added terms and conditions that did not appear in prior iterations of FAA grant agreements ("FY 2025 FAA AIG Grant Template"). The FY 2025 FAA AIG Grant Template has not been circulated for comment, as is statutorily required for changes to Grant Assurances.

571.    The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants that implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede that this requirement is material for purposes of the FCA (the "FAA Discrimination Condition"). While FAA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2025 FAA AIG Grant Template provides:

> Pursuant to Section (3)(b)(iv), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the sponsor:
>
> a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]; and
>
> b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

572.    The FAA Discrimination Condition is in apparent tension with statutorily required Grant Assurances imposed on sponsors with respect to FAA grant funds. For example, one of the statutorily required Grant Assurances sponsors must make for airport development grants is that the airport sponsor will take necessary action to ensure, to the maximum extent possible, that at least 10 percent of all businesses at the airport selling consumer products or providing consumer services to the public are small business concerns owned and controlled by "a socially and economically disadvantaged individual" or other small business concerns in historically underutilized business zones. 49 U.S.C. § 47107(e)(1). "Socially and economically disadvantaged

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 140

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

individual" is defined to include "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities," as well as women. 49 U.S.C. § 47113(a)(2); 15 U.S.C. § 637(d).

573.    The FAA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7). And the FAA Discrimination Condition is in tension with other provisions of the FY 2025 FAA AIG Grant Template. For example, the FY 2025 FAA AIG Grant Template states that the "sponsor's [Disadvantaged Business Enterprise] and [Airport Concession Disadvantaged Business Enterprise] programs as required by 49 C.F.R. Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement." But 49 C.F.R. 23.25(e), for instance, requires the use of "race-conscious measures" in implementing the Airport Concession Disadvantaged Business Enterprise program when race-neutral measures, standing alone, are not projected to be sufficient to meet an overall goal, and sets forth examples of race-conscious measures airports can implement.

574.    The FY 2025 FAA AIG Grant Template contains an additional condition requiring sponsors to cooperate with enforcement of any federal law, including federal immigration enforcement efforts (the "FAA Enforcement Condition").

575.    In particular, the FAA Enforcement Condition incorporates immigration enforcement into a provision addressing free speech and religious liberty as follows (immigration

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

enforcement language emphasized):

> The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination*; and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.*

576.    The FY 2025 FAA AIG Grant Template further states with respect to immigration: "Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration. The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter." The FY 2025 FAA AIG Grant Template does not explain how those criminal immigration statutes relate to airport grants or even apply to local governments.

577.    The FY 2025 FAA AIG Grant Template also requires the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant" (the "FAA EO Condition"). While this requirement existed in a similar form in prior agreements, the FY 2025 FAA AIG Grant Template lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders relate to funding of airport development or infrastructure.

578.    The FY 2025 FAA AIG Grant Template also states that the "FAA may terminate

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 142

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

this agreement and all of its obligations under this agreement" in certain circumstances, including if "FAA determines that termination of this agreement is in the public interest"; and further states that "[i]n terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA" (the "FAA Termination Condition"). The FY 2025 FAA AIG Grant Template does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure.

579.    AIP and AIG grant agreements require sponsors to certify a number of sponsor assurances (i.e., the Grant Assurances described above) that require sponsors to maintain and operate their facilities safely and efficiently and in accordance with specified conditions and include compliance with numerous statutes, agency rules, and executive orders.

580.    Plaintiffs re-allege and incorporate paragraphs 544 and 548 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FAA grants).

581.    Neither the statutory provisions authorizing the FAA grants, the relevant appropriations acts, nor any other legislation authorizes the FAA or DOT to condition the granting of these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

582.    In sum and as further explained below, the FAA Discrimination Condition, the FAA Enforcement Condition, the FAA EO Condition, the FAA Termination Condition

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 143

(collectively, the "FAA Grant Conditions"), including in the 2025 Grant Assurances, FAA AIG Grant Template, and any other agreement, template, assurances, or other terms and conditions, violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, and the Fifth Amendment's void-for-vagueness doctrine.

### d.) DOT and the FRA attach new, unlawful conditions to FRA Grants

583.    Implementing the Duffy Letter and the Trump administration Executive Orders, on April 16, 2025, DOT and FRA issued revised General Terms and Conditions applicable to FRA discretionary grants, including the RCE Grant Program ("2025 FRA General Terms and Conditions").[4]

584.    The 2025 FRA General Terms and Conditions imposed a new condition on all Fiscal Year 2024 FRA discretionary grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FRA Discrimination Condition"). While FRA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FRA General Terms and Conditions provided:

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

---

[4] The FRA's website indicates that the 2025 FRA General Terms and Conditions were further revised on April 23, 2025, but the revision is not accessible. *See* https://railroads.dot.gov/grants-loans/fra-discretionary-grant-agreements (last accessed May 19, 2025).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 144

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

585.    The FRA Discrimination Condition is in apparent tension with the goals of the RCE program as set forth by Congress. For example, one goal of the RCE program is "to reduce the impacts that freight movement and railroad operations may have on underserved communities." 49 U.S.C. § 22909(b)(3).

586.    The FRA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

587.    The FRA Discrimination Condition is also in tension with the RCE NOFO, issued July 10, 2024, which identifies "Equity and Justice" as a priority against which proposed projects would be assessed as part of the selection process.

588.    The 2025 FRA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FRA Enforcement Condition").

589.    In particular, the FRA Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 145

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

590.    The 2025 FRA General Terms and Conditions incorporate exhibits, which were revised on April 16, 2025 and again on April 30, 2025. Exhibit A requires grantees to certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FRA EO Condition"). While this requirement existed in a similar form in prior versions of the Exhibit, the revised Exhibit (as of April 30, 2025) lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders and statutes relate to funding of railway improvements or even apply to local governments.

591.    Plaintiffs re-allege and incorporate paragraphs 544 and 548 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the FRA grants).

592.    Neither the statutory provisions authorizing the FRA grants, the relevant appropriations acts, nor any other legislation authorizes the FRA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

593.    In sum and as further explained below, the FRA Discrimination Condition, the FRA Enforcement Condition, and the FRA EO Condition (collectively, the "FRA Grant Conditions")

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

violate the Separation of Powers, the Spending Clause, Tenth Amendment's anti-commandeering

principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### e.)    DOT attaches new, unlawful conditions to SMART Grants

594.    Implementing the Duffy Letter and the Trump administration Executive Orders, on

May 9, 2025, DOT issued revised General Terms and Conditions applicable to DOT SMART

Grants ("2025 DOT SMART General Terms and Conditions"). The 2025 DOT SMART General

Terms and Conditions are incorporated into the grant agreement for FY 2024 SMART Grants.

595.    The 2025 DOT SMART General Terms and Conditions imposed a new condition

on all FY 2024 SMART grants implementing President Trump's directive, as set out in the DEI

Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede

this requirement is material for purposes of the FCA ("DOT SMART Discrimination Condition").

While DOT grants have long required compliance with nondiscrimination laws and have been

subject to the FCA, the 2025 DOT SMART General Terms and Conditions provided:

> (b) Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].
> (c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

596.    The DOT SMART Discrimination Condition is in apparent tension with the goals

of the SMART Grant program as set forth by Congress, which required that the DOT Secretary

"shall give priority to" projects that would, among other things "promote a skilled workforce that

is inclusive of minority or disadvantaged groups." 135 Stat. at 842.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 147

597.    The DOT SMART Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

598.    The 2025 DOT SMART General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "DOT SMART Enforcement Condition").

599.    In particular, the DOT SMART Enforcement Condition provides:

> [T]he recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

600.    The 2025 SMART General Terms and Conditions incorporate exhibits, which were revised on May 9, 2025. Exhibit A requires grantees to certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" ("DOT SMART EO Condition"). While this requirement existed in a similar form in prior versions of the Exhibit, the revised Exhibit lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders or statutes relate to funding of advanced

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 148

smart community technologies and systems.

601.    Plaintiffs re-allege and incorporate paragraphs 544 and 548 above (describing the Duffy Letter) as if set forth fully herein. The Duffy Letter was directed to all recipients of DOT grants (including the DOT SMART Grants).

602.    Neither the statutory provisions creating the DOT SMART Grants, the relevant appropriations acts, nor any other legislation authorizes DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

603.    In sum and as further explained below, the DOT SMART Discrimination Condition, the DOT SMART Enforcement Condition, and the DOT SMART EO Condition (collectively, the "DOT SMART Grant Conditions") violate the Separation of Powers, the Spending Clause, Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 4.    HHS and its Operating Divisions and Agencies Attach New, Unlawful Conditions to HHS Grants

604.    HHS and its operating divisions and agencies have implemented President Trump's Executive Orders by making changes to HHS policy and attaching new and unlawful conditions (collectively, the "HHS Grant Conditions") across the expansive portfolio of HHS grants established by Congress and demanding grant recipients' agreement to those new conditions.

605.    For example, on April 16, 2025, HHS issued an updated HHS Grants Policy

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 149

Statement (2025 HHS GPS) applicable to discretionary grants that is "incorporated by reference in the official Notice of Award (NoA) as a standard term and condition." It applies to "awards and award modifications that add funding made on or after April 16, 2025," includes "supplements to award, competing and non-competing continuations," and applies to "all HHS recipients and the requirements flow down to subrecipients." The 2025 HHS GPS "is incorporated by reference as a standard term and condition of awards." The 2025 HHS GPS states that it does not apply to non-discretionary awards, but that "HHS agencies have the discretion to apply certain parts of the GPS to non-discretionary awards and other policies to" non-discretionary awards.[5]

606.    The 2025 HHS GPS imposed a new condition on HHS grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("HHS Discrimination Condition"). While HHS grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 HHS GPS states that in addition to filing Form HHS 690 (Assurance of Compliance with federal nondiscrimination laws, which was previously required under older versions of the GPS), "recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4)." Further, the 2025 HHS GPS states that "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ." For this purpose, the following definitions apply:

(a) DEI means "diversity, equity, and inclusion."

---

[5] The 2025 HHS GPS does not apply to NIH grant awards.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 150

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(b) DEIA means "diversity, equity, inclusion, and accessibility."
(c) Discriminatory equity ideology has the meaning set forth in
Section 2(b) of Executive Order 14190 of January 29, 2025.
. . . .
(e) Federal anti-discrimination laws means Federal civil rights law
that protect individual Americans from discrimination on the basis
of race, color, sex, religion, and national origin.

607.    In addition to these agency-wide conditions, several HHS operating divisions and

agencies have issued their own requirements. For example, CDC recently issued updated general

terms and conditions for both research and non-research awards. Those updated general terms and

conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must

comply.

608.    SAMHSA recently issued updated general terms and conditions for discretionary

grants. Those updated general terms and conditions incorporate the 2025 HHS GPS as applicable

grants policy with which recipients must comply. Moreover, in April 2025, SAMHSA updated its

Notice of Funding Opportunity (NOFO) Application Guide to state that "[a]ll activities proposed

in your application and budget narrative must be in alignment with the current Executive Orders"

(the "SAMHSA EO Condition") and that "[f]unds cannot be used to support or provide services,

either directly or indirectly, to removable or illegal aliens" (the "SAMHSA Immigration

Condition").

609.    ACF recently issued updated general terms and conditions applicable to grants

administered by ACF that expressly state that they apply to non-discretionary awards. ACF's

updated general terms and conditions contain a provision materially the same as the HHS

Discrimination Condition described above:

For *new awards made on or after May 8, 2025*, the following
is effective immediately:

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 151

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the FCA].

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory equity ideology.

610.    ACF may impose unspecified additional conditions via "post-award action," "supplemental" terms and conditions, and "remarks and/or specific award conditions."

611.    On May 14, 2025, HRSA issued updated general terms and conditions applicable to "all active awards." The revised HRSA terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply. They also contain the following provision (the "HRSA Gender Ideology Condition"):

By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 152

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

by Title IX certify as follows:

- Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in [the Gender Ideology Order], and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.
- The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.
- Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
- Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

It is not clear if HRSA's assertion that compliance with Title IX (or any other nondiscrimination law) purportedly now requires agreement to the Gender Ideology Order is shared by other HHS operating divisions and agencies, or is implicitly imported into other operating divisions and agencies' conditions requiring compliance with nondiscrimination laws that do not expressly contain this added gloss.

612.    Meanwhile, on May 6, 2025, HHS sent a "Dear Colleague" letter to medical schools receiving federal funds, providing "[HHS's] current interpretation of federal law." Regarding DEI, the letter stated "some American educational institutions . . . have adopted race-conscious policies under a broader umbrella of concepts known as 'systemic and structural racism' and 'diversity,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 153

equity, and inclusion' (DEI) to incorporate race-based criteria into training and discipline," and "[a]dditionally, certain DEI programs may confer advantages or impose burdens based on generalizations associated with racial identity, rather than evaluating individuals on their own merits. Such programs can create a hostile environment, denying a student the ability to participate fully in school life because of the student's race." The letter also warned that institutions "found to be out of compliance with federal civil rights law may, consistent with applicable law, be subject to investigation and measures to secure compliance with may, if unsuccessful, affect continued eligibility for federal funding" and stated HHS would "prioritize investigations" of institutions that, among other things, require DEI or diversity statements in connection with hiring. Letter from Anthony F. Archeval, Acting Director, HHS Office for Civil Rights, to medical schools that receive federal financial assistance (May 6, 2025), https://www.hhs.gov/sites/default/files/guidance-med-schools-dear-colleague-letter.pdf.

613.    In a May 14, 2025 statement to the Senate Committee on Health, Education, Labor, and Pensions regarding President Trump's FY 2026 budget, HHS Secretary Kennedy stated, among other things, that HHS is "committed to restoring a tradition of gold-standard, evidence-based science—not one driven by politicized DEI, gender ideology, nor sexual identity." Secretary Kennedy also stated that "NIH will no longer issue grants to promote radical gender ideology to the detriment of America's youth, or fund dangerous gain-of-function research, though related research will continue consistent with Administration policy and oversight. Our Administration is committed to eliminating radical gender ideologies that poison the minds of Americans." Statement by Robert F. Kennedy, Jr. on the President's Fiscal Year 2026 Budget before Committee on Health, Education, Labor, and Pensions (May 14, 2025), https://www.help.senate.gov/imo/media/doc/b1b74b8b-0612-8b5d-1904-

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 154

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a50babc1deea/HELP%20Secretary%20Kennedy%20Testimony.pdf.

614.    On July 3, 2025, ACF Acting Assistant Secretary Andrew Gradison issued a letter to Children's Bureau grant recipients suggesting that all DEI initiatives may violate federal nondiscrimination law. The letter states: "The Secretary of HHS has determined that awards supporting diversity, equity, and inclusion (DEI) do not meet a public purpose to the extent they are inconsistent with the Department's policy of improving the health and well-being of all Americans and may violate Federal civil rights law." The letter "encourages" grant recipients to "review all plans, services, strategies, and expenditures under these programs, including those made by subrecipients or contractors, to ensure that they do not support DEI initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." On or about the same date, OFA issued a similar letter to TANF grant recipients.

615.    Neither the statutory provisions creating the HHS grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes HHS, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA. Nor are Plaintiffs aware of any statute authorizing HHS, itself or through its operating divisions and agencies, to impose such conditions on any other HHS grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and statements from agency heads cannot change what these laws require under existing court decisions.

616.    In sum and as further explained below, the HHS Grant Conditions violate the

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 155

Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

**E.    Plaintiffs with Pass-Through Grants Have a Reasonable Concern that the Challenged Conditions Apply to Them**

617.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a subrecipient). Where a pass-through entity (for example, a state) provides federal funds to a subrecipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the subrecipient complies with applicable federal requirements. *See* 2 C.F.R. §§ 200.332(b)(2) (pass-through entity must provide to the subrecipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. Part 2400 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by HUD to non-federal entities); 2 C.F.R. Part 1201 (same for DOT).

618.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions at issue in this case incorporate applicable federal requirements against any subrecipients.

619.    For example, the CoC Grant Agreements provide that the "Recipient must comply with the applicable requirements in 2 CFR part 200, as may be amended from time to time."

620.    The FY 2024 SS4A General Terms and Conditions require that the recipient "monitor activities under this award, including activities under subawards and contracts, to ensure . . . that those activities comply with this agreement," and state that "[i]f the Recipient

makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e)." Exhibit A to the 2024 SS4A General Terms and Conditions—which incorporates the DEI and Gender Ideology Orders and two criminal immigration statutes as "applicable provisions" as discussed above—states that "[p]erformance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients." The 2025 FHWA General Terms and Conditions, the 2025 FRA General Terms and Conditions, and the 2025 DOT SMART General Terms and Conditions, and the Exhibits thereto, as well as the 2025 FAA Grant Assurances and FY 2025 FAA AIG Grant Template, contain similar language. And the FTA Master Agreement requires that grant recipients take measures to assure that "Third Party Participants" (defined to include subrecipients) "comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing."

621.    Similarly, the 2025 HHS GPS states that it "applies to subrecipients and contractors." Specifically, "[t]he terms and conditions of [HHS] awards flow down to subawards and subrecipients unless a particular GPS policy or award term and condition specifically says otherwise." ACF's updated general terms and conditions state that "[u]nless indicated otherwise . . . the T&Cs of Federal awards flow down to subrecipients and to contractors (when applicable) as described in 45 CFR §§75.351 – 75.353 (effective 10/1/2024: 2 CFR §200.333; effective 10/1/2025: 2 CFR §200.331 – 200.332)." And HRSA's updated general terms and conditions require that recipients "ensure the applicable general terms and conditions stated in this document flow down to subrecipients." HRSA's updated general terms and conditions link to HHS's Administrative and National Policy Requirements, which in turn lists examples of laws and

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

policies applicable to subrecipients, including nondiscrimination laws.

622.    Plaintiffs who receive grant funds from Defendants via pass-through grants (i.e., as subrecipients) have a reasonable concern, based on the agency statements and guidance, applicable regulations, and grant agreement language discussed above, that the challenged HUD, DOT, and HHS Grant Conditions apply to their use of the pass-through funds.

**F.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services**

623.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by the poison pill of heightened risk of FCA claims, or forgoing the benefit of grant funds—paid for (at least partially) through local federal taxes—that are necessary for crucial local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

624.    Nor is the heightened FCA risk merely hypothetical. A May 19, 2025 letter from Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws." The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 158

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

as with other federal agencies that enforce civil rights requirements for federal funding recipients" (including HUD) and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions." Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action." Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025) ("Blanche Letter"), https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=gov delivery.

625.    Withholding HUD grants from HUD Plaintiffs could result loss of access to housing and crucial housing and other services for millions of residents. For example, withholding HUD block grants from HUD Plaintiffs would jeopardize affordable housing development and preservation efforts. Many of HUD Plaintiffs' residents would lose access to essential services, including food assistance, mental health services, transitional housing, housing repair, housing access, early education, and senior wellness programs. Loss of this funding would also destabilize budgeting and strategic plans, including multi-year plans, built around federal funding assumptions. The loss of these funds would ripple through local economies affecting jobs, contractor revenues, and long-term community development outcomes such as access to food, basic services, and homeownership and housing stability. Subrecipients of these funds such as food banks, mental health providers, senior centers, and affordable housing agencies could face operational disruptions and be unable to meet the needs of low-income families

626.    Withholding CoC grants from CoC Plaintiffs in particular, could result in a loss of

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 159

hundreds of millions of dollars in funding for housing and other services that those plaintiffs have adopted to meet the basic needs of their homeless residents. It would result in those plaintiffs being unable to serve their residents resulting in the loss of access to housing, healthcare, counseling, and other assistance. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for homelessness services, would have devastating effects on their residents and communities more broadly.

627. Withholding DOT grants from DOT Plaintiffs would result in loss of billions of dollars in funding for critical services and projects for their residents. For example:

a. Withholding FTA grants from plaintiffs who rely on those funds could result in loss of funding for public transit services, including capital projects, maintenance, and improvements, that will result in long-lasting harm to those plaintiffs' finances and delays to or elimination of critical transit projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for public transit services, would threaten transit improvements and safety initiatives and have severe negative impacts on these services.

b. Withholding FHWA grants from plaintiffs who rely on those funds could result in loss of funding for street and roadway improvements, including enhancing pedestrian safety, reconfiguring major roadways to decrease crashes and improve transit, and building bike lanes, that will result in long-lasting harm to those plaintiffs' finances, delays to or elimination of critical infrastructure and safety projects, and diversion of funds from other crucial local projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for street and roadway projects, would threaten roadway improvement and safety

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 160

initiates and have severe negative impacts on these projects.

c.  Withholding FAA grants from plaintiffs who rely on those funds could result in a loss of funding for airport projects—including development and improvement of runways, taxiways, terminals, and roadways as well as airport transit, safety, and sustainability projects—that will result in long-lasting harm to those plaintiffs' finances, delays to or elimination of critical airport infrastructure and safety projects, and diversion of funds from other crucial airport improvement projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for airport development and infrastructure projects, would threaten airport improvement and safety initiatives and have severe negative impacts on these critical projects.

d.  Withholding FRA grants from plaintiffs who rely on those funds could result in a loss of funding for rail infrastructure projects, including for railroad crossing projects that seek to improve the safety and mobility of people and goods, that will result in long-lasting harm to those plaintiffs' finances and delays to or elimination of railway infrastructure and safety projects. The loss of this funding, which represents a significant percentage of those plaintiffs' total budgets for railroad projects, would threaten rail-related safety initiatives and have severe negative impacts on these projects.

e.  Withholding DOT SMART grants from plaintiffs who rely on those funds could result in a loss of funding for advanced smart community technologies and systems projects, including projects using advanced technology and data methods to improve transportation efficiency and safety. This will result in delays or

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 161

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

elimination of the planned projects, leading to continued and likely worsened inefficiencies, safety risks, and deterioration of air quality. The loss of this funding would threaten these transportation technology and modernization initiatives and have severe negative impacts on these projects.

628.    Withholding HHS grants from the HHS Plaintiffs would threaten or eliminate critical individual and public health services for millions of residents. Loss of funding could decimate public health budges and cause residents, including those most vulnerable, to lose access to meals, medical care, housing and lifesaving social safety net services. Loss of funding could also devastate local public health and child welfare agencies, who may be forced to conduct significant layoffs and operational reductions.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
### *(All Grant Conditions)*

629.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

630.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

631.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 162

632.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

633.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

634.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

635.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq.* The President has not done so.

636.    Congress has not conditioned the provision of HUD grants, DOT grants, or HHS grants on compliance with a prohibition on all forms of DEI policies and initiatives, nor on

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 163

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, and/or cutting off access to information about lawful abortions. Nor has Congress delegated to Defendants the authority to attach the HUD Grant Conditions, the DOT Grant Conditions, or the HHS Grant Conditions unilaterally.

637.    By imposing the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

638.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

639.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

640.    For these reasons, HUD and its program offices' conditioning of HUD grants on compliance with the HUD Grant Conditions violates the separation of powers doctrine.

641.    For the same reasons, DOT Defendants' conditioning of DOT grants on compliance with the DOT Grant Conditions violates the separation of powers doctrine.

642.    For the same reasons, HHS and its operating divisions and agencies' conditioning of HHS grants on compliance with the HHS Grant Conditions violates the separation of powers doctrine.

### Count 2: Spending Clause
### *(All Grant Conditions)*

643.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 164

644.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

645.    As described above, Defendants violate the separation of powers because the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause as well.

646.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

647.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

648.    Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* at 210.

649.    Even if Congress had delegated authority to the Executive and HUD to condition HUD grant funding on terms prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions, the HUD Grant Conditions would violate the Spending Clause by:

    a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 165

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

b.  imposing conditions that are so severe as to be coercive;

c.  imposing conditions that are not germane to the stated purpose of HUD program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

d.  with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require HUD grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id.* at 210.

650.    Similarly, even if Congress had delegated authority to the Executive or DOT Defendants to condition transportation, mass transit, highway, airport, and railroad funding on recipients' agreement to terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration or enforcement of federal immigration laws, the DOT Grant Conditions would violate the Spending Clause by imposing ambiguous grant conditions and imposing conditions not germane to the purposes of the statutes that authorize the DOT grant programs.

651.    Similarly, even if Congress had delegated authority to the Executive or HHS to condition HHS grant funding on recipients' agreement to terms prohibiting the advancement or promotion of DEI or gender ideology as conceived by the Administration, the HHS Grant Conditions would violate the Spending Clause by imposing ambiguous grant conditions, imposing conditions that are so severe as to be coercive, imposing conditions not germane to the purposes of the statutes that authorize the HHS grant programs, and, to the extent HHS and/or its operating divisions and agencies impose a prohibition on promoting "gender ideology," imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 166

## Count 3: Tenth Amendment
### *(All Grant Conditions)*

652.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

653.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

654.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012). States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 578.

655.    Even if Congress had delegated authority to the Executive or DOT Defendants to condition transportation, mass transit, highway, airport, and railroad funding on a prohibition on any policy that "promotes" the Administration's conception of an "illegal" DEI program or on participation in the Administration's aggressive enforcement of federal immigration laws, the DOT Grant Conditions would violate the Tenth Amendment by imposing conditions so severe as to coerce plaintiffs receiving such funds to adopt the Administration's reinterpretation of the law. *See id*. at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

656.    Further, even if Congress had delegated authority to the Executive or HUD to condition housing and development funding on a prohibition on any policy that the advances DEI as conceived by the Administration, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion," the HUD Grant Conditions would violate the Tenth Amendment by imposing conditions so severe

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 167

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

as to coerce plaintiffs receiving such funds to adopt the Administration's reinterpretation of the law. *See id.* at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

657.    Moreover, even if Congress had delegated authority to the Executive or HHS to condition health care and human services funding on denying services to immigrants or prohibiting any policy that advances DEI or gender ideology as conceived by the Administration, the HHS Grant Conditions would violate the Tenth Amendment by imposing conditions so severe as to coerce plaintiffs receiving such funds to adopt the Administration's reinterpretation of the law. *See id.* at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

### Count 4: Fifth Amendment Due Process (Vagueness)
*(All Grant Conditions)*

658.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

659.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

660.    The HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions are unconstitutionally vague.

661.    Initially, each of the EO Conditions is vague in purporting to incorporate all executive orders. Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients. The purported incorporation of all executive orders into the recipient or sponsor's use of grant funds renders the other new grant conditions vague.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 168

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

662.    Each of the Discrimination Conditions fails to make clear what conduct is prohibited and fails to specify clear standards for enforcement. This uncertainty is amplified by agency letters and statements, including the Duffy Letter, the Turner statements, HHS's policy guidance and the Kennedy statements, and the Blanche Letter, that are at odds with case law and statutes.

663.    Each of the HUD Enforcement Conditions (which incorporate by reference the Immigration Order) fails to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

664.    Similarly, each of the DOT Enforcement Conditions fails to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

665.    Similarly, the FAA Termination Condition does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure, leaving federal grant recipients without fair notice of what would trigger termination of their grants.

666.    The definition of "gender ideology" adopted in each of the Gender Ideology Conditions is so vague as to require people of ordinary intelligence to guess as to what is prohibited. By the same token, each of the Gender Ideology Conditions affords unfettered discretion to HUD, CPD, and HRSA (as well as any other HHS operating division or agency that may follow suit) to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

667.    The meaning of the phrase "promote elective abortion" is also vague, leaving

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

federal grant recipients without fair notice of what activities would violate the prohibition and affording HUD and other agencies unfettered discretion.

668.    The vagueness with which the terms and conditions identified above define the conduct they prohibit is likely to chill First Amendment protected expression on matters of public concern.

669.    Thus, the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious
### *(All Grant Conditions)*

670.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

671.    Defendants HUD, DOT, the DOT OAs (the FTA, the FHWA, the FAA, and the FRA), and HHS are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). Additionally, the CoC Grant Agreements, the HUD Certifications, the Fernandez Letter, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, the 2025 FRA General Terms and Conditions, the 2025 DOT SMART General Terms and Conditions, the 2025 HHS GPS, and the updated CDC, SAMHSA, ACF, and HRSA general terms and conditions are all agency actions subject to review under the APA.

672.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

673.    The CoC Grant Agreements are final agency actions of HUD because they reflect

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal CoC funds. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

674.    Similarly, the Fernandez Letter and HUD Certifications are final agency actions of HUD because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal CPD funds.

675.    Similarly, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, the 2025 FRA General Terms and Conditions, and the 2025 DOT SMART General Terms and Conditions are final agency actions of DOT because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal DOT funds.

676.    Similarly, the 2025 HHS GPS and the updated CDC, SAMHSA, ACF, and HRSA general terms and conditions are final agency actions of HHS because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal HHS funds.

677.    These actions determine rights and obligations and produce legal consequences

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 171

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

678.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

679.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

680.    HUD has provided no reasoned explanation for its decision to impose conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on HUD funds that have no connection to those issues.

681.    HUD has provided no reasoned basis for withholding funds Congress appropriated for disbursement, except to the extent the CoC Grant Agreements, the HUD Certifications, and Fernandez Letter make clear HUD is enacting the President's policy desires, as expressed in Executive Orders 14168, 14173, 14182, and 14218, in place of Congress's intent.

682.    HUD also ignores essential aspects of the "problem" it purports to address via the CoC and CPD grant programs, including HUD Plaintiffs' reasonable and inevitable reliance on

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 172

now at-risk funds, the expectation of reimbursement from already appropriated funds, and the potential impacts on homeless individuals and families, low-income individuals and families, and other vulnerable people who may be dissuaded from accepting services if they must verify their immigration status or are unable to use their identified gender in doing so.

683.    Similarly, neither DOT nor its EOs have provided any reasoned basis for anti-DEI-related conditions to the FTA, FHWA, FAA, FRA, and SMART grants, seeking to impose the Administration's view on all policies and programs, even when they are unrelated to programs receiving such grants. Moreover, DOT and its EOs failed to explain how the DOT Plaintiffs could simultaneously comply with the each of the DOT Discrimination Conditions, while also complying with statutory, regulatory, and other requirements that are in apparent tension with those Conditions.

684.    Nor has DOT or its EOs provided a reasoned basis for imposing conditions related to "cooperation" with federal immigration enforcement on DOT funds that have no connection to that issue.

685.    The DOT and its EOs also have ignored the DOT Plaintiffs' reasonable reliance on awarded, but not yet obligated, funds and the expectation of reimbursement from already appropriated funds.

686.    Similarly, HHS has provided no reasoned explanation for its decision to impose conditions related to prohibiting all kinds of DEI on HHS funds that have no connection to that issue, nor has HHS or HRSA provided any reasoned explanation for the decision to impose conditions relating to prohibiting the promotion of "gender ideology" on HRSA funds that have no connection to that issue.

687.    HHS also has ignored the HHS Plaintiffs' reasonable reliance on awarded, but not

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 173

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

yet obligated, funds and the expectation of reimbursement from already appropriated funds.

688.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Contrary to Constitution
### *(All Grant Conditions)*

689.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

690.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

691.    As described above, the imposition by HUD, including through its program offices, of the HUD Grant Conditions violates bedrock constitutional provisions and principles including the separation of powers between the President and Congress, the Spending Clause, and the Fifth Amendment.

692.    In addition, the imposition by DOT, including through its OAs, imposition of the DOT Grant Conditions violates the separation of powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

693.    In addition, the imposition by HHS, including through its operating divisions and agencies, of the HHS Grant Conditions violates the separation of powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

694.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 174

§ 2201 that imposing the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

**Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**In Excess of Statutory Authority**
***(All Grant Conditions)***

695.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

696.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

697.    Defendants may exercise only authority granted to them by statute or the Constitution.

698.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

699.    Neither the Homeless Assistance Act, the HCD Act, the HEARTH Act, the Appropriations Act, PRWORA, nor any other legislation authorizes HUD or its program offices to impose conditions on HUD grant funding related to prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions.

700.    In addition, none of the statutes authorizing the FTA, FHWA, FAA, FRA, and SMART grants, nor the relevant appropriations acts, authorize the DOT or its OAs to impose conditions on transportation, mass transit, highway, airport, or railroad funding related to prohibiting all forms of DEI policies and initiatives or promoting aggressive and lawless

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 175

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

immigration enforcement.

701.    In addition, none of the statutes authorizing the HHS grants, nor the relevant appropriations acts, authorize HHS or its operating divisions or agencies to impose conditions on HHS grant funding related to prohibiting all forms of DEI policies and initiatives, requiring exclusion of transgender people, or denying services to immigrants.

702.    Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, DOT, HUD, and HHS attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq.*

703.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions, the DOT Grant Conditions, and the HHS Grant Conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 8: Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to Regulation
### *(CoC and CDBG Grant Conditions)*

704.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

705.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A).

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 176

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

706.    HUD's Rule implementing the CoC program provides that recipients may be required to sign grant agreements containing terms and additional conditions established by HUD beyond those specifically listed to the extent those terms and conditions are established in the applicable NOFO. 24 C.F.R. § 578.23(c)(12). The NOFO under which the CoC Plaintiffs were awarded CoC funding for FY 2024 contains no terms or conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

707.    By imposing new terms and conditions on the CoC Grant Agreements not included in the NOFO or authorized elsewhere in the Rule or any other regulations, HUD failed to comply with its own regulations governing the formation of CoC grant agreements and failed to observe procedure required by law.

708.    The CoC Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the CoC Grant Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD from imposing the CoC Grant Conditions without complying with the APA.

709.    HUD's rule implementing the CDBG program provides that "HUD *will* approve a grant if the jurisdiction's submissions have been made and approved in accordance with 24 CFR part 91 and the certifications required therein are satisfactory to the [HUD] Secretary. The certifications will be satisfactory to the Secretary for this purpose unless the Secretary has determined pursuant to subpart O of this part that the grantee has not complied with the requirements of this part, has failed to carry out its consolidated plan as provided under § 570.903,

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 177

or has determined that there is evidence, not directly involving the grantee's past performance under this program, that tends to challenge in a substantial manner the grantee's certification of future performance." 24 C.F.R. § 570.304. Nothing in the certifications required under 24 CFR part 91 relate to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

710.    By imposing new terms and conditions on the CDBG grants not included in 24 C.F.R. part 91 or authorized elsewhere in any regulations, HUD failed to comply with its own regulations governing the formation of CDBG grant agreements and failed to observe procedure required by law.

711.    The HUD Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 24 C.F.R. § 570.304 that imposing the CPD Grant Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD from imposing the CPD Grant Conditions as to CDBG grants without complying with the APA.

**Count 9: Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Without Procedure Required By Law**
*(FTA, FAA, FRA, and HUD Grant Conditions)*

712.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

713.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

714.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 178

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Rels. Auth.*, 495 U.S. 641, 654 (1990).

715.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

716.    The FTA is subject to statutory notice-and-comment requirements for certain statements pertaining to grants issued under title 49, chapter 53 of the U.S. Code (including the FTA Grants). Specifically, "[t]he Administrator of the [FTA] shall follow applicable rulemaking procedures under section 553 of title 5 before the [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance under this chapter." 49 U.S.C. § 5334(k)(1). For this purpose, "binding obligation" means "a substantive policy statement, rule, or guidance document issued by the [FTA] that grants rights, imposes obligations, produces significant effects on private interests, or effects a significant change in existing policy." *Id.* § 5334(k)(2).

717.    The FTA, the FAA, and the FRA have also adopted regulations requiring those agencies to proceed by notice-and-comment rulemaking when they promulgate substantive rules. *See* 49 C.F.R. §§ 601.22(a), 601.24–601.28 (FTA); 14 C.F.R. Part 11 (FAA); 49 C.F.R. §§ 211.11–211.33 (FRA).

718.    Through the HUD Grant conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 179

grant agreements that require grant recipients to comply with various Administration directives as a condition to receiving federal HUD funds. These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy. *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules . . . create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

719.    In imposing the HUD Grant Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

720.    Through the FTA Grant Conditions, the FAA Grant Conditions, and the FRA Grant Conditions, the FTA, the FAA, and the FRA have not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new terms and conditions to FTA, FAA, and FRA Grants that require grant recipients to comply with various Administration directives as a condition to receiving federal transit, airport, and railroad funds, which are substantive policy statements, rules, or guidance documents that impose obligations or effect significant changes in existing policy, not interpretive rules or general statements of policy.

721.    In imposing the FTA Grant Conditions, the FTA failed to comply with the notice-and-comment requirements set forth in 49 U.S.C. § 5334(k)(1) and its own regulations, and thus failed to observe procedure required by law.

722.    In imposing the FAA Grant Conditions, the FAA failed to comply with the notice-

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 180

and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

723.    In imposing the FRA Grant Conditions, the FRA failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

724.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions, the FTA Grant Conditions, the FAA Grant Conditions, and the FRA Grant Conditions violates the APA because it is without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## VI.    PRAYER FOR RELIEF

WHEREFORE, HUD Plaintiffs request the following relief:

A.    A declaration that the HUD Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.    A preliminary and permanent injunction enjoining HUD and its program offices from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions to any HUD applications or action plans (including both annual action plans and grant-specific action plans) submitted by, or HUD funds received by or awarded to, directly or indirectly, HUD Plaintiffs or, with respect to CoC grants, members of CoC Plaintiffs' Continuums; and

WHEREFORE, DOT Plaintiffs request the following relief:

C.    A declaration that the DOT Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 181

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

D.      A preliminary and permanent injunction enjoining DOT Defendants from imposing or enforcing the DOT Grant Conditions or any materially similar terms or conditions to any DOT applications submitted by, or DOT funds received by or awarded to, directly or indirectly, DOT Plaintiffs; and

WHEREFORE, HHS Plaintiffs request the following relief:

E.      A declaration that the HHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

F.      A preliminary and permanent injunction enjoining HHS from imposing or enforcing the HHS Grant Conditions or any materially similar terms or conditions to any HHS applications submitted by, or HHS funds received by or awarded to, directly or indirectly, HHS Plaintiffs by HHS or any HHS operating administration; and

WHEREFORE, all Plaintiffs request the following additional relief:

G.      Award Plaintiffs their reasonable costs and attorneys' fees; and

H.      Grant any other further relief that the Court deems fit and proper.

DATED this 10th day of July, 2025.

PACIFICA LAW GROUP LLP

*/s/ Paul J. Lawrence*
Paul J. Lawrence, WSBA #13557
Jamie Lisagor, WSBA #39946
Sarah S. Washburn, WSBA #44418
Meha Goyal, WSBA #56058
Galen Knowles, WSBA #59644
Luther Reed-Caulkins, WSBA #62513
*Special Deputy Prosecutors*

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 182

Seattle, WA 98101
Tel: (206) 245-1700
Fax: (206) 245-1750
Paul.Lawrence@PacificaLawGroup.com
Jamie.Lisagor@PacificaLawGroup.com
Sarah.Washburn@PacificaLawGroup.com
Meha.Goyal@PacificaLawGroup.com
Galen.Knowles@PacificaLawGroup.com
Luther.Reed-Caulkins@PacificaLawGroup.com

*Attorneys for All Plaintiffs*


LEESA MANION
King County Prosecuting Attorney

*/s/ David J. Hackett*
David J. Hackett, WSBA #21234
*General Counsel to Executive*
Alison Holcomb, WSBA #23303
*Deputy General Counsel to Executive*
Erin Overbey, WSBA #21907
*Senior Deputy Prosecuting Attorney*
Cristy Craig, WSBA #27451
*Senior Deputy Prosecuting Attorney*
Donna Bond, WSBA #36177
*Senior Deputy Prosecuting Attorney*

Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov
aholcomb@kingcounty.gov
eroverbey@kingcounty.gov
cristy.craig@kingcounty.gov
donna.bond@kingcounty.gov

*Attorneys for Plaintiffs Martin Luther King, Jr. County*


JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

*/s/ Bridget E. Casey*
Bridget E. Casey, WSBA #30459

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 183

Rebecca J. Guadamud, WSBA #39718
Rebecca E. Wendling, WSBA #35887

Snohomish County Prosecuting Attorney's Office
3000 Rockefeller Avenue, M/S 504
Everett, WA 98201-4046
(425) 388-6392
Bridget.Casey@co.snohomish.wa.us
Rebecca.Guadamud@co.snohomish.wa.us
Rebecca.Wendling@co.snohomish.wa.us

*Attorneys for Plaintiff Snohomish County*


DAVID CHIU
San Francisco City Attorney

*/s/ David Chiu*
David Chiu (CA Bar No. 189542)
*San Francisco City Attorney*
Yvonne R. Meré (CA Bar No. 175394)
*Chief Deputy City Attorney*
Mollie M. Lee (CA Bar No. 251404)
*Chief of Strategic Advocacy*
Sara J. Eisenberg (CA Bar No. 269303)
*Chief of Complex & Affirmative Litigation*
Ronald H. Lee (CA Bar No. 238720)
*Assistant Chief, Complex & Affirmative Litigation*
Alexander J. Holtzman (CA Bar No. 311813)
*Deputy City Attorney*
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 554-4700
Cityattorney@sfcityatty.org
Yvonne.Mere@sfcityatty.org
Mollie.Lee@sfcityatty.org
Sara.Eisenberg@sfcityatty.org
Ronald.Lee@sfcityatty.org
Alexander.Holtzman@sfcityatty.org

*Attorneys for Plaintiffs City and County of San Francisco, San Francisco County Transportation Authority, and Treasure Island Mobility Management Agency*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 184

1

2       OFFICE OF THE COUNTY COUNSEL,
      COUNTY OF SANTA CLARA

3

4       */s/ Tony LoPresti*
      Tony LoPresti (CA Bar No. 289269)

5       *County Counsel*
      Kavita Narayan (CA Bar No. 264191)

6       *Chief Assistant County Counsel*
      Meredith A. Johnson (CA Bar No. 291018)

7       *Lead Deputy County Counsel*
      Stefanie L. Wilson (CA Bar No. 314899)

8       Cara H. Sandberg (CA Bar No. 291058)

9       *Deputy County Counsels*
      70 West Hedding Street

10       East Wing, 9th Floor

11       San José, CA 95110
      (408) 299-9021

12       tony.lopresti@cco.sccgov.org

13       kavita.narayan@cco.sccgov.org
      meredith.johnson@cco.sccgov.org

14       stefanie.wilson@cco.sccgov.org
      cara.sandberg@cco.sccgov.org

15

16       *Attorneys for Plaintiff County of Santa Clara*

17

18       ADAM CEDERBAUM
      Corporation Counsel, City of Boston

19       */s/ Samantha H. Fuchs*

20       Samantha H. Fuchs (MA BBO No. 708216)

21       *Senior Assistant Corporation Counsel*
      Samuel B. Dinning (MA BBO No. 704304)

22       *Senior Assistant Corporation Counsel*
      One City Hall Square, Room 615

23       Boston, MA 02201

24       (617) 635-4034
      samantha.fuchs@boston.gov

25       samuel.dinning@boston.gov

26       *Attorneys for Plaintiff City of Boston*

27

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 185

CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

*/s/ Richard N. Coglianese*
Richard N. Coglianese (OH Bar No. 0066830)
Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
Tel: (614) 645-0818
Fax: (614) 645-6949
rncoglianese@columbus.gov

*Attorney for Plaintiff City of Columbus*

PUBLIC RIGHTS PROJECT

*/s/ Sharanya Mohan*
Sharanya (Sai) Mohan (CA Bar No. 350675)
Naomi Tsu (OR Bar No. 242511)
Toby Merrill (MA Bar No. 601071)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
sai@publicrightsproject.org
naomi@publicrightsproject.org
toby@publicrightsproject.org

*Counsel for Plaintiffs City of Columbus, City
& County of Denver, Metro Government of
Nashville & Davidson County, Pima County,
County of Sonoma, City of Bend, City of
Cambridge, City of Chicago, City of Culver
City, City of Minneapolis, City of Pasadena,
City of Pittsburgh, City of Portland, City of
San José, City of Santa Monica, City of
Tucson, City of Wilsonville, Santa Monica
Housing Authority, County of Alameda, City
of Albuquerque, Mayor and City Council of
Baltimore, City of Bellevue, City of
Bellingham, City of Bremerton, County of
Dane, City of Eugene, City of Healdsburg,
County of Hennepin, Kitsap County, City of
Los Angeles, City of Milwaukee, Milwaukee*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 186

1
2
3
4
5
6
7

*County, Multnomah County, City of Oakland, City of Pacifica, City of Petaluma, Ramsey County, City of Rochester, City of Rohnert Park, San Mateo County, City of Santa Rosa, City of Watsonville, Culver City Housing Authority, Puget Sound Regional Council, Sonoma County Transportation Authority, and Sonoma County Community Development Commission*

8    MURIEL GOODE-TRUFANT
     Corporation Counsel of the City of New York

9
10   */s/ Doris Bernhardt*
     Doris Bernhardt (NY Bar No. 4449385)
11   Joshua P. Rubin (NY Bar No. 2734051)
     Aatif Iqbal (NY Bar No. 5068515)
12   *Assistant Corporation Counsels*
     100 Church Street
13   New York, NY 10007
     (212) 356-1000
14   dbernhar@law.nyc.gov
15   jrubin@law.nyc.gov
     aiqbal@law.nyc.gov
16
17   *Attorneys for Plaintiff City of New York*

18
19   ASHLEY M. KELLIHER
     Assistant City Attorney
20
     */s/ Ashley M. Kelliher*
21   Ashley M. Kelliher (CO Bar No. 40220)
22   *Assistant City Attorney*
     Denver City Attorney's Office
23   201 West Colfax Avenue
     Denver, Colorado 80202
24   Tel: (720) 913-3137
     Fax: (720) 913-3190
25   ashley.kelliher@denvergov.org
26
27

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 187

1    DAVID P. STEINBERGER
     Assistant City Attorney
2
     */s/ David P. Steinberger*
3    David P. Steinberger (CO Bar No. 48530)
4    *Assistant City Attorney*
     Denver City Attorney's Office
5    Denver International Airport
     8500 Pena Boulevard
6    Airport Office Building, 9th Floor
     Denver, Colorado 80249-6340
7    Tel: (303) 342-2562
8    david.steinberger@flydenver.com

9    *Attorneys for Plaintiff City and County of Denver*

10   LAURA CONOVER
11   Pima County Attorney

12   */s/ Bobby Yu*
13   Samuel E. Brown (AZ Bar No. 027474)
     Bobby Yu (AZ Bar No. 031237)
14   Kyle Johnson (AZ Bar No. 032908)
     Pima County Attorney's Office, Civil Division
15   32 N. Stone, Suite 2100
     Tucson, Arizona 85701
16   (520) 724-5700
17   sam.brown@pcao.pima.gov
     bobby.yu@pcao.pima.gov
18   kyle.johnson@pcao.pima.gov

19   *Attorneys for Plaintiff Pima County*

20

21   ROBERT H. PITTMAN, County Counsel

22   */s/ Joshua A. Myers*
23   Joshua A. Myers (CA Bar No. 250988)
     *Chief Deputy County Counsel*
24   Sonoma County Counsel's Office
     575 Administration Drive, Rm. 105A
25   Santa Rosa, CA 95403
     Tel: (707) 565-2421
26   Fax: (707) 565-2624
     Joshua.Myers@sonoma-county.org
27

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 188

*Attorneys for Plaintiffs County of Sonoma,*
*Sonoma County Transportation Authority, and*
*Sonoma County Community Development*
*Commission*

OFFICE OF THE CITY ATTORNEY FOR THE
CITY OF BEND

*/s/ Ian M. Leitheiser*
Ian M. Leitheiser (OSB #993106)
*City Attorney*
Elizabeth Oshel (OSB #104705)
*Senior Assistant City Attorney*
Michael J. Gaffney (OSB #251680)
*Senior Assistant City Attorney*
City of Bend
PO Box 431
Bend, OR 97709
(541) 693-2128
ileitheiser@bendoregon.gov
eoshel@bendoregon.gov
mgaffney@bendoregon.gov

*Attorneys for Plaintiff City of Bend*

CITY OF CAMBRIDGE, LAW DEPARTMENT
MEGAN B. BAYER, CITY SOLICITOR

*/s/ Megan B. Bayer*
Megan B. Bayer (MA BBO No. 669494)
*City Solicitor*
Elliott J. Veloso (MA BBO No. 677292)
*Deputy City Solicitor*
Diane Pires (MA BBO No. 681713)
*Assistant City Solicitor*
Cambridge City Hall, 3rd Floor
795 Massachusetts Avenue
Cambridge, MA 02139
(617) 349-4121
mbayer@cambridgema.gov
eveloso@cambridgema.gov
dpires@cambridgema.gov

*Attorneys for Plaintiff City of Cambridge*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 189

1

2      MARY B. RICHARDSON-LOWRY
       Corporation Counsel of the City of Chicago
3

4      */s/ Rebecca Hirsch*
       Rebecca Hirsch (IL Bar No. 6279592)
5      Chelsey Metcalf (IL Bar No. 6337233)
       City of Chicago Department of Law
6      121 North LaSalle Street, Room 600
       Chicago, Illinois 60602
7      (313) 744-9484
       rebecca.hirsch2@cityofchicago.org
8      chelsey.metcalf@cityofchicago.org
9
10     *Attorneys for Plaintiff City of Chicago*

11     KRISTYN ANDERSON
       City Attorney
12

13     */s/ Kristyn Anderson*
       Kristyn Anderson (MN Lic. 0267752)
14     *City Attorney*
       Sara J. Lathrop (MN Lic. 0310232)
15     Munazza Humayun (MN Lic. 0390788)
       *Assistant City Attorneys*
16     350 South Fifth Street
17     Minneapolis, MN 55415
       (612) 673-3000
18     kristyn.anderson@minneapolismn.gov
19     sara.lathrop@minneapolismn.gov
       munazza.humayun@minneapolismn.gov
20

21     *Attorneys for Plaintiff City of Minneapolis*
       KRYSIA KUBIAK, Esq.
22     City Solicitor

23     */s/ Julie E. Koren*
       Julie E. Koren (PA Bar No. 309642)
24     *Associate City Solicitor*
       City of Pittsburgh, Dept. of Law
25     313 City-County Building
       414 Grant Street
26     Pittsburgh, PA 15219

27     SECOND AMENDED COMPLAINT FOR
       DECLARATORY JUDGMENT AND
       INJUNCTIVE RELIEF - 190

(412) 255-2025
Julie.Koren@pittsburghpa.gov
Krysia.Kubiak@Pittsburghpa.gov

*Counsel for Plaintiff City of Pittsburgh*

ROBERT TAYLOR
Portland City Attorney

*/s/ Caroline Turco*
Caroline Turco (OR Bar No. 083813)
*Senior Deputy City Attorney*
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov

*Attorney for Plaintiff City of Portland*

NORA FRIMANN
City Attorney

*/s/ Nora Frimann*
Nora Frimann (CA Bar No. 93249)
*City Attorney*
Elisa Tolentino (CA Bar No. 245962)
*Chief Deputy City Attorney*
200 E Santa Clara St
San José, CA 95113-1905
Tel: (408) 535-1900
Fax: (408) 998-3131
cao.main@sanjoseca.gov

*Attorneys for Plaintiff City of San José*

CITY OF WILSONVILLE

*/s/ Amanda R. Guile-Hinman*
Amanda R. Guile-Hinman, WSBA #46282
29799 SW Town Center Loop E
Wilsonville, OR 97070

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 191

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(503) 570-1509
guile@wilsonvilleoregon.gov

*Attorneys for the City of Wilsonville*

CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY

*/s/ Andrés Muñoz*
Andrés Muñoz, WSBA #50224
Desmond Brown, WSBA #16232

Central Puget Sound Regional Transit Authority
401 S. Jackson St.
Seattle, WA 98104
(206) 665-8989
andres.munoz@soundtransit.org
desmond.brown@soundtransit.org

*Attorneys for the Central Puget Sound Regional
Transit Authority*

LAW, LYMAN, DANIEL, KAMERRER
& BOGDANOVICH, P.S.

*/s/ Jeffrey S. Myers*
Jeffrey S. Myers, WSBA #16390
Erin L. Hillier, WSBA #42883
Jakub Kocztorz, WSBA #61393

P.O. Box 11880
Olympia, WA 98508
Tel: (360) 754-3480
Fax: (360) 357-3511
jmyers@lldkb.com
ehillier@lldkb.com
jkocztorz@lldkb.com

*Attorneys for Plaintiff Intercity Transit*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 192

ANDERSON & KREIGER LLP

*/s/ Melissa C. Allison*
Melissa C. Allison (MA Bar No. 657470)
David S. Mackey (MA Bar No. 542277)
Christina S. Marshall (MA Bar No. 688348)
Anderson & Kreiger LLP
50 Milk Street, Floor 21
Boston, MA 02109
(617) 621-6500
mallison@andersonkreiger.com
dmackey@andersonkreiger.com
cmarshall@andersonkreiger.com

*Attorneys for Plaintiffs Port of Seattle and Milwaukee County*


KING COUNTY REGIONAL HOMELESSNESS AUTHORITY

*/s/ Edmund Witter*
Edmund Witter, WSBA #52339
King County Regional Homelessness Authority
400 Yesler Way Suite 600
Seattle, WA 98104
(206) 639-7013
Edmund.witter@kcrha.org

*Attorneys for Plaintiff King County Regional Homelessness Authority*


OFFICE OF THE COUNTY COUNSEL, COUNTY OF ALAMEDA

*/s/ Donna R. Ziegler*
Donna R. Ziegler (CA Bar No. 142415)*
County Counsel
K. Scott Dickey (CA Bar No. 184251)*
Assistant County Counsel
Jason M. Allen (CA Bar No. 284432)*
Senior Deputy County Counsel

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 193

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Office of County Counsel, County of Alameda
1221 Oak Street, Suite 450
Oakland, California 94612
(510) 272-6700
donna.ziegler@acgov.org
scott.dickey@acgov.org
jason.allen@acgov.org

*Attorneys for Plaintiff County of Alameda*


CITY OF ALBUQUERQUE

*/s/ Lauren Keefe*
Lauren Keefe, City Attorney (NM Lic. 14664)*
Devon P. King, Deputy City Attorney (NM Lic. 148108)*
One Civic Plaza NW
P.O. Box 2248
Albuquerque, NM 87103
(505) 768-4500
lkeefe@cabq.gov
dking@cabq.gov

*Attorneys for Plaintiff City of Albuquerque*


CITY OF BELLEVUE
OFFICE OF THE CITY ATTORNEY
Trisna Tanus, City Attorney

*/s/ Trisna Tanus*
Trisna Tanus, WSBA #46568

*/s/ Chad R. Barnes*
Chad R. Barnes, WSBA #30480

*/s/ Katherine B. White*
Katherine B. White, WSBA #46649

City of Bellevue
450 110th Avenue N.E.
P.O. Box 90012
Bellevue, WA 98009
Tel: (425) 452-2061

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 194

Fax: (425) 452-7256
ttanus@bellevuewa.gov
cbarnes@bellevuewa.gov
kbwhite@bellevuewa.gov

*Attorneys for Plaintiff City of Bellevue*

CITY OF BELLINGHAM

*/s/ Sarah W. Chaplin*
Sarah W. Chaplin, WSBA #51642
Senior Assistant City Attorney
City of Bellingham
210 Lottie Street
Bellingham, WA 98225
Tel: (360) 778-8270
Fax: (360) 778-8271
swchaplin@cob.org

*Attorneys for Plaintiff City of Bellingham*

BREMERTON CITY ATTORNEY

*/s/ Kylie J. Finnell*
Kylie J. Finnell, WSBA #34997
Bremerton City Attorney

*/s/ Brett Jette*
Brett Jette, WSBA #47903
Bremerton Assistant City Attorney

345 6th Street, Suite 100
Bremerton, WA 98337
Tel: (360) 473-2345
Fax: (360) 473-5161
legal@ci.bremerton.wa.us

*Attorneys for Plaintiff City of Bremerton*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 195

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

OFFICE OF THE CORPORATION COUNSEL
FOR DANE COUNTY

*/s/ Carlos A. Pabellon*
Carlos A. Pabellon (WI State Bar No. 1046945)*
*Corporation Counsel*
David R. Gault (WI State Bar No. 1016374)*
*Deputy Corporation Counsel*
County of Dane
City-County Building, Room 419
210 Martin Luther King, Jr. Blvd.
Madison, WI 53703
(608) 266-4355
pabellon.carlos@danecounty.gov
gault@danecounty.gov

*Attorneys for Plaintiff County of Dane*


CITY OF EUGENE

*/s/ Mark Kannen*
Mark Kannen (OSB 120999)*
*Assistant City Attorney*
Kathryn P. Brotherton (OSB 981530)*
*City Attorney*
City of Eugene
Eugene City Attorney's Office
500 E 4th Ave., Ste 301
Eugene, OR 97401
(541) 682-8447
mark.r.kannen@ci.eugene.or.us
kathryn.brotherton@ci.eugene.or.us

*Attorneys for Plaintiff City of Eugene*


BURKE, WILLIAMS & SORENSEN, LLP

*/s/ Samantha W. Zutler*
Samantha W. Zutler (CA Bar No. 238514)*
Eileen L. Ollivier (CA Bar No. 345880)*
BURKE, WILLIAMS & SORENSEN, LLP
1 California Street, Suite 3050
San Francisco, CA 94111-5432

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 196

Tel: (415) 655-8100
Fax: (415) 655-8099
szutler@bwslaw.com
eollivier@bwslaw.com

*Attorney for Plaintiffs City of Healdsburg and City of Watsonville*

/s/ Michelle Marchetta Kenyon
Michelle Marchetta Kenyon (CA Bar No. 127969)*
City Attorney
Eileen L. Ollivier (CA Bar No. 345880)*
BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650
Oakland, California 94612-3520
Tel: (510) 273-8780
Fax: (510) 839-9104
mkenyon@bwslaw.com
eollivier@bwslaw.com

*Attorneys for Plaintiffs City of Pacifica and City of Rohnert Park*

MARY F. MORIARTY
Hennepin County Attorney

/s/ Rebecca Holschuh
Rebecca L.S. Holschuh (MN Bar No. 0392251)*
Brittany K. McCormick (MN Bar No. 0395175)*
Assistant County Attorneys
300 South Sixth Street
Minneapolis, MN 55487
(612) 348-4797
Rebecca.Holschuh@hennepin.us
Brittany.McCormick@hennepin.us

*Attorneys for Plaintiff County of Hennepin*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 197

KITSAP COUNTY

*/s/ Kyla S. Bond*
Kyla S. Bond, WSBA #48309
Senior Deputy Prosecuting Attorney, Civil Division
Kitsap County Prosecuting Attorney's Office
614 Division Street, MS-35A
Port Orchard, WA 98366
(360) 337-4512
kbond@kitsap.gov

*Attorney for Plaintiff Kitsap County*


HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

*/s/ Michael J. Dundas*
Michael J. Dundas (CA Bar No. 226930)*
Adrienne S. Khorasanee (CA Bar No. 227704)*
Joshua M. Templet  (CA Bar No. 267098)*
Office of the Los Angeles City Attorney
200 North Main Street, Room 800
Los Angeles, California 90012
(213) 978-8100
mike.dundas@lacity.org
adrienne.khorasanee@lacity.org
joshua.templet@lacity.org

*Attorneys for Plaintiff City of Los Angeles*


MULTNOMAH COUNTY

*/s/ B. Andrew Jones*
B. Andrew Jones (OSB No. 091786)*
Deputy County Attorney
Multnomah County Attorney's Office
501 SE Hawthorne Blvd, Suite 500
Portland, OR, 97214
Tel: (503) 988-3138
Fax: (503) 988-3377
andy.jones@multco.us

*Attorneys for Plaintiff Multnomah County*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 198

1

2

CITY OF OAKLAND

3

*/s/ Ryan Richardson*
Ryan Richardson (CA Bar No. 223548)*

4

City Attorney
Maria Bee (CA Bar No. 167716)*

5

Chief Assistant City Attorney
Jaime Huling Delaye (CA Bar No. 270784)*

6

Supervising City Attorney
H. Luke Edwards (CA Bar No. 313756)*

7

Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor

8

Oakland, California 94612

9

Tel: (510) 238-3836
Fax: (510) 238-6500

10

ledwards@oaklandcityattorney.org

11

*Attorneys for Plaintiff City of Oakland*

12

13

CITY OF PETALUMA

14

*/s/ Eric Danly*

15

Eric Danly (CA Bar No. 201621)*
City Attorney

16

City of Petaluma
Petaluma City Hall

17

11 English Street
Petaluma, CA 94952

18

(707) 778-4402
EDanly@cityofpetaluma.org

19

20

*Attorney for Plaintiff City of Petaluma*

21

22

JOHN J. CHOI
RAMSEY COUNTY ATTORNEY

23

*/s/ Bradley Cousins*

24

Bradley Cousins (MN Bar No. 0400463)*
Stacey D'Andrea (MN Bar No. 0388320)*

25

Jada Lewis (MN Bar No. 0391287)*
Assistant Ramsey County Attorneys

26

360 Wabasha St. N., Suite 100

27

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 199

Saint Paul, MN 55102
(651) 266-3081 (Cousins)
(651) 266-3051 (D'Andrea)
(651) 266-3149 (Lewis)
Bradley.cousins@co.ramsey.mn.us
Stacey.dandrea@co.ramsey.mn.us
Jada.lewis@co.ramsey.mn.us

*Attorneys for Plaintiff Ramsey County*

CITY OF ROCHESTER

*/s/ Patrick Beath*
Patrick Beath, Corporation Counsel (NY Lic.
4999751)*
30 Church Street, Room 400A
Rochester, NY 14614
(585) 428-6812
patrick.beath@cityofrochester.gov

*Attorney for Plaintiff City of Rochester*

HEATHER FERBERT
City Attorney

*/s/ Mark Ankcorn*
Mark Ankcorn (CA Bar No. 166871)*
Senior Chief Deputy City Attorney
Julie Rau (CA Bar No. 317658)*
Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
MAnkcorn@sandiego.gov
JRau@sandiego.gov

*Attorneys for Plaintiff City of San Diego*

SAN MATEO COUNTY

*/s/ John D. Nibbelin*
John D. Nibbelin (CA Bar No. 184603)*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 200

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

County Counsel
Rebecca M. Archer (CA Bar No. 202743)*
Chief Deputy Counsel
Lauren F. Carroll (CA Bar No. 333446)*
Deputy County Counsel
500 County Center, 4th Floor
Redwood City, CA 94063
(650) 363-4757
jnibbelin@smcgov.org
rmarcher@smcgov.org
lcarroll@smcgov.org

*Attorneys for Plaintiff San Mateo County*


CITY OF SANTA ROSA

*/s/ Teresa L. Stricker*
Teresa L. Stricker (CA Bar No. 160601)*
City Attorney
Autumn Luna (CA Bar No. 288506)*
Chief Assistant City Attorney
Adam S. Abel (CA Bar No. 148210)*
Assistant City Attorney
Hannah E. Ford-Stille (CA Bar No. 335113)*
Deputy City Attorney
100 Santa Rosa Ave, Room 8
Santa Rosa, CA 95404
(707) 543-3040
tstricker@srcity.org
aluna@srcity.org
aabel@srcity.org
hfordstille@srcity.org

*Attorneys for Plaintiff City of Santa Rosa*


CASCADIA LAW GROUP PLLC

*/s/ Stephen R. Parkinson*
Stephen R. Parkinson, WSBA #21111
Cascadia Law Group PLLC
1201 Third Avenue, Suite 320
Seattle, WA 98101
(206) 292-6300

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 201

sparkinson@cascadialaw.com

*Attorneys for Plaintiff Puget Sound Regional Council*

*\* Pro Hac Vice application forthcoming*

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 202

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2025, I served a true and correct copy of the Second

Amended Complaint for Declaratory and Injunctive Relief and associated Summonses on the

existing parties by the method(s) indicated below:

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

I further certify that on July 10, 2025, I served a true and correct copy of the Amended

Complaint for Declaratory and Injunctive Relief and associated Summonses on the following

parties via certified mail:

| Summons Directed To: | Summons and Amended Complaint Mailed To: |
|---|---|
| Robert F. Kennedy, Jr. in his official capacity as Secretary of the U.S. Department of Health and Human Services | Robert F. Kennedy, Jr., Secretary of Health and Human Services<br>U.S. Department Of Health And Human Services<br>c/o Office of the General Counsel<br>200 Independence Avenue, SW<br>Washington, DC 20201 |
| U.S. Department Of Health And Human Services | U.S. Department Of Health And Human Services<br>Office of the General Counsel<br>200 Independence Avenue, SW<br>Washington, DC 20201 |

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 203

PACIFICA LAW GROUP LLP
401 UNION STREET, SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

| Attorney General of the United States | Attorney General of the United States<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 |
|---|---|
| Office of the United States Attorney for the Western District of Washington | Office of the United States Attorney<br>Western District of Washington<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271 |

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 10th day of July, 2025.

/s/ Gabriela DeGregorio
Gabriela DeGregorio
Litigation Assistant
Pacifica Law Group LLP

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF - 204