THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTIN LUTHER KING, JR. COUNTY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development, et al., <br><br> Defendants. | No. 2:25-cv-00814-BJR <br><br> DECLARATION OF KARIN MCGOWAN, EXECUTIVE DIRECTOR OF DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT FOR THE CITY AND COUNTY OF DENVER |

I, KARIN MCGOWAN declare as follows:

1. I am over eighteen years of age. I have personal knowledge of the facts contained in this declaration and am otherwise competent to testify to the matters in this declaration.

2. I am the Executive Director of the City and County of Denver's Department of Environmental Health (DDPHE). In this role, I oversee approximately 322 employees and am responsible for the department's approximately $189M annual budget. I was appointed to this position in June of 2024. I have over 15 years of experience working to safeguard public health in various roles for the State of Colorado and the City and County of Denver.

3. DDPHE works to protect and improve the health of Denver's residents and ensure a safe community. Its responsibilities are wide ranging and include providing community health services, conducting public health investigations at local businesses, tracking deadly substance

DECLARATION OF KARIN MCGOWAN - 1
No. 2:25-cv-00814-BJR

use trends, and working collaboratively with city, state and community partners to conduct achieve these goals.

4. The City of Denver is Colorado's most populous city. The City of Denver is home to over 700,000 people and is the economic engine for the region. A healthy public is essential to the economic health of the City of Denver and the regional economy.

5. DDPHE has received grant funding from the Federal government for decades. Federal grant funds are embedded in DDPHE's planning and budgeting process along with the expectation that it will continue to receive federal grant funds. One source of federal funding is the Ryan White HIV/AIDS Program Grants, administered by the Health Resources and Services Administration (HRSA), within the Department of Health and Human Services (DHHS).

6. The federal Ryan White Comprehensive AIDS Resources Emergency Act was enacted to provide care and support services to individuals and families living with HIV/AIDS. Under "Part A" of the Program, funds are distributed to Eligible Metropolitan Areas ("EMAs") and Transitional Grant Areas ("TGAs")—population centers that are the most severely affected by the HIV/AIDS epidemic—to develop coordinated delivery service systems of care for persons living with HIV/AIDS. *See* 42 U.S.C. §§ 300ff-11, -13, & -19. Part A Program grants are awarded to the city or county within the eligible area that provides outpatient and ambulatory services to the greatest number of individuals with HIV/AIDS. *See* 42 U.S.C. §300ff-12(a)(1).

7. The Denver Metropolitan Statistical Area, which includes five other counties and their municipalities, has been designated a Transitional Grant Area ("TGA") under the Ryan White program by HRSA/DHHS because it has had between 1,000 and 1,999 AIDS cases in the most recent five years. This elevated incidence of AIDS cases makes the Denver TGA eligible to apply for Ryan White Part A grants.

DECLARATION OF KARIN MCGOWAN - 2
No. 2:25-cv-00814-BJR

8. The City and County of Denver serves as the lead agency for the Denver TGA. This means that Denver is responsible for creating a Planning Body that develops a comprehensive HIV service system for the entire Denver TGA, and distributing subawards of these funds to various service providers. Through this process, the City and County of Denver ensures that core medical services and support services are available to people living with HIV. These services include outpatient ambulatory health services, early intervention services, and behavioral health services including substance abuse outpatient care. These services are necessary and vital to ensure that HIV's spread is contained in the Denver Metropolitan Area.

9. DDPHE has received funding under the Ryan White program since 1994. Since 2022, DDPHE has received over $7M in Ryan White Part A grants each year. The programs funded with these grants provide essential medical and supportive services to Denver area residents living with HIV/AIDS, helping secure healthier and more productive outcomes for those individuals and limiting further transmission in the Denver community as a whole. The cost and scale of the HIV/AIDS public health programs funded with these grants are too large to fund with only local sources. These critical public health projects will not happen without federal grant awards.

10. The Ryan White program operates on a fiscal year that runs from March 1 through the end of February of the following year. Denver typically receives a funding projection letter (Funding Letter) from HRSA/DHHS in the latter part of each calendar year advising Denver of the anticipated amount of funding for the upcoming year. The funds are actually awarded through two or more notices of award (NOA) issued during the fiscal year. Typically, Denver awards subcontracts to organizations implementing the program based on the amount stated in the Funding Letter, which allows the City and its subrecipients to plan for the full

DECLARATION OF KARIN MCGOWAN - 3
No. 2:25-cv-00814-BJR

program year and reduces administrative costs and burdens, and then amends those contracts as necessary based on the final NOA for the year.

11. For the 2025-26 fiscal year, Denver received a funding projection letter on August 1, 2024, indicating Denver's estimated anticipated funding was $4,789,218 for the total formula award and $405,742 for the Minority AIDS Initiative (MAI) award. On January 13, 2025, HRSA/DHHS issued Denver's first NOA in the amount of $1,406,203.00. That NOA incorporated HRSA's then-current General Terms and Conditions. That document incorporates by reference the HHS Grants Policy Statement.

12. On April 16, 2025, DHHS updated the HHS Grants Policy Statement (2025 Grants Policy Statement). The 2025 Grants Policy Statement states that it applies to all new awards and any modification of award that adds additional funding to an existing award.

13. The 2025 Grants Policy Statement added the following terms and conditions to the document:

> Additionally, recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
>
> (1) Definitions. As used in this clause –
>
>   (a) DEI means "diversity, equity, and inclusion."
>
>   (b) DEIA means "diversity, equity, inclusion, and accessibility."
>
>   (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
>
>   (d) Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.
>
>   (e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>
> (2) Grant award certification.
>
>   (a) By accepting the grant award, recipients are certifying that:

>> (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and
>
>> (ii) They do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott.
>
> (3) HHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws or engages in prohibited boycott.

14. On May 7, 2025, HRSA/DHHS issued Denver's second NOA. The second NOA provided an additional $2,068,410, bringing the total amount awarded for the fiscal year to $3,474,613.00. The second NOA also incorporates that HHS Grants Policy Statement. Because it was a modification of an award adding funds after April 16, 2025, it ostensibly incorporated the new anti-DEI language quoted in paragraph 12, imposing those conditions on Denver in the middle of a program fiscal year without any additional notice.

15. To the extent HRSA/DHHS interpret the new anti-DEI terms and conditions to broadly restrict DEI activities in ways that are not currently supported by federal anti-discrimination laws, Denver could be at risk of losing funds or not being timely reimbursed for critical services provided under the governing statutes, regulations, and terms and conditions of these grants. In the event Denver's reimbursements are delayed or withheld, Denver could be forced to carry a significant financial liability for months or even years.

16. Denver is already facing difficult budgetary decisions without the potential loss of these federal funds. Currently, Denver is facing a $50M budgetary shortfall in 2025, and a projected $200M shortfall in 2026 as a result of decreasing tax revenues due in part to inflation and national economic uncertainty. Denver has instituted a hiring freeze and Denver employees will each take furlough days in 2025 as cost-savings measure. Program cuts and eliminations as well as layoffs are likely to be necessary for 2026. The 2026 budget process is currently

underway and final decisions are not yet known, but the budget will have to be reduced.

17. If Denver's funding from the Ryan White program is wrongfully withheld or delayed, it will also contribute to the deterioration of Denver's public health. Some of the most vulnerable members of our population would be unable to access services that are essential to allowing residents living with HIV/AIDS to live healthy, safe, productive lives. This would result in worse health outcomes for these individuals, which in turn would increase public health risks throughout the Denver area by increasing the likelihood of further transmission of HIV throughout the community. Such outcomes would have an immediate and long-term negative impact on the public health and vitality of Denver and the Front Range region.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 7th day of July, 2025.

_____
Karin McGowan

DECLARATION OF KARIN MCGOWAN - 6
No. 2:25-cv-00814-BJR

# CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, I served a true and correct copy of the foregoing document on the following parties by the method(s) indicated below:

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 14th day of July, 2025.

/s/ Gabriela DeGregorio
Gabriela DeGregorio
Litigation Assistant
Pacifica Law Group LLP

CERTIFICATE OF SERVICE - 1

PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750