THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR. COUNTY, et al.,

Plaintiffs,

v.

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development, et al.,

Defendants.

No. 2:25-cv-00814

DECLARATION OF JESTIN D. JOHNSON

I, JESTIN D. JOHNSON, declare:

1. I am over the age of 18 years, am competent to testify as to the matters in this declaration, and make it based on my personal knowledge and review of relevant business records.

2. I am the City Administrator for the City of Oakland (City of Oakland). I have been in this position since 2023. I have had a long career in public service having worked as the deputy chief operating officer for the City of Atlanta, Georgia; assistant county manager for the Unified Government of Athens-Clarke County, Georgia; city manager for the City of Bisbee, Arizona; and as management assistant to the city manager for the City of Tucson, Arizona.

3. As City Administrator for the City of Oakland, I oversee the operations of most City departments, including the City's Department of Transportation (OakDOT) and the Department of Housing & Community Development (HCD). I work with the City's Finance Department, Mayor's Office, and City Council on the City's budget planning, budget priority setting, and establishment of a balanced biannual budget.

**The City of Oakland**

4. Located in the San Francisco Bay Area of Northern California, the City of Oakland is a charter city organized and existing under and by virtue of the laws of the state of California and incorporated on May 4, 1852. According to the U.S. Census Bureau, Oakland had an estimated population of 443,554 as of July 1, 2024. It ranks as approximately the 45th-largest city in the United States, and eighth-largest city in California.

5. Oakland is also a very diverse city: according to the U.S. Census Bureau, as of July 1, 2024 Oakland's population identified as 30.5% white, 28.9% Hispanic or Latino, 21.1% black, and 15.5% Asian. The same Census Bureau data notes over 11,000 veterans living in Oakland. Oakland's population is 27.1% foreign-born, with 39.9% of the population speaking a language other than English at home.

6. Oakland has over 4,000 employees, and recently adopted a total $4.2 billion budget for the two fiscal years 2025-2027. It operates a police department, fire department, sewer and stormwater systems; maintains approximately 830 miles of streets and over 130 parks; operates 18 libraries, an animal services program, and after school and Head Start programs for children; regulates the safety of buildings; and undertakes significant efforts to address homelessness and ensure the affordability of housing, amongst many other things.

7. While Oakland has much to be proud of, it also faces challenges. According to Census Bureau data, approximately 13.7% of persons in Oakland live in poverty, and Oakland's crime rates are generally higher than the national average. Oakland's 2024 "point-in-time" count estimated that 5,490 people live without permanent housing in Oakland, and for many years Oakland – like much of the San Francisco Bay Area – has faced a housing crisis. Racial segregation and poverty in Oakland were influenced by the federal government, through – among other things – policies such as "redlining," where the Home Owners' Loan Corporation, created by the New Deal, established a racially-discriminatory system of backing home loans; the exclusion of many black veterans from GI Bill benefits; and construction of U.S. interstate highways through West Oakland in a manner that destroyed many homes and cut off the predominantly African-American neighborhood from the rest of the City. The City continues to face inequities resulting, in part, from these federal actions.

**Oakland Values**

8. Oakland is committed to values of diversity, equity, and inclusion for all of its residents. The City has a department devoted to promoting these values across the City: the Department of Race and Equity. The department was established in 2016 by ordinance, Oakland Municipal Code section 2.29.170, et seq. Its mission is to "create a city where our diversity has been maintained, racial disparities have been eliminated and racial equity has been achieved." The Department's goals are to:

- Eliminate systemic causes of racial disparities in City Government,
- Promote inclusion and full participation for all residents of the City, and
- Reduce race-based disparities in our communities.

9. In furtherance of these goals, the Department of Racial Equity has conducted public education campaigns and created racial equity teams throughout departments in City government. The department has also provided tools and trainings to City staff to help advance equity.

10. Beyond the work of the Department of Racial Equity, the City performs frequent audits to ensure that it is advancing fairness and equity including in its labor agreements and in terms of the pay that its employees receive.

11. Moreover, the City pursues values of equity in management of City infrastructure. For example, the City's Capital Improvement Program (CIP), which, in fiscal years 2023-2025 was budgeted for $329 million in investments in the repair and replacement of existing City assets and delivery of new assets, such as buildings, roads, parks, traffic signals, sewers and drainage lines, uses a set of nine prioritization factors in scoring potential projects under consideration: 1) Equity, 2) Health and Safety, 3) Economy, 4) Environment, 5) Improvement, 6) Existing Conditions, 7) Shovel Ready, 8) Collaboration and 9) Required Work. The prioritization factors weigh Equity and Health and Safety as the most important factors. The City's CIP prioritization model has been recognized nationally: the City's Department of Race and Equity presented the model and its results at the White House Equitable Data roundtable on

March 24, 2023.

**Impacts of Withholding the U.S. Department of Transportation RAISE Grant**

12. OakDOT envisions, plans, builds, operates and maintains the City's transportation system. To do so, it relies in part on millions of dollars in federal funding from components of the federal DOT, such as the FHWA and FTA. Approximately 1% of OakDOT's capital budget comes from federal grants.

13. In July of 2021, OakDOT applied for funding from U.S. DOT's 2021 Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") competitively-awarded grant program. In November 2021, OakDOT was notified of a partial funding award, including $13,816,875 as a subrecipient of Caltrans for delivery of the Broadway Streetscape Improvements project, to make improvements to segments of Broadway, between 2nd Street and 11th Street and between 20th Street and Grand Avenue. The Broadway Streetscapes Improvement Project will enhance connectivity between Oakland's historic Chinatown, Old Oakland, and Jack London neighborhoods, and its San Francisco Bay waterfront.

14. Broadway is historically Oakland's "main street," and a major high-frequency transit corridor. More buses run on Broadway than on any other street in Oakland. That said, Broadway's current design leads to bus delays and unreliable travel times for transit users. Broadway is also part of Oakland's 2024 High Injury Network, meaning it is one of just 8% of streets that account for 60% of severe and fatal traffic crashes.

15. The Broadway Streetscape Improvements will enhance bus reliability and safety for all road users. Improvements include:

- Red bus-only lanes to extend the existing bus-only lanes and further improve transit access and reliability;
- Transit Signal Priority to help keep the signals green for approaching buses;
- New bus shelters, seating, and trash cans at bus stops;
- New street trees, landscaping, and public seating along the corridor;
- Pedestrian improvements such as bulb-outs, accessible curb ramps, high-visibility crosswalks, lighting, and wayfinding;

- Removal of the existing slip turn at the 6th Street and Broadway intersection. Following project construction, drivers will still be able to turn right, but with much better visibility for pedestrians;
- Fiber optic cable connectivity to improve signal coordination and enable the expansion of OAK WiFi;
- Upgrading traffic signals and provide protected left turns to increase safety;
- Repaving the road;
- Lowering the speed limit as part of a new Oakland ordinance to enhance safety.

16.     The RAISE grant is administered by the Federal Highway Administration ("FHWA") and subject to the FHWA general terms and conditions. As OakDOT is a subrecipient, the Sub-Recipient Agreement and Recipient Agreement must be signed by Caltrans and the City before being routed to FHWA for final signatures. In the fall of 2024, the City and Caltrans countersigned the Sub-Recipient Agreement and sent it to FHWA for signatures. That Sub-Recipient Agreement incorporated the 2022 FHWA general terms and conditions. FHWA did not fully execute that Sub-Recipient Agreement through countersignatures.

17.     On November 25, 2024, FHWA shared with OakDOT that under FHWA's new grant agreement execution and obligation policy, no discretionary grant agreements, including those for the RAISE grant, may be executed by FHWA unless the funds can be obligated the same day. Under that policy, the funds must already be allocated and Caltrans's request for authorization/obligation (E-76) must be approved and entered into the U.S. DOT's Financial Management Information System before the FHWA Administrator may sign any discretionary grant agreement.

18.     FHWA informed OakDOT on June 3, 2025 that OakDOT would be required to consent to new 2025 FHWA general terms and conditions as part of a newly revised Grant Agreement. A true and correct copy of the June 3, 2025 email from FHWA to OakDOT attaching the new draft Grant Agreement, new 2025 FHWA general terms and conditions, and new Exhibits to the 2025 FHWA general terms and conditions that OakDOT is being required to sign as a condition of receiving the $13.8 million in RAISE grant funds it has been awarded are

attached as **Exhibit A** that include challenged terms including the DEI and immigration terms.

19. In 2023, OakDOT began community engagement and design work on the Broadway Streetscape Improvements project. OakDOT is on schedule and concurrently working with Caltrans to submit a request for authorization/obligation (E-76) package to U.S. DOT's Financial Management Information System in July 2025. Once the E-76 is in U.S. DOT's Financial Management Information System, the only obstacle to obligating and encumbering OakDOT's $13.8 million in grant funds is OakDOT's unwillingness to agree to the new FHWA general terms and conditions and exhibits thereto. To date, no RAISE grant funds have been obligated, nor expended.

20. Currently, the legal deadline for obligating funds is September 30, 2027, and the expenditure deadline is September 30, 2032. However, in order to complete the project construction by the RAISE funding expenditure deadline and other secured non-federal funding deadlines, OakDOT needs to begin contractor procurement in August of 2025, in order to award contracts and begin the construction work in early 2026. Other secured non-federal funding for this project has a liquidation deadline of June 30, 2030. But for the need to meet federal requirements to obligate the funds, the project would be ready to advertise for construction today.

21. OakDOT cannot advertise the construction work without knowing whether the project will be partially funded by the RAISE grant and therefore subject to federal procurement guidelines. Advertising the work without knowing the certainty of the federal funding could result in a federally procured construction contract with associated federal project requirements and no federal funding or vice versa. Any changes to the construction contract may lead to delivery delays and risk of forfeiting other secured and in-progress grant funding on the project. If federal funds are secured, then the projects will be required to be federal procured. If not, then the projects without federal funding will be locally procured.

22. A failure of U.S. DOT to obligate the RAISE funds by August of 2025 will put OakDOT's ability to timely complete the Broadway Streetscape Improvements project in jeopardy. Oakland is in the midst of a budget crisis and made significant cuts to its 2025-2027

budget to address a structural deficit. The City may need to decide whether to pull away funds from another project to deliver the ready-to-construct Broadway Streetscape Improvements project or decide to indefinitely delay it.

23.     If OakDOT were to lose the $13.8 million RAISE grant federal investment in the Broadway Streetscape Improvements project, it would not only jeopardize the project's viability and risk forfeiting over $30 million in non-federal secured matching funds but would also delay urgent safety improvements along one of Oakland's high injury corridors. In particular, the funding award will impact a project that is also serving communities in the region's high and highest communities of concern. A true and correct copy of the Draft Racial Equity Impact Analysis for Public Review conducted on the anticipated impacts of the Broadway Streetscape Improvements project on Oakland's communities of concern is attached as **Exhibit B.**

24.     If the project is indefinitely delayed, its development will have used two years of staff capacity that could have been invested in other critical work.

25.     If the project is not timely completed, it will impact the City's ability to deliver on much-needed transit improvements coordinated with Alameda County Transportation Commission (Alameda CTC) and Alameda-Contra Costa Transit District (AC Transit), the region's transit provider.  The project has been coordinated that OakDOT and Alameda CTC can concurrently deliver overlapping segments of construction on Broadway, between 5th Steet and 6th Streets with OakDOT's Broadway Streetscape Improvements project and Alameda CTC's Oakland Alameda Access Improvements Project on a similar timeline to reduce construction impacts to one of Oakland's busiest commercial corridors and the critical access points to the Interstate 880 freeway and the City of Alameda via State Route 260.

**Impacts of Denying U.S. Department of Transportation Safe Streets and Roads for All Grant**

26.     Safe Streets and Roads for All (SS4A) is a competitively awarded grant program administered by U.S. DOT.

27.     In September 2024, OakDOT was awarded a $1 million SS4A grant.  Those funds have not been encumbered because the grant agreement has not yet been executed.

28.     On June 26, 2025, OakDOT also applied for an additional $5 million from the fiscal year 2025 SS4A grant program. As a requirement of applying, OakDOT was required to sign and submit forms SF-424 and SF424B. A true and correct copy of the signed form SF 424 submitted by OakDOT as part of its 2025 SS4A application is attached hereto as **Exhibit C**. A true and correct copy of the signed form SF-424B submitted by OakDOT as part of its 2025 SS4A application is attached hereto as **Exhibit D**. OakDOT has not yet been notified of any award decisions for the 2025 SS4A grant program.

29.     SS4A funds awarded to OakDOT would use SS4A funding to complete an Americans with Disabilities Act (ADA) Transition Plan in Oakland, which is a legally mandated plan under the ADA. ADA Transition Plans support safe pedestrian access for people of all ages and abilities and support the reduction of roadways fatalities, which disproportionately impact older Oaklanders and Oaklanders with disabilities. Older Oaklanders (65 years+) are more than two times as likely to be killed in a crash compared to all other Oaklanders, and 67% of older Oaklanders' fatalities occur while walking compared to only 26% for Oaklanders of all other ages. Moreover, Oaklanders with disabilities have a significantly higher mortality rate when involved in crashes. Oakland makes up 26% of Alameda County's senior population, which is projected to double—from 240,500 to 481,000—between 2010 and 2060. With 40% of adults over 65 expected to have a disability, the need for accessible pedestrian infrastructure is urgent.

30.     SS4A funds awarded to OakDOT would also fund the creation of a quick-build safety program pilot, which would implement traffic safety improvements at 20 intersections citywide. The proposed Quick-Build Program Pilot was developed with the goal of addressing urgent traffic safety needs in Oakland. Oakland has 64 uncontrolled crosswalks on multilane arterial or collector roadways where at least one pedestrian-involved collision has occurred in the past 10 years, accounting for 136 injured pedestrians and 10 pedestrians who were killed. More than half of these intersections are located on Oakland's 2024 High-Injury Network, the 8% of streets responsible for 60% of severe and fatal collisions. Half of severe and fatal crashes in the city occur at intersections, and over one-third of pedestrian fatalities and severe injuries are due to a driver failing to yield to a pedestrian at a crosswalk. It would take decades to improve safety

at these locations via major capital projects. The goal of the OakDOT Quick-Build Program Pilot is to test low-cost, high-impact strategies that can quickly improve safety at uncontrolled crosswalks over a wide geographical area.

31. If OakDOT were denied this SS4A federal funding, in the short term it would impact the City's ability to plan and make funding commitments for local match requirements.

32. In the long term, denial of SS4A funding would delay the launch of the City's quick-build program pilot and indefinitely delay the completion of the City's ADA Transition Plan.

33. Alternative funding options are unlikely to be secured, given Oakland's current budget crisis and the existence of relatively few alternative transportation grants that fund planning and quick build efforts.

34. The lack of traffic safety that would persist if OakDOT were denied the SS4A funding would have negative economic impacts. The proposed projects are intended to improve traffic safety in Oakland. The 2018 Citywide Crash Analysis analyzed nearly 2,000 injury collisions from 2012-2016 to understand the impacts on Oaklanders and how to effectively focus safety efforts. During that period, there was a 76% increase in severe or fatal injuries, which accounted for $900 million in yearly costs of traffic crashes.

**Impacts of Denying U.S. Department of Housing and Urban Development Formula Grant Funding**

35. Oakland is annually awarded the following formula grants from HUD: Community Development Block Grant (GDBG), HOME Investment Partnerships (HOME), Housing Opportunities for Persons With AIDS (HOPWA), and Emergency Solutions Grants (ESG). For fiscal year 2025-2026, Oakland has been awarded a total of $14,131,646.66 from HUD combined through these formula grants. These formula grants fund programs administered through a variety of City departments including Housing and Community Development Department (HCD), Human Services Department (HSD), and Economic and Workforce Development Department (EWD).

36. CDBG is designed to develop viable urban communities by providing decent

housing and a suitable living environment and expanding economic opportunities principally for low- and moderate-income people. In Oakland, this grant funds a wide variety of capital and service uses, including HCD's Code Compliance Relocation Program (relocation assistance for tenants displaced by code enforcement action), small business lending, improvements to public facilities, homelessness response and homelessness prevention services, affordable housing production and preservation, fair housing counseling, and owner-occupied home rehabilitation programs.

37. Oakland was an original CDBG recipient and has received an entitlement allocation since the program was first established in 1974. In fiscal year 2024-2025, Oakland was awarded $7,484,410 in CDBG funding. On May 14, 2025, Oakland was awarded $7,412,561 in CDBG funding from HUD for fiscal year 2025-2026. Based on Oakland's proposed fiscal year 2025-2026 city budget, $902,100 of this funding will be used to fund staff in HCD who administer the CDBG program, including subrecipient oversight. Another $700,000 of this money will fund staff who implement HCD's Code Compliance Relocation Program. And another $1,425,000 will fund HCD staff in the Home Rehabilitation Program, who design and supervise home rehabilitation projects. Finally, $315,000 of this award will fund staff in EWD who implement the Small Business Assistance Program.

38. HOME is a formula grant funding source for affordable housing construction, acquisition, and rehabilitation. Although it can be used for tenant-based rental assistance, in Oakland it is at present used exclusively for affordable housing development and/or the acquisition/rehabilitation of housing for affordable housing purposes.

39. Oakland has also been a HOME recipient since the program's inception in 1992. In fiscal year 2024-2025, Oakland was awarded $2,368,547 in HOME funding. On May 14, 2025, Oakland was awarded $2,276,584.66 in HOME funding from HUD for fiscal year 2025-2026. Based on Oakland's proposed fiscal year 2025-2026 city budget, $227,657.66 of this funding will be used to fund staff in HCD who administer the HOME program.

40. HOPWA is a formula grant funding source to provide housing and supportive services to persons with HIV/AIDS. HOPWA funds a variety of activities that assist HIV-

positive residents who are at risk of or are currently experiencing homelessness, as well as the construction of housing units reserved for HOPWA-eligible households. Oakland administers a consortium with Alameda and Contra Costa County, so a portion of the funding Oakland receives flows through Oakland to those two communities and the uses they have identified.

41. Oakland has administered HOPWA grants since at least 2001. In fiscal year 2024-2025, Oakland was awarded $3,761,466 in HOPWA funding. On May 14, 2025, Oakland was awarded $3,784,714 in HOPWA funding from HUD for fiscal year 2025-2026. Based on Oakland's proposed fiscal year 2025-2026 city budget, $113,541 of this funding will be used to fund staff in HSD who administer the HOPWA program.

42. ESG is a formula grant funding source that funds homelessness response efforts, including interim shelter and rapid rehousing programs.

43. Oakland has been an entitlement jurisdiction for ESG funding since the original authorizing act in 1987. In fiscal year 2024-2025, Oakland was awarded $646,128 in ESG funding. On May 14, 2025, Oakland was awarded $657,787 in ESG funding from HUD for fiscal year 2025-2026. Based on Oakland's proposed fiscal year 2025-2026 city budget, $49,334 of this funding will be used to fund staff in HSD who administer the ESG program.

44. As a condition of receiving the four formula grants from HUD, the City of Oakland must prepare a Consolidated Plan every five years. This Consolidated Plan discusses Oakland's housing market, housing needs, available local, state and federal resources, and identifies strategies the City will pursue to address unmet needs with available resources. In alignment with the broader goals and objectives identified in the Consolidated Plan, the City prepares and submits an Annual Action Plan (AAP) that describes proposed objectives, programs, and spending allocations of federal grants for a one-year plan. Following the completion of a fiscal year, the City of Oakland also prepares a Consolidated Annual Performance and Evaluation Report (CAPER) that describes the actual funds spent, activities carried out, and clients served in the past fiscal year.

45. The Consolidated Plan, Annual Action Plan, and Consolidated Annual Performance and Evaluation Report are required to incorporate public engagement, include a wide variety of

specific information, and be approved via a public hearing of the City Council. HUD then reviews to ensure the submitted documents meet the requirements as established by regulations. There is no kind of discretionary review based on whether they like Oakland's proposed uses of funds or not. If Oakland meets the requirements, it is entitled to the funds.

46. Adoption of the 2025-2029 Consolidated Plan and the fiscal year 25-26 Annual Action Plan was brought to the Oakland City Council as a single item. It was heard in the Community & Economic Development Committee on June 24, 2025, and received final approval at a public hearing on July 1, 2025.

47. The statutory deadline for Oakland to submit its Consolidated Plan and Annual Action Plan to HUD to be entitled to its fiscal year 2025-2026 grants is August 16, 2025. In advance of that statutory deadline, HCD must upload all required documentation into HUD's Integrated Disbursement and Information System and eCon Planning Suite. Pursuant to HUD guidance, HCD plans to complete its submission of all required documentation within 60 days of HUD's announcement of fiscal year 2025-2026 allocations, by July 12, 2025. The submission requires signing and returning forms SF-424 and SF-424B. HUD 424-B includes an assurance that Oakland "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."

48. In May 2025, HCD was informed by a representative of Oakland's local HUD Field Office who has knowledge of Oakland's grants that HUD will include new terms in the fiscal year 2025-2026 CDBG, HOME, HOPWA, and ESG grant agreements requiring Oakland's agreement to comply with new, additional executive orders. Oakland does not anticipate being able to agree to compliance with these anticipated new terms. These grant agreements are not expected to be executed until the fall of 2025, following submission of the Consolidated Plan and Annual Action Plan are submitted to HUD.

49. If Oakland does not receive its HUD formula grant funds, it will experience severe negative impacts on its affordable housing, homeless response, economic development, and other community development programs. For example:

- $834,368 of CDBG funds are budgeted for Oakland's Homelessness Prevention Program. If these funds are not available, approximately 80 households at imminent risk of homelessness would no longer receive assistance with back rent. As a result, these households will very likely experience a loss of housing and may become homeless. Oakland's local funds for homeless prevention would likely be depleted in no more than 6-9 months, at which point clients would no longer be able to be served.
- $2,211,411 of CDBG funds are budgeted for Home Rehabilitation Programs that primarily serve very and extremely low-income homeowners (a majority of whom are seniors). These programs serve approximately 50 households annually. Many of these homes have severe deferred maintenance issues such as indoor mold, exposed lead paint, water intrusion, or structural stability problems. Without CDBG funding, the City will be unable to pay for the program delivery staff who implement these programs and for the lending capital. As a result, at least some of these 50 households will likely be displaced from their homes by uninhabitable conditions and/or code enforcement action. In some cases, the continued existence of dangerous conditions may pose a threat to the health and safety of current residents even if the homes are not red-tagged (such as the persistence of peeling lead paint in a home with small children). Impacts from a loss of funding would be felt almost immediately, as these projects cannot be completed without the supervision and approval of the City staff who administer this program. The staffing cost of this program is largely funded by CDBG program delivery funding, and local funds would not be sufficient to both complete current projects and start new projects.
- $700,000 of CDBG funding is allocated to operate the Code Compliance Relocation Program. In cases where a tenant is displaced due to a code violation on the part of the landlord (such as illegally installed faulty wiring causing a fire), the tenant is eligible for temporary relocation assistance to ensure they are stabilized and do not become homeless. The City's use of CDBG funds ensures tenants do not

become homeless even when the landlord is unable to immediately pay a tenant the relocation cost. Without CDBG funds for the Code Compliance Relocation Program, tenants in this circumstance will instead face an imminent risk of homelessness if they do not have resources to independently find housing. Impacts would likely be felt promptly after a loss of funds, as Oakland will not be able to continue to staff this program and provide ongoing funds to displaced tenants with only local funds.

- $245,785 of HOPWA is budgeted for Short Term Rent, Mortgage and Utility Assistance and an additional $335,000 is budgeted for Tenant-Based Rental Assistance, all for persons with HIV/AIDS. Without HOPWA funding, Oakland will no longer be able to provide financial assistance to HIV-positive tenants and homeowners at risk of losing their housing. A loss of housing may lead to homelessness and aggravate the health challenges experienced by these HIV-positive individuals. Impacts would likely be felt promptly after a loss of funds; the City has no local funds allocated for these programs, and there would be no funds available to pay nonprofits for ongoing client services.

- $597,668 in ESG funding supports the cost of several sites offering interim shelter and rapid rehousing supports. A loss of ESG funding would result in a reduction in interim shelter/rapid rehousing slots. As a result, more individuals and families would remain unhoused with all the associated safety and health risks. Impacts would likely be felt in the near term after a loss of funding; the City's local capacity to fund homeless interventions on a city-wide level has fallen due to a loss of state-level funding, so there is no meaningful chance that local funds could replace lost federal funds.

- $2,048,927 in HOME funds are available in affordable housing capital. A loss of these funds would likely result in a loss of at least 10-15 affordable housing units annually. Medium-term affordable housing finance tends to be a lengthy process, so it may be several months before an impact is felt.

**Impacts of Denying U.S. Department of Housing and Urban Development Pathways to Reducing Obstacles to Housing Grant Funding**

50. The Pathways to Reducing Obstacles to Housing (PRO Housing) program is a competitive HUD grant that provides funding to communities that have taken action to become more housing development-friendly and sought federal funds to expand on those efforts. In fiscal year 2024, Oakland was awarded a one-time $7 million PRO Housing grant to fund a revolving predevelopment loan program for affordable housing, a new permit streamliner/expediter role in the Planning & Building Department for five years, and consultant support for inter-agency funding alignment. PRO Housing was awarded in a nationwide competition of local and state governments that took place in two rounds under a Notice of Funding Opportunity (NOFO) process.

51. The objective of the NOFO was to encourage cities to pursue new initiatives to spur the development of housing through the reduction of land use, regulatory, and administrative barriers. Applicants submitted a written narrative that described housing needs, how the proposed use of funds would address the key barriers to address that need, and described a proposed set of funding uses of up to $10 million in the first round and up to $7 million in the second round. Scoring was based on an evaluation of this written submission. Oakland's award was in the second round.

52. On January 24, 2025, Oakland and HUD executed a grant agreement for Oakland's PRO Housing grant.

53. In May of 2025, HCD was informed by a representative of Oakland's local HUD Field Office who has knowledge of Oakland's grants that HUD will require Oakland to execute an addendum to its PRO Housing grant agreement that includes new terms requiring Oakland's agreement to comply with new, additional executive orders. Oakland does not anticipate being able to agree to compliance with these anticipated new terms.

54. At present, although a grant agreement has been executed for the PRO Housing grant, no funds have been encumbered, obligated, or expended.

55. If Oakland does not receive its PRO Housing grant, it will not be able to fund the revolving predevelopment loan program for affordable housing that it had planned to, due to its current budget crisis, and the development of new affordable housing in Oakland will be hampered. Additionally, $1,172,758.25 of these funds are allocated to create and fund for five years a new position in the Planning and Building Department to expedite affordable housing approvals. The City is currently in the process of filling a recruitment for this position and won't have funding available to pay for this hire if the funds are not received. Not filling this position may result in lengthier approval processes for affordable housing projects, leading to construction cost escalation. This staffing impact will be felt as soon as within the next three months.

**Impacts of Denying U.S. Department of Housing and Urban Development Continuum of Care Grants**

56. Oakland is also a recipient of four different U.S. Department of Housing and Urban Development Continuum of Care Grants for 2025 and 2026. These grants go to support Oakland's homelessness response efforts and together are valued at approximately $5.4 million dollars.

57. This funding is critical to the City's efforts to alleviate the homelessness crisis within the City and goes to fund leasing interim and permanent supportive housing for homeless persons, administering the Homeless Management Information System, providing supportive services, and providing rental assistance, among other services.

58. Oakland has a significant homelessness problem with more than 5,000 persons suffering from homeless in the City. Obtaining resources to offer housing solutions for persons experiencing homelessness is critical to the City's attempts to combat homelessness and even with these funds the City does not have enough resources to fully address the full scope of the problem. Losing this funding because the City cannot comply with the grant conditions will lead to more persons becoming or remaining unhoused across the City.

59. So as not to jeopardize this funding, in June 2025 Oakland signed grant agreements that required compliance with all executive orders. However, Oakland believes this requirement

is unlawful and is therefore challenging those requirements now and intends to inform the U.S. Department of Housing and Urban Development of its position.

**Impacts of Denying U.S. Department of Health and Human Services Grants**

60. For decades, Oakland has received funding from the U.S. Department of Health and Human Services to fund Head Start Programs, including technical assistance and basic operations. The City of Oakland Head Start Programs offer free early childhood education and care, prenatal education and family services to low-income residents. These programs help prepare children for school from birth to age five. Oakland continues to have a high population of eligible low-income children under the age of 5, exceeding available early care slots.

61. In fiscal year 2024-2025, HSD received $13,484,533 in Head Start funding directly from HHS. HSD administers Head Start Programs itself and serves as a passthrough for its community partners. HSD has submitted its annual continuation application to HHS with a funding request of $13,797,057 for fiscal year 2025-2026, but has not yet received an award letter. In this fiscal year, Head Start plans to serve 622 infants, toddlers, and preschoolers throughout Oakland. Services will be delivered citywide through a combination of direct services and strategic partnerships with partner agencies.

62. Oakland has budgeted to provide a 20% non-federal match to these funds, but due to its current budget crisis, would not be able to make up for the loss of federal Head Start funds.

63. Oakland continues to have a high population of low-income children under the age of 5, exceeding available early care slots. For many parents, Head Start is the only free childcare option allowing them to work or finish school. The program also provides meals, diapers, wipes, formula, as well as disability, mental health, and health services including dental, vision and other developmental screenings, and referrals in the community.

64. If Oakland were to lose Head Start funding, Head Start centers and home-based programs would have to close. Not only would hundreds of children would lose access to educational and health services, their parents would lose access to free childcare that allows them to work. The loss of jobs in the community would go beyond the number of parents who are no longer able to work, as childcare provider jobs at Head Start would also be lost.

65. Head Start has been linked to long-term benefits such as better health, increased high school graduation rates, and higher employment. A loss of Head Start would mean a loss of academic and cognitive gains in the long term.

66. HHS, through its Substance Abuse and Mental Health Services Administration, also competitively awarded Oakland a Resiliency In Communities After Stress and Trauma (ReCAST) program grant in the amount of $5 million. The ReCAST program provides Oakland with $1 million per year every year for each of the five fiscal years from 2021-2022 through 2025-2026. Oakland's ReCAST project improves behavioral health outcomes and access to evidenced-based, promising practices to high risk youth and families most impacted by civil unrest and violence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 7th day of July, 2025 in Oakland, California.

JESTIN D. JOHNSON

# EXHIBIT A

| | |
|---|---|
| **From:** | Bianchi, Andrew (FHWA) |
| **To:** | Harris, Audrey |
| **Cc:** | Baca, Bob B@DOT; Lo, Seng@DOT; Sandhu, Jasdeep@DOT; Martin-Yambo, Zylkia (FHWA); Pangilinan, Peter (FHWA); Siu, Edmond; Chan, Yvonne; Guo, Chun (FHWA) |
| **Subject:** | R21: Reconnecting Oakland Approval to Proceed |
| **Date:** | Tuesday, June 3, 2025 7:36:38 AM |
| **Attachments:** | R21_CA_ReconnectingOakland_draftGA-NewTemplate-2025-0602.docx<br>raise-fy2021-fhwa-exhibits-20250423.pdf<br>raise-fy2021-fhwa-general-terms-and-conditions-20250423.pdf |
| **Importance:** | High |

Hi Audrey,

Your patience and keeping us informed has paid off. We have approval to move forward with your grant agreement and FHWA HQ has provided the pre-populated new template for you to review and process along with the latest Terms & Conditions and Exhibits. FHWA HQ has also asked for:

1. Provide in writing (an e-mail is acceptable) that you are choosing to be a pass through with the State DOT
2. A new clean thread e-mail of what you told me yesterday that you will be ready to start the project as soon as OST provides approval for your grant agreement.

I think both of those can be in the same e-mail.

I am not going to spoil the suspense that we will be loaded with some “hurry up and waits”. The new processes are unproven, so it could go very smoothly or not . . . but the plan is to get this grant agreement executed by the end of the month so we can keep things on schedule.

A meeting to go over the situation and make sure The City of Oakland, Caltrans, and FHWA are all on the same page may be worthwhile. Not saying we are rushing, but 4 weeks is still pretty quick to make sure all interested parties are aware and ready as we clear hurdles. They key to this will be regardless of when we get there, once the PDF OST approved version of the grant agreement is returned to us for signatures, the expectation is to execute and obligate within two weeks. We’ve tested that deadline before with no apparent consequence, but you never know what the future may hold. Just trying to put all of the cards on the table so we can plan accordingly.

Your thoughts are greatly appreciated at your earliest convenience.

Best Regards,

Andrew T. Bianchi, PE
U.S. Department of Transportation
Federal Highway Administration – California Division
Project Delivery North Team Lead
650 Capitol Mall, Suite 4-100
Sacramento, CA 95814
PH: 916-498-5128
andrew.bianchi@dot.gov

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE FISCAL YEAR 2021 RAISE GRANT PROGRAM**

This agreement is between the United States Department of Transportation (the "**USDOT**"), California Department Transportation (the "**Recipient**"), and the City of Oakland (the "**First-Tier Subrecipient**").

This agreement reflects the selection of the Recipient to receive a RAISE Grant for the Reconnecting Oakland: Safe, Reliable, and Equitable Access project.

The parties want the First-Tier Subrecipient to carry out the project with the Recipient's assistance and oversight.

The parties therefore agree to the following:

## ARTICLE 1
## GENERAL TERMS AND CONDITIONS

**1.1 General Terms and Conditions.**

(a) In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under The Fiscal Year 2021 Rebuilding American Infrastructure with Sustainability and Equity (RAISE) Grant Program: FHWA Projects," dated ~~June 6, 2022~~April 23, 2025, which is available at ~~http://go.usa.gov/xJKa5.~~https://www.transportation.gov/BUILDgrants/grant-agreements. Articles 8–31 are in the General Terms and Conditions. The General Terms and Conditions are part of this agreement.

Formatted: Hyperlink

(b) The Recipient states that it has knowledge of the General Terms and Conditions.

(c) The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

## ARTICLE 2
## APPLICATION, PROJECT, AND AWARD

**2.1 Application.**

Application Title: Reconnecting the Town: Enhancing Oakland with Safe, Reliable & Equitable Access

Application Date: July 10, 2021

**2.2 Award Amount.**

RAISE Grant Amount: $13,816,875

Federal Obligation Type: Single

**2.3 Award Dates.**

Budget Period End Date: 6/30/2031

**2.4 Urban or Rural Designation.**

Urban-Rural Designation: Urban

**2.5 Capital or Planning Designation.**

Capital-Planning Designation: Capital

**2.6 Federal Award Identification Number.** The Federal Award Identification Number will be generated when the FHWA Division authorizes the project in FMIS. The Recipient acknowledges that it has access to FMIS and can retrieve the FAIN from FMIS

## ARTICLE 3
## SUMMARY PROJECT INFORMATION

**3.1 Summary of Project's Statement of Work.**

This project will construct mobility improvements along the Broadway, 7th Street, and Martin Luther King Jr. Way Corridors in downtown Oakland, including pedestrian infrastructure and signal improvements; install bus-only lanes along the Broadway Corridor from 2nd to 11th Street and from 20th Street to Grand Avenue; and install new bikeways along Martin Luther King Jr. Way from 2nd to 7th Street. The project will also install fiber-optic cable on Broadway, 7th Street, and Martin Luther King Jr. Way.

**Commented [CM(1]: Recipient:** If Attachment A is revised, then review and determine if the changes require updates to OST's description of the project. If yes, then revise the project description and provide a concise explanation in Attachment D.

**3.2 Project's Estimated Schedule.**

| Milestone | Schedule Date |
|---|---|
| **Component 1: Broadway between 2nd Street and 11th Street & Broadway between 20th Street and Grand Avenue** | |
| Planned Construction Substantial Completion and Open to Traffic Date: | June 30, 2030 |
| **Component 2: 7th Street between Mandela Parkway and MLK Jr. Way** | |
| Planned Construction Substantial Completion and Open to Traffic Date: | December 31, 2029 |
| **Component 3: MLK Jr. Way between 2nd Street and 7th Street** | |
| Planned Construction Substantial Completion and Open to Traffic Date: | May 31, 2030 |

**Commented [CM(2]: Recipient:** Review the dates and update, if needed. Provide a concise explanation of schedule milestone changes in Attachment D.

3.3 **Project's Estimated Budget.**

| Eligible Project Costs | |
|---|---|
| RAISE Grant Amount: | $13,816,875 |
| Other Federal Funds: | $0 |
| Non-Federal Funds: | $29,916,555 |
| Total Eligible Project Cost: | $43,733,430 |

**Commented [CM(3]: Recipient:** Review the budget amounts and update, if needed. The information in this table must match the total project costs in Attachment B. Provide a concise explanation of the budget changes in Attachment D.

## ARTICLE 4
## CRITICAL MILESTONE DEADLINES

**4.1 Critical Milestone Deadlines.**

| Milestone | Deadline Date |
|---|---|
| Planned Construction Substantial Completion Date – MLK Jr. Way Corridor AHSC grant funded road diet bike lane improvements between 7th Street and San Pablo Avenue: | 12/31/2024 |

**Commented [CM(4]:** If this has been completed, please update to "Actual" from "Planned" or provide a new Planned date.

## ARTICLE 5
## PARTY INFORMATION

**5.1 Recipient's Unique Entity Identifier.**

Recipient's Unique Entity Identifier: UK66CLD4DX71

**5.2 Recipient Contact(s).**

Commented [CM(5]: Recipient: Review and update the contact information, if needed.

Ephrem Meharena
DLAE – Transportation Planning and Local Assistance
California Department of Transportation, District 4
111 Grand Avenue
Oakland, CA 94612
(510) 960-0806
ephrem.meharena@dot.ca.gov

**5.3 Recipient Key Personnel.**

None. The parties have not identified any individuals as key personnel for this award.

**5.4 USDOT Project Contact(s).**

Commented [CM(6]: Division: Review and update the contact information, if needed.

Peter Pangilinan
Discretionary Grants and Emergency Relief Program Manager
Senior Transportation Engineer – Districts 1, 2, 6, 10
FHWA – California Division
650 Capital Mall, Suite 4-100
Sacramento, CA 95814
(916) 498-5886
peter.pangilinan@dot.gov

## ARTICLE 6
## USDOT ADMINISTRATIVE INFORMATION

**6.1 Payment System.**

USDOT Payment System: FMIS

**6.2 Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization: FHWA Division

## ARTICLE 7
## SPECIAL GRANT TERMS

Commented [USDOT7]: **Drafting Instruction:** DOT and FHWA will consider whether additional special grant terms are needed on a project by project basis. For example, special grant terms may be considered for a project that requires agreements with a railroad, has special right of way transfer requirements, and/or has received approval from OST for Advance Construction. **See Example Document.**

**7.1 Subaward to First-Tier Subrecipient.**

(a) The Recipient hereby awards a subaward to the First-Tier Subrecipient for the purpose described in section 8.1.

(b) The Recipient and the First-Tier Subrecipient may enter into a separate agreement, to which the USDOT is not a party, assigning responsibilities, including administrative and oversight responsibilities, among the Recipient and the First-Tier Subrecipient.

(c) For the purpose of 2 ~~C.F.R.~~CFR parts 200 and 1201, the Recipient is a pass-through entity.

**7.2 First-Tier Subrecipient Statements and Responsibilities.**

(a) The First-Tier Subrecipient affirms all statements and acknowledgments that are attributed to the Recipient under sections 10.1 and 10.2.

(b) The First-Tier Subrecipient assumes the Recipient's reporting obligations under articles 14 and 15.

**7.3 State Oversight Responsibilities.** For the purpose of 23 U.S.C. 106(g), the Recipient shall act as if funds under this award are Federal funds under title 23, United States Code.

**ATTACHMENT A**
**STATEMENT OF WORK**

Commented [CM(8]: Recipient: Update the statement of work, if needed. Review the changes and determine if the project description in Section 3.1 must be revised. Provide a concise explanation of the revisions in Attachment D.

This project will construct mobility improvements along the Broadway, 7th Street and Martin Luther King Jr. Way Corridors in downtown Oakland, including pedestrian infrastructure and signal improvements; install bus-only lanes along the Broadway Corridor from 2nd to 11th Street and install new bikeways along Martin Luther King Jr. Way from 2nd to7th Street. The project will also install fiber-optic cable on Broadway, 7th Street and Martin Luther King Jr. Way.

The three RAISE grant project components described below will be constructed with three separate contracts:

Component 1: Broadway between 2nd Street and 11th Street and Broadway between 20th Street and Grand Avenue

As stated in the RAISE application, the proposed 0.52-mile Broadway segment will accommodate the extension of the city's fiber network on Broadway to just north of Embarcadero West and deliver improvements to bus operations and pedestrian safety on Broadway between 2nd Street and Grand Avenue.

- Red bus-only lanes will be installed on Broadway from 2nd Street to 11th Street and from 20th Street to Grand Avenue. These lanes will enable buses to bypass congestion and deliver faster and more reliable bus service to AC Transit riders.
- Traffic signals will be upgraded at 5th and 6th Streets to replace aging infrastructure and install mast arms for better visibility. A new traffic signal will be installed at 4th Street for pedestrian safety and improved bus operations.
- New ADA curb ramps will improve street safety for pedestrians, particularly those with disabilities.
- High-visibility crosswalk markings will be installed at all intersections between 2nd Street and 11th Street to increase visibility and improve pedestrian safety.
- Additional intersection safety lighting will be installed at the following intersections: 3rd Street, 4th Street, 5th Street and 6th Street.
- Fiber will be installed on Broadway between just north of Embarcadero West and 7th Street, which will enable the City to expand the free Wi-Fi network.

Component 2: 7th Street between Mandela Parkway and MLK Jr. Way

As stated in the RAISE application, the 7th Street segment will accommodate the extension of the City's fiber network.

- Fiber optic cable will be installed on 7th Street between Mandela Parkway and Brush Street, which will enable the City to expand the free Wi-Fi network.

Component 3: MLK Jr. Way between 2nd Street and 7th Street

As stated in the RAISE application, the MLK Jr. Way 2nd Street and 7th Street segment will be improved to extend new bike lanes, improve pedestrian safety along the corridor, and extend the City's fiber network into the Jack London Square neighborhood.

- Implement a cycle track along the east side of MLK between 2nd Street and 7th Street
- Repair sidewalks, install curb extensions, install street trees, provide additional street and intersection safety lighting, and provide additional pedestrian lighting along the east side of MLK, between 2nd Street and 7th Street.
- Traffic signals will be modified at 5th and 6th Streets to replace aging infrastructure and install a 5th Street protected left turn movement.
- New ADA curb ramps will improve street safety for pedestrians, particularly those with disabilities.
- High-visibility crosswalk markings will be installed at all intersections between 2nd Street to 7th Street to increase visibility and improve pedestrian safety. New pedestrian lighting will be installed on the east side of MLK between intersections, as well as for pedestrians crossing under I-880.
- Fiber will be installed on MLK Jr. Way between 7th Street and 2nd Street which will enable the City to expand the free Wi-Fi network.

**ATTACHMENT B**
**ESTIMATED PROJECT BUDGET**

Commented [CM(9]: Recipient: Review the budget information and update, if needed. The information in this attachment must match the total project costs in Section 3.3. Provide a concise explanation of the budget changes in Attachment D.

**1. Supplementary Fund Source Table(s)**

The following tables supplement the budget information in section 3.3.

| Eligible Costs | | | | |
|---|---|---|---|---|
| | **Component 1** | **Component 2** | **Component 3** | **Total** |
| RAISE Funds: | $13,816,875 | $0 | $0 | $13,816,875 |
| Other Federal Funds: | $0 | $0 | $0 | $0 |
| Non-Federal Funds: | $11,858,014 | $1,391,056 | $16,667,485 | $29,916,555 |
| Total: | $25,674,889 | $1,391,056 | $16,667,485 | $43,733,430 |

**2. Cost Classification Table**

| Cost Classification | Total Costs | Non-RAISE Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| Preliminary Engineering | $0 | $0 | **$0** |
| Construction | $36,412,030 | $0 | **$36,412,030** |
| Contingency | $7,321,400 | $0 | **$7,321,400** |
| **Project Total** | **$43,733,430** | **$0** | **$43,733,430** |

**ATTACHMENT C**
**PERFORMANCE MEASUREMENT INFORMATION**

**Study Area:** Bike and Pedestrian Count/Trip data will be collected on Broadway and Martin Luther King at 3rd Street and 7th Street.

Passenger counts will be collected for bus routes on Broadway between 2nd Street and 11th Street.

**Baseline Measurement Date:** 12/31/2024

**Baseline Report Date:** 2/28/2025

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Bike and Pedestrian Counts/Trips | Economic Competitiveness, Quality of Life<br><br>Average daily bicycle and pedestrian counts using National Bicycle & Pedestrian Documentation Project methodology by conducting hourly counts at key locations in the study area. Counts will be collected on a typical weekday, Saturday and Sunday and should be conducted monthly to produce a quarterly average. | Quarterly |
| Passenger Counts | Quality of Life<br><br>Route-level data consistent with system wide reports provided to NTD. Directional boarding and alighting counts by route and time of day for all transit stops in the study area for a typical weekday, Saturday and Sunday. | Quarterly |

**Commented [CM(10]: Recipient:** If the construction start date changes, then update this date to be 1 month before the new date.

**Commented [CM(11]: Recipient:** If the construction start date changes, then update this date to be 1-2 months after the new date

**ATTACHMENT D**
**CHANGES FROM APPLICATION**

**Scope**: The City of Oakland's application proposed improvements on three distinct corridors: Broadway, 7th Street, and Martin Luther King Jr. Way (MLK). The City is proposing to split the project scope into two phases because one of the components described in the application can be implemented with non-RAISE fund sources using a construction contract awarded by the City before the project was selected for a RAISE grant award. The component that will be removed from the RAISE grant is part of the "Early Implementation" phase described in the table below.

**Early Implementation**

| Component Name | Description |
|---|---|
| MLK between 7th Street and San Pablo Avenue (AHSC Local Grant Funded) | Roadway paving, striping, and installation of buffered (Class 2b) bikeways. |

The City is committed to delivering the Martin Luther King Jr. Way AHSC grant funded project, as the early implementation component. The original RAISE application assumed that all project components would be delivered in one phase by 2029. However, the City re-evaluated the RAISE grant scope of work (components) in response to receiving a reduced grant award. Early delivery of this one component in the RAISE grant application will proceed to construction earlier and deliver direct benefits to the Oakland neighborhoods with persistent poverty, including West Oakland, Downtown, Old Oakland, and Uptown. The contract that will be used to deliver the Early Implementation project component was not procured in a manner consistent with Federal requirements; therefore, the Early Implementation project component has been removed from the RAISE grant ($690,200).

**RAISE Project**
The RAISE project components described in Attachment A have also been modified based on preliminary engineering design. The modifications to each project component are described below:

<u>Component 1: Broadway between 2nd Street and 11th Street and Broadway between 20th Street and Grand Avenue</u>

- The Red bus-only lanes will not extend to Embarcadero West as described in the application. The northbound red bus-only lane begins at 2nd Street and the southbound bus-only lane ends at 3rd Street. The southbound buses will use 3rd Street to loop through Jefferson Street and 2nd Street to access an expanded transit hub on 2nd Street, near Washington. The core transit benefits of the project are not impacted by these clarifications to the scope as described in the original application.
- The application assumed that a new traffic signal would be needed at the Broadway/2nd Street intersection. However, the City's technical team reevaluated current and forecasted conditions and determined a traffic signal at this intersection will not meet the traffic signal warrant requirements. Therefore, traffic signal at the Broadway/2nd Street intersection and the southern bulbouts at this intersection have been removed from the proposed project.

**Commented [CM(12]:** Everything from the previous OST approved version has been carried over.
Update sections as needed in track changes.

**Commented [CM(13]: Recipient:** If there are revisions in Section 3.1 or Attachment A, then provide a concise explanation.
If there are no project scope changes, then enter "No changes".

Component 2: 7th Street between Mandela Parkway and MLK Jr. Way

- Fiber optic cable will be installed on 7th Street between Mandela Parkway and Brush Street, which will enable the City to expand the free Wi-Fi network.

Component 3: MLK between 2nd Street and 7th Street

- The RAISE project improvements to extend bike lanes (a cycle track on the east side of MLK), repair sidewalks, perform traffic signal modifications, install pedestrian lighting along the east side of MLK, and install landscaping will be concentrated in the blocks between 2nd Street and 7th Street, and these RAISE grant improvements will be installed prior to May 31, 2030.
- The fiber extension will be from 7th Street to the new traffic signal at 2nd Street. Upon further analysis, fiber will not be extended to Embarcadero West due to the need to cross underneath the Union Pacific Railroad (UPRR) at-grade intersection and the difficulty of obtaining UPRR permits. To facilitate Oak-Wifi installation, the project will install a new fiber cable into a new traffic signal pullbox at the MLK/2nd Street intersection.

**Schedule**: The removal of the Early Implementation component from the RAISE grant project will advance a portion of the project described in the application on a phased timeline beginning in 2024 and completed by December 31, 2024.

**Commented [CM(14]: Recipient:** If there are updates to the schedule milestones in Section 3.2, then provide a concise explanation.
If there are no schedule updates, then enter "No changes".

The project schedule originally anticipated an obligation date of September 30, 2024 – as described in the original grant application. The obligation date was changed due to delays associated with securing NEPA approvals. Completion of the NEPA process is required prior to finalizing the PS&E phase of work and securing the federal obligation of construction funds. The updated RAISE grant schedule for each of the project components are as follows:

The planned construction obligation date and construction substantial completion date for Component 1 are January 30, 2025, and June 30, 2030, respectively.

The planned construction substantial completion date for Component 2 is December 31, 2029.

The planned construction substantial completion date for Component 3 is May 31, 2030.

**Budget:** Total project costs submitted in June 2021 with the RAISE application have been updated as of November 2022 to reflect the following:

**Commented [CM(15]: Recipient:** If there are updates to the budget in Section 3.3 and/or Attachment B, then provide a concise explanation.
If there are no budget updates, then enter "No changes".

- Preliminary Engineering has been removed from the updated costing summaries.
- Overall, the City is experiencing significant supply chain issues and associated inflation. Cost estimates have been updated to reflect this situation.
- The scope designed for Broadway between 3rd Street and 4th Street with proposed transit bulbs has been refined to preserve existing historic street trees. The original estimate anticipated bulb construction only.
- The unit price to grind/overlay the roadways was originally underestimated. New estimates reflect significant supply chain issues and associated inflation.

- The quantities for reconstructing the Broadway/6th Street intersection (remove free-right) was originally underestimated. The removal of the free right turn is adjacent to an existing building that appears to have a basement that extends into the sidewalk area. Further, these improvements will require significant coordination with Caltrans because this intersection is a freeway off-ramp.
- Additional scope refinement identified an increased need of sidewalk reconstruction along northbound MLK and intersection curb extensions - mostly along the MLK corridor between 2nd Street and 7th Street.
- The Broadway corridor has several basements that extend out into the street, and the streetlight foundations and conduit work to connect streetlights has been refined since the original application. The original estimate excluded the City's required plant establishment costs, and the unit pricing for trees was significantly less than current pricing.

The estimated cost of the RAISE grant project increased from $32,936,000 ($26,418,206 excluding PE costs) in the application to $51,933,448 ($43,733,430 excluding PE costs). The City accepted a reduced RAISE grant award and evaluated options to complete the funding package for the project. Removal of the Early Implementation component from the RAISE grant project reduces the project cost by $690,200. This component will be advanced to construction in 2024 with Affordable Housing & Sustainable Communities (AHSC) funds. The estimated cost of the RAISE grant project components is $43,733,430, with the City securing additional non-Federal funds to complete the grant project budget.

The table below provides a summary comparison of the project budget.

| **Fund Source** | **Application** $ | % | **Reduced Award** $ | % | **Section 3.3 and Attachment B** $ | % |
|---|---|---|---|---|---|---|
| **Previously Incurred Costs** | | | | | | |
| Federal Funds | | | | | | |
| Non-Federal Funds | | | | | | |
| Total Previously Incurred Costs | | | | | | |
| **Future Eligible Project Costs** | | | | | | |
| RAISE Funds | 20,052,682 | 76 | 14,507,075 | 55 | 13,816,875 | 32 |
| Other Federal Funds | 0 | 0 | 0 | | 0 | 0 |
| Non-Federal Funds | 6,365,524 | 24 | 11,911,131 | 45 | 29,916,555 | 68 |
| Total Future Eligible Project Costs | 26,418,206 | 100 | 26,418,206 | 100 | 43,733,430 | 100 |
| Total Project Costs | 26,418,206 | | 26,418,206 | | 43,733,430 | |

**ATTACHMENT E**
**APPROVED PRE-AWARD COSTS**

**None.** The USDOT has not approved under this award any costs incurred under an advanced construction authorization (23 U.S.C. 115), any costs incurred prior to authorization (23 ~~C.F.R.~~CFR 1.9(b)), or any pre-award costs under 2 ~~C.F.R.~~CFR 200.458.

**RECIPIENT SIGNATURE PAGE**

The Recipient, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

California Department of Transportation

________________________ By: ______________________________

Date Signature of Recipient's Authorized Representative

Dee Lam

Name

Chief – Division of Local Assistance

Title

**Commented [USDOT16]:** **Drafting Instruction:** Identify the Recipient's authorized representative by name and title. If additional signatories are required, please duplicate the signatory block. If the Recipient has a specific format it uses for additional signatory blocks, such as legal, please format this page accordingly for OST review.

**FIRST-TIER SUBRECIPIENT SIGNATURE PAGE**

The First-Tier Subrecipient, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

City of Oakland

By: ______________________________

Signature of First-Tier Subrecipient's Authorized Representative

Josh Rowan

Name

Director, City of Oakland Department of Transportation

Title

______________________________

Date

Commented [USDOT17]: **Drafting Instruction:** Identify the First-Tier Subrecipient's authorized representative by name and title. If additional signatories are required, please duplicate the signatory block. If the First-Tier Subrecipient has a specific format it uses for additional signatory blocks, such as legal, please format this page accordingly for OST review.

**USDOT SIGNATURE PAGE**

Commented [USDOT18]: Drafting Instruction: Enter the name of the Division Administrator.

The USDOT, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

UNITED STATES DEPARTMENT OF TRANSPORTATION

| | |
|---|---|
| ______________________ Date | By: ______________________ Signature of USDOT's Authorized Representative |
| | ~~Elissa Konove~~Douglas R. Hecox ______________________ Name |
| | Acting FHWA California ~~[insert state]~~ Division Administrator ______________________ Title |

Formatted: Font color: Auto

Formatted: Font: +Headings CS (Times New Roman)

Formatted: Justified

**U.S. DEPARTMENT OF TRANSPORTATION**

**EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE
FISCAL YEAR 2021 RAISE GRANT PROGRAM**

**April 23, 2025**

**EXHIBIT A**
**APPLICABLE FEDERAL LAWS AND REGULATIONS**

By entering into this agreement for a FY 2021 RAISE Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**

a. Davis-Bacon Act – 40 U.S.C. 3141, et seq., as applicable under 23 U.S.C. 113
b. Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
c. Hatch Act – 5 U.S.C. 1501, et seq.
d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
e. National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
f. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
g. Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
h. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
i. Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
j. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
k. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
l. Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
m. Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
n. American Indian Religious Freedom Act, P.L. 95-341, as amended
o. Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
p. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
q. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
r. Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
s. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
t. Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
u. Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
v. National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
w. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
x. Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
y. Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
z. Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
aa. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
bb. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
cc. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.

dd. Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C. 1101 -1104, 541, et seq.

ee. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. 1352

ff. Freedom of Information Act – 5 U.S.C. 552, as amended

gg. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855

hh. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.

ii. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.

jj. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.

kk. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525

ll. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303 and 23 U.S.C. 138

mm. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.

nn. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26

oo. Wilderness Act – 16 U.S.C. 1131-1136

pp. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.

qq. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.

rr. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)

ss. Cargo Preference Act of 1954 – 46 U.S.C. 55305

tt. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232

uu. Bringing in and harboring certain aliens – 8 U.S.C. 1324

vv. Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

**Executive Orders**

a. Executive Order 11990 – Protection of Wetlands

b. Executive Order 12372 – Intergovernmental Review of Federal Programs

c. Executive Order 12549 – Debarment and Suspension

d. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers

e. Executive Order 14025 – Worker Organizing and Empowerment

f. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship

g. Executive Order 14154, Unleashing American Energy

h. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing

i. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

j. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**General Federal Regulations**

a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201

b.  Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200

c.  Investigative and Enforcement Procedures – 14 CFR Part 13

d.  Procedures for predetermination of wage rates – 29 CFR Part 1

e.  Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 CFR Part 3

f.  Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 CFR Part 5

g.  Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60, et seq.

h.  New Restrictions on Lobbying – 49 CFR Part 20

i.  Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto

j.  Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 CFR Part 24

k.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25

l.  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27

m.  DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 CFR Part 35

n.  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28

o.  Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 CFR Part 30

p.  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32

q.  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38

r.  Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 CFR Part 26 (as applicable under section 18.3 of this agreement), including any amendments thereto

**Office of Management and Budget Circulars**

a.  Any applicable OMB Circular based upon the specific FY 2021 RAISE Grant Recipient.

**Highway Federal Legislation**

a.  Highways – Title 23, U.S.C.

b.  Brooks Act (for FHWA projects, this incorporates Title IX of the Federal Property and Administrative Services Act of 1949 (formerly 40 U.S.C. 541, et seq.)) – 40 U.S.C. 1101-1104; 23 U.S.C. 112(b)(2)

c.  Letting of Contracts, 23 U.S.C. 112

d.  Highway Design and Construction Standards, 23 U.S.C. 109

e.  Prevailing Rate of Wage, 23 U.S.C. 113
f.  Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
g.  Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.
h.  Size, Weight, and Length Limitations – 23 U.S.C. 127, 49 U.S.C. 31101 et seq.
i.  Buy America – 23 U.S.C. 313
    (see http://www.fhwa.dot.gov/construction/contracts/buyam_qa.cfm)
j.  Nondiscrimination – 23 U.S.C. 140
k.  Efficient Environmental Reviews - 23 U.S.C. 139

**Federal Highway Regulations**
a.  Highways – Title 23, CFR
b.  Planning – 23 CFR Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
c.  National Highway System Design Standards – 23 CFR Part 625
d.  Preconstruction Procedures – 23 CFR Part 630 Subparts A and B
e.  Construction and Maintenance – 23 CFR Part 635
f.  Manual on Uniform Traffic Control Devices – 23 CFR Part 655
g.  Environmental Impact and Related Procedures – 23 CFR Part 771
h.  Procedures for Abatement of Highway Traffic and Construction Noise – 23 CFR Part 772
i.  Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 CFR Part 774
j.  Permitting Requirements under the National Pollutant Discharge Elimination System – 40 CFR Part 122
k.  Required Contract Provisions – 23 CFR Part 633 (Form 1273)
l.  External Programs – 23 CFR Part 230

Specific assurances required to be included in the FY 2021 RAISE Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 CFR Parts 21, 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under the FY 2021 RAISE grant program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 CFR section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

*"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2021 RAISE grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2021 RAISE Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
   b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely,

complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2021 RAISE grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2021 RAISE grant program.

## APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

    a. withholding payments to the contractor under the contract until the contractor complies; and/or
    b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant

thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Consolidated Appropriations Act, 2021 (Pub. L. 116-260, Dec. 27, 2020) the Regulations for the Administration of FY 2021 RAISE grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The  (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto;
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);

- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

**TERM B.2**
**CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS**

**2 CFR Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2021 RAISE grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2021 RAISE Grant, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to

the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**2. Instructions for Certification - Lower Tier Participants:**

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered

transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**TERM B.3**
**REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2021 (Pub. L. 116-260), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

   (1) Certify whether the entity has a Tax Delinquency; and

   (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If

   (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

   (2) an entity provides an affirmative response to either certification in section 3; or

   (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

   (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

   (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

   (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

   (1) require the SAM check in section 2;

   (2) require the certifications in section 3;

   (3) include the prohibition in section 4; and

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.3, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.3, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.3, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.3, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While
Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

(1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

(i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS: FORMAT AND CONTENT**

1. **Purpose**. The purpose of the Quarterly Project Progress Reports and Recertifications under this agreement for the FY 2021 RAISE grant program are to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

2. **Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. At the discretion of the USDOT, modifications or additions can be made to produce a quarterly reporting format that will most effectively serve both the Recipient and the USDOT. Some projects will have a more extensive quarterly status than others. For smaller projects, the USDOT may determine that the content of the quarterly reports will be streamlined and project status meetings will be held on a less-frequent basis. The first quarterly progress report should include a detailed description and, where appropriate, drawings of the items funded.

(a) **Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any deviations from the scope of work, the schedule, or the budget that are described in this agreement.

(b) **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable Recovery Act requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

(c) **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction in order to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

(d) **Project Scope Overview.** The purpose of this section is to provide a further update regarding the project scope. If the original scope contained in the grant agreement is still accurate, this section can simply state that the scope is unchanged.

(e) **Project Schedule.** An updated master program schedule reflecting the current status of the program activities should be included in this section. A Gantt (bar) type chart is probably the most appropriate for quarterly reporting purposes, with the ultimate

format to be agreed upon between the Recipient and the USDOT. It is imperative that the master program schedule be integrated, i.e., the individual contract milestones tied to each other, such that any delays occurring in one activity will be reflected throughout the entire program schedule, with a realistic completion date being reported. Narratives, tables, and/or graphs should accompany the updated master program schedule, basically detailing the current schedule status, delays and potential exposures, and recovery efforts. The following information should also be included:

- Current overall project completion percentage vs. latest plan percentage.
- Completion percentages vs. latest plan percentages for major activities such as right-of-way, major or critical design contracts, major or critical construction contracts, and significant force accounts or task orders. A schedule status description should also be included for each of these major or critical elements.
- Any delays or potential exposures to milestone and final completion dates. The delays and exposures should be quantified, and overall schedule impacts assessed. The reasons for the delays and exposures should be explained, and initiatives being analyzed or implemented in order to recover the schedule should be detailed.

(f) **Project Cost.** An updated cost spreadsheet reflecting the current forecasted cost vs. the latest approved budget vs. the baseline budget should be included in this section. One way to track project cost is to show: (1) Baseline Budget, (2) Latest Approved Budget, (3) Current Forecasted Cost Estimate, (4) Expenditures or Commitments to Date, and (5) Variance between Current Forecasted Cost and Latest Approved Budget. Line items should include all significant cost centers, such as prior costs, right-of-way, preliminary engineering, environmental mitigation, general engineering consultant, section design contracts, construction administration, utilities, construction packages, force accounts/task orders, wrap-up insurance, construction contingencies, management contingencies, and other contingencies. The line items can be broken-up in enough detail such that specific areas of cost change can be sufficiently tracked and future improvements made to the overall cost estimating methodology. A Program Total line should be included at the bottom of the spreadsheet. Narratives, tables, and/or graphs should accompany the updated cost spreadsheet, basically detailing the current cost status, reasons for cost deviations, impacts of cost overruns, and efforts to mitigate cost overruns. The following information should be provided:

- Reasons for each line item deviation from the approved budget, impacts resulting from the deviations, and initiatives being analyzed or implemented in order to recover any cost overruns.

- Transfer of costs to and from contingency line items, and reasons supporting the transfers.

- Speculative cost changes that potentially may develop in the future, a quantified dollar range for each potential cost change, and the current status of the speculative change. Also, a comparison analysis to the available contingency amounts should be included, showing that reasonable and sufficient amounts of contingency remain to keep the project within the latest approved budget.

- Detailed cost breakdown of the general engineering consultant (GEC) services (if applicable), including such line items as contract amounts, task orders issued (amounts), balance remaining for tasks, and accrued (billable) costs.

- Federal obligations and/or disbursements for the project, compared to planned obligations and disbursements.

**(g) Federal Financial Report (SF-425).** The Federal Financial Report (SF-425) is a financial reporting form used throughout the Federal Government Grant system. Recipients shall complete this form and attach it to each quarterly Project Progress and Monitoring Report. The form is available at https://www.grants.gov/forms/post-award-reporting-forms.html.

**(h) Certifications.**

**i.** A certification that the Recipient is in compliance with 2 CFR 200.303 (Internal Controls) and 2 CFR Part 200, Subpart F (Audit Requirements).

ii. The certification required under 2 CFR 200.415(a).

**EXHIBIT D**
**FORM FOR SUBSEQUENT OBLIGATION OF FUNDS**

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

As described in section 11.2(f) of the Agreement, this instrument obligates **[$XXX]** for **[insert portion of project listed in the Future Obligation Conditions Table of section 2.2]**.

**[Recipient name]** states that:

(1) section 3.1 and attachment A of the Agreement accurately describe the Project's activities;

(2) for each substantial completion date listed in section 3.2 of the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in section 3.2 of the Agreement;

(3) comparing the Project's current budget with the amounts listed in section 3.3 of the Agreement, the "Other Federal Funds" amount has not increased and each of the "State Funds," "Local Funds," "Other Funds," and "Total Eligible Project Cost" amounts have not decreased; and

(4) under the terms of article 12 of the Agreement, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

_______________ By: ______________________________

Date

Signature of Recipient's Authorized Representative

**[insert name]**

______________________________

Name

**[insert title]**

______________________________

Title

The USDOT has determined that:

(1) all conditions described in the Future Obligation Conditions Table in section 2.2 of the Agreement for this portion of the Project are satisfied; and

(2) all applicable Federal requirements for obligating these funds are satisfied.

______________ By: ______________________________

Date

Signature of USDOT's Authorized Representative

**[insert name]**

______________________________

Name

**[insert title]**

______________________________

Title

# U.S. DEPARTMENT OF TRANSPORTATION

# GENERAL TERMS AND CONDITIONS UNDER THE FISCAL YEAR 2021 REBUILDING AMERICAN INFRASTRUCTURE WITH SUSTAINABILITY AND EQUITY (RAISE) GRANT PROGRAM: FHWA PROJECTS

Revision date: April 23, 2025

**Table of Contents**

Article 8 Purpose .......... 5
8.1 Purpose. .......... 5
Article 9 USDOT ROLE .......... 5
9.1 Division of USDOT Responsibilities. .......... 5
9.2 USDOT Program Contacts. .......... 6
Article 10 RECIPIENT ROLE .......... 6
10.1 Statements on the Project. .......... 6
10.2 Statements on Authority and Capacity. .......... 6
10.3 USDOT Reliance. .......... 7
10.4 Project Delivery. .......... 7
10.5 Rights and Powers Affecting the Project. .......... 7
10.6 Notification of Changes to Key Personnel. .......... 7
Article 11 AWARD AMOUNT, OBLIGATION, AND TIME PERIODS .......... 8
11.1 Federal Award Amount. .......... 8
11.2 Federal Obligations. .......... 8
11.3 Budget Period. .......... 9
11.4 Period of Performance. .......... 9
Article 12 STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES .......... 9
12.1 Notification Requirement. .......... 9
12.2 Statement of Work Changes. .......... 10
12.3 Schedule Changes. .......... 10
12.4 Budget Changes. .......... 10
12.5 USDOT Acceptance of Changes. .......... 11
Article 13 GENERAL REPORTING TERMS .......... 11
13.1 Report Submission. .......... 11
13.2 Alternative Reporting Methods. .......... 12
13.3 Paperwork Reduction Act Notice. .......... 12
Article 14 PROGRESS AND FINANCIAL REPORTING .......... 12
14.1 Quarterly Project Progress Reports and Recertifications. .......... 12
14.2 Final Progress Reports and Financial Information. .......... 12
Article 15 PERFORMANCE REPORTING .......... 12
15.1 Baseline Performance Measurement. .......... 12
15.2 Post-construction Performance Measurement. .......... 13
15.3 Project Outcomes Report. .......... 13
15.4 Performance Reporting Survival. .......... 14
Article 16 NONCOMPLIANCE AND REMEDIES .......... 14
16.1 Noncompliance Determinations. .......... 14
16.2 Remedies. .......... 14
16.3 Other Oversight Entities. .......... 15
Article 17 AGREEMENT TERMINATION .......... 15
17.1 USDOT Termination. .......... 15
17.2 Closeout Termination. .......... 16
17.3 Post-Termination Adjustments. .......... 16
17.4 Non-Terminating Events. .......... 16
17.5 Other Remedies. .......... 16
Article 18 MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS .......... 17

18.1 Recipient Monitoring and Record Retention. ........ 17
18.2 Financial Records and Audits. ........ 17
18.3 Internal Controls. ........ 17
18.4 USDOT Record Access. ........ 18
Article 19 CONTRACTING AND SUBAWARDS ........ 18
19.1 Minimum Wage Rates. ........ 18
19.2 Buy America. ........ 18
19.3 Small and Disadvantaged Business Requirements. ........ 18
19.4 Engineering and Design Services. ........ 19
19.5 Foreign Market Restrictions. ........ 19
19.6 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment. ........ 19
19.7 Pass-through Entity Responsibilities. ........ 19
19.8 Subaward and Contract Authorization. ........ 19
Article 20 COSTS, PAYMENTS, AND UNEXPENDED FUNDS ........ 20
20.1 Limitation of Federal Award Amount. ........ 20
20.2 Projects Costs. ........ 20
20.3 Timing of Project Costs. ........ 20
20.4 Recipient Recovery of Federal Funds. ........ 20
20.5 Unexpended Federal Funds. ........ 20
20.6 Timing of Payments to the Recipient. ........ 20
20.7 Payment Method. ........ 21
20.8 Information Supporting Expenditures. ........ 21
20.9 Reimbursement Frequency. ........ 21
Article 21 LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY ........ 21
21.1 Liquidation of Recipient Obligations. ........ 21
21.2 Funds Cancellation. ........ 22
Article 22 AGREEMENT MODIFICATIONS ........ 22
22.1 Bilateral Modifications. ........ 22
22.2 Unilateral Contact Modifications. ........ 22
22.3 USDOT Unilateral Modifications. ........ 22
22.4 Other Modifications. ........ 22
Article 23 RESERVED ........ 23
Article 24 RESERVED ........ 23
Article 25 FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS ........ 23
25.1 Uniform Administrative Requirements for Federal Awards. ........ 23
25.2 Federal Law and Public Policy Requirements. ........ 23
25.3 Federal Freedom of Information Act. ........ 23
25.4 History of Performance. ........ 24
25.5 Whistleblower Protection. ........ 24
25.6 External Award Terms and Obligations. ........ 24
25.7 Incorporated Certifications. ........ 24
Article 26 ASSIGNMENT ........ 25
26.1 Assignment Prohibited. ........ 25
Article 27 WAIVER ........ 25
27.1 Waivers. ........ 25
Article 28 ADDITIONAL TERMS AND CONDITIONS ........ 25

28.1 Effect of Urban or Rural Designation. ... 25
28.2 Disclaimer of Federal Liability ... 25
28.3 Relocation and Real Property Acquisition. ... 25
28.4 Equipment Disposition. ... 26
Article 29 MANDATORY AWARD INFORMATION ... 26
29.1 Information Contained in a Federal Award. ... 26
Article 30 CONSTRUCTION AND DEFINITIONS ... 27
30.1 Attachments. ... 27
30.2 Exhibits. ... 27
30.3 Construction. ... 27
30.4 Integration. ... 27
30.5 Definitions. ... 27
Article 31 AGREEMENT EXECUTION AND EFFECTIVE DATE ... 28
31.1 Counterparts. ... 28
31.2 Effective Date. ... 28

# GENERAL TERMS AND CONDITIONS

The Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) appropriated funds to the United States Department of Transportation (the "**USDOT**") under the heading "National Infrastructure Investments." The funds are available to provide Federal financial assistance for surface transportation infrastructure projects that will have a significant local or regional impact. The USDOT program administering those funds is the RAISE grant program.

The USDOT published a "Notice of Funding Opportunity for the Department of Transportation's National Infrastructure Investments (i.e., the Rebuilding American Infrastructure With Sustainability and Equity (RAISE) Grant Program) Under the Consolidated Appropriations Act, 2021," 86 Fed. Reg. 21,794 (April 23, 2021) (the "**NOFO**") to solicit applications for Federal financial assistance.

These general terms and conditions are incorporated by reference in a project-specific agreement under the fiscal year 2021 RAISE grant program. Articles 1–7 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through E are project-specific attachments.

## ARTICLE 8
## PURPOSE

### 8.1 Purpose.

The purpose of this award is to advance capital investments in surface transportation infrastructure that will have a significant local or regional impact. The parties will accomplish that purpose by achieving the following objectives:

(1) timely completing the Project; and

(2) ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by section 3.3 and Attachment B.

## ARTICLE 9
## USDOT ROLE

### 9.1 Division of USDOT Responsibilities.

(a) The Office of the Secretary of Transportation is responsible for the USDOT's overall administration of the RAISE grant program, the approval of this agreement, and any modifications to this agreement under section 22.1.

(b) The Federal Highway Administration (the "**FHWA**") will administer this agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**9.2 USDOT Program Contacts.**

FHWA RAISE Program Manager
Federal Highway Administration
Office of Freight Management and Operations
1200 New Jersey Avenue SE
Room E84-429
Washington, DC 20590
(202) 366-2639 or (202) 366-1200
FHWA-TIGER.Reports@dot.gov

and

OST RAISE Grants Coordinator
United States Department of Transportation
Office of the Secretary
1200 New Jersey Avenue SE
Room W84-227
Washington, DC 20590
(202) 366-8914
BUILDGrants@dot.gov

## ARTICLE 10
## RECIPIENT ROLE

**10.1 Statements on the Project.**

The Recipient states that:

(1) all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2) Attachment D documents all material changes in the information contained in that application.

**10.2 Statements on Authority and Capacity.**

The Recipient states that:

(1) it has the authority to receive Federal financial assistance under this agreement;

(2) it has the legal authority to complete the Project;

(3) it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4) not less than the difference between the "Total Eligible Project Cost" and the "RAISE Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)      it has sufficient funds available to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)      the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 10 and in section 25.7 on behalf of the Recipient.

**10.3    USDOT Reliance.**

The Recipient acknowledges that:

(1)      the USDOT relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)      the USDOT relied on statements of fact in both the Technical Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)      the USDOT relied on statements of fact in both the Technical Application and this agreement to establish the terms of this agreement; and

(4)      the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**10.4    Project Delivery.**

(a)  The Recipient shall complete the Project under the terms of this agreement.

(b)  The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to projects of the Administering Operating Administration.

**10.5    Rights and Powers Affecting the Project.**

(a)  The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b)  The Recipient shall act, in a manner acceptable to the USDOT, to promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**10.6    Notification of Changes to Key Personnel.**

The Recipient shall notify all USDOT representatives who are identified in section 5.4 in writing within 30 calendar days of any change in key personnel who are identified in section 5.3.

## ARTICLE 11
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**11.1    Federal Award Amount.**

The USDOT hereby awards a RAISE Grant to the Recipient in the amount listed in section 2.2 as the RAISE Grant Amount.

**11.2    Federal Obligations.**

(a) If the Federal Obligation Type identified in section 2.2 is "Single," then this agreement obligates for the budget period the amount listed in section 2.2 as the RAISE Grant Amount and sections 11.2(c)–11.2(h) do not apply to this agreement.

(b) If the Federal Obligation Type identified in section 2.2 is "Multiple," then an amount up to the RAISE Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 11.2(c)–11.2(h).

(c) The RAISE Grant Allocation Table in section 2.2 allocates the RAISE Grant among separate portions of the Project for the purpose of obligations. The scope of each portion of the Project that is identified in that table is described in Attachment A.

(d) This agreement obligates for the budget period only the amounts allocated in the RAISE Grant Allocation Table in section 2.2 to the portions of the Project that are not listed in the Future Obligation Conditions Table in section 2.2.

(e) This agreement does not obligate amounts allocated in the RAISE Grant Allocation Table in section 2.2 to the portions of the Project that are listed in the Future Obligation Conditions Table in section 2.2. The parties may obligate the amounts allocated to those portions of the Project only as described in section 11.2(f) or by modifying this agreement under article 22.

(f) For each portion of the Project that is listed in the Future Obligation Conditions Table in section 2.2, the amount allocated to that portion of the Project in RAISE Grant Allocation Table in section 2.2 is obligated if, not later than September 30, 2024, the parties execute an instrument, in the form provided in Exhibit D, documenting that:

(1)    the USDOT determines that all of the conditions associated with that portion in the Future Obligation Conditions Table are satisfied;

(2)    the USDOT determines that all applicable Federal requirements for obligating the amount are satisfied; and

(3)    the Recipient states that it is not required to request a modification of this agreement under article 12.

(g) The Recipient shall not request reimbursement of costs for a portion of the Project that is listed in the Future Obligation Conditions Table in section 2.2 unless the amount

allocated to that portion of the Project in the RAISE Grant Allocation Table in section 2.2 is obligated under section 11.2(f).

(h) The Recipient acknowledges that:

    (1)    the USDOT is not liable for payments for a portion of the Project that is listed in in the Future Obligation Conditions Table in section 2.2 unless the amount allocated to that portion of the Project in the RAISE Grant Allocation Table in section 2.2 is obligated under section 11.2(f);

    (2)    any portion of the RAISE Grant that is not obligated under this section 11.2 before October 1, 2024, lapses on that date and becomes unavailable for the Project; and

    (3)    the USDOT may consider the failure to obligate funds before October 1, 2024, to be a basis for terminating this agreement under section 17.1.

**11.3    Budget Period.**

The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 2.3. In this agreement, "budget period" is used as defined at 2 CFR 200.1.

**11.4    Period of Performance.**

(a) If the USDOT Payment System identified in section 6.1 is "FMIS," then the period of performance for this award begins on the date of this agreement and ends on project end date in FMIS.

(b) If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the period of performance for this award begins on the date of this agreement and ends on the period of performance end date that is listed in section 2.3.

(c) In this agreement, "period of performance" is used as defined at 2 CFR 200.1.

## ARTICLE 12
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**12.1    Notification Requirement.**

The Recipient shall notify all USDOT representatives who are identified in section 5.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 12.1 is separate from any requirements under this article 12 that the Recipient request modification of this agreement.

**12.2    Statement of Work Changes.**

If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment A, then the Recipient shall request a modification of this agreement to update section 3.1 and Attachment A.

**12.3    Schedule Changes.**

If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this agreement to update the relevant dates:

(1)    a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2;

(2)    a schedule change would require the budget period to continue after the final budget period end date listed in section 2.3 (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements); or

(3)    the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing" and a schedule change would require the period of performance to continue after the period of performance end date listed in section 2.3.

For other schedule changes, the Recipient shall request a modification of this agreement unless the USDOT has consented, in writing consistent with the Administering Operating Administration's requirements, to the change.

**12.4    Budget Changes.**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient shall request a modification of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c)  For budget changes that are not identified in section 12.4(b), the Recipient shall request a modification of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with the Administering Operating

Administration's requirements, to the change.

(d) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with the Administering Operating Administration's requirements, specific additional activities that are within the scope of this award, as defined in sections 8.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 12.4(d) or the USDOT does not accept the Recipient's proposal under section 12.4(d), then:

(1) in a request under section 12.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2) if that modification reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall refund to the USDOT the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the "RAISE Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3.

(f) The Recipient acknowledges that amounts that are required to be refunded under section 12.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR parts 901).

### 12.5 USDOT Acceptance of Changes.

The USDOT may accept or reject modifications requested under this article 12, and in doing so may elect to consider only the interests of the RAISE grant program and the USDOT. The Recipient acknowledges that requesting a modification under this article 12 does not amend, modify, or supplement this agreement unless the USDOT accepts that modification request and the parties modify this agreement under section 22.1.

## ARTICLE 13
## GENERAL REPORTING TERMS

### 13.1 Report Submission.

The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 5.4 and all USDOT contacts who are listed in section 9.2.

**13.2 Alternative Reporting Methods.**

The Administering Operating Administration may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the Administering Operating Administration.

**13.3 Paperwork Reduction Act Notice.**

Under 5 CFR 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2105- 0563.

## ARTICLE 14
## PROGRESS AND FINANCIAL REPORTING

**14.1 Quarterly Project Progress Reports and Recertifications.**

On or before the 20th day of the first month of each calendar year quarter and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Project Progress Report and Recertification in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year quarter, then the Recipient shall submit the first Quarterly Project Progress Report and Recertification in the second calendar year quarter that begins after the date of this agreement.

**14.2 Final Progress Reports and Financial Information.**

No later than 120 days after the end of the period of performance, the Recipient shall submit

(1) a Final Project Progress Report and Recertification in the format and with the content described in Exhibit C for each Quarterly Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2) any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 15
## PERFORMANCE REPORTING

**15.1 Baseline Performance Measurement.**

If the Capital-Planning Designation in section 2.5 is "Capital," then:

(1) the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in Attachment C, accurate as of the Baseline Measurement Date that is identified in Attachment C; and

(2)     on or before the Baseline Report Date that is stated in Attachment C, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 15.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment C.

**15.2    Post-construction Performance Measurement.**

If the Capital-Planning Designation in section 2.5 is "Capital," then

(1)     for each performance measure that is identified in the Performance Measure Table in Attachment C with quarterly measurement frequency, for each of 12 consecutive calendar quarters, beginning with the first calendar quarter that begins after the Project substantial completion date, at least once during the quarter, the Recipient shall collect data for that performance measure;

(2)     for each performance measure that is identified in the Performance Measure Table in Attachment C with annual measurement frequency, the Recipient shall collect data for that performance measure on at least three separate occasions: (i) once during the four consecutive calendar quarters that begin after the Project substantial completion date; (ii) once during the fourth calendar quarter after the first collection; and (iii) once during the eighth calendar quarter after the first collection; and

(3)     not later than January 31 of each year that follows a calendar year during which data was collected under this section 15.2, the Recipient shall submit to the USDOT a Post-construction Performance Measurement Report containing the data collected under this section 15.2 in the previous calendar year and stating the dates when the data was collected.

If an external factor significantly affects the value of a performance measure collected under this section 15.2, then the Recipient shall identify that external factor in the Post-construction Performance Measurement Report and discuss its influence on the performance measure.

**15.3    Project Outcomes Report.**

If the Capital-Planning Designation in section 2.5 is "Capital," then the Recipient shall submit to the USDOT, not later than January 31 of the year that follows the final calendar year during which data was collected under section 15.2, a Project Outcomes Report that contains:

(1)     a narrative discussion detailing project successes and the influence of external factors on project expectations;

(2)     all baseline and post-construction performance measurement data that the Recipient reported in the Baseline Performance Measurement Report and the Post-construction Performance Measurement Reports; and

(3) an *ex post* examination of project effectiveness relative to the baseline data that the Recipient reported in the Baseline Performance Measurement Report.

**15.4 Performance Reporting Survival.**

The data collection and reporting requirements in this article 15 survive the termination of this agreement.

## ARTICLE 16
## NONCOMPLIANCE AND REMEDIES

**16.1 Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 16.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1) accept the remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy; or

(3) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1) after considering the Recipient's response under section 16.1(b); or

(2) if the Recipient fails to respond under section 16.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

**16.2 Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 16.1, the USDOT may impose a remedy, including:

(1)    additional conditions on the award;

(2)    any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

(3)    any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 16.2(a), before making a final determination of noncompliance under section 16.1. If it does so, then the notice provided under section 16.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 16.2 or making a public interest determination under section 16.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 16.2 constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR parts 901).

**16.3    Other Oversight Entities.**

Nothing in this article 16 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 17
## AGREEMENT TERMINATION

**17.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(1)    the Recipient fails to obtain or provide any non-RAISE Grant contribution or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

(2)    a construction start date for the Project or a component of the Project is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(3) a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4) the Recipient fails to meet a milestone listed in section 4.1 by the deadline date listed in that section for that milestone;

(5) the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(6) the USDOT determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 17.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 16.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 17.1.

**17.2 Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 CFR 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**17.3 Post-Termination Adjustments.**

The Recipient acknowledges that under 2 CFR 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**17.4 Non-Terminating Events.**

(a) The end of the budget period described under section 11.3 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The end of the period of performance described under section 11.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(c) The cancellation of funds under section 21.2 does not terminate this agreement or the Recipient's obligations under this agreement.

**17.5 Other Remedies.**

The termination authority under this article 17 supplements and does not limit the USDOT's remedial authority under article 16 or 2 CFR part 200, including 2 CFR 200.339–200.340.

## ARTICLE 18
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**18.1 Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

(1) that those activities comply with this agreement; and

(2) that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 CFR 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 CFR 200.334.

**18.2 Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 18.2(a) in accordance with a financial management system that meets the requirements of 2 CFR 200.302–200.307, 2 CFR 200 subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2021 RAISE grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

(1) list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 CFR 200 subpart F, including “FY 2021” in the program name; and

(2) list expenditures under that program on a separate row under Part II, Item 1 (“Federal Awards Expended During Fiscal Period”) of Form SF-SAC, including “FY 2021” in column c (“Additional Award Identification”).

**18.3 Internal Controls.**

The Recipient shall establish and maintain internal controls as required under 2 CFR 200.303.

**18.4 USDOT Record Access.**

The USDOT may access Recipient records related to this award under 2 CFR 200.337.

## ARTICLE 19
## CONTRACTING AND SUBAWARDS

**19.1 Minimum Wage Rates.**

The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with the Davis-Bacon Act, 40 U.S.C. 3141–3148, or 23 U.S.C. 113, as applicable, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

**19.2 Buy America.**

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c) Under 2 CFR 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The Recipient shall include the requirements of 2 CFR 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

**19.3 Small and Disadvantaged Business Requirements.**

If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26, including any amendments thereto. The Recipient shall expend all other funds under this award in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**19.4    Engineering and Design Services.**

The Recipient shall award each contract or sub- contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C. 1101-1104 as implemented in 23 U.S.C. 112(b)(2), or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**19.5    Foreign Market Restrictions.**

The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**19.6    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**19.7    Pass-through Entity Responsibilities.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR 200.331–200.333.

**19.8    Subaward and Contract Authorization.**

(a)  If the USDOT Office for Subaward and Contract Authorization identified in section 6.2 is "FHWA Division," then the Recipient shall comply with subaward and contract authorization requirements under 23 CFR chapter I, subchapter G.

(b)  If the USDOT Office for Subaward and Contract Authorization identified in section 6.2 is "FHWA Office of Acquisition and Grants Management," then the Recipient shall obtain prior written approval from the USDOT agreement officer pursuant to 2 CFR 200.308, 2 CFR 200 333, and 23 CFR part 172, as applicable, for the subaward or contracting out of any work under this agreement. Approvals under 2 CFR 200.308 will be contingent upon a fair and reasonable price determination on the part of the Recipient and the agreement officer's concurrence on that determination. Approvals under 2 CFR 200.308(f)(6) do not apply to the acquisition of supplies, materials, equipment, or general support services.

## ARTICLE 20
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

### 20.1 Limitation of Federal Award Amount.

Under this award, the USDOT shall not provide funding greater than the amount obligated under section 11.2. The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

### 20.2 Projects Costs.

This award is subject to the cost principles at 2 CFR 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

### 20.3 Timing of Project Costs.

(a) The Recipient shall not charge to this award costs that are incurred after the final budget period.

(b) The Recipient shall not charge to this award costs that were incurred before the date of this agreement unless those costs are identified in Attachment E and would have been allowable if incurred during the budget period. This limitation applies to costs incurred under an advance construction authorization (23 U.S.C. 115), costs incurred prior to authorization (23 CFR 1.9(b)), and pre-award costs under 2 CFR 200.458. This agreement hereby terminates and supersedes any previous USDOT approval for the Recipient to incur costs under this award for the Project. Attachment E is the exclusive USDOT approval of costs incurred before the date of this agreement.

### 20.4 Recipient Recovery of Federal Funds.

The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

### 20.5 Unexpended Federal Funds.

Any Federal funds that are awarded at section 11.1 but not expended on allocable, allowable costs remain the property of the United States.

### 20.6 Timing of Payments to the Recipient.

(a) Reimbursement is the payment method for the RAISE grant program.

(b) The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**20.7    Payment Method.**

(a) If the USDOT Payment System identified in section 6.1 is "FMIS," then the Recipient shall follow FMIS procedures to request and receive reimbursement payments under this award.

(b) If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method.

(c) The USDOT may deny a payment request that is not submitted using the method identified in this section 20.7.

**20.8    Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**20.9    Reimbursement Frequency.**

If the USDOT Payment System identified in section 6.1 is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.


## ARTICLE 21
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY


**21.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory funds cancellation date identified in section 21.2.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 CFR 200.344–200.346.

**21.2    Funds Cancellation.**

Outstanding FY 2021 RAISE Grant balances are canceled by statute after September 30, 2029, and are then unavailable for any purpose, including adjustments.

## ARTICLE 22
## AGREEMENT MODIFICATIONS

**22.1    Bilateral Modifications.**

The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**22.2    Unilateral Contact Modifications.**

(a)  The Recipient may update the contacts who are listed in section 5.2 by written notice to all of the USDOT contacts who are listed in sections 5.4 and 9.2.

(b)  The USDOT may update the contacts who are listed in sections 5.4 and 9.2 by written notice to all of the Recipient contacts who are listed in section 5.2.

**22.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 22.3, the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**22.4    Other Modifications.**

The parties shall not amend, modify, or supplement this agreement except as permitted under sections 22.1, 22.2, or 22.3. If an amendment, modification, or supplement is not permitted under section 22.1, not permitted under section 22.2, and not permitted under section 22.3, it is void.

## ARTICLE 23
## RESERVED

## ARTICLE 24
## RESERVED

## ARTICLE 25
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

### 25.1 Uniform Administrative Requirements for Federal Awards.

The Recipient shall comply with the obligations on non-Federal entities under 2 CFR parts 200 and 1201.

### 25.2 Federal Law and Public Policy Requirements.

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

### 25.3 Federal Freedom of Information Act.

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**25.4    History of Performance.**

Under 2 CFR 200.206, any Federal agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**25.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**25.6    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 30, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)    2 CFR part 175: Award Term for Trafficking in Persons; and

(4)    Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 CFR part 20: New Restrictions on Lobbying;

(2)    49 CFR part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)    49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**25.7    Incorporated Certifications.**

The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1) Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

## ARTICLE 26
## ASSIGNMENT

**26.1 Assignment Prohibited.**

The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 27
## WAIVER

**27.1 Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

## ARTICLE 28
## ADDITIONAL TERMS AND CONDITIONS

**28.1 Effect of Urban or Rural Designation.**

Based on information that the Recipient provided to the USDOT, including the Technical Application, at section 2.4 this agreement designates this award as an urban award or a rural award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**28.2 Disclaimer of Federal Liability.**

The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**28.3 Relocation and Real Property Acquisition.**

(a) To the greatest extent practicable under State law, the Recipient shall comply with the

land acquisition policies in 49 CFR 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 CFR 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, comparable replacement dwellings in accordance with 49 CFR 24.

**28.4 Equipment Disposition.**

(a) In accordance with 2 CFR 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project:

(1) if the entity that acquired the equipment is a State the State shall dispose of that equipment in accordance with State laws and procedures; and

(2) if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal law and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR 200.313; and

(3) if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity shall request disposition instructions from the Administering Operating Administration.

(b) In accordance with 2 CFR 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR 200.310–200.316 and 2 CFR 1201.313.

(c) The Recipient shall ensure compliance with this section 28.4 for all tiers of subawards under this award.

## ARTICLE 29
## MANDATORY AWARD INFORMATION

**29.1 Information Contained in a Federal Award.**

For 2 CFR 200.211:

(1) the "Federal Award Date" is the date of this agreement, as defined under section 31.2;

(2) the "Assistance Listings Number" is 20.933 and the "Assistance Listings Title" is "National Infrastructure Investments"; and

(3) this award is not for research and development.

## ARTICLE 30
## CONSTRUCTION AND DEFINITIONS

### 30.1 Attachments.

This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Statement of Work |
| Attachment B | Estimated Project Budget |
| Attachment C | Performance Measurement Information |
| Attachment D | Changes from Application |
| Attachment E | Approved Pre-Award Costs |

### 30.2 Exhibits.

The following exhibits, which are located in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2021 RAISE Grants Program," dated April 23, 2025, and available at https://www.transportation.gov/BUILDgrants/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

### 30.3 Construction.

If a provision in the exhibits or the attachments conflicts with a provision in articles 1–31, then the provision in articles 1–31 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

### 30.4 Integration.

This agreement constitutes the entire agreement of the parties relating to the RAISE grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the RAISE grant program and awards under that program.

### 30.5 Definitions.

In this agreement, the following definitions apply:

"**Program Statute**" means the statutory text under the heading "Department of Transportation—Office of the Secretary—National Infrastructure Investments" in title I of division L of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Technical Application, as modified by the

negotiated provisions of this agreement, including article 3 and Attachments A–E.

"**RAISE Grant**" means an award of funds that were made available under the NOFO.

"**Technical Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 31
## AGREEMENT EXECUTION AND EFFECTIVE DATE

### 31.1 Counterparts.

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

### 31.2 Effective Date.

The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a RAISE Grant when the USDOT's authorized representative signs it.

# EXHIBIT B

## BROADWAY STREETSCAPE IMPROVEMENTS

# Draft Racial Equity Impact Analysis for public review

CITY OF OAKLAND
DEPARTMENT OF TRANSPORTATION

# BROADWAY STREETSCAPE IMPROVEMENTS
## *Racial Equity Impact Analysis*

TRUC
ROUT
8th St

## Table of Contents

1. Introduction & Background
2. Project Area Communities
3. Equity Indicators
4. Identifying Equity Gaps & Recommendations
5. Next Steps
6. Conclusion & Contact Info

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION



# 1. INTRODUCTION & BACKGROUND

## *What is Racial Equity Impact Analysis?*

The framework for **Racial Equity Impact Analysis (REIA)** was developed by the Department of Race and Equity to explicitly embed racial equity into the City's decisions and policies. Unlike the blatantly discriminatory policies of the past, most policies today are not designed to intentionally exclude or to create additional barriers for people of color. Unfortunately, many policies still have real consequences that adversely affect how people of color experience and are impacted by systems.

For these conditions to change, City staff and policymakers must grow the capacity to assess and design explicitly for racial equity. REIA is a template to guide this process of change.

REIA is a tool for revealing racial disparities, unearthing root causes, engaging impacted communities and ultimately provides a set of specific recommendations to work with and a framework for evaluating impacts of decisions on equity.

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION

# 1. INTRODUCTION & BACKGROUND
## *What is Racial Equity Impact Analysis?*



**The City of Oakland REIA framework aims to:**

- Explicitly address issues of social and economic injustice, and structural racism

- Use data to identify groups impacted by racial disparities and racial equity outcomes

- Disrupt racial bias and assumptions embedded in policies, procedures and systems

- Build in decision-making prompts that evoke consideration of equity and inclusion of community

- Foster focused engagement of underserved stakeholders

- Systemically analyze potential impacts of City action or inaction on groups impacted by disparities

- Increase institution's capacity for, and commitment to results based accountability

# 1. INTRODUCTION & BACKGROUND
## *Applying REIA to Broadway*

This REIA is conducted on the **Broadway Streetscape Improvements,** a project that will be implemented on Broadway between 2nd Street and 11th Street and 20th Street to Grand Avenue. The scope of the project includes:

- Red bus-only lanes to improve transit access and reliability
- Transit Signal Priority (TSP) at all signalized intersections to help keep the signals green for approaching buses
- New bus shelters, seating, and trash cans at bus stops
- Additional street trees, landscaping, and public seating
- Pedestrian safety and accessibility measures such as large curb extensions, new ADA curb ramps, high-visibility crosswalks, upgraded intersection lighting, and wayfinding
- Broadway/I-880 underpass enhancements with lighting and placemaking elements
- Removal of the existing slip turn at 6th Street

# 2. PROJECT AREA COMMUNITIES

## *How does history impact project area communities today?*

Broadway is historically Oakland's "main street". Prior to the 1930s, downtown Oakland was the transit hub of a growing East Bay, where most people moved around on streetcars or on foot.

By the 1920s, car ownership began to grow, and Oakland's population increased to 300,000. Traffic congestion became a problem and constructing highways was seen as a solution. With additional highways and suburbs, neighborhoods became physically separated and East Bay suburban drivers began to bypass downtown Oakland.

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION

KAHNS

Source: https://www.spur.org/publications/urbanist-article/2015-02-03/four-plans-shaped-downtown-oaklands-first-100-years



# 2. PROJECT AREA COMMUNITIES
## *How is the project area defined?*

The project area is defined by seven census tracts that are within or adjacent to the project corridor.

This area has about 20,600 residents, with the majority living north of I-880.

Broadway is also a major commercial corridor with about 70,000 workers in the project area. Within these seven census tracts are over one-third of all jobs in Oakland.

**Population data source:** *American Community Survey (ACS) 2019 and 2021 5-Year Estimates. Census tracts include 4013, 4028, 4029, 4030, 4031, 4035.01, 9832.*

# 2. PROJECT AREA COMMUNITIES

## *Who are the people that will be impacted by this project?*

The project area residents differ from the City of Oakland as a whole in that there are more Asian residents (33% versus 16% citywide) and less Hispanic or Latino residents (7% versus 27% citywide).

Race and Ethinicity of Project Area Population
Project Area Residents
Citywide Residents
33%
16%
31%
29%
21%
22%
7%
27%
7%
6%
1%
0.5%
1%
1%
1%
0.3%
Asian
White
Black or African American
Hispanic or Latino
Two or more races
Native Hawaiian and Other Pacific Islander
Some other race
American Indian and Alaska Native

**Population data source:** *American Community Survey (ACS) 2021 5-Year Estimates.*

CITY OF OAKLAND

DEPARTMENT OF TRANSPORTATION

# 2. PROJECT AREA COMMUNITIES
## *Who are the people that will be impacted by this project?*

The project area has a high number of residents with very low-income residents—24% of residents make less than $20,000/year, compared to 13% citywide.

The number of residents with disabilities and who are over the age of 65, are also higher than residents citywide.

Income, disability, and age of project area residents versus residents citywide
24%
13%
52%
45%
17%
12%
21%
14%
Total Households with Income Less than $20,000
Total Households with Income Less than $75,000
Individuals with Disabilities
Individuals 65 years of age and older
Project Area Residents
Citywide

**Population data source:** *American Community Survey (ACS)* 2021 5-Year Estimates.

CITY OF OAKLAND DEPARTMENT OF TRANSPORTATION

# 2. PROJECT AREA COMMUNITIES

## *Who are the people that will be impacted by this project?*

The race and ethnicity of workers in the project area is similar to that of all Oakland workers.

Data also shows that workers in the project area have higher incomes when compared to all Oakland workers.

Race and Ethinicity of Project Area Population
Project Area Workers
All Oakland Workers
26%
23%
53%
53%
15%
17%
17%
22%
5%
4%
1%
1%
1%
1%
Asian
White
Black or African American
Hispanic or Latino
Two or more races
Native Hawaiian and Other Pacific Islander
American Indian and Alaska Native

**Population data source:** *U.S. Census Bureau, OnTheMap Application, https://onthemap.ces.census.gov (2021)*

CITY OF OAKLAND

DEPARTMENT OF TRANSPORTATION

# 2. PROJECT AREA COMMUNITIES

## *Who are the people that will be impacted by this project?*

The demographics of AC Transit users were captured in the 2023 Realign Survey. This survey showed that about 44% of frequent bus riders identify as a person of color and 50% of frequent rider householders have an annual income less than $75,000.

These results are different from the 2017 survey which showed that 75% of riders identify as people of color and about 67% are from low-income households. These changes in demographics may be a result of differing strategies to promote the surveys.

**Source:** *AC Transit Realign – Survey Results Technical Memo (2023). https://www.actransit.org/realign.*
*A total of 11,265 responded to the survey question about their race and ethnicity.*

DEPARTMENT OF TRANSPORTATION

# 2. PROJECT AREA COMMUNITIES
## *Who are the people that will be impacted by this project?*

**Broadway Streetscape Improvements Project Stakeholders**

- Residents who live near Broadway
- Businesses, organizations, and places of worship along and near Broadway
- People who take transit, walk, and roll along Broadway
- Neighbor Councils
- City of Oakland Commissions and Boards
- Advocacy groups
- Community-based organizations
- Other local agencies

CITY OF OAKLAND DEPARTMENT OF TRANSPORTATION



# 3. EQUITY INDICATORS
## *Overview of equity indicators*

Equity indicators help us to quantify, measure, and understand complex disparities. Indicators are chosen based on the anticipated project impacts. The indicators selected for this REIA include:

- Traffic collisions by race and age
- Traffic-related air pollution (TRAP)
- Mortality, attributed to Nitrogen Dioxide ($NO_2$)—an emission that results from burning fuel
- Urban tree canopy
- Internet access at home
- Household vehicle availability
- Community-identified AC Transit needs

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION

# 3. EQUITY INDICATORS: *Race and ethnicity of collision victims*

Collision victims on the Broadway corridor were twice as likely to be Black Oaklanders when compared to Oakland's population as a whole. This is similar to outcomes found in the citywide crash data analysis.

DEPARTMENT OF TRANSPORTATION

**Collision data source:** Transportation Injury Mapping System (TIMS), *Safe Transportation Research and Education Center, University of California, Berkeley*. Analysis used 5 years of data (2016 – 2020). **Population data source:** *American Community Survey (ACS)* 2021 5-Year Estimates.

# 3. EQUITY INDICATORS: *Age of collision victims*

Collision victims on the Broadway corridor were more likely to be between the ages of 15 and 24 and 45 and 64. Other age groups were underrepresented.

DEPARTMENT OF TRANSPORTATION

**Collision data source:** Transportation Injury Mapping System (TIMS), *Safe Transportation Research and Education Center, University of California, Berkeley*. Analysis used 5 years of data (2016 – 2020). **Population data source:** *American Community Survey (ACS)* 2021 5-Year Estimates.

# 3. EQUITY INDICATORS: *Air quality – Black Carbon (BC)*

Broadway Streetscape Improvements

micrograms per m³

0 0.25 0.50 0.75 1+

The Broadway project corridor has a high concentration of black carbon compared to nearby streets.

Black carbon particles come from burning fuel, especially diesel, wood and coal. High exposure is associated with heart attacks, stroke, and some forms of cancer.

The main source of black carbon particles on Broadway is likely from diesel powered trucks and buses. Broadway intersects with multiple truck routes and is the busiest transit corridor in AC Transit's system. Additionally, tall buildings can cause pockets of stagnant air flow, trapping pollutants.

**Source:** https://www.edf.org/airqualitymaps/oakland/pollution-and-health-concerns-west-oakland

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION

# 3. EQUITY INDICATORS: *Air quality – Nitric Oxide (NO)*




Source: https://www.edf.org/airqualitymaps/oakland/pollution-and-health-concerns-west-oakland

The Broadway project corridor has a very high concentration of nitric oxide (NO) compared to nearby streets.

Nitric oxide is strongly associated with heavy traffic. It forms smog and acid rain and can cause respiratory problems.



CITY OF OAKLAND

DEPARTMENT OF TRANSPORTATION

# 3. EQUITY INDICATORS: *Air quality – Nitrogen Dioxide (NO2)*

micrograms per m³

0 0.25 0.50 0.75 1+

**Broadway Streetscape Improvements**

The Broadway project corridor has a somewhat higher concentration of nitrogen dioxide (NO2) compared to nearby streets.

Nitrogen dioxide is formed when nitric oxide mixes with oxygen in the air. It's associated with respiratory problems.

**Source:** https://www.edf.org/airqualitymaps/oakland/pollution-and-health-concerns-west-oakland

CITY OF **OAKLAND**

**DEPARTMENT OF TRANSPORTATION**

# 3. EQUITY INDICATORS: *Outcomes of poor air quality*

The Broadway project corridor is in an area with the highest number of deaths attributable to nitrogen dioxide ($NO_2$) in Oakland.

Nitrogen dioxide is a traffic-related emission, and results from burning fuel. This data indicates that residents in this area likely to face negative health outcomes from traffic-related emissions.

**Source:** Oakland 2045 General Plan | Environmental Justice Element | September 2023

CITY OF OAKLAND | DEPARTMENT OF TRANSPORTATION

# 3. EQUITY INDICATORS: *Urban tree canopy*

The Broadway project corridor is in an area with less urban trees than most of Oakland.

Trees play a key role in the climate as they absorb carbon dioxide and help manage stormwater runoff. They also help fight pollution by improving air quality, aid in cooling on hot days, and generally make it more pleasant to recreate outside.

**Source:** Oakland 2045 General Plan | Environmental Justice Element | September 2023

# 3. EQUITY INDICATORS: *Home internet access*

The Broadway project corridor borders areas where more residents do not have internet access at home compared to the rest of Oakland. In two high density census tracts that border Broadway, approximately 24-36% of households do not have internet access.

The impacts of digital isolation, especially for older adults, people with disabilities, and communities of color, include less access to resources and decreased ability to participate in civic, political, and non-political activities, which compounds other barriers to civic engagement and increases impacts of racial disparities in access to resources and opportunities.

**Source:** Oakland 2045 General Plan | Environmental Justice Element | September 2023

# 3. EQUITY INDICATORS: *Household vehicle availability*

Households living near the Broadway project corridor have less access to vehicles than Oakland as a whole. About 40% of the project area households do not have access to a vehicle at home, compared to 15% of households citywide.

Cars remain an important mode of transportation for traveling to work, school, appointments, social gatherings, and getting groceries or other shopping. Car access is particularly beneficial in areas of the city where public transit is either inconsistent or unavailable and where streets are unsafe or inaccessible for pedestrians and bicyclists.

**Population data source:** *American Community Survey (ACS)* 2021 5-Year Estimates.

CITY OF OAKLAND | DEPARTMENT OF TRANSPORTATION

# 3. EQUITY INDICATORS: *AC Transit Improvements*

The 2023 AC Transit Realign Survey asked respondents to identify how they thought AC Transit service could be improved.

While most respondents stated that the most important improvements were more frequent and reliable service, safety was more of a concern for respondents who identified as a person of color. Of note, 23% of respondents who filled out paper surveys (rather than online) said safety was the most important improvement, compared to 8% of all respondents.

SERVICE IMPROVEMENTS
26%
of respondents requested reliable service
27% of respondents want more frequent service
17% of respondents want more coverage and to preserve existing coverage
9%
of respondents requested connections to other modes
8%
of respondents are concerned about their safety

**Source:** *AC Transit Realign – Survey Results Technical Memo (2023).* https://www.actransit.org/realign.

CITY OF OAKLAND
DEPARTMENT OF TRANSPORTATION

# 4. EXISTING DISPARITIES

**Collision victims are 2-3 times as likely to be Black or African American.**
Traffic collisions disproportionately impact Black Oaklanders on this corridor. While 21% of residents and 15% of workers identify as Black or African American along the project corridor, 43% of collision victims are Black or African American.

**Air quality is worse along Broadway, impacting nearby residents, bus riders, and individuals experiencing homelessness.**
Broadway has significantly higher levels of traffic-related air pollution (TRAP) than other nearby streets in Downtown, Uptown, Old Oakland, and Jack London. Nearby residents and those who spend time outside on Broadway, such as bus riders and individuals experiencing homelessness, are frequently exposed to these air pollutants. When compared to the rest of Oakland, the project area has more Asian residents, low-income households, individuals with disabilities, and seniors. One-third of project area residents are Asian, and half of households are low-income.

**The project area has a higher number of deaths attributable to traffic-related air pollution.**
About 10% of deaths in the project area are attributable to nitrogen dioxide (NO2). This rate is the highest in the City.

**The project area has some of the lowest urban tree canopy in the City**.
The project area has between 0-8% urban tree canopy coverage, while the highest in the city has 68% coverage. A lack of urban tree canopy can create uncomfortable conditions for those traveling on the street, especially for pedestrians and people waiting for the bus, and for individuals experiencing homelessness.

**More residents do not have home internet compared to the rest of Oakland.**
Approximately 24-36% of households in the project area do not have internet access. This results in less access to resources and decreased ability to participate in civic, political, and non-political activities, which increases impacts of racial disparities in access to resources and opportunities.

**More households do not have access to a personal vehicle compared to the rest of Oakland**.
40% of households in the project area do not have access to a personal vehicle, which is more than double when compared to all Oakland households.

**Communities want to see increased frequency and improved reliability, and POC bus riders prioritize safety.**
A survey has showed that while all respondents want increased bus frequency and better reliability, respondents identifying as persons of color prioritized safety more than White-identifying respondents.

# 5. IDENTIFYING EQUITY GAPS & RECOMMENDATIONS

| Disparity | How Project Addresses Disparities | Equity Gaps | Additional Recommended Actions |
|---|---|---|---|
| Traffic collisions | This project is expected to improve the safety of all road users. | The project is intended to reduce all collisions, but this does not mean that the race and ethnicity of collision victims will be proportional to the race and ethnicity of Oaklanders or those traveling on the street. | Identify the root cause of the disparity and/or expand scope to further address safety. |
| Air quality and health outcomes of poor air quality | This project is expected to reduce driving, thereby reducing emissions and improving air quality. | The project corridor has poor air quality and encouraging walking and rolling on the corridor by making it and pedestrian-friendly could increase exposure to poor air quality and have negative impacts on health. It may take a long time before air quality improves in the area because of mode shift or new vehicle technology. | Maximize tree planting along the corridor to improve air quality. Support AC Transit's transition to low emission buses. Support rerouting of diesel-powered trucks. Encourage bicyclists to take alternative routes. Share air quality information with priority equity communities. |
| Urban tree canopy | This project is planting new trees to help improve air quality through filtration and cooler temperatures. | N/A | New trees should be added where feasible. Although the project area shows low tree canopy, Broadway has more trees than most streets in the project area. Tree planting should be prioritized where gaps exist and where it brings the most benefit to priority equity communities. |
| Home internet access | This project will enable free WiFi along the corridor. | OakWiFi has not been evaluated and it is unknown how often it works or how often people can connect to it within buildings. | Evaluate OakWiFi and inform Oaklanders of what to expect when using it. |
| Access to personal vehicles | This project will improve safety for all road users, accessibility, and transit to make it easier to travel without access to a personal vehicle | While the project is improving pedestrian safety, accessibility, and transit, this does not always replace the need for a vehicle. Many car-less households in the project area may choose to live without a vehicle because of the proximity to regional and local transit. However, some households may not have access to a personal vehicle, carshare, or rideshare because they are cost prohibitive. | Expand Universal Basic Mobility to priority equity communities in the project area and in Oakland. Engage with communities to understand what modes they most prefer and what barriers there are to using these modes. |
| Community-identified bus improvements | This project will be improving reliability of bus service and safety for bus riders through improved lighting. | N/A | Conduct additional engagement to identify if additional safety improvements are needed. |

# 6. NEXT STEPS

- Inform project stakeholders that REIA has been drafted
- Update REIA based on stakeholder feedback
- Develop a project evaluation plan that incorporates equity indicators and conduct the evaluation.
- Work with OakDOT's Race and Equity Team (RET) to identify next steps on recommended actions

CITY OF
OAKLAND
DEPARTMENT OF
TRANSPORTATION

# CONTACT US

**Division Page**
www.oaklandca.gov/MPD

**Project Webpage**
www.oaklandca.gov/Broadway

**Contact**
mpd@oaklandca.gov



# EXHIBIT C

# EXHIBIT D

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2025, I served a true and correct copy of the foregoing document on the following parties by the method(s) indicated below:

| | |
|---|---|
| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 14th day of July, 2025.

*/s/ Gabriela DeGregorio*
Gabriela DeGregorio
Litigation Assistant
Pacifica Law Group LLP

PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750