1
2
3
4

THE HONORABLE BARBARA J. ROTHSTEIN

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7    MARTIN LUTHER KING, JR.
     COUNTY, et al.,
8
                              Plaintiffs,
9           v.

10   SCOTT TURNER in his official capacity
     as Secretary of the U.S. Department of
11   Housing and Urban Development, et al.,

12
                              Defendants.
13

No. 2:25-cv-00814-BJR

DECLARATION OF
CHRISTINA BIBLER,
DIRECTOR OF THE ECONOMIC
DEVELOPMENT DEPARTMENT,
CITY OF SAN DIEGO

14
15   I, CHRISTINA BIBLER, declare as follows:

16      1.    I am over eighteen years of age and this declaration is based on my personal

17   knowledge, information provided to me in the performance of my job duties, and review of

18   business records. If called as a witness, I could testify competently to the matters set out below.

19      2.    I hold a B.A. degree in Applied Arts and Sciences, M.A. degree in City Planning,

20   and Certificate in Community and Economic Development from San Diego State University.

21      3.    I have served as Director of Economic Development (EDD) for the City of San

22   Diego (City or San Diego) since 2019. I have worked for the City since 2016.

23      4.    In my position, I oversee the City's efforts in real estate services, airport

24   management, community and business engagement, cultural affairs, and strategic partnerships.

25   Also, I am responsible for managing the Economic Development Department's implementation

26   of the Economic Development Strategy, an initiative I spearheaded to support workers, families,

27

DECLARATION OF CHRISTINA BIBLER - 1
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and small businesses; bolster trade and innovation; and strengthen neighborhoods.

5.    For many years, San Diego has received and relies on federal funding from the U.S. Department of Housing and Urban Development (HUD) to address a wide range of housing and community development needs in the region. Overall, San Diego is a recipient of approximately $250 million in awarded and anticipated HUD funding through various grants, including but not limited to three federal entitlement grants: Community Development Block Grant (CDBG), Emergency Solutions Grant (ESG), and HOME Investment Partnerships Program (HOME). Of this amount, around $225 million is in active awarded grants and around $25 million is anticipated funding.

6.    Eligibility for HUD entitlement grants is based on a city's population size. And based on San Diego's population size of around 1.4 million people, which surpasses HUD's population threshold requirement of 80,000, San Diego automatically qualifies for entitlement allocations of federal funding annually. HUD's entitlement allocation of funding is determined by a statutory formula which considers San Diego's community needs, including the extent of poverty, housing overcrowding, age of housing stock, population size and growth lag.

7.    While San Diego does not have to apply through a formal competitive application process for HUD entitlement grants, each fiscal year, it is required to submit an Annual Action Plan, which serves as an application to HUD for these grants. This Plan specifies activities that will be supported by the entitlement allocation and anticipates outcomes that will assist the City to achieve goals it identified in its long-term Consolidated Plan for a five-year period. If, for any reason, San Diego does not submit its Plan by HUD's specified deadline, HUD will not execute a grant agreement to provide San Diego with HUD funding for the upcoming year.

8.    HUD funding is crucial and necessary for San Diego to address homelessness,

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

create affordable housing, provide rental assistance, and serve its residents.

9.      By way of example, San Diego is a recipient of approximately $94 million in awarded federal funding through the Community Development Block Grant since fiscal year 2018. For numerous years, HUD has awarded CDBG funding to San Diego annually, ranging between $10 million and $12 million each fiscal year. CDBG funding is intended to provide housing assistance and expand economic opportunities, principally for low- and moderate-income residents. The City's EDD employs a comprehensive application process to administer these funds to dozens of subrecipients, many of whom are local nonprofit organizations that assist residents. These organizations rely on CDBG funding to undertake various community development projects, such as providing property acquisition grants and loans for the creation of affordable housing, homeowner assistance, housing rehabilitation to improve the condition of homes, counseling services, public services, infrastructure and economic development, microenterprise assistance, business coaching, apprenticeships, and more. These projects are essential for San Diego to strengthen and build more resilient communities.

10.     Additionally, CDBG funding directly pays for the salary of sixteen full-time EDD City staff who assist with administering federal funds for community development projects, preparing Consolidated Annual Performance Reports for HUD after the end of each fiscal year, consulting with local organizations and stakeholders about community initiatives, and participating in extensive community engagement and public outreach. Funding also supports the work of employees from other City agencies, such as the City Attorney's Office as well as the Departments of Finance, Communications, and Engineering & Capital Projects. Last fiscal year alone, these City agencies expended around $4 million in reimbursable costs.

11.     Any pause, withholding, or termination of CDBG funds will cause substantial

DECLARATION OF CHRISTINA BIBLER - 3
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

harm to City staff, whose salaries are paid by these funds, but also to all subrecipient local organizations whose staff and projects depend on these funds to serve our communities. This may lead to layoffs of staff and hiring freezes for both the City and all its partner organizations. Reductions in City staffing would also limit San Diego's ability to monitor all HUD-funded programs for regulatory compliance. Further, loss of funding would delay the initiation of new projects and disrupt existing programs that help vulnerable residents in San Diego, affecting critical services such as healthcare, legal representation for children in the juvenile dependency system, meal delivery, and workforce training programs. Any denial of HUD funds would strain the City's overall budget, due to the lack of an alternative funding source.

12.     Further, the City may divert CDBG funding for immediate relief and solutions in the event of an emergency or disaster. If it does so, the City allocates at least 70% of funds to assist low- and moderate-income residents. A reason for this is that CDBG funds are vital to address local recovery needs that are not met by other federal or state programs.

13.     For instance, when San Diego declared a local state of emergency on January 22, 2024 due to a historic storm that caused severe flash flooding in the region, the City received CDBG-DR funds. Managed by and passed through California's Department of Housing and Community Development (HCD), these funds were instrumental for the City to assist in the repair infrastructure leading to homes that were damaged by the floods.

14.     Loss of CDBG funds and its uncertainty would impact the City's ability to plan for the regulatory timeliness test and would therefore hinder San Diego's capacity and ability to assist affected residents and under-resourced local small businesses with short- and long-term recovery efforts, including home buyer assistance, housing rehabilitation and reconstruction, acquisition of properties in unsafe areas to incentivize homeowner relocation, small business

DECLARATION OF CHRISTINA BIBLER - 4
No. 2:25-cv-00814-BJR

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

grants and loans, and restoration of damaged parks and neighborhood facilities.

15.    The City's Emergency Solutions Grant is another program that is also at risk. It is designed to assist individuals with regaining permanent housing after experiencing a housing crisis or homelessness. San Diego is a recipient of around $5.2 million in funds through the ESG program. Since fiscal year 2021, HUD has awarded San Diego approximately $1 million in ESG funding annually. The City depends on these funds to address and prevent homelessness, engage in street outreach, support emergency shelters, and provide rapid re-housing assistance. Loss of ESG funding would harm San Diego communities. In particular, it would diminish the City's continuous effort to engage in street outreach to reduce homelessness, offer rental subsidies, and provide case management and housing navigation services. It would further cause service programs to cease operations, particularly for homeless shelters, and indefinitely halt any ongoing housing construction, rehabilitation, or infrastructure projects. Ultimately, this would harm City residents and further exacerbate San Diego's severe housing crisis.

16.    San Diego's federal funding through the HOME program is another important example that may be threatened. It creates affordable housing for low-income households. The program is also intended to expand the capacity of nonprofit housing providers and strengthen the City's ability to provide housing and leverage private sector participation in housing projects. The City relies on approximately $39 million in awarded funds for the HOME program.

17.    The San Diego Housing Commission (SDHC) administers the HOME program for the City to purchase or rehabilitate affordable housing as well as provide rental assistance. Specifically, the SHDC uses funding for new affordable housing construction and rehabilitation and a First-Time Homebuyer program. Any disruption of funds to the program would directly harm low-income and marginalized residents and further worsen San Diego's housing situation.

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

For instance, loss of funding could additionally impact the housing situation for families whose incomes are less than 80% of San Diego's Area Median Income, veterans, seniors, and persons with disabilities. And the well-being of individuals supported by housing programs and services would be directly impacted, placing them at a greater risk of becoming unhoused.

18.     A final example of a threatened federal entitlement grant is San Diego's Housing Opportunities for Persons with AIDS (HOPWA) Program, for which the City is the entitlement jurisdiction and official grantee, and the County of San Diego is an alternative grantee pursuant to an agreement. The HOPWA program is aimed at assisting local communities in developing affordable housing opportunities and supportive services for low-income persons living with HIV/AIDS. HOPWA-eligible activities include direct housing, support services, information and referral, resource identification, technical assistance, and administration expenses.

19.     If funding for the HOPWA program stops, San Diego may have no choice but to eliminate short-term rental and mortgage assistance, permanent housing replacements, as well as emergency and transitional housing for low-income residents with HIV/AIDS. It would cause significant disruption to local efforts to help San Diegans in need of stable housing.

20.     It is important to note that HUD funding for CDBG, ESG, HOME, and HOPWA is set up to reimburse San Diego for eligible costs. This means that federal funds, once allocated, do not become immediately available. Instead, federal grant programs require the expenditure of San Diego's own funds first with the expectation of federal reimbursement later.

21.     Despite previously agreed upon entitlement allocations of funding as well as grant agreements with HUD, it is uncertain whether the City will receive federal reimbursements for funds that it already expended towards all the above-mentioned programs. As of May 30, 2025, the City has a negative cash balance of approximately $4.3 million that it is owed in federal

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

reimbursements from HUD. Meanwhile, San Diego continues to use its own funds to operate HUD-funded programs, operating under the assumption that HUD will reimburse eligible costs. This poses an enormous risk to the City's General Fund, which may have to absorb such costs, as San Diego faces a $258 million deficit for Fiscal Year 2026, which began on July 1, 2025. It also creates planning limitations, hampering the City's ability to plan its budget strategically.

22.     San Diego depends on and therefore anticipates seeking additional federal funding from competitive and entitlement grants for the current fiscal year and beyond.

23.     More recently, on June 30, 2025, the San Diego City Council approved the Fiscal Year 2026 Annual Action Plan prepared by the Economic Development Department. This Plan lays out how San Diego will administer around $43.5 million in HUD grants, comprised of $12.1 million in CDBG funds, $30.3 million in HOME funds, and $990,775 in ESG funds. Moreover, it breaks down the City's allocations to over twenty local nonprofits including Kitchens for Good, Monarch School, Serving Seniors, City Heights Community Development Corporation, Somali Family Service of San Diego, and Partnership for Environmental Progress.

24.     Notably, San Diego now faces a deadline of July 13, 2025 to submit its Fiscal Year 2026 Annual Action Plan to HUD, in addition to three mandatory forms and certifications: 1) SF-424, 2) required certifications in 24 CFR Part 91.225, 91.325 and 91.425, and 3) a revised HUD 424B Form, which demands that San Diego sign and certify under penalty of perjury its compliance with federal grant conditions. *See* Exhibit A, HUD Notice CPD-25-02. Specifically, these conditions require compliance with all applicable federal nondiscrimination requirements, "including those listed at 24 CFR §§ 5.105(a) and 5.106 as applicable," as well as assurance that funding will not be used "to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any appliable federal anti-discrimination laws." And if San

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Diego does not certify compliance with these grant conditions by the deadline, it is possible that HUD will forfeit the City's entitlement grants for this year.

25.     Any loss of federal funding would impair San Diego's overall ability and capacity to make transformative investments and resume meaningful work with mission-driven partners invested in our communities. It will devastate all of San Diego, exacerbating the severe housing crisis, hurting our most vulnerable residents, and jeopardizing public health and safety.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___ day of July, 2025, in San Diego, California.

Christina Bibler (Jul 9, 2025 18:21 PDT)

CHRISTINA BIBLER

PACIFICA LAW GROUP  LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-7000

OFFICE OF COMMUNITY PLANNING
AND DEVELOPMENT

Special Attention of:                          NOTICE: **CPD-25-02**
All CPD Division Directors
HUD Field Offices                              Issued: **January 14, 2025**
HUD Regional Offices                           Expires: **August 18, 2025**
All CDBG Grantees                              Cross Reference: 24 CFR Part 91
All HOME Participating Jurisdictions
All HTF Grantees
All ESG-Grantees
All HOPWA (Formula)-Grantees

---

Subject: Guidance on Submitting Consolidated Plans and Annual Action Plans for Fiscal Year (FY) 2025

**Purpose:**

The purpose of this Notice is to instruct all Community Development Block Grant (CDBG), HOME Investment Partnerships (HOME), Housing Trust Fund (HTF), Emergency Solutions Grants (ESG) and Housing Opportunities for Persons With AIDS (HOPWA) formula grantees on the timing of submission of FY 2025 Consolidated Plans and Action Plans. Grantees and HOME participating jurisdictions (PJs) should not submit their Plans until the actual grant amounts have been determined and announced by HUD. In addition, this Notice provides:

1. Instructions to grantees/PJs under each of the above programs regarding the application of a waiver and CPD program flexibility to meet the consolidated planning citizen participation requirements for the submission of FY 2025 Consolidated Plans and Action Plans;

2. Instructions to grantees/PJs under each of these programs regarding costs incurred prior to execution of a grant agreement; and

3. Information for Entitlement CDBG grantees and HOME PJs about waivers being made available to certain grantees/PJs to assist in the implementation of the pre-award costs instructions.

These provisions apply equally to grantees' three- to five-year Consolidated Plans as well as to annual Action Plans (either as a stand-alone document or as a component of the overall Consolidated Plan submission).

**Notes regarding applicability:**

This Notice uses the term "grantee" generically, to also include HOME PJs, except where the term appears in discussions explicitly limited to one of the other covered funding programs. The provisions of this Notice covering the Entitlement CDBG program also apply to Insular Area

grantees and CDBG non-entitlement county grantees in Hawaii, as the Entitlement CDBG program regulations also apply to their CDBG funds.

**What's New for FY 2025:**

Grantees are now required to submit a HUD 424B in addition to submission of a SF-424 and the required certifications in 24 CFR part 91. See page 5 of this Notice for additional information.

**Background:**

According to 24 CFR 91.15(a)(1), each grantee should submit its Consolidated Plan to HUD at least 45 days before the start of its program year. In addition, 24 CFR 91.15(a)(2) prohibits HUD from accepting a Consolidated Plan or Action Plan submission for FY 2025 funding earlier than November 15, 2024 or later than August 16, 2025. Even after a fiscal year's appropriation is enacted, HUD needs time to compute grantees' allocation amounts for the programs covered by the Consolidated Plan, and grantees may need time to adjust their proposed activities and budgets to account for the allocation amounts announced by HUD.

According to 24 CFR 91.500(a), a Plan will be deemed approved 45 days after HUD receives the Plan, unless HUD notifies the jurisdiction before that date that the Plan is disapproved. In past years, HUD typically did not disapprove a Plan solely because it was based on estimated allocation amounts. As a result, a Plan submitted by a grantee before its allocation amounts were announced typically received automatic approval, even though the Plan did not list the grantee's actual allocation amounts.

This practice resulted in significant additional work for both HUD and grantees. After the actual allocation amounts were announced, a grantee had to sign and submit a revised, SF-424 form to reflect the actual allocation amounts for each of its grants. In many cases, the grantee also had to make additional changes to its Plan to account for its actual allocation amounts, which may have triggered a substantial amendment under 24 CFR 91.505, depending on the grantee's citizen participation plan process. For FY 2025, HUD will not execute a grant agreement with a grantee until HUD has received a Plan (or an amended Plan) which incorporates the actual allocation amounts a grantee is to receive for FY 2025. Any Plan submitted without the actual allocation amount(s) or before the date of the allocation announcement will be disapproved by HUD and returned to the grantee.

**Procedures for Submission of FY 2025 Consolidated Plans and Action Plans by Grantees with Early Program Year Start Dates:**

HUD is issuing the following procedures to govern the submission and review of Consolidated Plans and Action Plans for FY 2025 funding prior to computation of FY 2025 allocation amounts. These procedures will apply to any grantee whose normal Consolidated Plan/Action Plan submission deadline (45 days before the start of the program year) falls either before, or less than 60 days after, the date HUD announces FY 2025 allocation amounts for CDBG, ESG, HOME and HOPWA funding. (See Section II. for a discussion of the timing of HTF allocations.) To date, Congress has not passed HUD's FY 2025 appropriation, and the date this appropriation will be made is unknown.

**Note**: These procedures will not apply to grantees whose normal Consolidated Plan/Action Plan submission deadline is more than 60 days after the HUD announcement of FY 2025 allocation amounts; those grantees should have sufficient time to revise their Plans to match actual allocation amounts prior to the due date for their Plan.

## I.    Submission Dates for FY 2025 Consolidated Plans/Action Plans for CDBG, ESG, HOME, HOPWA

Grantees are advised not to submit their Consolidated Plan/Action Plan until after the FY 2025 allocations have been announced. Grantees due to submit a new three- to five-year Consolidated Plan in FY 2025 should refrain from submitting the overall Consolidated Plan as well as the FY 2025 Action Plan contained within the overall document. HUD cannot complete its review of the overall Consolidated Plan components independent of the current year's Action Plan component. Once HUD informs grantees of their FY 2025 funding allocation amounts, each grantee should, prior to submission, ensure that the actual FY 2025 allocation amounts are reflected in the form SF-424, in the description of resources and objectives, and in the description of activities to be undertaken (or, for states, the method of distribution). It may be necessary for a grantee to revise its Action Plan before submission to HUD.

A grantee whose normal Consolidated Plan/Action Plan submission deadline is less than 60 days from the date that HUD announces FY 2025 allocation amounts may delay submission of its Consolidated Plan or Action Plan to HUD until 60 days after the date allocations are announced. This delay will give the grantee time to revise its Action Plan to incorporate actual allocation amounts, and to conduct any additional citizen participation, if necessary.

The table below gives examples—based on HUD announcing grant allocation amounts on April 25, 2025[1]—of grantee due dates for submitting Consolidated Plans and Action Plans and postponing plan due dates.

| Your PY Start Date | If HUD announced FY2025 grant allocations on April 25, 2025… |
|---|---|
| **January 1–June 1, 2025** | Your Consolidated Plan/Action Plan due date **passed before HUD announced grant allocations**. Therefore, you can postpone submitting your plan(s) until June 24, 2025. |
| **July 1–August 1, 2025** | Your Consolidated Plan/Action Plan due date is **less than 60 days after HUD announced grant allocations**. Therefore, you can also postpone submitting your plan(s) until June 24, 2025. |
| **September 1–October 1, 2025** | Your Consolidated Plan/Action Plan due date is **more than 60 days after HUD announced grant allocations**. Therefore, you are expected to submit your plan(s) by your normal due date, following the regulatory requirements in 24 CFR 91.15(a)(1). NOTE: HUD has determined it's not necessary to waive 24 CFR 91.15(a)(1) to implement the procedures in this Notice for FY 2025 Action Plans. This provision does not prohibit a grantee |

---

[1] This date is a fictional example as HUD does not know when it will announce FY 2025 grant allocation amounts. Congress must first pass a HUD appropriations bill and then HUD must calculate grantee allocation amounts.

| | from submitting a Plan in the eCon Planning Suite after that time. It is not necessary for an affected grantee to request an exception to its normal Action Plan submission date under 24 CFR 91.15(a)(1), nor is it necessary for a field office to grant an exception to the Action Plan submission deadlines under 24 CFR 91.20 to implement the procedures in this Notice. |
|---|---|

Under no circumstances, however, may a Consolidated Plan/Action Plan be submitted to HUD later than August 16, 2025. Failure to submit an Action Plan for FY 2025 by August 16, 2025, will result in the automatic loss of FY 2025 CDBG funds to the grantee. This requirement is established by statute, and HUD cannot waive the August 16 submission deadline. Funding under other CPD formula programs is not subject to this deadline but, since virtually all CPD formula grantees receive CDBG funding, the CDBG submission requirement effectively establishes the deadline for submission of Action Plans.

## II.    Submission Process for the Housing Trust Fund (HTF) Program

HTF is an affordable housing production program to increase and preserve the supply of decent, safe, and sanitary affordable housing for extremely low-income and very low-income families. (See 24 CFR Part 93). HTF is a formula grant program for States, as defined in 24 CFR 93.2.

The HTF regulation at 24 CFR 93.100 requires each State to include its HTF allocation plan in its Consolidated Plan or annual Action Plan, in accordance with 24 CFR Part 91. The regulation at 24 CFR 91.320(k)(5) provides the requirements for the HTF allocation plan, including the requirement that the plan describe the method for the distribution of the HTF funds and establish the application requirements and criteria for selecting applications.

The timing of the HTF allocations is different from other CPD formula programs (CDBG, HOME, HOPWA, and ESG) because the source of funding is through mandatory set-aside amounts from the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") rather than Federal appropriations. The earliest HUD expects to publish the HTF allocations is April 2025. If HTF allocations are not published before a State submits its Consolidated Plan/Action Plan, a State may submit its Consolidated Plan/Action Plan for the other CPD formula programs, then submit its HTF allocation plan as a substantial amendment to its annual Action Plan after the HTF allocations are published.

Further, pursuant to 24 CFR 91.220(l)(5), a unit of general local government selected by the grantee to administer all or a portion of its HTF program as a subgrantee must include a HTF allocation plan in its annual Action Plan that is consistent with the grantee's HTF allocation plan. The subgrantee's HTF allocation plan must describe the distribution of the HTF funds and establish the application requirements and criteria for the selection of applications submitted by eligible recipients that meet the local jurisdiction's priority housing needs. Due to the timing of the publication of HTF allocations and the selection process of HTF grantees, the subgrantee may submit its Consolidated Plan/Action Plan for the other CPD formula programs, then submit its HTF allocation plan as a substantial amendment to its annual Action Plan after the HTF allocations are published and the grantee has selected the subgrantee pursuant to their HTF allocation plan.

5

## III.    HUD Review of Consolidated Plans/Action Plans

HUD reviews Consolidated Plans/Action Plans based on 24 CFR 91.500(b). HUD's 45-day review period begins when grantees submit their plan(s) in the eCon Planning Suite OR when the grantee's CPD field office receives their original executed SF-424 (whichever is later).

Beginning in FY 2025, grantees must submit a new set of (3) forms and certifications with their Consolidated Plans and Action Plans:

1. SF-424
2. HUD-424B, Applicant and Recipient Assurances and Certifications[2]
3. Certifications required by 24 CFR 91.225, 91.325, and 91.425

**NOTE: Submission of the SF-424D is no longer required.**

HUD will disapprove as substantially incomplete any Consolidated Plan or Action Plan covering FY 2025 funding that does not reflect actual CDBG, HOME, ESG and HOPWA allocation amounts on the form SF-424, in the description of resources and objectives, and in the description of activities to be undertaken (or, for states, the method of distribution). A grantee whose Action Plan is disapproved for this reason is advised to resubmit a revised Plan after HUD has announced the actual FY 2025 allocation amounts, and after the grantee has incorporated the actual allocation amounts into its Plan. The HTF allocation must be included if the HTF allocations are published before the grantee submits its Consolidated Plan or Action Plan. (See Section II.).

24 CFR 91.500(b) states that HUD may disapprove a Plan or a portion of a Plan if it is inconsistent with the purpose of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12703), if it is substantially incomplete, or, in the case of a CDBG certification under §91.225(a) and (b) or §91.325(a) and (b), if it is not satisfactory to the Secretary in accordance with §570.304, §570.429(g), or §570.485(c). The following are examples provided in §91.500(b) of substantially incomplete Plans:

1. A Plan developed without the required citizen participation or the required consultation;
2. A Plan that fails to satisfy all the required elements in 24 CFR Part 91, as reflected in the eCon Planning Suite. This includes when the grantee has not provided a final statement of community development objectives and the projected use of funds;
3. A Plan for which a certification is rejected by HUD as inaccurate, after HUD has inspected the evidence and provided due notice and opportunity for comment; and
4. A Plan without a description of the manner in which the unit of general local government or state will provide financial or other assistance to a public housing agency if the public housing agency is designated by HUD as "troubled."

24 CFR 91.500(d) states that "(t)he jurisdiction may revise or resubmit a Plan within 45 days after the first notification of disapproval." HUD has determined that it is not necessary to

---

[2] Some certifications in the HUD-424B are also contained in the regulations at 24 CFR 91.225, 91.325, and 91.425. Both the HUD-424B and the certifications required in the above-cited regulations must be submitted in their entirety. Submitting both sets of certifications will assure grantees that they have met the Con Plan and Action Plan submission requirements.

waive this provision to implement the procedures in this Notice for FY 2025 Consolidated Plans/Action Plans. This provision does not prohibit a grantee whose application was disapproved from re-submitting a Plan after that time period.

24 CFR 91.105(c), 91.115(c) and 91.505 require a grantee to comply with citizen participation requirements when it undertakes a substantial amendment to an approved Plan. A Plan that has been disapproved by HUD is, by definition, not an approved Plan. When a grantee's Plan is disapproved by HUD, the Consolidated Plan regulations do not require a grantee to undertake further citizen participation on the changes the grantee makes before re-submitting the Plan. A major exception to this, however, would be if the reason for disapproval involved the grantee's failure to fulfill citizen participation requirements. 24 CFR 91.500(b) identifies a plan that was developed without the required citizen participation or the required consultation as an example of a consolidated plan that is considered substantially incomplete. However, as noted in this Notice, there are circumstances in which a grantee may need to make major revisions to a disapproved Plan, which could trigger further citizen participation efforts. A grantee with a disapproved Plan should review its citizen participation plan and local policies to determine whether it will need to conduct further citizen participation as a result of the changes it makes to incorporate actual allocation amounts into its Plan, prior to re-submission of the revised Plan.

## IV.    Development of Proposed Action Plans and Citizen Participation During the Interim

Before submitting an action plan to HUD, grantees must satisfy the applicable requirements for consultation and citizen participation described in 24 CFR part 91.[3] A grantee has several options regarding fulfilling its citizen participation obligations while waiting for HUD to announce FY 2025 allocation amounts:

a.   A grantee may conduct citizen participation on its draft Plan (with estimated funding amounts) according to its normal timetable and citizen participation procedures.

HUD cautions grantees that the expedited citizen participation procedures detailed in Federal Register Notice FR-6218-N-01, *Program Rules, Waivers, and Alternative Requirements Under the CARES Act for Community Development Block Grant Program Coronavirus Response Grants, Fiscal Year 2019 and 2020 Community Development Block Grants, and for Other Formula Programs,* and elsewhere are no longer available. Citizens must be given 30 days to comment on the FY 2025 Consolidated Plans, Action Plans and substantial amendments to those Plans.

A grantee pursuing this option should make clear that the funding levels shown in the draft Plan are estimated amounts. In addition, the grantee should include "contingency provision" language in its Action Plan which explains how it will adjust its proposed Plan to match its actual allocation amounts once actual amounts become known. By including such contingency language, a grantee can avoid the need to make significant revisions to its Plan (beyond incorporating the final allocation amounts into the Plan and the SF-424 form). The grantee may also avoid the potential need to conduct additional citizen participation on a Plan that has to be significantly revised to reflect actual allocation amounts.

---

[3] For example, the consultation requirements outlined at 24 CFR 91.100 require local governments to consult with various entities, including organizations that represent protected class members and those that enforce fair housing laws and public housing authorities.

Examples of contingency provisions include:

- A Plan could state that all proposed activities' budgets will be proportionally increased or decreased from the estimated funding levels to match actual allocation amounts.
- A grantee could express its budget in terms of percentages of the allocation to be budgeted to each planned activity, along with the grantee's current estimate of how many dollars that equates to for each activity. [For example, regardless of what the final allocation amounts are, the United Interfaith Street Outreach Program will receive 22 percent (currently estimated to be approximately $38,000) of the grantee's total ESG allocation, and the Tenant-Based Rental Assistance activity will receive 10 percent (currently estimated to be about $68,750) of the HOME allocation.]
- A Plan could state that any increase or decrease in funding to match actual allocation amounts will be applied to one or more specific activities (e.g., any increase or decrease relative to the grantee's estimated allocation amount will be applied to the single-family housing rehabilitation grant program).
- A Plan could list its proposed activities in priority order and indicate that the East Side Sidewalk Replacement activity listed in the plan is a "backup" activity that will be funded only if sufficient CDBG funding exists; or conversely, if the grantee's actual allocation is less than estimated, the East Side Sidewalk Replacement activity will not be funded in FY 2025.
- A Plan could state that, should the actual allocation amount exceed the grantee's estimate, the grantee will increase the Uptown Sewer Separation activity budget and will extend the service area block-by-block along the 600-900 blocks of Cherry Street, based on the amount of additional funding available.

A grantee may include these or other comparable provisions singly or in any combination to meet its needs. A grantee may adopt a different contingency approach for each of the programs covered by this Notice (CDBG, ESG, HOME, HOPWA and HTF).

       b.      Alternatively, a grantee may prepare a proposed Action Plan according to its normal timetable but wait until actual allocation amounts are known before undertaking citizen participation actions. Once allocation amounts are announced by HUD, the grantee will need to update relevant sections of its Plan (such as the listings of resources and objectives, and the description of activities or the state's method of distribution) to reflect actual allocation amounts before conducting citizen participation. All grantees intending to incur pre-award costs under the programs covered by this Notice should be aware that this option will not be available to them, as citizen participation requirements must be met before pre-award costs are incurred. (See Section V. below.)

HUD has developed these procedures to minimize disruption to grantees and to minimize duplication of effort by grantees. A grantee that does not follow either option a. or b. above (i.e., the grantee undertakes citizen participation according to its normal timetable, based solely on estimated funding levels, and the Plan does not contain any contingency language on how the final Plan will be adjusted to match actual allocation amounts) runs the risk of increasing its own work obligations and costs. The grantee will still be required to update its Plan to incorporate actual allocation amounts before submission to HUD. Depending on the requirements contained within the grantee's citizen participation plan, the grantee may need to undertake additional publication and citizen

participation processes based on the difference between its actual allocation amounts and the estimated amounts in its proposed Action Plan, and based on how the grantee plans to adjust its proposed activities to match its actual allocation amounts. Local policies and procedures may also require the grantee to obtain re-approval of the revised Plan from its legislative body or authorizing officials.

A draft Plan that has not yet been submitted to HUD is not an approved Plan. A draft Plan must be revised in accordance with the grantee's citizen participation requirements, which may not be the same as a grantee's citizen participation requirements for a substantial amendment to an approved Plan. A grantee that delays its Plan submission should review its citizen participation plan and local policies to determine whether it will need to conduct further citizen participation as a result of the changes it makes to incorporate actual allocation amounts into its Plan, prior to its submission.

States and Entitlement communities that also administer CDBG disaster recovery (CDBG-DR) and CDBG mitigation (CDBG-MIT) grants are advised to consult the applicable Federal Register notices that require the incorporation of these grants into Consolidated Plans within a specified period following the award of these grants. Grantees should consult guidance on this process here: https://www.hud.gov/program_offices/comm_planning/cdbg-dr/news/consolidated-plan-updates-2022-02.

## V.  Pre-Award Costs

### A. General Provisions Applicable to All Consolidated Plan Programs

Special attention must be paid to situations in which a grantee wishes to incur costs prior to grant award. For example, under certain programs, a grantee may want to execute annual renewals of agreements with social service providers to prevent interruption of social services. The annual performance cycle of these agreements might normally begin after the grantee's official program year start date but, under this Notice the grantee cannot even submit its Action Plan until after the date that the agreements need to be executed. Thus, the timing instructions in this Notice may cause some program costs to be classified as pre-award costs where they would otherwise not have been.

The government-wide Uniform Administrative Requirements, Cost Principles and Audit Requirements regulation, at 2 CFR Part 200, includes the following provision concerning agency approval of pre-award costs:

§ 200.458. Pre-award costs.  Pre-award costs are those incurred before the start date of the Federal award or subaward directly pursuant to the negotiation and in anticipation of the Federal award where such costs are necessary for efficient and timely performance of the scope of work. These costs are allowable only to the extent that they would have been allowed if incurred after the start date of the Federal award and only with the written approval of the Federal agency. If approved, these costs must be charged to the initial budget period of the Federal award unless otherwise specified by the Federal agency or pass-through entity.

This provision applies to the ESG, HOPWA and HTF programs.  It does not apply to the CDBG and HOME programs, which have pre-award cost requirements unique to those programs. (The HOME requirements, however, apply only to certain types of pre-award costs, see 24 CFR 92.212.) The following guidance applies to all five programs. Additionally, guidance unique to each separate program is provided below.

The Consolidated Plan regulations in 24 CFR Part 91 make distinctions between "a proposed Plan" and "a Plan." Most notably, 24 CFR 91.105(b) and 91.115(b) describe the citizen participation requirements for a grantee's proposed Plan. For purposes of this Notice regarding pre-award costs, HUD considers a grantee's Plan to have moved from being "a proposed Plan" to being "a Plan" once a grantee has completed the publication, public hearing and public comment requirements at 24 CFR 91.105(b)(2), (3) and (4) or 91.115(b)(2), (3) and (4), and has developed its written summary of comments received pursuant to 24 CFR 91.105(b)(5) or 91.115(b)(5).

To minimize additional workload on grantees and HUD field offices, this Notice establishes the following procedures implementing the 2 CFR 200.458 requirements cited above. This Notice provides conditional HUD approval of pre-award costs, contingent on the availability, requirements, and authorized uses of FY 2025 appropriations, if and when the following actions have been completed and documented by the grantee:

1. The grantee documents that the costs incurred prior to grant award are necessary for efficient and timely performance of the activity in question.

2. The grantee documents that the costs are for eligible activities under the regulations for the applicable funding program;

3. The grantee documents that it has complied with all other requirements for pre-award costs under the regulations for the applicable funding program or as described below;

4. The activity for which costs will be incurred is included in a Consolidated Plan/Action Plan;

5. The grantee documents completion of its citizen participation process by including in its files a written, dated summary of citizen participation comments received on its Plan, pursuant to 24 CFR 91.105(b)(5) or 91.115(b)(5) as applicable;

For CDBG, HOME, ESG, and HOPWA grantees, before committing any funds – including non-Federal funds – for a pre-award cost, the recipient must either make a written determination that the pre-award cost is for an activity that is exempt from environmental review or categorically excluded and not subject to review under related environmental laws and authorities under 24 CFR Part 58 or verify that the applicable environmental review has been completed and a Request for Release of Funds has been approved in accordance with 24 CFR Part 58, if applicable. Environmental regulations at 24 CFR 58.22 prohibit recipients and any other participant in the development process from committing HUD funds to a project until the environmental compliance review process has been successfully completed and until receipt of the Authority to Use Grant Funds, if applicable. In addition, until the environmental compliance review process has been successfully completed and until receipt of the Authority to Use Grant Funds, neither a recipient nor any participant in the development process may commit non-HUD funds on or undertake an activity or project if the activity or project would have an adverse environmental impact or limit the choice of reasonable alternatives.

If the grantee's files contain all other necessary documentation supporting the costs (described below for each program), the date of HUD approval for pre-award costs is the date of

the written summary of citizen participation comments, or the grantee's program year start date, whichever is later.

**Note**: Pre-award costs are incurred at the grantee's own risk because reimbursement is contingent upon the availability of appropriated funds for FY 2025, satisfaction of the applicable conditions in this Notice, and execution of the grant agreement with HUD. Any commitments or expenditures incurred by the grantee in excess of the funds provided by the grant and authorized under the applicable FY 2025 appropriations law would be the responsibility of the grantee to pay out of non-federal funds.

### B. Specific Provisions: Entitlement CDBG Program

The Entitlement CDBG program regulations specify, at 24 CFR 570.200(h), the situations under which a grantee may be reimbursed for costs incurred prior to the effective date of its grant agreement. The provisions of this Notice will affect how grantees comply with the pre-award cost reimbursement requirements.

1.  24 CFR 570.200(h) defines the effective date of a grantee's agreement as the grantee's program year start date or the date that the Consolidated Plan/Action Plan is received by HUD (whichever is later). Under the provisions of this Notice, a grantee's Plan may not be submitted to (and thus received by) HUD until several months after the grantee's program year start date. This may negatively affect grantees' ability to incur pre-award costs.

    Therefore, to assist affected grantees with pre-award costs, HUD has waived 24 CFR 570.200(h) in accordance with the attached memorandum (ATTACHMENT) to allow the effective date of a grantee's FY 2025 grant agreement to be the earlier of the grantee's program year start date or the date that the Consolidated Plan/Action Plan (with actual allocation amounts) is received by HUD. This waiver is applicable to any Entitlement CDBG grantee seeking to incur pre-award costs, whose Action Plan submission is delayed past the normal submission date in accordance with the terms of this Notice. An affected community applying this waiver shall document in writing the conditions giving rise to the need to use this waiver and maintain the documentation for HUD's review. Grantees' authority to make use of this waiver is only in effect until August 16, 2025, as that is the last date that a grantee may submit its FY 2025 Action Plan.

2.  24 CFR 570.200(h)(1)(i) requires that the activity for which the costs will be incurred must be included in a Consolidated Plan/Action Plan prior to the costs being incurred; grantee compliance with steps 4 and 5 under the general pre-award cost provisions stated in paragraph V.A. above will meet that requirement. However, grantees must also comply with §570.200(h)(1)(ii), which further specifies that the Plan must advise citizens of the extent to which the pre-award costs will affect future grants. CDBG grantees intending to incur pre-award costs are cautioned that option b. described in Section IV above is not likely to be a feasible alternative for them. HUD advises any Entitlement CDBG grantee intending to incur pre-award costs to follow the process described in Section IV. a. above; in doing so, the grantee will need to ensure that it has met the citizen participation and notification requirements above.

3.  Pursuant to §570.200(h)(1)(iii) and §570.604, the costs and corresponding activities

must comply with the environmental review requirements at 24 CFR Part 58.

### C. Specific Provisions: HOME Program

The HOME regulations specify situations under which a grantee may be reimbursed for costs incurred prior to the effective date of its grant agreement. The provisions of this Notice will affect how grantees comply with the pre-award cost reimbursement requirements.

1. 24 CFR 92.212(b) defines the effective date for incurring administrative and planning costs to be charged to the HOME allocation as the beginning of the PJ's consolidated program year or the date that the Consolidated Plan is received by HUD (whichever is later). To account for the delay in Federal appropriations, this Notice allows impacted PJs to postpone the submission of their Action Plans until several months after their program year start dates. This may negatively affect a PJ's ability to incur planning and administrative pre-award costs. Therefore, HUD has waived 24 CFR 92.212(b) to the extent necessary to permit eligible pre-award costs to be incurred as of the beginning of the program year or the date the consolidated plan describing the HOME allocation to which the costs will be charged is received by HUD, whichever is earlier.

2. The attachment to this Notice contains the HUD memorandum authorizing this waiver. This waiver is applicable to any HOME PJ seeking to incur pre-award administrative and planning costs, whose Action Plan submission is delayed past the normal submission date because of the delayed enactment of FY 2025 appropriations for the Department. An affected PJ applying this waiver shall document in writing the conditions giving rise to the need to use this waiver and maintain the documentation for HUD's review. A PJ's authority to make use of this waiver is only in effect until August 16, 2025, as that is the last date that a grantee may submit its FY 2025 Action Plan.

3. Pursuant to 24 CFR 92.212(a) and 24 CFR 92.352, the costs and corresponding activities must comply with HOME requirements, including the environmental review requirements at 24 CFR Part 58.

### D. Additional Provisions: ESG Program

An ESG grantee may be reimbursed for costs incurred before the Period of Performance of its FY 2025 grant, subject to the general conditions described in Section V.A., above, plus the following conditions:

1. Other than the date they are incurred, the costs and corresponding activities must comply with the ESG Program regulations at 24 CFR Part 576.

2. The costs and corresponding activities must comply with environmental review requirements. In accordance with these requirements and section 100261(3) of the MAP-21 Act, 24 CFR 576.407(d) does not apply. Recipients assume environmental review responsibilities under 24 CFR Part 58.

### E. Additional Provisions: HOPWA Program

A HOPWA formula grantee may be reimbursed for costs incurred before the Period of Performance of its FY 2025 grant, subject to the general conditions described in Section V.A., above, plus the following conditions:

1. Other than the date they are incurred, the costs and corresponding activities must comply with HOPWA program regulations at 24 CFR Part 574.

2. The costs and corresponding activities must comply with environmental review requirements at 24 CFR 574.510 and 24 CFR Part 58.

### F. Additional Provisions: HTF Program

HTF grantees may be reimbursed for pre-award costs permitted under 2 CFR 200.458 for planning activities and preparation of the HTF allocation plan. Eligible pre-award costs may include the cost of public hearings, consultations, and publication of public notices, as well as developing program guidelines. Such costs must be necessary for efficient and timely performance of the HTF program. Pre-award costs may not exceed five percent of the minimum statutory allocation amount of $3 million. The costs and corresponding activities must comply with all HTF requirements, including environmental review requirements at 24 CFR 93.301(f).

## VI. Applicability of This Notice to Future Years

This Notice applies only to Consolidated Plans/Action Plans submitted for FY 2025 funding. HUD anticipates revising the Consolidated Plan regulations (and other related regulations) to explicitly include, as a basis for disapproval of a Plan, that a Plan does not contain and reflect a grantee's actual allocation amount. For further information on potential rulemaking in this area, see HUD's June 3, 2015, Federal Register Notice (80 FR 31538). That document solicited public comments on possible amendments to the Consolidated Plan regulations and the CDBG Entitlement regulations to effect such a change. See Sections II.B.1., II.B.2 and II.B.7 of the Notice, pages 31544 and 31546. (Please note, however, that the public comment period for that Federal Register Notice has closed.)

**For further information:**

Grantees with questions concerning this Notice should direct their inquiries to their local HUD Field Office Community Planning and Development Division. Field Offices should direct their questions to the following individuals at the applicable Headquarters program office:

For the Office of Block Grant Assistance, Gloria Coates at gloria.l.coates@hud.gov for the Entitlement CDBG program or Erinn Martin at erinn.m.martin@hud.gov for the State CDBG program;
for the Office of Affordable Housing Programs, Diane Thompson at diane.a.thompson@hud.gov;
for the Office of Special Needs Assistance Programs, Karen Deblasio at karen.m.deblasio@hud.gov; and
for the Office of HIV/AIDS Housing at Jeffrey Kiemen jeffrey.t.kiemen@hud.gov or hopwa@hud.gov

ATTACHMENT

Availability of Waivers of Community Planning and Development Grant Program Requirements to Facilitate the Ability to Incur Pre-Award Costs in FY 2025



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-7000

PRINCIPAL DEPUTY ASSISTANT SECRETARY
FOR COMMUNITY PLANNING AND DEVELOPMENT

MEMORANDUM FOR:    All Community Planning and Development
                   Field Office Division Directors

                   _Marion McFadden_  12/10/2024

FROM:              Marion McFadden, Principal Deputy Assistant Secretary, D

SUBJECT:           Availability of a Waiver of Community Planning and
                   Development Grant Program Requirements to Facilitate the
                   Ability to Incur Pre-Award Costs in FY 2025

PURPOSE:

    This memorandum explains the availability of waivers of certain regulatory
requirements associated with two Community Planning and Development (CPD) grant
programs to facilitate the continuation of eligible activities and ongoing planning and
administrative costs due to a delay by HUD in the receipt of annual appropriations for FY 2025.
This memorandum covers the following CPD programs:

- Community Development Block Grant (CDBG), and
- HOME Investment Partnerships (HOME)

BACKGROUND:

    HUD is issuing procedures to govern the submission and review of action plans for
FY 2025 funding prior to the enactment of a FY 2025 appropriation bill. Grantees are advised
not to submit a consolidated plan or action plan until the FY 2025 formula allocations have been
announced. However, an action plan must be submitted to HUD no later than August 16, 2025.

    The delay in the receipt of annual appropriations by HUD and implementation of these
procedures for FY 2025 may have negative consequences for CDBG and HOME grantees that
intend to incur eligible costs prior to the award of FY 2025 funding. Some activities might
otherwise be interrupted, and grantees might not otherwise be able to use CDBG or HOME
funds for planning and administrative costs of administering their programs.

NOTIFICATION PROCESS:

This waiver will apply to any Entitlement, Insular or Hawaii non-entitlement CDBG grantee and to any HOME participating jurisdiction whose program year start date for FY 2025 funding occurs during the period starting January 1, 2025, and ending October 1, 2025, or 60 days after HUD announcement of FY 2025 allocation amounts for formula program funding (whichever comes first). This waiver is available for use by any applicable CDBG grantee or HOME participating jurisdiction whose action plan submission is delayed past the normal submission date because of delayed enactment of FY 2025 appropriations for the Department. Any affected grantee taking advantage of this waiver shall document in writing the conditions giving rise to the need to use this waiver and shall maintain such documentation for HUD's review. This waiver authority is only in effect until August 16, 2025.

WAIVER AUTHORITY:

Without this waiver, some activities might be interrupted while implementing these procedures. In addition, grantees might not otherwise be able to use CDBG and HOME funds for ongoing planning and administrative costs of administering their programs. To address communities' needs and to ensure that programs can continue without disturbance, I find that good cause exists pursuant to 24 CFR 5.110 to waive the CPD program regulatory requirements set forth below.

WAIVER AVAILABILITY:

1. Pre-award Costs

Requirement:    For CDBG, the effective date of the grant agreement is the program year start date or the date that the consolidated plan is received by HUD, whichever is later. These dates determine when a grantee may incur pre-award costs. For HOME, eligible administrative and planning costs may be incurred as of the beginning of the program year or the date the consolidated plan describing the HOME allocation to which the costs will be charged is received by HUD, whichever is later.

Citations:    24 CFR 570.200(h) (Entitlement CDBG program, the Insular Areas CDBG program, and for grants to non-entitlement counties in Hawaii) and 24 CFR 92.212(b) (HOME participating jurisdictions)

Explanation:    The waiver of 24 CFR 570.200(h) will allow a grantee to treat the effective date of the grant agreement as the program year start date or the date that the consolidated plan/action plan (with actual allocation amounts) is received by HUD, whichever is *earlier*. HUD waives 24 CFR 92.212(b) to the extent necessary to permit eligible administrative and planning pre-award costs to be incurred as of the beginning of the program year or the date the consolidated plan describing the HOME allocation to which the costs will be charged is received by HUD, whichever is *earlier*.

Justification:    HUD recognizes that some activities may be interrupted, and grantees and participating jurisdictions might not otherwise be able to use CDBG and HOME funds for eligible pre-award costs without this waiver.

Applicability: This waiver is in effect until August 16, 2025, or until superseded by any rule that may become effective before that date and is transmitted with the "Guidance on Submitting Consolidated Plans and Annual Action Plans for Fiscal Year (FY) 2025."

Finally, I want to express my appreciation for your efforts to support the timely and effective use of CPD funds.  Thank you.

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that on July 14, 2025, I served a true and correct copy of the foregoing

4  document on the following parties by the method(s) indicated below:

5

| Brian C. Kipnis<br>Annalisa L. Cravens<br>Sarah L. Bishop<br>Rebecca S. Cohen<br>*Assistant United States Attorneys*<br><br>Office of the United States Attorney<br>700 Stewart Street, Suite 5220<br>Seattle, WA 98101-1271<br>brian.kipnis@usdoj.gov<br>annalisa.cravens@usdoj.gov<br>sarah.bishop@usdoj.gov<br>rebecca.cohen@usdoj.gov<br><br>*Attorneys for Defendants* | ☒ CM/ECF E-service<br>☐ Email<br>☐ U.S. Mail<br>☐ Certified Mail / Return Receipt Requested<br>☐ Hand delivery / Personal service |
|---|---|

14

15      I declare under penalty of perjury under the laws of the United States and the State of

16  Washington that the foregoing is true and correct.

17

18      DATED this 14th day of July, 2025.

19                                              */s/ Gabriela DeGregorio*
                                               Gabriela DeGregorio
20                                              Litigation Assistant
                                               Pacifica Law Group LLP

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE - 1

PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750