The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESMTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR. COUNTY, *et al*.

                                    Plaintiffs,

vs.

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development, *et al*.,

                                    Defendants.

NO. 2:25-cv-814

**ORDER GRANTING PLAINTIFFS' THIRD MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Congress, as the branch of government constitutionally entrusted with the power of the purse, has long made critical investments in programs to end homelessness, strengthen communities, and improve local infrastructure. These budget decisions are not mere technical exercises, they reflect difficult judgments (and compromises) about how best to allocate our nation's resources. Every dollar allocated is a deliberate decision on how to serve the public good. And under the constitution, it is Congress—not the President—that has the authority to

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

make those judgments. Yet that is precisely what the Plaintiffs in this case allege the current

administration has attempted to override. They contend that the Trump Administration

unlawfully seeks to impose hotly contested political conditions on funds that Congress has

already appropriated—substituting the Executive's preferences for the will of Congress, in clear

defiance of constitutional limits.

On June 3, 2025, this Court enjoined Defendants U.S. Department of Housing and Urban

Development ("HUD") and U.S. Department of Transportation ("DOT") from imposing

unlawful funding conditions on an estimated $4 billion in HUD Continuum of Care Program

("CoC") and DOT grants that had been awarded to the then Plaintiffs—at the time 31 local

governments and agencies—to support vital programs across the country, including

homelessness prevention and transportation infrastructure. This Court determined that those

Plaintiffs are likely to succeed on the merits of their claims that Defendants' actions violated the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., as contrary to the constitution

and in excess of statutory authority, and arbitrary and capricious.

On July 10, 2025, Plaintiffs filed an amended complaint in which they added

approximately 30 additional local governments and agencies as plaintiffs and the U.S.

Department of Health and Human Services ("HHS") as a defendant. Currently before the Court is

Plaintiffs' Third Motion for Preliminary Injunction. Dkt. No. 186. Plaintiffs allege that not only is

HUD attempting to impose the same unlawful funding conditions that this Court previously

enjoined on CoC grants awarded to some of the newly added Plaintiffs, but it is attempting to

impose the funding conditions on all HUD grants, regardless of whether they are CoC grants.

Plaintiffs further claim that DOT is also attempting to impose the same previously enjoined

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 2

funding conditions on grants awarded to some of the newly added Plaintiffs. Lastly, Plaintiffs allege that HHS has begun imposing substantially similar unlawful funding conditions on its grants. Plaintiffs assert that Defendants' actions threaten more than $12 billion in funding that is needed to support essential and life-sustaining programs in their communities and seek a preliminary injunction extending the relief that this Court previously granted in June 2025 to the newly added Plaintiffs that have CoC and/or DOT grants, barring HHS from applying the unlawful funding conditions on its grants, and barring HUD from doing the same as to all of its grant programs.

Having reviewed the briefs and exhibits filed in support of and in opposition to the motion, the record of the case, and the relevant legal authority, the Court will grant the motion. The reasoning for the Court's decision follows.

## II.    PROCEDURAL HISTORY

This case started on May 2, 2025 when Martin Luther King, Jr. County ("King County"), Pierce County, Snohomish County, City and County of San Francisco ("San Francisco"), Santa Clara County, Boston, Columbus, and New York City (collectively, "the Original Plaintiffs") sued HUD, DOT, and the Federal Transit Administration ("FTA"), as well as the agencies' heads in their official capacities, challenging the imposition of new funding conditions on grants that the Original Plaintiffs had been conditionally awarded for fiscal year 2024.[1] Dkt. 1. Seven of the Original Plaintiffs (excluding Columbus) then moved for a temporary restraining order ("TRO") on May 5, 2025. The Court held a hearing and granted their motion two days later. Dkt. Nos. 5,

---

[1]The original Defendants were HUD, DOT, Scott Turner in his official capacity as Secretary of HUD, Sean Duffy in his official capacity as Secretary of DOT, FTA, and Matthew Welbes as the acting Director of FTA. Dkt. No. 1 at ¶¶ 16-21.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 3

51–52. At the conclusion of the TRO hearing, the Original Plaintiffs stated their intent to move for a preliminary injunction on the same issues subject to the TRO, which was set to expire fourteen days later. Dkt. No. 53. The Court ordered briefing and on May 21, 2025, held a hearing on the motion for a preliminary injunction. *Id.*; Dkt. No. 73. At the conclusion of that hearing, the Court determined that good cause existed to extend the TRO by another fourteen days, to June 4, 2025, and stated that it would issue a written decision on the motion for preliminary injunction by that date. Dkt. No. 73.

Later that day the Original Plaintiffs filed an amended complaint adding 23 local governments and agencies as Plaintiffs, as well as the Federal Highway Administration ("FHWA"), the Federal Aviation Administration ("FAA"), the Federal Railroad Administration ("FRA"), and the component heads in their official capacities, as Defendants.[2] Dkt. No. 71. The 23 newly added Plaintiffs brought the same claims and challenged the same funding conditions as the Original Plaintiffs. Dkt. 71. They also sought a TRO and preliminary injunction, which the Court granted. Dkt. Nos. 72, 152. Defendants appealed the preliminary injunction order to the U.S. Court of Appeals for the Ninth Circuit, where the appeal remains pending.[3] Dkt. No. 173.

---

[2] The 23 newly added Plaintiffs were the City and County of Denver, Colorado ("Denver"), the Metropolitan government of Nashville and Davidson County, Tennessee ("Nashville"), Pima County, Arizona ("Pima County"), County of Sonoma, California ("Sonoma"), City of Bend, Oregon ("Bend"), City of Cambridge, Massachusetts ("Cambridge"), City of Chicago, Illinois ("Chicago"), City of Culver City, California, ("Culver City"), City of Minneapolis, Minnesota ("Minneapolis"), City of Pittsburgh, Pennsylvania ("Pittsburgh"), City of Portland, Oregon ("Portland"), City of San Jose, California ("San Jose"), City of Santa Monica, California ("Santa Monica"), City of Pasadena, California ("Pasadena"), City of Tucson, Arizona ("Tucson"), City of Wilsonville, Oregon ("Wilsonville"), Central Puget Sound Regional Transit Authority located in King, Pierce, and Snohomish Counties, Washington ("CPSRTA"), Intercity Transit located in Thurston County, Washington ("Intercity Transit"), Port of Seattle, Washington ("Port of Seattle"), King County Regional Homelessness Authority located in King County, Washington ("King County RHA"), Santa Monica Housing Authority, California ("Santa Monica HA"), San Francisco County Transportation Authority, located in the City and County of San Francisco, California ("SFCTA"), and Treasure Island Mobility Management Agency located in Treasure Island and Yerba Buena Island, California ("TIMMA"). Dkt. No. 71 at ¶¶ 8-38. The newly added Defendants were FHWA, Gloria M. Shepard as the acting Director of FHWA, FAA, Chris Rocheleau as acting Administrator of FAA, FRA, and Drew Feeley as acting Administrator of FRA. *Id*. at ¶¶ 39-50.

[3] In moving for leave to file the second amended complaint, Plaintiffs asserted that the "claims in the [second amended complaint] challenging new grant conditions are indistinguishable on the facts and law [from] the existing

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 4

1    On July 10, 2025, Plaintiffs filed a second amended complaint adding another 29 local

2  governments and agencies as plaintiffs.[4] Dkt. No. 184. Plaintiffs continue to challenge the HUD

3  and DOT funding conditions as before, but now have added HUD grants outside the CoC

4  program, and have brought new claims against HHS and its agencies, including the Administration

5  for Children and Families ("ACF"), Health Resources and Services Administration ("HRSA"),

6  National Institutes of Health ("NIH"), Substance Abuse and Mental Health Services Administration

7  ("SAMHSA"), and the Centers for Disease Control and Prevention ("CDC"). As before, Plaintiffs

8  seek a preliminary injunction enjoining the imposition of the new funding conditions on their

9  federal grants.

10    The new Plaintiffs challenging the imposition of the new funding conditions on HUD

11  CoC grants are Alameda County, Albuquerque, Baltimore, Columbus, Dane County, Hennepin

12

13  claims." Dkt. No. 181 at 4. Defendants did not oppose the motion. While the Ninth Circuit has not ruled directly on
   the issue of whether a district court retains jurisdiction to allow amendment of pleadings pending appeal of a

14  preliminary injunction, district courts within this circuit have recognized that pending interlocutory appeal they
   retain jurisdiction over matters that would not change the issues before the appellate court. *See e.g. Center for Food*

15  *Safety v. Vilsack*, 2011 WL 672802 at *2 (N.D. Cal. 2011). In light of this, the Court concluded that it retained
   jurisdiction to allow the requested amendment because a significant portion of the second amended complaint

16  simply adds new Plaintiffs challenging Defendants' imposition of the previously enjoined unlawful funding
   conditions on CoC HUD and DOT grants. And while the second amended complaint does also challenge

17  Defendants' imposition of funding conditions on non-COC HUD and HHS grants, the challenged conditions are
   either identical or substantially similar to the previously imposed conditions, and the claims implicate identical legal
   issues. In addition, several of the newly added Plaintiffs face a fast-approaching deadline of August 15, 2025 to

18  submit consolidated/action plans to HUD or forfeit the formula grant funding. Dkt. No. 186 at 1; Dkt. No. 184 at ¶
   623. Nevertheless, if it is determined that this Court lacked jurisdiction because an appeal is pending, then this Court
   issues this order as an indicative ruling pursuant to Fed. Rule of Civ. P. 62.1(3).

19  [4] The 29 newly added Plaintiffs are County of Alameda ("Alameda County"), City of Albuquerque
   ("Albuquerque"), Mayor and City Council of Baltimore ("Baltimore"), City of Bellevue ("Bellevue"), City of

20  Bellingham ("Bellingham"), City of Bremerton ("Bremerton"), County of Dane ("Dane County"), City of Eugene
   ("Eugene"), City of Healdsburg ("Healdsburg"), County of Hennepin ("Hennepin County"), Kitsap County, City of
   Los Angeles ("Los Angeles"), City of Milwaukee ("Milwaukee"), Milwaukee County, Multnomah County, City of

21  Oakland ("Oakland"), City of Pacifica ("Pacifica"), City of Petaluma ("Petaluma"), Ramsey County, City of
   Rochester ("Rochester"), City of Rohnert Park ("Rohnert Park"), City of San Diego ("San Diego"), County of San

22  Mateo ("San Mateo County"), City of Santa Rosa ("Santa Rosa"), City of Watsonville ("Watsonville"), Culver City
   Housing Authority ("CCHA"), Puget Sound Regional Council ("PSRC"), Sonoma County Transportation Authority
   ("SCTA"), and Sonoma County Community Development Commission (SCCDC"). Dkt. No. 184 at ¶¶ 136-253.

23

24  ORDER GRANTING PLAINTIFFS' THIRD
   MOTION FOR PRELIMINARY INJUNCTION

25  - 5

County, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, San Mateo County, and Sonoma County (collectively, "the New CoC Plaintiffs").

The new Plaintiffs challenging the imposition of the new funding conditions on DOT grants are Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Cambridge, Dane County, Eugene, Healdsburg, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Milwaukee County, Multnomah County, Oakland, Pacifica, Pasadena, Petaluma, PSRC, Ramsey County, Rochester, Rohnert Park, San Diego, San Mateo County, Santa Rosa, SCTA, and Watsonville (collectively, "the New DOT Plaintiffs").

The Plaintiffs challenging the new funding conditions on non-CoC HUD grants are King County, Pierce County, Snohomish County, Boston, Columbus, San Francisco, Santa Clara, NYC, Bend Cambridge, Chicago, Culver City, Minneapolis, Nashville, Pasadena, Pima County, Pittsburgh, Portland, San Jose, Santa Monica, Tucson, King County RHA, Santa Monica HA, Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Dane County, Eugene, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, Rochester, San Diego, San Mateo County, Santa Rosa, Sonoma County, Watsonville, CCHA, and SCCDC (collectively, "the Non-CoC HUD Plaintiffs").

Lastly, the Plaintiffs challenging the HHS grants are Alameda County, Baltimore, Boston, Cambridge, Chicago, Columbus, Dane County, Denver, Eugene, Hennepin County, King County, Milwaukee, Minneapolis, Multnomah County, NYC, Oakland, Pacifica, Pierce

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

County, Pima County, Ramsey County, Rochester, San Francisco, Santa Clara, San Mateo

County, Snohomish County, and Wilsonville (collectively, "the HHS Plaintiffs").[5]

### III.    FACTUAL BACKGROUND[6]

As stated above, initially this lawsuit concerned the allocation of congressionally

appropriated federal funds through HUD and DOT grant programs, and several DOT operating

administrations. Originally the lawsuit concerned only HUD grants through its CoC program, but

with the second amended complaint, while Plaintiffs still challenge the funding conditions on the

CoC grants (as well as DOT grants), they now object to funding conditions that HUD seeks to

impose on all of its grants. In addition, the lawsuit has expanded to include grants administered by

HHS and several of its operating administrations, including ACF, HRSA, NIH, SAMHSA, and

the CDC.

### A.    HUD CoC and DOT Grants

HUD administers the CoC program with funds appropriated by Congress through the

McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11301(b)(2)–(3). The CoC program is

designed to assist individuals and families experiencing homelessness by providing services to

help such individuals move into transitional and permanent housing, with the goal of long-term

stability. Congress established DOT in 1966 "to assure the coordinated, effective administration

of the transportation programs of the Federal Government" and has established by statute a wide

variety of grant programs that provide federal funds to state and local governments for public

transit services. *See* Department of Transportation Act, Pub. L. No. 89-670, 80 Stat. 931 (1966).

---

[5] Note, several Plaintiffs fall into more than one Plaintiff group.
[6] This Court assumes familiarity with the detailed fact section set forth in its June 3, 2025 order granting Plaintiffs' motions for a preliminary injunction. Dkt. No. 169.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1.     **The Funding Conditions on HUD CoC and DOT Grants**

In the first two motions for a preliminary injunction, Plaintiffs charged HUD and DOT with imposing funding conditions that are not authorized by statute on HUD CoC and DOT grants and are therefore unlawful. Plaintiffs argued that the new funding conditions sought to coerce grant recipients dependent on federal funding into implementing the Trump Administration's policy agenda. Specifically, Plaintiffs objected to the following six conditions with respect to the CoC grants:

A.    The recipient "shall not use grant funds to promote 'gender ideology,' as defined in E.O. 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";

B.    The recipient "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]";

C.    The recipient "certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964";

D.    The recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment";

E.    "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation"; and

F.    "Subject to the exceptions provided by [the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA")], the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 8

Dkt. No. 11 ("McSpadden Decl."), Ex. A at 3. And Plaintiffs objected to the following three

conditions with respect to the DOT grants:

A.    "Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal
Discrimination and Restoring Merit-Based Opportunity, the Recipient
agrees that its compliance in all respects with all applicable Federal anti-
discrimination laws is material to the government's payment decisions for
purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]";

B.    "Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal
Discrimination and Restoring Merit-Based Opportunity, by entering into
this Agreement, Recipient certifies that it does not operate any programs
promoting diversity, equity, and inclusion (DEI) initiatives that violate any
applicable Federal anti-discrimination laws"; and

C.    "[T]he Recipient will cooperate with Federal officials in the enforcement of
Federal law, including cooperating with and not impeding U.S. Immigration
and Customs Enforcement (ICE) and other Federal offices and components
of the Department of Homeland Security in the enforcement of Federal
immigration law."

Dkt. No. 71 at ¶¶ 164, 172. In addition, the new funding conditions also required recipients to

comply with all executive orders. McSpadden Decl., Ex. A at 1, ¶ 5; Dkt. No. 71 at ¶¶ 168, 170.

Plaintiffs challenged Defendants' imposition of the foregoing conditions on the grants,

arguing that the conditions are unconstitutional, violate the APA, and exceed statutory authority.

They further argued that they would be irreparably harmed if the conditions were imposed on the

grants and sought injunctive relief from this Court.

## 2.    This Court Grants Injunctive Relief to Plaintiffs

This Court determined that Plaintiffs were entitled to a preliminary injunction because

they satisfied the *Winter* factors. Dkt. No. 169 at 30 (citing *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008)). Plaintiffs established that they are likely to succeed on the merits of their

APA claim because Defendants' actions are contrary to the constitution, in excess of statutory

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 9

authority, and arbitrary and capricious. *Id*. at 30-38. Plaintiffs also demonstrated that they were likely to suffer irreparable harm in the absence of preliminary injunctive relief and that the balance of equities weighed in favor of Plaintiffs. *Id*. at 39-45. Therefore, among other relief, the Court enjoined Defendants from:

> (1) imposing or enforcing the new funding conditions, as defined in Plaintiffs' motions for preliminary injunction, or any materially similar terms or conditions with respect to any HUD CoC or DOT funds awarded to Plaintiffs;

> (2) with respect to Plaintiffs, rescinding, withholding, cancelling, or otherwise not processing any HUD CoC and/or DOT Agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning HUD CoC and/or DOT funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objection to conditions enjoined by this preliminary injunction;

> (3) requiring Plaintiffs to make any "certification" or other representation related to compliance with such terms or conditions; or

> (4) refusing to issue, process, or sign HUD CoC and/or DOT Agreements based on Plaintiffs' participation in this lawsuit.

*Id*. at 46-48.

### 3.    New HUD CoC and DOT Plaintiffs

Plaintiffs allege that despite this Court enjoining Defendants from imposing the unlawful funding conditions on the Original Plaintiffs' HUD CoC grants, Defendants are attempting to impose the conditions on CoC grants awarded to Alameda County, Albuquerque, Baltimore, Dane County, Hennepin County, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, San Mateo County, and Sonoma County—the New CoC Plaintiffs. Dkt. No. 184 at ¶¶ 292-293. According to Plaintiffs, the CoC grants will allow the New CoC Plaintiffs "to continue homelessness assistance programs, ensuring [their] ability to serve their residents so they [will] not experience a sudden drop off in the availability of housing services, permanent and

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

transitional housing, and other assistance." *Id*. at ¶ 300. Plaintiffs further allege that in reliance

on the awards, many of the New CoC Plaintiffs "already notified service providers of

forthcoming funding and/or contracted with service providers for homelessness assistance

services." *Id*. at ¶ 301.

In addition, Plaintiffs allege that Defendants also continue to impose the funding

conditions on DOT grants awarded to Alameda County, Albuquerque, Baltimore, Bellevue,

Bellingham, Bremerton, Cambridge, Dane County, Eugene, Healdsburg, Hennepin County,

Kitsap County, Los Angeles, Milwaukee, Milwaukee County, Multnomah County, Oakland,

Pacifica, Pasadena, Petaluma, PSRC, Ramsey County, Rochester, Rohnert Park, San Diego, San

Mateo County, Santa Rosa, SCTA, and Watsonville—the New DOT Plaintiffs. According to

Plaintiffs, each of the New DOT Plaintiffs "previously received, currently receive, or are

otherwise eligible to receive DOT grants, directly and/or on a pass-through basis. *Id.* at ¶ 391.

Plaintiffs further allege that each of the New DOT Plaintiffs rely on the DOT grants to undertake

transportation-related projects for the benefit of their communities.

Plaintiffs claim that "[t]he grant conditions that Defendants seek to impose leave [the

New CoC and DOT] Plaintiffs with the Hobson's choice of accepting illegal conditions that are

without authority, contrary to the Constitution, and accompanied by the poison pill of heightened

risk of FCA claims or forgoing the benefit of grant funds—paid for (at least partially) through

local federal taxes—that are necessary for crucial local services." *Id*. at ¶ 623. Finally, Plaintiffs

assert that loss of these grant funds would result in loss of billions of dollars in funding for

critical services and projects for the New CoC and DOT Plaintiffs, destabilizing their

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

communities. *Id*. at ¶¶ 625-627. Plaintiffs request that this Court extend its injunction against Defendants to the New CoC and DOT Plaintiffs' grants.

B.    **Non-CoC HUD Grants**

Plaintiffs allege that in addition to CoC grants, many of them receive or are otherwise eligible to receive non-CoC HUD grants—the Non-CoC HUD Plaintiffs. These grants include congressionally appropriated funding for homelessness assistance, affordable housing, community development programs, and other services that benefit the Non-CoC HUD Plaintiffs' communities, including the Community Development Block Grant ("CDBG") program, 42 U.S.C. §§ 5303–06; the Emergency Solutions Grant ("ESG") program, which funds emergency shelters and homelessness services, *id*. §§ 11371–78; the Home Investment Partnerships ("HOME") program, which supports affordable housing, *id*. §§ 12741–56; and the Housing Opportunities for Persons with AIDS ("HOPWA") program, *id*. §§ 12901–12. Dkt. No. 184 at ¶¶ 302-358.

Plaintiffs allege, and Defendants do not dispute, that HUD seeks to impose on *all* HUD grants substantially similar funding conditions to those that this Court previously enjoined. As evidence of this, Plaintiffs point to the fact that in April 2025, HUD amended its General Administrative, National, and Departmental Policy Requirements and Terms (the "HUD Policy Terms") that sets forth the "various laws and policies that may apply to recipients of" HUD grant awards. Dkt. No. 184 at ¶ 516. The amended HUD Policy Terms list President Trump's executive orders among the "laws and policies that may apply" to HUD grants as well as language materially the same as the previously enjoined funding conditions. *Id*. at ¶ 520.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

In addition, Plaintiffs note that in May 2025, HUD amended its standard Applicant and Recipient Assurances and Certifications ("the HUD Certifications") to require applicants to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." Dkt. No. 271, Amaral Decl., Ex. B; Dkt. No. 184 at ¶ 522. Local governments and agencies must submit the HUD Certifications with certain consolidated plans and/or action plans annually as a condition to receiving CDBG, ESG, HOME, and HOPWA formula funding.

Lastly, on June 5, 2025, HUD's Office of Community Planning and Development ("CPD"), which administers the CoC, CDBG, ESG, HOME, and HOPWA programs, issued a letter announcing HUD's decision to impose on all CPD formula grants funding conditions substantially similar to the previously enjoined funding conditions. Dkt. No. 184 at ¶¶ 524-525. These funding conditions include requiring recipients to certify that they: (1) "shall not use grant funds to promote 'gender ideology,'" (2) will not "use any grant funds to fund or promote elective abortions," (3) will "use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States," and (4) agree that they will not use funding to "subsidiz[e] or promot[e] … illegal immigration or [to] seek to shield illegal aliens from deportation." *Id*. at ¶¶ 527-533.

Plaintiffs claim that HUD has already notified at least three Non-CoC HUD Plaintiffs that their consolidated/action plans violate the newly imposed funding conditions. For instance, HUD threatened to disapprove Petaluma's 2025 Consolidated Action Plan for CDBG funds because it allegedly violated the DEI, gender ideology, and immigration funding conditions by including

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1    references to "equity," "environmental justice," "transgender or gender non-conforming," and

2    "undocumented individuals." Dkt. No. 244, Cochran Decl., Ex. B. Bellevue and King County

3    received similar notices. Dkt. No. 195, Esparza Decl., Ex. A; Dkt. No. 222, Third Supp. Marshall

4    Decl., Ex. B. HUD gave Petaluma, Bellevue, and King County less than 48 hours to remedy the

5    purported violations by scrubbing their plans of the offending language. *Id*.; Cochran Decl. at ¶

6    12. King County's plan was subsequently disapproved. Dkt. No. 223, Holcomb Decl., Ex. A.

7           Plaintiffs further allege that the Non-CoC HUD Plaintiffs face immediate and irreparable

8    harm from imposition of the funding conditions. Several Non-CoC HUD Plaintiffs face a

9    deadline of Saturday, August 16, 2025 to submit consolidated/action plans to HUD or forfeit the

10   formula grant funding. Dkt. No. 186 at 1; Dkt. No. 184 at ¶ 623. Plaintiffs assert that loss of this

11   funding would disrupt the lives of the Non-CoC HUD Plaintiffs' most vulnerable residents,

12   likely leading to evictions and increased homelessness and further straining local resources.

13   According to Plaintiffs, even a temporary loss of funding would set back efforts to create and

14   preserve affordable housing, ameliorate homelessness, and house low-income individuals living

15   with HIV/AIDS. Dkt. No. 184 at ¶ 625. Plaintiffs request that this Court enjoin Defendants from

16   imposing the new funding conditions on the Non-CoC HUD Plaintiffs' grants.

17        **C.**    **HHS Grants**

18          HHS administers both competitive grant programs and formula and block grant programs

19   that provide funds to local governments to enhance the health and well-being of their

20   communities. In administering grant programs, HHS often acts through its operating divisions

21   and agencies. For instance, ACF administers discretionary and formula grants to support

22   programs that serve children and families. HRSA awards a variety of competitive and formula

23
     ORDER GRANTING PLAINTIFFS' THIRD
24   MOTION FOR PRELIMINARY INJUNCTION

25     - 14

grants including Primary Care/Health Centers, Health Workforce Training, HIV/AIDS, Organ Donation, Maternal and Child Health, Rural Health, the Health Center Program, and the Ryan White HIV/AIDS program. SAMHSA administers both competitive, discretionary grant programs and noncompetitive formula grant programs to fund substance use and mental health services to advance the behavioral health and improve the lives of those living with mental and substance use disorders. The CDC provides funding to support public health systems and activities by local and state governments. It supports programs such as HIV/AIDS, Viral Hepatitis, STI, and TB Prevention; Chronic Disease Prevention and Health Promotion; Public Health Preparedness and Response; and Injury Prevention and Control.

Congress annually appropriates funding for these HHS grant programs, setting forth priorities and directives to the Secretary of HHS with respect to the funding. Examples of such appropriation legislation are: Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1523–28, 1567–98; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 397–402, 441–74; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4808–13, 4854–87; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 272–77, 397–419.

Plaintiffs allege that the HHS Plaintiffs have received, currently receive, or are otherwise eligible to receive federal grants administered by ACF, HRSA, SAMHSA, and CDC, among others. Collectively, HHS Plaintiffs rely on over $2 billion in appropriated federal funds from HHS grant programs which support essential health programs and services in the HHS Plaintiffs' communities, such as child welfare assistance, adoption and foster care services, and healthcare for low-income individuals and those living with HIV/AIDS. Dkt. No. 184 at ¶¶ 475.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 15

Plaintiffs claim that like HUD and DOT, HHS has begun attaching unlawful funding conditions to HHS grants that are substantially similar to those that this Court previously enjoined, including by updating HHS's Grants Policy Statement in April 2025 ("the 2025 HHS GPS") to provide:

> [R]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
>
>> (1) Definitions. As used in this clause –
>> (a) DEI means "diversity, equity, and inclusion."
>> (b) DEIA means "diversity, equity, inclusion, and accessibility."
>
> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
>         . . . . .
>
> By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws.

Dkt. No. 184 at ¶ 606.[7]

Plaintiffs further alleged that in addition to these agency-wide changes, several HHS operating divisions and agencies have issued their own general terms and conditions incorporating the 2025 HHS GPS. For instance, ACF updated its Standard Terms and Conditions that apply to both discretionary and non-discretionary awards, to add a certification that states:

---

[7] On July 24, 2025, after Plaintiffs filed the instant motion, HHS updated the 2025 HHS GPS, removing express references to DEI but stating: "By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." 2025 HHS GPS at 18, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-july-2025.pdf. Thus, the foregoing certification is required even to just "apply[]" for federal funds from HHS. The 2025 HHS GPS also states that "[r]ecipients are responsible for ensuring subrecipients, contractors, and partners also comply." *Id.*

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 16

*For new awards made on or after May 8, 2025*, the following is effective immediately:

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the FCA].

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory equity ideology.

*Id*. at ¶ 609.[8]

Likewise, HRSA issued updated general terms and conditions applicable to all active awards. The revised HRSA terms and conditions incorporate the 2025 HHS GPS and also contain the following new provision:

---

[8] On July 29, 2025, ACF updated its Standard Terms and Conditions again to remove express references to DEI.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 17

By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:

- Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.

- The above requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement.

- Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

- Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.

- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

Dkt. No. 184 at ¶ 611. Plaintiffs allege that SAMHSA and the CDC have also updated their terms to contain funding conditions that require recipients not to promote gender ideology. *Id*. at ¶¶ 607-08.

Plaintiffs argue that foregoing funding conditions are unconstitutional, violate the APA, exceed statutory authority, and are President Trump's attempt to coerce grant recipients that rely on federal funds into implementing his political agenda. According to Plaintiffs, withholding "HHS grants from the HHS Plaintiffs would threaten or eliminate critical individual and public health services for millions of residents. Loss of funding could decimate public health budgets

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 18

1    and cause residents, including those most vulnerable, to lose access to meals, medical care,

2    housing and lifesaving social safety net services. Loss of funding could also devastate local

3    public health and child welfare agencies, who may be forced to conduct significant layoffs and

4    operational reductions." *Id*. at ¶ 628. Therefore, Plaintiffs request that this Court enjoin HHS

5    and/or its operating agencies from imposing the new funding conditions on the HHS Plaintiffs'

6    grants.

7                                    **IV.    DISCUSSION**

8        **A.    Legal Standard**

9            A preliminary injunction is a matter of equitable discretion and is "an extraordinary

10   remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

11   relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking

12   preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is

13   likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

14   tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, an

15   injunction may issue where "the likelihood of success is such that serious questions going to the

16   merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided

17   that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v.*

18   *Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted).

19   Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled

20   to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). The

21   most important *Winter* factor is likelihood of success on the merits. *See Disney Enters., Inc. v.*

22   *VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

23   ORDER GRANTING PLAINTIFFS' THIRD
24   MOTION FOR PRELIMINARY INJUNCTION

25    - 19

1     **B.      Plaintiffs' Claims Are Reviewable under the APA**

2          As they did when they opposed Plaintiffs' first two motions for a preliminary injunction,

3     Defendants argue that Plaintiffs' claims are not reviewable by this Court because the actions at

4     issue are committed to the agencies' discretion. While "the APA establishes a basic presumption

5     of judicial review for one suffering legal wrong because of agency action, that presumption can

6     be rebutted by a showing that . . . the agency action is committed to agency discretion by law."

7     *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020)

8     (cleaned up); 5 U.S.C. § 701(a)(2). Where that is the case, courts have no authority to review or

9     set aside the agency's action.

10         However, as this Court previously concluded, this exception to the "basic presumption of

11     judicial review" does not apply in this case. Agency action is committed to agency discretion only

12     in those "rare instances where statutes are drawn in such broad terms that in a given case there is

13     no law to apply, thereby leaving the court with no meaningful standard against which to judge the

14     agency's exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015);

15     *Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015), as revised (Nov. 25, 2015). Once again,

16     Defendants have failed to demonstrate that the contested conditions fall within "[t]his limited

17     category of unreviewable actions." *Regents*, 140 S. Ct. at 1905 (citing *Weyerhaeuser Co. v.*

18     *United States Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). As before, Defendants rely on

19     *Lincoln v. Vigil*, 508 U.S. 182 (1993) for the principle that an agency's decision to cancel a

20     program is unreviewable because how to allocate funds "'from a lump-sum appropriation' is an

21     'administrative decision traditionally regarded as committed to agency discretion.'" Dkt. No. 334

22     at 11 (citing 508 U.S. at 192). This Court previously concluded that the agency action in *Lincoln*

23     ORDER GRANTING PLAINTIFFS' THIRD
24     MOTION FOR PRELIMINARY INJUNCTION

25     - 20

differed materially from the actions at issue in this case, namely that the funds at issue in this case are not appropriate in undifferentiated "lump sums" as they were in *Lincoln*. Dkt. No. 169 at 28. Rather, the grants at issue here "abound with specific directives" that provide substantial guidance as to how the agencies' discretion should be exercised in implementing these programs. *Id*. at 28-29. Defendants ignore entirely this Court's previous conclusion, and the Court once again concludes that Plaintiffs' claims do not involve the "narrow category" of agency actions that are unreviewable under the APA.

### C.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

The Court has already determined that Defendants' attempt to impose the challenged funding conditions on the CoC and DOT grants violated the APA. *See generally* Dkt. No. 169. Defendants present no argument as to why this conclusion should not apply equally to the New CoC and DOT Plaintiffs; thus, the Court concludes that the New CoC and DOT Plaintiffs are also likely to succeed on the merits of their APA claim and focuses the remainder of its analysis on the Defendants' actions with respect to the non-CoC HUD and HHS grants.

The APA broadly "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Regents*, 140 S. Ct. at 1905 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). Under the APA, agencies must "engage in reasoned decisionmaking," and courts are empowered to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As stated above, Plaintiffs challenge Defendants' actions as "contrary to constitutional right" and "in excess

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

of statutory authority," and as arbitrary and capricious. *See* Dkt. No. 184, Counts 5, 6, and 7, ¶¶ 670-703.

### 1. Defendants' Actions Violate the APA as Contrary to the Constitution and in Excess of Statutory Authority (Counts 6 & 7)

#### (a) Separation of Powers Doctrine

Under the APA, a court may set aside an agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs challenge Defendants' conditions as both contrary to the Constitution's Separation of Powers doctrine and in excess of any authority conferred by Congress. Dkt. No. 184 at ¶¶ 690-703. As with this Court's prior order enjoining Defendants' actions, because the Separation of Powers doctrine and the APA's "in excess of statutory authority" standard both turn on the same essential question— whether the agency acted within the bounds of its authority, either as conferred by the Constitution or delegated by Congress—the Court addresses the claims in a single analysis.

The Separation of Powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.")). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28, 2473 (1990)).

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 22

In contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *San Francisco*, 897 F.3d at 1231. Quite the contrary, it is well-established that an executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see California v. Trump*, 379 F. Supp. 3d 928, 941 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020). When an agency is charged with administering a statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235.

Plaintiffs argue that in attempting to condition disbursement of funds in part on grounds not authorized by Congress, but rather on Executive Branch policy, Defendants are acting in violation of the Separation of Powers principle and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs argue that the statutes authorizing the grants at issue do not confer on Defendants the kind of authority they are attempting to assert. For the reasons explained below, and in its June 3, 2025 order, the Court agrees.

### (b)    The Non-CoC HUD Funding Conditions

Plaintiffs contend that the contested conditions must be set aside because the statute's underlying the non-CoC HUD grants do not give HUD the authority to impose "conditions that

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1    prohibit DEI or promotion of 'gender ideology' or 'elective abortion' or require participation in

2    federal immigration enforcement, immigration status verification, or adherence to EOs unrelated

3    to the grant's purpose." Dkt. No. 186 at 9. Defendants counter that they do have the authority to

4    impose the challenged conditions, citing to HUD regulations that require "federal agencies [to]

5    incorporate 'statutory, executive order, other Presidential directive, or regulatory requirements'

6    into the terms and conditions" of HUD grants. Dkt. No. 334 at 8 citing 2 C.F.R. §

7    200.211(c)(1)(ii). However, as this Court noted in rejecting this argument the first time

8    Defendants raised it, "an agency *regulation* cannot create *statutory* authority; only Congress can

9    do that." Dkt. No. 169 at 33 (emphasis in original). Defendants must point to a *statutory* source

10   that confers the authority. Without such a source, the agency action violates the separation of

11   powers principle.

12        Next Defendants argue that the challenged conditions "merely require grant recipients to

13   agree to comply with existing federal laws, like federal antidiscrimination laws" and "Congress

14   has expressly authorized HUD to require that grantees comply with federal laws." Dkt. No. 334 at

15   8 (citing 42 U.S.C. § 5304(b)(6) ("Any [CDBG] grant … shall be made only if the grantee

16   certifies to the satisfaction of the Secretary that … the grantee will comply with the other

17   provisions of this chapter and with other applicable laws.")). The problem with Defendants'

18   argument is that they fail to acknowledge the evidence in the record that demonstrates that

19   Defendants interpret federal antidiscrimination laws in a manner that is inconsistent with well-

20   established legal precedent. For example, on April 4, 2025, DOT Secretary Duffy issued a letter

21   "To All Recipients of U.S. Department of Transportation Funding" in which he stated that "*any*

22   policy, program, or activity" that is "designed to achieve so called "diversity, equity, and

23   ORDER GRANTING PLAINTIFFS' THIRD
24   MOTION FOR PRELIMINARY INJUNCTION

25    - 24

1    inclusion,' or 'DEI[]' goals[] presumptively violates Federal law" even if the policy, program, or

2    activity is "described in neutral terms." Dkt. No. 6 at 346 (emphasis added). Secretary Duffy's

3    statement can easily be interpreted to mean that a federal grant recipient that has a "policy" to

4    accommodate individuals with disabilities so that those individuals can participate in an "activity"

5    has "presumptively violate[d] Federal law."  This, of course, is inconsistent with well-established

6    federal precedent that requires entities that receive federal funds to provide reasonable

7    accommodations for qualified individuals with disabilities so that they can participate in their

8    programs. *See e.g., U.S. Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 604

9    (1986) ("Section 504 prohibits discrimination against any qualified handicapped individual under

10   'any program or activity receiving Federal financial assistance.'"); *Muir v. United States Dept. of*

11   *Homeland Security*, 2025 WL 2088450, *6 (D.C. Cir. July 25, 2025) ("Section 504 of the

12   Rehabilitation Act prohibits discrimination against disabled persons by recipients of federal

13   funds."); *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (It is a basic tenet of the

14   Rehabilitation Act of 1973 "that the government must take reasonable affirmative steps to

15   accommodate the handicapped, except where undue hardship would result").

16        Likewise, on May 19, 2025, U.S. Deputy Attorney General Todd Blanche sent a

17   memorandum to all United States Attorneys, among others, in which he stated that federal fund

18   recipients may run afoul of the False Claims Act if they allow transgender individuals to use

19   bathrooms consistent with their gender identities (*i.e.*, "allow[] men to intrude into women's

20   bathrooms"). Dkt. No. 65 at 5. Deputy Attorney General Blanche's statement contradicts the

21   decisions of multiple appellate courts that have held that federal law forbids discrimination based

22   on transgender status. *See e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th

23
24   ORDER GRANTING PLAINTIFFS' THIRD
     MOTION FOR PRELIMINARY INJUNCTION

25    - 25

Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination);

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023)

("[D]iscrimination against transgender persons is sex discrimination for Title IX purposes . . . .").

And as recently as July 29, 2025, U.S. Attorney General Pam Bondi issued a

memorandum titled "Guidance for Recipients of Federal Funds regarding Unlawful

Discrimination" in which she purports to "clarif[y] the application of federal antidiscrimination

laws to programs or initiatives that may involve discriminatory practices, including those labeled

as Diversity, Equity, and Inclusion ("DEI") programs." Dkt. No. 331, Ex. A at 1. Among other

"clarifications", Attorney General Bondi states that the use of "[f]acially neutral criteria (e.g.,

'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for

protected characteristics violate federal law if designed or applied with the intention of

advantaging or disadvantaging individuals based on protected characteristics." *Id*. at 2. This

"clarification," however, is inconsistent with Supreme Court precedent that has "consistently

declined to find constitutionally suspect" the adoption of race-neutral criteria "out of a desire . . .

to improve racial diversity and inclusion"—even where the decision-maker was "well aware" the

race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864,

885–86 (4th Cir. 2023) (internal quotation marks and citation omitted) (citing, *inter alia*, *Tex.*

*Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015). Nor

does Supreme Court precedent prohibit the use of diversity statements for the purpose of

advancing racial diversity goals; to the contrary, in *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard College*, the Court described these goals as "commendable" and

"worthy" (though insufficient to justify race-based admissions). 600 U.S. 181, 214-15, 230

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

(2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."); *United States v. Skrmetti*, 145 S. Ct. 1816, 1854 (2025) (Thomas, J., concurring) (suggesting strict scrutiny does not apply to "a university's decision to credit 'an applicant's discussion of how race affected his or her life'" simply because it is "inextricably bound up with" the applicant's race) (cleaned up).

The above demonstrates that Plaintiffs are at the mercy of Defendants' interpretation of federal antidiscrimination laws, regardless of how those laws are interpreted by the courts. Indeed, this has already played out in this case where HUD recently informed King County that it was rejecting King County's CDBG Consolidated Plan submission for Program Year 2025 because HUD "is questioning the accuracy of King County's … certification that the [CDBG] funds described in [the plan] will be administered in conformity with applicable laws, including Executive Orders." Dkt. No. 223 at 5-6. Among other reasons HUD expressed concern was King County's use of words such as "equity," "migrant," and "immigrant" throughout the plan. *Id*. at 6-8. In order to assuage HUD's concerns, King County was instructed to replace "all 'equity' references" throughout the plan with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" and to replace all references to "migrant" and "immigrant" with "legal/documented migrant/immigrant." *Id*. at 8. However, as Plaintiffs aptly point out, "[n]o case law … suggests that using words like 'equity' or 'migrant' violates *any* law." dkt. no. 335 at 3, thus refuting Defendants' claim that the challenged funding requirements "merely require grant recipients to

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

agree to comply with existing federal laws, like federal antidiscrimination laws," dkt. no. 334 at 8.[9]

Moreover, Defendants' ability to impose the challenged conditions on the non-CoC HUD grants is further constrained by 42 U.S.C. § 12711, which prohibits HUD from "denying funds made available under [HUD] programs . . . based on the adoption, continuation, or discontinuation" of any lawful local policies. Stated differently, "HUD may not … *condition* funding on changes to local policies." *Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015) (emphasis in original). Yet that is exactly what Defendants attempt to do here; they are leveraging the Non-CoC HUD Plaintiffs' dependence on federal funding to coerce them into replacing their own local policies with the Trump Administration's political agenda.

---

[9] Nor are the new funding conditions authorized by PRWORA or the Hyde Amendment as Defendants claim. The challenged funding conditions purport to require non-CoC HUD Plaintiffs to "use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States." Dkt. No. 184 at ¶¶ 492, 517. While PRWORA does provide that noncitizens without qualifying immigration status are ineligible for certain "Federal public benefit[s]," 8 U.S.C. § 1611(a), it does not require grant recipients to verify eligibility *until* the U.S. Attorney General has promulgated regulations implementing a verification requirement. *See id*. § 1642(a); § 1642(b) ("Not later than 24 months after the date the regulations described in subsection (a) are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations."). The Attorney General is yet to promulgate a final regulation implementing a verification requirement. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). By requiring grant recipients to verify eligibility by using SAVE (or an equivalent system) without the benefit of implementing regulations and/or the two-year ramp-up period, Defendants are attempting to rewrite PRWORA, not implement it.

The Hyde Amendment also does not authorize the challenged funding condition that requires the Non-CoC HUD Plaintiffs to certify that no grant funds will be used "to promote elective abortions." Dkt. No. 1854 at ¶¶ 494, 520. The Hyde Amendment bars use of federal funds to pay for or to require a person to facilitate an abortion; it does not prohibit federally funded programs from promoting elective abortions, which could be read to include providing program participants with information about lawful abortions. Pub. L. 118-42, §§ 202–03, 138 Stat. 153.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1    Lastly, the challenged funding conditions conflict with statutory provisions authorizing

2    the HUD grant programs. Far from barring diversity-related "inclusion," Congress *requires*

3    consideration of diversity when allocating HUD funds. For instance, the HUD Secretary is

4    required to set aside CDBG funds for "[s]pecial purpose grants," including grants to "historically

5    Black colleges." 42 U.S.C. § 5307(b)(2); *see also id*. § 5307(c) (requiring CDBG funds be

6    allocated to provide "assistance to economically disadvantaged and minority students"). And in

7    authorizing the HOME and HOPWA programs, Congress acted to "improve housing

8    opportunities for all residents of the United States, particularly members of disadvantaged

9    minorities, on a nondiscriminatory basis." 42 U.S.C. § 12702(3). Congress also requires HOME

10    recipients "to establish and oversee a minority outreach program . . . to ensure the inclusion, to

11    the maximum extent possible, of minorities and women, and entities owned by minorities and

12    women . . . in all contracts[] entered into by the participating jurisdiction." 42 U.S.C. § 12831(a).

13    Based on the foregoing, the Court concludes that the Non-CoC HUD Plaintiffs are likely

14    to prevail on their claim that in attempting to impose the challenged funding conditions on the

15    recipients of non-CoC funds, Defendants have run afoul of the Separation of Powers doctrine, and

16    are acting in excess of statutory authority, and that under the APA, those conditions must be set

17    aside.

18                            **(c) The HHS Grants Funding Conditions**

19    Defendants' attempts to identify statutory authority for imposing the contested conditions

20    on the HHS grants suffer from similar deficiencies. As an initial matter, Defendants once again

21    rely on agency regulations for the authority to impose the conditions, but as noted above, agency

22    regulations are not the equivalent of statutory authority, and HHS' attempt to rely on them also

23    ORDER GRANTING PLAINTIFFS' THIRD
24    MOTION FOR PRELIMINARY INJUNCTION

25    - 29

1    fails. Nor does Defendants' reliance on generic statutory provisions authorizing the HHS

2    Secretary to prescribe the "form and manner" for grant applications and the "information" it

3    must "contain" fair any better. Dkt. No. 335 at 6 (citing 42 U.S.C. §§ 254b(k)(1), 300ff-15(a),

4    (b), 290ee-1(b)(1)(B)). These provisions only encompass prescriptions as to form, manner, and

5    information, and Defendants' claim that such ministerial provision authorize wide-ranging

6    substantive conditions on hotly debated policy choices runs afoul of the well-established

7    principle that "Congress … does not alter the fundamental details of a regulatory scheme in

8    vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."

9    *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

10            Defendants also invoke Title IX of the Education Amendments Act of 1972, which

11    prohibits sex discrimination by federal education funding recipients, as authority for requiring

12    HHS grant recipients to comply with Presidential Executive Order 14168 "Defending Women

13    From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

14    This Executive Order mandates that "[f]ederal funds shall not be used to promote gender

15    ideology" and requires grant recipients to "recognize two sexes, male and female" and that

16    "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality."

17    But nothing in Title IX mandates such understandings. To the contrary, as cited above courts

18    have concluded that failure to recognize an individual's transgender status constituted

19    discrimination under Title IX. *See e.g., Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 616–

20    17 (4th Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX

21    discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir.

22    2023) ("[D]iscrimination against transgender persons is sex discrimination for Title IX purposes

23
24    ORDER GRANTING PLAINTIFFS' THIRD
       MOTION FOR PRELIMINARY INJUNCTION

25    - 30

. . . .”). As such, far from enforcing Title IX, Defendants seek to graft new requirements into the statute.

Accordingly, the Court concludes that the HHS Plaintiffs are likely to prevail on their claim that in attempting to impose the conditions in the 2025 HHS GPS and the various operating agencies and divisions' terms and conditions, Defendants have acted in a manner that violates the Separation of Powers doctrine and exceeds statutory authority, and that under the APA those conditions must be set aside.

###### 2.    Defendants' Actions Were "Arbitrary and Capricious," 5 U.S.C. § 702(2)(A) (Count 5)

Plaintiffs also assert that the challenged conditions must be set aside as "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); Dkt. No. 184 at ¶¶ 671-688. The APA requires agencies to engage in "reasoned decisionmaking," and their actions must be "reasonable and reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on "factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs maintain that Defendants have not followed these prescriptions and have failed to provide reasonable explanations for any of the challenged funding conditions.

Defendants do not dispute that they have not offered contemporary, reasoned explanations for the imposition of the challenged funding conditions; rather, they argue that they are not required to do so because the conditions are not subject to notice-and-comment rulemaking. Defendants are mistaken. "The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,'" *Bennett v.*

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1   *Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704), whether or not that action is subject to

2   notice-and-comment rulemaking. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627,

3   635–36 (D.C. Cir. 2019). Defendants do not contest that the challenged funding conditions are

4   final agency actions. As such, each agency must have "reasonably considered the relevant issues

5   and reasonably explained its decision" to impose the challenged conditions. *Barton v. Off. of*

6   *Navajo*, 125 F.4th 978, 982 (9th Cir. 2025) (cleaned up).

7          At most, the Defendants rely on reference to the Trump Administration's executive

8   orders to justify the imposition of the challenged funding conditions, but as this Court previously

9   stated "rote incorporation of executive orders—especially ones involving politically charged

10  policy matters that are the subject of intense disagreement and bear no substantive relations to

11  the agency's underlying action—does not constitute 'reasoned decisionmaking.'" Dkt. No. 169 at

12  38. Thus, the Court concludes that Plaintiffs are likely to succeed on the merit of their claim that

13  Defendants' imposition of the challenged funding conditions is arbitrary and capricious, which is

14  an independent ground for setting aide those conditions.[10]

15

16  [10] Plaintiffs have asserted several other claims both under the APA and under the Constitution. See Dkt. No. 184 at
    ¶¶ 630-669, 704-724. The Court does not reach these claims at this stage, in part because "[t]he Court need only find
    that Plaintiffs are likely to succeed on one of [their] claims for [the likelihood-of-success] factor to weigh in favor of
17  a preliminary injunction," and a ruling on Plaintiffs' additional claims would not affect the relief afforded. *Aids
    Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *7 (D.D.C.
18  Mar. 10, 2025). Furthermore, the Court adheres to the "fundamental and longstanding principle of judicial restraint"
    that requires courts to "avoid reaching constitutional questions in advance of the necessity of deciding them." *Al
    Otro Lado v. Exec. Off. for Immigr. Rev.*, No. 22-55988, 2024 WL 5692756, at *14 (9th Cir. May 14, 2025)
19  (vacating district court's "entry of judgment for Plaintiffs on the constitutional due process claim" where judgment
    was granted in Plaintiffs' favor on APA claim) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439,
20  445 (1988)); *see also Washington v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020) ("[A] court should not
    reach a constitutional question if there is some other ground upon which to dispose of the case. Given that this Court
21  has already determined that Defendants' [action] violates the APA and, therefore, can dispose of the case on that
    basis, the Court exercises restraint and declines to reach the constitutional claims raised by Washington.") (cleaned
22  up, citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Harmon v. Brucker*, 355 U.S.
    579, 581 (1958)). Because Plaintiffs are likely to prevail on Counts 5, 6 and 7 of their Second Amended
23  Complaint—that the challenged actions were arbitrary and capricious, contrary to the constitutional Separation of

24  ORDER GRANTING PLAINTIFFS' THIRD
    MOTION FOR PRELIMINARY INJUNCTION

25   - 32

### D.    Irreparable Injury

A plaintiff seeking a preliminary injunction must establish that it is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991)).

The Court addressed this issue when previously granting preliminary relief, stating:

> Plaintiffs allege several forms of irreparable harm that are either presently occurring, or are likely to occur, in the absence of injunctive relief. They are facing a choice between two untenable options; as this Court has already determined, 'Defendants have put Plaintiffs in the position of having to choose between accepting conditions that they believe are unconstitutional and risking the loss of hundreds of millions of dollars in federal grant funding, including funding that they have already budgeted and are committed to spending.' On the one hand, being forced to accept conditions that are contrary either to statute or to the Constitution (or both) is a constitutional injury, and constitutional injuries are 'unquestionably' irreparable. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

> On the other hand, avoiding the constitutional offense by refusing to agree to the new funding conditions may very well result in the loss of access to promised grant funds. And indeed, Defendants have not denied that Plaintiffs would be assuming this risk by not signing the agreements. They merely complain that Plaintiffs have not provided details as to when exactly that loss will occur. But this argument misses the point. It is this looming risk itself that is the injury, and one that Plaintiffs are already suffering. Courts evaluating similar circumstances have recognized that this injury of acute budgetary uncertainty is irreparable; '[w]ithout clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services. These mitigating steps will cause the Counties irreparable harm.' *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017). While a preliminary injunction will not eliminate these risks entirely, Plaintiffs have demonstrated it will at least mitigate them pending

---

Powers doctrine, and in excess of Defendants' statutory authority, and must therefore be set aside under the APA—the Court's inquiry into the likelihood-of-success factor is at an end.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

resolution of this case on its merits.

> Furthermore, Plaintiffs have submitted substantive and detailed evidence illustrating the ways in which a loss of grant funds would be devastating and irreparable if these risks in fact materialize. . . . . The administration's attempt to compel Plaintiffs' compliance with unrelated policy objectives by leveraging the needs of our most vulnerable fellow human beings is breathtaking in its callousness. Defendants' argument that these harms are not irreparable is simply wrong.

Dkt. No. 169 at 39-42 (some internal citations omitted).

Plaintiffs have once again provided comprehensive evidence (in the form of nearly 100 declarations from local government and agency administrators, *see* dkt. nos. 187-282) demonstrating that should the loss of the grant funds come to pass, the resulting harm would be severe and irreparable. In addition, Plaintiffs have provided substantial evidence demonstrating that this harm is not, as Defendants suggest, merely monetary in nature. Adequate financial compensation for the destabilization of immediate and future budgets, reductions in workforce, hundreds of shelter-unstable families losing access to housing, loss of access to health care services to vulnerable populations, and the termination of transportation projects simply does not exist. Therefore, the Court concludes that the harms Plaintiffs have alleged are quintessentially irreparable in nature and can be avoided only by entry of the requested injunction.

### E.    The Balance of Equities and Public Interest Favor Plaintiffs

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters*, 869 F.3d at 866 (quoting *Winter*, 555 U.S. at 24). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 34

1  and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.

2  2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

3          Defendants once again argue that the balance of equities and the public interest favor

4  Defendants because "[en]suring compliance with federal laws is assuredly in the public interest."

5  Dkt. No. 334 at 14. But as discussed *supra*, the contested funding conditions are not

6  congressionally authorized, nor do they merely seek compliance with federal law. Defendants do

7  not have a legitimate interest in ensuring that funds are spent pursuant to conditions that were

8  likely imposed in violation of the APA and/or the Constitution. *See Valle del Sol Inc. v. Whiting*,

9  732 F.3d 1006, 1029 (9th Cir. 2013) (there is no legitimate government interest in violating

10  federal law). Defendants also contend that "Plaintiffs could be compensated for any lost money

11  after a ruling on the merits" in this case. Dkt. No. 334 at 14. The Court has already rejected the

12  notion that Plaintiffs could be adequately compensated for the devastation that would result from

13  the loss of the federal funding. Thus, for the reasons outlined above, the irreparable harms

14  Plaintiffs face in the absence of an injunction tip the balance of equities sharply in their favor.

15        **F.**     **The Court Denies Defendants' Request for a Bond and Request to Stay**

16          Defendants request that if this Court issues an injunction, it be stayed pending any appeal

17  and further requests that this Court require Plaintiffs to post a bond for the value of the specific

18  grants subject to the injunction pursuant to Fed. R. Civ. P. 65(c). The Court denies both requests.

19  Defendants have not met the standard for a stay. *See, e.g.*, *Maryland v. Dep't of Agriculture*, JKB-

20  25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("It is generally logically inconsistent

21  for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on

22  which those decisions are premised are almost perfect opposites."). Nor have Defendants argued,

23  ORDER GRANTING PLAINTIFFS' THIRD
24  MOTION FOR PRELIMINARY INJUNCTION

25    - 35

1   let alone demonstrated, that they will suffer any material harm from the injunction the Court

2   issues today. "Despite the seemingly mandatory language, Rule 65(c) invests the district court

3   with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d

4   1067, 1086 (9th Cir. 2009) (citations and internal quotation marks omitted). "In particular, the

5   district court may dispense with the filing of a bond when it concludes there is no realistic

6   likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (cleaned up).

7                                    **V.    CONCLUSION**

8          For the foregoing reasons,

9          1.      Plaintiffs' Third Motion for Preliminary Injunction is GRANTED;

10         2.      HUD and its officers, agents, servants, employees, and attorneys, and any other

11   persons who are in active concert or participation with them (collectively "Enjoined HUD CoC

12   Parties"), are enjoined from (1) imposing or enforcing the CoC Grant Conditions, as defined in

13   the Appendix II to this Order, or any materially similar terms or conditions at any stage of the

14   grantmaking process, including but not limited to in new grant applications, notices of funding

15   availability or opportunity, certifications, grant agreements, or post-award submissions, with

16   respect to any CoC funds awarded to the New CoC Plaintiffs or members of their Continuums;

17   (2) as to the New CoC Plaintiffs or members of their Continuums, rescinding, withholding,

18   cancelling, or otherwise not processing any CoC Agreements, or pausing, freezing, impeding,

19   blocking, cancelling, terminating, delaying, withholding, or conditioning CoC funds, based on

20   such terms or conditions, including without limitation failing or refusing to process and

21   otherwise implement grants signed with changes or other objections to conditions enjoined by

22   this preliminary injunction; (3) requiring the New CoC Plaintiffs or members of their

23   ORDER GRANTING PLAINTIFFS' THIRD
24   MOTION FOR PRELIMINARY INJUNCTION

25

Continuums to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign CoC Agreements based on New CoC Plaintiffs' participation in this lawsuit;

3. The Enjoined HUD CoC Parties shall immediately treat any actions taken to implement or enforce the CoC Grant Conditions or any materially similar terms or conditions as to the New CoC Plaintiffs or their Continuums, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; while this preliminary injunction is in effect, shall treat as null and void any such conditions included in any grant agreement executed by any New CoC Plaintiff or member of a New CoC Plaintiff's Continuum; and may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction. The Enjoined HUD CoC Parties shall immediately take every step necessary to effectuate this order, including without limitation clearing any administrative, operational, or technical hurdles to implementation;

4. HUD, all of the HUD program offices, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined HUD Parties"), are enjoined from (1) imposing or enforcing the Non-CoC HUD Grant Conditions, as defined in the Appendix II to this Order, or any materially similar terms or conditions at any stage of the grant-making process, including but not limited to in new grant applications, notices of funding availability or opportunity, certifications, grant agreements, or post-award submissions, with respect to any non-CoC HUD funds awarded to the Non-CoC HUD Plaintiffs, their consortia, or their subrecipients; (2) as to the Non-CoC HUD Plaintiffs, their consortia, or their subrecipients, rescinding, withholding, cancelling, or otherwise

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

not processing any non-CoC HUD awards, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning non-CoC HUD funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objections to conditions enjoined by this preliminary injunction; (3) requiring the Non-CoC HUD Plaintiffs, their consortia, or their subrecipients to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign grant agreements based on the Non-CoC HUD Plaintiffs' participation in this lawsuit;

5.    The Enjoined HUD Parties shall immediately treat any actions taken to implement or enforce the Non-CoC HUD Grant Conditions or any materially similar terms or conditions as to the Non-CoC HUD Plaintiffs, their consortia, or their subrecipients, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; while this preliminary injunction is in effect, shall treat as null and void any such conditions included in any grant agreement executed by any Non-CoC HUD Plaintiff, a member of its consortium, or its subrecipient; and may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction. The Enjoined HUD Parties shall immediately take every step necessary to effectuate this order, including without limitation clearing any administrative, operational, or technical hurdles to implementation;

6.    DOT, all of the DOT operating agencies, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined DOT Parties"), are enjoined from (1) imposing or enforcing the DOT Grant Conditions, as defined in the Appendix II to this Order, or any materially similar

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

terms or conditions at any stage of the grant-making process, including but not limited to in new grant applications, notices of funding availability or opportunity, certifications, grant agreements, or post-award submissions, as to any DOT funds awarded, directly or indirectly, to the New DOT Plaintiffs or their subrecipients; (2) as to the New DOT Plaintiffs or their subrecipients, rescinding, withholding, cancelling, or otherwise not processing the DOT grant awards, or pausing, freezing, impeding, blocking, canceling, terminating, delaying, withholding, or conditioning DOT funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objections to conditions enjoined by this preliminary injunction; (3) requiring the New DOT Plaintiffs or their subrecipients to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign grant agreements based on New DOT Plaintiffs' participation in this lawsuit;

7.      The Enjoined DOT Parties shall immediately treat any actions taken to implement or enforce the DOT Grant Conditions or any materially similar terms or conditions as to DOT funds awarded, directly or indirectly, to the New DOT Plaintiffs or their subrecipients, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; while this preliminary injunction is in effect, shall treat as null and void any such conditions included in any grant agreement executed by any New DOT Plaintiff or its subrecipient; and may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction. The Enjoined DOT Parties shall immediately take every step necessary to effectuate this order, including without limitation clearing any administrative, operational, or technical hurdles to implementation;

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

8.      HHS, all of the HHS operating divisions and agencies, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined HHS Parties"), are enjoined from (1) imposing or enforcing the HHS Grant Conditions, as defined in the Appendix II to this Order, or any materially similar terms or conditions at any stage of the grant-making process, including but not limited to in new grant applications, notices of funding availability or opportunity, certifications, grant agreements, or post-award submissions, as to any HHS funds awarded, directly or indirectly, to the HHS Plaintiffs or their subrecipients; (2) as to the HHS Plaintiffs or their subrecipients, rescinding, withholding, cancelling, or otherwise not processing HHS grant awards, or pausing, freezing, impeding, blocking, canceling, terminating, delaying, withholding, or conditioning HHS funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objections to conditions enjoined by this preliminary injunction; (3) requiring the HHS Plaintiffs or their subrecipients to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign grant agreements based on HHS Plaintiffs' participation in this lawsuit;

9.      The Enjoined HHS Parties shall immediately treat any actions taken to implement or enforce the HHS Grant Conditions or any materially similar terms or conditions as to HHS funds awarded, directly or indirectly, to the HHS Plaintiffs or their subrecipients, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; while this preliminary injunction is in effect, shall treat as null and void any such conditions included in any grant agreement executed by any HHS Plaintiff or its subrecipient;

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

and may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction. The Enjoined HHS Parties shall immediately take every step necessary to effectuate this order, including without limitation clearing any administrative, operational, or technical hurdles to implementation;

10.    Defendants' counsel shall provide written notice of this Order to all Defendants and their employees by the end of business on the second day after issuance of this Order;

11.    By the end of business on the second day after issuance of this Order, the Defendants SHALL FILE on the Court's electronic docket and serve upon Plaintiffs a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the foregoing notice (paragraph 10 above) and an explanation as to whom the notice was sent;

12.    This order shall remain in effect pending further orders from this Court.

Dated this 12th day of August 2025.


_Barbara J. Rothstein_
Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 41

# APPENDIX I

## A.    Complaint filed May 2, 2025

### 1.    Plaintiffs

#### a.    CoC Plaintiffs[11]

King County, Pierce County, Snohomish County, City and County of San Francisco, Santa Clara County, Boston, Columbus, and New York City.

#### b.    DOT Plaintiff

King County

### 2.    Defendants

United States Department of Housing and Urban Development ("HUD"), Department of Transportation ("DOT"), and the Federal Transit Administration ("FTA"), as well as the agencies' heads in their official capacities (Scott Turner in his official capacity as Secretary of HUD, Sean Duffy in his official capacity as Secretary of DOT, and Matthew Welbes in his official capacity as acting Director of the FTA).

## B.    First Amended Complaint filed May 21, 2025

### 1.    Plaintiffs added:

#### a.    Added CoC Plaintiffs

Metropolitan Government of Nashville & Davidson County ("Nashville"), Pima County, Cambridge, San Jose, Pasadena, Tucson, King County Regional Homelessness Authority located in King County, Washington ("King County RHA"), Santa Monica Housing Authority, California ("Santa Monica HA")

#### b.    Added DOT Plaintiffs

Denver, Nashville, Pima County, Sonoma County, Bend, Chicago, Culver City, Minneapolis, Pittsburgh, San Jose, Santa Monica, Tucson, Wilsonville, Central Puget Sound Regional Transit Authority located in King, Pierce, and Snohomish Counties, Washington ("CPSRTA"), Intercity Transit located in Thurston County, Washington ("Intercity Transit"), Port

---

[11] A Plaintiff may be included in more than one Plaintiff Group.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

of Seattle, San Francisco County Transportation Authority, located in the City and County of San Francisco, California ("SFCTA"), and Treasure Island Mobility Management Agency located in Treasure Island and Yerba Buena Island, California ("TIMMA")

### 2.    Defendants added

Federal Highway Administration ("FHWA"), the Federal Aviation Administration ("FAA"), the Federal Railroad Administration ("FRA"), and component heads in their official capacities (Tariq Bokhari as the acting Administrator of FTA,[12] Gloria M. Shepard as the acting Director of FHWA, Chris Rocheleau as acting Administrator of FAA, and Drew Feeley as acting Administrator of FRA).

### C.    Second Amended Complaint filed July 10, 2025

#### 1.    Plaintiffs Added [13]

##### a.    CoC Plaintiffs

Alameda County, Albuquerque, Baltimore, Columbus, Dane County, Hennepin County, Milwaukee, Multnomah County, Oakland, Petaluma, Ramsey County, San Mateo County, and Sonoma County.

##### b.    DOT Plaintiffs

Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Cambridge, Dane County, Eugene, Healdsburg, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Milwaukee County, Multnomah County, Oakland, Pacifica, Pasadena, Petaluma, PSRC, Ramsey County, Rochester, Rohnert Park, San Diego, San Mateo County, Santa Rosa, SCTA, and Watsonville.

##### c.    Non-CoC HUD Plaintiffs

King County, Pierce County, Snohomish County, Boston, Columbus, San Francisco, Santa Clara, NYC, Bend Cambridge, Chicago, Culver City, Minneapolis, Nashville, Pasadena, Pima County, Pittsburgh, Portland, San Jose, Santa Monica, Tucson, King County RHA, Santa Monica HA, Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Dane County, Eugene, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Multnomah County, Oakland,

---

[12] Replacing Matthew Welbes in his official capacity as acting Director of the FTA.
[13] Some of these are new Plaintiffs; some previous Plaintiffs but with new claims.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

Petaluma, Ramsey County, Rochester, San Diego, San Mateo County, Santa Rosa, Sonoma County, Watsonville, CCHA, and SCCDC

### d.    HHS Plaintiffs

Alameda County, Baltimore, Boston, Cambridge, Chicago, Columbus, Dane County, Denver, Eugene, Hennepin County, King County, Milwaukee, Minneapolis, Multnomah County, NYC, Oakland, Pacifica, Pierce County, Pima County, Ramsey County, Rochester, San Francisco, Santa Clara, San Mateo County, Snohomish County, and Wilsonville.

### 2.    Defendants added

HHS and its agencies, including the Administration for Children and Families ("ACF"), Health Resources and Services Administration ("HRSA"), National Institutes of Health ("NIH"), Substance Abuse and Mental Health Services Administration ("SAMHSA"), and the Centers for Disease Control and Prevention ("CDC"), as well as Robert F. Kennedy in his official capacity as the Secretary of HHS.

## APPENDIX II

The **"CoC Grant Conditions"** enjoined by this Order are the following terms and conditions:

– The recipient or applicant shall not use grant funds to promote "gender ideology," as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

– The recipient or applicant agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

– The recipient or applicant certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

– The recipient or applicant shall not use any Grant Funds to fund or promote elective abortions, as required by Executive Order 14182, Enforcing the Hyde Amendment;

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 44

– The recipient or applicant must administer its grant in accordance
with all applicable immigration restrictions and requirements,
including the eligibility and verification requirements that apply
under title IV of the Personal Responsibility and Work Opportunity
Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646)
("PRWORA") and any applicable requirements that HUD, the
Attorney General, or the U.S. Center for Immigration Services [sic]
may establish from time to time to comply with PRWORA,
Executive Order 14218, or other Executive Orders or immigration
laws;

– No state or unit of general local government that receives funding
under this grant may use that funding in a manner that by design or
effect facilitates the subsidization or promotion of illegal
immigration or abets policies that seek to shield illegal aliens from
deportation;

– Subject to the exceptions provided by PRWORA, the recipient or
applicant must use SAVE, or an equivalent verification system
approved by the Federal government, to prevent any Federal public
benefit from being provided to an ineligible alien who entered the
United States illegally or is otherwise unlawfully present in the
United States;

– The recipient or applicant agrees that use of Grant Funds and its
operation of projects assisted with Grant Funds are governed by all
Executive Orders.

The **"Non-CoC HUD Grant Conditions"** enjoined by this Order are the following terms
and conditions:

– The recipient or applicant will not use Federal funding to promote
diversity, equity, and inclusion ("DEI") mandates, policies,
programs, or activities that violate any applicable Federal
antidiscrimination laws;

– The recipient or applicant shall not use grant funds to promote
"gender ideology," as defined in Executive Order 14168, Defending
Women from Gender Ideology Extremism and Restoring Biological
Truth to the Federal Government;

– The recipient or applicant agrees that its compliance in all respects
with all applicable Federal anti-discrimination laws is material to the

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

– The recipient or applicant certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;

– The recipient or applicant shall not use any grant funds to fund or promote elective abortions, as required by Executive Order 14182, Enforcing the Hyde Amendment;

– The recipient or applicant must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) ("PRWORA") and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws;

– If applicable, no state or unit of general local government that receives or applies for funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation;

– Unless excepted by PRWORA, the recipient or applicant must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

– The recipient or applicant must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to E.O. 14182, Enforcing the Hyde Amendment; Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; Executive Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

The **"DOT Grant Conditions"** enjoined by this Order are the following terms and conditions:

- Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the recipient or applicant agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

- Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the recipient or applicant certifies that it does not operate any programs promoting diversity, equity, and inclusion ("DEI") initiatives that violate any applicable Federal anti-discrimination laws;

- The recipient or applicant agrees to comply with executive orders, including but not limited to Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, as they relate to the application, acceptance, and use of Federal funds for this project or grant;

- The recipient or applicant will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement ("ICE") and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law;

- The recipient or applicant will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter.

- The recipient or applicant must comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination;

- The recipient or applicant must comply with all applicable executive orders as they relate to the application, acceptance, and use of Federal funds for this Project;

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 47

– Performance under this agreement or application shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the recipient or applicant and any applicable sub-recipients. The applicable provisions to this agreement or application include, but are not limited to, the following: Bringing in and harboring certain aliens – 8 U.S.C. 1324; Aiding or assisting certain aliens to enter – 8 U.S.C. 1327; Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing; Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity.

The **"HHS Grant Conditions"** enjoined by this Order are the following terms and conditions:

– The recipient or applicant must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

. . . .

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws;

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

– By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply.

– All activities proposed in your application and budget narrative must be in alignment with the current Executive Orders;

– Recipients are required to comply with all applicable Executive Orders;

– Funds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens;

– By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients or applicants, whose programs, are covered by Title IX certify as follows:

The recipient or applicant is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.

The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.

Payments under the Agreement are predicated on compliance with the above requirements, and therefore the recipient or applicant is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

The recipient or applicant acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The recipient or applicant acknowledges that a knowing false statement relating to recipient's or applicant's compliance with the above requirements and/or eligibility for the Agreement may subject the recipient or applicant to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION