THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTIN LUTHER KING, JR. COUNTY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development, et al.,<br><br>Defendants. | No. 2:25-cv-00814-BJR<br><br>DECLARATION OF JULIA WELLE AYRES IN SUPPORT OF PLAINTIFFS' FIFTH MOTION FOR PRELIMINARY INJUNCTION |

I, JULIA WELLE AYRES, declare:

1. I am a resident of the State of Minnesota and I am over the age of 18 years. I am competent to testify as to the matters in this declaration, and make it based on personal knowledge and my review of relevant records.

2. In my dual roles at the County of Hennepin ("Hennepin County" or "County"), I serve as the Director of Housing Development and Housing Stability. I have been overseeing Housing Development since December 2018, and Housing Stability since March 2026. In these positions, I direct homelessness prevention, emergency shelter and street outreach, our coordinated entry system, support services for people exiting homelessness, affordable multifamily housing finance, homeownership, and home health and safety improvements. My responsibilities include policy planning, legislative analysis, long-term financial management, federal compliance, and

performance management. I have previously worked for nonprofit supportive housing programs, for the State of Minnesota in housing entitlement programs, and for the County overseeing state and federal funding for homelessness prevention and rapid rehousing. I have been working on affordable, low-income, and homelessness prevention housing and services for 20 years.

3. Hennepin County has been working with our partners to build vibrant communities, support economic opportunity, and create a strong housing ecosystem since receiving our first Community Development Block Grant ("CDBG") from the U.S. Department of Housing and Urban Development ("HUD") in 1975 (for which the County serves as the lead entity of a CDBG Urban County). In the fifty years since, Hennepin County has grown its partnership with HUD, now also receiving funding from the HOME Investment Partnerships Program (1992) (for which the County serves as the lead entity of a HOME Consortium within the Urban County), Emergency Solutions Grant (1995) (also on behalf of the Urban County), Lead Hazard Reduction (2003), Healthy Homes Production (2011), and Continuum of Care (2000) and Youth Homelessness Demonstration Project (2022) (for which the County serves as the collaborative applicant of the Minneapolis/Hennepin Continuum of Care), in addition to several Community Project Funding ("CPF") awards, Neighborhood Stabilization Program, and pandemic-era funding responses. Hennepin County and HUD have worked in partnership toward continuous program improvement, development and demonstration of best practices, process efficiencies, and on-the-ground problem solving. Through this partnership, this funding now ***annually*** prevents 125 evictions, creates or preserves 550 affordable housing units, and assists 1,400 households who have exited homelessness with permanent housing and supportive services that prevent returns to homelessness for 87% of households. These funding investments from HUD have spurred state and local investments to grow the impact of the federal funding, but the federal funds are the backbone of our strategies. Without HUD's funding support and partnership, Hennepin County residents simply would not have had access to these resources and opportunities to continually grow their housing and economic stability.

4. To-date, Hennepin County has received four (4) grant agreements containing the

New HUD Conditions: FY2026 CDBG ($2,976,713.00), HOME ($1,537,441.27), ESG ($263,131.00), and CPF ($500,000.00). True and correct copies of these agreements are attached as **Exhibits A through D**.

5. The County has not executed these grant agreements because the New HUD Conditions are unlawful, exceed HUD authority, and are too vague to meaningfully understand or comply with. To my knowledge, the new HUD Conditions have not been previously imposed on HUD funding. These conditions present an untenable choice—either accept these terms or forgo these entitlement (CDBG, HOME, ESG) and Congressionally directed (CPF) funds, which would compromise services and projects that have served County residents for decades.

6. The "HUD Fiduciary Condition" attempts to contractually impose an undefined legal and ethical duty upon the County to act as a fiduciary to HUD and "the American people" (also undefined) as beneficiaries. This unauthorized expansion of the grantor-grantee relationship runs counter to the programs these grants have supported, which must be organized and executed in a way that benefits the individual recipients of services and/or housing. Compliance and accountability standards are already established by statute and regulations, ensuring that grant recipients spend funds as Congressionally authorized. The County cannot agree to create a vague, new fiduciary relationship outside of this regulatory structure, which would enable HUD to claim a breach of the grant agreement for almost any reason and terminate the agreement.

7. The County also cannot agree to the HUD Fraud Condition, which attempts to impose undefined and completely unknown future requirements outside the parameters of the existing statutory and regulatory compliance framework. The County cannot guess as to what "cooperate fully" means with respect to either HUD or the Administration's Fraud Task Force, nor can the County discern what "in all manners and respects as required by HUD" may mean now, at the point of grant execution, or at any time in the future. This limitless approach to compliance requirements is not what Congress authorized, nor does it resemble the audit and compliance requirements the County has successfully navigated for decades. Like the HUD Fiduciary Condition, the HUD Fraud Condition would enable HUD to make impossible requests of the

County, claim noncompliance, and terminate the grant for any reason. This level of uncertainty increases financial risk to Hennepin County and its taxpayers if federal funding sources for these services become unavailable or unreliable.

8. The HUD Recordkeeping Condition also puts the County in an impossible position in requiring retention of "any and all data" relating to (or "on") any individual or entity that directly or *indirectly* receives *any benefit* from a HUD grant. The indirect benefits of funding provided through these HUD grants have tails that would be impossible for the County to track and document. For example, an individual may secure employment in part due to having stable housing or even simply access to adequate restroom and shower facilities and a place to store personal belongings while attending interviews. They may improve their access to food by having a stable living situation where they can receive food assistance or access other forms of community support. A residential block may see improved safety and home values from the home repairs to a single home, and a census tract may benefit from improvements to the neighborhood park. HUD does not propose how recipients are supposed to document these life and community improvements made possible by HUD funding, and attempting to do so would result in incalculable costs of time and personnel to the County.

9. Finally, the HUD Anti-Harm Reduction Condition is also unlawful and would substantially diminish the County's ability to contract with community nonprofits that also happen to provide lawful and high-impact harm reduction services, outside of their contract requirements with the County. Minnesota law exempts hypodermic syringes or needles and products that detect the presence of fentanyl or a fentanyl analog in a controlled substance from the definition of "drug paraphernalia." Minn. Stat. § 152.01, subd. 18. This state exemption is explicitly allowed under the Controlled Substances Act. *See* 21 U.S.C. § 863(a), (f)(1). Nothing in statute or regulation prohibits the County from using HUD funds to contract with nonprofits that distribute these items to residents, in compliance with state and federal law, particularly when those activities themselves are not supported by or funded by federal funds. Many nonprofits the County contracts with are large, national entities with diverse service portfolios. The analysis required to ensure that none of

these partners undertake any activities that could be construed to meet the Anti-Harm Reduction Condition would be impossible. For example, this term would prevent the County from contracting with an organization uniquely positioned to engage with and permanently house people experiencing unsheltered homelessness if that organization's large national portfolio included any harm reduction service, anywhere.

10. The County has seen the New HUD Conditions in its Program Year 2026 grant agreements for CDBG, HOME, ESG, and CPF, but anticipates that these conditions will soon be applied across all County HUD grants. This has been the County's historic experience with HUD terms and conditions and other federal programs, including requirements involving record retention, lead-safe housing and environmental reviews, and the 2025 Executive Orders.

11. In a typical year, the County would execute grant agreements upon receipt, then execute contractor and subrecipient agreements upon expiration of prior year agreements to ensure continuity of resident services and assistance, and to timely fund capital projects (including home repair) as soon as anticipated projects have completed all scopes, reviews, and fund development. This year, however, the County has already experienced significant impacts due to HUD distributing grant agreements later than usual, and because of the new, untenable terms. Resident services were discontinued upon exhaustion of prior year funds, leaving providers without emergency assistance for residents at risk of homelessness. At least one provider had to take out a short-term cash-flow loan to cover its payroll. One public facility improvement project delayed its slated early fall construction start. Health and safety improvements to a 128-unit affordable housing development, including water intrusion mitigation and security fencing, have been delayed at least nine months until spring 2027, which puts residents at physical risk. Continued grant execution delays will result in a cascade of delayed, and ultimately denied, resident services unless the County uses other funds to cover these services. Delaying past December will return 20 families to homelessness in the depths of Minnesota's winter; delaying past February 2027 will require the County to withhold proceed-to-work orders on new home health and safety repair projects for low-income homeowners; and delaying past March 2027 will result in a

discontinuance of the County's community land trust provider's pipeline development.

12. In addition, even the current delay is challenging Hennepin County's ability to meet HUD's compliance requirements, specifically spending timeliness. Hennepin County's inability to timely expend CDBG funds before the May 2026 test was the result of a six-to-seven-month delay in starting the 2025 program year due to the unprecedented amount of uncertainty created by the federal administration's Executive Orders and changing HUD guidance, which required additional analysis, and ultimately the need to seek injunctive relief through federal litigation for several of those requirements. Meeting timeliness requirements for the 2026 program year is expected to be impossible for the same reasons experienced in the 2025 program year.

13. If the County ultimately loses Program Year 2026 HUD funding, it would be forced to divert local funding, mostly property tax funds, from other core County services to cover at least $3 million in emergency assistance, rapid rehousing and services for permanent housing, and home health and safety repair expenses incurred under the promise of federal reimbursement through entitlement funds, and to cancel or discontinue projects and services beyond the County's capacity to fund locally.

14. Prior to 2025, Hennepin County complied with federal requirements and worked to meet shared County and HUD goals in housing and community development. This included awarding federal funds to housing development projects and entering into subrecipient agreements with full confidence that reimbursement commitments would be honored by HUD. In return, our partners trusted our commitments and delivered services and created new housing even through unavoidable delays in government funding. With the implementation of new, drastic, sudden, and near-constant changes from HUD, the County and its partners are having to delay and disrupt services for longer and longer periods of time, and the County needs to constantly monitor the HUD landscape and assess whether it can execute new subrecipient agreements timely, or needs to prematurely terminate subrecipient agreements and contracts for lack of federal funding. These delays and instability ultimately leads to increased homelessness and subsequent harms to the education, employment, and health of Hennepin County residents.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 9 day of November, 2026.

Signed by:
Julia Welle Ayres
E960633CB6CF4FC...

Julia Welle Ayres